# EXHIBIT 2

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>c48011_424b5.txt
<TEXT>
```

Filed Pursuant to Rule 424(b)(5)
Registration No. 333-139817-07

PROSPECTUS SUPPLEMENT TO PROSPECTUS DATED FEBRUARY 13, 2007

$953,736,200
(Approximate)(1)
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-HE2
GSAMP TRUST 2007-HE2
Issuing Entity
GS MORTGAGE SECURITIES CORP.
Depositor
GOLDMAN SACHS MORTGAGE COMPANY
Sponsor
WELLS FARGO BANK, N.A.
Master Servicer and Securities Administrator
AVELO MORTGAGE, L.L.C.
Servicer

--------------------------------------------------------------------------------
CONSIDER CAREFULLY THE RISK FACTORS THE FOLLOWING SECURITIES ARE BEING OFFERED:
BEGINNING ON PAGE S-17 IN THIS PROSPECTUS SUPPLEMENT AND PAGE 2 IN THE
ACCOMPANYING PROSPECTUS.


The certificates will represent interests in GSAMP Trust 2007-HE2 and will not
represent interests in or obligations of GS Mortgage Securities Corp., the
underwriter, the servicer, Goldman Sachs Mortgage Company, the original loan
sellers, the securities administrator, the master servicer, the trustee or any
of their respective affiliates.


This prospectus supplement may be used to offer and sell the offered
certificates only if accompanied by the prospectus.
--------------------------------------------------------------------------------

The following securities are being offered:


| CLASS | APPROXIMATE INITIAL CLASS PRINCIPAL BALANCE(1) | PASS-THROUGH RATE | TYPE | RATINGS (S&P/MOODY'S) |
|-------|------------|--------------|-------------|---------------|
| A-1   | $370,801,000 | Variable(2)  | Senior      | AAA/Aaa |
| A-2A  | $216,267,000 | Variable(3)  | Senior      | AAA/Aaa |
| A-2B  | $ 50,045,000 | Variable(4)  | Senior      | AAA/Aaa |
| A-2C  | $ 74,161,000 | Variable(5)  | Senior      | AAA/Aaa |
| A-2D  | $ 28,668,000 | Variable(6)  | Senior      | AAA/Aaa |
| M-1   | $ 42,961,000 | Variable(7)  | Subordinate | AA+/Aa1 |
| M-2   | $ 39,423,000 | Variable(8)  | Subordinate | AA/Aa2 |
| M-3   | $ 24,261,000 | Variable(9)  | Subordinate | AA-/Aa3 |
| M-4   | $ 21,228,000 | Variable(10) | Subordinate | A+/A1 |
| M-5   | $ 19,206,000 | Variable(11) | Subordinate | A/A2 |
| M-6   | $ 17,184,000 | Variable(12) | Subordinate | A-/A3 |
| M-7   | $ 18,196,000 | Variable(13) | Subordinate | BBB+/Baa1 |
| M-8   | $ 16,173,000 | Variable(14) | Subordinate | BBB/Baa2 |

| M-9 | $ 15,162,000 | Variable(15) | Subordinate      | BBB-/Baa3 |
| R   | $ 50         | N/A(16)      | Senior/Residual  | AAA/N/A   |
| RC  | $ 100        | N/A(16)      | Senior/Residual  | AAA/N/A   |
| RX  | $ 50         | N/A(16)      | Senior/Residual  | AAA/N/A   |

------------------
Footnotes appear on the following page.


Each class of certificates will receive monthly distributions of interest,
principal or both, commencing on April 25, 2007.

    ASSETS OF THE ISSUING ENTITY--

o       Fixed- and adjustable-rate subprime mortgage loans secured by first- or
        second-lien mortgages or deeds of trust on residential real properties.

    CREDIT ENHANCEMENT--

o       Subordination of the subordinate certificates to the senior certificates
        as described in this prospectus supplement under "DESCRIPTION OF THE
        CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES"; and

o       Excess interest and overcollateralization as described in this
        prospectus supplement under "DESCRIPTION OF THE
        CERTIFICATES--OVERCOLLATERALIZATION PROVISIONS."

    INTEREST RATE SUPPORT--

o       An interest rate swap agreement with Goldman Sachs Mitsui Marine
        Derivative Products, L.P., as swap provider, for the benefit of the
        certificates as described in this prospectus supplement under
        "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT."

o       An interest rate cap agreement with Goldman Sachs Mitsui Marine
        Derivative Products, L.P., as cap provider, for the benefit of the
        certificates as described in this prospectus supplement under
        "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE CAP AGREEMENT."

GSAMP Trust 2007-HE2 will issue seventeen classes of offered certificates. Each
class of certificates will receive monthly distributions of interest, principal
or both, as described in this prospectus supplement. The table above contains a
list of the classes of offered certificates, including the initial class
principal balance, pass-through rate and special characteristics of each class.
The proceeds to GS Mortgage Securities Corp. from the sale of the offered
certificates (excluding accrued interest) will be approximately 99.29% of the
class principal balance of the offered certificates before deducting expenses.
The underwriter's commission will be the difference between the price it pays to
GS Mortgage Securities Corp. for the offered certificates and the amount it
receives from the sale of the offered certificates to the public.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES
COMMISSION HAS APPROVED OR DISAPPROVED OF THE OFFERED CERTIFICATES OR DETERMINED
THAT THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS IS ACCURATE OR COMPLETE. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. GS MORTGAGE SECURITIES
CORP. WILL NOT LIST THE OFFERED CERTIFICATES ON ANY SECURITIES EXCHANGE OR ON
ANY AUTOMATED QUOTATION SYSTEM OF ANY SECURITIES ASSOCIATION.

                            GOLDMAN, SACHS & CO.
            The date of this prospectus supplement is April 17, 2007.


<PAGE>

(1)  Subject to a variance of +/-10%.

(2)  The Class A-1 certificates will have a pass-through rate equal to the least
     of (i) one-month LIBOR plus 0. 235% (0.470% after the first distribution
     date on which the optional clean-up call is exercisable), (ii) the Loan
     Group I Cap, as described in this prospectus supplement under "DESCRIPTION
     OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" and (iii) the
     WAC Cap, as described in this prospectus supplement under "DESCRIPTION OF
     THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL."

(3)  The Class A-2A certificates will have a pass-through rate equal to the
     least of (i) one-month LIBOR plus 0.120% (0.240% after the first
     distribution date on which the optional clean-up call is exercisable), (ii)
     the Loan Group II Cap, as described in this prospectus supplement under
     "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL"
     and (iii) the WAC Cap.

(4)  The Class A-2B certificates will have a pass-through rate equal to the
     least of (i) one-month LIBOR plus 0.210% (0.420% after the first
     distribution date on which the optional clean-up call is exercisable), (ii)
     the Loan Group II Cap and (iii) the WAC Cap.

(5)  The Class A-2C certificates will have a pass-through rate equal to the
     least of (i) one-month LIBOR plus 0.270% (0.540% after the first
     distribution date on which the optional clean-up call is exercisable), (ii)
     the Loan Group II Cap and (iii) the WAC Cap.

(6)  The Class A-2D certificates will have a pass-through rate equal to the
     least of (i) one-month LIBOR plus 0.370% (0.740% after the first
     distribution date on which the optional clean-up call is exercisable), (ii)
     the Loan Group II Cap and (iii) the WAC Cap.

(7)  The Class M-1 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 0.500% (0.750% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(8)  The Class M-2 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 0.550% (0.825% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(9)  The Class M-3 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 0.900% (1.350% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(10) The Class M-4 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 1.250% (1.875% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(11) The Class M-5 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 1.650% (2.475% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(12) The Class M-6 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 2.200% (3.300% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(13) The Class M-7 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 2.250% (3.375% after the first
     distribution date on which the optional clean-up call is exercisable) and

(ii) the WAC Cap.

(14) The Class M-8 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 2.250% (3.375% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(15) The Class M-9 certificates will have a pass-through rate equal to the
     lesser of (i) one-month LIBOR plus 2.250% (3.375% after the first
     distribution date on which the optional clean-up call is exercisable) and
     (ii) the WAC Cap.

(16) The Class R, Class RC and Class RX certificates are not entitled to receive
     any distributions of interest.

                                  S-2


<PAGE>


                            TABLE OF CONTENTS


IMPORTANT NOTICE ABOUT THE
     INFORMATION PRESENTED IN
     THIS PROSPECTUS
     SUPPLEMENT AND THE
     PROSPECTUS...................................S-5
EUROPEAN ECONOMIC AREA............................S-5
UNITED KINGDOM....................................S-5
NOTICE TO UNITED KINGDOM INVESTORS................S-6
SUMMARY INFORMATION...............................S-7
RISK FACTORS.....................................S-17
THE MORTGAGE LOAN POOL...........................S-38
     General.....................................S-38
     The Mortgage Loans..........................S-40
     The Group I Mortgage Loans..................S-42
     The Group II Mortgage Loans.................S-44
     Prepayment Premiums.........................S-45
     Adjustable-Rate Mortgage Loans..............S-45
     The Index...................................S-46
     New Century.................................S-46
THE SERVICER.....................................S-59
     General.....................................S-59
     Avelo Mortgage, L.L.C.......................S-59
THE MASTER SERVICER..............................S-60
THE SPONSOR......................................S-61
STATIC POOL INFORMATION..........................S-62
THE DEPOSITOR....................................S-62
THE ISSUING ENTITY...............................S-63
THE SECURITIES ADMINISTRATOR.....................S-63
THE TRUSTEE......................................S-63
THE CUSTODIANS...................................S-64
INTEREST RATE CAP AND SWAP COUNTERPARTY..........S-64
DESCRIPTION OF THE CERTIFICATES..................S-64
     General.....................................S-64
     Book-Entry Registration.....................S-66
     Definitive Certificates.....................S-69
     Assignment of the Mortgage Loans............S-69
     Delivery of Mortgage Loan Documents.........S-70
     Representations and Warranties
          Relating to the Mortgage Loans.........S-71
     Payments on the Mortgage Loans..............S-74

Administration Fees...........................S-76
Distributions.................................S-76
Calculation of Interest and Principal.......S-77
Priority of Distributions and
    Allocation of Losses....................S-78
Allocation of Principal Payments to
    Class A Certificates....................S-82
Supplemental Interest Trust.................S-83
Calculation of One-Month LIBOR..............S-83
Excess Reserve Fund Account.................S-84
Interest Rate Swap Agreement................S-84
Interest Rate Cap Agreement.................S-87
Overcollateralization Provisions............S-87
Restrictions on Transfer of the
    Residual Certificates...................S-88
Reports to Certificateholders...............S-90
Yield on the Residual Certificates..........S-91
THE POOLING AND SERVICING AGREEMENT.............S-92
General.....................................S-92
Subservicers................................S-92
Servicing, Securities Administrator,
    Trustee and Custodial Fees and
    Other Compensation and
    Payment of Expenses.....................S-92
P&I Advances and Servicing Advances.........S-93
Prepayment Interest Shortfalls..............S-94
Servicer Reports............................S-94
Collection and Other Servicing Procedures...S-95
Hazard Insurance............................S-96
Realization Upon Defaulted Mortgage Loans...S-97
Optional Repurchase of Delinquent
    Mortgage Loans..........................S-97
Removal and Resignation of the Servicer.....S-97
Eligibility Requirements for Trustee
    and Securities Administrator;
    Resignation and Removal of
    Trustee and Securities
    Administrator...........................S-99
Compensation of the Master
    Servicer and the Securities
    Administrator...........................S-99
Indemnification and Third Party Claims.....S-100
Limitation on Liability of the
    Master Servicer.........................S-101
Assignment or Delegation of Duties
    by the Master Servicer;
    Resignation.............................S-101
Master Servicer Events of Default;
    Waiver; Termination.....................S-102
Assumption of Master Servicing by Trustee..S-103
Termination; Optional Clean-up Call........S-104
Amendment...................................S-105
Certain Matters Regarding the
    Depositor, the Servicer, the
    Securities Administrator, the
    Custodians and the Trustee..............S-105
PREPAYMENT AND YIELD CONSIDERATIONS.............S-106
Structuring Assumptions.....................S-106
Defaults....................................S-117
Prepayment Considerations and Risks........S-117
Overcollateralization Provisions...........S-119
Subordinated Certificates..................S-119
Effect on Yields Due to Rapid Prepayments..S-120
Weighted Average Lives of the
    LIBOR Certificates......................S-120

```
    Decrement Tables............................S-121
    WAC Cap, Loan Group I Cap and
       Loan Group II Cap.....................S-129
    Final Scheduled Distribution Date..........S-130
FEDERAL INCOME TAX CONSEQUENCES.................S-130
    General....................................S-130
    Taxation of Regular Interests..............S-130
    Residual Certificates......................S-131
    Status of the Offered Certificates.........S-132
    The Basis Risk Contract Component..........S-132
    Other Matters..............................S-134
STATE AND LOCAL TAXES...........................S-134
ERISA CONSIDERATIONS............................S-134
LEGAL INVESTMENT................................S-136
LEGAL MATTERS...................................S-137
METHOD OF DISTRIBUTION..........................S-137
REPORTS TO CERTIFICATEHOLDERS...................S-137
RATINGS.........................................S-138
GLOSSARY OF TERMS...............................S-139
ANNEX I - CERTAIN U.S. FEDERAL INCOME TAX
    DOCUMENTATION REQUIREMENTS....................I-1
ANNEX II - INTEREST RATE SWAP NOTIONAL
    AMOUNT AMORTIZATION SCHEDULE................II-1
ANNEX III - INTEREST RATE CAP SCHEDULE.........III-1
SCHEDULE A - COLLATERAL TERM SHEET...............A-1
```

S-4

<PAGE>

                IMPORTANT NOTICE ABOUT THE INFORMATION PRESENTED IN THIS
                       PROSPECTUS SUPPLEMENT AND THE PROSPECTUS

        We provide information to you about the certificates in two separate
documents that progressively provide more detail: (a) the prospectus, which
provides general information, some of which may not apply directly to your
series of certificates and (b) this prospectus supplement, which describes the
specific terms of your series of certificates.

        We include cross references in this prospectus supplement and the
prospectus to captions in these materials where you can find further related
discussions. The preceding table of contents and the table of contents included
in the prospectus provide the pages on which these captions are located.

        Capitalized terms used in this prospectus supplement and in the prospectus
are either defined in the "GLOSSARY OF TERMS" beginning on page S-139 of this
prospectus supplement or have the meanings given to them on the page indicated
in the "Index" beginning on page 128 of the prospectus.

        In this prospectus supplement, the terms "depositor," "we," "us" and "our"
refer to GS Mortgage Securities Corp.

        All annexes and schedules to this prospectus supplement are part of this
prospectus supplement.

                            EUROPEAN ECONOMIC AREA

        In relation to each Member State of the European Economic Area which has
implemented the Prospectus Directive (each, a "RELEVANT MEMBER STATE"), the
underwriter has represented and agreed that with effect from and including the
date on which the Prospectus Directive is implemented in that Relevant Member
State (the "RELEVANT IMPLEMENTATION DATE") it has not made and will not make an

offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more than (euro)43,000,000 and (3) an annual net turnover of more than (euro)50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

UNITED KINGDOM

The underwriter has represented and agreed that:

(a) (i) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (ii) it has not offered or sold and will not offer or sell the certificates other than to persons whose ordinary activities involve

S-5

<PAGE>

them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the certificates would otherwise constitute a contravention of Section 19 of the Financial Services and Markets Act 2000 (the "FSMA");

(b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the FSMA does not apply to the issuer; and

(c) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

NOTICE TO UNITED KINGDOM INVESTORS

The distribution of this prospectus supplement if made by a person who is not an authorized person under the FSMA is being made only to, or directed only at persons who (1) are outside the United Kingdom, (2) have professional experience in matters relating to investments, or (3) are persons falling within Articles 49(2)(a) through (d) ("high net worth companies, unincorporated associations, etc.") or 19 (Investment Professionals) of the Financial Services and Market Act 2000 (Financial Promotion) Order 2005 (all such persons together being referred to as the "RELEVANT PERSONS"). This prospectus supplement must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this prospectus supplement relates, including the offered certificates, is available only to Relevant Persons and will be engaged in only with Relevant Persons.

Potential investors in the United Kingdom are advised that all, or most, of the protections afforded by the United Kingdom regulatory system will not apply to an investment in the issuing entity and that compensation will not be available under the United Kingdom Financial Services Compensation Scheme.

S-6

<PAGE>

SUMMARY INFORMATION

The following summary highlights selected information from this prospectus supplement. It does not contain all of the information you need to consider in making your investment decision. To understand the terms of the offered certificates, read carefully this entire prospectus supplement and the prospectus.

This summary provides an overview of certain calculations, cash flows and other information to aid your understanding. This summary is qualified by the full description of these calculations, cash flows and other information in this prospectus supplement and the prospectus.

THE TRANSACTION PARTIES

SPONSOR. Goldman Sachs Mortgage Company, a New York limited partnership with its principal executive offices at 85 Broad Street, New York, New York 10004, and its telephone number is (212) 902-1000.

DEPOSITOR. GS Mortgage Securities Corp., a Delaware corporation with its principal executive offices at 85 Broad Street, New York, New York 10004, and its telephone number is (212) 902-1000.

ISSUING ENTITY.  GSAMP Trust 2007-HE2.

SECURITIES ADMINISTRATOR AND MASTER SERVICER. Wells Fargo Bank, N.A., a national banking association. The corporate trust office of the Securities Administrator is located (i) for purposes of certificate transfers, at Wells Fargo Center, Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479, and (ii) for all other purposes, at 9062 Old Annapolis Road, Columbia, Maryland 21045, Re: GSAMP Trust 2007-HE2, and its telephone number is (410) 884-2000.

TRUSTEE. LaSalle Bank National Association, a national banking association. The corporate trust office of the trustee is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois 60603, Attention: Global Securities and Trust Services, and its telephone number is (312) 992-4855.

SERVICER. Avelo Mortgage, L.L.C., a Delaware limited liability company. The principal executive office of Avelo is 600 E. Las Colinas Boulevard, Suite 620, Irving, Texas 75039, and its telephone number is (972) 910-7000.

ORIGINAL LOAN SELLERS.

    o    NC Capital Corporation, a California corporation. The principal
          executive office of NC Capital Corporation is 18400 Von Karman, Suite
          1000, Irvine, California 92612, and its telephone number is (949)
          440-7030.

    o    Aegis Mortgage Corporation, a Delaware corporation. The principal
          executive office of Aegis is 3250 Briarpark, Suite 400, Houston, Texas
          77042, and its telephone number is (800) 991-5625.

    o    SouthStar Funding, LLC, a Delaware limited liability company. The
          principal executive office of SouthStar is 400 Northridge Road, Suite
          1000, Atlanta, Georgia 30350, and its telephone number is (770)
          641-4134.

The original loan sellers also include various loan sellers that individually
sold mortgage loans comprising less than 5% of the total mortgage loans in the
issuing entity and certain entities that sold mortgage loans to the sponsor
under the sponsor's mortgage conduit program. Pursuant to the mortgage conduit
program, the sponsor purchases mortgage loans originated by the original loan
sellers if the mortgage loans generally satisfy the sponsor's underwriting
guidelines.

CUSTODIANS.

    o    Deutsche Bank National Trust Company, a national banking association,
          will act as a custodian with respect to 72.89% of the mortgage loans.
          The office of Deutsche Bank National Trust Company is located at 1761
          East St. Andrew Place, Santa Ana, California 92705-4934, and its
          telephone number is (714) 247-6000.

    o    U.S. Bank National Association, a national banking association, will
          act as a custodian with respect to 27.11% of the mortgage loans. The
          custodial office of U.S. Bank is located at 1133 Rankin Street, Suite
          100, St. Paul, Minnesota 55116, and its telephone number (651)
          695-6105.

S-7

<PAGE>

    SWAP AND CAP PROVIDER. Goldman Sachs Mitsui Marine Derivative Products,
L.P., a Delaware limited partnership, will provide an interest rate swap and
interest rate cap for this transaction. The principal executive office of the
swap provider and cap provider is located at 85 Broad Street, New York, New York
10004, and its telephone number is (212) 902-1000. See "INTEREST RATE CAP AND
SWAP COUNTERPARTY" in this prospectus supplement.

    The following diagram illustrates the various parties involved in the
transaction and their functions.



```
<TABLE>
<S>                     <C>                     <C>                     <C>
<C>
                                                ----------------------------
                                                  Original Loan Sellers
                                                ----------------------------
                                                            |
                                                            |  Loans
                                                            |
                                                ----------------------------
```



```
</TABLE>
```

THE OFFERED CERTIFICATES

    The GSAMP Trust 2007-HE2 will issue the Mortgage Pass-Through Certificates,
Series 2007-HE2. Seventeen classes of the certificates-- Class A-1, Class A-2A,
Class A-2B, Class A-2C, Class A-2D, Class M-1, Class M-2, Class M-3, Class M-4,
Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class R, Class RC and
Class RX -- are being offered to you by this prospectus supplement. The Class
A-1, Class A-2A, Class A-2B, Class A-2C and Class A-2D certificates are
sometimes referred to as "Class A certificates" in this prospectus supplement.
The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7,
Class M-8 and Class M-9 certificates are sometimes referred to as "Class M
certificates" in this prospectus supplement. The Class R, Class RC and Class RX
certificates are sometimes referred to as "residual certificates" in this
prospectus supplement. The offered certificates, other than the residual
certificates are sometimes referred to as the "LIBOR certificates" in this
prospectus supplement. The Class A-1 certificates generally represent interests
in the group I mortgage loans. The Class A-2A, Class A-2B, Class A-2C and Class
A-2D certificates generally represent interests in the group II mortgage loans.
The Class M certificates and the residual certificates represent interests in
all of the mortgage loans in the issuing entity.

THE OTHER CERTIFICATES

    The issuing entity will also issue three other classes of certificates--the
Class X, Class P and Class C certificates--that are not being offered by this

prospectus supplement.

The Class X certificates will initially represent an interest of approximately 5.65% of the aggregate scheduled principal balance of the mortgage loans in the issuing entity, which is the initial overcollateralization required by the pooling and servicing agreement.

The Class P certificates will not have a principal balance and will not be entitled to distributions in respect of principal or interest. The Class P certificates will be entitled to all prepayment premiums or charges received in respect of the mortgage loans.

The Class C certificates will not have a principal balance and will not be entitled to distributions in respect of principal or interest. The Class C certificates will be entitled to direct the servicer to exercise the optional clean-up call, as further described in this prospectus supplement.

The Class X and Class P certificates will represent interests in all of the mortgage loans.

STRUCTURAL OVERVIEW

The following chart illustrates generally the distribution priorities and the subordination features applicable to the certificates.

```
                   | -------------------------------------- /|\
                   |   Class A-1*            Class A-2A*      |
                   |                         Class A-2B*      |
                   |                         Class A-2C*      |
                   |                         Class A-2D*      |
                   | -------------------------------------- |
                   |              Class M-1                 |
                   | -------------------------------------- |
Accrued            |              Class M-2                 |
certificate        | -------------------------------------- |
interest,          |              Class M-3                 |
then               | -------------------------------------- |   Loans
principal          |              Class M-4                 |
                   | -------------------------------------- |
                   |              Class M-5                 |
                   | -------------------------------------- |
                   |              Class M-6                 |
                   | -------------------------------------- |
                   |              Class M-7                 |
                   | -------------------------------------- |
                   |              Class M-8                 |
                   | -------------------------------------- |
                   |              Class M-9                 |
                   | -------------------------------------- |
                   |              Class X                   |
                 \|/ -------------------------------------- |
```

---------------

*   Interest and principal distributions will be allocated among the Class A certificates as further described in this prospectus supplement. Losses will not be allocated to the Class A certificates until the final distribution date.

S-8

<PAGE>

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

CLOSING DATE

    On or about April 20, 2007.

CUT-OFF DATE

    March 1, 2007.

STATISTICAL CALCULATION DATE

    All statistical information regarding the mortgage loans in this prospectus
supplement is based on the scheduled principal balances of the mortgage loans as
of the statistical calculation date of February 1, 2007, unless otherwise
specified in this prospectus supplement.

DISTRIBUTION DATE

    Distributions on the certificates will be made on the 25th day of each
month, or, if the 25th day is not a business day, on the next business day,
beginning in April 2007, to the holders of record on the preceding record date.

FINAL SCHEDULED DISTRIBUTION DATE

    The final scheduled distribution date for distributions on each class of
LIBOR certificates is the distribution date in March 2037, and for distributions
on the residual certificates will be the distribution date in March 2047. See
"PREPAYMENT AND YIELD CONSIDERATIONS--FINAL SCHEDULED DISTRIBUTION DATE" in this
prospectus supplement.

RECORD DATE

    The record date for the LIBOR certificates for any distribution date will
be the last business day of the applicable interest accrual period, unless the
certificates are issued in definitive form, in which case the record date will
be the last business day of the month preceding the month in which the related
distribution date occurs. The Class R, Class RC and Class RX certificates will
be offered only in definitive form and the record date for the residual
certificates will be the last business day of the month preceding the month in
which the related distribution date occurs.

PASS-THROUGH RATES

    The offered certificates will have the pass-through rates set forth on page
S-2 of this prospectus supplement.

    Interest will accrue on the LIBOR certificates on the basis of a 360-day
year and the actual number of days elapsed in the applicable interest accrual
period.

INTEREST ACCRUAL PERIOD

    The interest accrual period for the LIBOR certificates for any distribution
date will be the period from and including the preceding distribution date (or,
in the case of the first distribution date, the closing date) through the day
before the current distribution date.

    The residual certificates will not be entitled to any distributions of
interest.

DISTRIBUTION PRIORITIES

    Distributions on the certificates are required to be made monthly on each
distribution date from available funds (after giving effect to the payment of
any fees and expenses of the servicer, the custodians, the trustee, the master
servicer and the securities administrator) to the classes of certificates in the

following order of priority:

     (a) to an account for payment to the provider of the interest rate swap
agreement of certain amounts payable to the swap provider;

     (b) from the portion of the available funds allocable to interest payments
on the mortgage loans, (i) first, concurrently as described in this prospectus
supplement, to the Class A-1, Class A-2A, Class A-2B, Class A-2C and Class A-2D
certificates, their accrued certificate interest for the related interest
accrual period and any unpaid interest amounts from prior distribution dates,
payable generally from the interest payments on the mortgage loans in the
applicable loan group related to those classes of certificates (as further
described in "DESCRIPTION OF THE CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND
ALLOCATION OF LOSSES" in this prospectus supplement) and (ii) second, to the
Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7,
Class M-8 and Class M-9, certificates, in that order, their accrued certificate
interest;

     (c)(i) on each distribution date prior to the Stepdown Date or on which a
Trigger Event is in effect, an amount equal to the principal distribution amount
(as further described in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF
INTEREST AND PRINCIPAL" in this prospectus supplement), (i) first, to the Class
A certificates, pursuant to the allocation described below, until their
respective class

                                      S-9


<PAGE>

certificate balances have been reduced to zero and (ii) second, to the Class
M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8
and Class M-9 certificates, in that order, until their respective class
certificate balances have been reduced to zero;

     (ii) on each distribution date on and after the Stepdown Date and on which
a Trigger Event is not in effect, (i) first, to the Class A certificates,
pursuant to the allocation described below, the lesser of the principal
distribution amount and an amount equal to the principal distribution
entitlement for the Class A certificates (as further described in "DESCRIPTION
OF THE CERTIFICATES-- PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in
this prospectus supplement) until their respective class certificate balances
have been reduced to zero and (ii) second, to the Class M-1, Class M-2, Class
M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9
certificates, in that order, in each case, the lesser of the remaining portion
of the principal distribution amount and an amount equal to the principal
distribution entitlement for that class of certificates (as further described in
"DESCRIPTION OF THE CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF
LOSSES" in this prospectus supplement), until their respective class certificate
balances have been reduced to zero;

     (d) any amount remaining after the distributions in clauses (a), (b) and
(c) above, (i) first, to the Class M-1, Class M-2, Class M-3, Class M-4, Class
M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates, in that order,
any unpaid interest amounts from prior distribution dates for those classes,
(ii) second, to the excess reserve fund account, an amount equal to any Basis
Risk Payment (as defined in the "GLOSSARY OF TERMS" in this prospectus
supplement) for that distribution date, (iii) third, from funds on deposit in
the excess reserve fund account, an amount equal to any basis risk carry forward
amount with respect to the LIBOR certificates for that distribution date in the
same order and priority in which accrued certificate interest is allocated among
those classes of certificates, with the allocation to the Class A certificates
being PRO RATA based on their respective basis risk carry forward amounts, (iv)
fourth, to the supplemental interest trust, any defaulted swap termination

Case 1:19-cv-02307-RCG  Document 29-2  Filed 05/29/20  Page 15 of 418
https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

payments owed to the swap provider, (v) fifth, if a 40-Year Trigger Event (as
defined below) is in effect, any remaining amounts, first, to the Class A
certificates, allocated as described in the following paragraph, and then
sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class
M-6, Class M-7, Class M-8 and Class M-9 certificates, the lesser of (x) any
remaining amounts and (y) the amount necessary to increase the
overcollateralization amount for such distribution date so that a 40-Year
Trigger Event is no longer in effect, in each case, until their respective class
certificate balances have been reduced to zero and (vi) sixth, to the Class X or
the residual certificates, any remaining amounts.

    Principal distributions on the Class A-1 certificates will generally be
made from principal payments on the group I mortgage loans. Principal
distributions on the Class A-2A, Class A-2B, Class A-2C and Class A-2D
certificates will generally be made from principal payments on the group II
mortgage loans. Principal distributions on the Class A-2 certificates will be
paid sequentially to the Class A-2A, Class A-2B, Class A-2C and Class A-2D
certificates, in that order, until their respective class certificate balances
have been reduced to zero. However, from and after the distribution date on
which the aggregate class certificate balances of the Class M certificates and
the principal balance of the Class X certificates have been reduced to zero, any
principal distributions allocated to the Class A certificates are required to be
distributed PRO RATA to the Class A certificates, based on their respective
class certificate balances, until their class certificate balances have been
reduced to zero.

    "Stepdown Date" is defined in the "GLOSSARY OF TERMS" included in this
prospectus supplement and generally means the earlier to occur of (a) the date
on which the aggregate class certificate balances of the Class A certificates
have been reduced to zero and (b) the later to occur of (i) the distribution
date in April 2010 and (ii) the first distribution date on which the
subordination below the Class A certificates is greater than or equal to 53.60%
of the aggregate stated principal balance of the mortgage loans for that
distribution date.

    "Trigger Event" is defined in the "GLOSSARY OF TERMS" included in this
prospectus supplement and generally means, with respect to any distribution
date, the circumstances in which (i) the rolling three month average of the
aggregate unpaid principal balance of mortgage loans that are 60 days or more
delinquent, including mortgage loans in foreclosure, all REO properties and all
mortgage loans where the mortgagor has filed for bankruptcy or (ii) the
aggregate amount of realized losses incurred since the cut-off date, in

                                    S-10

<PAGE>

    each case, exceeds the applicable percentages described in the definition of
"Trigger Event" included in the "GLOSSARY OF TERMS."

    "40-Year Trigger Event" is defined in the "GLOSSARY OF TERMS" included in
this prospectus supplement and generally is in effect if on the 241st
distribution date or any distribution date thereafter, the aggregate stated
principal balance of the mortgage loans with 40-year original terms to maturity
exceeds the overcollateralization amount for such distribution date.

    In addition to the distributions set forth above, distributions will be
required to be made to certificateholders from any payments received by the
issuing entity under the interest rate swap agreement and the interest rate cap
agreement. Such payments will be made in the order and priority described under
"Description of the Certificates--supplemental Interest Trust" in this
prospectus supplement.

CREDIT ENHANCEMENT

    The credit enhancement provided for the benefit of the holders of the
certificates consists solely of:

    o    an initial overcollateralization amount of approximately 5.65% of the
         aggregate scheduled principal balance of the mortgage loans as of the
         cut-off date,

    o    the use of excess interest, after taking into account certain payments
         received or paid by the issuing entity pursuant to the interest rate
         swap agreement described below and received by the issuing entity
         pursuant to the interest rate cap agreement described below, to cover
         losses on the mortgage loans and as a distribution of principal to
         restore overcollateralization to a specified level as a result of
         losses,

    o    the subordination of distributions on the more subordinate classes of
         certificates to the required distributions on the more senior classes
         of certificates, and

    o    the allocation of losses on the mortgage loans to the most subordinate
         classes of certificates then outstanding.

INTEREST RATE SWAP AGREEMENT

        On the closing date, an interest rate swap agreement with Goldman Sachs
Mitsui Marine Derivative Products, L.P. will be assigned to and assumed by the
issuing entity. Goldman Sachs Mitsui Marine Derivative Products, L.P. has a
counterparty rating of "Aaa" from Moody's Investors Service, Inc. and a credit
rating of "AAA" from Standard & Poor's Ratings Services, a division of The
McGraw-Hill Companies, Inc. Under the interest rate swap agreement, with respect
to the first 60 distribution dates the issuing entity will pay to the swap
provider a fixed payment at a per annum rate of 5.00% (calculated on an
actual/360 basis) and the swap provider will pay to the issuing entity a
floating payment at a rate of one-month LIBOR (as determined pursuant to the
interest rate swap agreement, calculated on an actual/360 basis), in each case
calculated on a scheduled notional amount set forth on Annex II to this
prospectus supplement. To the extent that the fixed payment from the issuing
entity exceeds the floating payment from the swap provider payable with respect
to any of the first 60 distribution dates, amounts otherwise available for
payments on the certificates will be applied on that distribution date to make a
net payment to the swap provider, and to the extent that the floating payment
from the swap provider exceeds the fixed payment from the issuing entity payable
with respect to any of the first 60 distribution dates, the swap provider will
owe a net payment to the issuing entity on the business day preceding that
distribution date. Any net amounts received by or paid out from the issuing
entity under the interest rate swap agreement will either increase or reduce the
amount available to make payments on the certificates, as described under
"DESCRIPTION OF THE CERTIFICATES--SUPPLEMENTAL INTEREST Trust" in this
prospectus supplement. The interest rate swap agreement is scheduled to
terminate following the distribution date in March 2012.

    For further information regarding the interest rate swap agreement, see
"DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this
prospectus supplement.

INTEREST RATE CAP AGREEMENT

    The LIBOR certificates will have the benefit of an interest rate cap
agreement provided by Goldman Sachs Mitsui Marine Derivative Products, L.P., as
cap provider. All obligations of

Case 1:19-cv-08307-PGG Document 29-3 Filed 05/29/20 Page 17 of 418

S-11

<PAGE>

the issuing entity under the interest rate cap agreement will be paid on or
prior to the closing date.

     The interest rate cap agreement will have an initial notional amount of $0.
In connection with the first 60 distribution dates, the cap provider will be
obligated under the interest rate cap agreement to pay to the issuing entity an
amount equal to the product of (a) the excess, if any, of (i) the one-month
LIBOR rate as of that distribution date over (ii) the cap strike rate of 6.50%
per annum, (b) a notional amount equal to the applicable scheduled notional
amount set forth on Annex III to this prospectus supplement, and (c) the actual
number of days in the applicable interest accrual period divided by 360. Any
amounts received by the issuing entity under the interest rate cap agreement
will increase the amount available to make payments on the certificates, as
described under "DESCRIPTION OF THE CERTIFICATES--SUPPLEMENTAL INTEREST TRUST"
in this prospectus supplement. The cap provider's obligations under this
interest rate cap agreement will terminate following the distribution date in
March 2012.

     For further information regarding the interest rate cap agreement, see
"DESCRIPTION OF THE CERTIFICATES--INTEREST RATE CAP Agreement" in this
prospectus supplement.

THE MORTGAGE LOANS

     The mortgage loans to be included in the issuing entity will be
conventional, adjustable- and fixed-rate subprime mortgage loans secured by
first- and second-lien mortgages or deeds of trust on residential real
properties. All of the mortgage loans were purchased by the sponsor from (a) NC
Capital Corporation, (b) Aegis Mortgage Corporation, (c) SouthStar Funding, LLC,
(d) various loan sellers that each individually sold mortgage loans comprising
less than 5% of the total mortgage loans in the issuing entity and (e) various
mortgage loan sellers through Goldman Sachs Mortgage Company's mortgage conduit
program. The sponsor will make certain representations and warranties relating
to all of the mortgage loans.

     On the closing date, the sponsor will transfer the mortgage loans to the
depositor and the issuing entity will acquire the mortgage loans from the
depositor. As of the statistical calculation date, the aggregate scheduled
principal balance of the mortgage loans was approximately $998,091,543, of which
approximately 73.47% are adjustable-rate and approximately 26.53% are
fixed-rate.


                                      S-12


<PAGE>


     The mortgage loans have original terms to maturity of not greater than 480
months, have a weighted average remaining term to scheduled maturity of 358
months and have the following approximate characteristics as of the statistical
calculation date:

                       SELECTED MORTGAGE LOAN POOL DATA(1)

<TABLE>
<CAPTION>
                                                               Group I              Group

II

| | Adjustable-Rate | Fixed-Rate | Adjustable-Rate | Fixed-Rate | Aggregate |
|---|---|---|---|---|---|
| \<S\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> |
| Aggregate Scheduled Principal Balance: | $368,755,407 | $138,285,500 | $364,583,906 | $126,466,730 | $998,091,543 |
| Number of Mortgage Loans: | 1,867 | 975 | 1,272 | 916 | 5,030 |
| Average Scheduled Principal Balance: | $197,512 | $141,831 | $286,623 | $138,064 | $198,428 |
| Weighted Average Gross Interest Rate: | 8.316% | 7.977% | 8.013% | 8.265% | 8.152% |
| Weighted Average Net Interest Rate:(2) | 7.806% | 7.467% | 7.503% | 7.755% | 7.642% |
| Weighted Average Original FICO Score: | 608 | 627 | 627 | 644 | 622 |
| Weighted Average Combined Original LTV Ratio:(3) | 82.56% | 79.99% | 81.29% | 79.75% | 81.38% |
| Weighted Average Combined Original LTV Ratio with Silent Seconds:(3) | 85.78% | 81.47% | 88.67% | 82.03% | 85.76% |
| Weighted Average Stated Remaining Term (months): | 360 | 353 | 360 | 355 | 358 |
| Weighted Average Seasoning (months): | 1 | 1 | 1 | 1 | 1 |
| Weighted Average Months to Roll:(4) | 26 | N/A | 25 | N/A | 26 |
| Weighted Average Gross Margin:(4) | 6.096% | N/A | 6.014% | N/A | 6.055% |
| Weighted Average Initial Rate Cap:(4) | 2.121% | N/A | 2.104% | N/A | 2.113% |
| Weighted Average Periodic Rate Cap:(4) | 1.376% | N/A | 1.356% | N/A | 1.366% |
| Weighted Average Gross Maximum Lifetime Rate:(4) | 15.071% | N/A | 14.729% | N/A | 14.901% |
| Percentage of Mortgage Loans with Silent Seconds:(5) | 13.53% | 6.34% | 31.28% | 9.11% | 18.46% |
| Non-Zero Weighted Average Debt to Income Ratio at Origination: | 42.12% | 40.90% | 42.25% | 41.45% | 41.91% |
| Percentage of Mortgage Loans with Mortgage Insurance: | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

</TABLE>

----------------------------------------
(1)  All percentages calculated in this table are based on scheduled principal
     balances, unless otherwise noted, as of the statistical calculation date
     and are subject to a variance of +/-10%.
(2)  The weighted average net interest rate is equal to the weighted average
     gross interest rate less the servicing and master servicing fee rates.
(3)  With respect to the second lien mortgage loans, the combined original LTV
     ratio reflects the ratio of the sum of the original principal balance of
     the second lien mortgage loans, plus the original principal balance of the
     related first lien mortgage loan to the original value of the related
     mortgaged property. The combined original LTV ratio with silent seconds
     reflects the ratio of the sum of the original principal balance of the
     second lien mortgage loans, including any second lien mortgage loan not
     included in the mortgage loan pool that is secured by the related mortgaged
     property and originated in connection with the origination of the first
     lien mortgage loan, plus the original principal balance of the related

first lien mortgage loan, to the original value of the related mortgaged property.

(4) Represents the weighted average of the adjustable-rate mortgage loans in the mortgage loan pool.

(5) Represents percentage of mortgage loans in the mortgage loan pool as to which a second lien mortgage loan secured by the related mortgaged property was originated in connection with the origination of the first lien mortgage loan and the second lien mortgage loan is not included in the mortgage loan pool.


Generally, after an initial fixed-rate period, the interest rate on all of the adjustable-rate mortgage loans will adjust semi-annually on each adjustment date to equal the sum of six-month LIBOR and the gross margin for that mortgage loan subject to periodic and lifetime limitations. See "THE MORTGAGE LOAN POOL--THE INDEX" in this prospectus supplement.

The first adjustment date generally will occur only after an initial period of approximately two years to five years.

For additional information regarding the mortgage loans, see "THE MORTGAGE LOAN POOL" in this prospectus supplement.

SERVICING OF THE MORTGAGE LOANS AND SECURITIES ADMINISTRATION

Avelo Mortgage, L.L.C. will act as servicer with respect to all of the mortgage loans. The servicer will be obligated to service and administer the mortgage loans on behalf of the issuing entity, for the benefit of the holders of the certificates. See "THE SERVICER" and "THE POOLING AND SERVICING AGREEMENT" in this prospectus supplement.

Wells Fargo Bank, N.A. will act as master servicer and will be required to monitor the performance of the servicer pursuant to the pooling and servicing agreement. Wells Fargo Bank, N.A., acting as the securities administrator, may perform certain functions and services of the trustee, which are described in this prospectus supplement. See "THE MASTER SERVICER" and "THE SECURITIES ADMINISTRATOR" in this prospectus supplement.

OPTIONAL TERMINATION OF THE ISSUING ENTITY

The majority holders in the aggregate of the Class C certificates may, at their option, direct the servicer to purchase the mortgage loans and terminate the issuing entity on any distribution date when the aggregate stated principal balance, as further described in this prospectus

                                    S-13


<PAGE>


supplement, of the mortgage loans as of the last day of the related due period is equal to or less than 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. Any such purchase of the mortgage loans would result in the final distribution on the certificates on that distribution date.

ADVANCES

The servicer will be required to make cash advances with respect to delinquent payments of principal and interest on the mortgage loans and cash advances to preserve and protect the mortgaged property (such as for real property taxes and insurance), unless the servicer reasonably believes that the cash advances cannot be repaid from future payments or other collections on the mortgage loans for which such advances are being made. The master servicer

acting as successor servicer will advance its own funds to make advances if the
servicer fails to do so (unless it deems the advances to be nonrecoverable) as
required under the pooling and servicing agreement. These cash advances are only
intended to maintain a regular flow of scheduled interest and principal payments
on the certificates or to preserve and protect the mortgaged property and are
not intended to guarantee or insure against losses. The servicer (and the master
servicer acting as successor servicer) will not be obligated to make any
advances of balloon payments or advances of principal with respect to any REO
property or on any second lien mortgage loan.

DENOMINATIONS

     The LIBOR certificates will be issued and available only in book-entry
form, in minimum denominations of $25,000 initial principal amount and integral
multiples of $1 in excess of $25,000, except that one certificate of each class
may be issued in a different amount. The residual certificates will be issued
and available only in definitive form, in minimum denominations of $50.

SERVICING, MASTER SERVICING, SECURITIES ADMINISTRATOR, TRUSTEE AND CUSTODIAN
FEES

     The servicer is entitled with respect to each mortgage loan serviced by it
to a monthly servicing fee, which will be retained by the servicer from such
mortgage loan or payable monthly from amounts on deposit in the collection
account. The servicing fee will be an amount equal to interest at one twelfth of
a rate equal to 0.50% on the stated principal balance of each mortgage loan.

     The master servicer is entitled with respect to each mortgage loan to a
monthly master servicer fee, which will be remitted to the master servicer
monthly by the servicer from amounts on deposit in the collection account. The
master servicer fee will be an amount less than or equal to one-twelfth of a
rate equal to 0.01% on the stated principal balance of each mortgage loan.

     The securities administrator will be entitled to retain any net interest or
other income earned on deposits in the distribution account, and the securities
administrator will pay the trustee and each custodian, as applicable, the
trustee fee and the custodial fee, as applicable, from the securities
administrator's own funds.

OPTIONAL REPURCHASE OF DELINQUENT MORTGAGE LOANS

     The depositor (or its assignee) has the option, but is not obligated, to
purchase from the issuing entity any mortgage loan that is 90 days or more
delinquent or that has been converted to an REO property, as described in this
prospectus supplement under "THE POOLING AND SERVICING AGREEMENT--OPTIONAL
REPURCHASE OF DELINQUENT MORTGAGE LOANS."

REQUIRED REPURCHASES OR SUBSTITUTIONS OF MORTGAGE LOANS

     The sponsor will make certain representations and warranties relating to
all of the mortgage loans. If with respect to any mortgage loan any of these
representations and warranties are breached in any material respect as of the
date made, or there exists any uncured material document defect, the sponsor
will be obligated to repurchase, or substitute for, the mortgage loan as further
described in this prospectus supplement under "DESCRIPTION OF THE
CERTIFICATES--REPRESENTATIONS AND WARRANTIES RELATING TO THE MORTGAGE LOANS" and
"--DELIVERY OF MORTGAGE LOAN DOCUMENTS."

     If a mortgagor with respect to a mortgage loan fails to make its first
payment (or the first or second payment in the case of one of the applicable
loan sellers that individually sold mortgage loans comprising less than 5% of
the total mortgage loans in the issuing entity) after

<PAGE>

the date that mortgage loan was purchased by the sponsor from the applicable
original loan seller, the issuing entity, with the depositor's consent, may
direct the applicable original loan sellers to repurchase that mortgage loan as
further described in this prospectus supplement under "DESCRIPTION OF THE
CERTIFICATES--REPRESENTATIONS AND WARRANTIES RELATING TO THE MORTGAGE LOANS."

ERISA CONSIDERATIONS

     Subject to the conditions described under "ERISA CONSIDERATIONS" in this
prospectus supplement, the offered certificates, other than the residual
certificates, may be purchased by an employee benefit plan or other retirement
arrangement subject to Title I of ERISA or Section 4975 of the Internal Revenue
Code. Sales of the residual certificates to such plans or retirement
arrangements are prohibited.

     In making a decision regarding investing in any class of offered
certificates, other than the residual certificates, fiduciaries of such plans or
arrangements should consider the additional requirements resulting from the
interest rate swap agreement as discussed under "ERISA CONSIDERATIONS" in this
prospectus supplement.

FEDERAL TAX ASPECTS

     Cadwalader, Wickersham & Taft LLP acted as tax counsel to GS Mortgage
Securities Corp. and is of the opinion that:

     o    portions of the issuing entity will be treated as multiple real estate
          mortgage investment conduits, or REMICs, for federal income tax
          purposes,

     o    the LIBOR certificates will represent regular interests in a REMIC,
          which will be treated as debt instruments of a REMIC, and will
          represent interests in certain basis risk carry forward amounts
          pursuant to the payment priorities in the transaction. Basis risk
          carry forward amounts will be treated as payments under a notional
          principal contract for federal income tax purposes,

     o    the Class RC certificates will represent the beneficial ownership of
          the residual interest in the REMIC that will hold the mortgage loans,

     o    the Class R certificates will represent the beneficial ownership of
          the residual interest in certain other REMICs formed pursuant to the
          pooling and servicing agreement, and

     o    the Class RX certificates will represent the beneficial ownership of
          the residual interest in another REMIC formed pursuant to the pooling
          and servicing agreement.

LEGAL INVESTMENT

     The offered certificates will not constitute "mortgage related securities"
for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as
amended. If your investment activities are subject to legal investment laws and
regulations, regulatory capital requirements, or review by regulatory
authorities, then you may be subject to restrictions on investment in the
offered certificates. You should consult your own legal advisors for assistance
in determining the suitability of and consequences to you of the purchase,
ownership and sale of the offered certificates. See "RISK FACTORS--YOUR
INVESTMENT MAY NOT BE LIQUID" in this prospectus supplement and "LEGAL
INVESTMENT" in this prospectus supplement and in the prospectus.

S-15

<PAGE>


RATINGS

     In order to be issued, the offered certificates must be assigned ratings
not lower than the following by Standard & Poor's Ratings Services, a division
of The McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.:

| CLASS | S&P | MOODY'S |
| --- | --- | --- |
| A-1............ | AAA | Aaa |
| A-2A........... | AAA | Aaa |
| A-2B........... | AAA | Aaa |
| A-2C........... | AAA | Aaa |
| A-2D........... | AAA | Aaa |
| M-1............ | AA+ | Aa1 |
| M-2............ | AA | Aa2 |
| M-3............ | AA- | Aa3 |
| M-4............ | A+ | A1 |
| M-5............ | A | A2 |
| M-6............ | A- | A3 |
| M-7............ | BBB+ | Baa1 |
| M-8............ | BBB | Baa2 |
| M-9............ | BBB- | Baa3 |
| R  ............ | AAA | N/A |
| RC | AAA | N/A |
| RX | AAA | N/A |

     A security rating is not a recommendation to buy, sell or hold securities.
These ratings may be lowered or withdrawn at any time by any of the rating
agencies.


S-16


<PAGE>


                              RISK FACTORS

     THE OFFERED CERTIFICATES ARE NOT SUITABLE INVESTMENTS FOR ALL INVESTORS. IN
PARTICULAR, YOU SHOULD NOT PURCHASE ANY CLASS OF OFFERED CERTIFICATES UNLESS YOU
UNDERSTAND AND ARE ABLE TO BEAR THE PREPAYMENT, CREDIT, LIQUIDITY AND MARKET
RISKS ASSOCIATED WITH THAT CLASS DISCUSSED BELOW AND UNDER THE HEADING "RISK
FACTORS" IN THE PROSPECTUS.

     THE OFFERED CERTIFICATES ARE COMPLEX SECURITIES AND IT IS IMPORTANT THAT
YOU POSSESS, EITHER ALONE OR TOGETHER WITH AN INVESTMENT ADVISOR, THE EXPERTISE
NECESSARY TO EVALUATE THE INFORMATION CONTAINED IN THIS PROSPECTUS SUPPLEMENT
AND THE PROSPECTUS IN THE CONTEXT OF YOUR FINANCIAL SITUATION.

     ALL PERCENTAGES OF MORTGAGE LOANS IN THIS "RISK FACTORS" SECTION ARE BASED
ON THE SCHEDULED PRINCIPAL BALANCES OF THE MORTGAGE LOANS AS OF THE STATISTICAL
CALCULATION DATE OF FEBRUARY 1, 2007.

| LESS STRINGENT UNDERWRITING | The mortgage loans were made, in part, to |
| STANDARDS AND THE RESULTANT | borrowers who, for one reason or another, |
| POTENTIAL FOR DELINQUENCIES | are not able, or do not wish, to obtain |

ON THE MORTGAGE LOANS COULD LEAD TO LOSSES ON YOUR CERTIFICATES

financing from traditional sources. These mortgage loans may be considered to be of a riskier nature than mortgage loans made by traditional certificates may be deemed to be at a greater risk of loss than if the mortgage loans were made to other types of borrowers.

The underwriting standards used in the origination of the mortgage loans held by the issuing entity are generally less stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and in certain other respects. Mortgage loan borrowers may have an impaired or unsubstantiated credit history. As a result of this less stringent approach to underwriting, the mortgage loans purchased by the issuing entity will likely experience higher rates of delinquencies, defaults and foreclosures than mortgage loans underwritten in a manner which is more similar to the Fannie Mae and Freddie Mac guidelines.

In addition, as described below under "--RECENT DEVELOPMENTS REGARDING NEW CENTURY FINANCIAL CORPORATION," New Century Financial Corporation and its subsidiaries (which include NC Capital Corporation, the originator of approximately 71.91% of the mortgage loans) have been experiencing severe financial difficulties. These difficulties may have adversely affected NC Capital Corporation's application of its underwriting standards in a manner that would have an adverse effect on the default and loss experience of the mortgage loans in the future.

RECENTLY, THE SUBPRIME MORTGAGE LOAN MARKET HAS EXPERIENCED INCREASING LEVELS OF DELINQUENCIES AND DEFAULTS; INCREASED USE OF NEW MORTGAGE LOAN PRODUCTS BY BORROWERS MAY RESULT IN HIGHER LEVELS OF DELINQUENCIES AND LOSSES GENERALLY

In recent years, borrowers have increasingly financed their homes with new mortgage loan products, which in many cases have allowed them to purchase homes that they might otherwise have been unable to afford. Many of these new products feature low monthly payments during the initial years of the loan that can increase (in some cases, significantly) over the loan term. There is little historical data with respect to the performance of these new mortgage loan products, especially during a period of increased delinquencies or defaults for such mortgage loan products. Consequently, as borrowers face potentially higher monthly payments for the remaining terms of their loans, it is possible that, combined with other economic conditions such as increasing interest rates and deterioration of home values, borrower delinquencies and defaults could exceed levels anticipated by you.

S-17

<PAGE>

Recently, the subprime mortgage loan market has experienced increasing levels of delinquencies and defaults, and we cannot assure you that this will not continue. The increased levels of delinquencies and defaults, as well as a deterioration in general real estate market conditions, have also resulted generally in loan originators being required to repurchase an increasingly greater number of mortgage loans pursuant to early payment default and representation and warranty provisions in their loan sale agreements. This has led to a deterioration in the financial performance of many subprime loan originators, and in some cases, has caused certain loan originators to cease operations. As described below under "--RECENT DEVELOPMENTS REGARDING NEW CENTURY FINANCIAL CORPORATION," New Century Financial Corporation, the parent of NC Capital Corporation, has recently experienced severe financial difficulties and has become the subject of various legal and governmental investigations and proceedings and has filed for bankruptcy. In addition, SouthStar Funding, LLC also recently filed for bankruptcy. Deterioration in the financial condition of New Century Financial Corporation and NC Capital Corporation or any other loan originator could adversely affect the ability of a loan originator to repurchase mortgage loans as to which an early payment default has occurred. If a loan originator is unable for any reason to satisfy its obligations to repurchase mortgage loans as to which an early payment default exists, neither the depositor nor any other person will be obligated to repurchase such loans. In addition, any such investigations or proceedings could adversely affect the ability of a loan originator to perform any other obligations with respect to the mortgage loans, such as the servicing of mortgage loans or the transfer of servicing to a successor servicer, and could possibly impact the ability of a servicer to collect or foreclose on mortgage loans. In light of the foregoing, you should consider the heightened risks associated with investing in the offered certificates, and the risk that your investment in the offered certificates may perform worse than you anticipate.

RECENT DEVELOPMENTS REGARDING NEW CENTURY FINANCIAL CORPORATION

New Century Financial Corporation, parent of NC Capital Corporation, has recently experienced severe financial difficulties, and on April 2, 2007, New Century Financial Corporation filed a voluntary petition for reorganization under Chapter 11 of the

United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. New Century Financial Corporation previously announced that its lenders will no longer provide financing to it or its subsidiaries, that these lenders have also notified New Century Financial Corporation of certain events of default under various mortgage loan financing arrangements, and that, as a result, these lenders have sold or intend to sell any outstanding mortgage loans subject to these financing arrangements. In addition, New Century Financial Corporation announced that it and its subsidiaries have ceased selling mortgage loans to or servicing mortgage loans for Federal Home Loan Mortgage Corp. and Federal National Mortgage Association. New Century Financial Corporation also announced that it has received cease and desist orders from numerous states alleging violations of state laws. In addition, the Securities and Exchange Commission and the U.S. Attorney's office have commenced investigations into certain of New Century Financial Corporation's financial statements. In addition, New Century Financial Corporation and certain of its subsidiaries have recently entered into a Stipulated Preliminary Injunction with the Ohio Attorney General and the Ohio Department of Commerce, Division of Financial Institutions which, among other things, restricts New Century Financial Corporation, their

                    S-18


<PAGE>


subsidiaries and their agents, officers, employees and anyone acting in concert or participation with them from initiating new foreclosure actions or continuing to prosecute pending foreclosure actions or evicting consumers in Ohio without prior approval from the state of Ohio. See "MORTGAGE LOAN POOL--NEW CENTURY--RECENT DEVELOPMENTS REGARDING NEW CENTURY" in this prospectus supplement for further information regarding these developments.

As a result of the foregoing, we cannot assure you that these matters would not adversely affect the ability of NC Capital Corporation to purchase mortgage loans as to which an early payment default has occurred, the ability of New Century Mortgage Corporation to transfer servicing with respect to mortgage loans secured by Ohio mortgaged properties, or the ability of the servicer to take actions (including

foreclosure) that may be essential to preserve the value of the mortgage loans included in the issuing entity that were purchased by the sponsor from NC Capital Corporation.

VIOLATION OF VARIOUS FEDERAL, STATE AND LOCAL LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

There has been a continued focus by state and federal banking regulatory agencies, state attorneys general offices, the Federal Trade Commission, the U.S. Department of Justice, the U.S. Department of Housing and Urban Development and state and local governmental authorities on certain lending practices by some companies in the subprime industry, sometimes referred to as "predatory lending" practices. Sanctions have been imposed by state, local and federal governmental agencies for practices including, but not limited to, charging borrowers excessive fees, imposing higher interest rates than the borrower's credit risk warrants and failing to adequately disclose the material terms of loans to the borrowers.

Applicable state and local laws generally regulate interest rates and other charges, require certain disclosure, impact closing practices and require licensing of originators. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

o   the Federal Truth in Lending Act and Regulation Z promulgated under that Act, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

o   the Equal Credit Opportunity Act and Regulation B promulgated under that Act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o   the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience.

Violations of certain provisions of these federal, state and local laws, as well as actions by governmental agencies,

authorities and attorneys general, may limit
the ability of the servicer to collect all
or part of the principal of, or interest on,
the mortgage loans and in addition could
subject the issuing entity to damages and
administrative enforcement

S-19

<PAGE>

(including disgorgement of prior interest
and fees paid). In particular, an
originator's failure to comply with certain
requirements of federal and state laws could
subject the issuing entity (and other
assignees of the mortgage loans) to monetary
penalties, and result in the obligors'
rescinding the mortgage loans against either
the issuing entity or subsequent holders of
the mortgage loans.

The sponsor will represent with respect to
the mortgage loans, that such mortgage loan
is in compliance with applicable federal,
state and local laws and regulations. In
addition, the sponsor will also represent
that none of the mortgage loans sold by it
(i) are "high cost loans," (ii) are covered
by the Home Ownership and Equity Protection
Act of 1994 or (iii) are in violation of, or
classified as "high cost," "threshold,"
"predatory" or "covered" loans under any
other applicable state, federal or local
law. In the event of a breach of any of such
representations, the sponsor will be
obligated to cure such breach or repurchase
or, for a limited period of time, replace
the affected mortgage loan, in the manner
and to the extent described in this
prospectus supplement.

As described above under "--RECENT
DEVELOPMENTS REGARDING NEW CENTURY FINANCIAL
CORPORATION," a number of state regulatory
authorities have taken action against New
Century Financial Corporation and its
subsidiaries, including NC Capital
Corporation, for alleged violations of state
laws. Certain of those actions prohibit New
Century Financial Corporation from pursuing
foreclosure actions, and in the future one
or more additional states could seek similar
limitations on the servicer's ability to
take actions (such as pursuing foreclosures)
that may be essential to preserve the value
of the mortgage loans on behalf of the
issuing entity. Any such limitations could
adversely affect the issuing entity's
ability to realize on the mortgage loans.

GEOGRAPHIC CONCENTRATION OF               Different geographic regions of the United

THE MORTGAGE LOANS IN            States from time to time will experience
PARTICULAR JURISDICTIONS MAY     weaker regional economic conditions and
RESULT IN GREATER LOSSES IF      housing markets, and, consequently, may
THOSE JURISDICTIONS              experience higher rates of loss and
EXPERIENCE ECONOMIC DOWNTURNS    delinquency on mortgage loans generally. Any
                                 concentration of the mortgage loans in a
                                 region may present risk considerations in
                                 addition to those generally present for
                                 similar mortgage-backed securities without
                                 that concentration. This may subject the
                                 mortgage loans held by the issuing entity to
                                 the risk that a downturn in the economy in
                                 this region of the country would more
                                 greatly affect the pool than if the pool
                                 were more diversified.

                                 In particular, the following approximate
                                 percentages of mortgage loans were secured
                                 by mortgaged properties located in the
                                 following states:

                                 All mortgage loans

|           | CALIFORNIA | FLORIDA | NEW YORK |
|-----------|------------|---------|----------|
|           | ---------- | ------- | -------- |
|           | 29.34%     | 10.33%  | 5.96%    |

Group I mortgage loans

|           | CALIFORNIA | FLORIDA | NEW YORK |
|-----------|------------|---------|----------|
|           | ---------- | ------- | -------- |
|           | 20.82%     | 10.81%  | 5.53%    |

Group II mortgage loans

|           | CALIFORNIA | FLORIDA | NEW YORK |
|-----------|------------|---------|----------|
|           | ---------- | ------- | -------- |
|           | 38.14%     | 9.82%   | 6.42%    |

                                 S-20

<PAGE>

                                 Approximately 29.34% of the mortgage loans
                                 are secured by mortgaged properties that are
                                 located in California. Property in
                                 California may be more susceptible than
                                 homes located in other parts of the country
                                 to certain types of uninsurable hazards,
                                 such as earthquakes, floods, mudslides and
                                 other natural disasters.

                                 Because of the relative geographic
                                 concentration of the mortgaged properties
                                 within the certain states, losses on the
                                 mortgage loans may be higher than would be
                                 the case if the mortgaged properties were
                                 more geographically diversified. For
                                 example, some of the mortgaged properties
                                 may be more susceptible to certain types of
                                 special hazards, such as earthquakes,
                                 hurricanes, floods, fires and other natural

disasters and major civil disturbances, than residential properties located in other parts of the country. In addition, the economies of the states with high concentrations of mortgaged properties may be adversely affected to a greater degree than the economies of other areas of the country by certain regional developments. If the residential real estate markets in an area of concentration experience an overall decline in property values after the dates of origination of the respective mortgage loans, then the rates of delinquencies, foreclosures and losses on the mortgage loans may increase and the increase may be substantial.

Further, the concentration of the mortgage loans in one or more states will have a disproportionate effect on certificateholders if the regulatory authorities in any those states take actions against the related originator or the servicer that impairs the issuing entity's ability to realize on those mortgage loans. See "--VIOLATION OF VARIOUS FEDERAL, STATE AND LOCAL LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS" above.

The concentration of mortgage loans with specific characteristics relating to the types of properties, property characteristics and geographic location are likely to change over time. Principal payments may affect the concentration levels. Principal payments could include voluntary prepayments and prepayments resulting from casualty or condemnation, defaults and liquidations and from repurchases due to breaches of representations and warranties. Because principal payments on the mortgage loans are payable to the subordinated certificates at a slower rate than principal payments are made to the Class A certificates, the subordinated certificates are more likely to be exposed to any risks associated with changes in concentrations of mortgage loan or property characteristics.

EFFECT ON YIELDS CAUSED BY PREPAYMENTS, DEFAULTS AND LOSSES

Mortgagors may prepay their mortgage loans in whole or in part at any time. A prepayment of a mortgage loan generally will result in a prepayment on the certificates. We cannot predict the rate at which mortgagors will repay their mortgage loans. We cannot assure you that the actual prepayment rates of the mortgage loans included in the issuing entity will conform to any historical prepayment rates or any forecasts of prepayment rates described or reflected in any reports or studies relating to pools of mortgage loans similar to the types of mortgage loans included in the issuing entity.

If you purchase your certificates at a
discount and principal is repaid slower than
you anticipate, then your yield may be lower
than you anticipate.


                    S-21


<PAGE>


If you purchase your certificates at a
premium and principal is repaid faster than
you anticipate, then your yield may be lower
than you anticipate.

The rate of prepayments on the mortgage
loans will be sensitive to prevailing
interest rates. Generally, for fixed-rate
mortgage loans, if prevailing interest rates
decline significantly below the interest
rates on the fixed-rate mortgage loans, the
fixed-rate mortgage loans are more likely to
prepay than if prevailing rates remain above
the interest rates on the fixed-rate
mortgage loans. Conversely, if prevailing
interest rates rise significantly,
prepayments on the fixed-rate mortgage loans
may decrease.

The prepayment behavior of the
adjustable-rate mortgage loans and of the
fixed-rate mortgage loans may respond to
different factors, or may respond
differently to the same factors. If, at the
time of their first adjustment, the interest
rates on any of the adjustable-rate mortgage
loans would be subject to adjustment to a
rate higher than the then prevailing
interest rates available to borrowers, the
borrowers may prepay their adjustable-rate
mortgage loans. The adjustable-rate mortgage
loans may also suffer an increase in
defaults and liquidations following upward
adjustments of their interest rates,
especially following their initial
adjustments.

Approximately 73.79% of the group I mortgage
loans and approximately 76.14% of the group
II mortgage loans require the mortgagor to
pay a prepayment premium in certain
instances if the mortgagor prepays the
mortgage loan during a stated period, which
may be from one year to three years after
the mortgage loan was originated. A
prepayment premium may or may not discourage
a mortgagor from prepaying the related
mortgage loan during the applicable period.

The sponsor may be required to purchase
mortgage loans from the issuing entity in
the event certain breaches of its respective

representations and warranties occur or
certain material document defects occur,
which in each case, have not been cured. In
addition, a mortgagor with respect to a
mortgage loan fails to make its first
payment (or the first or second payment in
the case of one of the applicable loan
sellers that individually sold mortgage
loans comprising less than 5% of the total
mortgage loans in the issuing entity) after
the date that mortgage loan was purchased by
the sponsor from the applicable original
loan seller, the applicable loan seller may
be obligated to purchase that mortgage loan
from the issuing entity. These purchases
will have the same effect on the holders of
the LIBOR certificates as a prepayment of
those mortgage loans.

The majority Class C certificateholders may,
at their option, direct the servicer to
purchase all of the mortgage loans and
terminate the issuing entity on any
distribution date when the aggregate stated
principal balance of the mortgage loans as
of the last day of the related due period is
equal to or less than 10% of the aggregate
stated principal balance of all of the
mortgage loans as of the cut-off date.

If the rate of default and the amount of
losses on the mortgage loans is higher than
you expect, then your yield may be lower
than you expect.

                    S-22

<PAGE>

As a result of the absorption of realized
losses on the mortgage loans by excess
interest and overcollateralization as
described in this prospectus supplement,
liquidations of defaulted mortgage loans,
whether or not realized losses are incurred
upon the liquidations, will result in an
earlier return of principal to the LIBOR
certificates and will influence the yield on
the LIBOR certificates in a manner similar
to the manner in which principal prepayments
on the mortgage loans will influence the
yield on the LIBOR certificates.

The overcollateralization provisions are
intended to result in an accelerated rate of
principal distributions to holders of the
LIBOR certificates then entitled to
principal distributions at any time that the
overcollateralization provided by the
mortgage loan pool falls below the required
level. An earlier return of principal to the
holders of the LIBOR certificates as a

result of the overcollateralization provisions will influence the yield on the LIBOR certificates in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the LIBOR certificates.

The multiple class structure of the LIBOR certificates causes the yield of certain classes of the LIBOR certificates to be particularly sensitive to changes in the rates of prepayments of mortgage loans. Because distributions of principal will be made to the classes of LIBOR certificates according to the priorities described in this prospectus supplement, the yield to maturity on those classes of LIBOR certificates will be sensitive to the rates of prepayment on the mortgage loans experienced both before and after the commencement of principal distributions on those classes. In particular, the subordinated certificates (i.e., the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates) do not receive any portion of the amount of principal payable to the LIBOR certificates prior to the distribution date in April 2010 unless the aggregate certificate principal balance of the Class A certificates has been reduced to zero. Thereafter, subject to the loss and delinquency performance of the mortgage loan pool, the subordinated certificates may continue to receive no portion of the amount of principal then payable to the LIBOR certificates unless the aggregate certificate principal balance of the Class A certificates has been reduced to zero. The weighted average lives of the subordinated certificates will therefore be longer than would otherwise be the case.

The value of your certificates may be reduced if the rate of default or the amount of losses is higher than expected.

If the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of the certificates may be lowered in the future. This would probably reduce the value of those certificates. No one will be required to supplement any credit enhancement or to take any other action to maintain any rating of the certificates.

Newly originated mortgage loans may be more likely to default, which may cause losses on the offered certificates.

Defaults on mortgage loans tend to occur at higher rates during the early years of the mortgage loans. Substantially all of the mortgage loans have been originated within

the 12 months prior to their sale to the
issuing entity. As a result, the issuing
entity may experience higher rates of

S-23

&lt;PAGE&gt;

default than if the mortgage loans had been
outstanding for a longer period of time.

The credit enhancement features may be
inadequate to provide protection for the
LIBOR certificates.

The credit enhancement features described in
this prospectus supplement are intended to
enhance the likelihood that holders of the
Class A certificates, and to a limited
extent, the holders of the Class M-1, Class
M-2, Class M-3, Class M-4, Class M-5, Class
M-6, Class M-7, Class M-8 and Class M-9
certificates will receive regular payments
of interest and principal. However, we
cannot assure you that the applicable credit
enhancement will adequately cover any
shortfalls in cash available to pay your
certificates as a result of delinquencies or
defaults on the mortgage loans. If
delinquencies or defaults occur on the
mortgage loans, neither the servicer nor the
master servicer will advance scheduled
monthly payments of interest and principal
on delinquent or defaulted mortgage loans if
the advances are not likely to be recovered.

If substantial losses occur as a result of
defaults and delinquent payments on the
mortgage loans, you may suffer losses, even
if you own Class A certificates.

INTEREST GENERATED BY THE        The weighted average of the interest rates
MORTGAGE LOANS MAY BE            on the mortgage loans is expected to be
INSUFFICIENT TO RESTORE          higher than the pass-through rates on the
THE REQUIRED LEVEL OF            LIBOR certificates. Interest on the mortgage
OVERCOLLATERALIZATION            loans, after taking into account certain
                                 payments received by the issuing entity
                                 pursuant to the interest rate cap agreement
                                 or received or paid by the issuing entity
                                 pursuant to the interest rate swap
                                 agreement, is expected to generate more
                                 interest than is needed to pay interest owed
                                 on the LIBOR certificates and to pay certain
                                 fees and expenses payable by the issuing
                                 entity. Any remaining interest will then be
                                 used to absorb losses that occur on the
                                 mortgage loans. After these financial
                                 obligations of the issuing entity are
                                 covered, the available excess interest will
                                 be used to maintain the
                                 overcollateralization at the required level
                                 determined as described in this prospectus

supplement. We cannot assure you, however,
that enough excess interest will be
generated to absorb losses or to maintain
the required level of overcollateralization.
The factors described below, as well as the
factors described below under "--EFFECT OF
MORTGAGE INTEREST RATES AND OTHER FACTORS ON
THE PASS-THROUGH RATES ON THE LIBOR
CERTIFICATES," will affect the amount of
excess interest available to the issuing
entity.

Every time a mortgage loan is prepaid in
full, excess interest may be reduced because
the mortgage loan will no longer be
outstanding and generating interest. In the
event of a partial prepayment, the mortgage
loan will be generating less interest.

Every time a mortgage loan is liquidated or
written off, excess interest may be reduced
because those mortgage loans will no longer
be outstanding and generating interest.

If the rates of delinquencies, defaults or
losses on the mortgage loans turn out to be
higher than expected, excess interest will
be reduced by the amount necessary to
compensate for any shortfalls in cash
available to make required distributions on
the LIBOR certificates.

                    S-24


<PAGE>

            All of the adjustable-rate mortgage loans
            have interest rates that adjust based on an
            index that is different from the index used
            to determine the pass-through rates on the
            LIBOR certificates, and the fixed-rate
            mortgage loans have interest rates that do
            not adjust. In addition, the first
            adjustment of the interest rates for
            approximately 83.58% of the adjustable-rate
            mortgage loans will not occur until two
            years after the date of origination. The
            first adjustment of the interest rates for
            approximately 14.99% of the adjustable-rate
            mortgage loans will not occur until three
            years after the date of origination. The
            first adjustment of the interest rates for
            approximately 1.43% of the adjustable-rate
            mortgage loans will not occur until five
            years after the date of origination. See
            "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE
            MORTGAGE LOANS" in this prospectus
            supplement. As a result, the pass-through
            rates on the LIBOR certificates may increase
            relative to the weighted average of the
            interest rates on the mortgage loans, or the
            pass-through rates on the LIBOR certificates

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

may remain constant as the weighted average
of the interest rates on the mortgage loans
declines. In either case, this would require
that more of the interest generated by the
mortgage loans be applied to cover interest
on the LIBOR certificates. The pass-through
rates on the Class A certificates cannot
exceed the lesser of the weighted average
interest rate of the mortgage loans, reduced
for net payments to the swap provider or
increased by net payments from the swap
provider or payments from the cap provider,
in the applicable mortgage loan group or in
the mortgage loan pool, in either case less
certain fees and expenses payable by the
issuing entity, and the pass-through rates
on the Class M certificates cannot exceed
the weighted average interest rate of the
mortgage loans, reduced for net payments to
the swap provider or increased by net
payments from the swap provider or payments
from the cap provider, in the mortgage loan
pool less certain fees and expenses payable
by the issuing entity.

If prepayments, defaults and liquidations
occur more rapidly on the mortgage loans
with relatively higher interest rates than
on the mortgage loans with relatively lower
interest rates, the amount of excess
interest generated by the mortgage loans
will be less than would otherwise be the
case.

Investors in the LIBOR certificates, and
particularly the subordinated certificates,
should consider the risk that the
overcollateralization may not be sufficient
to protect your certificates from losses.

EFFECT OF MORTGAGE INTEREST    The LIBOR certificates accrue interest at
RATES AND OTHER FACTORS ON    pass-through rates based on the one-month
THE PASS-THROUGH RATES ON    LIBOR index plus specified margins, but are
THE LIBOR CERTIFICATES    subject to certain limitations. Those
limitations on the pass-through rates for
the LIBOR certificates are based, in part,
on the weighted average of the net interest
rates on the mortgage loans adjusted for net
payments to or from the swap provider or
payments from the cap provider. A variety of
factors, in addition to those described in
the previous Risk Factor, could limit the
pass-through rates and adversely affect the
yield to maturity on the LIBOR certificates.
Some of these factors are described below:

The interest rates on the fixed-rate
mortgage loans will not adjust, and the
interest rates on all of the adjustable-rate
mortgage loans are based on a six-month
LIBOR index. The adjustable-rate mortgage
loans have periodic and maximum limitations
on adjustments to their interest rates, and
approximately 80.80% of the adjustable-rate
mortgage loans in group I and approximately

86.38% of the adjustable-rate mortgage loans

S-25

<PAGE>

in group II will have the first adjustment to their interest rates after approximately two years, with the remaining having their first adjustment either three years or five years after the origination of those mortgage loans. As a result of the limit on the pass-through rates on the LIBOR certificates, those LIBOR certificates may accrue less interest than they would accrue if their pass-through rates were based solely on the one-month LIBOR index plus the specified margins.

The six-month LIBOR index may change at different times and in different amounts than the one-month LIBOR index. As a result, it is possible that interest rates on certain of the adjustable-rate mortgage loans may decline while the pass-through rates on the LIBOR certificates are stable or rising. It is also possible that the interest rates on the adjustable-rate mortgage loans and the pass-through rates for the LIBOR certificates may decline or increase during the same period, but that the pass-through rates on these certificates may decline more slowly or increase more rapidly.

The pass-through rates for the LIBOR certificates adjust monthly and are subject to maximum interest rate caps while the interest rates on the adjustable-rate mortgage loans adjust less frequently and the interest rates on the fixed-rate mortgage loans do not adjust. Consequently, the limit on the pass-through rates on the LIBOR certificates may limit increases in the pass-through rates for those classes for extended periods in a rising interest rate environment.

If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher interest rates than on the mortgage loans with relatively lower interest rates, the pass-through rates on the LIBOR certificates are more likely to be limited.

If the pass-through rates on the LIBOR certificates are limited for any distribution date due to a cap based on the weighted average net interest rates of the mortgage loans and, in the case of the Class A certificates also, on the weighted average net interest rates of the related loan group (in each case, reduced by certain fees and

expenses and adjusted for net payments to or from the swap provider or payments from the cap provider), the resulting interest shortfalls may be recovered by the holders of these certificates on the same distribution date or on future distribution dates on a subordinated basis to the extent that on that distribution date or future distribution dates there are available funds remaining after certain other distributions on the LIBOR certificates and the payment of certain fees and expenses of the issuing entity. However, we cannot assure you that these funds will be sufficient to fully cover these shortfalls.

EFFECT ON YIELDS DUE TO RAPID PREPAYMENTS; NO ASSURANCE OF AMOUNTS RECEIVED UNDER THE INTEREST RATE SWAP AGREEMENT AND THE INTEREST RATE CAP AGREEMENT

Any net payment payable to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may reduce the pass-through rates on the LIBOR certificates.

If the rate of prepayments on the mortgage loans is faster than anticipated, the amount on which payments due under the interest rate swap agreement are calculated may exceed the aggregate scheduled principal balance of the mortgage loans in the pool, thereby increasing the relative proportion of interest collections on the mortgage loans that must be applied to make net payments to the swap provider. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the LIBOR certificates.

S-26

<PAGE>

In addition, certain swap termination payments arising under the interest rate swap agreement are payable to the swap provider on a senior basis and such payments may reduce amounts available for distribution to certificateholders.

Any amounts received under the interest rate swap agreement and the interest rate cap agreement will be applied as described in this prospectus supplement to pay interest shortfalls, restore overcollateralization and cover losses. However, no amounts will be payable to the issuing entity by the swap provider unless the floating payment owed by the swap provider for a distribution date (based on a per annum rate equal to one-month LIBOR and as determined pursuant to the interest rate swap agreement) exceeds the fixed payment owed to the swap provider for that distribution date (based on a per

annum rate equal to 5.00%) set forth on the fixed rate monthly schedule. In addition, while the interest rate cap agreement is in effect, the cap provider will not be obligated to pay to the issuing entity any amount unless one-month LIBOR exceeds 6.50% per annum. We cannot assure you that any amounts will be received under the interest rate swap agreement or the interest rate cap agreement, or that any such amounts that are received will be sufficient to cover interest shortfalls or losses on the mortgage loans, or to restore required overcollateralization.

See "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL," "--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES," "--SUPPLEMENTAL INTEREST TRUST," "--INTEREST RATE SWAP AGREEMENT" and "--INTEREST RATE CAP AGREEMENT" in this prospectus supplement.

PREPAYMENTS ON THE MORTGAGE LOANS COULD LEAD TO SHORTFALLS IN THE DISTRIBUTION OF INTEREST ON YOUR CERTIFICATES

When a voluntary principal prepayment is made by the mortgagor on a mortgage loan (excluding any payments made upon liquidation of any mortgage loan), the mortgagor is charged interest on the amount of prepaid principal only up to the date of the prepayment, instead of for a full month. However, principal prepayments will only be passed through to the holders of the certificates once a month on the distribution date which follows the calendar month in which the prepayment was received by the servicer. The servicer is obligated to pay an amount, without any right of reimbursement, for those shortfalls in interest collections payable on the certificates that are attributable to the difference between the interest paid by a mortgagor in connection with voluntary principal prepayments in full and thirty days' interest on the prepaid mortgage loan, but only to the extent of one-half of the monthly servicing fee for the related distribution date.

If the servicer fails to make such compensating interest payments or the shortfall exceeds one-half of the monthly servicing fee for the related distribution date, there will be fewer funds available for the distribution of interest on the certificates. In addition, no compensating interest payments from the servicer will be available to cover prepayment interest shortfalls resulting from partial prepayments or involuntary prepayments (such as liquidation of a defaulted mortgage loan). Such shortfalls of interest, if they result in the inability of the issuing entity to pay the full amount of the current interest on the certificates, will result in a reduction of the yield on your

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.htm

certificates.

S-27

<PAGE>

| | |
|---|---|
| THE WEIGHTED AVERAGE LIVES OF, AND THE YIELDS TO MATURITY ON, THE SUBORDINATED CERTIFICATES ARE SENSITIVE TO MORTGAGOR DEFAULTS AND LOSSES ON THE MORTGAGE LOANS | The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates will be progressively more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on LOANS the mortgage loans. If the actual rate and severity of losses on the mortgage loans is higher than those assumed by an investor in such certificates, the actual yield to maturity of such certificates may be lower than the yield anticipated by such holder based on such assumption. The timing of losses on the mortgage loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage loans are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the mortgage loans, to the extent they exceed the amount of excess interest and overcollateralization following distributions of principal on the related distribution date, will reduce the certificate principal balance of the Class M-9, Class M-8, Class M-7, Class M-6, Class M-5, Class M-4, Class M-3, Class M-2 and Class M-1 certificates, in that order. As a result of such reductions, less interest will accrue on such class of certificates than would otherwise be the case. |

Once a realized loss on a mortgage loan is allocated to a certificate, no principal or interest will be distributable with respect to such written down amount and the holder of the certificate will not be entitled to reimbursements for such lost interest or principal even if funds are available for reimbursement, except to the extent of any subsequent recoveries received on liquidated mortgage loans after they have been liquidated.

Unless the aggregate certificate principal balances of the Class A certificates have been reduced to zero, the subordinated certificates will not be entitled to any principal distributions until April 2010 or a later date as described in this prospectus supplement, or during any period in which delinquencies or cumulative losses on the

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

mortgage loans exceed certain levels. As a
result, the weighted average lives of the
subordinated certificates will be longer
than would otherwise be the case if
distributions of principal were allocated
among all of the certificates at the same
time. As a result of the longer weighted
average lives of the subordinated
certificates, the holders of those
certificates have a greater risk of
suffering a loss on their investments.
Further, because those certificates might
not receive any principal if certain
delinquency levels occur, it is possible for
those certificates to receive no principal
distributions even if no losses have
occurred on the mortgage loan pool.

In addition, the multiple class structure of
the subordinated certificates causes the
yield of those classes to be particularly
sensitive to changes in the rates of
prepayment of the mortgage loans. Because
distributions of principal will be made to
the holders of those certificates according
to the priorities described in this
prospectus supplement, the yield to maturity
on the subordinated certificates will be
sensitive to the rates of prepayment on the
mortgage loans experienced both before and
after the commencement of principal
distributions on those classes. The yield to
maturity on the subordinated certificates
will also be extremely sensitive to losses
due to defaults on the mortgage loans (and
the timing of those losses), to the extent
such losses are not covered by excess
interest after taking into account certain
payments received or paid by the issuing

                    S-28

<PAGE>

entity pursuant to the interest rate swap
agreement, payments received by the issuing
entity pursuant to the interest rate cap
agreement, the Class X certificates or a
class of subordinated certificates with a
lower payment priority. Furthermore, as
described in this prospectus supplement, the
timing of receipt of principal and interest
by the subordinated certificates may be
adversely affected by losses even if such
classes of certificates do not ultimately
bear such loss.

The depositor (or its assignee) has the
option to purchase mortgage loans that
become 90 days or more delinquent or that
have been converted to an REO property. Any
such purchase would have the same effect on

the holders of certificates as a prepayment
of the mortgage loans. The depositor may
exercise such option on its own behalf or on
behalf of another party who might benefit
from the removal of such delinquent mortgage
loans. The removal of any delinquent
mortgage loan by the depositor pursuant to
this option may have an effect on whether or
not there exists, or continues to exist, a
loss and delinquency trigger event, which
determines the level of
overcollateralization. Therefore, depending
on the circumstances, the exercise of this
purchase option may adversely affect the
market value of your certificates.

Finally, the effect on the market value of
the subordinated certificates of changes in
market interest rates or market yields for
similar securities may be greater than for
the Class A certificates.

DELAY IN RECEIPT OF          Substantial delays could be encountered in
LIQUIDATION PROCEEDS;        connection with the liquidation of
LIQUIDATION PROCEEDS MAY BE    delinquent mortgage loans. Further,
LESS THAN THE MORTGAGE LOAN    reimbursement of advances made on a mortgage
BALANCE                         loan, liquidation expenses such as legal
   fees, real estate taxes, hazard insurance
and maintenance and preservation expenses
may reduce the portion of liquidation
proceeds payable on the certificates. If a
mortgaged property fails to provide adequate
security for the mortgage loan, you will
incur a loss on your investment if the
credit enhancements described in this
prospectus supplement are insufficient to
cover the loss.

HIGH COMBINED ORIGINAL       Mortgage loans with higher combined original
LOAN-TO-VALUE RATIOS         loan-to-value ratios may present a greater
INCREASE RISK OF LOSS        risk of loss than mortgage loans with or
combined original loan-to-value ratios of
80% or below. Approximately 46.02% of the
mortgage loans had combined original
loan-to-value ratios greater than 80%, as
calculated as described under "THE MORTGAGE
LOAN POOL--GENERAL" in this prospectus
supplement.

Additionally, the determination of the value
of a mortgaged property used in the
calculation of the combined original
loan-to-value ratio of the mortgage loans
may differ from the appraised value of such
mortgaged properties if current appraisals
were obtained.

SOME OF THE MORTGAGE LOANS    Approximately 19.55% of the mortgage loans
HAVE AN INITIAL INTEREST-ONLY   have an initial interest-only period of up
PERIOD, WHICH MAY RESULT IN    to ten years. During this period, the
INCREASED DELINQUENCIES AND    payment made by the related mortgagor will
LOSSES                        be less than it would be if the principal of
the mortgage loan was required to amortize.
In addition, the mortgage loan principal
balance will not be reduced because there

will be no scheduled monthly payments of
principal during this period. As a result,
no principal payments will be made on the
LIBOR certificates with respect to these
mortgage loans during their interest-only
period unless there is a principal
prepayment.

S-29

<PAGE>

After the initial interest-only period, the
scheduled monthly payment on these mortgage
loans will increase, which may result in
increased delinquencies by the related
mortgagors, particularly if interest rates
have increased and the mortgagor is unable
to refinance. In addition, losses may be
greater on these mortgage loans as a result
of there being no principal amortization
during the early years of these mortgage
loans. Although the amount of principal
included in each scheduled monthly payment
for a traditional mortgage loan is
relatively small during the first few years
after the origination of a mortgage loan, in
the aggregate the amount can be significant.
Any resulting delinquencies and losses, to
the extent not covered by the applicable
credit enhancement described in this
prospectus supplement, will be allocated to
the LIBOR certificates in reverse order of
seniority.

The use of mortgage loans with an initial
interest-only period has recently increased
in popularity in the mortgage marketplace,
but historical performance data for
interest-only mortgage loans is limited as
compared to performance data for mortgage
loans that amortize from origination. The
performance of interest-only mortgage loans
may be significantly different from mortgage
loans that amortize from origination. In
particular, there may be a higher
expectation by these mortgagors of
refinancing their mortgage loans with a new
mortgage loan, in particular, one with an
initial interest-only period, which may
result in higher or lower prepayment speeds
than would otherwise be the case. In
addition, the failure by the related
mortgagor to build equity in the mortgaged
property may affect the delinquency, loss
and prepayment experience with respect to
these mortgage loans.

A PORTION OF THE MORTGAGE        Approximately 3.52% of the mortgage loans
LOANS ARE SECURED BY            are secured by second lien mortgages which
SUBORDINATE MORTGAGES; IN       are subordinate to the rights of the holder
THE EVENT OF A DEFAULT,         of the related senior mortgages. As a

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

THESE MORTGAGE LOANS ARE MORE LIKELY TO EXPERIENCE LOSSES

result, the proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the principal balance of the mortgage loan only to the extent that the claims, if any, of each related senior mortgagee are satisfied in full, including any related foreclosure costs. In addition, a holder of a subordinate or junior mortgage may not foreclose on the mortgaged property securing such mortgage unless it either pays the entire amount of the senior mortgages to the mortgagees at or prior to the foreclosure sale or undertakes the obligation to make payments on each senior mortgage in the event of a default under the mortgage. The issuing entity will have no source of funds to satisfy any senior mortgage or make payments due to any senior mortgagee.

An overall decline in the residential real estate markets could adversely affect the values of the mortgaged properties and cause the outstanding principal balances of the second lien mortgage loans, together with the senior mortgage loans secured by the same mortgaged properties, to equal or exceed the value of the mortgaged properties. This type of a decline would adversely affect the position of a second mortgagee before having the same effect on the related first mortgagee. A rise in interest rates over a period of time and the general condition of a mortgaged property as well as other factors may have the effect of reducing the value of the mortgaged property from the appraised value at the time the mortgage loan was originated. If there is a reduction in value of the mortgaged property, the ratio of the amount of the mortgage loan to the value of the mortgaged property may increase over what it was at the time the mortgage loan was originated. This type of increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the second lien mortgage loan after satisfaction of any senior liens. In

S-30

<PAGE>

circumstances where the servicer determines that it would be uneconomical to foreclose on the related property, the servicer may write off the entire outstanding principal balance of the related second lien mortgage loan as bad debt.

PAYMENTS IN FULL OF A BALLOON LOAN DEPEND ON THE BORROWER'S

Approximately 46.25% of the mortgage loans will not be fully amortizing over their

| ABILITY TO REFINANCE THE BALLOON LOAN OR SELL THE MORTGAGED PROPERTY | terms to maturity and, thus, will require substantial principal payments, i.e., balloon payments, at their stated maturity. Mortgage loans with balloon payments involve a greater degree of risk because the ability of a borrower to make a balloon payment typically will depend upon its ability either to timely refinance the loan or to timely sell the related mortgaged property. The ability of a borrower to accomplish either of these goals will be affected by a number of factors, including: |

    o   the level of availale interest rates at the time of sale or refinancing;

    o   the borrower's equity in the related mortgaged property;

    o   the financial condition of the mortgagor;

    o   tax laws;

    o   prevailing general economic conditions; and

    o   the availability of credit for single family real properties generally.

| THE INTEREST RATE SWAP AGREEMENT AND THE INTEREST RATE CAP AGREEMENT ARE SUBJECT TO COUNTERPARTY RISK | The assets of the issuing entity include an interest rate swap agreement that will require the swap provider to make certain payments for the benefit of the holders of the LIBOR certificates and an interest rate cap agreement that will require the cap provider to make certain payments for the benefit of the holders of the LIBOR certificates. To the extent that payments on the LIBOR certificates depend in part on payments to be received by the securities administrator under the interest rate swap agreement, the ability of the securities administrator to make those payments on those certificates will be subject to the credit risk of the swap provider. See "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" and "--INTEREST RATE CAP AGREEMENT" in this prospectus supplement. |

| THE CREDIT RATING OF THE SWAP PROVIDER AND CAP PROVIDER COULD AFFECT THE RATING OF THE OFFERED CERTIFICATES | The swap provider under the interest rate swap agreement and the cap provider under the interest rate cap agreement will have, as of the closing date, a counterparty rating of "Aaa" from Moody's Investors Service, Inc. and a credit rating of "AAA" from Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. The ratings on the offered certificates are dependent in part upon the credit ratings of Goldman Sachs Mitsui Marine Derivative Products, L.P. If a credit rating of Goldman Sachs Mitsui Marine Derivative Products, |

L.P. is qualified, reduced or withdrawn and
a substitute counterparty is not obtained in
accordance with the terms of the interest
rate swap agreement or the interest rate cap
agreement, the ratings of the offered
certificates may be qualified, reduced or
withdrawn. As a result, the value and
marketability of the offered certificates
may be adversely affected. See "DESCRIPTION
OF THE CERTIFICATES--INTEREST RATE SWAP
AGREEMENT" and "--INTEREST RATE CAP
AGREEMENT" in this prospectus supplement.

                    S-31


<PAGE>


THE APPLICABLE ORIGINAL          The loan sellers may be obligated to
LOAN SELLER MAY NOT BE           repurchase from the issuing entity mortgage
ABLE TO REPURCHASE               loans with respect to which a mortgagor has
DEFECTIVE MORTGAGE LOANS         failed to make its first payment (or first
                                 or second payment in certain cases) after
                                 the date the sponsor purchased the mortgage
                                 loan from the applicable loan seller. It is
                                 possible that such applicable loan seller
                                 may not be capable of repurchasing any such
                                 mortgage loans, for financial or other
                                 reasons. The inability of such applicable
                                 loan seller to repurchase mortgage loans
                                 would likely cause the mortgage loans to
                                 experience higher rates of delinquencies,
                                 defaults and losses. As a result, shortfalls
                                 in the distributions due on the certificates
                                 could occur.


BANKRUPTCY OF THE                The depositor and the sponsor may be
DEPOSITOR OR THE SPONSOR         eligible to become a debtor under the United
MAY DELAY OR REDUCE              States Bankruptcy Code. If the depositor or
COLLECTIONS ON LOANS             the sponsor for the certificates were to
                                 become a debtor under the United States
                                 Bankruptcy Code, the bankruptcy court could
                                 be asked to determine whether the mortgage
                                 loans constitute property of the debtor, or
                                 whether they constitute property of the
                                 issuing entity. If the bankruptcy court were
                                 to determine that the mortgage loans
                                 constitute property of the estate of the
                                 debtor, there could be delays in payments to
                                 certificateholders of collections on the
                                 mortgage loans and/or reductions in the
                                 amount of the payments paid to
                                 certificateholders. The mortgage loans would
                                 not constitute property of the estate of the
                                 depositor or of the sponsor if the transfer
                                 of the mortgage loans from the sponsor to
                                 the depositor and from the depositor to the
                                 issuing entity are treated as true sales,
                                 rather than pledges, of the mortgage loans.

                                 The transactions contemplated by this
                                 prospectus supplement and the related
                                 prospectus will be structured so that, if

there were to be a bankruptcy proceeding
with respect to the sponsor or the
depositor, the transfers described above
should be treated as true sales, and not as
pledges. The mortgage loans should
accordingly be treated as property of the
related issuing entity and not as part of
the bankruptcy estate of the depositor or
sponsor. In addition, the depositor is
operated in a manner that should make it
unlikely that it would become the subject of
a bankruptcy filing.

However, there can be no assurance that a
bankruptcy court would not recharacterize
the transfers described above as borrowings
of the depositor or sponsor secured by
pledges of the mortgage loans. Any request
by the debtor (or any of its creditors) for
such a recharacterization of these
transfers, if successful, could result in
delays in payments of collections on the
mortgage loans and/or reductions in the
amount of the payments paid to
certificateholders, which could result in
losses on the certificates. Even if a
request to recharacterize these transfers
were to be denied, delays in payments on the
mortgage loans and resulting delays or
losses on the certificates could result.

THE TRANSFER OF SERVICING        Although the transfer of servicing with
MAY RESULT IN HIGHER             respect to the mortgage loans to Avelo
DELINQUENCIES AND DEFAULTS       Mortgage, L.L.C. is scheduled to occur
WHICH MAY ADVERSELY AFFECT       before the closing date, all transfers of
THE YIELD ON YOUR CERTIFICATES   servicing involve the risk of disruption in
                                 collections due to data input errors,
                                 misapplied or misdirected payments, system
                                 incompatibilities, the requirement to notify
                                 the mortgagors about the servicing transfer,
                                 delays caused by the transfer of the related
                                 servicing mortgage files and records to the
                                 new servicer and other reasons. Servicing
                                 transfer issues of this sort may be
                                 aggravated with respect to the transfer of
                                 servicing of mortgage loans acquired from NC
                                 Capital Corporation due to recent
                                 developments affecting its parent, New

                                 S-32

<PAGE>

                                 Century Financial Corporation, as described
                                 above under "--RECENT DEVELOPMENTS REGARDING
                                 NEW CENTURY FINANCIAL CORPORATION". As a
                                 result of servicing transfers or any delays
                                 associated with the transfers, the rate of
                                 delinquencies and defaults on the related
                                 mortgage loans could increase at least for a
                                 period of time.

THE SPONSOR AND ITS
AFFILIATES MAY HAVE
CONFLICTS OF INTEREST

Recent developments in the subprime mortgage market have led to a deterioration in the financial performance of many subprime loan originators. See "--RECENTLY, THE SUBPRIME MORTGAGE LOAN MARKET HAS EXPERIENCED INCREASING LEVELS OF DELINQUENCIES AND DEFAULTS; INCREASED USE OF NEW MORTGAGE PRODUCTS BY BORROWERS MAY RESULT IN HIGHER LEVELS OF DELINQUENCIES AND LOSSES GENERALLY" above. Due to these developments affecting these subprime loan originators, certain conflicts of interest may exist or may arise as a result of transactions or relationships that the sponsor and its affiliates may have or may enter into in the future with one or more of the loan sellers.

In taking any actions or engaging in other transactions with those loan sellers, the sponsor and its affiliates are not required to take into account the effect of such actions or transactions on the issuing entity or the certificateholders. Among other things, the sponsor and its affiliates may purchase, as principal, loans originated or sold by such loan sellers that are not included in the issuing entity, and may seek to enforce against such loan sellers any remedies they may have if an early payment default or breach of representation and warranty occurs with respect to such other loans. The sponsor or its affiliates may provide secured or unsecured financing to one or more loan sellers, and may seek to enforce remedies against such loan seller if an event of default occurs in respect of that financing. The sponsor and its affiliates will not have any obligation to account to the issuing entity for any amounts they collect in respect of any loans, financing or other transactions they may have with any loan seller, and the sponsor and its affiliates will have no obligation to pursue any claims against such loan sellers on behalf of the issuing entity or with respect to loans included in the issuing entity.

EXTERNAL EVENTS MAY
INCREASE THE RISK OF LOSS
ON THE MORTGAGE LOANS

In response to previously executed and threatened terrorist attacks in the United States and foreign countries, the United States has initiated military operations and has placed a substantial number of armed forces reservists and members of the National Guard on active duty status. It is possible that the number of reservists and members of the National Guard placed on active duty status in the near future may increase. To the extent that a member of the military, or a member of the armed forces reserves or National Guard who are called to active duty, is a mortgagor of a mortgage loan in the issuing entity, the interest rate limitation of the Servicemembers Civil Relief Act and any comparable state law,

will apply. Substantially all of the mortgage loans have interest rates which exceed such limitation, if applicable. This may result in interest shortfalls on the mortgage loans, which, in turn will be allocated first to excess interest on the mortgage loans for the related distribution date and thereafter to reduce the accrued interest on the LIBOR certificates on a pro rata basis. None of the depositor, the sponsor, the underwriter, the original loan sellers, the servicer, the master servicer, the securities administrator, the trustee or any other person has taken any action to determine whether any of the mortgage loans would be affected by such interest rate limitation. See "LEGAL ASPECTS OF THE MORTGAGE LOANS--SERVICEMEMBERS CIVIL RELIEF ACT AND THE CALIFORNIA MILITARY AND VETERANS CODE" in the prospectus.

S-33

<PAGE>

THE CERTIFICATES ARE OBLIGATIONS OF THE ISSUING ENTITY ONLY

The certificates will not represent an interest in or obligation of the depositor, the sponsor, the underwriter, the original loan sellers, the servicer, the master servicer, the securities administrator, the trustee or any of their respective affiliates. Neither the certificates nor the underlying mortgage loans will be guaranteed or insured by any governmental agency or instrumentality or by the depositor, the sponsor, the underwriter, the original loan sellers, the servicer, the master servicer, the securities administrator, the trustee or any of their respective affiliates. Proceeds of the assets included in the issuing entity (including the interest rate swap agreement and the interest rate cap agreement) will be the sole source of payments on the offered certificates, and there will be no recourse to the depositor, the underwriter, the sponsor, the original loan sellers, the servicer, the master servicer, the securities administrator, the trustee or any other person in the event that such proceeds are insufficient or otherwise unavailable to make all payments provided for under the LIBOR certificates.

YOUR INVESTMENT MAY NOT BE LIQUID

The underwriter intends to make a secondary market in the offered certificates, but it will have no obligation to do so. We cannot assure you that such a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the certificates are likely to fluctuate; these

fluctuations may be significant and could
result in significant losses to you.

The secondary markets for asset-backed
securities have experienced periods of
illiquidity and can be expected to do so in
the future. Illiquidity means that there may
not be any purchasers for the certificates
you may purchase. Although any class of
certificates may experience illiquidity, it
is more likely that classes of certificates
that are more sensitive to prepayment,
credit or interest rate risk, or that have
been structured to meet the investment
requirements of limited categories of
investors, will experience illiquidity. You
should consider that illiquidity may also
result from legal or regulatory changes, or
from the adoption or change of accounting
rules, that affect some or all of the
classes of the certificates generally or
particular types of investors. Illiquidity
can have a severely adverse effect on the
prices of securities.

The offered certificates will not constitute
"mortgage related securities" for purposes
of the Secondary Mortgage Market Enhancement
Act of 1984, as amended. Accordingly, many
institutions that lack the legal authority
to invest in securities that do not
constitute "mortgage related securities"
will not be able to invest in the offered
certificates, thereby limiting the market
for those certificates. If your investment
activities are subject to legal investment
laws and regulations, regulatory capital
requirements, or review by regulatory
authorities, then you may be subject to
restrictions on investment in the offered
certificates. See "LEGAL INVESTMENT" in this
prospectus supplement and in the prospectus.

You should consult your own financial,
accounting, tax and legal advisors for
assistance in determining the suitability of
and consequences to you of the purchase,
ownership and sale of the offered
certificates.

S-34

<PAGE>

THE RATINGS ON YOUR            Each rating agency rating the offered
CERTIFICATES COULD BE          certificates may change or withdraw its
REDUCED OR WITHDRAWN           initial ratings at any time in the future
                               if, in its judgment, circumstances warrant a
                               change. No person is obligated to maintain
                               the ratings at their initial levels. If a
                               rating agency reduces or withdraws its
                               rating on one or more classes of the offered

certificates, the liquidity and market value of the affected certificates is likely to be reduced.

THE SERVICING FEE MAY BE INSUFFICIENT TO ENGAGE REPLACEMENT SERVICERS

To the extent that this prospectus supplement indicates that the fee payable to the servicer is based on a fee rate that is a percentage of the outstanding mortgage loan balances, no assurance can be made that such fee rate in the future will be sufficient to attract replacement servicers to accept an appointment. In addition, to the extent the mortgage pool of any series has amortized significantly at the time that a replacement servicer is sought, the aggregate fee that would be payable to any such replacement may not be sufficient to attract a replacement to accept an appointment.

THE OFFERED CERTIFICATES MAY NOT BE SUITABLE INVESTMENTS

The offered certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The offered certificates are complex investments that should be considered only by investors who, either alone or with their financial, accounting, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

RISKS RELATED TO THE CLASS R, CLASS RC AND CLASS RX CERTIFICATES

The holders of the residual certificates must include the taxable income or loss of the related REMIC or REMICs in determining their federal taxable income. Prospective investors are cautioned that the residual certificateholders' REMIC taxable income and the tax liability associated with the residual certificates may be substantial during certain periods, in which event the holders of the residual certificates must have sufficient sources of funds to pay such tax liability. Other than an initial distribution on the first distribution date, it is not anticipated that the residual certificateholders will receive distributions from the issuing entity. Furthermore, it is anticipated that all or a substantial portion of the taxable income of the related REMIC includible by the holders of the residual certificates will be treated as "excess inclusion" income, resulting in (i) the inability of those holders to use net operating losses to offset such income, (ii) the treatment of such income as "unrelated business taxable income" to certain holders who are otherwise tax exempt and (iii) the treatment of such income as subject to 30% withholding tax to certain non-U.S. investors, with no exemption or treaty reduction.

Under the provisions of the Internal Revenue

Code of 1986 relating to REMICs, it is
likely that the residual certificates will
be considered to be "non-economic residual
interests," with the result that transfers
of them would be disregarded for federal
income tax purposes if any significant
purpose of the transferor was to impede the
assessment or collection of tax.
Accordingly, the transferee affidavit used
for transfers of the residual certificates
will require the transferee to affirm that
it (i) historically has paid its debts as
they have come due and intends to do so in
the future, (ii) understands that it may
incur tax liabilities with respect to the
residual certificates in excess of cash
flows generated by them, (iii) intends to
pay

S-35

<PAGE>

taxes associated with holding the residual
certificates as such taxes become due, (iv)
will not cause the income from the residual
certificates to be attributable to a foreign
permanent establishment or fixed base,
within the meaning of an applicable income
tax treaty, of the transferee or any other
U.S. person and (v) will not transfer the
residual certificates to any person or
entity that does not provide a similar
affidavit.

The transferor must certify in writing to
the securities administrator that, as of the
date of transfer, it had no knowledge or
reason to know that the affirmations made by
the transferee pursuant to the preceding
sentence were false. In addition, Treasury
regulations provide alternatives for either
paying the transferee of the residual
certificates a formula specified minimum
price or transferring the residual
certificates to an eligible corporation
under certain conditions in order to meet
the safe harbor against the possible
disregard of such transfer.

Finally, residual certificates generally may
not be transferred to a person who is not a
U.S. person unless the income on those
residual certificates is effectively
connected with the conduct of a U.S. trade
or business and the transferee furnishes the
transferor and the securities administrator
with an effective Internal Revenue Service
Form W-8ECI. See "DESCRIPTION OF THE
CERTIFICATES--RESTRICTIONS ON TRANSFER OF
THE RESIDUAL CERTIFICATES" in this

prospectus supplement and "FEDERAL INCOME TAX CONSEQUENCES--TAX TREATMENT OF REMIC RESIDUAL INTERESTS--NON-RECOGNITION OF CERTAIN TRANSFERS FOR FEDERAL INCOME TAX PURPOSES" in the prospectus.

An individual, trust or estate that holds residual certificates (whether the residual certificates are held directly or indirectly through certain pass-through entities) also may have additional gross income with respect to such residual certificates but may be subject to limitations or disallowance of deductions for servicing fees on the loans and other administrative expenses properly allocable to such residual certificates in computing such holder's regular tax liability, and may not be able to deduct such fees or expenses to any extent in computing such holder's alternative minimum tax liability. The pooling and servicing agreement will require that any such gross income and such fees and expenses will be allocable to holders of the residual certificates in proportion to their respective ownership interests. See "FEDERAL INCOME TAX CONSEQUENCES--TAX TREATMENT OF REMIC RESIDUAL INTERESTS" and "--SPECIAL CONSIDERATIONS FOR CERTAIN TYPES OF INVESTORS--INDIVIDUALS AND PASS-THROUGH ENTITIES" in the prospectus. In addition, some portion of a purchaser's basis, if any, in residual certificates may not be recovered until termination of the issuing entity. Furthermore, Treasury regulations have been issued concerning the federal income tax consequences of any consideration paid to a transferee on a transfer of residual certificates. Any transferee of residual certificates receiving such consideration should consult its tax advisors regarding these regulations. See "FEDERAL INCOME TAX CONSEQUENCES--SPECIAL CONSIDERATIONS FOR CERTAIN TYPES OF INVESTORS--DISPOSITION OF RESIDUAL CERTIFICATES" in the prospectus.

Due to the special tax treatment of residual interests, the effective after-tax return of the residual certificates may be significantly lower than would be the case if the residual certificates were taxed as debt instruments and could be negative.

S-36

<PAGE>

THE RECORDING OF THE MORTGAGES IN THE NAME OF MERS MAY AFFECT THE YIELD ON THE CERTIFICATES

The mortgages or assignments of mortgage for some of the mortgage loans have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, including the

issuing entity. Subsequent assignments of
those mortgages are registered
electronically through the MERS system.
However, if MERS discontinues the MERS
system and it becomes necessary to record an
assignment of mortgage to the trustee, any
related expenses will be paid by the issuing
entity and will reduce the amount available
to make distributions on the certificates.

The recording of mortgages in the name of
MERS is a relatively new practice in the
mortgage lending industry. Public recording
officers and others may have limited, if
any, experience with lenders seeking to
foreclose mortgages, assignments of which
are registered with MERS. Accordingly,
delays and additional costs in commencing,
prosecuting and completing foreclosure
proceedings and conducting foreclosure sales
of the mortgaged properties could result.
Those delays and the additional costs could
in turn delay the distribution of
liquidation proceeds to certificateholders
and increase the amount of losses on the
mortgage loans. In that regard, a Florida
court has ruled that MERS lacked standing to
pursue foreclosure proceedings on behalf of
the beneficial owners of several mortgage
notes who were not named parties to the
proceedings.

S-37

<PAGE>

THE MORTGAGE LOAN POOL

    The statistical information presented in this prospectus supplement
concerning the mortgage loans is based on the scheduled principal balances of
the mortgage loans as of the statistical calculation date, which is February 1,
2007. The mortgage loan principal balances that are transferred to the issuing
entity will be the scheduled principal balances as of the cut-off date, March 1,
2007. With respect to the mortgage loan pool, some scheduled principal
amortization will occur, and some unscheduled principal amortization may occur
from the statistical calculation date to the cut-off date and from the cut-off
date to the closing date. Moreover, certain mortgage loans included in the
mortgage loan pool as of the statistical calculation date may not be included in
the final mortgage loan pool because they may prepay in full prior to the
cut-off date, or they may be determined not to meet the eligibility requirements
for the final mortgage loan pool. In addition, certain other mortgage loans may
be included in the final mortgage loan pool. As a result of the foregoing, the
statistical distribution of characteristics as of the cut-off date and as of the
closing date for the final mortgage loan pool may vary somewhat from the
statistical distribution of such characteristics as of the statistical
calculation date as presented in this prospectus supplement, although such
variance should not be material. In addition, the final mortgage loan pool may
vary plus or minus 10% from the statistical calculation pool of mortgage loans
described in this prospectus supplement.

GENERAL

The issuing entity will primarily consist of approximately 5,030 conventional, subprime, adjustable- and fixed-rate, first-lien and second-lien residential mortgage loans with original terms to maturity from their first scheduled payment due date of not more than 40 years, having an aggregate scheduled principal balance of approximately $998,091,543. Approximately 71.91% of mortgage loans in the issuing entity (the "NEW CENTURY MORTGAGE LOANS") were acquired by the sponsor from NC Capital Corporation ("NC Capital"), approximately 12.12% of mortgage loans in the issuing entity (the "AEGIS MORTGAGE LOANS") were acquired by the sponsor from Aegis Mortgage Corporation ("AEGIS"), approximately 11.06% of mortgage loans in the issuing entity (the "SOUTHSTAR MORTGAGE LOANS") were acquired by the sponsor from SouthStar Funding, LLC ("SOUTHSTAR"), approximately 3.20% of mortgage loans in the issuing entity (the "BULK MORTGAGE LOANS") were acquired by the sponsor from various loan sellers that each individually sold mortgage loans comprising less than 5% of the total mortgage loans in the issuing entity and approximately 1.71% of mortgage loans in the issuing entity (the "CONDUIT MORTGAGE LOANS") were acquired by the sponsor from various loan sellers via the Goldman Sachs Mortgage Conduit Program.

The mortgage loans were originated or acquired generally in accordance with the underwriting guidelines of the original loan sellers, or in the sponsor's underwriting guidelines in the case of the conduit mortgage loans. See "--NEW CENTURY" below for a summary of the underwriting guidelines for NC Capital, whose mortgage loans represent 20% or more of the mortgage loans as of the cut-off date. In general, because these underwriting guidelines, and the underwriting guidelines pursuant to which the other mortgage loans were originated, do not conform to Fannie Mae or Freddie Mac guidelines, the mortgage loans are likely to experience higher rates of delinquency, foreclosure and bankruptcy than if they had been underwritten in accordance with Fannie Mae or Freddie Mac guidelines.

Approximately 26.53% of the mortgage loans in the issuing entity are fixed-rate mortgage loans and approximately 73.47% are adjustable-rate mortgage loans, as described in more detail under "--ADJUSTABLE-RATE MORTGAGE LOANS" below. As of the statistical calculation date, approximately 99.66% of the mortgage loans have scheduled monthly payment due dates on the first day of the month, and approximately 0.34% of the mortgage loans have scheduled month payment due dates on a different day of the month, from the 5th to the 27th day of the month. Interest on the mortgage loans accrues on the basis of a 360-day year consisting of twelve 30-day months.

All of the mortgage loans are secured by first or second mortgages, deeds of trust or similar security instruments creating first- or second-liens, on residential properties consisting of one- to four-family

S-38

<PAGE>

dwelling units, individual condominium units, townhouses and individual units in planned unit developments.

Pursuant to its terms, each mortgage loan, other than a loan secured by a condominium unit, is required to be covered by a standard hazard insurance policy in an amount equal to the lower of the unpaid principal amount of that mortgage loan or the replacement value of the improvements on the related mortgaged property.

Generally, a condominium association is responsible for maintaining hazard insurance covering the entire building.

The "COMBINED ORIGINAL LOAN-TO-VALUE RATIO" or "CLTV" of a second lien

mortgage loan at any time is generally, unless otherwise provided in the applicable underwriting guidelines, the ratio of (a) the sum of (i) the principal balance of the related first lien mortgage loan, and (ii) the original principal balance of the second lien mortgage loan to (b) the lesser of (i) the appraised value of the mortgaged property at the time the second lien mortgage loan is originated, or (ii) the sales price of the mortgaged property at the time of origination. However, in the case of a refinanced mortgage loan, the value is based solely upon the appraisal made at the time of origination of that refinanced mortgage loan.

Approximately 53.75% of the mortgage loans are fully amortizing, and approximately 46.25% of the mortgage loans are balloon mortgage loans.

<center>S-39</center>

<PAGE>

THE MORTGAGE LOANS

The pool of mortgage loans has the following approximate aggregate characteristics as of the statistical calculation date:(1)

<TABLE>
<CAPTION>

| MORTGAGE LOANS IN THE AGGREGATE | GROUP I MORTGAGE LOANS | GROUP II MORTGAGE LOANS |
|---|---|---|
| <S> | <C> | <C> |
| <C> | | |
| Aggregate Scheduled Principal Balance: $998,091,543 | $507,040,906 | $491,050,636 |
| Number of Mortgage Loans: 5,030 | 2,842 | 2,188 |
| Average Scheduled Principal Balance: $198,428 | $178,410 | $224,429 |
| Weighted Average Gross Interest Rate: 8.152% | 8.223% | 8.077% |
| Weighted Average Net Interest Rate:(2) 7.642% | 7.713% | 7.567% |
| Weighted Average Original FICO Score: 622 | 613 | 631 |
| Weighted Average Combined Original LTV Ratio:(3) 81.38% | 81.86% | 80.89% |
| Weighted Average Combined Original LTV Ratio with Silent Seconds:(3) 85.76% | 84.60% | 86.96% |
| Weighted Average Stated Remaining Term (months): 358 | 358 | 359 |
| Weighted Average Seasoning (months): 1 | 1 | 1 |
| Weighted Average Months to Roll:(4) 26 | 26 | 25 |
| Weighted Average Gross Margin:(4) 6.055% | 6.096% | 6.014% |
| Weighted Average Initial Rate Cap:(4) 2.113% | 2.121% | 2.104% |
| Weighted Average Periodic Rate Cap:(4) 1.366% | 1.376% | 1.356% |
| Weighted Average Gross Maximum Lifetime Rate:(4) | 15.071% | 14.729% |

14.901%
| | | |
|---|---|---|
| Percentage of Mortgage Loans with Silent Seconds:(5) | 11.57% | 25.57% |

18.46%
| | | |
|---|---|---|
| Non-Zero Weighted Average Debt to Income Ratio at Origination: | 41.79% | 42.04% |

41.91%
| | | |
|---|---|---|
| Percentage of Mortgage Loans with Mortgage Insurance: | 0.00% | 0.00% |

0.00%
</TABLE>

----------------------------------------
(1) All percentages calculated in this table are based on scheduled principal
    balances, unless otherwise noted, as of the statistical calculation date
    and are subject to a variance of +/-10%.
(2) The weighted average net interest rate is equal to the weighted average
    gross interest rate less the servicing and master servicing fee rates.
(3) With respect to the second lien mortgage loans, the combined original LTV
    ratio reflects the ratio of the sum of the original principal balance of
    the second lien mortgage loans, plus the original principal balance of the
    related first lien mortgage loan to the original value of the related
    mortgaged property. The combined original LTV ratio with silent seconds
    reflects the ratio of the sum of the original principal balance of the
    second lien mortgage loans, including any second lien mortgage loan not
    included in the mortgage loan pool that is secured by the related mortgaged
    property and originated in connection with the origination of the first
    lien mortgage loan, plus the original principal balance of the related
    first lien mortgage loan, to the original value of the related mortgaged
    property.
(4) Represents the weighted average of the adjustable-rate mortgage loans in
    the mortgage loan pool.
(5) Represents percentage of mortgage loans in the mortgage loan pool as to
    which a second lien mortgage loan secured by the related mortgaged property
    was originated in connection with the origination of the first lien
    mortgage loan and the second lien mortgage loan is not included in the
    mortgage loan pool.

    The scheduled principal balances of the mortgage loans range from
approximately $15,409 to approximately $1,148,000. The mortgage loans had an
average scheduled principal balance of approximately $198,428.

    The weighted average combined original loan-to-value ratio of the mortgage
loans is approximately 81.38% and approximately 46.02% of the mortgage loans
have combined original loan-to-value ratios exceeding 80.00%.

    Approximately 96.48% of the mortgage loans are secured by first liens, and
approximately 3.52% of the mortgage loans are secured by second liens.

    Approximately 19.55% of the mortgage loans are interest-only for a period
of time.

    No more than approximately 0.38% of the mortgage loans are secured by
mortgaged properties located in any one zip-code area.

    None of the mortgage loans imposes a Prepayment Premium for a term in
excess of three years.

    As of the cut-off date, none of the mortgage loans are Delinquent. A
mortgage loan will be considered past due, or "DELINQUENT," if the payment due
on the related contractual payment date is not received by the immediately
succeeding contractual payment date.

    As of the cut-off date, 1.48% of the mortgage loans have been one payment
past due one time during the twelve months preceding the cut-off date. As of the
cut-off date, 0.24% of the mortgage loans have been one payment past due two
times during the twelve months preceding the cut-off date. As of the cut-off
date, 0.04% of the mortgage loans have been one payment past due three times

during the twelve months preceding the cut-off date. As of the cut-off date, no mortgage loan has been one payment past due more than three times during the twelve months preceding the cut-off date.

<div align="center">S-40</div>

<PAGE>

As of the cut-off date, 0.17% of the mortgage loans have been two payments past due one time during the twelve months preceding the cut-off date. As of the cut-off date, 0.05% of the mortgage loans have been two payments past due two times during the twelve months preceding the cut-off date. As of the cut-off date, no mortgage loan has been two payments past due more than two times during the twelve months preceding the cut-off date.

As of the cut-off date, 0.08% of the mortgage loans have been three or more payments past due during the twelve months preceding the cut-off date.

The tables on Schedule A set forth certain statistical information with respect to the aggregate mortgage loan pool. Due to rounding, the percentages shown may not precisely total 100.00%.

<div align="center">S-41</div>

<PAGE>

THE GROUP I MORTGAGE LOANS

The group I mortgage loans have the following approximate aggregate characteristics as of the statistical calculation date:(1)

<TABLE>
<CAPTION>

| GROUP I FIXED-RATE MORTGAGE LOANS | GROUP I MORTGAGE LOANS IN THE AGGREGATE | GROUP I ARM MORTGAGE LOANS |
|---|---|---|
| <S> <C> | <C> | <C> |
| Aggregate Scheduled Principal Balance: $138,285,500 | $507,040,906 | $368,755,407 |
| Number of Mortgage Loans: 975 | 2,842 | 1,867 |
| Average Scheduled Principal Balance: $141,831 | $178,410 | $197,512 |
| Weighted Average Gross Interest Rate: 7.977% | 8.223% | 8.316% |
| Weighted Average Net Interest Rate:(2) 7.467% | 7.713% | 7.806% |
| Weighted Average Original FICO Score: 627 | 613 | 608 |
| Weighted Average Combined Original LTV Ratio:(3) 79.99% | 81.86% | 82.56% |
| Weighted Average Combined Original LTV Ratio with Silent Seconds: (3) 81.47% | 84.60% | 85.78% |

| | | |
|---|---|---|
| Weighted Average Stated Remaining Term (months): 353 | 358 | 360 |
| Weighted Average Seasoning (months): 1 | 1 | 1 |
| Weighted Average Months to Roll:(4) N/A | 26 | 26 |
| Weighted Average Gross Margin:(4) N/A | 6.096% | 6.096% |
| Weighted Average Initial Rate Cap:(4) N/A | 2.121% | 2.121% |
| Weighted Average Periodic Rate Cap:(4) N/A | 1.376% | 1.376% |
| Weighted Average Gross Maximum Lifetime Rate:(4) N/A | 15.071% | 15.071% |
| Percentage of Mortgage Loans with Silent Seconds:(5) 6.34% | 11.57% | 13.53% |
| Non-Zero Weighted Average Debt to Income Ratio at Origination: 40.90% | 41.79% | 42.12% |
| Percentage of Mortgage Loans with Mortgage Insurance: 0.00% | 0.00% | 0.00% |

</TABLE>

----------------------------------------

(1)  All percentages calculated in this table are based on scheduled principal
     balances, unless otherwise noted, as of the statistical calculation date
     and are subject to a variance of +/-10%.
(2)  The weighted average net interest rate is equal to the weighted average
     gross interest rate less the servicing and master servicing fee rates.
(3)  With respect to the second lien mortgage loans, the combined original LTV
     ratio reflects the ratio of the sum of the original principal balance of
     the second lien mortgage loans, plus the original principal balance of the
     related first lien mortgage loan to the original value of the related
     mortgaged property. The combined original LTV ratio with silent seconds
     reflects the ratio of the sum of the original principal balance of the
     second lien mortgage loans, including any second lien mortgage loan not
     included in the mortgage loan pool that is secured by the related mortgaged
     property and originated in connection with the origination of the first
     lien mortgage loan, plus the original principal balance of the related
     first lien mortgage loan, to the original value of the related mortgaged
     property.
(4)  Represents the weighted average of the adjustable-rate mortgage loans in
     the mortgage loan pool.
(5)  Represents percentage of mortgage loans in the mortgage loan pool as to
     which a second lien mortgage loan secured by the related mortgaged property
     was originated in connection with the origination of the first lien
     mortgage loan and the second lien mortgage loan is not included in the
     mortgage loan pool.

     The scheduled principal balances of the group I mortgage loans range from
approximately $15,409 to approximately $712,500. The group I mortgage loans had
an average scheduled principal balance of approximately $178,410.

     The weighted average combined original loan-to-value ratio of the group I
mortgage loans is approximately 81.86% and approximately 53.97% of the group I
mortgage loans have combined original loan-to-value ratios exceeding 80.00%.

     Approximately 98.42% of the group I mortgage loans are secured by first
liens, and approximately 1.58% of the group I mortgage loans are secured by
second liens.

     Approximately 14.60% of the group I mortgage loans are interest-only for a
period of time.

     No more than approximately 0.35% of the group I mortgage loans are secured
by mortgaged properties located in any one zip-code area.

None of the group I mortgage loans imposes a Prepayment Premium for a term in excess of three years.

As of the cut-off date, none of the group I mortgage loans are Delinquent.

As of the cut-off date, 0.19% of the group I mortgage loans have been one payment past due one time during the twelve months preceding the cut-off date. As of the cut-off date, 0.08% of the group I mortgage loans have been one payment past due two times during the twelve months preceding the cut-off date. As of the cut-off date, no group I mortgage loans have been one payment past due more than two times during the twelve months preceding the cut-off date.

S-42

<PAGE>

As of the cut-off date, 0.05% of the group I mortgage loans have been two payments past due one time during the twelve months preceding the cut-off date. As of the cut-off date, no group I mortgage loan has been two payments past due more than two times during the twelve months preceding the cut-off date.

As of the cut-off date, no group I mortgage loan has been three or more payments past due during the twelve months preceding the cut-off date.

The tables on Schedule A set forth certain statistical information with respect to the group I mortgage loans. Due to rounding, the percentages shown may not precisely total 100.00%.

S-43

<PAGE>

THE GROUP II MORTGAGE LOANS

The group II mortgage loans have the following approximate aggregate characteristics as of the statistical calculation date:(1)

<TABLE>
<CAPTION>

| GROUP II FIXED-RATE MORTGAGE LOANS | GROUP II MORTGAGE LOANS IN THE AGGREGATE | GROUP II ARM MORTGAGE LOANS |
|---|---|---|
| -------------- | ---------------- | -------------- |
| <S> <C> | <C> | <C> |
| Aggregate Scheduled Principal Balance: $126,466,730 | $491,050,636 | $364,583,906 |
| Number of Mortgage Loans: 916 | 2,188 | 1,272 |
| Average Scheduled Principal Balance: $138,064 | $224,429 | $286,623 |
| Weighted Average Gross Interest Rate: 8.265% | 8.077% | 8.013% |
| Weighted Average Net Interest Rate:(2) | 7.567% | 7.503% |

```
7.755%
Weighted Average Original FICO Score:                            631             627
644
Weighted Average Combined Original LTV Ratio:(3)              80.89%          81.29%
79.75%
Weighted Average Combined Original LTV Ratio with Silent
  Seconds:(3)                                                86.96%          88.67%
82.03%
Weighted Average Stated Remaining Term (months):                359             360
355
Weighted Average Seasoning (months):                              1               1
1
Weighted Average Months to Roll:(4)                              25              25
N/A
Weighted Average Gross Margin:(4)                            6.014%          6.014%
N/A
Weighted Average Initial Rate Cap:(4)                        2.104%          2.104%
N/A
Weighted Average Periodic Rate Cap:(4)                       1.356%          1.356%
N/A
Weighted Average Gross Maximum Lifetime Rate:(4)            14.729%         14.729%
N/A
Percentage of Mortgage Loans with Silent Seconds:(5)         25.57%          31.28%
9.11%
Non-Zero Weighted Average Debt to Income Ratio at
Origination:                                                 42.04%          42.25%
41.45%
Percentage of Mortgage Loans with Mortgage Insurance:         0.00%           0.00%
0.00%
</TABLE>

---------------------------------------

(1)  All percentages calculated in this table are based on scheduled principal
     balances, unless otherwise noted, as of the statistical calculation date
     and are subject to a variance of +/-10%.
(2)  The weighted average net interest rate is equal to the weighted average
     gross interest rate less the servicing and master servicing fee rates.
(3)  With respect to the second lien mortgage loans, the combined original LTV
     ratio reflects the ratio of the sum of the original principal balance of
     the second lien mortgage loans, plus the original principal balance of the
     related first lien mortgage loan to the original value of the related
     mortgaged property. The combined original LTV ratio with silent seconds
     reflects the ratio of the sum of the original principal balance of the
     second lien mortgage loans, including any second lien mortgage loan not
     included in the mortgage loan pool that is secured by the related mortgaged
     property and originated in connection with the origination of the first
     lien mortgage loan, plus the original principal balance of the related
     first lien mortgage loan, to the original value of the related mortgaged
     property.
(4)  Represents the weighted average of the adjustable-rate mortgage loans in
     the mortgage loan pool.
(5)  Represents percentage of mortgage loans in the mortgage loan pool as to
     which a second lien mortgage loan secured by the related mortgaged property
     was originated in connection with the origination of the first lien
     mortgage loan and the second lien mortgage loan is not included in the
     mortgage loan pool.


     The scheduled principal balances of the group II mortgage loans range from
approximately $17,984 to approximately $1,148,000. The group II mortgage
loans had an average scheduled principal balance of approximately $224,429.


     The weighted average combined original loan-to-value ratio of the group II
mortgage loans is approximately 80.89% and approximately 37.81% of the group II
mortgage loans have combined original loan-to-value ratios exceeding 80.00%.
```

Approximately 94.49% of the group II mortgage loans are secured by first liens, and approximately 5.51% of the group II mortgage loans are secured by second liens.

Approximately 24.66% of the group II mortgage loans are interest-only for a period of time.

No more than approximately 0.51% of the group II mortgage loans are secured by mortgaged properties located in any one zip code area.

None of the group II mortgage loans imposes a Prepayment Premium for a term in excess of three years.

As of the cut-off date, none of the group II mortgage loans are Delinquent.

As of the cut-off date, 2.78% of the group II mortgage loans have been one payment past due one time during the twelve months preceding the cut-off date. As of the cut-off date, 0.40% of the group II mortgage loans have been one payment past due two times during the twelve months preceding the cut-off date. As of the cut-off date, 0.09% of the group II mortgage loans have been three payments past due time during the twelve months preceding the cut-off date. As of the cut-off date, no group II mortgage

S-44

<PAGE>

loan has been one payment past due more than three times during the twelve months preceding the cut-off date.

As of the cut-off date, 0.29% of the group II mortgage loans have been two payments past due one time during the twelve months preceding the cut-off date. As of the cut-off date, 0.10% of the group II mortgage loans have been two payments past due two times during the twelve months preceding the cut-off date. As of the cut-off date, no group II mortgage loan has been two payments past due more than two times during the twelve months preceding the cut-off date.

As of the cut-off date, 0.17% of the group II mortgage loan has been three or more payments past due during the twelve months preceding the cut-off date.

The tables on Schedule A set forth certain statistical information with respect to the group II mortgage loans. Due to rounding, the percentages shown may not precisely total 100.00%.

PREPAYMENT PREMIUMS

Approximately 74.95% of the mortgage loans provide for payment by the borrower of a prepayment premium (each, a "PREPAYMENT PREMIUM") in connection with certain voluntary, full or partial prepayments of principal. Generally, each such mortgage loan provides for payment of a Prepayment Premium in connection with certain voluntary full or partial prepayments made within the period of time specified in the related mortgage note, ranging from one year to three years from the date of origination of such mortgage loan, or the penalty period, as described in this prospectus supplement. The amount of the applicable Prepayment Premium, to the extent permitted under applicable federal or state law, is as provided in the related mortgage note. No mortgage loan imposes a Prepayment Premium for a term in excess of three years. Prepayment Premiums collected from borrowers will be paid to the holders of the Class P certificates and will not be available for payment to the LIBOR certificates.

The servicer may waive, in whole or in part, a Prepayment Premium only

under the following circumstances: (i) such waiver relates to a default or a
reasonably foreseeable default and would, in the reasonable judgment of the
servicer, maximize recovery of total proceeds taking into account the value of
such Prepayment Premium and the related mortgage loan, (ii) collection of such
Prepayment Premium is limited by or not permitted to be collected by applicable
federal, state or local law or regulation, (iii) the collection of the
Prepayment Premium would be considered "predatory" pursuant to written guidance
published or issued by any applicable federal, state or local regulatory
authority acting in its official capacity and having jurisdiction over such
matters, (iv) the enforceability of such Prepayment Premium is limited (1) by
bankruptcy, insolvency, moratorium, receivership or other similar laws relating
to creditors' rights generally or (2) due to acceleration in connection with a
foreclosure or other involuntary payment or (v) if the servicer has not been
provided with information sufficient to enable it to collect the Prepayment
Premium. However, with respect to any group I mortgage loan, the servicer will
be required to waive such Prepayment Premium if the mortgage loan is accelerated
or paid-off in connection with the workout of a Delinquent mortgage loan or due
to the related mortgagor's default, notwithstanding that the terms of the
mortgage loan or federal or state law might permit the imposition of such
Prepayment Premium.

ADJUSTABLE-RATE MORTGAGE LOANS

     All of the adjustable-rate mortgage loans provide for semi-annual
adjustment of the related interest rate based on the six-month LIBOR loan index
(as described below under "--THE INDEX") as specified in the related mortgage
note, and for corresponding adjustments to the monthly payment amount, in each
case on each applicable adjustment date (each such date, an "ADJUSTMENT DATE").
The first such adjustment for approximately 83.58% of the adjustable-rate
mortgage loans will occur after an initial period of approximately two years
following origination; in the case of approximately 14.99% of the
adjustable-rate mortgage loans, three years following origination and in the
case of approximately 1.43% of the adjustable-rate mortgage loans, five years
following origination.

     On each Adjustment Date for an adjustable-rate mortgage loan, the interest
rate will be adjusted to equal the sum, rounded generally to the nearest
multiple of 1/8% of the index and a fixed percentage amount (the "GROSS
MARGIN"). However, the interest rate on each such mortgage loan will not
increase or

                                      S-45

<PAGE>

decrease by more than a fixed percentage as specified in the related mortgage
note (the "PERIODIC CAP") on any related Adjustment Date, except in the case of
the first Adjustment Date, and will not exceed a specified maximum interest rate
over the life of the adjustable-rate mortgage loan (the "MAXIMUM RATE") or be
less than a specified minimum interest rate over the life of the adjustable-rate
mortgage loan (the "MINIMUM RATE"). The Periodic Caps for the adjustable-rate
mortgage loans are:

     o    2.000% for approximately 0.09% of the adjustable-rate mortgage loans;

     o    1.500% for approximately 73.02% of the adjustable-rate mortgage loans;
          and

     o    1.000% for approximately 26.88% of the adjustable-rate mortgage loans.

     The interest rate generally will not increase or decrease on the first
Adjustment Date by more than a fixed percentage specified in the related

mortgage note (the "INITIAL CAP"). The Initial Caps for all of the
adjustable-rate mortgage loans are:

    o   3.500% for approximately 0.05% of the adjustable-rate mortgage loans;

    o   3.200% for approximately 0.02% of the adjustable-rate mortgage loans;

    o   3.000% for approximately 11.49% of the adjustable-rate mortgage loans;

    o   2.000% for approximately 88.12% of the adjustable-rate mortgage loans;
        and

    o   1.000% for approximately 0.33% of the adjustable-rate mortgage loans.

    Effective with the first monthly payment due on each adjustable-rate
mortgage loan (other than any adjustable-rate mortgage loans that are balloon
mortgage loans) after each related Adjustment Date, or, with respect to the
adjustable-rate interest-only mortgage loans, following the interest-only
period, the monthly payment amount will be adjusted to an amount that will
amortize fully the outstanding principal balance of the related adjustable-rate
mortgage loan over its remaining term, and pay interest at the interest rate as
so adjusted. Due to the application of the Initial Caps, Periodic Caps and
Maximum Rates, the interest rate on each such adjustable-rate mortgage loan, as
adjusted on any related Adjustment Date, may be less than the sum of the Index
and the related Gross Margin, rounded as described in this prospectus
supplement. See "--THE INDEX" below. The adjustable-rate mortgage loans
generally do not permit the related borrowers to convert their adjustable
interest rate to a fixed interest rate.

THE INDEX

    The Index used in determining the interest rates on all of the
adjustable-rate mortgage loans is the average of the interbank offered rates for
six month United States dollar deposits in the London market, calculated as
provided in the related mortgage note (the "SIX-MONTH LIBOR LOAN INDEX") and as
most recently available either as of (1) the first business day occurring in a
specified period of time prior to such Adjustment Date, (2) the first business
day of the month preceding the month of such Adjustment Date or (3) the last
business day of the second month preceding the month in which such Adjustment
Date occurs, as specified in the related mortgage note. In the event that the
Index becomes unavailable or otherwise unpublished, the servicer will select a
comparable alternative index over which it has no direct control and which is
readily verifiable.

NEW CENTURY

    The information set forth under this heading "--NEW CENTURY" has been
provided by NC Capital Corporation ("NC CAPITAL"). The information set forth
under the subheading "--UNDERWRITING GUIDELINES" below relates solely to the
mortgage loans acquired from NC Capital.

    GENERAL

    New Century Mortgage Corporation transferred the mortgage loans to its
affiliate, NC Capital, which, in turn, sold the mortgage loans to an affiliate
of the depositor. New Century Mortgage Corporation is a wholly-owned operating
subsidiary of New Century Financial Corporation ("NEW CENTURY"). Subject to

S-46

<PAGE>

the discussion under "--RECENT DEVELOPMENTS REGARDING NEW CENTURY" below, founded in 1995 and headquartered in Irvine, California, New Century is a real estate investment trust and one of the nation's premier full service mortgage finance companies, providing first and second mortgage products to borrowers nationwide. Subject to the discussion under "--RECENT DEVELOPMENTS REGARDING NEW CENTURY" below, New Century Financial Corporation offers a broad range of mortgage products designed to meet the needs of all borrowers.

Subject to the discussion under "--RECENT DEVELOPMENTS REGARDING NEW CENTURY" below, New Century Mortgage Corporation is a consumer finance and mortgage banking company that originates, purchases and sells first lien and second lien mortgage loans and other consumer loans. New Century Mortgage Corporation emphasizes the origination of mortgages loans that are commonly referred to as non-conforming "B&C" mortgage loans or subprime mortgage loans.

As of September 30, 2006, New Century Financial Corporation employed approximately 7,100 associates and originated loans through its wholesale network of more than 55,000 independent mortgage brokers through 33 regional processing centers operating in 19 states. Its retail network operates through 235 sales offices in 36 states. For the nine months ending September 30, 2006, New Century Financial Corporation originated $45.4 billion in mortgage loans.

The following table describes the size, composition and growth of New Century's total residential mortgage loan production over the periods indicated.

| | DECEMBER 31, 2003 | | DECEMBER 31, 2004 | | DECEMBER 31, 2005 | | SEPTEMBER 30, 2006 | |
| | TOTAL MORTGAGE LOAN | | TOTAL MORTGAGE LOAN | | TOTAL MORTGAGE LOAN | | TOTAL MORTGAGE LOAN | |
| | NUMBER | PRODUCTION ($) | NUMBER | PRODUCTION ($) | NUMBER | PRODUCTION ($) | NUMBER | PRODUCTION ($) |
|---|---|---|---|---|---|---|---|---|
| Residential Mortgage Loans.... | 164,373 | 27,382,838 | 242,877 | 42,199,640 | 310,389 | 56,108,241 | 245,839 | 45,443,272 |

RECENT DEVELOPMENTS REGARDING NEW CENTURY

Pursuant to a Form 8-K filed on February 7, 2007, New Century, the parent of NC Capital, announced that it would restate its consolidated financial statements for the quarters ended March 31, June 30 and September 30, 2006 to correct errors New Century discovered in the application of generally accepted accounting principles regarding its allowance for mortgage loan repurchase losses. Specifically, New Century announced that it did not include the expected discount upon disposition of such mortgage loans when estimating its allowance for loan repurchase losses. In addition, New Century stated that its methodology for estimating the volume of repurchase claims to be included in the repurchase calculation did not properly consider, in each of the first three quarters of 2006, the growing volume of repurchase claims outstanding that resulted from the increasing pace of repurchase requests that occurred in 2006. As a result of the foregoing, New Century announced that it expects that, once restated, its net earnings for each of the first three quarters of 2006 will be reduced.

Pursuant to a Form 12b-25 filed on March 2, 2007 (the "MARCH 2ND
ANNOUNCEMENT"), New Century stated that it had previously reported that it had
been served with a complaint for a purported securities class action and was
aware of nine additional purported class action lawsuits that had been filed
against it and certain of its officers and directors alleging certain violations
of federal securities laws.

According to the March 2nd Announcement, New Century stated that since that
time, it has become aware of four related derivative complaints against certain
of its directors and officers, making essentially the same allegations as the
federal securities cases relating to New Century's restatements. New Century
stated that it believes that the derivative cases have been or will be filed in
Orange County Superior Court, and that it anticipates that similar actions may
be filed in the future.

New Century also announced that it was delaying the filing of its Annual
Report on Form 10-K for the fiscal year ended December 31, 2006.

New Century announced that, although a full review is ongoing, it expects
that the modifications to the allowance for loan repurchase losses will result
in restated net income for the first three quarters of

                                      S-47


<PAGE>

2006 that is significantly lower than previously reported in New Century's 2006
interim financial statements.

In addition, New Century announced that although New Century's mortgage
loan origination volume increased in 2006 when compared to 2005, New Century's
results of operations for the quarter and year ended December 31, 2006 will
reflect declines in earnings and profitability when compared to the same periods
in 2005. New Century currently expects that it will report a pretax loss for
both the fourth quarter and the full year ended December 31, 2006.

According to the March 2nd Announcement, in the event New Century is unable
to obtain satisfactory amendments to and/or waivers of the covenants in its
financing arrangements from a sufficient number of its lenders, or obtain
alternative funding sources, New Century's auditor, KPMG, has informed New
Century's Audit Committee that its report on New Century's financial statements
will include an explanatory paragraph indicating that substantial doubt exists
as to New Century's ability to continue as a going concern.

Pursuant to a Form 8-K filed on March 8, 2007 by New Century, New Century
stated that as a result of its current constrained funding capacity, New Century
elected to cease accepting loan applications from prospective borrowers
effective immediately while it sought to obtain additional funding capacity.

Pursuant to a Form 8-K filed on March 13, 2007 (the "MARCH 13TH
ANNOUNCEMENT"), by New Century, New Century received a letter from the staff of
the Pacific Regional Office of the Securities Exchange Commission ("SEC") on
March 12, 2007, stating that the staff was conducting a preliminary
investigation involving New Century and requesting production of certain
documents. In addition, New Century stated that the staff of the SEC had also
previously requested a meeting with New Century to discuss the events leading up
to the announcement by New Century of the restatement of its financial
statements and New Century intends to comply with the SEC's request.

In addition, New Century stated in the March 13th Announcement that, on
February 28, 2007, New Century received a letter from the United States
Attorney's Office for the Central District of California ("U.S. ATTORNEY'S
OFFICE") indicating that it was conducting a criminal inquiry under the federal

securities laws in connection with trading in New Century's securities, as well
as accounting errors regarding New Century's allowance for repurchase losses.
New Century also stated that it has subsequently received a grand jury subpoena
requesting production of certain documents. New Century stated that it intends
to cooperate with the requests of the U.S. Attorney's Office.

    Pursuant to a Form 8-K/A filed on March 13, 2007 (the "MARCH 13TH FORM
8-K/A ANNOUNCEMENT") by New Century, New Century stated that as of March 9,
2007, all of New Century's lenders under its short-term repurchase agreements
and aggregation credit facilities had discontinued their financing with New
Century or had notified New Century of their intent to do so. It further stated
in the March 13th Form 8-K/A Announcement that New Century has received notices
from certain of its lenders asserting that New Century and/or its subsidiaries
have violated their respective obligations under certain of these financing
arrangements and that such violations amount to events of default. According to
the March 13th Form 8-K/A Announcement, certain of these lenders have further
advised New Century that they are accelerating New Century's obligation to
repurchase all outstanding mortgage loans financed under the applicable
agreements.

    Pursuant to a Form 8-K filed on March 14, 2007 (the "MARCH 14TH
ANNOUNCEMENT") by New Century, New Century stated that the staff of the New York
Stock Exchange ("NYSE") issued a press release, dated March 13, 2007, announcing
its determination that New Century's common stock is no longer suitable for
continued listing on the NYSE and will be suspended immediately. New Century
announced that the NYSE's press release cited New Century's recent disclosures
regarding its liquidity position, as well as New Century's prior announcement
regarding the need to restate certain of its historical financial statements, in
support of its determination that New Century's common stock and preferred stock
are no longer suitable for continued listing on the NYSE.

    In addition, New Century announced that the NYSE's press release also
stated that an application to the SEC to delist New Century's stock from the
NYSE is pending the completion of the applicable

                                    S-48


<PAGE>

procedures, including any appeal by New Century of the NYSE staff's decision.
New Century stated that it is reviewing the NYSE staff's decision and
accordingly has not yet determined whether it will appeal the staff's decision
to delist New Century's stock.

    According to the March 14th Announcement, New Century has been engaged in
recent ongoing discussions with its state regulators regarding New Century's
funding constraints and the impact on consumers who are in various stages of the
loan origination process with New Century. New Century stated that it has
advised these regulators that it has ceased accepting loan applications and that
as of March 14, 2007, New Century and its subsidiaries are unable to fund any
mortgage loans, including mortgage loans for those consumers who were already in
the loan origination process with New Century.

    According to the March 14th Announcement, on March 13, 2007, New Century
and certain of its subsidiaries received cease and desist orders from regulators
in the States of Massachusetts, New Hampshire, New Jersey and New York. New
Century stated that the cease and desist orders contain allegations that certain
of New Century's subsidiaries have engaged in violations of applicable state
law, including, among other things, failure to fund mortgage loans after a
mortgage closing, failure to meet certain financial requirements, including net
worth and available liquidity, and failure to timely notify the state regulators

of defaults and terminations under certain of its financing arrangements.

According to the March 14th Announcement, the cease and desist orders seek to restrain the New Century subsidiaries from taking certain actions, including, among other things, engaging in further violations of state law, taking new applications for mortgage loans in the relevant jurisdiction, and paying dividends or bonuses to officers, directors or shareholders of the applicable subsidiaries. In addition, the cease and desist orders also seek to cause the New Century subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the New Century subsidiaries, and the provision of regular information to the state regulators regarding the New Century subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state. Furthermore, certain of the cease and desist orders also require one or more of the New Century subsidiaries to show cause why their license should not be revoked or why administrative penalties should not be assessed.

According to the March 14th Announcement, the cease and desist orders generally become permanent if not promptly appealed by the applicable subsidiaries. New Century stated that it is reviewing these orders and accordingly has not yet determined whether it will appeal all or any portion of any of the orders. New Century announced that, subject to its funding limitations, it intends to comply with the orders pending any such appeal.

Pursuant to a Form 8-K filed on March 19, 2007 (the "MARCH 19TH ANNOUNCEMENT") by New Century, New Century stated that on March 14, 2007 and March 15, 2007, it received additional cease and desist orders from the States of Connecticut, Maryland, Rhode Island and Tennessee (collectively, the "MARCH 14-15 ORDERS"). New Century stated that the cease and desist orders contain allegations that certain of New Century's subsidiaries have engaged in violations of applicable state law, including, among other things, failure to fund mortgage loans after a mortgage closing. Additionally, New Century stated that on March 14, 2007, certain of New Century's subsidiaries, entered into a Consent Agreement and Order, dated March 14, 2007, with the Commonwealth of Pennsylvania Department of Banking, Bureau of Supervision and Enforcement (the "CONSENT AGREEMENT").

The March 19th Announcement indicated that the March 14-15 Orders and the Consent Agreement seek to restrain New Century's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of applicable state law and taking new applications for mortgage loans in the relevant jurisdiction. New Century stated that the March 14-15 Orders and the Consent Agreement also seek to cause the subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage

S-49

<PAGE>

loans in that state. According to New Century, certain of the March 14-15 Orders also seek to revoke the licenses of one or more of New Century's subsidiaries or assess administrative penalties.

According to the March 19th Announcement, the March 14-15 Orders generally become permanent if not promptly appealed by the applicable subsidiaries. New

Century and its subsidiaries are reviewing the March 14-15 Orders and accordingly have not yet determined whether they will appeal all or any portion of the March 14-15 Orders.

According to the March 19th Announcement, on March 14, 2007, in connection with a civil action filed against New Century and certain of its subsidiaries in an Ohio state court (the "OHIO COMPLAINT") by the Attorney General of Ohio and the Ohio Division of Commerce, Division of Financial Institutions, such Ohio state court issued a temporary restraining order, which was subsequently modified by the court on March 16, 2007, against New Century (as modified, the "OHIO TRO"). New Century stated that the Ohio Complaint and the Ohio TRO contain allegations that New Century has engaged in violations of applicable Ohio state law, including, among other things, failure to fund mortgage loans after closing. New Century stated that the Ohio TRO restrains New Century from taking certain actions, including, among other things, (i) engaging in violations of Ohio state law, (ii) soliciting applicants and taking new applications for mortgage loans in Ohio and (iii) initiating, prosecuting or enforcing foreclosure actions in Ohio. New Century announced that the Ohio TRO also requires New Century to confer with the Ohio Attorney General and Division of Commerce by March 22, 2007 regarding the treatment of Ohio loans that are more than 60 days delinquent and are held for sale. New Century stated that the restraints imposed by the Ohio TRO could further harm New Century's business. In addition, New Century announced that it is reviewing the Ohio Complaint and the Ohio TRO and accordingly has not yet determined whether it will appeal all or any portion of the Ohio TRO. Subject to its funding limitations, New Century stated that it intends to comply with the Ohio TRO pending any appeal.

Pursuant to a Form 8-K filed on March 20, 2007 (the "MARCH 20TH ANNOUNCEMENT") by New Century, New Century stated that it received a Notice of Breach and Termination of Mortgage Selling and Servicing Contract, dated March 14, 2007, from the Federal National Mortgage Association ("FANNIE MAE"). New Century stated that the Fannie Mae notice purports to terminate its mortgage selling and servicing contract (the "FANNIE MAE CONTRACT") with New Century Mortgage Corporation ("NCMC"), a subsidiary of New Century, for cause, based on alleged breaches of the Fannie Mae Contract as well as alleged breaches by NCMC under other contracts with Fannie Mae. New Century stated that as a result of the purported termination, New Century and its subsidiaries are no longer able to sell mortgage loans directly to Fannie Mae or act as the primary servicer of any mortgage loans for Fannie Mae.

In addition, according to the March 20th announcement, on March 16, 2007, New Century received additional cease and desist orders from the State of California (the "CALIFORNIA ORDERS") and certain of New Century's subsidiaries entered into consent agreements with the State of Florida's Office of Financial Regulation and the State of Washington's Department of Financial Institutions, respectively, each dated March 16, 2007 (the "MARCH 16 AGREEMENTS," and together with the California Orders, the "MARCH 16 ORDERS AND CONSENT AGREEMENTS").

According to the March 20th Announcement, consistent with certain other previous consent agreements, the March 16 Orders and Consent Agreements contain allegations that certain of New Century's subsidiaries have engaged in violations of state law, including, among other things, failure to fund mortgage loans after closing. New Century stated that consistent with certain other previous consent agreements, the March 16 Orders and Consent Agreements seek to restrain New Century's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction. New Century announced that the March 16 Orders and Consent Agreements also seek to cause the New Century subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold fees relating to pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the New Century subsidiaries, and the provision of regular information to the state regulators regarding the New Century subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in

that state. New Century stated that the California Orders become permanent if
not promptly appealed by the applicable

S-50

<PAGE>

subsidiaries. According to the March 20th Announcement, New Century and its
subsidiaries are reviewing the California Orders and accordingly have not yet
determined whether they will appeal all or any portion of the California Orders.

    Pursuant to a Form 8-K filed on March 22, 2007 (the "MARCH 22ND
ANNOUNCEMENT") by New Century, New Century announced that it had received
notices from Barclays Bank PLC ("BARCLAYS"), in which Barclays alleged that
certain events of default had occurred, as defined in that certain Master
Repurchase Agreement, dated as of March 31, 2006 (as amended to date), by and
among New Century, certain of New Century's subsidiaries, Barclays and Sheffield
Receivables Corporation (the "BARCLAYS AGREEMENT"), and purported to accelerate
to March 14, 2007 the obligation of New Century's subsidiaries to repurchase all
outstanding mortgage loans financed under the Barclays Agreement and to
terminate the Barclays Agreement as of that same date. New Century estimated
that the aggregate repurchase obligation (the outstanding mortgage loans
financed) of its subsidiaries under the Barclays Agreement was approximately
$0.9 billion as of March 12, 2007.

    According to the March 22nd Announcement, on March 16, 2007, the parties to
the Barclays Agreement entered into a letter agreement (the "BARCLAYS LETTER
AGREEMENT") pursuant to which Barclays and Sheffield Receivables Corporation
agreed to release New Century and its subsidiaries from its aggregate repurchase
obligation under the Barclays Agreement and New Century and its subsidiaries
agreed to release their rights to outstanding mortgage loans that had been
financed under the Barclays Agreement. New century stated that the effectiveness
of the releases in the Barclays Letter Agreement is subject to the satisfaction
of certain preconditions, including that (i) New Century and its subsidiaries
shall have made certain payments to Barclays, including forwarding to Barclays
all amounts received by New Century and its subsidiaries after March 1, 2007
with respect to the mortgage loans under the Barclays Agreement, and (ii) New
Century and its subsidiaries shall have taken certain actions to facilitate the
transfer of the servicing function with respect to the mortgage loans under the
Barclays Agreement to a third party appointed by Barclays. New Century stated
that as of March 22, 2007, New Century was still in the process of satisfying
these preconditions.

    According to the March 22nd Announcement, the Barclays Letter Agreement
provides that the outstanding mortgage loans financed under the Barclays
Agreement are being transferred to Barclays "as is", without any representations
or warranties by New Century or its subsidiaries, and without any holdback by
Barclays. New Century stated that New Century and its subsidiaries have agreed,
that if they enter into a settlement or release with any of New Century's other
lenders and any such release contains materially more favorable terms for the
benefit of any such lender than those in the Barclays Letter Agreement, then
Barclays will be entitled to such more favorable terms. According to the March
22nd Announcement, New Century stated that the Barclays Letter Agreement
provides that a release with another lender will not be deemed to have terms
that are materially more favorable to that lender from an economic standpoint if
the terms of such release do not provide for more to such lender than the amount
of the outstanding mortgage loans financed by such lender, plus accrued price
differential or interest and the transmittal of the principal portion of any
loan payments received. New Century stated that the continuing effectiveness of
the release by Barclays under the Barclays Letter Agreement is subject to New
Century's compliance with this provision. According to New Century, upon the
effectiveness of the releases contemplated by the Barclays Letter Agreement, the

aggregate repurchase obligation (the outstanding mortgage loans financed) of New
Century under its credit facilities will be reduced by approximately $0.9
billion and New Century will have realized a loss from this transaction of
approximately $46 million.

In addition, according to the March 22nd Announcement, New Century has
received cease and desist orders from several states and entered into consent
agreements with several states (the "PREVIOUS ORDERS AND CONSENT AGREEMENTS"),
and on March 20, 2007, certain of New Century's subsidiaries entered into a
consent agreement with the State of Maine's Office of Consumer Credit
Regulation, respectively (the "MARCH 20 CONSENT AGREEMENT").

According to the March 22nd Announcement, consistent with the Previous
Orders and Consent Agreements, the March 20 Consent Agreement contains
allegations that certain of New Century's subsidiaries have engaged in
violations of state law, including, among other things, failure to fund

<div align="center">S-51</div>

&lt;PAGE&gt;

mortgage loans after closing. Consistent with the Previous Orders and Consent
Agreements, the March 20 Consent Agreement seeks to restrain New Century's
subsidiaries from taking certain actions, including, among other things,
engaging in alleged violations of state law and taking new applications for
mortgage loans in the relevant jurisdiction. The March 20 Consent Agreement also
seeks to cause the New Century subsidiaries to affirmatively take certain
actions, including the creation of escrow accounts to hold fees relating to
pending mortgage applications, the transfer to other lenders of the outstanding
mortgage applications and unfunded mortgage loans held by the subsidiaries, and
the provision of regular information to the state regulators regarding the
subsidiaries' activities in the applicable state, including the status of all
outstanding mortgage applications and unfunded mortgage loans in that state.

Pursuant to a Form 8-K filed on March 28, 2007 (the "MARCH 28TH
ANNOUNCEMENT"), New Century stated that on March 26, 2007, New Century notified
the Federal Home Loan Mortgage Corp. ("FREDDIE MAC"), that it was voluntarily
terminating its eligibility with Freddie Mac. New Century stated that as a
result of this termination, New Century and its subsidiaries are no longer able
to sell mortgage loans directly to Freddie Mac or act as the primary servicer of
any mortgage loans for Freddie Mac.

According to the March 28th Announcement, several of New Century's lenders
have notified New Century of their intent to sell the outstanding mortgage loans
that have been financed by the respective lender and offset the proceeds from
such sale against the New Century's obligations to the lender, while reserving
their rights to seek recovery of any remaining deficiency from New Century. New
Century stated that it has notified these lenders of its concerns that any such
sale be conducted in an appropriate manner, in accordance with applicable law
and in accordance with the terms of the applicable financing agreement between
the parties.

According to the March 28th Announcement, on March 27, 2007, New Century
announced that it had signed consent agreements with the State of Idaho's
Department of Finance, the State of Iowa's Superintendent of Banking, the State
of Michigan's Office of Financial and Insurance Services and the State of
Wyoming's Banking Commissioner (the "MARCH 27TH CONSENT AGREEMENTS"). New
Century stated that although it has signed the March 27th Consent Agreements and
expects to comply with their terms, New Century has not yet received counterpart
signatures from the respective states, and accordingly, such March 27th Consent
Agreements may not be binding on the respective states. According to New
Century, the March 27th Consent Agreements contain allegations that certain of

New Century's subsidiaries have engaged in violations of state law, including, among other things, failure to fund mortgage loans after closing. The March 27th Consent Agreements restrain New Century's subsidiaries from taking certain actions, including, among other things, engaging in alleged violations of state law and taking new applications for mortgage loans in the relevant jurisdiction.

In addition, according to the March 28th Announcement, the March 27th Consent Agreements also compel New Century's subsidiaries to affirmatively take certain actions, including the creation of escrow accounts to hold any up front fees collected in connection with pending mortgage applications, the transfer to other lenders of the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and the provision of regular information to the state regulators regarding the subsidiaries' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

According to the March 28th Announcement, New Century anticipates that cease and desist orders will continue to be received by New Century and its subsidiaries from additional states in the future and that New Century and its subsidiaries may enter into additional consent agreements similar to the consent agreements already entered into by New Century. New Century stated that it intends to continue to cooperate with its regulators in order to mitigate the impact on consumers resulting from New Century's funding constraints.

Pursuant to a Form 8-K filed on March 30, 2007 (the "MARCH 30TH ANNOUNCEMENT"), New Century announced that it and certain of its subsidiaries, including NCMC (collectively, the "NEW CENTURY DEFENDANTS"), filed a motion for dissolution of modified temporary restraining order and motion for an emergency hearing, and opposition to a preliminary injunction in connection with the Ohio Complaint. New Century announced that on March 28, 2007, the Defendants and the State of Ohio reached

S-52

<PAGE>

agreement on a stipulated preliminary injunction effective for 90 days (the "OHIO SPI"), which was entered by the Ohio court. New Century stated that the Ohio SPI replaces the Ohio TRO and provides for a stay of the litigation for 90 days. New Century stated that the Ohio SPI restrains the New Century Defendants from taking certain actions, including, among other things, engaging in alleged violations of Ohio state law and taking new applications for mortgage loans.

According to the March 30th Announcement, New Century announced that the Ohio SPI also compels the New Century Defendants to take certain actions, including the transfer to other lenders of any outstanding mortgage applications and unfunded mortgage loans, the placement in escrow of any upfront fees collected in connection with pending mortgage applications, and the provision of regular information to the state regarding New Century's activities in Ohio, including the status of all outstanding mortgage applications and unfunded mortgage loans. New Century announced that the Ohio SPI also requires the New Century Defendants to submit certain categories of mortgage loans (and related information) as to which it intends to foreclose to the State of Ohio for the State of Ohio to review. New Century announced that the State of Ohio may object for cause to the New Century proceeding with a particular foreclosure and if New Century is unable to convince the State of Ohio to permit it to proceed, the foreclosure will not proceed for the duration of the Ohio SPI. In addition, New Century announced that the Ohio SPI also provides for the State of Ohio to review and object for cause to the New Century Defendants selling, transferring or assigning certain categories of mortgage loans that are more than 60 days delinquent.

In addition, according to the March 30th Announcement, New Century announced that in the event that the State of Ohio or the New Century Defendants believe the other is not acting in good faith, the Ohio SPI provides that the complaining party should notify the other of such concern and if the concern is not resolved, then either party may notify the other of their intent to file a motion with the court to terminate the Ohio SPI and request to reschedule the previously canceled preliminary injunction hearing. In addition, New Century announced that the Ohio SPI provides that in such event neither party will object to the scheduling of a prompt preliminary injunction hearing or the termination of the Ohio SPI at such a preliminary injunction hearing.

Pursuant to a Form 8-K filed on April 6, 2007 (the "APRIL 6TH ANNOUNCEMENT"), New Century announced that on April 2, 2007, New Century and certain of its subsidiaries, including NC Capital, filed voluntary petitions for reorganization (the "BANKRUPTCY Filings") under Chapter 11 of the United States Bankruptcy Code (the "BANKRUPTCY CODE") in the United States Bankruptcy Court for the District of Delaware (the "BANKRUPTCY COURT"). The Bankruptcy Filings are being jointly administered by the Honorable Kevin J. Carey under the caption "IN RE NEW CENTURY TRS HOLDINGS, INC., ET AL., CASE NO. 07-10416." According to the April 6th Announcement, New Century and its subsidiaries will continue to operate their businesses as "debtors-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

According to the April 6th Announcement, in connection with the Bankruptcy Filings, New Century and certain of its subsidiaries reduced their workforce by a total of approximately 3,200 people nationwide (approximately 54% of their total aggregate workforce). New Century announced that although estimates are subject to change as additional information becomes available, New Century expects to incur severance pay expenses and make related cash expenditures of approximately $4.6 million in connection with the reduction in its workforce.

In addition, according to the April 6th Announcement, New Century and certain of its subsidiaries entered into an asset purchase agreement with Greenwich Capital Financial Products, Inc. to sell certain mortgage loans originated by New Century as well as residual interests in certain securitization trusts owned by New Century for approximately $50 million. New Century stated that the consummation of the transaction is subject to higher and better bids and approval by the Bankruptcy Court.

According to the April 6th Announcement, New Century announced that it obtained a commitment from The CIT Group/Business Credit, Inc. and Greenwich Capital Financial Products, Inc. to provide New Century with up to $150 million in debtor-in-possession financing, subject to Bankruptcy Court approval.

S-53

<PAGE>

In addition, New Century announced that as of April 3, 2007, New Century has disposed of all of the mortgage loans in its inventory.

Pursuant to a Form 8-K filed on April 16, 2007 (the "APRIL 16TH ANNOUNCEMENT"), New Century announced that the Commonwealth of Massachusetts Office of the Attorney General issued a Civil Investigation Demand to New Century, which requests certain documents relating to New Century's loan origination business practices in connection with an investigation conducted pursuant to the Attorney General's authority to enforce consumer protection statutes. According to the April 16th Announcement, New Century stated that it is cooperating with this investigation.

UNDERWRITING GUIDELINES

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

The mortgage loans originated or acquired by New Century Mortgage Corporation were done so in accordance with the underwriting guidelines established by it (collectively, the "NEW CENTURY UNDERWRITING GUIDELINES"). The following is a general summary of the New Century Underwriting Guidelines generally applied, with some variation, by New Century Mortgage Corporation. This summary does not purport to be a complete description of the underwriting standards of New Century Mortgage Corporation.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While New Century Mortgage Corporation's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century Mortgage Corporation also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property. The mortgage loans, in most cases, bear higher rates of interest than mortgage loans that are originated in accordance with Fannie Mae and Freddie Mac standards, which is likely to result in rates of delinquencies and foreclosures that are higher, and that may be substantially higher, than those experienced by portfolios of mortgage loans underwritten in a more traditional manner. As a result of New Century Mortgage Corporation's underwriting criteria, changes in the values of the related mortgaged properties may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related mortgage loans. In addition, there can be no assurance that the value of the related mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review.

The mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the mortgage loans in the mortgage pool will represent these exceptions.

Each applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. The New Century Underwriting Guidelines require a credit report on each applicant from a credit reporting company. The report typically contains information relating to matters such as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments. Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. These appraisers inspect and appraise the subject property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac. The New Century Underwriting

S-54

<PAGE>

Guidelines require a review of the appraisal by a qualified employee of New
Century Mortgage Corporation or by an appraiser retained by New Century Mortgage
Corporation. New Century Mortgage Corporation uses the value as determined by
the review in computing the loan-to-value ratio of the related mortgage loan if
the appraised value of a mortgaged property, as determined by a review, is (i)
more than 10% greater but less than or equal to 25% lower than the value as
determined by the appraisal for mortgage loans having a loan-to-value ratio or a
combined loan-to-value ratio of up to 90%, and (ii) more than 5% greater but
less than or equal to 25% lower than the value as determined by the appraisal
for mortgage loans having a loan-to-value ration or a combined loan-to-value
ratio of between 91-95%. For mortgage loans having a loan-to-value ratio or a
combined loan-to-value ratio greater than 95%, the appraised value as determined
by the review is used in computing the loan-to-value ratio of the related
mortgage loan. If the appraised value of a mortgaged property as determined by a
review is 25% or more lower than the value as determined by the appraisal, then
New Century Mortgage Corporation obtains a new appraisal and repeats the review
process.

     The mortgage loans were originated consistent with and generally conform to
the New Century Underwriting Guidelines' full documentation, limited
documentation and stated income documentation residential loan programs. Under
each of the programs, New Century Mortgage Corporation reviews the applicant's
source of income, calculates the amount of income from sources indicated on the
loan application or similar documentation, reviews the credit history of the
applicant, calculates the debt service-to-income ratio to determine the
applicant's ability to repay the loan, reviews the type and use of the property
being financed, and reviews the property. In determining the ability of the
applicant to repay the loan, a qualifying rate has been created under the New
Century Underwriting Guidelines that generally is equal to the interest rate on
that loan. The New Century Underwriting Guidelines require that mortgage loans
be underwritten in a standardized procedure which complies with applicable
federal and state laws and regulations and requires New Century's underwriters
to be satisfied that the value of the property being financed, as indicated by
an appraisal and a review of the appraisal, currently supports the outstanding
loan balance. In general, the maximum loan amount for mortgage loans originated
under the programs is $1,500,000 (additional requirements may be imposed in
connection with mortgage loans in excess of $1,500,000). The New Century
Underwriting Guidelines generally permit loans on one- to four-family
residential properties to have a loan-to-value ratio at origination of up to 95%
with respect to first lien loans. The maximum loan-to-value ratio depends on,
among other things, the purpose of the mortgage loan, a borrower's credit
history, home ownership history, mortgage payment history or rental payment
history, repayment ability and debt service-to-income ratio, as well as the type
and use of the property. With respect to mortgage loans secured by mortgaged
properties acquired by a mortgagor under a "lease option purchase," the
loan-to-value ratio of the related mortgage loan is based on the appraised value
at the time of origination of the mortgage loan.

     The New Century Underwriting Guidelines require that the income of each
applicant for a mortgage loan under the full documentation program be verified.
The specific income documentation required for New Century Mortgage
Corporation's various programs is as follows: under the full documentation
program, applicants usually are required to submit one written form of
verification of stable income for at least 12 months from the applicant's
employer for salaried employees and 24 months for self-employed applicants;
under the limited documentation program, applicants usually are required to
submit verification of stable income for at least 6 months, such as 6
consecutive months of complete personal checking account bank statements, and
under the stated income documentation program, an applicant may be qualified
based upon monthly income as stated on the mortgage loan application if the
applicant meets certain criteria. All the foregoing programs require that, with
respect to salaried employees, there be a telephone verification of the
applicant's employment. Verification of the source of funds, if any, that are
required to be deposited by the applicant into escrow in the case of a purchase
money loan is required.

In evaluating the credit quality of borrowers, New Century Mortgage Corporation utilizes credit bureau risk scores, or a FICO score, a statistical ranking of likely future credit performance developed by Fair, Isaac & Company and the three national credit data repositories: Equifax, TransUnion and Experian.

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

<div align="center">S-55</div>

<PAGE>

"AA" RISK. Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%. The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan. An existing mortgage loan must be less than 30 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; PROVIDED, HOWEVER, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% is permitted for a mortgage loan on a non-owner occupied single family or two unit property or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and non-owner occupied three to four family residential properties or high-rise condominiums is 85%. The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80%. The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"A+" RISK. Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments), are required for loan-to-value ratios above 90%. A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income

documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% (or 90% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two-unit property. A maximum loan-to-value ratio of 90% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied property single family or two unit property or a three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote or unique properties and a non-owner occupied three to four family residential property is 85% (or 80% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for non-owner occupied rural, remote or unique properties is 80% (or 75% for mortgage loans originated under the stated income documentation program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"A-" RISK. Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. A maximum of three 30 day late payments within the last

S-56

<PAGE>

12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; PROVIDED, HOWEVER, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 95% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 95% (or 85% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on an owner occupied single family or two unit property. A maximum loan-to-value ratio of 90% (or 80% for mortgage loans originated under the stated income documentation program) is permitted for a mortgage loan on a non-owner occupied single family or two unit property or three to four family residential property. The maximum loan-to-value ratio for owner occupied rural, remote, or unique properties, and non-owner occupied three to four family residential properties is 85% (or 80% for mortgage loans originated under the stated income documentation program). The maximum loan-to-value ratio for a non-owner occupied rural, remote or unique property is 80% (or 70% for mortgage loans originated under the stated income documentation program). The maximum combined

loan-to-value ratio, including any related subordinate lien, is 100%, for a
refinance loan and 100%, for a purchase money loan. The maximum debt
service-to-income ratio is usually 50% unless the loan-to-value ratio is
reduced.

    "B" RISK. Under the "B" risk category, an applicant must have a FICO score
of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30
day late payments and a maximum of one 60 day late payment within the last 12
months is acceptable on an existing mortgage loan. An existing mortgage loan
must be less than 90 days late at the time of funding of the loan. No bankruptcy
may have occurred during the preceding year for borrowers with a FICO score
less than or equal to 550; PROVIDED, HOWEVER, that a Chapter 7 bankruptcy for a
borrower with a FICO score in excess of 550 may have occurred as long as such
bankruptcy has been discharged at least one day prior to funding of the loan. A
borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the
proceeds of the borrower's loan (such loan may not exceed an 90% loan-to-value
ratio for borrowers with a FICO score of less than 550). No notice of default
filings or foreclosures (or submission of deeds in lieu of foreclosure) may have
occurred during the preceding 18 months. The mortgaged property must be in at
least average condition. A maximum loan-to-value ratio of 90% (or 80% for
mortgage loans originated under the stated income documentation program), is
permitted for a mortgage loan on an owner occupied singe family or two unit
property. A maximum loan-to-value ratio of 85% (or 75% for mortgage loans
originated under the stated income documentation program) is permitted for a
mortgage loan on a non-owner occupied single family or two unit property or a
three to four family residential property. The maximum loan-to-value ratio for
owner occupied rural, remote or unique properties, and a non-owner occupied
three to four family property is 80% (or 70% for mortgage loans originated under
the stated income documentation program). The maximum loan-to-value ratio for a
non-owner occupied rural, remote or unique property is 75% (or 65% for mortgage
loans originated under the stated income documentation program). The maximum
combined loan-to-value ratio, including any related subordinate lien, is 100%,
for a refinance loan and for a purchase money loan. The maximum debt
service-to-income ratio is usually 50%, unless the loan-to-value ratio is
reduced.

    "C" RISK. Under the "C" risk category, an applicant must have a FICO score
of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30
day and 60 day late payments and a maximum of one 90 day late payment within the
last 12 months is acceptable on an existing mortgage loan. An existing mortgage
loan must be less than 120 days late at the time of funding of the loan. All
bankruptcies must be discharged at least one day prior to funding of the loan;
PROVIDED, HOWEVER, that Chapter 13 bankruptcies may be discharged with loan
proceeds. No notice of default filings may have occurred during the preceding 12
months. The mortgaged property must be in at least average condition.

                                    S-57


<PAGE>


In most cases, a maximum loan-to-value ratio of 80% (or 75% for mortgage loans
originated under the stated income documentation program) for a mortgage loan on
an owner occupied single family or two unit property is permitted. A maximum
loan-to-value ratio of 75% is permitted for a mortgage loan on a non-owner
occupied single family or 2 unit property (refinance only), three to four family
residential property (or 70% for mortgage loans originated under the stated
income documentation program). The maximum loan-to-value ratio for owner
occupied rural, remote or unique properties, and non-owner occupied three to
four family residential properties 70% (or 65% for mortgages originated under
the stated income documentation program). The maximum loan-to-value ratio for a
non-owner occupied rural, remote or unique property (refinance only) is 65% (or
60% for mortgage loans originated under the stated income documentation

program). The maximum combined loan-to-value ratio, including any related subordinate lien, is 85% for a refinance loan and for a purchase money loan. The maximum debt service-to-income ratio is usually 50% unless the loan-to-value ratio is reduced.

"C-" RISK. Under the "C-" risk category, an applicant must have a FICO score of 500, or greater. Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 150 days late at the time of funding of the loan. There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; PROVIDED, HOWEVER, that Chapter 13 bankruptcies may be discharged with loan proceeds. The mortgaged property must be in at least average condition. A maximum loan-to-value ratio of 70% (55% for mortgage loans originated under the stated income documentation program), is permitted for a mortgage loan on a owner occupied single family or two unit property. A maximum loan-to-value ratio of 65% is permitted for a mortgage loan on a non-owner occupied property single family or two unit property (refinance only), or a three to four family residential property (50% for a mortgage loan on a non-owner occupied property, or a three to four family residential property originated under the stated income documentation program). Rural, remote or unique properties are not allowed. The maximum combined loan-to-value ratio, including any related subordinate lien, is 80% for a refinance loan and 80% for a purchase money loan. The maximum debt service-to-income ratio is usually 55%.

SPECIAL PROGRAMS. New Century Mortgage Corporation originates loans which it calls "special programs" to enable borrowers with higher FICO scores and good mortgage histories the ability to obtain larger loan amounts or higher loan-to-value ratios. Special programs extend loan-to-value ratios to a maximum of 100%, and combined 80/20 (first/second) loan combinations to 100% combined loan-to-value ratios and loan amounts to $1,500,000 with higher minimum FICO scores and paid-as-agreed minimum tradeline requirements. No bankruptcy filing may have occurred during the preceding two years for borrowers with FICO scores less than 600, under the full income documentation program, or 620, under the limited income, and 640 under the stated income documentation programs (Chapter 13 bankruptcies may not be paid off with loan proceeds) for combined 80%/20% (first/second) loan combinations. For first mortgage loans having 100% loan-to-value ratios, no bankruptcy filing may have occurred during the preceding two years. No notice of default filings may have occurred during the preceding two years. The mortgaged property must be in at least average condition. The maximum combined loan-to-value ratio, including any related subordinate lien, is 100%, for either a refinance loan or a purchase money loan. The maximum debt service-to-income ratio is usually 50%.

EXCEPTIONS. As described above, the foregoing categories and criteria are guidelines only. On a case by case basis, it may be determined that an applicant warrants a debt service-to-income ratio exception, a pricing exception, a loan-to-value ratio exception, an exception from certain requirements of a particular risk category, etc. An exception may be allowed if the application reflects compensating factors, such as: low loan-to-value ratio; a maximum of one 30 day late payment on all mortgage loans during the last 12 months; and stable employment or ownership of current residence of four or more years. An exception may also be allowed if the applicant places a down payment through escrow of at least 20% of the purchase price of the mortgaged property or if the new loan reduces the applicant's monthly aggregate mortgage payment by 25% or more. Accordingly, a mortgagor may qualify in a more favorable risk category than, in the absence of compensating factors, would satisfy only the criteria of a less favorable risk category. It is expected that a substantial portion of the mortgage loans will represent these kinds of exceptions.

S-58

<PAGE>

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

THE SERVICER

GENERAL

    The mortgage loans will be serviced by Avelo Mortgage, L.L.C. ("AVELO").
Avelo will act as servicer for all of the mortgage loans. Avelo is an affiliate
through common parent ownership of the depositor, the sponsor, the swap provider
and the underwriter.

    The servicer will service the related mortgage loans in accordance with the
pooling and servicing agreement.

AVELO MORTGAGE, L.L.C.

    Avelo provided the information under this subheading "--AVELO MORTGAGE,
L.L.C."

    GENERAL

    Avelo, a Delaware limited liability company, is a wholly-owned subsidiary
of Archon Group, L.P., which is a subsidiary of The Goldman Sachs Group, Inc., a
publicly traded Delaware Corporation (NYSE: GS). Avelo is an affiliate of the
depositor, the sponsor, the swap provider under the interest rate swap agreement
and the cap provider under the interest rate cap agreement. Avelo began mortgage
loan servicing operations by boarding loans in December 2005, and activated its
first mortgage loans in January 2006.

    EXPERIENCE AND PROCEDURES OF AVELO

    Currently, Avelo's servicing portfolio largely consists of non-prime
fixed-rate and adjustable-rate, first and second-lien conventional mortgage
loans. Avelo's servicing system, REALServicing, is able to service virtually any
type of mortgage loan product. In addition to conventional products, Avelo also
services interest-only products, option ARMs, flex payment option ARMs and
mortgage loans with amortization periods of up to 40 years.

    The REALServicing system is Avelo's core loan servicing system. It provides
loan level detail of the mortgage accounts and interacts with all of Avelo's
related systems such as its customer service interactive voice response unit and
customer service website.

    All mortgage loans are serviced according to Avelo's life of loan credit
risk management strategy, which was developed primarily for the servicing of
non-prime mortgage loans. The risk of delinquency and loss associated with
non-prime loans requires active communication with borrowers. Avelo attempts to
mitigate this risk by: (i) using technology to provide employees with extensive
data on the loan and borrower; (ii) placing an introductory call to borrowers;
(iii) using a predictive dialer to create calling campaigns for delinquent
loans; and (iv) making account information and payment solutions available to
borrowers online. Contact with borrowers is initiated through outbound telephone
campaigns, monthly billing statements, and direct mail. This contact is tailored
to reflect the borrower's payment habits, loan risk profile, and loan status.

    Outsourcing of non-customer servicing functions has allowed Avelo to
maintain a high standard of performance at reduced costs. Avelo has successfully
outsourced various functions, including but not limited to, escrow management,
lockbox, and REO tracking.

    During the second month of delinquency (generally 45 days delinquent), with
no resolution pending, a breach notice outlining the required timeframe for
curing the default will be sent to the related borrower. The Default Management
Department continues active collection and loss mitigation functions that may
offer the borrower relief through different alternatives designed to resolve the

delinquency over time.

     A pre-foreclosure review is performed concurrently with the activities of
the Default Management Department, and the file prepared for referral to local
counsel to begin the foreclosure process. Avelo's

                                    S-59


<PAGE>


goal is to avoid foreclosure, where possible, and the Loss Mitigation Department
continues servicing activities throughout the foreclosure process.

     Delinquent accounts not resolved through collection and loss mitigation
activities in most cases will be foreclosed in accordance with State and local
laws. The foreclosure process and local counsel are monitored for compliance and
performance. Properties acquired through foreclosure are managed through an
outsourcing relationship with a national provider of REO management services.
Avelo closely manages the service provider for key factors such as
price-to-value ratio, days-on-market, and inventory turnover.

     SIZE, COMPOSITION AND GROWTH OF AVELO'S PORTFOLIO OF SERVICED ASSETS

     Currently, Avelo's servicing portfolio consists of prime and non-prime,
fixed and adjustable-rate, first and second-lien conventional mortgage loans.
Avelo's servicing portfolio was established starting in December 2005 and has
experienced significant relative growth since then. As of February 28, 2007,
Avelo is servicing approximately $10.4 billion of mortgage loans.

     AVELO RATING INFORMATION

     Avelo has been approved as a select servicer for S&P and is in the process
of obtaining a rating from Moody's. In addition, Avelo is approved as a servicer
for Fannie Mae and Freddie Mac.

     CHANGES TO AVELO'S POLICIES AND PROCEDURES

     Avelo has formulated and will continue to update its servicer policies and
procedures. Avelo's servicer policies and procedures comply with state law and
are in conformity with standard mortgage banking practices.

     AVELO'S COMPLIANCE WITH APPLICABLE REGULATION AB SERVICING CRITERIA

     Avelo assessed its compliance with the applicable Regulation AB Servicing
Criteria for the period from February 24, 2006 through December 31, 2006 and
identified a material instance of non-compliance with the servicing criterion
set forth in Item 1122(d)(2)(vii) of Regulation AB. Specifically, for a period
of time after Avelo commenced servicing loans in asset-backed securities
transactions, Avelo did not prepare reconciliations for all asset-backed
securities-related bank accounts within 30 calendar days after the bank
statement cut-off date, or as such other number of days as specified in the
transaction agreements and reconciling items were not resolved within 90 days of
their original identification or such other number of days as specified in the
transaction agreements. Avelo had previously taken steps to remedy these issues,
and as of the date of Avelo's audit that identified this material instance of
non-compliance, all such bank account reconciliations were current. No issues
were found or arose from the delay in reconciling the bank accounts.

                              THE MASTER SERVICER

     Wells Fargo Bank, N.A. will act as the master servicer for the mortgage
loans pursuant to the terms of the pooling and servicing agreement.

The master servicer is responsible for the aggregation of monthly servicer reports and remittances and for the oversight of the performance of the servicer under the terms of the pooling and servicing agreement. In particular, the master servicer independently calculates monthly loan balances based on servicer data, compares its results to servicer loan-level reports and reconciles any discrepancies with the servicer. The master servicer also reviews the servicing of defaulted loans for compliance with the terms of the pooling and servicing agreement. In addition, upon the occurrence of certain servicer events of default under the terms of the pooling and servicing agreement, the master servicer may be required to enforce certain remedies on behalf of the issuing entity against such defaulting servicer. Wells Fargo has been engaged in the business of master servicing since June 30, 1995. As of December 31, 2006, Wells

<center>S-60</center>

<PAGE>

Fargo Bank was acting as master servicer for approximately 1,427 series of residential mortgage-backed securities with an aggregate outstanding principal balance of approximately $748 billion.

<center>THE SPONSOR</center>

The sponsor is Goldman Sachs Mortgage Company, a New York limited partnership ("GSMC"). GSMC is the parent of the depositor and an affiliate, through common parent ownership, of the underwriter, the swap provider, the cap provider and the servicer.

GSMC was formed in 1984. Its general partner is Goldman Sachs Real Estate Funding Corp. and its limited partner is The Goldman Sachs Group, Inc. (NYSE:GS). GSMC's executive offices are located at 85 Broad Street, New York, New York 10004, telephone number (212) 902-1000. GSMC purchases closed, independently funded, first and subordinate lien residential mortgage loans for its own investment, securitization or resale. In addition, GSMC provides warehouse and repurchase financing to mortgage lenders. GSMC does not service loans. Instead GSMC contracts with another entity to service the loans on its behalf. GSMC also may engage in the secondary market activities noted above for non-real estate-secured loans in certain jurisdictions and other activities, but its principal business activity involves real estate-secured assets.

GSMC has been active as a sponsor in the securitization market since 2001. As a sponsor, GSMC acquires residential mortgage loans in the secondary mortgage market and initiates the securitization of the loans it acquires by transferring the mortgage loans to the depositor, which loans will ultimately be transferred to the issuing entity for the related securitization.

As of December 31, 2006, GSMC has sponsored the securitization of approximately $162 billion of residential mortgage loans, which include prime, subprime, Alt-A, FHA/VA/RHS, second lien, home equity lines of credit, "scratch and dent," re-performing and seasoned loans, among others.

GSMC acquires residential mortgage loans in two contexts:

   (1)  through bulk purchases, generally consisting of mortgage loan pools greater than $50 million; and

   (2)  through conduit purchases.

Prior to acquiring any residential mortgage loans, GSMC will conduct a review of the related mortgage loan seller. GSMC's review process consists of reviewing select financial information for credit and risk assessment and

underwriting guideline review, senior level management discussion and background
checks. The scope of the mortgage loan due diligence will depend on the credit
quality of the mortgage loans.

    The underwriting guideline review considers mortgage loan origination
processes and systems. In addition, such review considers corporate policy and
procedures relating to state and federal predatory lending and high cost lending
laws, origination practices by jurisdiction, historical loan level loss
experience, quality control practices, significant litigation and material
investors.

    Servicers are assessed based upon review of systems and reporting
capabilities (as compared against industry standard), review of collection
procedures and confirmation of servicers' ability to provide loan-level data. In
addition, GSMC conducts background checks, meets with senior management to
determine whether the servicer complies with industry standards and otherwise
monitors the servicer on an ongoing basis. GSMC has been the sponsor of
securitizations backed by subprime mortgage loans since 2002.

                                    S-61

<PAGE>

    The following table describes the approximate initial principal amount of
loans securitized in subprime mortgage loan securitizations sponsored by GSMC
since 2002.

|        | Approximate Initial Principal Amount of Loans Securitized |
| ------ | --------------------- |
| Year   |                       |
| 2002   | $  4.4 billion        |
| 2003   | $  2.1 billion        |
| 2004   | $  9.7 billion        |
| 2005   | $ 14.5 billion        |
| 2006   | $ 15.0 billion        |

                         STATIC POOL INFORMATION

    Information concerning the sponsor's prior residential mortgage loan
securitizations involving fixed- and adjustable-rate subprime mortgage loans
secured by first or second-lien mortgages or deeds of trust in residential real
properties issued by the depositor is available on the internet at
HTTP://WWW.GS.COM/STATICPOOLINFO/. On this website, listed under the heading
"Subprime," there is a link entitled "GSAMP 2007-HE2" where you can view for
each of these securitizations, summary pool information as of the applicable
securitization cut-off date and delinquency, cumulative loss, and prepayment
information as of each distribution date by securitization for the past five
years or, since the applicable securitization closing date if the applicable
securitization closing date occurred less than five years from the date of this
prospectus supplement. Each of these mortgage loan securitizations is unique,
and the characteristics of each securitized mortgage loan pool varies from each
other as well as from the mortgage loans to be included in the issuing entity
that will issue the certificates offered by this prospectus supplement. In
addition, the performance information relating to the prior securitizations
described above may have been influenced by factors beyond the sponsor's
control, such as housing prices and market interest rates. Therefore, the
performance of these prior mortgage loan securitizations is likely not to be
indicative of the future performance of the mortgage loans to be included in the
issuing entity related to this offering.

In the event any changes or updates are made to the information available
on the website, the depositor will provide to any person a copy of the
information as it existed as of the date of this prospectus supplement upon
request who writes or calls the depositor at 85 Broad Street, New York, New York
10004, Attention: Jennifer Cohen, telephone number (212) 357-2280.

In addition, the information available on the website relating to any
mortgage loan securitizations issued prior to January 1, 2006 is not deemed to
be part of this prospectus supplement, the accompanying prospectus or the
depositor's registration statement.

THE DEPOSITOR

The depositor is GS Mortgage Securities Corp., a Delaware corporation. The
depositor is a wholly-owned subsidiary of the sponsor, GSMC, and is an
affiliate, through common parent ownership, of the underwriter, the swap
provider, the cap provider and the servicer. The depositor will not have any
business operations other than securitizing mortgage assets and related
activities.

The certificate of incorporation of the depositor limits its activities to
those necessary or convenient to carry out its securitization activities. The
depositor will have limited obligations with respect to a series of securities.
The depositor will obtain the mortgage loans from the sponsor, and may also
assign to the trustee certain rights of the sponsor with respect to the mortgage
loans. See "DESCRIPTION OF THE CERTIFICATES--ASSIGNMENT OF THE MORTGAGE LOANS"
in this prospectus supplement. In addition, after the issuance of the
certificates, the depositor will have certain limited obligations, which
includes, without limitation, appointing a successor trustee if the trustee
resigns or is otherwise removed and preparing, or causing to be prepared,
certain reports filed under the Securities Exchange Act of 1934, as amended.

S-62

<PAGE>

THE ISSUING ENTITY

GSAMP Trust 2007-HE2, the issuing entity, will be formed on the closing
date pursuant to the pooling and servicing agreement. The issuing entity will be
a New York common law trust with no officers or directors and no continuing
duties other than to hold and service the mortgage loans and related assets and
issue the certificates. The fiscal year end for the issuing entity will be
December 31, commencing with December 31, 2007.

THE SECURITIES ADMINISTRATOR

Wells Fargo will act as securities administrator under the pooling and
servicing agreement. Wells Fargo is a national banking association and a
wholly-owned subsidiary of Wells Fargo & Company. A diversified financial
services company with approximately $482 billion in assets, more than 23 million
customers and more than 158,000 employees, as of December 31, 2006, Wells Fargo
& Company is a U.S. bank holding company, providing banking, insurance, trust,
mortgage and consumer finance services throughout the United States and
internationally. Wells Fargo provides retail and commercial banking services and
corporate trust, custody, securities lending, securities transfer, cash
management, investment management and other financial and fiduciary services.
The depositor, the sponsor and the servicer may maintain banking and other
commercial relationships with Wells Fargo and its affiliates. Wells Fargo's
principal corporate trust offices are located at 9062 Old Annapolis Road,
Columbia, Maryland 21045-1951 (among other locations) and its office for

certificate transfer services is located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota 55479.

Wells Fargo's assessment of compliance with applicable servicing criteria relating to its provision of master servicing, trustee, securities administration and paying agent services for the twelve months ended December 31, 2006, furnished pursuant to Item 1122 of Regulation AB, discloses that it was not in compliance with the 1122(d)(3)(i) servicing criteria during that reporting period. The assessment of compliance indicates that certain monthly investor or remittance reports included errors in the calculation and/or the reporting of delinquencies for the related pool assets, which errors may or may not have been material, and that all such errors were the result of data processing errors and/or the mistaken interpretation of data provided by other parties participating in the servicing function. The assessment further states that all necessary adjustments to Wells Fargo's data processing systems and/or interpretive clarifications have been made to correct those errors and to remedy related procedures.

Under the terms of the pooling and servicing agreement, Wells Fargo is responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. As securities administrator, Wells Fargo is responsible for the preparation and filing of all REMIC tax returns on behalf of the Trust REMICs and the preparation of monthly reports on Form 10-D, annual reports on Form 10-K and certain current reports on Form 8-K that are required to be filed with the Securities and Exchange Commission on behalf of the issuing entity. Wells Fargo has been engaged in the business of securities administration since June 30, 1995. As of December 31, 2006, Wells Fargo was acting as securities administrator with respect to more than $1 trillion of outstanding residential mortgage-backed securities.

Wells Fargo serves or may have served within the past two years as mortgage loan file custodian for various mortgage loans owned by the sponsor or an affiliate of the sponsor. The terms of the custodial agreement under which those services are provided by Wells Fargo are customary for the mortgage-backed securitization industry and provide for the delivery, receipt, review and safekeeping of mortgage loan files.

THE TRUSTEE

LaSalle Bank National Association will be the trustee under the pooling and servicing agreement. LaSalle Bank National Association is a national banking association formed under the federal laws of the United States of America. Its parent company, LaSalle Bank Corporation, is an indirect subsidiary of ABN AMRO Bank N.V., a Netherlands banking corporation. LaSalle has extensive experience serving as trustee on securitizations of residential mortgage loans. Since January 1994, LaSalle has served as

S-63

<PAGE>

trustee, securities administrator or paying agent on over 500 residential mortgage-backed security transactions involving assets similar to the mortgage loans. As of December 31, 2006, LaSalle serves as trustee, securities administrator or paying agent on over 425 residential mortgage-backed security transactions. The depositor, the servicer and other parties to the transaction may maintain other banking relationships in the ordinary course of business with the trustee. The trustee's corporate trust office is located at 135 South LaSalle Street, Suite 1511, Chicago, Illinois, 60603. Attention: Global Securities and Trust Services - GSAMP 2007-HE2 or at such other address as the trustee may designate from time to time.

## THE CUSTODIANS

Deutsche Bank National Trust Company, a national banking association, will act as a custodian with respect to 72.89% of the mortgage loans and U.S. Bank National Association, a national banking association, will act as a custodian with respect to 27.11% of the mortgage loans.

The office of Deutsche Bank National Trust Company is located at 1761 East St. Andrew Place, Santa Ana, California 92705-4934, and its telephone number is (714) 247-6000.

The custodial office of U.S. Bank is located at 1133 Rankin Street, Suite 100, St. Paul, Minnesota 55116, and its telephone number (651) 695-6105.

Each custodian will act as a custodian of the applicable mortgage loan files pursuant to the pooling and servicing agreement. Each custodian will be responsible to hold and safeguard the applicable mortgage notes and other contents of the applicable mortgage files on behalf of the certificateholders. Deutsche Bank National Trust Company segregates the applicable mortgage files for which it acts as custodian by boarding each applicable mortgage file in an electronic tracking system, which identifies the owner of the mortgage file and the mortgage file's specific location in the applicable custodian's vault. The mortgage files held by U.S. Bank are tracked electronically to identify that they are held by U.S. Bank. U.S. Bank uses a barcode tracking system to track the location of, and owner or secured party with respect to each mortgage file that it holds as a custodian, including the mortgage files held on behalf of the Trustee.

For information, with respect to each custodian's liability under the pooling and servicing agreement and any indemnification that the custodian will be entitled to from the issuing entity, see "THE POOLING AND SERVICING AGREEMENT--CERTAIN MATTERS REGARDING THE DEPOSITOR, THE SERVICER, THE SECURITIES ADMINISTRATOR, THE CUSTODIANS AND THE TRUSTEE" in this prospectus supplement.

## INTEREST RATE CAP AND SWAP COUNTERPARTY

The interest rate cap agreement and the interest rate swap agreement will be provided by Goldman Sachs Mitsui Marine Derivative Products, L.P., a Delaware limited partnership ("GSMMDP," the "SWAP PROVIDER" or the "CAP PROVIDER"). GSMMDP is primarily engaged in the business of dealing in derivative instruments. GSMMDP has a counterparty rating of "Aaa" from Moody's Investors Service, Inc. and a credit rating of "AAA" from Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. GSMMDP is an affiliate of the sponsor, the depositor and the underwriter through common parent ownership.

## DESCRIPTION OF THE CERTIFICATES

GENERAL

On the closing date, the issuing entity will be created and the depositor will cause the issuing entity to issue the certificates. The certificates will be issued in twenty classes--the Class A-1, Class A-2A, Class A-2B, Class A-2C, Class A-2D, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class R, Class RC, Class RX, Class C, Class P and Class X certificates. Only the Class A-1, Class A-2A, Class A-2B, Class A-2C, Class A-2D, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class R, Class RC and Class RX certificates (collectively, the "OFFERED CERTIFICATES") will be offered under this

<PAGE>

prospectus supplement. The Class R, Class RC and Class RX certificates are referred to as the "RESIDUAL CERTIFICATES" in this prospectus supplement. The Offered Certificates, other than the Residual Certificates, are referred to as the "LIBOR CERTIFICATES" in this prospectus supplement. The Offered Certificates that are LIBOR Certificates are referred to as "OFFERED LIBOR CERTIFICATES" in this prospectus supplement. The certificates will collectively represent the entire undivided ownership interest in the issuing entity, subject to the limits and priority of distribution provided for in that agreement.

The assets of the issuing entity will consist of:

o     the mortgage loans, together with the related mortgage files and all related collections and proceeds due and collected after the cut-off date;

o     such assets as from time to time are identified as REO property and related collections and proceeds;

o     assets that are deposited in the accounts described in this prospectus supplement and invested in accordance with the pooling and servicing agreement;

o     an interest rate swap agreement; and

o     an interest rate cap agreement.

The LIBOR Certificates will be issued and available only in book-entry form, in minimum denominations of $25,000 initial principal amount and integral multiples of $1 in excess of $25,000, except that one certificate of each class may be issued in an amount less than $25,000. The Residual Certificates will be issued and available only in definitive form, in minimum denominations of $50. For information regarding the issuance of certificates in book-entry form, see "--BOOK-ENTRY REGISTRATION" below.

Voting rights will be allocated among holders of the certificates in proportion to the Class Certificate Balances of their respective certificates on such date, except that the Class X and Class P certificates will each be allocated 1% of the voting rights. The Class C certificates and the Residual Certificates will not be entitled to any voting rights. The Class X and Class P certificates will initially be held by the underwriter.

The Class A-1 certificates will generally represent interests in the group I mortgage loans and the Class A-2A, Class A-2B, Class A-2C and Class A-2D certificates will generally represent an interest in the group II mortgage loans. The Class R, Class RC, Class RX, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates will represent interests in all of the mortgage loans in the issuing entity.

The following chart illustrates generally the distribution priorities and the subordination features applicable to the certificates.

```
                    | ------------------------------------ /|\
                    |     Class A-1*           Class A-2A*   |
                    |                          Class A-2B*   |
                    |                          Class A-2C*   |
                    |                          Class A-2D*   |
                    | ------------------------------------   |
                    |                Class M-1               |
                    | ------------------------------------   |
    Accrued         |                Class M-2               |
    certificate     | ------------------------------------   |
```

```
interest,      |                                              |
then           |         Class M-3                            |
principal      |  ------------------------------------------  | Loans
               |         Class M-4                            |
               |  ------------------------------------------  |
               |         Class M-5                            |
               |  ------------------------------------------  |
               |         Class M-6                            |
               |  ------------------------------------------  |
               |         Class M-7                            |
               |  ------------------------------------------  |
               |         Class M-8                            |
               |  ------------------------------------------  |
               |         Class M-9                            |
               |  ------------------------------------------  |
               |         Class X                              |
        \|/    |  ------------------------------------------  |
```

```
---------------
*    Interest and principal distributions will be allocated among the Class A
     certificates as further described in this prospectus supplement. Losses
     will not be allocated to the Class A certificates until the final
     Distribution Date.
```

S-65

<PAGE>

BOOK-ENTRY REGISTRATION

     The LIBOR Certificates are sometimes referred to in this prospectus
supplement as "BOOK-ENTRY CERTIFICATES." No person acquiring an interest in the
book-entry certificates will be entitled to receive a definitive certificate
representing an obligation of the issuing entity, except under the limited
circumstances described in this prospectus supplement. Beneficial owners may
elect to hold their interests through The Depository Trust Corporation ("DTC")
in the United States, or Clearstream Banking, societe anonyme or Euroclear Bank,
as operator of the Euroclear System, in Europe. Transfers within DTC,
Clearstream or Euroclear, as the case may be, will be in accordance with the
usual rules and operating procedures of the relevant system. So long as the
LIBOR Certificates are book-entry certificates, such certificates will be
evidenced by one or more certificates registered in the name of Cede & Co.,
which will be the "HOLDER" of such certificates, as the nominee of DTC or one of
the relevant depositories. Cross-market transfers between persons holding
directly or indirectly through DTC, on the one hand, and counterparties holding
directly or indirectly through Clearstream or Euroclear, on the other, will be
effected in DTC through the relevant depositories of Clearstream or Euroclear,
respectively, and each a participating member of DTC. The interests of the
beneficial owners of interests in the LIBOR Certificates will be represented by
book entries on the records of DTC and its participating members. All references
in this prospectus supplement to the LIBOR Certificates reflect the rights of
beneficial owners only as such rights may be exercised through DTC and its
participating organizations for so long as such certificates are held by DTC.

     The beneficial owners of the LIBOR Certificates may elect to hold their
certificates through DTC in the United States, or Clearstream or Euroclear if
they are participants in such systems, or indirectly through organizations which
are participants in such systems. The LIBOR Certificates will be issued in one
or more certificates which in the aggregate equal the outstanding principal
balance or notional amount of the related class of certificates and will
initially be registered in the name of Cede & Co., the nominee of DTC.
Clearstream and Euroclear will hold omnibus positions on behalf of their
participants through customers securities accounts in Clearstream's and

Euroclear's names on the books of their respective depositories which in turn
will hold such positions in customers' securities accounts in the depositories
names on the books of DTC. Except as described below, no beneficial owner will
be entitled to receive a physical or definitive certificates. Unless and until
definitive certificates are issued, it is anticipated that the only holder of
the LIBOR Certificates will be Cede & Co., as nominee of DTC. Beneficial owners
will not be holders or certificateholders as those terms are used in the pooling
and servicing agreement. Beneficial owners are only permitted to exercise their
rights indirectly through participants and DTC.

        The beneficial owner's ownership of a book-entry certificate will be
recorded on the records of the brokerage firm, bank, thrift institution or other
financial intermediary that maintains the beneficial owner's account for such
purpose. In turn, the financial intermediary's ownership of such book-entry
certificate will be recorded on the records of DTC or on the records of a
participating firm that acts as agent for the financial intermediary, whose
interest will in turn be recorded on the records of DTC, if the beneficial
owner's financial intermediary is not a DTC participant and on the records of
Clearstream or Euroclear, as appropriate.

        DTC is a limited purpose trust company organized under the laws of the
State of New York, a member of the Federal Reserve System, a clearing
corporation within the meaning of the New York UCC and a "clearing agency"
registered pursuant to Section 17A of the Exchange Act. DTC was created to hold
securities for its participants and to facilitate the clearance and settlement
of securities transactions between participants through electronic book-entries,
thus eliminating the need for physical movement of certificates. Participants
include securities brokers and dealers, including underwriters, banks, trust
companies and clearing corporations. Indirect access to the DTC system also is
available to others such as banks, brokers, dealers and trust companies that
clear through or maintain a custodial relationship with a participant, either
directly or indirectly through indirect participants.

        Under the rules, regulations and procedures creating and affecting DTC and
its operations, DTC is required to make book-entry transfers of book-entry
certificates, such as the LIBOR Certificates, among participants on whose behalf
it acts with respect to the book-entry certificates and to receive and transmit


                                    S-66

<PAGE>

distributions of principal of and interest on the book-entry certificates.
Participants and indirect participants with which beneficial owners have
accounts with respect to the book-entry certificates similarly are required to
make book-entry transfers and receive and transmit such distributions on behalf
of their respective beneficial owners.

        Beneficial owners that are not participants or indirect participants but
desire to purchase, sell or otherwise transfer ownership of, or other interests
in, book-entry certificates may do so only through participants and indirect
participants. In addition, beneficial owners will receive all distributions of
principal and interest from the securities administrator, or a paying agent on
behalf of the securities administrator, through DTC participants. DTC will
forward such distributions to its participants, which thereafter will forward
them to indirect participants or beneficial owners. Beneficial owners will not
be recognized by the securities administrator, the trustee or any paying agent
as holders of the LIBOR Certificates, and beneficial owners will be permitted to
exercise the rights of the holders of the LIBOR Certificates only indirectly
through DTC and its participants.

        Because of time zone differences, it is possible that credits of securities
received in Clearstream or Euroclear as a result of a transaction with a
participant will be made during subsequent securities settlement processing and
dated the business day following the DTC settlement date. Such credits or any

transactions in such securities settled during such processing will be reported to the relevant Euroclear or Clearstream participants on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream participant or Euroclear participant to a DTC participant will be received with value on the DTC settlement date but, due to time zone differences, may be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC.

Transfers between participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depositary, each of which is a participating member of DTC; provided, however, that such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depositary to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving distribution in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the relevant depositories for Clearstream or Euroclear.

Clearstream holds securities for its participant organizations and facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in accounts of Clearstream participants, thus eliminating the need for physical movement of securities. Transactions may be settled through Clearstream in many currencies, including United States dollars. Clearstream provides to its Clearstream participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. Clearstream participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream participant, either directly or indirectly.

Euroclear was created to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby

S-67

<PAGE>

eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium (the "EUROCLEAR OPERATOR"). The Euroclear Operator holds securities and book-entry interests in securities for participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear participants, and between Euroclear participants and participants of certain other securities intermediaries through electronic book-entry changes in accounts of such participants or other securities intermediaries. Non-participants of Euroclear may hold and transfer book-entry interests in the LIBOR Certificates through accounts with a direct participant of Euroclear or

any other securities intermediary that holds book-entry interests in the LIBOR
Certificates through one or more securities intermediaries standing between such
other securities intermediary and the Euroclear Operator.

     Securities clearance accounts and cash accounts with the Euroclear Operator
are governed by the Terms and Conditions Governing Use of Euroclear and the
related Operating Procedures of the Euroclear System, and applicable Belgian
law. All securities in Euroclear are held on a fungible basis without
attribution of specific certificates to specific securities clearance accounts.
The Euroclear Operator acts only on behalf of Euroclear participants and has no
record of or relationship with the persons holding through Euroclear
participants.

     Distributions on the book-entry certificates will be made on each
Distribution Date by the securities administrator to Cede & Co., as nominee of
DTC. DTC will be responsible for crediting the amount of such distributions to
the accounts of the applicable DTC participants in accordance with DTC's normal
procedures. Each DTC participant will be responsible for disbursing such
distribution to the beneficial owners of the book-entry certificates that it
represents and to each financial intermediary for which it acts as agent. Each
such financial intermediary will be responsible for disbursing funds to the
beneficial owners of the book-entry certificates that it represents.

     Under a book-entry format, beneficial owners of the book-entry certificates
may experience some delay in their receipt of distributions, since such
distributions will be forwarded by the securities administrator to Cede & Co.,
as nominee of DTC. Distributions with respect to certificates held through
Clearstream or Euroclear will be credited to the cash accounts of Clearstream
participants or Euroclear participants in accordance with the relevant system's
rules and procedures, to the extent received by the relevant depositary. Such
distributions will be subject to tax reporting in accordance with relevant
United States tax laws and regulations. Because DTC can only act on behalf of
financial intermediaries, the ability of a beneficial owner to pledge book-entry
certificates to persons or entities that do not participate in the DTC system,
or otherwise take actions in respect of such book-entry certificates, may be
limited due to the lack of physical certificates for such book-entry
certificates. In addition, issuance of the book-entry certificates in book-entry
form may reduce the liquidity of such certificates in the secondary market since
certain potential investors may be unwilling to purchase certificates for which
they cannot obtain physical certificates.

     Monthly and annual reports on the issuing entity made available by the
securities administrator to Cede & Co., as nominee of DTC, may be made available
to beneficial owners upon request, in accordance with the rules, regulations and
procedures creating and affecting DTC, and to the financial intermediaries to
whose DTC accounts the book-entry certificates of such beneficial owners are
credited.

     DTC has advised the depositor that it will take any action permitted to be
taken by a holder of the LIBOR Certificates under the pooling and servicing
agreement only at the direction of one or more participants to whose accounts
with DTC the book-entry certificates are credited. Additionally, DTC has advised
the depositor that it will take such actions with respect to specified
percentages of voting rights only at the direction of and on behalf of
participants whose holdings of book-entry certificates evidence such specified
percentages of voting rights. DTC may take conflicting actions with respect to
percentages of voting rights to the extent that participants whose holdings of
book-entry certificates evidence such percentages of voting rights authorize
divergent action.

                                    S-68

<PAGE>

     None of the issuing entity, the depositor, the sponsor, the servicer, the

master servicer, the securities administrator or the trustee will have any
responsibility for any aspect of the records relating to or distributions made
on account of beneficial ownership interests of the book-entry certificates held
by Cede & Co., as nominee for DTC, or for maintaining, supervising or reviewing
any records relating to such beneficial ownership interests or transfers of
them.

     Although DTC, Clearstream and Euroclear have agreed to the foregoing
procedures in order to facilitate transfers of certificates among participants
of DTC, Clearstream and Euroclear, they are under no obligation to perform or
continue to perform such procedures and such procedures may be discontinued at
any time. See "DESCRIPTION OF THE SECURITIES--BOOK-ENTRY REGISTRATION" in the
prospectus.

     See also the attached Annex I for certain information regarding U.S.
federal income tax documentation requirements for investors holding certificates
through Clearstream or Euroclear (or through DTC if the holder has an address
outside the United States).

DEFINITIVE CERTIFICATES

     The LIBOR Certificates, which will be issued initially as book-entry
certificates, will be converted to definitive certificates and reissued to
beneficial owners or their nominees, rather than to DTC or its nominee, only if
(a) DTC or the depositor advises the securities administrator in writing that
DTC is no longer willing or able to properly discharge its responsibilities as
depository with respect to the book-entry certificates and the securities
administrator or the depositor is unable to locate a qualified successor or (b)
the depositor notifies DTC of its intent to terminate the book-entry system
through DTC and, upon receipt of notice of such intent from DTC, the
participants holding beneficial interests in the certificates agree to initiate
such termination.

     Upon the occurrence of any event described in the immediately preceding
paragraph, DTC or the securities administrator, as applicable, will be required
to notify all participants of the availability through DTC of definitive
certificates. Upon delivery of definitive certificates, the securities
administrator will reissue the book-entry certificates as definitive
certificates to beneficial owners. Distributions of principal of, and interest
on, the book-entry certificates will thereafter be made by the securities
administrator, or a paying agent on behalf of the securities administrator,
directly to holders of definitive certificates in accordance with the procedures
set forth in the pooling and servicing agreement.

     Definitive certificates will be transferable and exchangeable at the
offices of the securities administrator, its agent or the certificate registrar
designated from time to time for those purposes. As of the closing, the
securities administrator designates its office located at Sixth Street and
Marquette Avenue, Minneapolis, Minnesota 55479 for those purposes. No service
charge will be imposed for any registration of transfer or exchange, but the
securities administrator may require payment of a sum sufficient to cover any
tax or other governmental charge imposed in connection with the transfer or
exchange.

ASSIGNMENT OF THE MORTGAGE LOANS

     Pursuant to certain mortgage loan purchase and warranties agreements, the
original loan sellers sold mortgage loans, without recourse, to GSMC. GSMC will
sell and convey the mortgage loans, including all principal outstanding as of,
and interest due and accruing after, the close of business on the cut-off date,
without recourse, to the depositor on the closing date. Pursuant to the pooling
and servicing agreement, the depositor will sell, without recourse, to the
issuing entity, all right, title and interest in and to each mortgage loan,
including all principal outstanding as of, and interest due after, the close of
business on the cut-off date. Each such transfer will convey all right, title

and interest in and to (a) principal outstanding as of the close of business on
the cut-off date (after giving effect to payments of principal due on that date,
whether or not received) and (b) interest due and accrued on each such mortgage
loan after the cut-off date. However, GSMC will not convey to the depositor, and
will retain all of its right, title and interest in and to (x) principal due on
each mortgage loan on or prior to the cut-off date and principal prepayments in
full and curtailments (i.e., partial prepayments) received on each such mortgage
loan on


                                    S-69
<PAGE>

or prior to the cut-off date and (y) interest due and accrued on each mortgage
loan on or prior to the cut-off date.

DELIVERY OF MORTGAGE LOAN DOCUMENTS

     In connection with the sale, transfer and assignment of each mortgage loan
to the issuing entity, the depositor will cause to be delivered to the
applicable custodian, on or before the closing date, the following documents
with respect to each mortgage loan which documents constitute the mortgage file:

    (a)  the original mortgage note, with all riders, endorsed without recourse
         in blank by the last endorsee, including all intervening endorsements
         showing a complete chain of endorsement from the originator to the
         last endorsee (except for no more than 1.00% of the mortgage loans for
         which there is a lost note affidavit and a copy of the mortgage note);

    (b)  the original of any guarantee executed in connection with the mortgage
         note;

    (c)  the related original mortgage, with all riders, and evidence of its
         recording or, in certain circumstances, (i) a copy of the mortgage
         certified by the title company, escrow agent or closing attorney
         stating that such mortgage has been dispatched for recordation and the
         original recorded mortgage or a copy of such mortgage certified by the
         appropriate public recording office will be promptly delivered upon
         receipt by the applicable original loan seller, or (ii) a copy of the
         mortgage certified by the appropriate public recording office to be a
         true and complete copy of the recorded original;

    (d)  except with respect to each MERS Designated Mortgage Loan, the
         originals of all intervening mortgage assignment(s), showing a
         complete chain of assignment from the originator of the related
         mortgage loan to the last endorsee or, in certain limited
         circumstances, (i) a copy of the intervening mortgage assignment or
         certified by the title company, escrow agent or closing attorney
         stating that such intervening mortgage assignment has been dispatched
         for recordation and the original intervening mortgage assignment or a
         copy of such intervening mortgage assignment certified by the
         appropriate public recording office will be promptly delivered upon
         receipt by the applicable original loan seller, or (ii) a copy of the
         intervening mortgage assignment certified by the appropriate public
         recording office to be a true and complete copy of the recorded
         original;

    (e)  except with respect to each MERS Designated Mortgage Loan, the
         original mortgage assignment in recordable form, which, if acceptable
         for recording in the relevant jurisdiction, may be included in a
         blanket assignment or assignments, of each mortgage from the last
         endorsee in blank;

    (f)  originals of all assumption, modification, consolidation and extension
         agreements, if any, with evidence of recording on them;

(g)  an original title insurance policy or, in the event the original
     policy is unavailable, a certified true copy of the related policy
     binder or commitment for title certified to be true and complete by
     the title insurance company; and

(h)  the original (or a copy of) any security agreement, chattel mortgage
     or equivalent document executed in connection with the mortgage.


     Pursuant to the pooling and servicing agreement, each custodian will agree
to execute and deliver on or prior to the closing date an acknowledgement of
receipt of the original mortgage note, item (a) above, with respect to the
applicable mortgage loans, with any exceptions noted. Each custodian will agree,
for the benefit of the holders of the certificates, to review, or cause to be
reviewed, each mortgage file required to be held by it within ninety days after
the closing date - or, with respect to any Substitute Mortgage Loan delivered to
the applicable custodian or the trustee, within thirty days after the receipt of
the mortgage file by the applicable custodian, - and to deliver a certification
generally to the effect that, as to each mortgage loan listed in the schedule of
mortgage loans:

     o    all documents required to be reviewed by it pursuant to the pooling
          and servicing agreement are in its possession;


                                   S-70

<PAGE>

     o    each such document has been reviewed by it and appears regular on its
          face and relates to such mortgage loan;

     o    based on its examination and only as to the foregoing documents,
          certain information set forth on the schedule of mortgage loans
          accurately reflects the information set forth in the mortgage file
          delivered on such date; and

     o    each mortgage note has been endorsed as provided in the pooling and
          servicing agreement.


     If the applicable custodian during the process of reviewing the mortgage
files, finds any document constituting a part of a mortgage file that is not
executed, has not been received or is unrelated to the mortgage loans, or that
any mortgage loan does not conform to the review criteria as set forth in the
pooling and servicing agreement, the applicable custodian is required to
promptly so notify GSMC, the servicer and the depositor in writing. GSMC will be
required to use reasonable efforts to cause to be remedied a material defect in
a document constituting part of a mortgage file of which it is so notified by
the applicable custodian or the trustee, as applicable. If, however, within 180
days after the earlier of either discovery by or notice to GSMC of such defect,
GSMC has not caused the defect to be remedied, GSMC will be required to purchase
such mortgage loan at a price equal to the outstanding principal balance of such
mortgage loan as of the date of repurchase, plus all related accrued and unpaid
interest at the applicable interest rate, plus the amount of any outstanding
advances owed to and reasonably incurred by the servicer, plus all costs and
expenses reasonably incurred by the servicer or the trustee in connection with
the mortgage loan or such repurchase and any costs and damages incurred by the
issuing entity in connection with any violation by the related mortgage loan of
any predatory or abusive lending law. In any case, the purchase price will be
deposited in the distribution account on the next succeeding Servicer Remittance
Date after deducting any amounts received in respect of such repurchased
mortgage loan or loans and being held in the distribution account for future
distribution to the extent such amounts have not yet been applied to principal
or interest on such mortgage loan or, with respect to any mortgage loan, GSMC
(only within two years of the closing date) may substitute in lieu of such
mortgage loan a Substitute Mortgage Loan and, if applicable, remit to the

servicer any Substitution Adjustment Amount. The obligations of GSMC to cure
that defect or to substitute or repurchase the applicable mortgage loan for that
defect will constitute the sole remedies respecting that defect available to the
holders of the certificates, the depositor, the servicer and the custodians.

REPRESENTATIONS AND WARRANTIES RELATING TO THE MORTGAGE LOANS

       Pursuant to a representations and warranties agreement (the "GSMC
REPRESENTATIONS AGREEMENT"), GSMC will make certain representations and
warranties with respect to each mortgage loan as of the closing date. The
representations and warranties made by GSMC include, but are not limited to:

   (1)  Except with respect to the Delinquent mortgage loans described under
        "THE MORTGAGE LOAN POOL--THE MORTGAGE LOANS" in this prospectus
        supplement, no payment required under the mortgage loan is one-month
        or more Delinquent;

   (2)  The mortgage loan is not subject to any right of rescission, set-off,
        counterclaim or defense, including, without limitation, the defense of
        usury, nor will the operation of any of the terms of the mortgage note
        or the mortgage, or the exercise of any right under the mortgage note
        or the mortgage, render either the mortgage note or the mortgage
        unenforceable, in whole or in part, or subject to any right of
        rescission, set-off, counterclaim or defense, including without
        limitation the defense of usury, and no such right of rescission,
        set-off, counterclaim or defense has been asserted with respect to
        such mortgage note or mortgage. To the best knowledge of the
        representing party, no mortgagor was a debtor in any state or federal
        bankruptcy or insolvency proceeding at the time the mortgage loan was
        originated;

   (3)  Pursuant to the terms of the mortgage, all buildings or other
        improvements upon the mortgaged property are insured by a generally
        acceptable insurer against loss by fire or hazards of extended
        coverage;

                                    S-71
<PAGE>

   (4)  The mortgage loan at origination complied in all respects with all
        applicable federal, state and local laws;

   (5)  The mortgage is a valid, subsisting and enforceable first or second
        (as applicable) lien on the mortgaged property, including all
        buildings and improvements on the mortgaged property and all
        additions, alterations and replacements made at any time with respect
        to the related mortgaged property. The lien of the mortgage is subject
        only to

        (A)  the first-lien, in case of second-lien mortgage loan;

        (B)  the lien of current real property taxes and assessments not yet
             due and payable;

        (C)  covenants, conditions and restrictions, rights of way, easements
             and other matters of the public record as of the date of
             recording acceptable to prudent mortgage lending institutions
             generally and specifically referred to in the lender's title
             insurance policy delivered to the originator of the mortgage loan
             and (a) specifically referred to or otherwise considered in the
             appraisal made for the originator of the mortgage loan or (b)
             which do not adversely affect the appraised value of the
             mortgaged property set forth in such appraisal; and

    (D) other matters to which like properties are commonly subject which
        do not materially interfere with the benefits of the security
        intended to be provided by the mortgage or the use, enjoyment,
        value or marketability of the related mortgaged property;

(6) The mortgage note and the mortgage and any other agreement executed
    and delivered by a mortgagor in connection with a mortgage loan are
    genuine, and each is the legal, valid and binding obligation of the
    signatory enforceable in accordance with its terms (including, without
    limitation, any provisions relating to prepayment charges or
    penalties), except as limited by bankruptcy, insolvency or other
    similar laws affecting creditor's rights. To the best knowledge of the
    representing party, all parties to the mortgage note, the mortgage and
    any such other agreement had legal capacity to enter into the mortgage
    loan and to execute and deliver the mortgage note, the mortgage and
    any such other agreement, and the mortgage note, the mortgage and any
    such other agreement have been duly and properly executed by such
    person;

(7) The mortgage loan is covered by an American Land Title Association
    lender's title insurance policy or other generally acceptable form of
    policy;

(8) Except as otherwise set forth in paragraph (1) above with respect to
    certain Delinquent mortgage loans, other than a mortgage loan which is
    due but not yet Delinquent, there is no default, breach, violation or
    event which would permit acceleration under the mortgage or the
    mortgage note and no event which, with the passage of time or with
    notice and the expiration of any grace or cure period, would
    constitute a default, breach, violation or event which would permit
    acceleration, and neither the representing party nor its affiliates or
    any of its respective predecessors have waived any default, breach,
    violation or event which would permit acceleration. With respect to
    each second-lien mortgage loan, (i) the prior mortgage is in full
    force and effect, (ii) there is no default, breach, violation or event
    of acceleration existing under such prior mortgage or the related
    mortgage note, (iii) no event which, with the passage of time or with
    notice and the expiration of any grace or cure period, would
    constitute a default, breach, violation or event of acceleration under
    the prior mortgage, and either (A) the prior mortgage contains a
    provision which allows or (B) applicable law requires, the mortgagee
    under the second-lien mortgage loan to receive notice of, and affords
    such mortgagee an opportunity to cure any default by payment in full
    or otherwise under the prior mortgage;

(9) The mortgage contains customary and enforceable provisions that render
    the rights and remedies of the holder of the mortgage adequate for the
    realization against the mortgaged property of the benefits of the
    security provided by the mortgaged property, including,

                                    S-72

<PAGE>

(i) in the case of a mortgage designated as a deed of trust, by
trustee's sale, and (ii) otherwise by judicial foreclosure;

    (10) There is no proceeding pending or, to the representing party's
         knowledge, as applicable, threatened for the total or partial
         condemnation of the mortgaged property, and the mortgaged property is
         undamaged by waste, fire, earthquake or earth movement, windstorm,
         flood, tornado or other casualty so as to affect adversely the value
         of the mortgaged property as security for the mortgage loan or the use
         for which the premises were intended;

(11) No mortgage loan is (i) covered by the provisions of the Home
     Ownership and Equity Protection Act of 1994 or (ii) in violation of,
     or classified as a "high cost," "threshold," "covered" (excluding home
     loans defined as "covered home loans" in the New Jersey Home Ownership
     Security Act of 2002 that were originated between November 26, 2003
     and July 7, 2004) or "predatory" loan under, any other applicable
     state, federal or local law (or a similarly classified loan using
     different terminology under a law imposing heightened regulatory
     scrutiny or additional legal liability for residential mortgage loans
     having high interest rates, points and/or fees);

(12) No mortgage loan originated on or after October 1, 2002, imposes a
     prepayment premium for a term in excess of three years after its
     origination, unless such mortgage loan was modified to reduce the
     prepayment period to no more than three years from the date of the
     mortgage note and the mortgagor was notified in writing of such
     reduction in prepayment premium period. No mortgage loan originated
     prior to October 1, 2002, imposes a prepayment premium for a term in
     excess of five years after its origination;

(13) No mortgage loan subject to the Georgia Fair Lending Act and secured
     by property located in the state of Georgia was originated on or after
     October 1, 2002 and prior to March 7, 2003;

(14) In connection with the origination of each mortgage loan, no proceeds
     from any mortgage loan were used to finance a single-premium
     credit-life insurance policy; and

(15) With respect to any mortgage loan originated on or after August 1,
     2004, neither the related mortgage nor the related mortgage note
     requires the mortgagor to submit to arbitration to resolve any dispute
     arising out of or relating in any way to the mortgage loan.

In addition, GSMC will represent and warrant that none of the group I
mortgage loans has a prepayment penalty period in excess of three years.

     Pursuant to the GSMC Representations Agreement, upon the discovery by GSMC,
the servicer, the master servicer, the securities administrator, the depositor,
the custodians or the trustee that any of the representations and warranties
contained in the GSMC Representations Agreement have been breached in any
material respect as of the date made, with the result that value of, or the
interests of the trustee or the holders of the certificates in the related
mortgage loan, were materially and adversely affected, the party discovering
such breach will be required to give prompt written notice to the other parties.
Subject to certain provisions of the GSMC Representations Agreement, within 90
days of the earlier to occur of GSMC's discovery of or its receipt of notice of
any such breach with respect to a mortgage loan, GSMC will be required to:

     o    use its best efforts to promptly cure such breach in all material
          respects,

     o    within two years of the closing date, remove each mortgage loan which
          has given rise to the requirement for action by the representing
          party, substitute one or more Substitute Mortgage Loans and, if the
          outstanding principal balance of such Substitute Mortgage Loans as of
          the date of such substitution is less than the outstanding principal
          balance, plus accrued and unpaid interest, of the replaced mortgage
          loans as of the date of substitution, deliver to the issuing entity
          the amount of such shortfall (the "SUBSTITUTION ADJUSTMENT AMOUNT"),
          or

                                        S-73

<PAGE>

    o     repurchase such mortgage loan at a repurchase price equal to the outstanding principal balance of such mortgage loan as of the date of repurchase, plus all related accrued and unpaid interest at the applicable interest rate, plus the amount of any outstanding advances owed to and reasonably incurred by the servicer, plus all costs and expenses reasonably incurred by the servicer or the trustee in connection with the mortgage loan or such repurchase and any costs and damages incurred by the issuing entity in connection with any violation by the related mortgage loan of any predatory or abusive lending law.

     Each of the applicable mortgage loan purchase and warranties agreements and its related trade confirmation letter requires the applicable original loan seller to repurchase any mortgage loan where the mortgagor fails to make its first payment (or the first or second payment in the case of one of the applicable original loan sellers) after the applicable Original Sale Date. It is possible that a mortgagor with respect to a mortgage loan transferred to the issuing entity might have failed to make one of these payments after the applicable Original Sale Date. In that circumstance, the issuing entity, with the depositor's consent, may direct the applicable original loan seller to repurchase that mortgage loan from the issuing entity. The repurchase price payable to the issuing entity will generally be the same as the repurchase price described above for breaches of representations and warranties.

     Notwithstanding the foregoing, pursuant to the terms of the GSMC Representations Agreement, in the event of discovery by GSMC or any party to the pooling and servicing agreement (a) that a mortgage loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code resulting from a breach of any representation or warranty contained in the GSMC Representations Agreement, or (b) of a breach of the representations and warranties listed as number (11), (12), (13), (14) or (15) in the third preceding full paragraph, GSMC will be required to repurchase the related mortgage loan at the applicable repurchase price within 60 days of such discovery or receipt of notice. The repurchase price with respect to such mortgage loan will be required to be deposited into the distribution account on the next succeeding Servicer Remittance Date after deducting any amounts received in respect of such repurchased mortgage loan or mortgage loans and being held in the distribution account for future distribution to the extent such amounts have not yet been applied to principal or interest on such mortgage loan.

     The obligations of GSMC to cure such breach or to substitute or repurchase the applicable mortgage loan will constitute the sole remedies respecting a material breach of any such representation or warranty to the holders of the certificates, the depositor, the servicer, the custodians, the master servicer, the securities administrator and the trustee.

PAYMENTS ON THE MORTGAGE LOANS

     The pooling and servicing agreement provides that the servicer is required to establish and maintain a separate collection account. The pooling and servicing agreement permits the servicer to direct any depository institution maintaining the collection account to invest the funds in the collection account in one or more eligible investments that mature, unless payable on demand, no later than the business day preceding the Servicer Remittance Date, as described below.

     The servicer is obligated to deposit or cause to be deposited in the collection account generally within two business days of determining the proper cash application after receipt of such funds, amounts representing the following payments and other collections received by it on or with respect to the mortgage loans after the cut-off date, other than in respect of monthly payments on the mortgage loans due and accrued on each mortgage loan up to and including any due date occurring prior to the cut-off date:

    o    all payments on account of principal, including prepayments of principal on the mortgage loans;

    o    all payments on account of interest, net of the servicing fee, on the mortgage loans;

    o    all Liquidation Proceeds;

S-74

<PAGE>

    o    all Insurance Proceeds and Condemnation Proceeds to the extent such Insurance Proceeds or Condemnation Proceeds are not to be applied to the restoration of the related mortgaged property or released to the related borrower in accordance with the express requirements of law or in accordance with prudent and customary servicing practices;

    o    all Substitution Adjustment Amounts for Substitute Mortgage Loans;

    o    all other amounts required to be deposited in the collection account pursuant to the pooling and servicing agreement; and

    o    any amounts required to be deposited in connection with net losses realized on investments of funds in the collection account.

The servicer is not permitted to commingle funds in the collection account with any other funds or assets.

The securities administrator, as paying agent for the benefit of the certificateholders, will be obligated to set up a distribution account with respect to the certificates into which the master servicer, upon receipt from the servicer, will be required to deposit or cause to be deposited the funds required to be remitted by the servicer on the Servicer Remittance Date. The pooling and servicing agreement permits but does not require the master servicer to invest the funds in the distribution account in one or more eligible investments that mature on or prior to the next Distribution Date.

The funds required to be remitted by the servicer on each Servicer Remittance Date will be equal to the sum, without duplication, of:

    o    all collections of scheduled principal and interest on the mortgage loans received by the servicer on or prior to the related Determination Date;

    o    all principal prepayments, Insurance Proceeds, Condemnation Proceeds and Liquidation Proceeds, if any, collected by the servicer during the related Prepayment Period;

    o    all P&I Advances made by the servicer with respect to payments due to be received on the mortgage loans on the related due date;

    o    amounts of compensating interest required to be deposited in connection with principal prepayments that are received during the prior calendar month, as described under "THE POOLING AND SERVICING AGREEMENT--PREPAYMENT INTEREST SHORTFALLS" in this prospectus supplement; and

    o    any other amounts required to be placed in the collection account by the servicer pursuant to the pooling and servicing agreement,

but excluding the following:

(a)    for any mortgage loan with respect to which the servicer has previously made an unreimbursed P&I Advance, amounts received on such

mortgage loan which represent late payments of principal and interest, Insurance Proceeds, Condemnation Proceeds or Liquidation Proceeds, to the extent of such unreimbursed P&I Advance;

(b)  amounts received on a particular mortgage loan with respect to which the servicer has previously made an unreimbursed servicing advance, to the extent of such unreimbursed servicing advance;

(c)  amounts representing prior advances by the servicer that are reimbursed to the servicer in connection with the modification of a mortgage loan;

(d)  for such Servicer Remittance Date, the aggregate servicing fee;

                                    S-75
<PAGE>

(e)  all net income from eligible investments that are held in the collection account for the account of the servicer;

(f)  all amounts recovered by the servicer in respect of late fees, assumption fees and similar fees;

(g)  for all mortgage loans for which P&I Advances or servicing advances are determined to be non-recoverable, all amounts equal to unreimbursed P&I Advances and servicing advances for such mortgage loans;

(h)  certain other amounts which are reimbursable to the depositor or the servicer, as provided in the pooling and servicing agreement;

(i)  all funds inadvertently placed in the collection account by the servicer; and

(j)  all collections of principal and interest not required to be remitted on each Servicer Remittance Date.

    The amounts described in clauses (a) through (j) above may be withdrawn by the servicer from the collection account on or prior to each Servicer Remittance Date.

ADMINISTRATION FEES

    As described under the definition of "AVAILABLE FUNDS" included in the "GLOSSARY OF TERMS" in this prospectus supplement, funds collected on the mortgage loans that are available for distribution to certificateholders will be net of the servicing fee and the master servicer fee payable on each mortgage loan. On each Distribution Date, the servicer and the master servicer will be entitled to their fee prior to the certificateholders receiving any distributions. The servicing fee and the master servicer fee for any Distribution Date for any mortgage loan will be an amount equal to one-twelfth of the servicing fee rate or the master servicer fee rate, as applicable, on the Stated Principal Balance of such mortgage loan as of the first day of the related Due Period, or as of the cut-off date, in the case of the first Distribution Date. The following table identifies the per annum fee rate applicable in calculating the servicing fee and the master servicer fee.

| FEE | PER ANNUM FEE RATE |
| --- | --- |
| Servicing Fee | 0.50% |
| Master Servicer Fee | 0.01% |

    The securities administrator will be entitled to retain any net interest or other income earned on deposits in the distribution account, and the securities

administrator will pay the trustee and each custodian their respective fees from
the securities administrator's own funds.

     In addition to the servicing fee and the master servicer fee, funds
collected on the mortgage loans that are available for distribution to the
certificateholders will also be net of any indemnification payments made to the
depositor, the servicer, the custodians, the master servicer, the securities
administrator or the trustee, as described under "THE POOLING AND SERVICING
AGREEMENT--CERTAIN MATTERS REGARDING THE DEPOSITOR, THE SERVICER, THE SECURITIES
ADMINISTRATOR, THE CUSTODIANS AND THE TRUSTEE" in this prospectus supplement,
and reimbursements for certain unanticipated expenses borne by the depositor,
the servicer, the custodians, the master servicer, the securities administrator
or the trustee, as described in this prospectus supplement and the accompanying
prospectus.

DISTRIBUTIONS

     Distributions on the certificates will be required to be made by the
securities administrator on the 25th day of each month, or, if that day is not a
business day, on the first business day thereafter, commencing in April 2007
(each, a "DISTRIBUTION DATE"), to the persons in whose names the certificates
are registered on the related Record Date.

                                    S-76
<PAGE>

     Distributions on each Distribution Date will be made by wire transfer in
immediately available funds to the account of the certificateholder at a bank or
other depository institution having appropriate wire transfer facilities as
directed by that certificateholder in its written wire instructions provided to
the securities administrator or if no wire instructions are provided then by
check mailed to the address of the person entitled to the distribution as it
appears on the applicable certificate register. However, the final distribution
in retirement of the certificates will be made only upon presentment and
surrender of those certificates at the office of the securities administrator
designated from time to time for those purposes. Initially, the securities
administrator designates the offices of its agent located Sixth Street and
Marquette Avenue, Minneapolis, Minnesota 55479 for those purposes.

CALCULATION OF INTEREST AND PRINCIPAL

     For any Distribution Date, the "PASS-THROUGH RATE" for each class of LIBOR
Certificates will be a per annum rate as set forth below:

         (a)  for the Class A-1 certificates, equal to the least of (1)
              One-Month LIBOR plus the related fixed margin for that class and
              that Distribution Date, (2) a per annum rate equal to the product
              of (i) 30 divided by the actual number of days in the applicable
              Interest Accrual Period and (ii) the sum of (A) the weighted
              average of the interest rates for each group I mortgage loan (in
              each case, less the applicable Expense Fee Rate), then in effect
              on the beginning of the related Due Period and (B) payments
              required to be made by the cap provider under the interest rate
              cap agreement ("CAP PAYMENTS"), if any, plus Net Swap Receipts,
              if any, less Net Swap Payments, if any, for that Distribution
              Date, divided by the Stated Principal Balance of the mortgage
              loans at the beginning of the related Due Period, multiplied by
              12 (referred to as the "LOAN GROUP I CAP") and (3) the WAC Cap;

         (b)  for each of the Class A-2A, Class A-2B, Class A-2C and Class A-2D
              certificates, equal to the least of (1) One-Month LIBOR plus the
              related fixed margin for that class and that Distribution Date,
              (2) a per annum rate equal to the product of (i) 30 divided by
              the actual number of days in the applicable Interest Accrual

Period and (ii) the sum of (A) the weighted average of the interest rates for each group II mortgage loan (in each case, less the applicable Expense Fee Rate) then in effect on the beginning of the related Due Period and (B) Cap Payments, if any, plus Net Swap Receipts, if any, less Net Swap Payments, if any, for that Distribution Date, divided by the Stated Principal Balance of the mortgage loans at the beginning of the related Due Period, multiplied by 12 (referred to as the "LOAN GROUP II CAP") and (3) the WAC Cap; and

(c)  for each of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates equal to the lesser of (1) One-Month LIBOR plus the related fixed margin for that class and that Distribution Date, and (2) the WAC Cap.

The "WAC CAP" for any Distribution Date will be a per annum rate equal to the product of (i) 30 divided by the actual number of days in the applicable Interest Accrual Period and (ii) the sum of (A) the weighted average of the interest rates on the mortgage loans (in each case, less the Expense Fee Rate) in effect at the beginning of the related Due Period on the mortgage loans, and (B) Cap Payments, if any, plus Net Swap Receipts, if any, less Net Swap Payments, if any, for that Distribution Date, divided by the Stated Principal Balance of the mortgage loans at the beginning of the related Due Period, multiplied by 12.

The fixed margin for each class of LIBOR Certificates is as follows: Class A-1, 0.235%; Class A-2A, 0.120%; Class A-2B, 0.210%; Class A-2C, 0.270%; Class A-2D, 0.370%; Class M-1, 0.500%; Class M-2, 0.550%; Class M-3, 0.900%; Class M-4, 1.250%; Class M-5, 1.650%; Class M-6, 2.200%; Class M-7, 2.250%; Class M-8, 2.250%; and Class M-9, 2.250%. On the Distribution Date immediately following the initial Distribution Date on which the majority Class C certificateholders have the option to direct the servicer to purchase all of the mortgage loans as described under "THE POOLING AND SERVICING AGREEMENT--TERMINATION; OPTIONAL CLEAN-UP CALL" in this prospectus supplement and each Distribution Date thereafter, the fixed margin for each class of LIBOR Certificates will increase to the following: Class A-1, 0.470%; Class A-2A, 0.240%; Class A-2B, 0.420%; Class A-2C, 0.540%; Class A-2D, 0.740%;

S-77

<PAGE>

Class M-1, 0.750%; Class M-2, 0.825%; Class M-3, 1.350%; Class M-4, 1.875%; Class M-5, 2.475%; Class M-6, 3.300%; Class M-7, 3.375%; Class M-8, 3.375%; and Class M-9 3.375%.

On each Distribution Date, distributions in reduction of the Class Certificate Balance of the certificates entitled to receive distributions of principal will be made in an amount equal to the Principal Distribution Amount. The "PRINCIPAL DISTRIBUTION AMOUNT" for each Distribution Date will equal the sum of (i) the Basic Principal Distribution Amount for that Distribution Date and (ii) the Extra Principal Distribution Amount for that Distribution Date.

Distributions will be determined in part based on the performance of individual loan groups and for such purpose any Net Swap Payments, Net Swap Receipts, Cap Payments or Swap Termination Payments will be allocated between loan groups based on the respective aggregate Stated Principal Balance of the mortgage loans in each loan group.

PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES

On each Distribution Date, the securities administrator will be required to make the disbursements and transfers specified below from the Available Funds then on deposit in the distribution account in the following order of priority:

STEP 1

(i)  to the holders of each class of LIBOR Certificates and to the
     Supplemental Interest Trust in the following order of priority:

     (a)  to the Supplemental Interest Trust, the sum of (x) all Net Swap
          Payments and (y) any Swap Termination Payment (to the extent not
          previously paid to the Swap Provider with funds paid by a
          replacement swap provider to the issuing entity), other than a
          Defaulted Swap Termination Payment, owed to the Swap Provider
          with respect to that Distribution Date;

     (b)  concurrently, (1) from Interest Remittance Amount related to the
          group I mortgage loans to the Class A-1 certificates, the related
          Accrued Certificate Interest and Unpaid Interest Amount for the
          Class A-1 certificates; and (2) from Interest Remittance Amount
          related to the group II mortgage loans, PRO RATA (based on the
          accrued and unpaid interest distributable to the Class A-2A,
          Class A-2B, Class A-2C and Class A-2D certificates) to the Class
          A-2A, Class A-2B, Class A-2C and Class A-2D certificates, the
          related Accrued Certificate Interest and Unpaid Interest Amounts
          for the Class A-2A, Class A-2B, Class A-2C and Class A-2D
          certificates; provided, that if the Interest Remittance Amount
          for either group of mortgage loans is insufficient to make the
          related payments set forth clause (1) or (2) above, any Interest
          Remittance Amount relating to the other group of mortgage loans
          remaining after payment of the related Accrued Certificate
          Interest and Unpaid Interest Amounts will be available to cover
          that shortfall;

     (c)  from any remaining Interest Remittance Amounts, to the Class M-1
          certificates, the Accrued Certificate Interest for that class;

     (d)  from any remaining Interest Remittance Amounts, to the Class M-2
          certificates, the Accrued Certificate Interest for that class;

     (e)  from any remaining Interest Remittance Amounts, to the Class M-3
          certificates, the Accrued Certificate Interest for that class;

     (f)  from any remaining Interest Remittance Amounts, to the Class M-4
          certificates, the Accrued Certificate Interest for that class;

     (g)  from any remaining Interest Remittance Amounts, to the Class M-5
          certificates, the Accrued Certificate Interest for that class;

                              S-78

<PAGE>

     (h)  from any remaining Interest Remittance Amounts, to the Class M-6
          certificates, the Accrued Certificate Interest for that class;

     (i)  from any remaining Interest Remittance Amounts, to the Class M-7
          certificates, the Accrued Certificate Interest for that class;

     (j)  from any remaining Interest Remittance Amounts, to the Class M-8
          certificates, the Accrued Certificate Interest for that class;
          and

     (k)  from any remaining Interest Remittance Amounts, to the Class M-9
          certificates, the Accrued Certificate Interest for that class;

STEP 2

(ii)  (A) on each Distribution Date (a) prior to the Stepdown Date or (b)
      with respect to which a Trigger Event is in effect, to the holders of
      the class or classes of LIBOR Certificates then entitled to
      distributions of principal as set forth below, an amount equal to the
      Principal Distribution Amount in the following order of priority:

      (a)  sequentially:

           concurrently, to the Class R, Class RC and Class RX
           certificates, PRO RATA, until their respective Class Certificate
           Balances have been reduced to zero, and

           to the Class A certificates, allocated among those classes as
           described under "--ALLOCATION OF PRINCIPAL PAYMENTS TO CLASS A
           CERTIFICATES" below until their respective Class Certificate Balances
           are reduced to zero; and

      (b)  sequentially to the Class M-1, Class M-2, Class M-3, Class M-4,
           Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9
           certificates, in that order, until their respective Class
           Certificate Balances are reduced to zero;

           (B)  on each Distribution Date (a) on or after the Stepdown Date
                and (b) so long as a Trigger Event is not in effect, to the
                holders of the class or classes of LIBOR Certificates then
                entitled to distributions of principal as set forth below,
                an amount equal to the Principal Distribution Amount in the
                following order of priority:

      (a)  to the Class A certificates, the lesser of (x) the Principal
           Distribution Amount and (y) the Class A Principal Distribution
           Amount, allocated among those classes as described under
           "--ALLOCATION OF PRINCIPAL PAYMENTS TO CLASS A CERTIFICATES"
           below, until their respective Class Certificate Balances are
           reduced to zero;

      (b)  to the Class M-1 certificates, the lesser of (x) the excess of
           (i) the Principal Distribution Amount over (ii) the amount
           distributed to the Class A certificates in clause (ii)(B)(a)
           above, and (y) the Class M-1 Principal Distribution Amount, until
           their Class Certificate Balance has been reduced to zero;

      (c)  to the Class M-2 certificates, the lesser of (x) the excess of
           (i) the Principal Distribution Amount over (ii) the amount
           distributed to the Class A certificates in clause (ii)(B)(a)
           above and to the Class M-1 certificates in clause (ii)(B)(b)
           above, and (y) the Class M-2 Principal Distribution Amount, until
           their Class Certificate Balance has been reduced to zero;

      (d)  to the Class M-3 certificates, the lesser of (x) the excess of
           (i) the Principal Distribution Amount over (ii) the amount
           distributed to the Class A certificates in clause (ii)(B)(a)
           above, to the Class M-1 certificates in clause (ii)(B)(b) above
           and to the Class M-2 certificates in clause (ii)(B)(c) above, and
           (y) the Class M-3 Principal Distribution Amount, until their
           Class Certificate Balance has been reduced to zero;

                                    S-79

<PAGE>

      (e)  to the Class M-4 certificates, the lesser of (x) the excess of
           (i) the Principal Distribution Amount over (ii) the amount
           distributed to the Class A certificates in clause (ii)(B)(a)
           above, to the Class M-1 certificates in clause (ii)(B)(b) above,
           to the Class M-2 certificates in clause (ii)(B)(c) above and to

the Class M-3 certificates in clause (ii)(B)(d) above, and (y)
the Class M-4 Principal Distribution Amount, until their Class
Certificate Balance has been reduced to zero;

(f) to the Class M-5 certificates, the lesser of (x) the excess of
(i) the Principal Distribution Amount over (ii) the amount
distributed to the Class A certificates in clause (ii)(B)(a)
above, to the Class M-1 certificates in clause (ii)(B)(b) above,
to the Class M-2 certificates in clause (ii)(B)(c) above, to the
Class M-3 certificates in clause (ii)(B)(d) above and to the
Class M-4 certificates in clause (ii)(B)(e) above, and (y) the
Class M-5 Principal Distribution Amount, until their Class
Certificate Balance has been reduced to zero;

(g) to the Class M-6 certificates, the lesser of (x) the excess of
(i) the Principal Distribution Amount over (ii) the amount
distributed to the Class A certificates in clause (ii)(B)(a)
above, to the Class M-1 certificates in clause (ii)(B)(b) above,
to the Class M-2 certificates in clause (ii)(B)(c) above, to the
Class M-3 certificates in clause (ii)(B)(d) above, to the Class
M-4 certificates in clause (ii)(B)(e) above and to the Class M-5
certificates in clause (ii)(B)(f) above, and (y) the Class M-6
Principal Distribution Amount, until their Class Certificate
Balance has been reduced to zero;

(h) to the Class M-7 certificates, the lesser of (x) the excess of
(i) the Principal Distribution Amount over (ii) the amount
distributed to the Class A certificates in clause (ii)(B)(a)
above, to the Class M-1 certificates in clause (ii)(B)(b) above,
to the Class M-2 certificates in clause (ii)(B)(c) above, to the
Class M-3 certificates in clause (ii)(B)(d) above, to the Class
M-4 certificates in clause (ii)(B)(e) above, to the Class M-5
certificates in clause (ii)(B)(f) above and to the Class M-6
certificates in clause (ii)(B)(g) above, and (y) the Class M-7
Principal Distribution Amount, until their Class Certificate
Balance has been reduced to zero;

(i) to the Class M-8 certificates, the lesser of (x) the excess of
(i) the Principal Distribution Amount over (ii) the amount
distributed to the Class A certificates in clause (ii)(B)(a)
above, to the Class M-1 certificates in clause (ii)(B)(b) above,
to the Class M-2 certificates in clause (ii)(B)(c) above, to the
Class M-3 certificates in clause (ii)(B)(d) above, to the Class
M-4 certificates in clause (ii)(B)(e) above, to the Class M-5
certificates in clause (ii)(B)(f) above, to the Class M-6
certificates in clause (ii)(B)(g) above and to the Class M-7
certificates in clause (ii)(B)(h) above, and (y) the Class M-8
Principal Distribution Amount, until their Class Certificate
Balance has been reduced to zero; and

(j) to the Class M-9 certificates, the lesser of (x) the excess of
(i) the Principal Distribution Amount over (ii) the amount
distributed to the Class A certificates in clause (ii)(B)(a)
above, to the Class M-1 certificates in clause (ii)(B)(b) above,
to the Class M-2 certificates in clause (ii)(B)(c) above, to the
Class M-3 certificates in clause (ii)(B)(d) above, to the Class
M-4 certificates in clause (ii)(B)(e) above, to the Class M-5
certificates in clause (ii)(B)(f) above, to the Class M-6
certificates in clause (ii)(B)(g) above, to the Class M-7
certificates in clause (ii)(B)(h) above and to the Class M-8
certificates in clause (ii)(B)(i) above, and (y) the Class M-9
Principal Distribution Amount, until their Class Certificate
Balance has been reduced to zero;

STEP 3

(iii)any amount remaining after the distributions in clauses (i) and (ii)
     above is required to be distributed in the following order of
     priority:

     (a)  to the holders of the Class M-1 certificates, any Unpaid Interest
          Amount for that class;

     (b)  to the holders of the Class M-2 certificates, any Unpaid Interest
          Amount for that class;

     (c)  to the holders of the Class M-3 certificates, any Unpaid Interest
          Amount for that class;

     (d)  to the holders of the Class M-4 certificates, any Unpaid Interest
          Amount for that class;

                                    S-80
<PAGE>

     (e)  to the holders of the Class M-5 certificates, any Unpaid Interest
          Amount for that class;

     (f)  to the holders of the Class M-6 certificates, any Unpaid Interest
          Amount for that class;

     (g)  to the holders of the Class M-7 certificates, any Unpaid Interest
          Amount for that class;

     (h)  to the holders of the Class M-8 certificates, any Unpaid Interest
          Amount for that class;

     (i)  to the holders of the Class M-9 certificates, any Unpaid Interest
          Amount for that class;

     (j)  to the Excess Reserve Fund Account, the amount of any Basis Risk
          Payment for that Distribution Date;

     (k)  from funds on deposit in the Excess Reserve Fund Account with
          respect to that Distribution Date, an amount equal to any Basis
          Risk Carry Forward Amount with respect to the LIBOR Certificates
          for that Distribution Date in the same order and priority in
          which Accrued Certificate Interest is allocated among those
          classes of certificates, with the allocation to the Class A
          certificates being PRO RATA based on their respective Basis Risk
          Carry Forward Amounts;

     (l)  to the Supplemental Interest Trust, the amount of any Defaulted
          Swap Termination Payment owed to the Swap Provider;

     (m)  if a 40-Year Trigger Event is in effect, any remaining amounts,
          first, to the Class A certificates, allocated to those classes as
          described under "--ALLOCATION OF PRINCIPAL PAYMENTS TO CLASS A
          CERTIFICATES" below, and then sequentially to the Class M-1,
          Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7,
          Class M-8 and Class M-9 certificates, the lesser of (x) any
          remaining amounts and (y) the amount necessary to increase the
          actual Overcollateralized Amount for such Distribution Date so
          that a 40-Year Trigger Event is no longer in effect, in each
          case, until their respective Class Certificate Balances have been
          reduced to zero;

     (n)  to the holders of the Class X certificates, those amounts of

interest and principal as set forth in the pooling and servicing agreement; and

(o) to the holders of the Residual Certificates, any remaining amount as set forth in the pooling and servicing agreement.

Notwithstanding the foregoing, if the Stepdown Date is the date on which the Class Certificate Balance of the Class A certificates is reduced to zero, any Principal Distribution Amount remaining after principal distributions to the Class A certificates pursuant to clause (ii)(A) above under the subheading "STEP 2" above will be included as part of the distributions pursuant to clause (ii)(B) above under the subheading "STEP 2" above.

On each Distribution Date, the securities administrator is required to distribute to the holders of the Class P certificates all amounts representing Prepayment Premiums in respect of the mortgage loans received during the related Prepayment Period, as set forth in the pooling and servicing agreement.

The Class C certificates will not have a principal balance and will not be entitled to distributions in respect of principal or interest. The Class C certificates will be entitled to direct the servicer to exercise the optional clean-up call, as described under "THE POOLING AND SERVICING AGREEMENT--TERMINATION; OPTIONAL CLEAN-UP CALL" in this prospectus supplement.

If on any Distribution Date, after giving effect to all distributions of principal as described above and allocations of payments from the Supplemental Interest Trust to pay principal as described under "--SUPPLEMENTAL INTEREST TRUST" below, the aggregate Class Certificate Balance of the LIBOR Certificates exceeds the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date, the Class Certificate Balance of the applicable Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates will be reduced, in inverse order of seniority (beginning with the Class M-9 certificates) by an amount equal to that excess, until that Class Certificate

                                    S-81

<PAGE>

Balance is reduced to zero. That reduction of a Class Certificate Balance is referred to as an "APPLIED REALIZED LOSS AMOUNT." In the event Applied Realized Loss Amounts are allocated to any class of certificates, their Class Certificate Balance will be reduced by the amount so allocated, and no funds will be distributable with respect to the written down amounts or with respect to interest or Basis Risk Carry Forward Amounts on the written down amounts on that Distribution Date or any future Distribution Dates, even if funds are otherwise available for distribution. Notwithstanding the foregoing, if after an Applied Realized Loss Amount is allocated to reduce the Class Certificate Balance of any class of certificates, amounts are received with respect to any mortgage loan or related mortgaged property that had previously been liquidated or otherwise disposed of (any such amount being referred to as a "SUBSEQUENT RECOVERY"), the Class Certificate Balance of each class of certificates that was previously reduced by Applied Realized Loss Amounts will be increased, in order of seniority, by the amount of the Subsequent Recoveries (but not in excess of the Applied Realized Loss Amount allocated to the applicable class of certificates). Any Subsequent Recovery that is received during a Prepayment Period will be treated as Liquidation Proceeds and included as part of the Principal Remittance Amount for the related Distribution Date.

On any Distribution Date, any shortfalls resulting from the application of the Servicemembers Civil Relief Act or other similar state statute and any prepayment interest shortfalls not covered by Compensating Interest (as further described in "THE POOLING AND SERVICING AGREEMENT--PREPAYMENT INTEREST SHORTFALLS" in this prospectus supplement) will be allocated first to reduce the amount of interest otherwise distributable on the Class X certificates, and thereafter to reduce the Accrued Certificate Interest on the LIBOR Certificates

on a PRO RATA basis based on the respective amounts of interest accrued on those certificates for that Distribution DATE. THE HOLDERS OF THOSE CERTIFICATES TO WHICH SUCH SHORTFALLS ARE ALLOCATED WILL NOT BE ENTITLED TO REIMBURSEMENT FOR THE ALLOCATION OF ANY OF THOSE SHORTFALLS DESCRIBED IN THE PRECEDING SENTENCE.

ALLOCATION OF PRINCIPAL PAYMENTS TO CLASS A CERTIFICATES

    All principal distributions to the holders of the Class A certificates on any Distribution Date will be allocated among the Class A-1 Certificate Group (i.e., the Class A-1 certificates) and the Class A-2 Certificate Group (i.e., the Class A-2A, Class A-2B, Class A-2C and Class A-2D certificates) based on the Class A Principal Allocation Percentage for the Class A-1 Certificate Group and Class A-2 Certificate Group, as applicable. However, if the Class Certificate Balances of the Class A certificates in any Class A Certificate Group is reduced to zero, then the remaining amount of principal distributions distributable to the Class A certificates in that Class A Certificate Group on that Distribution Date, and the amount of principal distributions distributable on all subsequent Distribution Dates, will be distributed to the other Class A Certificate Group remaining outstanding, until the Class Certificate Balances of the Class A certificates in that Class A Certificate Group have been reduced to zero. Payments of principal to the Class A-1 Certificate Group will be made first from payments relating to the group I mortgage loans, and payments of principal to the Class A-2 Certificate Group will be made first from payments relating to the group II mortgage loans.

    Principal distributions allocated to the Class A-1 Certificate Group are required to be distributed to the Class A-1 certificates, until their Class Certificate Balance has been reduced to zero.

    Principal distributions allocated to the Class A-2 Certificate Group are required to be distributed sequentially to the Class A-2A certificates, until their Class Certificate Balance has been reduced to zero, then to the Class A-2B certificates, until their Class Certificate Balance has been reduced to zero, then to the Class A-2C certificates, until their Class Certificate Balance has been reduced to zero and then to the Class A-2D certificates, until their Class Certificate Balance has been reduced to zero.

    Notwithstanding the foregoing, from and after the Distribution Date on which the Class Certificate Balances of the Subordinated Certificates and the principal balance of the Class X certificates have been reduced to zero, any principal distributions allocated to the Class A certificates are required to be allocated PRO RATA to the Class A certificates based on their respective Class Certificate Balances, until their respective Class Certificate Balances have been reduced to zero.

                                    S-82

<PAGE>

SUPPLEMENTAL INTEREST TRUST

    On any Distribution Date, Swap Termination Payments, Net Swap Payments owed to the Swap Provider, Net Swap Receipts and Cap Payments for that Distribution Date will be deposited into a trust account (the "SUPPLEMENTAL INTEREST TRUST") established by the securities administrator as an asset of the issuing entity. Funds in the Supplemental Interest Trust will be distributed in the following order of priority:

            (A)  to the Swap Provider, the sum of (x) all Net Swap Payments and
                 (y) any Swap Termination Payment, other than a Defaulted Swap
                 Termination Payment, if any, owed to the Swap Provider for that
                 Distribution Date (to the extent not previously paid to the Swap
                 Provider with funds paid by a replacement swap provider to the
                 issuing entity);

    (B)  to the certificateholders, to pay Accrued Certificate Interest
        and, if applicable, any Unpaid Interest Amounts as described
        under the subheading "STEP 1" in "--PRIORITY OF DISTRIBUTIONS AND
        ALLOCATION OF LOSSES" above, to the extent unpaid from Available
        Funds;

    (C)  to the certificateholders, to pay principal as described under
        the subheading "STEP 2" in "--PRIORITY OF DISTRIBUTIONS AND
        ALLOCATION OF LOSSES" above, but only to the extent necessary to
        restore the Overcollateralized Amount to the Specified
        Overcollateralized Amount as a result of current or prior
        Realized Losses not previously reimbursed, after giving effect to
        payments and distributions from Available Funds;

    (D)  to the certificateholders, to pay Unpaid Interest Amounts and
        Basis Risk Carry Forward Amounts as described under the
        subheading "STEP 3" in "--PRIORITY OF DISTRIBUTIONS AND
        ALLOCATION OF LOSSES" above, to the extent unpaid from Available
        Funds (including funds on deposit in the Excess Reserve Fund
        Account);

    (E)  to the Swap Provider, any Defaulted Swap Termination Payment owed
        to the Swap Provider for that Distribution Date; and

    (F)  to the holders of the Class X certificates, any remaining
        amounts.


    Notwithstanding the foregoing, in the event that the issuing entity
receives a Swap Termination Payment, and a successor swap provider cannot be
obtained, then the securities administrator will be required to deposit the Swap
Termination Payment into the reserve account that is a sub-account of the
Supplemental Interest Trust. On each subsequent Distribution Date (so long as
funds are available in the reserve account), the securities administrator will
be required to withdraw from the reserve account and deposit into the
Supplemental Interest Trust an amount equal to the amount of any Net Swap
Receipt due the issuing entity (calculated in accordance with the terms of the
original interest rate swap agreement) and treat such amount as a Net Swap
Receipt for purposes of determining the distributions from the Supplemental
Interest Trust. The remaining amount in the reserve account will remain in that
account and will not be treated as a Swap Termination Payment for purposes of
determining the distributions from the Supplemental Interest Trust until the
final Distribution Date. We cannot assure you that the amount of the Swap
Termination Payment deposited into the reserve account will be sufficient to
enable the securities administrator to pay each Net Swap Receipt that would have
otherwise been payable by the Swap Provider on each subsequent Distribution
Date.

    The Supplemental Interest Trust will not be an asset of any REMIC.

CALCULATION OF ONE-MONTH LIBOR

    On each LIBOR Determination Date, the securities administrator will be
required to determine One-Month LIBOR for the next Interest Accrual Period for
the LIBOR Certificates.


                             S-83

<PAGE>

EXCESS RESERVE FUND ACCOUNT

    The "BASIS RISK PAYMENT" for any Distribution Date will be the aggregate of
the Basis Risk Carry Forward Amounts for that date. However, with respect to any
Distribution Date, the payment cannot exceed the amount of Available Funds
otherwise distributable on the Class X certificates or payable from the

Supplemental Interest Trust.

If, on any Distribution Date, the Pass-Through Rate for any class of LIBOR Certificates is based upon the Loan Group I Cap, the Loan Group II Cap or the WAC Cap, as applicable, the sum of (x) the excess of (i) the amount of interest that class of certificates would have been entitled to receive on that Distribution Date had the Pass-Through Rate not been subject to the Loan Group I Cap, the Loan Group II Cap or the WAC Cap, over (ii) the amount of interest that class of certificates received on that Distribution Date based on its capped Pass-Through Rate and (y) the unpaid portion of any such excess described in clause (x) from prior Distribution Dates (and related accrued interest at the then applicable Pass-Through Rate on that class of certificates, without giving effect to those caps) is the "BASIS RISK CARRY FORWARD AMOUNT" for those classes of certificates.

Any Basis Risk Carry Forward Amount on any class of certificates will be paid on that Distribution Date or future Distribution Dates from and to the extent of funds available for distribution to that class of certificates in the Excess Reserve Fund Account and the Supplemental Interest Trust with respect to such Distribution Date (each as and to the extent described in this prospectus supplement). In the event any class of certificates is no longer outstanding, the applicable certificateholders will not be entitled to receive Basis Risk Carry Forward Amounts for that class of certificates.

In the event the Class Certificate Balance of any class of LIBOR Certificates is reduced because of Applied Realized Loss Amounts (and is not subsequently increased as a result of any Subsequent Recoveries), the applicable certificateholders will not be entitled to receive Basis Risk Carry Forward Amounts on the written down amounts on that Distribution Date or any future Distribution Dates, even if funds are otherwise available for distribution except to the extent that the Class Certificate Balance is increased as a result of any Subsequent Recovery. The ratings on the LIBOR Certificates do not address the likelihood of the payment of any Basis Risk Carry Forward Amount.

Pursuant to the pooling and servicing agreement, an account (the "EXCESS RESERVE FUND ACCOUNT") will be established by the securities administrator as an asset of the issuing entity. The Excess Reserve Fund Account will not be an asset of any REMIC. Holders of each of the LIBOR Certificates will be entitled to receive payments from the Excess Reserve Fund Account pursuant to the pooling and servicing agreement in an amount equal to any Basis Risk Carry Forward Amount for that class of certificates. The Excess Reserve Fund Account is required to be funded from amounts that would otherwise be paid to the Class X certificates. Any distribution by the securities administrator from amounts in the Excess Reserve Fund Account is required to be made on the applicable Distribution Date. Any Basis Risk Carry Forward Amounts remaining after amounts in the Excess Reserve Fund Account are used are payable from the Supplemental Interest Trust in the priority specified in "--SUPPLEMENTAL INTEREST TRUST" above.

INTEREST RATE SWAP AGREEMENT

On the closing date, an interest rate swap agreement with the Swap Provider will be assigned to and assumed by the issuing entity. Under the interest rate swap agreement, with respect to the first 60 Distribution Dates, the issuing entity will pay to the Swap Provider fixed payments at a rate of 5.00% per annum (calculated on an actual/360 basis), and the Swap Provider will pay to the issuing entity floating payments at a rate of one-month LIBOR (as determined pursuant to the interest rate swap agreement), in each case calculated on a notional amount equal to a scheduled notional amount set forth on Annex II to this prospectus supplement. To the extent that a fixed payment exceeds the floating payment payable with respect to any of the first 60 Distribution Dates, amounts otherwise available to certificateholders will be applied on such Distribution Date to make a net payment to the Swap Provider (each, a "NET SWAP PAYMENT"), and to the extent that the floating payment from the Swap Provider exceeds the fixed payment from the issuing entity payable with respect to any of

the first 60 Distribution Dates, the Swap

S-84

<PAGE>

Provider will owe a net payment to the securities administrator for deposit into the Supplemental Interest Trust on the business day preceding such Distribution Date (each, a "NET SWAP RECEIPT").

All payments due to the Swap Provider under the interest rate swap agreement will be paid from Available Funds on each applicable Distribution Date in accordance with the priority of payments described under "--SUPPLEMENTAL INTEREST TRUST" above and with any funds received from a replacement swap provider on any date on which such funds are received by the issuing entity. Any Swap Termination Payment (as defined below) other than a Defaulted Swap Termination Payment (as defined below) due to the Swap Provider will be paid on a senior basis on each applicable Distribution Date in accordance with the priority of payments and any Defaulted Swap Termination Payment owed by the issuing entity to the Swap Provider will be paid by the issuing entity on a subordinated basis. However, to the extent any payments are received by the issuing entity as a result of entering into replacement transaction(s) following a Downgrade Terminating Event (as defined below), the Swap Provider that is being replaced will have first priority to those payments over certificateholders, the servicer, the master servicer and the securities administrator and, on the date on which such payment is received by the issuing entity, the issuing entity will pay to the Swap Provider the lesser of (x) the amount so received and (y) any Swap Termination Payment owed to the Swap Provider (to the extent not already paid by the issuing entity) that is being replaced. If any such amount received from a replacement swap provider and paid to the Swap Provider is less than the full amount of a Swap Termination Payment owed to the Swap Provider, the remaining amount of Swap Termination Payment will remain payable to the Swap Provider in accordance with the priority of payments described under "--SUPPLEMENTAL INTEREST TRUST" above.

A "SWAP TERMINATION PAYMENT" is a termination payment required to be made by either the issuing entity or the Swap Provider pursuant to the interest rate swap agreement as a result of termination of the interest rate swap agreement.

The interest rate swap agreement can be terminated upon an event of default under that agreement or an early termination event under that agreement. Events of default under the interest rate swap agreement include, among other things, the following:

o    failure to pay,

o    bankruptcy and insolvency events, and

o    a merger by the Swap Provider without an assumption of its obligations under the interest rate swap agreement.

Early termination events under the interest rate swap agreement include, among other things:

o    illegality (which generally relates to changes in law causing it to become unlawful for either party (or its guarantor, if applicable) to perform its obligations under the interest rate swap agreement or guaranty, as applicable),

o    a tax event (which generally relates to either party to the interest rate swap agreement receiving a payment under the interest rate swap agreement from which an amount has been deducted or withheld for or on account of taxes or paying an additional amount on account of an indemnifiable tax),

        o    a tax event upon merger (which generally relates to either party
              receiving a payment under the interest rate swap agreement from which
              an amount has been deducted or withheld for or on account of taxes or
              paying an additional amount on account of an indemnifiable tax, in
              each case, resulting from a merger),

        o    upon the irrevocable direction to dissolve or otherwise terminate the
              issuing entity following which all assets of the issuing entity will
              be liquidated and the proceeds of such liquidation will be distributed
              to certificateholders, and

        o    upon the exercise of the Optional Clean-up Call.

<div align="center">S-85</div>

&lt;PAGE&gt;

    "DEFAULTED SWAP TERMINATION PAYMENT" means any termination payment required
to be made by the issuing entity to the Swap Provider pursuant to the interest
rate swap agreement as a result of an event of default under the interest rate
swap agreement with respect to which the Swap Provider is the defaulting party
or a termination event under that agreement (other than illegality, a tax event
or a tax event upon merger of the Swap Provider) with respect to which the Swap
Provider is the sole affected party or with respect to a termination resulting
from a Substitution Event (as described below).

    In addition to the termination events specified above, it will be an
additional termination event under the interest rate swap agreement (such event,
a "DOWNGRADE TERMINATING EVENT") if (x) either of the rating agencies downgrades
the Swap Provider below the Required Swap Counterparty Rating (but the Swap
Provider has a rating of at least "BBB-" or "A-3," if applicable, by S&P or "A1"
by Moody's or either of the rating agencies withdraws its rating of the Swap
Provider) and (y) at least one of the following events has not occurred (except
to the extent otherwise approved by the rating agencies):

        (i)    within the time period specified in the interest rate swap
              agreement with respect to such downgrade, the Swap Provider
              will transfer the interest rate swap agreement, in whole, but
              not in part, to a counterparty that satisfies the Required
              Swap Counterparty Rating, subject to the satisfaction of the
              Rating Agency Condition;

        (ii)   within the time period specified in the interest rate swap
              agreement with respect to such downgrade, the Swap Provider
              will collateralize its exposure to the issuing entity pursuant
              to an ISDA Credit Support Annex, subject to the satisfaction
              of the Rating Agency Condition; provided that such ISDA Credit
              Support Annex will be made a credit support document for the
              Swap Provider pursuant to an amendment to the interest rate
              swap agreement;

        (iii) within the time period specified in the interest rate swap
              agreement with respect to such downgrade, the obligations of
              such Swap Provider under the interest rate swap agreement will
              be guaranteed by a person or entity that satisfies the
              Required Swap Counterparty Rating, subject to the satisfaction
              of the Rating Agency Condition; or

        (iv)  within the time period specified in the interest rate swap
              agreement with respect to such downgrade, such Swap Provider
              will take such other steps, if any, to enable the issuing
              entity to satisfy the Rating Agency Condition.

    It will also be an additional termination event under the interest rate
swap agreement if the Swap Provider has a rating of less than "BBB-" or "A-3,"
if applicable, by S&P or "A1" by Moody's and within the time period specified in

the interest rate swap agreement, such Swap Provider, while collateralizing its exposure to the issuing entity, fails to transfer the interest rate swap agreement at its sole cost and expense, in whole, but not in part, to a counterparty that satisfies the Required Swap Counterparty Rating, subject to satisfaction of the Rating Agency Condition (a "SUBSTITUTION EVENT").

Finally, it will also be an additional termination event under the interest rate swap agreement if the depositor determines at any time that it is required for purpose of compliance with Item 1115(b)(1) or (b)(2) of the Asset Backed Securities Regulation, 17 C.F.R. ss.ss.229.1100-229.1123 ("REGULATION AB"), to provide any financial data relating to the Swap Provider. If such a determination is made, the Swap Provider will be permitted a reasonable period of time to select a successor swap provider at the sole cost and expense of the terminated swap provider. If no such successor is provided, the Swap Provider will be required to pay any applicable Defaulted Swap Termination Payment.

The Swap Provider is an affiliate, through common parent ownership, of the depositor, the sponsor, the servicer and the underwriter, which arrangement may create certain conflicts of interest.

If the issuing entity is unable to or, if applicable, chooses not to obtain a substitute interest rate swap agreement in the event that the interest rate swap agreement is terminated, interest distributable on the certificates will be paid from amounts received on the mortgage loans without the benefit of an interest rate swap agreement or a substitute interest rate swap agreement.

                                    S-86
<PAGE>

On or after the closing date and so long as the Rating Agency Condition has been satisfied, (i) the issuing entity may, with the consent of the Swap Provider, assign or transfer all or a portion of the interest rate swap agreement, (ii) the Swap Provider may, subject to certain limitations on assignment set forth in the interest rate swap agreement, assign its obligations under the interest rate swap agreement to any institution, (iii) the interest rate swap agreement may be amended and/or (iv) the interest rate swap agreement may be terminated or replaced.

The interest rate swap agreement is scheduled to terminate by its terms following the Distribution Date in March 2012 and upon termination of the interest rate swap agreement no further amounts will be paid to the Swap Provider by the issuing entity and no further amounts will be paid to the issuing entity by the Swap Provider.

The Significance Percentage of the interest rate swap agreement will be less than 10% as of the closing date. The Significance Percentage is calculated by reference to the "SIGNIFICANCE ESTIMATE" of the interest rate swap agreement which is determined based on a reasonable good faith estimate of maximum probable exposure represented by the interest rate swap agreement made in substantially the same manner as that used in the sponsor's internal risk management process in respect of similar instruments. The "SIGNIFICANCE PERCENTAGE" is the percentage that the amount of the Significance Estimate represents of the aggregate principal balance of the mortgage loans.

INTEREST RATE CAP AGREEMENT

The LIBOR Certificates will have the benefit of an interest rate cap agreement provided by the Cap Provider. All obligations of the issuing entity under the interest rate cap agreement will be paid on or prior to the closing date.

The interest rate cap agreement will have an initial notional amount of $0. In connection with the first 60 Distribution Dates, the Cap Provider will be obligated under this interest rate cap agreement to pay to the securities administrator, for deposit into the Supplemental Interest Trust, an amount equal

to the product of (a) the excess, if any, of (i) the one-month LIBOR rate as of
that Distribution Date over (ii) the cap strike rate of 6.50% per annum, (b) a
notional amount equal to the applicable scheduled notional amount set forth on
Annex III to this prospectus supplement, and (c) the actual number of days in
the applicable interest accrual period divided by 360. The Cap Provider's
obligations under the interest rate cap agreement will terminate following the
Distribution Date in March 2012.

The specified cap notional amounts for the interest rate cap agreement are
set forth on Annex III to this prospectus supplement.

Amounts, if any, payable under the interest rate cap agreement with respect
to any Distribution Date will be applied as set forth under "--SUPPLEMENTAL
INTEREST TRUST" above.

The interest rate cap agreement will be governed by and construed in
accordance with the law of the State of New York. The obligations of the Cap
Provider are limited to those specifically set forth in the interest rate cap
agreement.

The Significance Percentage of the interest rate cap agreement will be less
than 10% as of the closing date.

OVERCOLLATERALIZATION PROVISIONS

The Total Monthly Excess Spread, if any, on any Distribution Date may be
applied as an accelerated payment of principal of the LIBOR Certificates, to the
limited extent described below. Any such application of Total Monthly Excess
Spread to the payment of Extra Principal Distribution Amount to the class or
classes of certificates then entitled to distributions of principal would have
the effect of accelerating the amortization of those certificates relative to
the amortization of the related mortgage loans. The portion, if any, of the
Available Funds not required to be distributed to holders of the LIBOR
Certificates or paid to the Supplemental Interest Trust as described above on
any Distribution Date will be paid to the holders of the Class X certificates
and will not be available on any future Distribution Date to

S-87

<PAGE>

cover Extra Principal Distribution Amounts, Unpaid Interest Amounts or Basis
Risk Carry Forward Amounts.

With respect to any Distribution Date, the excess, if any, of (a) the
aggregate Stated Principal Balances of the mortgage loans for that Distribution
Date over (b) the aggregate Class Certificate Balance of the LIBOR Certificates
and the Residual Certificates as of that date (after taking into account the
distribution of the Principal Remittance Amount on those certificates on that
Distribution Date) is the "OVERCOLLATERALIZED AMOUNT" as of that Distribution
Date. The pooling and servicing agreement will require that the Total Monthly
Excess Spread be applied as an accelerated payment of principal on the
certificates then entitled to receive distributions of principal to the extent
that the Specified Overcollateralized Amount exceeds the Overcollateralized
Amount as of that Distribution Date (the excess is referred to as an
"OVERCOLLATERALIZATION DEFICIENCY"). Any amount of Total Monthly Excess Spread
actually applied as an accelerated payment of principal is an "EXTRA PRINCIPAL
DISTRIBUTION AMOUNT." The required level of the Overcollateralized Amount with
respect to a Distribution Date is the "SPECIFIED OVERCOLLATERALIZED AMOUNT" and
is set forth in the definition of Specified Overcollateralized Amount in the
"GLOSSARY OF TERMS" in this prospectus supplement. On or after the Stepdown
Date, the Specified Overcollateralized Amount may decrease, subject to a floor
and certain triggers. If a Trigger Event occurs, the Specified
Overcollateralized Amount may not "step down." Total Monthly Excess Spread will
then be applied to the payment in reduction of principal of the class or classes
of certificates then entitled to distributions of principal during the period

that a Trigger Event is in effect, to the extent necessary to restore the
Overcollateralized Amount at the Specified Overcollateralized Amount.

     In the event that a Specified Overcollateralized Amount is permitted to
decrease or "step down" on a Distribution Date in the future, or in the event
that an Excess Overcollateralized Amount otherwise exists, the pooling and
servicing agreement provides that some or all of the principal which would
otherwise be distributed to the holders of the LIBOR Certificates on that
Distribution Date will be distributed to the holders of the Class X certificates
on that Distribution Date (to the extent not required to pay certain other
amounts entitled to a higher priority of payment as described under the
subheading "STEP 3" in "--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES"
above) until the Excess Overcollateralized Amount is reduced to zero. This has
the effect of decelerating the amortization of the LIBOR Certificates relative
to the amortization of the mortgage loans, and of reducing the related
Overcollateralized Amount. With respect to any Distribution Date, the excess, if
any, of (a) the Overcollateralized Amount on that Distribution Date over (b) the
Specified Overcollateralized Amount is the "EXCESS OVERCOLLATERALIZED AMOUNT"
with respect to that Distribution Date. If, on any Distribution Date, the Excess
Overcollateralized Amount is, or, after taking into account all other
distributions to be made on that Distribution Date, would be, greater than zero
(i.e., the related Overcollateralized Amount is or would be greater than the
related Specified Overcollateralized Amount), then any amounts relating to
principal which would otherwise be distributed to the holders of the LIBOR
Certificates on that Distribution Date will instead be distributed to the
holders of the Class X certificates (to the extent not required to pay Unpaid
Interest Amounts or Basis Risk Carry Forward Amounts to the LIBOR Certificates
or certain other amounts entitled to a higher priority of payment as described
under the subheading "STEP 3" in "--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF
LOSSES" above) in an amount equal to the lesser of (x) the Excess
Overcollateralized Amount and (y) the Net Monthly Excess Cash Flow (referred to
as the "OVERCOLLATERALIZATION REDUCTION AMOUNT" for that Distribution Date). The
"NET MONTHLY EXCESS CASH FLOW" is the amount of Available Funds remaining on a
Distribution Date after taking into account the amount necessary to make all
payments of interest and principal to the LIBOR Certificates and all amounts
required to be paid to the Swap Provider on that Distribution Date from
Available Funds (other than Defaulted Swap Termination Payments).

RESTRICTIONS ON TRANSFER OF THE RESIDUAL CERTIFICATES

     The REMIC provisions of the Code impose certain taxes on (i) transferors of
residual interests to, or agents that acquire residual interests on behalf of,
disqualified organizations and (ii) certain pass-through entities that have
disqualified organizations as beneficial owners. No tax will be imposed on a
pass-through entity (other than an "electing large partnership") with regard to
the Residual Certificates to the extent it has received an affidavit from each
owner of a Residual Certificate indicating that the owner is not a disqualified
organization or a nominee for a disqualified organization. The pooling and
servicing agreement will provide that no legal or beneficial interest in a
Residual Certificate may be transferred to or

                                   S-88
<PAGE>

registered in the name of any person unless (i) the proposed purchaser provides
to the transferor and the securities administrator an affidavit, substantially
in the form set forth in the pooling and servicing agreement, to the effect
that, among other items, such transferee is not a disqualified organization and
is not purchasing such Residual Certificate as an agent (i.e., as a broker,
nominee, or other middleman for such purpose) for a disqualified organization
and is otherwise making such purchase pursuant to a permitted transfer and (ii)
the transferor states in a writing to the securities administrator that it has
no actual knowledge that such affidavit is false. Further the affidavit requires
the transferee to affirm that it (i) historically has paid its debts as they
have come due and intends to do so in the future, (ii) understands that it may

incur tax liabilities with respect to such Residual Certificate in excess of cash flows generated thereby, (iii) intends to pay taxes associated with holding such Residual Certificate as such taxes become due, (iv) will not cause the income attributable to such Residual Certificate to be attributable to a foreign permanent establishment or fixed base, within the meaning of an applicable income tax treaty, of the transferee or any other U.S. person and (v) will not transfer such Residual Certificate to any person or entity that does not provide a similar affidavit. The transferor must also certify in a writing to the securities administrator in the form set forth in the pooling and servicing agreement that it had no knowledge or reason to know that the affirmations made by the transferee pursuant to the preceding clauses (i), (iii) and (iv) were false.

In addition, Treasury regulations require either that (i) the transferor of a Residual Certificate pay the transferee a specified minimum formula amount designed to compensate the transferee for assuming the related tax liability or (ii) the transfer be to an eligible corporation that agrees to make any further qualifying transfers in order to meet the safe harbor against the possible disregard of such transfer. Because these rules are not mandatory but would provide safe harbor protection, the pooling and servicing agreement will not require that they be met as a condition to transfer of the Residual Certificates. Holders of the Residual Certificates are advised to consult their tax advisors as to whether and how to qualify for protection of the safe harbor for transfers and whether or in what amount any payment should be made upon transfer of the Residual Certificate. See "FEDERAL INCOME TAX CONSEQUENCES--TAX TREATMENT OF REMIC REGULAR INTERESTS AND OTHER DEBT INSTRUMENTS," and "-TAX TREATMENT OF REMIC RESIDUAL INTERESTS--NON-RECOGNITION OF CERTAIN TRANSFERS FOR FEDERAL INCOME TAX PURPOSES" in the prospectus.

Finally, the Residual Certificates may not be purchased by or transferred to any person that is not a "U.S. PERSON" unless (i) such person holds such Residual Certificates in connection with the conduct of trade or business within the United States and furnishes the transferor and the securities administrator with an effective Internal Revenue Service Form W-8ECI or (ii) the transferee delivers to both the transferor and the securities administrator an opinion of a nationally recognized tax counsel to the effect that such transfer is in accordance with the requirements of the Code and the regulations promulgated under the Code and that such transfer of the Residual Certificates will not be disregarded for federal income tax purposes. The term "U.S. Person" means a citizen or resident of the United States, a corporation or partnership created or organized in or under the laws of the United States, any State or the District of Columbia (unless, in the case of a partnership, Treasury regulations are adopted that provide otherwise), including an entity treated as a corporation or partnership for federal income tax purposes, an estate whose income is subject to U.S. federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of such trust, and one or more such U.S. Persons have the authority to control all substantial decisions of such trust (or, to the extent provided in applicable Treasury regulations, a trust in existence on August 20, 1996, which is eligible to elect to be treated as a U.S. Person and so elects). Under temporary and final Treasury Regulations, effective August 1, 2006, a U.S. partnership having a partner who is not a U.S. Person will be required to pay withholding tax in respect of excess inclusion income allocable to such non-U.S. partner, even if no cash distributions are made to such partner. Accordingly, the pooling and servicing agreement will prohibit transfer of a Residual Certificate to a U.S. Person treated as a partnership for federal income tax purposes, any beneficial owner of which (other than through a U.S. corporation) is (or is permitted to be under the related partnership agreement) a non-U.S. Person.

The pooling and servicing agreement provides that any attempted or purported transfer of Residual Certificates in violation of those transfer restrictions will be null and void ab initio and will vest no rights in any purported transferee and will not relieve the transferor of any obligations with respect to the Residual

S-89

<PAGE>

Certificates. Any transferor or agent to whom information is provided as to any
applicable tax imposed on such transferor or agent may be required to bear the
cost of computing or providing such information.

The Residual Certificates may not be purchased by or transferred to any
person which is a Plan (as defined in "ERISA CONSIDERATIONS" below) or any plan
or arrangement subject to Similar Law. See "ERISA CONSIDERATIONS" in this
prospectus supplement and in the prospectus.

The Residual Certificates will contain a legend describing the foregoing
restrictions.

REPORTS TO CERTIFICATEHOLDERS

On each Distribution Date the securities administrator will make available
via its internet website to each holder of an Offered Certificate a distribution
report, based on information provided to the securities administrator by the
master servicer, the servicer and the swap provider, containing the following:

    o    the amount of the distribution allocable to principal, separately
         identifying the aggregate amount of any principal prepayments and
         Liquidation Proceeds included in that distribution;

    o    the amount of the distribution allocable to interest, any Unpaid
         Interest Amounts included in such distribution and any remaining
         Unpaid Interest Amounts after giving effect to such distribution, any
         Basis Risk Carry Forward Amount for such Distribution Date and the
         amount of all Basis Risk Carry Forward Amounts covered by withdrawals
         from the Excess Reserve Fund Account on such Distribution Date;

    o    if the distribution to the holders of such class of certificates is
         less than the full amount that would be distributable to such holders
         if there were sufficient funds available for such distribution, the
         amount of the shortfall and the allocation of the shortfall as between
         principal and interest, including any Basis Risk Carry Forward Amount
         not covered by amounts in the Excess Reserve Fund Account;

    o    the Class Certificate Balance of each class of certificates after
         giving effect to the distribution of principal on such Distribution
         Date;

    o    the aggregate Stated Principal Balance of the mortgage loans for the
         following Distribution Date;

    o    the amount of the expenses and fees paid to or retained by the
         servicer and paid to or retained by the securities administrator with
         respect to such Distribution Date;

    o    the Pass-Through Rate for each such class of certificates with respect
         to such Distribution Date;

    o    the amount of advances included in the distribution on such
         Distribution Date and the aggregate amount of advances reported by the
         servicer, if provided by the servicer (and the master servicer as
         successor servicer and any other successor servicer, if applicable) as
         outstanding as of the close of business on the Determination Date
         immediately preceding such Distribution Date;

    o    the aggregate number and aggregate Stated Principal Balance of such
         mortgage loans (1) as to which the scheduled payment is Delinquent 31
         to 60 days, 61 to 90 days and 91 or more days, (2) that have become

REO property, (3) that are in foreclosure and (4) that are in
bankruptcy, in each case as of the close of business on the last
business day of the immediately preceding month;

- o    the total number and principal balance of any REO properties (and
market value, if available) as of the close of business on the last
business day of the immediately preceding month;

- o    whether a Trigger Event has occurred and is continuing (including the
separate components of the calculation demonstrating the existence of
the Trigger Event and the aggregate outstanding balance of all
mortgage loans 60 or more days Delinquent);

<div align="center">S-90</div>

&lt;PAGE&gt;

- o    the amount on deposit in the Excess Reserve Fund Account (after giving
effect to distributions on such Distribution Date);

- o    in the aggregate and for each class of certificates, the aggregate
amount of Applied Realized Loss Amounts incurred during the preceding
calendar month and aggregate Applied Realized Loss Amounts through
such Distribution Date;

- o    the amount of any Net Monthly Excess Cash Flow on such Distribution
Date and the allocation of it to the certificateholders with respect
to Unpaid Interest Amounts;

- o    the Overcollateralized Amount and Specified Overcollateralized Amount;

- o    Prepayment Premiums collected by the servicer;

- o    the percentage equal to the aggregate realized losses divided by the
aggregate Stated Principal Balance of the mortgage loans as of the
cut-off date;

- o    the amount distributed on the Class X certificates;

- o    the amount of any Subsequent Recoveries for such Distribution Date, to
the extent provided by the servicer;

- o    the Record Date for such Distribution Date; and

- o    updated mortgage loan information, such as weighted average interest
rate, and weighted average remaining term.

The securities administrator will provide the monthly distribution report
via the securities administrator's internet website. The securities
administrator's website will initially be located at https://www.ctslink.com and
assistance in using the website can be obtained by calling the securities
administrator's customer service desk at (866) 846-4526. Parties that are unable
to use the website are entitled to have a paper copy mailed to them via first
class mail by calling the securities administrator's customer service desk and
requesting a copy. As a condition to access the securities administrator's
internet website, the securities administrator may require registration and the
acceptance of a disclaimer. The securities administrator will have the right to
change the way the monthly statements to certificateholders are distributed in
order to make such distribution more convenient and/or more accessible to the
above parties and the securities administrator will provide timely and adequate
notification to all above parties regarding any such changes. The securities
administrator will not be liable for the dissemination of information in
accordance with the pooling and servicing agreement.

The securities administrator will also be entitled to rely on, but will not
be responsible for, the content or accuracy of any information provided by third

parties for purposes of preparing the monthly distribution report and may affix
to that report any disclaimer it deems appropriate in its reasonable discretion
(without suggesting liability on the part of any other party to the pooling and
servicing agreement).

YIELD ON THE RESIDUAL CERTIFICATES

     The after-tax rate of return to the holders of the Residual Certificates
will reflect their pre-tax rates of return (which may be zero), reduced by the
taxes required to be paid with respect to such certificates. If you hold a
Residual Certificate, you may have tax liabilities during the early years of the
related REMIC's term that substantially exceed any distributions payable on your
Residual Certificate during any such period. In addition, the present value of
the tax liabilities with respect to your Residual Certificate may substantially
exceed the present value of any distributions on your Residual Certificate and
of any tax benefits that may arise with respect to it. ACCORDINGLY, THE AFTER
TAX RATE OF RETURN ON THE RESIDUAL CERTIFICATES MAY BE NEGATIVE OR MAY BE
OTHERWISE SIGNIFICANTLY ADVERSELY AFFECTED. The timing and amount of taxable
income attributable to the Residual Certificates will depend on, among other
things, the timing and amounts of prepayments and losses experienced with
respect to the mortgage loans. If you own a Residual Certificate, you should
consult your tax advisors regarding the effect of taxes and the

                                   S-91

<PAGE>

receipt of any payments made in connection with the purchase of the Residual
Certificate on your after tax rate of return. See "FEDERAL INCOME TAX
CONSEQUENCES" in this prospectus supplement and in the prospectus.

                    THE POOLING AND SERVICING AGREEMENT

GENERAL

     The pooling and servicing agreement will be entered into among the
depositor, Wells Fargo Bank, N.A., Avelo, LaSalle Bank National Association,
U.S. Bank National Association and Deutsche Bank National Trust Company. The
pooling and servicing agreement will govern the rights and responsibilities of
the parties responsible for administering the issuing entity.

     In servicing the mortgage loans, the servicer will be required to use the
same care as it customarily employs in servicing and administering similar
mortgage loans for its own account, in accordance with customary and standard
mortgage servicing practices of mortgage lenders and loan servicers
administering similar mortgage loans and in accordance with the terms of the
pooling and servicing agreement. The methodology the servicer will employ for
determining delinquencies is as described in the definition of "DELINQUENT" in
this prospectus supplement.

SUBSERVICERS

     The servicer may enter into subservicing agreements with subservicers for
the servicing and administration of the mortgage loans. However, as set forth in
the pooling and servicing agreement, no subservicing agreement will generally
take effect until 30 days after written notice is received by each of the
securities administrator, the master servicer, the trustee and the depositor.
The terms of any subservicing agreement may not be inconsistent with any of the
provisions of the pooling and servicing agreement. Any subservicing agreement
will include the provision that such agreement may be immediately terminated by
the depositor, the master servicer or the trustee without fee, in accordance
with the terms of the pooling and servicing agreement, in the event that the
servicer, for any reason, is no longer a servicer (including termination due to
a servicer event of default).

     The servicer will remain obligated and primarily liable to the trustee for

the servicing and administering of the mortgage loans in accordance with the provisions of the pooling and servicing agreement without diminution of such obligation or liability by virtue of the subservicing agreements or arrangements or by virtue of indemnification from the subservicer and to the same extent and under the same terms and conditions as if the servicer alone were servicing and administering the mortgage loans. The servicer will be solely liable for all fees owed by it to any subservicer, regardless of whether the servicer's compensation is sufficient to pay the subservicer fees.

SERVICING, SECURITIES ADMINISTRATOR, TRUSTEE AND CUSTODIAL FEES AND
OTHER COMPENSATION AND PAYMENT OF EXPENSES

    As compensation for its activities as the servicer under the pooling and servicing agreement, the servicer is entitled with respect to each mortgage loan serviced by it to the servicing fee, which will be retained by the servicer or payable monthly from amounts on deposit in the collection account. The servicing fee for each Distribution Date will be an amount equal to one-twelfth of the servicing fee rate for the applicable mortgage loan on the Stated Principal Balance of such mortgage loan as of the first day of the related Due Period, or as of the cut-off date, in the case of the first Distribution Date. See "DESCRIPTION OF THE CERTIFICATES--ADMINISTRATION FEES" in this prospectus supplement. In addition, the servicer is entitled to receive, as additional servicing compensation, to the extent permitted by applicable law and the related mortgage notes, any late payment charges, modification fees, assumption fees or similar items (other than Prepayment Premiums). The servicer is also entitled to withdraw from the collection account or any related escrow account, to the extent permitted by applicable law, any net interest or other income earned on deposits in the collection account or escrow account, as the case may be. The servicer will be required to pay all expenses incurred by it in connection with its servicing

                                    S-92
<PAGE>

activities under the pooling and servicing agreement and is not entitled to reimbursement for such expenses, except as specifically provided in the pooling and servicing agreement.

    As compensation for its activities as securities administrator, the securities administrator will be entitled to retain any net interest or other income earned on deposits in the distribution account.

    As compensation for its activities as trustee under the pooling and servicing agreement, the trustee will be entitled to a fee, which will be paid to the trustee by the securities administrator from its own funds.

     As compensation for its activities as custodian under the pooling and servicing agreement, each custodian will be entitled to a fee, which will be paid to each custodian by the securities administrator from its own funds.

    See "DESCRIPTION OF THE CERTIFICATES--ADMINISTRATION FEES" in this prospectus supplement.

P&I ADVANCES AND SERVICING ADVANCES

    The servicer is required to make P&I Advances on each Servicer Remittance Date with respect to each mortgage loan it services, subject to the servicer's determination in its good faith business judgment that such advance would be recoverable. The servicer will not be required, however, to make any P&I Advances with respect to reductions in the amount of the monthly payments due on the mortgage loans as a result of a final, non-appealable adjudication by a court of competent jurisdiction in a bankruptcy proceeding, or as a result of the application of the Servicemembers Civil Relief Act. Such P&I Advances by the servicer are reimbursable to the servicer subject to certain conditions and restrictions, and are intended to provide sufficient funds for the payment of

interest to the holders of the certificates. Notwithstanding the servicer's determination in its good faith business judgment that a P&I Advance was recoverable when made, if a P&I Advance becomes a nonrecoverable advance, the servicer will be entitled to reimbursement for that advance from any amounts in the collection account. The servicer, and the master servicer acting as successor servicer, will not be obligated to make any advances of balloon payments, principal on any second-lien mortgage loan or principal with respect to any REO property. The master servicer (including the trustee as successor master servicer and any other successor master servicer, if applicable), acting as successor servicer, will advance its own funds to make P&I Advances if the servicer fails to do so, subject to its own recoverability determination and as required under the pooling and servicing agreement. See "DESCRIPTION OF THE CERTIFICATES--PAYMENTS ON THE MORTGAGE LOANS" in this prospectus supplement.

The servicer is required to advance amounts with respect to the mortgage loans serviced by it, subject to its determination that such advance would be recoverable, constituting reasonable "out of pocket" costs and expenses relating to:

   o   the preservation, restoration, inspection and protection of the
       mortgaged property,

   o   enforcement or judicial proceedings, including foreclosures, and

   o   certain other customary amounts described in the pooling and servicing
       agreement.

These servicing advances by the servicer (including the master servicer as successor servicer or any other successor servicer, if applicable) are reimbursable to the servicer subject to certain conditions and restrictions. In the event that, notwithstanding the servicer's good faith determination at the time the servicing advance was made that it would be recoverable, the servicing advance becomes a nonrecoverable advance, the servicer will be entitled to reimbursement for that advance from any amounts in the collection account. The master servicer (including the trustee as successor master servicer and any other successor master servicer, if applicable), acting as successor servicer, will advance its own funds to make servicing advances if the servicer fails to do so, subject to its own recoverability determination and as required under the pooling and servicing agreement.

The servicer (including the master servicer as successor servicer or any other successor servicer, if applicable) may recover P&I Advances and servicing advances to the extent permitted by the pooling and

                                   S-93

<PAGE>

servicing agreement. This reimbursement may come from mortgage loan payments that are not required to be remitted in the month of receipt on the Servicer Remittance Date, or, if not recovered from such collections or from the mortgagor on whose behalf such servicing advance or P&I Advance was made, from late collections on the related mortgage loan, including Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the servicer from the mortgagor or otherwise relating to the mortgage loan. In the event a P&I Advance or a servicing advance becomes a nonrecoverable advance, the servicer (including the master servicer as successor servicer or any other successor servicer, if applicable) may be reimbursed for such advance from any amounts in the collection account. The servicer may also reimburse itself from any amounts in the collection account for any prior P&I Advances and servicing advances which have not otherwise been reimbursed at the time a mortgage loan is modified.

In addition, the servicer may withdraw from the collection account funds that were not included in Available Funds for the preceding Distribution Date to reimburse itself for P&I Advances and servicing advances previously made.

The servicer (including the master servicer as successor servicer or any other successor servicer, if applicable) will not be required to make any P&I Advance or servicing advance which it determines would be a nonrecoverable P&I Advance or nonrecoverable servicing advance. A P&I Advance or servicing advance is "NONRECOVERABLE" if in the good faith business judgment of the servicer (including the master servicer as successor servicer or any other successor servicer, if applicable) (as stated in an officer's certificate of the servicer delivered to the securities administrator), such P&I Advance or servicing advance would not ultimately be recoverable.

PREPAYMENT INTEREST SHORTFALLS

In the event of any voluntary principal prepayments in full on any mortgage loans during any Prepayment Period (excluding any payments made upon liquidation of any mortgage loan and voluntary principal prepayments in part), the servicer will be obligated to pay, by no later than the Servicer Remittance Date for the related Distribution Date, compensating interest, without any right of reimbursement, for those shortfalls in interest collections resulting from such voluntary prepayments in full. The amount of compensating interest payable by the servicer ("COMPENSATING INTEREST") will be equal to the difference between the interest paid by the applicable mortgagors for that Prepayment Period in connection with the prepayments in full and thirty days' interest on the related mortgage loans, but only to the extent of one-half of the monthly servicing fee for the related Distribution Date.

SERVICER REPORTS

On a date preceding the applicable Distribution Date, the servicer is required to deliver to the securities administrator and the depositor a servicer remittance report setting forth the information as required by the pooling and servicing agreement to enable the securities administrator to make the distributions set forth under "DESCRIPTION OF THE CERTIFICATES-- PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this prospectus supplement and containing the information to be included in the distribution report for that Distribution Date delivered by the securities administrator. The servicer and the master servicer is required to deliver to the depositor, the master servicer (in the case of the servicer), the securities administrator, the trustee and the rating agencies by not later than March 15th of each year, starting in 2008, an officer's certificate stating that:

o    a review of the activities of the servicer or the master servicer, as
     applicable, during the preceding calendar year and of performance
     under the pooling and servicing agreement has been made under such
     officer's supervision; and

o    to the best of such officer's knowledge, based on such review, the
     servicer or the master servicer, as applicable, has fulfilled all of
     its obligations under the pooling and servicing agreement in all
     material respects for such year, or, if there has been a failure to
     fulfill any such obligation in any material respect, specifying each
     failure known to such officer and the nature and status of such

                              S-94
<PAGE>

          failure, including the steps being taken by the servicer or the master
          servicer, as applicable, to remedy such failure.

In addition, on or prior to March 15th of each year, starting in 2008, the servicer, the securities administrator, the master servicer, the trustee (in its capacity as successor master servicer) and each custodian will be required to deliver to the depositor an assessment of compliance with servicing criteria that contains the following:

o     a statement of the party's responsibility for assessing compliance
      with the servicing criteria applicable to it;

o     a statement that the party used the criteria in Item 1122(d) of
      Regulation AB to assess compliance with the applicable servicing
      criteria;

o     the party's assessment of compliance with the applicable servicing
      criteria during and as of the end of the prior calendar year, setting
      forth any material instance of noncompliance identified by the party;
      and

o     a statement that a registered public accounting firm has issued an
      attestation report on the party's assessment of compliance with the
      applicable servicing criteria during and as of the end of the prior
      calendar year.

     Each party that is required to deliver an assessment of compliance with
servicing criteria will also be required to simultaneously deliver an
attestation report of a registered public accounting firm, prepared in
accordance with the standards for attestation engagements issued or adopted by
the Public Company Accounting Oversight Board, that expresses an opinion, or
states that an opinion cannot be expressed, concerning the party's assessment of
compliance with the applicable servicing criteria. You may obtain copies of
these statements and reports without charge upon written request to the
securities administrator at the address provided in this prospectus supplement.

COLLECTION AND OTHER SERVICING PROCEDURES

     The servicer will be responsible for making reasonable efforts to collect
all payments called for under the mortgage loans and will, consistent with the
pooling and servicing agreement, follow such collection procedures as it follows
with respect to loans held for its own account that are comparable to the
mortgage loans. Consistent with the above, the servicer may (i) waive any late
payment charge or, if applicable, any penalty interest or (ii) extend the due
dates for the monthly payments for a period of not more than 180 days, subject
to the provisions of the pooling and servicing agreement.

     The servicer will be required to act with respect to mortgage loans in
default, or as to which default is reasonably foreseeable, in accordance with
procedures set forth in the pooling and servicing agreement. These procedures
among other things, may result in (i) foreclosing on the mortgage loan, (ii)
accepting the deed to the related mortgaged property in lieu of foreclosure,
(iii) granting the borrower under the mortgage loan a modification or
forbearance, which may consist of waiving, modifying or varying any term of such
mortgage loan (including modifications that would change the mortgage interest
rate, forgive the payment of principal or interest, or extend the final maturity
date of such mortgage loan) or (iv) accepting payment from the borrower of an
amount less than the principal balance of the mortgage loan in final
satisfaction of the mortgage loan. In addition, the final maturity date of any
mortgage loan may not be extended beyond the final scheduled Distribution Date
for the LIBOR Certificates.

     The servicer will be required to accurately and fully report its borrower
payment histories to all three national credit repositories in a timely manner
with respect to each mortgage loan.

     If a mortgaged property has been or is about to be conveyed by the
mortgagor, the servicer will be obligated to accelerate the maturity of the
mortgage loan, unless the servicer, in its sole business judgment, believes it
is unable to enforce that mortgage loan's "due-on-sale" clause under applicable
law or that such enforcement is not in

                                   S-95

<PAGE>

the best interest of the issuing entity. If it reasonably believes it may be
restricted for any reason from enforcing such a "due-on-sale" clause or that
such enforcement is not in the best interest of the issuing entity, the servicer
may enter into an assumption and modification agreement with the person to whom
such property has been or is about to be conveyed, pursuant to which such person
becomes liable under the mortgage note.

Any fee collected by the servicer for entering into an assumption or
modification agreement will be retained by the servicer as additional servicing
compensation. In connection with any such assumption or modification, none of
the outstanding principal amount, the interest rate borne by the mortgage note
relating to each mortgage loan nor the final maturity date for such mortgage
loan may be changed, unless the mortgagor is in default with respect to the
mortgage loan or such default is, in the judgment of the servicer, reasonably
foreseeable. For a description of circumstances in which the servicer may be
unable to enforce "due-on-sale" clauses, see "LEGAL ASPECTS OF THE MORTGAGE
LOANS--DUE-ON-SALE CLAUSES" in the prospectus.

HAZARD INSURANCE

The servicer is required to cause to be maintained for each mortgaged
property a hazard insurance policy which contains a standard mortgagee's clause
with coverage in an amount equal to the lesser of (i) the amount necessary to
fully compensate for any damage or loss to the improvements that are a part of
such property on a replacement cost basis and (ii) the principal balance of the
mortgage loan, but in each case in an amount not less than such amount as is
necessary to prevent the mortgagor and/or the mortgagee from becoming a
co-insurer. As set forth above, all amounts collected by the servicer under any
hazard policy, except for amounts to be applied to the restoration or repair of
the mortgaged property or released to the borrower in accordance with the
servicer's normal servicing procedures, to the extent they constitute net
Liquidation Proceeds, Condemnation Proceeds or Insurance Proceeds, will
ultimately be deposited in the collection account. The ability of the servicer
to assure that hazard insurance proceeds are appropriately applied may be
dependent on its being named as an additional insured under any hazard insurance
policy, or upon the extent to which information in this regard is furnished to
the servicer by a borrower. The pooling and servicing agreement provides that
the servicer may satisfy its obligation to cause hazard policies to be
maintained by maintaining a blanket policy in accordance with the pooling and
servicing agreement, insuring against losses on the mortgage loans. If such
blanket policy contains a deductible clause, the servicer is obligated to
deposit in the collection account the sums which would have been deposited in
the collection account but for such clause.

In general, the standard form of fire and extended coverage policy covers
physical damage to or destruction of the improvements on the property by fire,
lightning, explosion, smoke, windstorm and hail, and riot, strike and civil
commotion, subject to the conditions and exclusions specified in each policy.
Although the policies relating to the mortgage loans will be underwritten by
different insurers under different state laws in accordance with different
applicable state forms and therefore will not contain identical terms and
conditions, the terms of the policies are dictated by respective state laws, and
most such policies typically do not cover any physical damage resulting from the
following: war, revolution, governmental actions, floods and other weather
related causes, earth movement, including earthquakes, landslides and mudflows,
nuclear reactions, wet or dry rot, vermin, rodents, insects or domestic animals,
theft and, in certain cases, vandalism. The foregoing list is merely indicative
of certain kinds of uninsured risks and is not intended to be all inclusive.

The hazard insurance policies covering the mortgaged properties typically
contain a co-insurance clause which in effect requires the insured at all times
to carry insurance of a specified percentage, generally 80% to 90%, of the full
replacement value of the improvements on the property in order to recover the
full amount of any partial loss. If the insured's coverage falls below this

specified percentage, such clause generally provides that the insurer's liability in the event of partial loss does not exceed the greater of (x) the replacement cost of the improvements less physical depreciation or (y) such proportion of the loss as the amount of insurance carried bears to the specified percentage of the full replacement cost of such improvements.

Since residential properties, generally, have historically appreciated in value over time, if the amount of hazard insurance maintained on the improvements securing the mortgage loans were to decline as the principal balances owing on the improvements decreased, hazard insurance proceeds could be insufficient to restore fully the damaged property in the event of a partial loss.

<div align="center">S-96</div>

&lt;PAGE&gt;

REALIZATION UPON DEFAULTED MORTGAGE LOANS

The servicer will be required to foreclose upon, or otherwise comparably convert to ownership, mortgaged properties securing such of the mortgage loans as come into default when, in the opinion of the servicer, no satisfactory arrangements can be made for the collection of delinquent payments. In connection with such foreclosure or other conversion, the servicer will follow such practices as it deems necessary or advisable and as are in keeping with the servicer's general loan servicing activities and the pooling and servicing agreement. However, the servicer will not expend its own funds in connection with foreclosure or other conversion, correction of a default on a senior mortgage or restoration of any property unless the servicer believes such foreclosure, correction or restoration will increase net Liquidation Proceeds and that such expenses will be recoverable by the servicer. With respect to second lien mortgage loans, the servicer may write off the entire outstanding principal balance of the mortgage loan in circumstances where the servicer determines it would be uneconomical to foreclose on the related mortgaged property.

OPTIONAL REPURCHASE OF DELINQUENT MORTGAGE LOANS

The depositor (or its assignee) has the option, but is not obligated, to purchase from the issuing entity any mortgage loan that is 90 days or more Delinquent or that has been converted to an REO property, subject to certain terms and conditions set forth in the pooling and servicing agreement. The purchase price will be 100% of the unpaid principal balance of the mortgage loan, plus all related accrued and unpaid interest, and the amount of any unreimbursed servicing advances related to the mortgage loan.

REMOVAL AND RESIGNATION OF THE SERVICER

The master servicer may, and the master servicer is required to at the direction of the majority of voting rights in the certificates, remove the servicer upon the occurrence and continuation beyond the applicable cure period of any event described in clauses (a) through (g) below. Each of the following constitutes a "SERVICER EVENT OF DEFAULT":

        (a)  any failure by the servicer to remit to the securities administrator any payment required to be made by the servicer under the terms of the pooling and servicing agreement, which continues unremedied for one business day after the date upon which written notice of such failure, requiring the same to be remedied, is given to the servicer by the depositor or the securities administrator or to the servicer, the depositor, the master servicer, the securities administrator or the trustee by the holders of certificates entitled to at least 25% of the voting rights in the certificates; or

        (b)  any failure on the part of the servicer duly to observe or

perform in any material respect any other of the covenants or
agreements on the part of the servicer contained in the pooling
and servicing agreement, or the breach of any representation and
warranty set forth in the pooling and servicing agreement to be
true and correct, which continues unremedied for a period of
thirty days after the earlier of (i) the date on which written
notice of such failure or breach, as applicable, requiring the
same to be remedied, is given to the servicer by the depositor,
the master servicer, the securities administrator or the trustee;
provided, however, that in the case of a failure or breach that
cannot be cured within 30 days after notice or actual knowledge
by the servicer, the cure period may be extended upon delivery by
the servicer to the securities administrator of a certificate to
the effect that the servicer believes in good faith that such
failure or breach can be cured within such additional time period
and the servicer is diligently pursuing remedial action; or

    (c)  a decree or order of a court or agency or supervisory authority
having jurisdiction in an involuntary case under any present or
future federal or state bankruptcy, insolvency or similar law or
for the appointment of a conservator or receiver or liquidator in
any insolvency, readjustment of debt, marshalling of assets and
liabilities or similar proceedings, or for the winding up or
liquidation of its affairs, is entered against the servicer and
such decree or order remains in force, undischarged or unstayed
for a period of sixty days; or

<div align="center">S-97</div>

&lt;PAGE&gt;

    (d)  the servicer consents to the appointment of a conservator or
receiver or liquidator in any insolvency, readjustment of debt,
marshalling of assets and liabilities or similar proceedings of
or relating to the servicer or of or relating to all or
substantially all of the servicer's property; or

    (e)  the servicer admits in writing its inability generally to pay its
debts as they become due, file a petition to take advantage of
any applicable insolvency or reorganization statute, makes an
assignment for the benefit of its creditors, or voluntarily
suspends payment of its obligations; or

    (f)  the failure by the servicer to make any P&I Advance on any
Servicer Remittance Date which continues unremedied for one
business day after that Servicer Remittance Date; or

    (g)  certain servicing performance criteria as set forth in the
pooling and servicing agreement are not satisfied as of any
Distribution Date.

    Except to permit subservicers as provided under the pooling and servicing
agreement to act as subservicers, the servicer may not assign its obligations
under the pooling and servicing agreement nor resign from the obligations and
duties imposed on it by the pooling and servicing agreement except by mutual
consent of the servicer, the depositor, the securities administrator and the
trustee or upon the determination that the servicer's duties under the pooling
and servicing agreement are no longer permissible under applicable law and such
incapacity cannot be cured by the servicer without the incurrence of
unreasonable expense. No such resignation will become effective until a
successor has assumed the servicer's responsibilities and obligations in
accordance with the pooling and servicing agreement.

    Pursuant to the terms of the pooling and servicing agreement, upon removal
or resignation of the servicer, the master servicer will become the successor
servicer or will appoint a successor servicer. The master servicer, as successor

servicer, will be obligated to make P&I Advances and servicing advances and certain other advances unless it determines reasonably and in good faith that such advances would not be recoverable. The master servicer, as successor servicer, will be obligated to assume the other responsibilities, duties and liabilities of the predecessor servicer as soon as practicable, but in no event later than 90 days after the master servicer has notified the predecessor servicer that it is being terminated. If, however, the master servicer is unwilling or unable to act as successor servicer, or the holders of the certificates entitled to a majority of the voting rights in the certificates so request, the master servicer is required to appoint, or petition a court of competent jurisdiction to appoint, in accordance with the provisions of the pooling and servicing agreement, any established mortgage loan servicing institution acceptable to the rating agencies and having a net worth of not less than $30,000,000 as the successor servicer in the assumption of all or any part of the responsibilities, duties or liabilities of the predecessor servicer.

Any successor to the servicer will be required to give notice to the affected borrowers of such change of servicer, in accordance with applicable federal and state law, and will be required, during the term of its service as the servicer, to maintain in force the insurance policy or policies that the servicer is required to maintain.

The master servicer and any other successor servicer, in such capacity, is entitled to the same reimbursement for advances and no more than the same servicing compensation (including income earned on the collection account) as the servicer or such greater compensation if consented to by the rating agencies rating the Offered Certificates and a majority of the certificateholders. See "--SERVICING, SECURITIES ADMINISTRATOR, TRUSTEE AND CUSTODIAL FEES AND OTHER COMPENSATION AND PAYMENT OF EXPENSES" above.

A terminated servicer, subject to certain provisions in the pooling and servicing agreement, will be obligated to pay all of its own out-of-pocket costs and expenses, without reimbursement from the issuing entity, to transfer the servicing files to a successor servicer and it will be obligated to pay certain reasonable out-of-pocket costs and expenses of a servicing transfer incurred by parties other than a terminated servicer without reimbursement from the issuing entity. In the event a terminated servicer defaults in its obligations to pay such costs, the successor servicer will be obligated to pay such costs but

<div align="center">S-98</div>

<PAGE>

will be entitled to reimbursement for such costs from the issuing entity or if the successor servicer fails to pay, the master servicer will pay such costs from the issuing entity.

ELIGIBILITY REQUIREMENTS FOR TRUSTEE AND SECURITIES ADMINISTRATOR; RESIGNATION AND REMOVAL OF TRUSTEE AND SECURITIES ADMINISTRATOR

The trustee and the securities administrator must be a corporation or association organized and doing business under the laws of a state or the United States of America, authorized under such laws to exercise corporate trust powers. The trustee and the securities administrator must have a combined capital and surplus of at least $50,000,000, be subject to supervision or examination by federal or state authority and, with respect to the trustee, have a credit rating that would not cause any of the rating agencies to reduce their respective then current ratings of the certificates and, with respect to the securities administrator, have a credit rating of at least investment grade. In case at any time the trustee or the securities administrator ceases to be eligible, the trustee or the securities administrator, as applicable, will resign in the manner and with the effect as specified below.

The trustee or the securities administrator may at any time resign as trustee or securities administrator, as applicable, by giving written notice of resignation, with respect to the trustee, to the depositor, the servicer, the

master servicer, the securities administrator and each rating agency and, with respect to the securities administrator, to the depositor, the trustee and each rating agency, not less than 60 days before the date specified in such notice, when such resignation is to take effect, and acceptance by a successor trustee or securities administrator, as applicable, meeting the related eligibility requirements of the trustee or the securities administrator, as applicable. If no successor trustee or securities administrator, as applicable, meeting the related eligibility requirements has been so appointed and has accepted appointment within 30 days after the giving of such notice or resignation, the resigning trustee or securities administrator, as applicable, may petition any court of competent jurisdiction for the appointment of a successor trustee or securities administrator, as applicable.

If at any time the trustee or the securities administrator ceases to meet the related eligibility requirements and fails to resign after written request by the depositor or if at any time the trustee or the securities administrator becomes incapable of acting, or is adjudged as bankrupt or insolvent, or a receiver of the trustee or the securities administrator or of their respective property is appointed, or any public officer takes charge or control of the trustee or the securities administrator or of their respective property or affairs for the purpose of rehabilitation, conservation or liquidation, or a tax is imposed with respect to the issuing entity by any state in which the trustee, the securities administrator or the issuing entity is located and the imposition of such tax would be avoided by the appointment of a different trustee or securities administrator, as applicable, then the depositor or the servicer may remove the trustee or the securities administrator, as applicable and appoint a successor trustee or securities administrator, as applicable.

The holders of certificates entitled to a majority of the voting rights may at any time remove the trustee and appoint a successor trustee by written instrument or instruments, signed by such holders or their attorneys-in-fact duly authorized.

Any resignation or removal of the trustee or the securities administrator and appointment of a successor trustee or securities administrator, as applicable, will become effective upon acceptance of appointment by the successor trustee or securities administrator, as applicable.

COMPENSATION OF THE MASTER SERVICER AND THE SECURITIES ADMINISTRATOR

As compensation for its services as master servicer, the master servicer will be entitled, with respect to each mortgage loan, to the master servicing fee, which will be remitted to the master servicer monthly by the servicer from amounts on deposit in the collection account. The master servicing fee for each Distribution Date will be an amount equal to one-twelfth of the master servicing fee rate for each mortgage loan on the Stated Principal Balance of such mortgage loan as of the first day of the related Due Period, or as of the cut-off date, in the case of the first Distribution Date. The master servicing fee rate with respect to each mortgage loan will be a rate per annum of 0.01%. In the event the master

S-99

<PAGE>

servicer assumes the duties of the servicer under the pooling and servicing agreement, it will be entitled to receive as compensation, the servicing fee, if any, and other compensation that would have been payable to the servicer under the pooling and servicing agreement.

Under the terms of the pooling and servicing agreement, the securities administrator may withdraw from the distribution account, (i) the master servicer fee; (ii) amounts necessary to reimburse itself, the master servicer or the servicer for any previously unreimbursed advances and any advance that the master servicer deems to be nonrecoverable from the applicable mortgage loan proceeds, (iii) an aggregate annual amount to indemnify the master servicer and

itself for amounts due under the terms of the pooling and servicing agreement;
(iv) amounts in respect of reimbursements to which the master servicer or the
servicer is entitled in accordance with the terms of the pooling and servicing
agreement, subject to the limit on such amounts described below under
"--INDEMNIFICATION AND THIRD PARTY CLAIMS" and (v) any other amounts permitted
to be withdrawn under the terms of the pooling and servicing agreement. The
master servicer will be required to pay all ordinary expenses incurred by it in
connection with its activities as master servicer without reimbursement.

     The master servicer will be required to pay the costs associated with
monitoring the servicer. The master servicer will also be required to pay the
costs of terminating the servicer, appointing a successor servicer or the costs
of transferring servicing to the master servicer and will be entitled to be
reimbursed for those costs by the successor servicer and/or the terminated
servicer pursuant to the terms of the pooling and servicing agreement. To the
extent such servicing transfer costs are not paid by the terminated servicer or
the successor servicer, the master servicer will be reimbursed by the issuing
entity for out-of-pocket costs associated with the transfer of servicing of any
of the mortgage loans from the servicer to the master servicer or to any other
successor servicer.

INDEMNIFICATION AND THIRD PARTY CLAIMS

     The master servicer will be required to indemnify the depositor, the
securities administrator, the trustee and the servicer and hold each of them
harmless against any loss, damages, penalties, fines, forfeitures, legal fees
and related costs, judgments, and other costs and expenses resulting from any
claim, demand, defense or assertion based on or grounded upon, or resulting
from, a material breach of the master servicer's representations and warranties
set forth in the pooling and servicing agreement. The enforcement of the
obligation of the master servicer to indemnify the depositor, the securities
administrator, the trustee and the servicer constitutes the sole remedy of the
depositor, the securities administrator, the trustee and the servicer in the
event of a breach of the master servicer's representations and warranties. Such
indemnification shall survive termination of the master servicer under the
pooling and servicing agreement or the termination of the pooling and servicing
agreement. Any cause of action against the master servicer relating to or
arising out of the breach of any representations and warranties made by the
master servicer in the pooling and servicing agreement shall accrue upon
discovery of such breach by any of the depositor, the master servicer, the
securities administrator, the trustee or the servicer or notice of such breach
by any one of such parties to the other parties.

     The master servicer will be required to indemnify the depositor, the
securities administrator, the trustee and the servicer, and hold each of them
harmless against any and all claims, losses, penalties, fines, forfeitures,
legal fees and related costs, judgments, and any other costs, liability, fees
and expenses that they may sustain as a result of the master servicer's willful
misfeasance, bad faith or negligence in the performance of its duties or by
reason of its reckless disregard for its obligations and duties under the
pooling and servicing agreement. The depositor, the securities administrator,
the trustee and the servicer shall immediately notify the master servicer if a
claim is made by a third-party under the pooling and servicing agreement or any
of the mortgage loans which entitles the depositor, the securities
administrator, the trustee or the servicer or the issuing entity to
indemnification by the master servicer under the pooling and servicing
agreement. The master servicer will be obligated to assume the defense of any
such claim and pay all expenses in connection with the claim, including counsel
fees, and promptly pay, discharge and satisfy any judgment or decree which may
be entered against it or them in respect of such claim.

                                       S-100
<PAGE>

     The issuing entity will be obligated to indemnify the master servicer and

hold it harmless against any and all claims, losses, penalties, fines,
forfeitures, legal fees and related costs, judgments, and any other costs,
liabilities, fees and expenses that the master servicer may incur or sustain in
connection with, arising out of or related to the pooling and servicing
agreement or the certificates, except to the extent that any such loss,
liability or expense is related to (i) a material breach of the master
servicer's representations and warranties in the pooling and servicing agreement
or (ii) the master servicer's willful misfeasance, bad faith or negligence or by
reason of its reckless disregard of its duties and obligations under the pooling
and servicing agreement. The master servicer shall be entitled to reimbursement
for any such indemnified amount from funds on deposit in the distribution
account. Amounts available to pay indemnified cost and expenses may also be
applied to reimburse the master servicer for servicing transfer costs to the
extent such costs are not reimbursed out of amounts allocated therefor or from
other sources described in "--COMPENSATION OF THE MASTER SERVICER AND THE
SECURITIES ADMINISTRATOR" above.

LIMITATION ON LIABILITY OF THE MASTER SERVICER

     Neither the master servicer nor any of its directors, officers, employees
or agents will be under any liability to the trustee, the securities
administrator, the servicer or the certificateholders for any action taken, or
for refraining from the taking of any action, in good faith, or for errors in
judgment. However, the master servicer shall remain liable for its willful
misfeasance, bad faith, negligence or reckless disregard in the performance of
its duties under the pooling and servicing agreement. The master servicer will
be under no obligation to appear in, prosecute or defend any legal action that
is not incidental to its duties to master service the mortgage loans in
accordance with the pooling and servicing agreement and that, in the opinion of
the master servicer, may involve it in any expenses or liability. However, the
master servicer may, in its sole discretion, undertake any such action that it
may deem necessary or desirable in respect of the pooling and servicing
agreement and the rights and duties of the parties to that agreement and the
interests of the certificateholders under that agreement. In the event of any
litigation regarding the master servicer's duties, the legal expenses and costs
of such action and any liability resulting from such action shall be borne by
the issuing entity.

     The master servicer will not be liable for any acts or omissions of the
servicer except to the extent that damages or expenses are incurred as a result
of such acts or omissions and such damages and expenses would not have been
incurred but for the negligence, willful misfeasance, bad faith or recklessness
of the master servicer in supervising, monitoring and overseeing the obligations
of the servicer.

ASSIGNMENT OR DELEGATION OF DUTIES BY THE MASTER SERVICER; RESIGNATION

     The master servicer will not be permitted to assign or transfer any of its
rights, benefits or privileges under the pooling and servicing agreement to any
other entity, or delegate to or subcontract with, or authorize or appoint any
other entity to perform any of the duties, covenants or obligations to be
performed by the master servicer. However, the master servicer will have the
right to sell and assign its rights and delegate to any qualified entity its
duties and obligations to be performed and carried out as the master servicer
with the prior written consent of the depositor (which consent shall not be
unreasonably withheld) and upon delivery to the trustee and the depositor of a
letter from each rating agency to the effect that such action shall not result
in a downgrade, qualification or withdrawal of the ratings assigned to any of
the certificates, and in compliance with the other requirements set forth in the
pooling and servicing agreement. If the duties of the master servicer are
transferred to a successor master servicer, the fees and other compensation
payable to the master servicer under the pooling and servicing agreement shall
thereafter be payable to such successor master servicer, but in no event shall
exceed the compensation payable to the predecessor master servicer.

Any entity into which the master servicer may be merged or consolidated, or any entity resulting from any merger, conversion, other change in form to which the master servicer shall be a party, or any entity which succeeds to the business of the master servicer, will become the successor to the master servicer, without the execution or filing of any paper or any further act on the part of any of the parties to the pooling and servicing agreement. However, the successor to the master servicer must be an entity (or

<div align="center">S-101</div>

<PAGE>

have an affiliate) that is qualified and approved to service mortgage loans by Fannie Mae and Freddie Mac and shall have a net worth of not less than $25,000,000.

The master servicer will not be permitted to resign unless the master servicer's duties under the pooling and servicing agreement are no longer permissible under applicable law or are in material conflict under applicable law with other activities carried on by it and such conflict cannot be cured. Any resignation of the master servicer shall be evidenced by an opinion of counsel prepared by counsel to the master servicer and delivered to the trustee. No such resignation will become effective until the trustee assumes, or a successor master servicer reasonably satisfactory to the trustee and the depositor assumes, the master servicer's responsibilities and obligations under the pooling and servicing agreement.

If at any time, Wells Fargo, as securities administrator, resigns or is removed as securities administrator pursuant to the pooling and servicing agreement, then, at such time, Wells Fargo will be required to resign as master servicer under the pooling and servicing agreement. If at any time, Wells Fargo, as master servicer, resigns or is removed as master servicer pursuant to the pooling and servicing agreement, then, at such time, Wells Fargo will be required to resign as securities administrator under the pooling and servicing agreement.

MASTER SERVICER EVENTS OF DEFAULT; WAIVER; TERMINATION

Under the terms of the pooling and servicing agreement, each of the following shall constitute a "MASTER SERVICER EVENT OF DEFAULT" by the master servicer:

    (a)  the failure by the master servicer to cause to be deposited in the distribution account any amounts received by it from the servicer or to make any advance required to be made by it under the terms of the pooling and servicing agreement, which failure continues unremedied for a period of two (2) business days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the master servicer;

    (b)  the failure by the master servicer to duly observe or perform, in any material respect, any other covenants, obligations or agreements of the master servicer set forth in the pooling and servicing agreement, which failure continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the master servicer by the trustee or to the master servicer and trustee by holders of certificates evidencing at least 25% of the voting rights;

    (c)  a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its

affairs, shall have been entered against the master servicer and
such decree or order shall have remained in force, undischarged
or unstayed for a period of sixty (60) days;

(d)  the master servicer consents to the appointment of a conservator
or receiver or liquidator in any insolvency, bankruptcy,
readjustment of debt, marshaling of assets and liabilities or
similar proceedings of or relating to the master servicer or
relating to all or substantially all of its property;

(e)  the master servicer admits in writing of its inability to pay its
debts as they become due, files a petition to take advantage of
any applicable insolvency or reorganization statute, makes an
assignment for the benefit of its creditors, or voluntarily
suspends payment of its obligations for three (3) business days;

(f)  except as otherwise set forth in the pooling and servicing
agreement, the master servicer attempts to assign its
responsibilities under the pooling and servicing agreement or to
delegate all or any portion of its duties under that agreement
without the consent of the trustee, the securities administrator
and the depositor; or

                              S-102
<PAGE>

(g)  the indictment of the master servicer for the taking of any
action by the master servicer, any of its affiliates, directors
or employees that constitutes fraud or criminal activity in the
performance of its obligations under the pooling and servicing
agreement, in each case, where such action materially and
adversely affects the ability of the master servicer to perform
its obligations under the pooling and servicing agreement
(subject to the condition that such indictment is not dismissed
within ninety (90) days).

     By written notice, the trustee may, with the consent of certificateholders
representing a majority of the voting rights in the certificates, waive any
default by the master servicer in the performance of its obligations under the
pooling and servicing agreement and its consequences. Upon any waiver of a past
default, such default shall cease to exist and any master servicer event of
default arising from that default shall be deemed to have been remedied for
every purpose under the pooling and servicing agreement.

     So long as a master servicer event of default remains uncured, the trustee
may, and upon the request of the holders of certificates representing at least a
majority of the voting rights shall, by notice in writing to the master servicer
terminate the master servicer for cause. Upon the termination of the master
servicer, the master servicer shall prepare, execute and deliver to any
successor entity designated by the trustee any and all documents and other
instruments related to the performance of its duties under the pooling and
servicing agreement and any mortgage files related to any pool of mortgage loans
with respect to which it acts as a successor servicer, in each case, at the
master servicer's expense. The master servicer shall cooperate with the trustee
and such successor master servicer to effectively transfer its duties under the
pooling and servicing agreement.

ASSUMPTION OF MASTER SERVICING BY TRUSTEE

     In the event the master servicer can no longer function in that capacity
under the pooling and servicing agreement and no successor master servicer has
accepted appointment as provided for in the pooling and servicing agreement, the
trustee (or its designee) shall assume all of the rights and obligations of the
master servicer under the pooling and servicing agreement or shall petition any
court of competent jurisdiction for the appointment of a successor master

servicer. The trustee, its designee or any other successor master servicer
appointed by the trustee, shall be deemed to have assumed all of the master
servicer's rights, duties and obligations under the pooling and servicing
agreement to the same extent as if such agreements had been assigned to the
trustee, its designee or any successor master servicer, except that the master
servicer shall not thereby be relieved of any liability or obligation under the
pooling and servicing agreement accruing prior to its replacement as master
servicer and the master servicer will be required to indemnify and hold harmless
the trustee from and against all costs, damages, expenses and liabilities
(including reasonable attorneys' fees) incurred by the trustee as a result of
such liability or obligations of the master servicer and in connection with the
trustee's assumption (but not its performance, except to the extent that costs
or liability of the trustee are created or increased as a result of negligent or
wrongful acts or omissions of the master servicer prior to its replacement as
master servicer) of the master servicer's obligations, duties or
responsibilities under the pooling and servicing agreement.

    If the master servicer has resigned or been terminated, upon the request of
the trustee (but at the expense of the master servicer), the master servicer
will be required to deliver to any successor all documents and records relating
to the related mortgage loans and an accounting of amounts collected and held by
it and otherwise use its best efforts to effect the orderly and efficient
transfer of such documents and records to any successor party.

    Subject to certain provisions in the pooling and servicing agreement, the
master servicer (and any successor master servicer) will be obligated to pay all
of its own out-of-pocket costs and expenses, without reimbursement from the
issuing entity, to transfer the master servicing to the trustee (or its
designee) and will be obligated to pay certain out-of-pocket costs and expenses
incurred by the trustee and other parties in connection with the transfer of
master servicing. In the event the terminated master servicer fails to pay such
costs, the trustee (and such other parties) will be entitled to reimbursement
for such costs from the issuing entity.

                                     S-103

<PAGE>

TERMINATION; OPTIONAL CLEAN-UP CALL

    The majority Class C certificateholders in the aggregate may, at their
option, direct the servicer to purchase the mortgage loans and REO properties
and terminate the issuing entity on any Distribution Date when the aggregate
Stated Principal Balance of the mortgage loans, as of the last day of the
related Due Period, is equal to or less than 10% of the aggregate Stated
Principal Balance of the mortgage loans as of the cut-off date (the right to
direct such purchase being referred to as the "OPTIONAL CLEAN-UP CALL"). If the
depositor or one of its affiliates is a Class C certificateholder exercising
this option, it may only do so with at least one other unaffiliated person that
holds at least a 10% percentage interest in the Class C certificates. At any
time the majority Class C certificateholders have the option to direct the
servicer to purchase the mortgage loans, the first person to provide notice to
exercise the right will have the right to purchase the mortgage loans. The
purchase price for the mortgage loans will be an amount equal to the sum of (i)
100% of the unpaid principal balance of each mortgage loan (other than mortgage
loans related to any REO property) plus accrued and unpaid interest on those
mortgage loans at the applicable interest rate and the amount of outstanding
servicing advances on such mortgage loans through the due date preceding the
date of purchase, (ii) the lesser of (x) the appraised value of any REO
property, as determined by an appraisal completed by an independent appraiser
selected by the party exercising the right to purchase the mortgage loans at its
expense and (y) the unpaid principal balance of each mortgage loan related to
any REO property plus accrued and unpaid interest on those mortgage loans at the
applicable interest rate and (iii) any Swap Termination Payment other than a
Defaulted Swap Termination Payment owed to the Swap Provider. Any such purchase
of the mortgage loans would result in the final distribution on the certificates

on such Distribution Date.

The issuing entity also is required to terminate upon the later of: (i) the distribution to certificateholders of the final payment or collection with respect to the last mortgage loan (or P&I Advances of same by the servicer) or (ii) the disposition of all funds with respect to the last mortgage loan and the remittance of all funds due under the pooling and servicing agreement. However, in no event will the issuing entity established by the pooling and servicing agreement terminate later than twenty-one years after the death of the last surviving lineal descendant of the person named in the pooling and servicing agreement.

The pooling and servicing agreement requires the servicer to direct the securities administrator to send a notice of final distribution to each certificateholder in the event that there are no outstanding mortgage loans and no other funds or assets in the issuing entity other than the funds in the collection account. The securities administrator will be required to promptly send the notice of final distribution by letter to certificateholders and the trustee mailed within the month of such final distribution. Any such notice of final distribution will be required to specify (a) the Distribution Date upon which final distribution on the certificates will be made upon presentation and surrender of certificates at the office designated in the notice, (b) the amount of such final distribution, (c) the location of the office or agency at which such presentation and surrender must be made and (d) that the Record Date otherwise applicable to such Distribution Date is not applicable, distributions being made only upon presentation and surrender of the certificates at the office specified in the notice.

In the event a notice of final distribution is given, the servicer will be required to remit all funds in the collection account to the securities administrator for deposit in the distribution account on the business day prior to the applicable Distribution Date in an amount equal to the final distribution in respect of the certificates. Upon final deposit with respect to the issuing entity and the receipt by the securities administrator of a request for release of the mortgage loan files, the securities administrator will be required to promptly release to the servicer or its designee the mortgage loan files.

Upon presentation and surrender of the certificates, the securities administrator will be required to cause to be distributed to the certificateholders of each class (after reimbursement of all amounts due to the servicer, the depositor, the securities administrator and the trustee pursuant to the pooling and servicing agreement and to the extent funds are available for such distribution) (i) its Class Certificate Balance plus accrued interest in the case of an interest bearing certificate and all other amounts to which such classes are entitled and (ii) as to the Residual Certificates, the amount, if any, which remains on

S-104

<PAGE>

deposit in the distribution account (other than the amounts retained to meet claims) after application pursuant to clause (i) above.

In the event that any affected certificateholder does not surrender certificates for cancellation within six months after the date specified in the notice of final distribution, the securities administrator will be required to give a second written notice to the remaining certificateholders to surrender their certificates for cancellation and receive the final distribution. If within six months after the second notice all the applicable certificates have been surrendered for cancellation, the securities administrator may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining certificateholders concerning surrender of their certificates, and the related costs will be paid out of the funds and other assets which remain assets of the issuing entity. If within one year after the second notice all certificates have not been surrendered for cancellation, the residual

certificateholders will be entitled to all unclaimed funds and other assets of the issuing entity.

AMENDMENT

The pooling and servicing agreement may be amended from time to time by the depositor, the servicer, the master servicer, the securities administrator, the custodians and the trustee by written agreement, without notice to, or consent of, the holders of the certificates, to cure any ambiguity or mistake, to correct any defective provision or supplement any provision in the pooling and servicing agreement that may be inconsistent with any other provision in the pooling and servicing agreement, to add to the duties of the depositor, the servicer, the master servicer, the securities administrator or the trustee or to comply with any requirements in the Code or Regulation AB. The pooling and servicing agreement may also be amended to add or modify any other provisions with respect to matters or questions arising under the pooling and servicing agreement or to modify, alter, amend, add to or rescind any of the terms or provisions contained in the pooling and servicing agreement; provided, that such amendment will not adversely affect in any material respect the interest of any certificateholder, as evidenced by (i) an opinion of counsel delivered to the trustee, at the expense of the party requesting the amendment (which will not be at the expense of the issuing entity), confirming that the amendment will not adversely affect in any material respect the interests of any holder of the certificates or (ii) a letter from each rating agency confirming that such amendment will not cause the reduction, qualification or withdrawal of the then current ratings of the certificates. However, any amendment to the pooling and servicing agreement that would otherwise require the consent of holders of the certificates is required to be made as described in the next paragraph.

The pooling and servicing agreement may be amended from time to time by the depositor, the servicer, the master servicer, the securities administrator, the custodians the trustee and holders of certificates evidencing percentage interests aggregating not less than 66-2/3% of each class of certificates affected by the amendment for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the pooling and servicing agreement or of modifying in any manner the rights of the holders of the certificates; provided, however, that no such amendment will (i) reduce in any manner the amount of, or delay the timing of, payments required to be distributed on any certificate without the consent of the holder of that certificate, (ii) adversely affect in any material respect the interests of the holders of any class of certificates in a manner other than as described in clause (i) above without the consent of the holders of certificates of that class evidencing percentage interests aggregating not less than 66-2/3% of that class or (iii) reduce the percentage of the certificates whose holders are required to consent to any such amendment without the consent of the holders of 100% of the certificates then outstanding.

CERTAIN MATTERS REGARDING THE DEPOSITOR, THE SERVICER, THE SECURITIES ADMINISTRATOR, THE CUSTODIANS AND THE TRUSTEE

The pooling and servicing agreement provides that none of the depositor, the servicer, the custodians, the master servicer, the securities administrator, the trustee nor any of their directors, officers, employees or agents will be under any liability to the certificateholders for any action taken, or for refraining from the taking of any action, in good faith pursuant to the pooling and servicing agreement, or for errors in judgment, provided that none of the depositor, the servicer, the custodians, the master

S-105

<PAGE>

servicer, the securities administrator or the trustee will be protected against liability arising from any breach of representations or warranties made by it or from any liability which may be imposed by reason of the depositor's, the servicer's, the custodians', the securities administrator's or the trustee's, as

the case may be, willful misfeasance, bad faith or negligence (or gross
negligence in the case of the depositor) in the performance of its duties or by
reason of its reckless disregard of obligations and duties under the pooling and
servicing agreement.

     The depositor, the servicer, the custodians, the master servicer, the
securities administrator, the trustee (in such capacity and individually) and
any director, officer, employee, affiliate or agent of the depositor, the
servicer or the trustee will be indemnified by the issuing entity and held
harmless against any loss, liability or expense incurred in connection with any
audit, controversy or judicial proceeding relating to a governmental taxing
authority or any legal action relating to the pooling and servicing agreement or
the certificates, or any unanticipated or extraordinary expense other than any
loss, liability or expense incurred by reason of the depositor's, the
servicer's, the custodians', the master servicer's, the securities
administrator's, or the trustee's, as the case may be, willful misfeasance, bad
faith or negligence (or gross negligence in the case of the depositor) in the
performance of its duties or by reason of its reckless disregard of obligations
and duties under the pooling and servicing agreement.

     None of the depositor, the servicer, any custodian, the securities
administrator or the trustee is obligated under the pooling and servicing
agreement to appear in, prosecute or defend any legal action that is not
incidental to its respective duties which in its opinion may involve it in any
expense or liability, provided that, in accordance with the provisions of the
pooling and servicing agreement, the depositor, the servicer, any custodian, the
master servicer, the securities administrator and the trustee, as applicable,
may undertake any action any of them deem necessary or desirable in respect of
(i) the rights and duties of the parties to the pooling and servicing agreement
and (ii) with respect to actions taken by the depositor, the interests of the
trustee and the certificateholders. In the event the depositor, the servicer, a
custodian, the master servicer, the securities administrator or the trustee
undertakes any such action, the legal expenses and costs of such action and any
resulting liability will be expenses, costs and liabilities of the issuing
entity, and the depositor, the servicer, the custodians, the master servicer,
the securities administrator and the trustee will be entitled to be reimbursed
for such expenses, costs and liabilities out of the issuing entity.

                     PREPAYMENT AND YIELD CONSIDERATIONS

STRUCTURING ASSUMPTIONS

     The prepayment model used in this prospectus supplement represents an
assumed rate of prepayment ("PREPAYMENT ASSUMPTION") each month relative to the
then outstanding principal balance of a pool of mortgage loans for the life of
those mortgage loans. The Prepayment Assumption does not purport to be a
historical description of prepayment experience or a prediction of the
anticipated rate of prepayment of any pool of mortgage loans, including the
related mortgage loans. For the adjustable-rate mortgage loans, a 100%
Prepayment Assumption as used in this prospectus supplement is the
"ADJUSTABLE-RATE PREPAYMENT CURVE" or "ARM PPC," which assumes a constant
prepayment rate ("CPR") of 5.00% per annum of the then outstanding principal
balance of a hypothetical pool of adjustable-rate mortgage loans in the first
month of the life of such mortgage loans and an additional approximate 1/11th of
25.00% per annum in each month thereafter until 30.00% CPR is reached in the
twelfth month and remaining at 30.00% CPR until the twenty-fourth month. From
the twenty-fifth month until the twenty-seventh month ARM PPC assumes a constant
prepayment rate of 60.00% CPR per annum. Beginning in the twenty-eighth month
and in each month thereafter during the life of such mortgage loans, ARM PPC
assumes a constant prepayment rate of 35.00% CPR per annum each month. For the
fixed-rate mortgage loans, a 100% Prepayment Assumption as used in this
prospectus supplement is the "FIXED-RATE PREPAYMENT CURVE," which assumes a CPR
of 5.00% per annum of the then outstanding principal balance of each fixed-rate
mortgage loan in the first month each fixed-rate mortgage loan is outstanding
and an additional approximately 1/11th of 19.00% per annum in each month

thereafter until 24.00% CPR is reached in the twelfth month such fixed-rate
mortgage loan is outstanding. In each month thereafter during the life of such
mortgage loans, the Fixed-Rate Prepayment Curve assumes a constant prepayment
rate of 24.00% CPR per annum each month.

                                   S-106
<PAGE>


     Since the tables were prepared on the basis of the assumptions in the
following paragraph, there are discrepancies between the characteristics of the
actual mortgage loans and the characteristics of the mortgage loans assumed in
preparing the tables. Any discrepancy may have an effect upon the percentages of
the Class Certificate Balances outstanding and weighted average lives of the
Offered LIBOR Certificates set forth in the tables. In addition, since the
actual mortgage loans in the issuing entity have characteristics which differ
from those assumed in preparing the tables set forth below, the distributions of
principal on the Offered LIBOR Certificates may be made earlier or later than as
indicated in the tables.


     Unless otherwise specified, the information in the tables in this
prospectus supplement has been prepared on the basis of the following assumed
characteristics of the mortgage loans and the following additional assumptions
which collectively are the structuring assumptions ("STRUCTURING ASSUMPTIONS"):


     o    the closing date for the certificates occurs on April 20, 2007;

     o    distributions on the certificates are made on the 25th day of each
          month, commencing in April 2007, regardless if such day is a business
          day, in accordance with the priorities described in this prospectus
          supplement;

     o    the mortgage loan prepayment rates with respect to the assumed
          mortgage loans are a multiple of the applicable Prepayment Assumption
          as stated in the table under the heading "PREPAYMENT SCENARIOS" under
          "--DECREMENT TABLES" below;

     o    prepayments include 30 days' interest on the related mortgage loan;

     o    the Optional Clean-up Call is not exercised (except with respect to
          the weighted average life to call where the Optional Clean-up Call is
          assumed to be exercised when it is first exercisable);

     o    the Specified Overcollateralized Amount is initially as specified in
          this prospectus supplement and thereafter decreases in accordance with
          the provisions in this prospectus supplement;

     o    all adjustable-rate mortgage loans are indexed to the Six-Month LIBOR
          Loan Index;

     o    with respect to each adjustable-rate mortgage loan, (a) the interest
          rate for each mortgage loan is adjusted on its next rate Adjustment
          Date (and on subsequent Adjustment Dates, if necessary) to a rate
          equal to the Gross Margin plus the Index (subject to the applicable
          initial and periodic rate caps and maximum and minimum interest
          rates), (b) the Six-Month LIBOR Loan Index remains constant at 5.314%,
          and (c) the scheduled monthly payment on the mortgage loans is
          adjusted to equal a fully amortizing payment, except in the case of
          the interest-only mortgage loans during the interest-only period;

     o    following the next Adjustment Date, all adjustable-rate mortgage loans
          are assumed to adjust every six months;

     o    the Expense Fee Rate is 0.5100%;

     o    One-Month LIBOR remains constant at 5.320%;

o   no Swap Termination Payments are paid or received by the issuing
    entity;

o   no delinquencies or defaults in the payment by mortgagors of principal
    of and interest on the mortgage loans are experienced;

o   scheduled payments on the mortgage loans are received on the first day
    of each month commencing in the calendar month of the first
    Distribution Date and are computed prior to giving effect to
    prepayments received on the last day of the prior month;

o   prepayments represent prepayments in full of individual mortgage loans
    and are received on the last day of each month, commencing in the
    calendar month in which the closing date occurs;

o   prepayment speeds are capped at 85.00% CPR for all scenarios;

                                  S-107

<PAGE>

o   the initial Class Certificate Balance of each class of certificates is
    as set forth in this prospectus supplement, except that the Residual
    Certificates are assumed to be zero;

o   interest accrues on each class of certificates at the applicable
    Pass-Through Rate set forth or described in this prospectus
    supplement;

o   with respect to adjustable-rate mortgage loans, (a) the mortgage loans
    with an initial fixed period less than 84 months will use the
    Adjustable-Rate Prepayment Curve and (b) the mortgage loans with an
    initial fixed period equal to or greater than 84 months will use the
    Fixed-Rate Prepayment Curve; and

o   the assumed mortgage loans have the approximate characteristics
    described below:

                                  S-108

<PAGE>

<TABLE>
<CAPTION>

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Margin Description (%) | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | |
| 1 22 | 8.80828 | 2 YR ARM 6.09769 | 21,449,811.10 | 358 | 358 | 2 | LIBOR_6MO |
| 1 23 | 9.06713 | 2 YR ARM 6.27653 | 883,570.89 | 359 | 359 | 1 | LIBOR_6MO |
| 1 23 | 8.23497 | 2 YR ARM 6.09412 | 344,377.83 | 359 | 359 | 1 | LIBOR_6MO |
| 1 | | 2 YR ARM | 69,250.05 | 357 | 357 | 3 | LIBOR_6MO |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 21 | | 9.65000 | 5.50000 | | | | |
| | 1 | | 2 YR ARM | 91,941.92 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 8.30000 | 5.30000 | | | | |
| | 1 | | 2 YR ARM | 3,672,495.29 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.63607 | 6.28643 | | | | |
| | 1 | | 2 YR ARM | 6,794,493.66 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.45806 | 6.42641 | | | | |
| | 1 | | 2 YR ARM | 1,840,692.53 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 9.15597 | 6.36347 | | | | |
| | 1 | | 2 YR ARM | 518,317.17 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.27731 | 6.20588 | | | | |
| | 1 | | 2 YR ARM | 250,679.67 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.39472 | 6.22044 | | | | |
| | 1 | | 2 YR ARM | 6,395,987.88 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.16323 | 6.18365 | | | | |
| | 1 | | 2 YR ARM | 168,913.30 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 9.30000 | 5.30000 | | | | |
| | 1 | | 2 YR ARM | 127,875.57 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.57500 | 7.57500 | | | | |
| | 1 | | 2 YR ARM | 2,619,610.89 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.10817 | 6.37628 | | | | |
| | 1 | | 2 YR ARM | 3,908,094.51 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 8.80647 | 5.53726 | | | | |
| | 1 | | 2 YR ARM | 926,026.14 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 9.34124 | 6.22905 | | | | |
| | 1 | | 2 YR ARM | 468,600.77 | 359 | 359 | 1 | LIBOR_6MO |
| 23 | | 8.32542 | 6.57895 | | | | |
| | 1 | | 2 YR ARM | 184,769.23 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.37500 | 7.37500 | | | | |
| | 1 | | 2 YR ARM | 33,285,440.10 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.72677 | 6.28561 | | | | |
| | 1 | | 2 YR ARM | 82,491.85 | 352 | 352 | 8 | LIBOR_6MO |
| 16 | | 9.90000 | 6.00000 | | | | |
| | 1 | | 2 YR ARM | 248,448.86 | 349 | 349 | 11 | LIBOR_6MO |
| 13 | | 9.35000 | 6.45000 | | | | |
| | 1 | | 2 YR ARM 40/40 | 1,256,238.12 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | | 8.83902 | 5.54710 | | | | |
| | 1 | | 2 YR ARM 40/40 | 191,908.69 | 478 | 478 | 2 | LIBOR_6MO |
| 22 | | 8.65000 | 5.65000 | | | | |
| | 1 | | 2 YR ARM 40/40 | 81,685.85 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | | 9.70000 | 6.70000 | | | | |
| | 1 | | 2 YR ARM 40/40 | 249,968.58 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | | 10.75000 | 7.00000 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 37,494,619.15 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.87430 | 6.12900 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 136,260.39 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | | 7.95000 | 6.05000 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 1,230,097.07 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | | 8.63375 | 6.48037 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 127,487.70 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | | 11.60000 | 7.30000 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 194,785.56 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | | 7.50000 | 4.25000 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 274,635.43 | 473 | 353 | 7 | LIBOR_6MO |
| 17 | | 7.99000 | 6.00000 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 1,367,496.36 | 477 | 357 | 3 | LIBOR_6MO |
| 21 | | 9.77469 | 6.17046 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 3,861,591.17 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.13736 | 6.24590 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 1,139,141.49 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | | 8.75590 | 6.22992 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 686,569.76 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | | 7.13023 | 5.70181 | | | | |
| | 1 | | 2 YR ARM BALLOON 40/30 | 648,553.20 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | | 9.77828 | 6.29838 | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 2 YR ARM BALLOON 40/30 | 3,896,531.23 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.91225 | 6.16962 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 126,376.75 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 9.50000 | 6.95000 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 99,777.13 | 475 | 355 | 5 | LIBOR_6MO |
| 19 | 6.47500 | 5.95000 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 5,752,857.08 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.24941 | 6.35094 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 74,789.04 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 10.25000 | 7.00000 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 1,584,702.22 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.41496 | 5.77737 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 635,948.46 | 477 | 357 | 3 | LIBOR_6MO |
| 21 | 9.26221 | 5.89472 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 147,953.11 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 7.65000 | 4.40000 | | | | |
| 1 | 2 YR ARM BALLOON 40/30 | 61,965,356.53 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.32973 | 6.26689 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 751,796.06 | 538 | 358 | 2 | LIBOR_6MO |
| 22 | 8.19148 | 7.07445 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 358,176.13 | 539 | 359 | 1 | LIBOR_6MO |
| 23 | 8.56465 | 7.56534 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 204,444.55 | 538 | 358 | 2 | LIBOR_6MO |
| 22 | 9.00000 | 8.00000 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 1,062,184.98 | 539 | 359 | 1 | LIBOR_6MO |
| 23 | 7.88995 | 7.17676 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 161,969.28 | 539 | 359 | 1 | LIBOR_6MO |
| 23 | 7.99900 | 7.00000 | | | | |
| 1 | 2 YR ARM BALLOON 45/30 | 194,956.35 | 539 | 359 | 1 | LIBOR_6MO |
| 23 | 7.50000 | 6.50000 | | | | |
| 1 | 2 YR ARM BALLOON 50/30 | 9,703,109.14 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 8.01365 | 5.89785 | | | | |
| 1 | 2 YR ARM BALLOON 50/30 | 1,019,589.72 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 8.23835 | 6.09177 | | | | |
| 1 | 2 YR ARM BALLOON 50/30 | 957,451.90 | 598 | 358 | 2 | LIBOR_6MO |
| 22 | 8.67941 | 6.20477 | | | | |
| 1 | 2 YR ARM BALLOON 50/30 | 711,729.65 | 598 | 358 | 2 | LIBOR_6MO |
| 22 | 8.19869 | 6.00660 | | | | |
| 1 | 2 YR ARM BALLOON 50/30 | 432,350.78 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 8.77489 | 6.27618 | | | | |

</TABLE>


<TABLE>
<CAPTION>

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1 | 1.97610 | 1.32654 | 15.46649 | 8.78694 | - |
| 1 | 2.00000 | 1.41504 | 15.89721 | 9.06713 | - |
| 1 | 2.00000 | 1.50000 | 15.23497 | 8.23497 | - |
| 1 | 2.00000 | 1.00000 | 15.65000 | 9.65000 | - |
| 1 | 2.00000 | 1.00000 | 14.30000 | 8.30000 | - |
| 1 | 2.09429 | 1.43892 | 15.51392 | 8.57686 | - |
| 1 | 2.11409 | 1.34022 | 16.13849 | 9.45806 | - |
| 1 | 2.00000 | 1.34388 | 15.84374 | 9.15597 | - |
| 1 | 2.00000 | 1.50000 | 15.27731 | 8.27731 | - |
| 1 | 2.00000 | 1.50000 | 15.39472 | 8.39472 | - |
| 1 | 2.02515 | 1.27882 | 15.69712 | 9.16323 | - |
| 1 | 2.00000 | 1.00000 | 15.30000 | 9.30000 | - |
| 1 | 3.00000 | 1.00000 | 15.57500 | 9.57500 | - |

| 1 | 2.00000 | 1.47281 | 16.05380 | 9.10817 | - |
| 1 | 2.06719 | 1.02775 | 14.86197 | 8.80647 | - |
| 1 | 2.00000 | 1.00000 | 15.34124 | 9.34124 | - |
| 1 | 2.00000 | 1.00000 | 14.32542 | 6.57895 | - |
| 1 | 2.00000 | 1.00000 | 14.37500 | 7.37500 | - |
| 1 | 2.07368 | 1.43679 | 15.61367 | 8.67783 | - |
| 1 | 3.00000 | 1.00000 | 16.90000 | 9.90000 | - |
| 1 | 3.00000 | 1.00000 | 16.35000 | 6.45000 | - |
| 1 | 2.00000 | 1.00000 | 14.83902 | 8.83902 | - |
| 1 | 2.00000 | 1.00000 | 14.65000 | 8.65000 | - |
| 1 | 2.00000 | 1.00000 | 15.70000 | 9.70000 | - |
| 1 | 2.00000 | 1.00000 | 16.75000 | 10.75000 | - |
| 1 | 2.00319 | 1.48613 | 15.83739 | 8.87430 | - |
| 1 | 2.00000 | 1.50000 | 14.95000 | 7.95000 | - |
| 1 | 2.00000 | 1.50000 | 15.63375 | 8.63375 | - |
| 1 | 2.00000 | 1.50000 | 18.60000 | 11.60000 | - |
| 1 | 2.00000 | 1.00000 | 13.50000 | 7.50000 | - |
| 1 | 3.00000 | 1.00000 | 13.99000 | 6.00000 | - |
| 1 | 2.00000 | 1.50000 | 16.77469 | 9.77469 | - |
| 1 | 2.02672 | 1.45232 | 16.13861 | 9.13736 | - |
| 1 | 2.00000 | 1.38943 | 15.53477 | 8.75590 | - |
| 1 | 2.00000 | 1.50000 | 14.13023 | 7.13023 | - |
| 1 | 2.00000 | 1.50000 | 16.77828 | 9.77828 | - |
| 1 | 2.00000 | 1.48834 | 15.88894 | 8.91225 | - |
| 1 | 2.00000 | 1.50000 | 16.50000 | 9.50000 | - |
| 1 | 2.00000 | 1.50000 | 13.47500 | 6.47500 | - |
| 1 | 2.00000 | 1.50000 | 15.24941 | 8.24941 | - |
| 1 | 2.00000 | 1.00000 | 16.25000 | 10.25000 | - |
| 1 | 2.00000 | 1.18854 | 14.79205 | 8.41496 | - |
| 1 | 2.00000 | 1.00000 | 15.26221 | 9.26221 | - |
| 1 | 2.00000 | 1.00000 | 13.65000 | 7.65000 | - |
| 1 | 2.08257 | 1.45528 | 15.24458 | 8.32973 | - |
| 1 | 2.00000 | 1.00000 | 14.19148 | 7.07445 | - |
| 1 | 2.00000 | 1.00000 | 14.56465 | 7.56534 | - |
| 1 | 2.00000 | 1.00000 | 15.00000 | 8.00000 | - |
| 1 | 2.00000 | 1.00000 | 13.88995 | 7.17676 | - |
| 1 | 2.00000 | 1.00000 | 13.99900 | 7.00000 | - |
| 1 | 2.00000 | 1.00000 | 13.50000 | 6.50000 | - |
| 1 | 2.00000 | 1.43212 | 14.87789 | 8.01365 | - |
| 1 | 2.00000 | 1.26659 | 14.77154 | 8.23835 | - |
| 1 | 2.00000 | 1.50000 | 15.67941 | 8.67941 | - |
| 1 | 2.00000 | 1.50000 | 15.19869 | 8.19869 | - |
| 1 | 2.00000 | 1.50000 | 15.77489 | 8.77489 | - |

</TABLE>


                                    S-109

<PAGE>


<TABLE>
<CAPTION>

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Description Margin(%) | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |

```
<C>        <C>           <C>
    1    2 YR ARM BALLOON 50/30     244,946.46     599     359     1     LIBOR_6MO
23   6.52500    6.30000
    1    2 YR ARM BALLOON 50/30     808,120.52     599     359     1     LIBOR_6MO
23   7.83650    6.18323
    1    2 YR ARM BALLOON 50/30     863,582.10     599     359     1     LIBOR_6MO
23   7.18134    6.09879
    1    2 YR ARM BALLOON 50/30     950,270.09     598     358     2     LIBOR_6MO
22   8.98785    5.68514
    1    2 YR ARM BALLOON 50/30     718,389.46     599     359     1     LIBOR_6MO
23   7.75422    5.22259
    1    2 YR ARM BALLOON 50/30  17,537,687.75     596     358     2     LIBOR_6MO
22   7.53507    6.11857
    1    2 YR ARM BALLOON 50/30     176,486.85     598     358     2     LIBOR_6MO
22   11.10000   7.00000
    1    2 YR ARM IO              10,217,036.67     300     358     2     LIBOR_6MO
22   7.80120    5.97357
    1    2 YR ARM IO                 315,400.00     300     358     2     LIBOR_6MO
22   8.37987    6.17987
    1    2 YR ARM IO                 256,500.00     300     355     5     LIBOR_6MO
19   7.40000    6.05000
    1    2 YR ARM IO                 227,150.00     300     358     2     LIBOR_6MO
22   6.67500    6.30000
    1    2 YR ARM IO                 311,000.00     300     359     1     LIBOR_6MO
23   8.55000    5.55000
    1    2 YR ARM IO               2,954,699.97     300     358     2     LIBOR_6MO
22   7.50795    6.06490
    1    2 YR ARM IO               1,432,265.30     300     357     3     LIBOR_6MO
21   8.37022    5.98403
    1    2 YR ARM IO                 985,675.00     300     358     2     LIBOR_6MO
22   7.75228    6.05610
    1    2 YR ARM IO               1,071,900.00     300     358     2     LIBOR_6MO
22   7.27285    6.11577
    1    2 YR ARM IO                 313,500.00     300     358     2     LIBOR_6MO
22   5.70000    6.05000
    1    2 YR ARM IO               1,538,048.06     300     358     2     LIBOR_6MO
22   8.00378    5.87024
    1    2 YR ARM IO               3,126,119.97     300     358     2     LIBOR_6MO
22   7.24971    6.13591
    1    2 YR ARM IO                 413,215.00     300     359     2     LIBOR_6MO
23   8.60606    5.50852
    1    2 YR ARM IO                 260,592.00     300     358     2     LIBOR_6MO
22   7.22731    4.22731
    1    2 YR ARM IO                 207,200.00     300     359     1     LIBOR_6MO
23   6.78500    3.53500
    1    2 YR ARM IO              28,670,347.24     300     358     2     LIBOR_6MO
22   7.33423    5.98392
    1    2 YR ARM IO                 173,500.00     240     359     1     LIBOR_6MO
23   7.75000    6.75000
    1    2 YR ARM IO                 293,000.00     240     359     1     LIBOR_6MO
23   7.75000    6.75000
    1    2 YR ARM IO                 548,847.88     240     358     2     LIBOR_6MO
22   8.05198    7.11575
    1    2 YR ARM IO                 148,500.00     240     354     6     LIBOR_6MO
18   10.50000   7.87500
    1    3 YR ARM                 7,660,098.39     358     358     2     LIBOR_6MO
34   8.61141    6.10421
    1    3 YR ARM                   835,284.48     357     357     3     LIBOR_6MO
33   8.22798    6.01872
    1    3 YR ARM                   268,718.91     358     358     2     LIBOR_6MO
34   7.75000    5.75000
    1    3 YR ARM                   388,464.81     357     357     3     LIBOR_6MO
33   7.68568    6.23704
    1    3 YR ARM                   102,765.70     359     359     1     LIBOR_6MO
35   7.00000    3.75000
```

```
         1              3 YR ARM              547,255.82       358          358          2         LIBOR_6MO
34      7.18307        6.17198
         1              3 YR ARM            1,134,367.83       358          358          2         LIBOR_6MO
34      7.88031        5.88031
         1              3 YR ARM            1,177,819.48       357          357          3         LIBOR_6MO
33      9.08575        6.27480
         1              3 YR ARM              269,538.30       358          358          2         LIBOR_6MO
34      6.80000        5.90000
         1              3 YR ARM              452,795.52       356          356          4         LIBOR_6MO
32     10.18958        7.58275
         1              3 YR ARM              242,487.41       355          355          5         LIBOR_6MO
31     10.34383        8.00000
         1              3 YR ARM            5,254,513.61       358          358          2         LIBOR_6MO
34      8.06961        5.89187
         1       3 YR ARM BALLOON 40/30    10,756,979.69       478          358          2         LIBOR_6MO
34      8.82508        6.16084
         1       3 YR ARM BALLOON 40/30       691,775.14       476          356          4         LIBOR_6MO
32      8.36591        6.34249
         1       3 YR ARM BALLOON 40/30     1,415,958.11       477          357          3         LIBOR_6MO
33      8.66606        6.15579
         1       3 YR ARM BALLOON 40/30       321,362.72       478          358          2         LIBOR_6MO
34      5.85000        3.85000
         1       3 YR ARM BALLOON 40/30     1,132,028.24       478          358          2         LIBOR_6MO
34      7.21440        6.13706
         1       3 YR ARM BALLOON 40/30       427,607.70       476          356          4         LIBOR_6MO
32      8.31353        6.49989
         1       3 YR ARM BALLOON 40/30     1,410,613.97       479          359          1         LIBOR_6MO
35      7.84613        4.59613
         1       3 YR ARM BALLOON 40/30        84,040.38       479          359          1         LIBOR_6MO
35      8.70000        5.45000
         1       3 YR ARM BALLOON 40/30        55,952.17       475          355          5         LIBOR_6MO
31      9.80000        6.75000
         1       3 YR ARM BALLOON 40/30       391,250.32       478          358          2         LIBOR_6MO
34      7.78762        5.78762
         1       3 YR ARM BALLOON 40/30     1,739,804.39       476          357          3         LIBOR_6MO
33      9.07172        6.37778
         1       3 YR ARM BALLOON 40/30     1,501,097.01       477          358          2         LIBOR_6MO
34      7.44536        5.46239
         1       3 YR ARM BALLOON 40/30     2,216,098.50       477          357          3         LIBOR_6MO
33      7.80630        5.75802
         1       3 YR ARM BALLOON 40/30       159,965.31       479          359          1         LIBOR_6MO
35      8.95000        5.70000
         1       3 YR ARM BALLOON 40/30       222,974.83       477          357          3         LIBOR_6MO
33      6.75000        6.05000
         1       3 YR ARM BALLOON 40/30       515,627.85       477          358          2         LIBOR_6MO
34      9.04387        6.16195
         1       3 YR ARM BALLOON 40/30     8,554,537.95       478          358          2         LIBOR_6MO
34      8.06429        5.97925
</TABLE>


<TABLE>
<CAPTION>
```

|  |  |  | Gross | | Original Interest |
|  | Initial Periodic | Periodic | Lifetime | Floor | Only Period |
| Group | Cap (%) | Cap (%) | Maximum Rate (%) | Rate (%) | (Months)(1) |
| ---------- | --------- | ---------- | ---------- | --------- | ------------ |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1 | 2.00000 | 1.50000 | 13.52500 | 6.52500 | - |
| 1 | 2.00000 | 1.41586 | 14.66822 | 7.83650 | - |
| 1 | 2.00000 | 1.50000 | 14.18134 | 7.18134 | - |
| 1 | 2.00000 | 1.19349 | 15.37484 | 8.98785 | - |
| 1 | 2.00000 | 1.00000 | 13.75422 | 7.75422 | - |

| 1 | 2.15245 | 1.42628 | 14.39265 | 7.53507 | - |
|---|---------|---------|----------|---------|---|
| 1 | 2.00000 | 1.00000 | 17.10000 | 11.10000 | - |
| 1 | 2.04357 | 1.41300 | 14.62719 | 7.80120 | 60 |
| 1 | 2.00000 | 1.50000 | 15.37987 | 8.37987 | 60 |
| 1 | 2.00000 | 1.50000 | 14.40000 | 7.40000 | 60 |
| 1 | 2.00000 | 1.50000 | 13.67500 | 6.67500 | 60 |
| 1 | 2.00000 | 1.00000 | 14.55000 | 8.55000 | 60 |
| 1 | 2.12993 | 1.43504 | 14.37802 | 7.50795 | 60 |
| 1 | 2.00000 | 1.36586 | 15.10193 | 8.37022 | 60 |
| 1 | 2.00000 | 1.50000 | 14.75228 | 7.75228 | 60 |
| 1 | 2.00000 | 1.50000 | 14.27285 | 7.27285 | 60 |
| 1 | 2.00000 | 1.50000 | 12.70000 | 5.70000 | 60 |
| 1 | 2.00000 | 1.31473 | 14.63324 | 7.50054 | 60 |
| 1 | 2.00000 | 1.50000 | 14.24971 | 7.24971 | 60 |
| 1 | 2.00000 | 1.00000 | 14.60606 | 8.60606 | 60 |
| 1 | 2.00000 | 1.00000 | 13.22731 | 7.22731 | 60 |
| 1 | 2.00000 | 1.00000 | 12.78500 | 6.78500 | 60 |
| 1 | 2.08075 | 1.45962 | 14.25348 | 7.33423 | 60 |
| 1 | 2.00000 | 1.00000 | 13.75000 | 6.75000 | 120 |
| 1 | 2.00000 | 1.00000 | 13.75000 | 6.75000 | 120 |
| 1 | 2.00000 | 1.00000 | 14.05198 | 7.11575 | 120 |
| 1 | 2.00000 | 1.00000 | 16.50000 | 7.87500 | 120 |
| 1 | 2.33606 | 1.25684 | 15.12510 | 8.61141 | - |
| 1 | 2.60756 | 1.09526 | 14.41850 | 8.22798 | - |
| 1 | 3.00000 | 1.00000 | 13.75000 | 7.75000 | - |
| 1 | 2.49877 | 1.25062 | 14.18691 | 7.68568 | - |
| 1 | 2.00000 | 1.00000 | 13.00000 | 7.00000 | - |
| 1 | 2.00000 | 1.50000 | 14.18307 | 7.18307 | - |
| 1 | 3.00000 | 1.00000 | 13.88031 | 7.88031 | - |
| 1 | 2.30340 | 1.25765 | 15.60104 | 9.08575 | - |
| 1 | 2.00000 | 1.50000 | 13.80000 | 6.80000 | - |
| 1 | 2.41317 | 1.29342 | 16.77641 | 10.18958 | - |
| 1 | 3.00000 | 1.00000 | 16.34383 | 10.34383 | - |
| 1 | 2.64722 | 1.17917 | 14.43350 | 8.06961 | - |
| 1 | 2.11080 | 1.37434 | 15.57375 | 8.82508 | - |
| 1 | 2.00000 | 1.50000 | 15.36591 | 8.36591 | - |
| 1 | 2.57221 | 1.21390 | 15.09385 | 8.66606 | - |
| 1 | 3.00000 | 1.00000 | 11.85000 | 5.85000 | - |
| 1 | 2.27635 | 1.36182 | 13.93805 | 7.21440 | - |
| 1 | 2.42231 | 1.15570 | 14.62493 | 8.31353 | - |
| 1 | 2.00000 | 1.00000 | 13.84613 | 7.84613 | - |
| 1 | 2.00000 | 1.00000 | 14.70000 | 8.70000 | - |
| 1 | 2.00000 | 1.50000 | 16.80000 | 9.80000 | - |
| 1 | 3.00000 | 1.00000 | 13.78762 | 7.78762 | - |
| 1 | 2.21679 | 1.28085 | 15.63342 | 9.07172 | - |
| 1 | 2.91484 | 1.04258 | 13.53052 | 7.44536 | - |
| 1 | 2.63065 | 1.18467 | 14.17565 | 7.80630 | - |
| 1 | 2.00000 | 1.00000 | 14.95000 | 8.95000 | - |
| 1 | 2.00000 | 1.50000 | 13.75000 | 6.75000 | - |
| 1 | 2.36306 | 1.00000 | 15.04387 | 9.04387 | - |
| 1 | 2.46429 | 1.26786 | 14.60000 | 8.06429 | - |

```
</TABLE>
```

S-110

```
<PAGE>


<TABLE>
<CAPTION>
```

|  |  | Cut-off | Remaining | Remaining |  |
|---|---|---|---|---|---|
| First |  | Date | Amortization | Term to |  |
| Rate | Gross |  |  |  |  |
|  |  | Principal | Term | Maturity | Seasoning |

```
Reset      Interest   Gross
  Group              Description        Balance ($)   (Months)(1)  (Months)    (Months)      Index
(Months)  Rate (%)  Margin(%)
---------- ---------- ----------        --------------  -----------  ---------  ----------  ----------
--------  ---------  ----------
<S>          <C>        <C>               <C>           <C>          <C>         <C>         <C>
<C>         <C>        <C>
    1          3 YR ARM BALLOON 50/30    732,643.90      599          359          1         LIBOR_6MO
35      7.10077    5.99956
    1          3 YR ARM BALLOON 50/30    198,918.63      598          358          2         LIBOR_6MO
34      6.71500    4.71500
    1          3 YR ARM BALLOON 50/30    121,482.50      599          359          1         LIBOR_6MO
35      7.65000    5.95000
    1          3 YR ARM BALLOON 50/30    208,769.93      599          359          1         LIBOR_6MO
35      7.65000    5.95000
    1          3 YR ARM BALLOON 50/30    390,439.03      599          359          1         LIBOR_6MO
35      9.10097    6.56058
    1          3 YR ARM BALLOON 50/30     87,392.88      598          358          2         LIBOR_6MO
34     11.15000    6.05000
    1          3 YR ARM BALLOON 50/30    128,782.81      599          359          1         LIBOR_6MO
35      7.85000    6.30000
    1          3 YR ARM BALLOON 50/30    166,522.92      598          358          2         LIBOR_6MO
34      6.37500    4.37500
    1          3 YR ARM BALLOON 50/30    247,862.02      598          358          2         LIBOR_6MO
34      7.10000    6.30000
    1          3 YR ARM BALLOON 50/30  4,036,998.71      597          358          2         LIBOR_6MO
34      7.34959    5.83322
    1          3 YR ARM IO             2,585,260.36      300          358          2         LIBOR_6MO
34      7.74675    5.49306
    1          3 YR ARM IO               884,460.85      300          359          1         LIBOR_6MO
35      7.30549    6.11784
    1          3 YR ARM IO               947,949.99      300          358          2         LIBOR_6MO
34      7.33723    4.08723
    1          3 YR ARM IO               117,900.00      300          358          2         LIBOR_6MO
34      8.15000    6.30000
    1          3 YR ARM IO               128,000.00      300          359          1         LIBOR_6MO
35      7.72500    5.90000
    1          3 YR ARM IO               415,000.00      300          359          1         LIBOR_6MO
35      8.45000    5.95000
    1          3 YR ARM IO               295,599.04      300          358          2         LIBOR_6MO
34      7.49000    5.49000
    1          3 YR ARM IO               153,000.00      300          359          1         LIBOR_6MO
35      6.87500    3.62500
    1          3 YR ARM IO             4,834,210.36      300          358          2         LIBOR_6MO
34      7.00862    5.12699
    1          40 YR FIXED               68,978.14      479          479          1            -
 -      7.65000       -
    1          5 YR ARM                 528,958.67      359          359          1         LIBOR_6MO
59      7.39130    4.72897
    1          5 YR ARM                 151,920.36      359          359          1         LIBOR_6MO
59      9.20000    6.20000
    1          5 YR ARM                 249,842.20      359          359          1         LIBOR_6MO
59      8.30000    5.30000
    1          5 YR ARM                 224,533.53      359          359          1         LIBOR_6MO
59      9.25000    6.25000
    1          5 YR ARM                  62,477.22      359          359          1         LIBOR_6MO
59     10.90000    7.00000
    1          5 YR ARM                 179,872.96      359          359          1         LIBOR_6MO
59      7.75000    6.75000
    1          5 YR ARM                 228,976.20      358          358          2         LIBOR_6MO
58      7.47621    5.75995
    1          5 YR ARM BALLOON 40/30   118,711.28      479          359          1         LIBOR_6MO
59      7.55000    5.00000
    1          5 YR ARM BALLOON 40/30 1,067,320.65      478          358          2         LIBOR_6MO
58      6.39110    4.39110
```

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 5 YR ARM BALLOON 45/30 | 166,936.47 | 538 | 358 | 2 | LIBOR_6MO |
| 58 | 8.00000 | 7.00000 | | | | |
| 1 | 5 YR ARM BALLOON 50/30 | 132,041.58 | 599 | 359 | 1 | LIBOR_6MO |
| 59 | 9.75000 | 6.75000 | | | | |
| 1 | 5 YR ARM BALLOON 50/30 | 225,611.37 | 598 | 358 | 2 | LIBOR_6MO |
| 58 | 6.82500 | 4.82500 | | | | |
| 1 | 5 YR ARM IO | 580,500.00 | 300 | 359 | 1 | LIBOR_6MO |
| 59 | 6.43953 | 3.43953 | | | | |
| 1 | 5 YR ARM IO | 236,500.00 | 300 | 358 | 2 | LIBOR_6MO |
| 58 | 9.45402 | 6.39093 | | | | |
| 1 | FIXED | 17,226,698.81 | 344 | 345 | 2 | - |
| - | 8.61936 | - | | | | |
| 1 | FIXED | 606,110.70 | 359 | 359 | 1 | - |
| - | 7.12542 | - | | | | |
| 1 | FIXED | 1,628,802.00 | 357 | 357 | 3 | - |
| - | 8.41925 | - | | | | |
| 1 | FIXED | 3,205,923.60 | 348 | 348 | 1 | - |
| - | 7.35564 | - | | | | |
| 1 | FIXED | 1,010,443.72 | 358 | 358 | 2 | - |
| - | 9.30356 | - | | | | |
| 1 | FIXED | 159,932.90 | 359 | 359 | 1 | - |
| - | 10.25000 | - | | | | |
| 1 | FIXED | 814,748.72 | 359 | 359 | 1 | - |
| - | 7.63350 | - | | | | |
| 1 | FIXED | 146,944.65 | 359 | 359 | 1 | - |
| - | 10.75000 | - | | | | |
| 1 | FIXED | 523,281.17 | 310 | 310 | 1 | - |
| - | 9.08854 | - | | | | |
| 1 | FIXED | 170,742.90 | 358 | 358 | 2 | - |
| - | 7.45100 | - | | | | |
| 1 | FIXED | 4,035,303.78 | 342 | 343 | 2 | - |
| - | 8.82108 | - | | | | |
| 1 | FIXED | 1,897,873.03 | 337 | 337 | 2 | - |
| - | 7.70632 | - | | | | |
| 1 | FIXED | 534,163.20 | 359 | 359 | 1 | - |
| - | 8.50149 | - | | | | |
| 1 | FIXED | 256,248.78 | 357 | 357 | 3 | - |
| - | 7.72935 | - | | | | |
| 1 | FIXED | 113,808.52 | 358 | 359 | 1 | - |
| - | 6.87500 | - | | | | |
| 1 | FIXED | 1,971,984.88 | 350 | 350 | 2 | - |
| - | 8.02358 | - | | | | |
| 1 | FIXED | 234,365.48 | 355 | 355 | 5 | - |
| - | 9.52312 | - | | | | |
| 1 | FIXED | 2,060,605.95 | 325 | 325 | 2 | - |
| - | 6.86077 | - | | | | |
| 1 | FIXED | 1,380,417.78 | 358 | 358 | 2 | - |
| - | 8.10339 | - | | | | |
| 1 | FIXED | 3,106,043.50 | 358 | 358 | 2 | - |
| - | 7.88059 | - | | | | |
| 1 | FIXED | 1,013,655.64 | 359 | 359 | 1 | - |
| - | 8.42638 | - | | | | |
| 1 | FIXED | 792,508.72 | 359 | 359 | 1 | - |
| - | 7.94589 | - | | | | |

</TABLE>


<TABLE>
<CAPTION>

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| ------- | -------- | -------- | ---------- | -------- | ------------ |

```
<S>        <C>        <C>        <C>        <C>        <C>
1       2.00000    1.50000   14.10077    7.10077       -
1       3.00000    1.00000   12.71500    6.71500       -
1       2.00000    1.50000   14.65000    7.65000       -
1       2.00000    1.50000   14.65000    7.65000       -
1       2.45961    1.00000   15.10097    9.10097       -
1       2.00000    1.50000   18.15000   11.15000       -
1       2.00000    1.50000   14.85000    7.85000       -
1       3.00000    1.00000   12.37500    6.37500       -
1       2.00000    1.50000   14.10000    7.10000       -
1       2.57664    1.21168   13.77295    7.34959       -
1       2.45359    1.10769   13.96213    7.74675      60
1       2.00000    1.50000   14.30549    7.30549      60
1       2.00000    1.00000   13.33723    7.33723      60
1       2.00000    1.50000   15.15000    8.15000      60
1       2.00000    1.50000   14.72500    7.72500      60
1       2.00000    1.50000   15.45000    8.45000      60
1       3.00000    1.00000   13.49000    7.49000      60
1       2.00000    1.00000   12.87500    6.87500      60
1       2.76273    1.11863   13.24589    7.00862      60
1          -          -          -          -          -
1       2.42112    1.00000   13.39130    7.39130       -
1       2.00000    1.00000   15.20000    9.20000       -
1       2.00000    1.00000   14.30000    8.30000       -
1       2.00000    1.00000   15.25000    9.25000       -
1       2.00000    1.00000   16.90000   10.90000       -
1       2.00000    1.00000   13.75000    6.75000       -
1       2.71626    1.00000   13.47621    7.19247       -
1       2.00000    1.00000   13.55000    7.55000       -
1       3.00000    1.00000   12.39110    6.39110       -
1       2.00000    1.00000   14.00000    7.00000       -
1       2.00000    1.00000   15.75000    9.75000       -
1       3.00000    1.00000   12.82500    6.82500       -
1       2.00000    1.00000   12.43953    6.43953      60
1       2.00000    1.00000   15.45402    9.45402      60
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
1          -          -          -          -          -
</TABLE>
```

S-111

<PAGE>

<TABLE>

&lt;CAPTION&gt;

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Description Margin(%) | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|
| &lt;S&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | &lt;C&gt; |
| &lt;C&gt; | &lt;C&gt; | &lt;C&gt; | | | | | |
| 1 | 7.57817 | FIXED - | 26,824,360.91 | 346 | 346 | 2 | - |
| 1 | 8.94707 | FIXED BALLOON 40/30 | 3,861,057.94 | 478 | 358 | 2 | - |
| 1 | 9.38871 | FIXED BALLOON 40/30 - | 420,435.38 | 479 | 359 | 1 | - |
| 1 | 11.87500 | FIXED BALLOON 40/30 - | 238,436.11 | 477 | 357 | 3 | - |
| 1 | 8.39606 | FIXED BALLOON 40/30 - | 330,254.74 | 478 | 358 | 2 | - |
| 1 | 7.32133 | FIXED BALLOON 40/30 - | 2,108,700.26 | 478 | 358 | 2 | - |
| 1 | 9.27862 | FIXED BALLOON 40/30 - | 539,549.55 | 479 | 359 | 1 | - |
| 1 | 7.61172 | FIXED BALLOON 40/30 - | 778,591.45 | 479 | 359 | 1 | - |
| 1 | 8.59061 | FIXED BALLOON 40/30 - | 2,179,200.91 | 479 | 359 | 1 | - |
| 1 | 7.34850 | FIXED BALLOON 40/30 - | 696,963.57 | 478 | 358 | 2 | - |
| 1 | 7.52906 | FIXED BALLOON 40/30 - | 846,805.32 | 478 | 358 | 2 | - |
| 1 | 9.04316 | FIXED BALLOON 40/30 - | 997,094.18 | 478 | 358 | 2 | - |
| 1 | 7.19132 | FIXED BALLOON 40/30 - | 681,788.99 | 479 | 359 | 1 | - |
| 1 | 8.14696 | FIXED BALLOON 40/30 - | 819,538.22 | 479 | 359 | 1 | - |
| 1 | 7.67685 | FIXED BALLOON 40/30 - | 12,494,530.54 | 478 | 358 | 2 | - |
| 1 | 8.19033 | FIXED BALLOON 45/30 | 320,411.55 | 538 | 358 | 2 | - |
| 1 | 8.92615 | FIXED BALLOON 45/30 - | 325,924.02 | 538 | 358 | 2 | - |
| 1 | 7.84490 | FIXED BALLOON 50/30 - | 2,119,756.14 | 599 | 359 | 1 | - |
| 1 | 6.86175 | FIXED BALLOON 50/30 - | 2,462,797.13 | 598 | 358 | 2 | - |
| 1 | 7.90000 | FIXED BALLOON 50/30 - | 278,131.89 | 598 | 358 | 2 | - |
| 1 | 8.18556 | FIXED BALLOON 50/30 - | 506,716.84 | 599 | 359 | 1 | - |
| 1 | 7.95262 | FIXED BALLOON 50/30 - | 459,202.29 | 598 | 358 | 2 | - |
| 1 | 6.86925 | FIXED BALLOON 50/30 - | 451,824.98 | 598 | 358 | 2 | - |
| 1 | 6.82500 | FIXED BALLOON 50/30 - | 256,949.68 | 599 | 359 | 1 | - |
| 1 | 7.98240 | FIXED BALLOON 50/30 - | 726,476.82 | 598 | 358 | 2 | - |
| 1 | | FIXED BALLOON 50/30 | 409,303.68 | 598 | 358 | 2 | - |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| - | 6.27692 | - | | | | | |
| 1 | | FIXED BALLOON 50/30 | 267,948.95 | 599 | 359 | 1 | - |
| - | 6.90000 | - | | | | | |
| 1 | | FIXED BALLOON 50/30 | 211,953.25 | 599 | 359 | 1 | - |
| - | 6.50000 | - | | | | | |
| 1 | | FIXED BALLOON 50/30 | 14,944,523.64 | 598 | 358 | 2 | - |
| - | 6.99311 | - | | | | | |
| 1 | | FIXED IO | 1,015,499.99 | 300 | 358 | 2 | - |
| - | 7.60776 | - | | | | | |
| 1 | | FIXED IO | 2,361,513.47 | 300 | 357 | 3 | - |
| - | 6.67814 | - | | | | | |
| 1 | | FIXED IO | 108,000.00 | 300 | 359 | 1 | - |
| - | 8.92500 | - | | | | | |
| 1 | | FIXED IO | 725,500.00 | 300 | 358 | 2 | - |
| - | 6.25000 | - | | | | | |
| 1 | | FIXED IO | 615,414.13 | 300 | 358 | 2 | - |
| - | 6.59103 | - | | | | | |
| 1 | | FIXED IO | 415,249.99 | 300 | 358 | 2 | - |
| - | 6.62098 | - | | | | | |
| 1 | | FIXED IO | 220,000.00 | 300 | 355 | 5 | - |
| - | 8.19000 | - | | | | | |
| 1 | | FIXED IO | 3,925,615.90 | 300 | 358 | 2 | - |
| - | 6.93148 | - | | | | | |
| 1 | | FIXED | 4,467,444.54 | 357 | 357 | 3 | - |
| - | 11.17832 | - | | | | | |
| 1 | | FIXED | 20,187.98 | 358 | 358 | 2 | - |
| - | 11.85000 | - | | | | | |
| 1 | | FIXED | 34,327.85 | 353 | 355 | 5 | - |
| - | 11.65000 | - | | | | | |
| 1 | | FIXED | 169,791.09 | 358 | 358 | 2 | - |
| - | 10.16200 | - | | | | | |
| 1 | | FIXED | 174,820.20 | 356 | 357 | 3 | - |
| - | 11.87020 | - | | | | | |
| 1 | | FIXED | 156,872.08 | 358 | 358 | 2 | - |
| - | 11.05511 | - | | | | | |
| 1 | | FIXED | 978,882.96 | 357 | 357 | 3 | - |
| - | 10.43406 | - | | | | | |
| 1 | | FIXED | 195,696.88 | 344 | 344 | 2 | - |
| - | 11.46717 | - | | | | | |
| 1 | | FIXED | 37,302.45 | 357 | 357 | 3 | - |
| - | 10.23500 | - | | | | | |
| 1 | | FIXED | 72,155.48 | 358 | 358 | 2 | - |
| - | 12.50000 | - | | | | | |
| 1 | | FIXED | 158,272.78 | 358 | 358 | 2 | - |
| - | 11.24179 | - | | | | | |
| 1 | | FIXED | 75,580.39 | 356 | 356 | 4 | - |
| - | 10.52969 | - | | | | | |
| 1 | | FIXED | 79,881.63 | 352 | 358 | 2 | - |
| - | 11.15668 | - | | | | | |
| 1 | | FIXED | 1,105,056.49 | 344 | 344 | 2 | - |
| - | 10.61871 | - | | | | | |
| 1 | | FIXED BALLOON 30/15 | 176,174.21 | 357 | 177 | 3 | - |
| - | 12.25182 | - | | | | | |
| 1 | | FIXED BALLOON 30/15 | 43,389.20 | 359 | 179 | 1 | - |
| - | 12.62500 | - | | | | | |
| 1 | | FIXED BALLOON 30/15 | 31,991.58 | 359 | 179 | 1 | - |
| - | 12.37500 | - | | | | | |
| 1 | | FIXED BALLOON 30/15 | 28,985.90 | 358 | 178 | 2 | - |
| - | 12.75000 | - | | | | | |
| 2 | | 2 YR ARM | 15,642,808.78 | 358 | 358 | 2 | LIBOR_6MO |
| 22 | 8.71812 | 6.13656 | | | | | |

&lt;/TABLE&gt;

&lt;TABLE&gt;

<CAPTION>

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | 60 |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 1 | - | - | - | - | - |
| 2 | 2.13978 | 1.30035 | 15.35638 | 8.69917 | - |
</TABLE>

S-112

<PAGE>

<TABLE>
<CAPTION>

```
                                      Cut-off        Remaining      Remaining
First                                  Date         Amortization    Term to
Rate          Gross                  Principal          Term        Maturity      Seasoning
Reset       Interest     Gross       Balance ($)    (Months)(1)    (Months)      (Months)       Index
 Group      Rate (%)   Description
(Months)                Margin(%)
--------   ----------  -----=----   --------------  -------------  -----------  ----------  ---------
--------   ----------  -------
<S>            <C>          <C>          <C>            <C>           <C>          <C>          <C>
<C>      <C>         <C>
     2              2 YR ARM        869,219.10      358            358           2         LIBOR_6MO
22    10.66168   7.00000
     2              2 YR ARM        301,194.07      359            359           1         LIBOR_6MO
23     5.90000   6.05000
     2              2 YR ARM        164,662.76      355            355           5         LIBOR_6MO
19    10.45000   6.99000
     2              2 YR ARM      2,207,635.78      359            359           1         LIBOR_6MO
23     8.56878   5.73073
     2              2 YR ARM      2,602,089.78      358            358           2         LIBOR_6MO
22     8.16164   6.12392
     2              2 YR ARM      6,798,901.20      358            358           2         LIBOR_6MO
22     9.13758   6.00735
     2              2 YR ARM        839,678.54      357            357           3         LIBOR_6MO
21    10.25258   6.03080
     2              2 YR ARM        402,214.79      359            359           1         LIBOR_6MO
23     8.76624   6.17048
     2              2 YR ARM        118,654.17      358            358           2         LIBOR_6MO
22    10.45000   7.45000
     2              2 YR ARM      3,889,387.24      359            359           1         LIBOR_6MO
23     8.79477   5.99816
     2              2 YR ARM        174,793.68      358            358           2         LIBOR_6MO
22     8.65000   5.65000
     2              2 YR ARM      1,231,502.46      358            358           2         LIBOR_6MO
22     8.68549   6.33543
     2              2 YR ARM      9,862,554.50      359            359           1         LIBOR_6MO
23     8.60454   5.48587
     2              2 YR ARM        628,117.40      358            358           2         LIBOR_6MO
22     7.85230   4.61466
     2              2 YR ARM        599,457.45      354            354           6         LIBOR_6MO
18     8.49270   5.08943
     2              2 YR ARM     20,719,364.70      358            358           2         LIBOR_6MO
22     8.43521   6.18318
     2              2 YR ARM        310,144.79      354            354           6         LIBOR_6MO
18    10.19008   6.71603
     2              2 YR ARM         67,913.85      358            358           2         LIBOR_6MO
22     8.30000   5.30000
     2              2 YR ARM        297,625.36      357            357           3         LIBOR_6MO
21     7.82271   4.58408
     2              2 YR ARM        201,264.86      359            359           1         LIBOR_6MO
23     8.00000   5.00000
     2              2 YR ARM         61,435.52      349            349          11         LIBOR_6MO
13     7.88000   5.75000
     2              2 YR ARM        156,576.16      358            358           2         LIBOR_6MO
22     7.71000   6.71000
```

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 2 YR ARM 40/40 | 286,895.17 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | 9.38307 | 6.38307 | | | | |
| 2 | 2 YR ARM 40/40 | 271,917.45 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | 7.80000 | 4.80000 | | | | |
| 2 | 2 YR ARM 40/40 | 422,006.76 | 478 | 478 | 2 | LIBOR_6MO |
| 22 | 8.28549 | 5.28549 | | | | |
| 2 | 2 YR ARM 40/40 | 341,640.16 | 479 | 479 | 1 | LIBOR_6MO |
| 23 | 7.60000 | 4.60000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 32,332,709.99 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.60865 | 6.13211 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 491,123.82 | 476 | 357 | 3 | LIBOR_6MO |
| 21 | 12.05000 | 5.95000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 183,923.97 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 9.12500 | 6.15000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 205,114.58 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 9.10000 | 6.15000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 135,470.18 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 8.90000 | 5.75000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 2,891,223.20 | 477 | 357 | 3 | LIBOR_6MO |
| 21 | 9.41985 | 6.44383 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 2,293,460.80 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.74054 | 6.44744 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 207,667.45 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 6.85000 | 6.05000 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 477,299.27 | 477 | 357 | 3 | LIBOR_6MO |
| 21 | 7.38956 | 5.87048 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 2,317,363.19 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.32753 | 6.25721 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 1,938,729.59 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 8.15444 | 6.31385 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 1,950,205.71 | 478 | 359 | 1 | LIBOR_6MO |
| 23 | 8.00580 | 4.79176 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 514,862.38 | 479 | 359 | 1 | LIBOR_6MO |
| 23 | 8.25185 | 5.73779 | | | | |
| 2 | 2 YR ARM BALLOON 40/30 | 53,167,583.24 | 478 | 358 | 2 | LIBOR_6MO |
| 22 | 7.98655 | 6.24473 | | | | |
| 2 | 2 YR ARM BALLOON 45/30 | 574,876.49 | 539 | 359 | 1 | LIBOR_6MO |
| 23 | 7.62500 | 6.75000 | | | | |
| 2 | 2 YR ARM BALLOON 45/30 | 1,769,505.02 | 538 | 359 | 1 | LIBOR_6MO |
| 23 | 8.38933 | 7.71366 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 12,341,465.30 | 592 | 358 | 2 | LIBOR_6MO |
| 22 | 8.49055 | 5.97974 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 289,486.27 | 598 | 358 | 2 | LIBOR_6MO |
| 22 | 12.20000 | 7.00000 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 520,151.99 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 8.81000 | 6.25000 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 945,536.29 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 10.00199 | 6.37205 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 2,041,376.93 | 597 | 357 | 3 | LIBOR_6MO |
| 21 | 9.24167 | 6.54425 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 819,865.42 | 598 | 358 | 2 | LIBOR_6MO |
| 22 | 8.87521 | 6.44394 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 707,192.37 | 598 | 358 | 2 | LIBOR_6MO |
| 22 | 7.47122 | 5.91407 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 718,598.57 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 6.62500 | 5.95000 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 323,430.56 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 9.90000 | 6.90000 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 901,515.35 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 7.03355 | 6.20774 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 3,354,333.57 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 8.42513 | 5.39168 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 863,222.13 | 599 | 359 | 1 | LIBOR_6MO |
| 23 | 9.37609 | 5.80278 | | | | |
| 2 | 2 YR ARM BALLOON 50/30 | 657,825.96 | 599 | 359 | 1 | LIBOR_6MO |

```
23      8.34874     5.34874
 2      2 YR ARM BALLOON 50/30    35,564,581.63    598    358    2    LIBOR_6MO
22      7.53900     6.06544
</TABLE>
```

```
<TABLE>
<CAPTION>
```

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| --------- | --------- | ---------- | --------- | --------- | ------------ |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 2 | 2.00000 | 1.00000 | 16.66168 | 10.66168 | - |
| 2 | 2.00000 | 1.50000 | 12.90000 | 5.90000 | - |
| 2 | 3.00000 | 1.50000 | 16.45000 | 10.45000 | - |
| 2 | 2.16726 | 1.00000 | 14.56878 | 8.56878 | - |
| 2 | 2.00000 | 1.50000 | 15.16164 | 8.16164 | - |
| 2 | 2.06073 | 1.17410 | 15.48790 | 9.13758 | - |
| 2 | 3.00000 | 1.00000 | 16.25258 | 10.25258 | - |
| 2 | 2.00000 | 1.50000 | 15.76624 | 8.76624 | - |
| 2 | 2.00000 | 1.00000 | 16.45000 | 10.45000 | - |
| 2 | 2.09743 | 1.19615 | 15.20439 | 8.79477 | - |
| 2 | 2.00000 | 1.00000 | 14.65000 | 8.65000 | - |
| 2 | 2.11274 | 1.39980 | 15.48508 | 8.68549 | - |
| 2 | 2.04407 | 1.02264 | 14.64983 | 8.60454 | - |
| 2 | 2.00000 | 1.00000 | 13.85230 | 7.85230 | - |
| 2 | 2.00000 | 1.00000 | 14.49270 | 8.49270 | - |
| 2 | 2.15145 | 1.40138 | 15.23798 | 8.42822 | - |
| 2 | 2.70992 | 1.00000 | 16.90000 | 10.19008 | - |
| 2 | 2.00000 | 1.00000 | 14.30000 | 8.30000 | - |
| 2 | 2.34090 | 1.00000 | 14.16361 | 7.82271 | - |
| 2 | 2.00000 | 1.00000 | 14.00000 | 8.00000 | - |
| 2 | 2.00000 | 1.00000 | 13.88000 | 7.88000 | - |
| 2 | 2.00000 | 1.00000 | 13.71000 | 7.71000 | - |
| 2 | 2.00000 | 1.00000 | 15.38307 | 9.38307 | - |
| 2 | 2.00000 | 1.00000 | 13.80000 | 7.80000 | - |
| 2 | 2.00000 | 1.00000 | 14.28549 | 8.28549 | - |
| 2 | 2.00000 | 1.00000 | 13.60000 | 7.60000 | - |
| 2 | 2.01508 | 1.44290 | 15.48382 | 8.60865 | - |
| 2 | 2.00000 | 1.50000 | 19.05000 | 12.05000 | - |
| 2 | 2.00000 | 1.50000 | 16.12500 | 9.12500 | - |
| 2 | 2.00000 | 1.50000 | 16.10000 | 9.10000 | - |
| 2 | 2.00000 | 1.00000 | 14.90000 | 8.90000 | - |
| 2 | 2.00000 | 1.50000 | 16.41985 | 9.41985 | - |
| 2 | 2.00000 | 1.32113 | 15.38280 | 8.74054 | - |
| 2 | 2.00000 | 1.50000 | 13.85000 | 6.85000 | - |
| 2 | 2.00000 | 1.50000 | 14.38956 | 7.38956 | - |
| 2 | 2.00000 | 1.43478 | 15.19708 | 8.32753 | - |
| 2 | 2.00000 | 1.50000 | 15.15444 | 8.15444 | - |
| 2 | 2.10238 | 1.00000 | 14.00580 | 8.00580 | - |
| 2 | 2.00000 | 1.14952 | 14.55089 | 8.25185 | - |
| 2 | 2.10127 | 1.44223 | 14.85696 | 7.98655 | - |
| 2 | 2.00000 | 1.00000 | 13.62500 | 6.75000 | - |
| 2 | 2.00000 | 1.00000 | 14.38933 | 7.71366 | - |
| 2 | 2.05844 | 1.43445 | 15.30100 | 8.49055 | - |
| 2 | 2.00000 | 1.00000 | 18.20000 | 12.20000 | - |
| 2 | 2.00000 | 1.50000 | 15.81000 | 8.81000 | - |
| 2 | 2.00000 | 1.00000 | 16.00199 | 10.00199 | - |
| 2 | 2.49954 | 1.50000 | 15.74213 | 9.24167 | - |
| 2 | 2.00000 | 1.26827 | 15.41175 | 8.87521 | - |
| 2 | 2.38075 | 1.38075 | 14.23272 | 7.47122 | - |
| 2 | 2.00000 | 1.50000 | 13.62500 | 6.62500 | - |

```
            2      2.00000      1.00000     15.90000      9.90000      -
            2      2.00000      1.50000     14.03355      7.03355      -
            2      2.00000      1.00000     14.42513      8.42513      -
            2      2.00000      1.00000     15.37609      9.37609      -
            2      2.00000      1.00000     14.34874      8.34874      -
            2      2.09959      1.46854     14.43941      7.53900      -
</TABLE>
```

                                            S-113

<PAGE>

<TABLE>
<CAPTION>

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Margin(%) | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | |
| 2 23 | 2 YR ARM BALLOON 50/30 10.20000 | 7.00000 | 134,992.80 | 599 | 359 | 1 | LIBOR_6MO |
| 2 23 | 2 YR ARM BALLOON 50/30 6.95000 | 3.95000 | 479,910.25 | 599 | 359 | 1 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 8.35460 | 6.14284 | 19,172,652.47 | 300 | 358 | 2 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 8.50000 | 5.50000 | 206,300.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 8.25000 | 6.05000 | 536,000.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 7.68694 | 5.40000 | 582,700.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 7.60000 | 4.60000 | 378,000.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 7.83579 | 5.98836 | 6,971,871.98 | 300 | 358 | 2 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 8.95000 | 5.95000 | 666,370.23 | 300 | 358 | 2 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 7.05259 | 6.05000 | 741,028.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 7.09890 | 5.97478 | 545,599.99 | 300 | 358 | 2 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 7.75111 | 5.67594 | 1,915,420.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 7.22855 | 6.31147 | 1,084,150.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 7.71565 | 4.96403 | 2,006,600.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 8.50000 | 5.50000 | 608,550.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 6.85000 | 3.85000 | 300,000.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 22 | 2 YR ARM IO 7.27581 | 6.08092 | 56,128,018.85 | 300 | 358 | 2 | LIBOR_6MO |
| 2 16 | 2 YR ARM IO 8.37263 | 5.91849 | 308,404.34 | 300 | 352 | 8 | LIBOR_6MO |
| 2 23 | 2 YR ARM IO 8.25000 | 7.25000 | 554,400.00 | 240 | 359 | 1 | LIBOR_6MO |
</TABLE>

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | 2 YR ARM IO | 217,900.00 | 240 | 352 | 8 | LIBOR_6MO |
| 16 | 8.95000   7.25000 | | | | | |
| 2 | 2 YR ARM IO | 178,499.89 | 240 | 359 | 1 | LIBOR_6MO |
| 23 | 8.87500   7.75000 | | | | | |
| 2 | 2 YR ARM IO | 1,452,000.00 | 240 | 359 | 1 | LIBOR_6MO |
| 23 | 7.72521   6.15083 | | | | | |
| 2 | 3 YR ARM | 6,281,974.34 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 8.57146   6.02518 | | | | | |
| 2 | 3 YR ARM | 119,855.57 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 8.55000   5.05000 | | | | | |
| 2 | 3 YR ARM | 282,991.23 | 359 | 359 | 1 | LIBOR_6MO |
| 35 | 9.03408   5.72332 | | | | | |
| 2 | 3 YR ARM | 211,637.46 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 6.80000   3.80000 | | | | | |
| 2 | 3 YR ARM | 427,083.29 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 8.01047   6.15376 | | | | | |
| 2 | 3 YR ARM | 51,979.56 | 359 | 359 | 1 | LIBOR_6MO |
| 35 | 10.55000   7.00000 | | | | | |
| 2 | 3 YR ARM | 342,709.53 | 359 | 359 | 1 | LIBOR_6MO |
| 35 | 8.07438   4.90599 | | | | | |
| 2 | 3 YR ARM | 82,623.29 | 359 | 359 | 1 | LIBOR_6MO |
| 35 | 11.45000   7.00000 | | | | | |
| 2 | 3 YR ARM | 1,152,751.99 | 356 | 356 | 4 | LIBOR_6MO |
| 32 | 9.18490   7.45252 | | | | | |
| 2 | 3 YR ARM | 199,626.73 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 6.35000   6.05000 | | | | | |
| 2 | 3 YR ARM | 636,706.90 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 7.80288   5.64555 | | | | | |
| 2 | 3 YR ARM | 184,331.28 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 5.99900   2.99900 | | | | | |
| 2 | 3 YR ARM | 113,848.74 | 358 | 358 | 2 | LIBOR_6MO |
| 34 | 8.17500   6.17500 | | | | | |
| 2 | 3 YR ARM | 604,051.59 | 357 | 357 | 3 | LIBOR_6MO |
| 33 | 8.45455   6.54067 | | | | | |
| 2 | 3 YR ARM | 2,362,728.16 | 357 | 357 | 3 | LIBOR_6MO |
| 33 | 8.07815   6.12948 | | | | | |
| 2 | 3 YR ARM 40/40 | 201,404.17 | 479 | 479 | 1 | LIBOR_6MO |
| 35 | 6.20000   3.20000 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 3,442,383.83 | 477 | 357 | 3 | LIBOR_6MO |
| 33 | 8.59398   6.27623 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 1,075,844.61 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 8.17609   5.60981 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 232,403.93 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 9.12500   7.12500 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 603,483.48 | 477 | 358 | 2 | LIBOR_6MO |
| 34 | 8.24330   6.24330 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 349,688.38 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 6.45000   4.45000 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 208,928.88 | 479 | 359 | 1 | LIBOR_6MO |
| 35 | 7.40000   5.95000 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 193,971.84 | 477 | 357 | 3 | LIBOR_6MO |
| 33 | 9.51445   6.27810 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 832,412.35 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 7.53964   5.53964 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 1,121,894.17 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 7.14487   5.14487 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 141,760.56 | 473 | 353 | 7 | LIBOR_6MO |
| 29 | 8.74000   7.74000 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 219,834.21 | 478 | 358 | 2 | LIBOR_6MO |
| 34 | 7.05000   4.05000 | | | | | |
| 2 | 3 YR ARM BALLOON 40/30 | 4,690,050.03 | 477 | 357 | 3 | LIBOR_6MO |
| 33 | 7.38733   5.60161 | | | | | |
| 2 | 3 YR ARM BALLOON 50/30 | 1,257,235.52 | 599 | 359 | 1 | LIBOR_6MO |
| 35 | 8.75965   6.15926 | | | | | |
| 2 | 3 YR ARM BALLOON 50/30 | 300,631.75 | 598 | 358 | 2 | LIBOR_6MO |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 34 | 6.60000 | 5.95000 | | | | | |
| 2 | | 3 YR ARM BALLOON 50/30 | 335,917.38 | 598 | 358 | 2 | LIBOR_6MO |
| 34 | 8.07500 | 6.15000 | | | | | |
| 2 | | 3 YR ARM BALLOON 50/30 | 485,827.57 | 598 | 358 | 2 | LIBOR_6MO |
| 34 | 7.10000 | 5.10000 | | | | | |
| 2 | | 3 YR ARM BALLOON 50/30 | 4,058,393.53 | 597 | 357 | 3 | LIBOR_6MO |
| 33 | 7.24828 | 5.53107 | | | | | |
| 2 | | 3 YR ARM IO | 975,000.00 | 300 | 358 | 2 | LIBOR_6MO |
| 34 | 7.48409 | 5.74473 | | | | | |

</TABLE>

<TABLE>
<CAPTION>

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| 2 | 2.00000 | 1.00000 | 16.20000 | 10.20000 | - |
| 2 | 2.00000 | 1.00000 | 12.95000 | 6.95000 | - |
| 2 | 2.09347 | 1.41021 | 15.23934 | 8.35460 | 60 |
| 2 | 2.00000 | 1.00000 | 14.50000 | 8.50000 | 60 |
| 2 | 2.00000 | 1.50000 | 15.25000 | 8.25000 | 60 |
| 2 | 2.71306 | 1.00000 | 13.68694 | 7.68694 | 60 |
| 2 | 2.00000 | 1.00000 | 13.60000 | 7.60000 | 60 |
| 2 | 2.07459 | 1.46271 | 14.76120 | 7.83579 | 60 |
| 2 | 2.00000 | 1.00000 | 14.95000 | 8.95000 | 60 |
| 2 | 2.00000 | 1.50000 | 14.05259 | 7.05259 | 60 |
| 2 | 2.00000 | 1.50000 | 14.09890 | 7.09890 | 60 |
| 2 | 2.00000 | 1.28655 | 14.32421 | 7.44554 | 60 |
| 2 | 2.00000 | 1.39709 | 14.02273 | 7.22855 | 60 |
| 2 | 2.00000 | 1.06937 | 13.85440 | 7.71565 | 60 |
| 2 | 2.00000 | 1.00000 | 14.50000 | 8.50000 | 60 |
| 2 | 2.00000 | 1.00000 | 12.85000 | 6.85000 | 60 |
| 2 | 2.06250 | 1.46875 | 14.21331 | 7.27581 | 60 |
| 2 | 3.00000 | 1.00000 | 15.37263 | 8.37263 | 60 |
| 2 | 2.00000 | 1.00000 | 14.25000 | 7.25000 | 120 |
| 2 | 3.00000 | 1.00000 | 14.95000 | 7.25000 | 120 |
| 2 | 2.00000 | 1.00000 | 14.87500 | 7.75000 | 120 |
| 2 | 2.00000 | 1.00000 | 13.72521 | 6.15083 | 120 |
| 2 | 2.23539 | 1.24885 | 15.06916 | 8.57146 | - |
| 2 | 3.00000 | 1.00000 | 14.55000 | 8.55000 | - |
| 2 | 2.00000 | 1.00000 | 15.03408 | 9.03408 | - |
| 2 | 2.00000 | 1.00000 | 12.80000 | 6.80000 | - |
| 2 | 2.00000 | 1.50000 | 15.01047 | 8.01047 | - |
| 2 | 2.00000 | 1.00000 | 16.55000 | 10.55000 | - |
| 2 | 2.00000 | 1.00000 | 14.07438 | 8.07438 | - |
| 2 | 2.00000 | 1.00000 | 17.45000 | 11.45000 | - |
| 2 | 2.50024 | 1.17536 | 15.53561 | 9.18490 | - |
| 2 | 2.00000 | 1.50000 | 13.35000 | 6.35000 | - |
| 2 | 2.84267 | 1.00000 | 13.80288 | 7.80288 | - |
| 2 | 3.00000 | 1.00000 | 11.99900 | 5.99900 | - |
| 2 | 3.00000 | 1.00000 | 14.17500 | 8.17500 | - |
| 2 | 2.54306 | 1.00000 | 14.45455 | 8.45455 | - |
| 2 | 2.80426 | 1.09787 | 14.27389 | 8.07815 | - |
| 2 | 2.00000 | 1.00000 | 12.20000 | 6.20000 | - |
| 2 | 2.09465 | 1.33142 | 15.25682 | 8.59398 | - |
| 2 | 2.54698 | 1.00000 | 14.17609 | 8.17609 | - |
| 2 | 3.00000 | 1.00000 | 15.12500 | 9.12500 | - |
| 2 | 3.00000 | 1.00000 | 14.24330 | 8.24330 | - |
| 2 | 3.00000 | 1.00000 | 12.45000 | 6.45000 | - |
| 2 | 2.00000 | 1.50000 | 14.40000 | 7.40000 | - |

| 2 | 2.00000 | 1.50000 | 16.51445 | 9.51445 | - |
|---|---------|---------|----------|---------|---|
| 2 | 3.00000 | 1.00000 | 13.53964 | 7.53964 | - |
| 2 | 3.00000 | 1.00000 | 13.14487 | 7.14487 | - |
| 2 | 3.00000 | 1.00000 | 14.74000 | 8.74000 | - |
| 2 | 2.00000 | 1.00000 | 13.05000 | 7.05000 | - |
| 2 | 2.54774 | 1.22613 | 13.83959 | 7.38733 | - |
| 2 | 2.00000 | 1.41293 | 15.58550 | 8.75965 | - |
| 2 | 2.00000 | 1.50000 | 13.60000 | 6.60000 | - |
| 2 | 2.00000 | 1.50000 | 15.07500 | 8.07500 | - |
| 2 | 3.00000 | 1.00000 | 13.10000 | 7.10000 | - |
| 2 | 2.74482 | 1.23985 | 13.50346 | 7.24828 | - |
| 2 | 2.15795 | 1.36154 | 14.20717 | 7.48409 | 60 |

</TABLE>

S-114

<PAGE>

<TABLE>
<CAPTION>

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Margin(%) | Description | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | | | | | | | | |
| 2 / 34 | 7.46179 | 5.46179 | 3 YR ARM IO | 868,316.46 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / 32 | 7.50000 | 5.50000 | 3 YR ARM IO | 400,000.00 | 300 | 356 | 4 | LIBOR_6MO |
| 2 / 34 | 8.00000 | 5.95000 | 3 YR ARM IO | 562,350.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / 35 | 7.45000 | 4.20000 | 3 YR ARM IO | 489,250.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 / 34 | 8.95000 | 5.95000 | 3 YR ARM IO | 264,200.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / 35 | 7.45000 | 4.45000 | 3 YR ARM IO | 341,100.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 / 34 | 6.60000 | 4.60000 | 3 YR ARM IO | 357,000.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / 34 | 7.92500 | 5.92500 | 3 YR ARM IO | 488,000.00 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / 35 | 5.85000 | 6.30000 | 3 YR ARM IO | 260,791.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 / 35 | 9.95000 | 6.95000 | 3 YR ARM IO | 118,000.00 | 300 | 359 | 1 | LIBOR_6MO |
| 2 / 34 | 6.42189 | 5.05733 | 3 YR ARM IO | 6,870,114.97 | 300 | 358 | 2 | LIBOR_6MO |
| 2 / - | 7.85842 | - | 40 YR FIXED | 1,363,610.11 | 479 | 479 | 1 | - |
| 2 / 59 | 8.95000 | 5.95000 | 5 YR ARM | 94,947.56 | 359 | 359 | 1 | LIBOR_6MO |
| 2 / 59 | 6.95000 | 3.95000 | 5 YR ARM | 99,917.22 | 359 | 359 | 1 | LIBOR_6MO |
| 2 / 59 | 6.90000 | 5.00000 | 5 YR ARM | 221,211.88 | 359 | 359 | 1 | LIBOR_6MO |
| 2 | | | 5 YR ARM | 1,249,017.96 | 359 | 359 | 1 | LIBOR_6MO |

| 59 | 7.65873 | 4.63623 | 2 | 5 YR ARM BALLOON 40/30 | 603,625.48 | 478 | 358 | 2 | LIBOR_6MO |
|---|---|---|---|---|---|---|---|---|---|
| 58 | 7.16119 | 4.16119 | 2 | 5 YR ARM BALLOON 40/30 | 193,895.77 | 479 | 359 | 1 | LIBOR_6MO |
| 59 | 5.75000 | 2.75000 | 2 | 5 YR ARM BALLOON 40/30 | 441,042.38 | 478 | 358 | 2 | LIBOR_6MO |
| 58 | 5.90215 | 3.90215 | 2 | 5 YR ARM BALLOON 50/30 | 472,439.28 | 599 | 359 | 1 | LIBOR_6MO |
| 59 | 7.95000 | 4.95000 | 2 | 5 YR ARM BALLOON 50/30 | 97,490.36 | 598 | 358 | 2 | LIBOR_6MO |
| 58 | 10.40000 | 7.00000 | 2 | 5 YR ARM BALLOON 50/30 | 154,973.58 | 599 | 359 | 1 | LIBOR_6MO |
| 59 | 7.20000 | 4.20000 | 2 | 5 YR ARM BALLOON 50/30 | 610,774.94 | 599 | 359 | 1 | LIBOR_6MO |
| 59 | 6.78720 | 3.78720 | 2 | 5 YR ARM IO | 164,744.00 | 300 | 358 | 2 | LIBOR_6MO |
| 58 | 7.85000 | 4.85000 | 2 | 5 YR ARM IO | 203,300.00 | 300 | 359 | 1 | LIBOR_6MO |
| 59 | 8.60000 | 5.60000 | 2 | 5 YR ARM IO | 180,000.00 | 300 | 359 | 1 | LIBOR_6MO |
| 59 | 6.15000 | 3.15000 | 2 | 5 YR ARM IO | 343,000.00 | 300 | 359 | 1 | LIBOR_6MO |
| 59 | 7.68469 | 4.68469 | 2 | 5 YR ARM IO | 1,100,000.00 | 240 | 359 | 1 | LIBOR_6MO |
| 59 | 7.75000 | 6.62500 | 2 | FIXED | 8,352,928.06 | 343 | 343 | 1 | - |
| - | 8.28842 | - | 2 | FIXED | 131,816.78 | 358 | 358 | 2 | - |
| - | 7.85000 |  | 2 | FIXED | 77,956.04 | 359 | 359 | 1 | - |
| - | 8.85000 |  | 2 | FIXED | 254,509.63 | 351 | 358 | 2 | - |
| - | 7.76105 |  | 2 | FIXED | 669,098.10 | 358 | 358 | 2 | - |
| - | 8.95188 |  | 2 | FIXED | 1,976,630.49 | 359 | 359 | 1 | - |
| - | 7.08418 |  | 2 | FIXED | 799,923.94 | 359 | 359 | 1 | - |
| - | 9.73352 |  | 2 | FIXED | 744,717.81 | 358 | 358 | 2 | - |
| - | 7.39673 |  | 2 | FIXED | 203,768.22 | 359 | 359 | 1 | - |
| - | 8.84454 |  | 2 | FIXED | 138,945.82 | 359 | 359 | 1 | - |
| - | 10.60235 |  | 2 | FIXED | 244,879.48 | 359 | 359 | 1 | - |
| - | 9.50000 |  | 2 | FIXED | 1,481,074.19 | 349 | 349 | 2 | - |
| - | 8.39037 |  | 2 | FIXED | 830,503.04 | 358 | 358 | 2 | - |
| - | 7.35916 |  | 2 | FIXED | 648,662.74 | 357 | 357 | 3 | - |
| - | 7.92500 |  | 2 | FIXED | 182,927.27 | 359 | 359 | 1 | - |
| - | 10.50000 |  | 2 | FIXED | 4,028,930.62 | 356 | 356 | 1 | - |
| - | 7.67574 |  | 2 | FIXED | 114,046.97 | 359 | 359 | 1 | - |
| - | 9.81354 |  | 2 | FIXED | 1,461,014.92 | 334 | 334 | 3 | - |
| - | 6.86734 |  | 2 | FIXED | 1,040,776.73 | 358 | 358 | 2 | - |
| - | 7.99610 |  | 2 | FIXED | 205,367.44 | 178 | 178 | 2 | - |
| - | 9.65000 | - |  |  |  |  |  |  |  |

```
      2          FIXED        6,715,216.67    355       355       1        -
-     7.83402        -
      2          FIXED          584,848.70    358       358       2        -
-     8.71740        -
      2          FIXED          694,440.32    359       359       1        -
-     7.11083        -
      2          FIXED       17,977,161.08    342       342       2        -
-     7.34733
      2     FIXED BALLOON 40/30  2,815,538.46  477       358       2        -
-     8.81918        -
      2     FIXED BALLOON 40/30    314,738.27  478       358       2        -
-     6.70000        -
      2     FIXED BALLOON 40/30  2,952,689.49  479       359       1        -
-     7.65248        -
      2     FIXED BALLOON 40/30     89,982.15  479       359       1        -
-     9.25000        -
</TABLE>


<TABLE>
<CAPTION>
```

| Group | Initial Periodic Cap (%) | Periodic Cap (%) | Gross Lifetime Maximum Rate (%) | Floor Rate (%) | Original Interest Only Period (Months)(1) |
|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| 2 | 3.00000 | 1.00000 | 13.46179 | 7.46179 | 60 |
| 2 | 3.00000 | 1.00000 | 13.50000 | 7.50000 | 60 |
| 2 | 2.00000 | 1.50000 | 15.00000 | 8.00000 | 60 |
| 2 | 2.00000 | 1.00000 | 13.45000 | 7.45000 | 60 |
| 2 | 2.00000 | 1.00000 | 14.95000 | 8.95000 | 60 |
| 2 | 2.00000 | 1.00000 | 13.45000 | 7.45000 | 60 |
| 2 | 3.00000 | 1.00000 | 12.60000 | 6.60000 | 60 |
| 2 | 3.00000 | 1.00000 | 13.92500 | 7.92500 | 60 |
| 2 | 2.00000 | 1.50000 | 12.85000 | 5.85000 | 60 |
| 2 | 2.00000 | 1.00000 | 15.95000 | 9.95000 | 60 |
| 2 | 2.49218 | 1.25391 | 12.92971 | 6.42189 | 60 |
| 2 | - | - | - | - | - |
| 2 | 2.00000 | 1.00000 | 14.95000 | 8.95000 | - |
| 2 | 2.00000 | 1.00000 | 12.95000 | 6.95000 | - |
| 2 | 2.00000 | 1.00000 | 12.90000 | 6.90000 | - |
| 2 | 2.00000 | 1.00000 | 13.65873 | 7.65873 | - |
| 2 | 2.00000 | 1.00000 | 13.16119 | 7.16119 | - |
| 2 | 2.00000 | 1.00000 | 11.75000 | 5.75000 | - |
| 2 | 3.18571 | 1.00000 | 12.08786 | 5.90215 | - |
| 2 | 2.00000 | 1.00000 | 13.95000 | 7.95000 | - |
| 2 | 2.00000 | 1.00000 | 16.40000 | 10.40000 | - |
| 2 | 2.00000 | 1.00000 | 13.20000 | 7.20000 | - |
| 2 | 2.00000 | 1.00000 | 12.78720 | 6.78720 | - |
| 2 | 2.00000 | 1.00000 | 13.85000 | 7.85000 | 60 |
| 2 | 2.00000 | 1.00000 | 14.60000 | 8.60000 | 60 |
| 2 | 2.00000 | 1.00000 | 12.15000 | 6.15000 | 60 |
| 2 | 2.00000 | 1.00000 | 13.68469 | 7.68469 | 60 |
| 2 | 2.00000 | 1.00000 | 13.75000 | 6.62500 | 120 |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |
| 2 | - | - | - | - | - |

```
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
                 2          -          -          -          -          -
</TABLE>
```

S-115

`<PAGE>`

`<TABLE>`
`<CAPTION>`

| First Rate Reset Group (Months) | Gross Interest Rate (%) | Gross Description Margin(%) | Cut-off Date Principal Balance ($) | Remaining Amortization Term (Months)(1) | Remaining Term to Maturity (Months) | Seasoning (Months) | Index |
|---|---|---|---|---|---|---|---|
| --------- | -------- | ---------- | -------------- | ------------- | --------- | ---------- | ------- |
| -------- | -------- | ---------- | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | |
| 2 | 8.95000 | FIXED BALLOON 40/30 - | 197,270.64 | 477 | 356 | 4 | - |
| 2 | 7.15198 | FIXED BALLOON 40/30 - | 1,289,935.31 | 479 | 359 | 1 | - |
| 2 | 7.67523 | FIXED BALLOON 40/30 - | 419,693.63 | 478 | 358 | 2 | - |
| 2 | 6.39905 | FIXED BALLOON 40/30 - | 699,968.20 | 478 | 358 | 2 | - |
| 2 | 6.80000 | FIXED BALLOON 40/30 - | 72,941.01 | 478 | 358 | 2 | - |
| 2 | 9.98743 | FIXED BALLOON 40/30 - | 359,703.99 | 479 | 359 | 1 | - |
| 2 | 9.33491 | FIXED BALLOON 40/30 - | 195,956.77 | 479 | 359 | 1 | - |
| 2 | 10.10000 | FIXED BALLOON 40/30 - | 49,992.32 | 479 | 359 | 1 | - |
| 2 | 7.15692 | FIXED BALLOON 40/30 - | 11,486,604.54 | 478 | 358 | 2 | - |
| 2 | 8.50633 | FIXED BALLOON 50/30 - | 1,355,099.52 | 598 | 358 | 2 | - |
| 2 | 7.15628 | FIXED BALLOON 50/30 - | 2,008,906.72 | 598 | 358 | 2 | - |
| 2 | 8.78832 | FIXED BALLOON 50/30 - | 615,833.49 | 597 | 357 | 3 | - |
| 2 | | FIXED BALLOON 50/30 | 159,912.01 | 596 | 358 | 2 | - |

| | | Type | Amount | | | | |
|---|---|---|---|---|---|---|---|
| - | | | | | | | 7.55000 - |
| | 2 | FIXED BALLOON 50/30 | 695,823.80 | 598 | 358 | 2 | - |
| - | | | | | | | 6.79927 - |
| | 2 | FIXED BALLOON 50/30 | 192,406.80 | 598 | 358 | 2 | - |
| - | | | | | | | 6.25000 - |
| | 2 | FIXED BALLOON 50/30 | 786,144.72 | 599 | 359 | 1 | - |
| - | | | | | | | 8.62105 - |
| | 2 | FIXED BALLOON 50/30 | 9,303,043.32 | 598 | 358 | 2 | - |
| - | | | | | | | 6.73053 - |
| | 2 | FIXED IO | 982,598.67 | 300 | 358 | 2 | - |
| - | | | | | | | 7.36267 - |
| | 2 | FIXED IO | 3,207,149.99 | 300 | 357 | 3 | - |
| - | | | | | | | 6.53665 - |
| | 2 | FIXED IO | 232,700.00 | 300 | 358 | 2 | - |
| - | | | | | | | 7.84000 - |
| | 2 | FIXED IO | 363,696.00 | 300 | 358 | 2 | - |
| - | | | | | | | 8.32957 - |
| | 2 | FIXED IO | 360,000.00 | 300 | 358 | 2 | - |
| - | | | | | | | 9.00000 - |
| | 2 | FIXED IO | 7,120,019.32 | 300 | 358 | 2 | - |
| - | | | | | | | 6.60997 - |
| | 2 | FIXED | 12,872,194.45 | 357 | 357 | 2 | - |
| - | | | | | | | 11.00855 - |
| | 2 | FIXED | 21,967.62 | 358 | 358 | 2 | - |
| - | | | | | | | 12.10000 - |
| | 2 | FIXED | 26,964.82 | 358 | 358 | 2 | - |
| - | | | | | | | 12.10000 - |
| | 2 | FIXED | 203,612.26 | 357 | 357 | 3 | - |
| - | | | | | | | 11.81844 - |
| | 2 | FIXED | 832,162.21 | 357 | 357 | 3 | - |
| - | | | | | | | 11.70663 - |
| | 2 | FIXED | 235,960.03 | 357 | 357 | 3 | - |
| - | | | | | | | 11.12781 - |
| | 2 | FIXED | 113,538.76 | 357 | 357 | 3 | - |
| - | | | | | | | 10.35485 - |
| | 2 | FIXED | 69,949.73 | 358 | 358 | 2 | - |
| - | | | | | | | 10.99000 - |
| | 2 | FIXED | 30,623.82 | 357 | 357 | 3 | - |
| - | | | | | | | 8.50000 - |
| | 2 | FIXED | 364,346.58 | 357 | 358 | 2 | - |
| - | | | | | | | 10.61812 - |
| | 2 | FIXED | 46,473.19 | 358 | 358 | 2 | - |
| - | | | | | | | 11.99000 - |
| | 2 | FIXED | 6,953,368.19 | 357 | 358 | 2 | - |
| - | | | | | | | 11.24910 - |
| | 2 | FIXED | 417,744.50 | 358 | 358 | 2 | - |
| - | | | | | | | 10.66470 - |
| | 2 | FIXED | 234,223.67 | 332 | 332 | 2 | - |
| - | | | | | | | 11.75763 - |
| | 2 | FIXED | 264,116.61 | 356 | 356 | 4 | - |
| - | | | | | | | 10.94055 - |
| | 2 | FIXED | 146,952.07 | 359 | 359 | 1 | - |
| - | | | | | | | 11.42144 - |
| | 2 | FIXED | 4,275,302.62 | 358 | 358 | 2 | - |
| - | | | | | | | 10.72118 - |
| | 2 | FIXED BALLOON 30/15 | 181,116.60 | 358 | 178 | 2 | - |
| - | | | | | | | 12.54237 - |
| | 2 | FIXED BALLOON 30/15 | 262,937.52 | 359 | 179 | 1 | - |
| - | | | | | | | 12.84316 - |
| | 2 | FIXED BALLOON 30/15 | 41,154.09 | 355 | 178 | 2 | - |
| - | | | | | | | 13.50000 - |
| | 2 | FIXED BALLOON 30/15 | 274,923.48 | 359 | 179 | 1 | - |
| - | | | | | | | 12.12500 - |

</TABLE>

```
<TABLE>
<CAPTION>

                                            Gross              Original
                                            Lifetime           Interest
                       Initial              Maximum            Only
                       Periodic   Periodic  Rate      Floor    Period
             Group     Cap (%)    Cap (%)   (%)       Rate (%) (Months)(1)
             --------- ---------- --------- --------- -------- -----------
<S>          <C>       <C>        <C>       <C>       <C>      <C>
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -         60
             2          -          -          -          -         60
             2          -          -          -          -         60
             2          -          -          -          -         60
             2          -          -          -          -         60
             2          -          -          -          -         60
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
             2          -          -          -          -          -
</TABLE>
```

--------------------------------------
(1)  With respect to the assumed mortgage loans with an interest only period,
     the remaining amortization period will not commence until the interest only
     period has ended.

While it is assumed that each of the mortgage loans prepays at the specified constant percentages of the Prepayment Assumption, this is not likely to be the case.

DEFAULTS

The yield to maturity of the LIBOR Certificates, and particularly the Subordinated Certificates, will be sensitive to defaults on the mortgage loans. If a purchaser of a LIBOR Certificate calculates its anticipated yield based on an assumed rate of default and amount of losses that is lower than the default rate and amount of losses actually incurred, its actual yield to maturity will be lower than that so calculated. Except to the extent of any Subsequent Recoveries, holders of the LIBOR Certificates will not receive reimbursement for Applied Realized Loss Amounts applied to their certificates. In general, the earlier a loss occurs, the greater is the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the mortgage loans. Because the mortgage loans were underwritten in accordance with standards less stringent than those generally acceptable to Fannie Mae and Freddie Mac with regard to a borrower's credit standing and repayment ability, the risk of delinquencies with respect to, and losses on, the mortgage loans will be greater than that of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

PREPAYMENT CONSIDERATIONS AND RISKS

The rate of principal payments on the LIBOR Certificates, the aggregate amount of distributions on the LIBOR Certificates and the yields to maturity of the LIBOR Certificates will be related to the rate and timing of payments of principal on the mortgage loans in the related loan group. The rate of principal payments on the mortgage loans will in turn be affected by the amortization schedules of the mortgage loans and by the rate of principal prepayments (including for this purpose prepayments resulting from refinancing, liquidations of the mortgage loans due to defaults, casualties or condemnations and repurchases by a selling party or purchases pursuant to the Optional Clean-up Call, as described in this prospectus supplement). Because certain of the mortgage loans contain Prepayment Premiums, the rate of principal payments may be less than the rate of principal payments for mortgage loans which did not have Prepayment Premiums. The mortgage loans are subject to the "due-on-sale" provisions included in the mortgage loans. See "THE MORTGAGE LOAN POOL" in this prospectus supplement.

Prepayments, liquidations and purchases of the mortgage loans (including any optional repurchase of the remaining mortgage loans in the issuing entity in connection with the termination of the issuing entity, in each case as described in this prospectus supplement) will result in distributions on the LIBOR Certificates of principal amounts which would otherwise be distributed over the remaining terms of the mortgage loans. Since the rate of payment of principal on the mortgage loans will depend on future events and a variety of other factors, no assurance can be given as to that rate or the rate of principal prepayments. The extent to which the yield to maturity of a class of LIBOR Certificates may vary from the anticipated yield will depend upon the degree to which that LIBOR Certificate is purchased at a discount or premium, and the degree to which the timing of payments on that LIBOR Certificate is sensitive to prepayments, liquidations and purchases of the mortgage loans. Further, an investor should consider the risk that, in the case of any LIBOR Certificate purchased at a discount, a slower than anticipated rate of principal payments (including prepayments) on the mortgage loans could result in an actual yield to that investor that is lower than the anticipated yield and, in the case of any LIBOR Certificate purchased at a premium, a faster than anticipated rate of principal payments on the mortgage loans could result in an actual yield to that investor that is lower than the anticipated yield.

The rate of principal payments (including prepayments) on pools of mortgage loans may vary significantly over time and may be influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties and servicing decisions. In general, if prevailing interest rates were to fall significantly below the interest rates on the fixed-rate mortgage loans, the mortgage loans could be subject to higher prepayment rates than if prevailing interest rates were to remain at or above the interest

<div align="center">S-117</div>

&lt;PAGE&gt;


rates on the mortgage loans. Conversely, if prevailing interest rates were to rise significantly, the rate of prepayments on the fixed-rate mortgage loans would generally be expected to decrease. No assurances can be given as to the rate of prepayments on the mortgage loans in stable or changing interest rate environments.

As is the case with fixed-rate mortgage loans, the adjustable-rate mortgage loans ("ARMS") may be subject to a greater rate of principal prepayments in a low interest rate environment. For example, if prevailing interest rates were to fall, mortgagors with ARMS may be inclined to refinance their ARMS with a fixed-rate loan to "lock in" a lower interest rate. The existence of the applicable Periodic Cap and Maximum Rate also may affect the likelihood of prepayments resulting from refinancings. In addition, the delinquency and loss experience of the ARMS may differ from that on the fixed-rate mortgage loans because the amount of the monthly payments on the ARMS are subject to adjustment on each Adjustment Date. ARMS may be subject to greater rates of prepayments as they approach their initial Adjustment Dates as borrowers seek to avoid changes in their monthly payments. In addition, a substantial majority of the ARMS will not have their initial Adjustment Date until two to five years after their origination. The prepayment experience of these adjustable-rate mortgage loans may differ from that of the other ARMS. Such adjustable-rate mortgage loans may be subject to greater rates of prepayments as they approach their initial Adjustment Dates even if market interest rates are only slightly higher or lower than the interest rates on the adjustable-rate mortgage loans with their initial Adjustment Date two to five years after their origination (as the case may be) as borrowers seek to avoid changes in their monthly payments.

The timing of changes in the rate of prepayments on the mortgage loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments is consistent with an investor's expectation. In general, the earlier a prepayment of principal on the mortgage loans, the greater the effect on an investor's yield to maturity. The effect on an investor's yield as a result of principal payments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the certificates may not be offset by a subsequent like decrease (or increase) in the rate of principal payments.

When a mortgagor prepays a mortgage loan in whole or in part prior to the due date in the related Prepayment Period for the mortgage loan, the mortgagor pays interest on the amount prepaid only to the date of prepayment instead of for the entire month. Absent sufficient Compensating Interest (to the extent available as described in this prospectus supplement to cover prepayment interest shortfalls resulting from principal prepayments), a shortfall will occur in the amount due to certificateholders since the certificateholders are generally entitled to receive a full month of interest. Also, when a mortgagor prepays a mortgage loan in part together with the scheduled payment for a month on or after the related due date, the principal balance of the mortgage loan is reduced by the amount in excess of the scheduled payment as of that due date,

but the principal is not distributed to certificateholders until the
Distribution Date in the next month; therefore, up to one month of interest
shortfall accrues on the amount of such excess.

    To the extent that the amount of Compensating Interest is insufficient to
cover the deficiency in interest payable as a result of the timing of a
prepayment, the remaining deficiency, to the extent not offset by interest
otherwise payable to the Class X Certificates, will be allocated to the LIBOR
Certificates, PRO RATA, according to the amount of interest to which each class
of LIBOR Certificates would otherwise be entitled in reduction of that amount.

    The Pass-Through Rate for each class of LIBOR Certificates may be
calculated by reference to the Loan Group I Cap, Loan Group II Cap or the WAC
Cap. If the mortgage loans bearing higher interest rates, either through higher
fixed-rates, or in the case of the adjustable-rate mortgage loans, higher
margins or an increase in the Index (and consequently, higher net mortgage
interest rates), were to prepay, the weighted average net mortgage interest rate
would be lower than otherwise would be the case. In addition, changes in
One-Month LIBOR (on which the Pass-Through Rates of the LIBOR Certificates are
based) may not correlate with changes in the Six-Month LIBOR Loan Index. It is
possible that a decrease in the Six-Month LIBOR Loan Index, which would be
expected to result in faster prepayments, could occur simultaneously with an
increased level of One-Month LIBOR. If the

                                    S-118
<PAGE>

Pass-Through Rates on any class of LIBOR Certificates, calculated without
reference to any applicable Loan Group I Cap, Loan Group II Cap, or the WAC Cap,
were to be higher than those applicable caps, the Pass-Through Rate on those
classes of certificates would be lower than otherwise would be the case.
Although holders of those classes of certificates are entitled to receive any
Basis Risk Carry Forward Amount from and to the extent of funds available in the
Excess Reserve Fund Account and to the extent available for payment from the
Supplemental Interest Trust, there is no assurance that those funds will be
available or sufficient for those purposes. The ratings of the LIBOR
Certificates do not address the likelihood of the payment of any Basis Risk
Carry Forward Amount.

OVERCOLLATERALIZATION PROVISIONS

    The operation of the overcollateralization provisions of the pooling and
servicing agreement will affect the weighted average lives of the Offered
Certificates and consequently the yields to maturity of those certificates. If
at any time the Overcollateralized Amount is less than the Specified
Overcollateralized Amount, Total Monthly Excess Spread and certain amounts
available in the Supplemental Interest Trust will be applied as distributions of
principal to the class or classes of certificates then entitled to distributions
of principal until the Overcollateralized Amount equals the Specified
Overcollateralized Amount. This would have the effect of reducing the weighted
average lives of those certificates. The actual Overcollateralized Amount may
change from Distribution Date to Distribution Date producing uneven
distributions of Total Monthly Excess Spread. There can be no assurance that the
Overcollateralized Amount will never be less than the Specified
Overcollateralized Amount.

    Total Monthly Excess Spread generally is a function of the excess of
interest collected or advanced on the mortgage loans over the interest required
to pay interest on the LIBOR Certificates and expenses at the Expense Fee Rate,
as well as Net Swap Payments, Net Swap Receipts and Cap Payments. Mortgage loans
with higher net interest rates will contribute more interest to the Total
Monthly Excess Spread. Mortgage loans with higher net interest rates may prepay
faster than mortgage loans with relatively lower net interest rates in response
to a given change in market interest rates. Any disproportionate prepayments of

mortgage loans with higher net interest rates may adversely affect the amount of Total Monthly Excess Spread available to make accelerated payments of principal of the LIBOR Certificates.

    As a result of the interaction of the foregoing factors, the effect of the overcollateralization provisions on the weighted average lives of the LIBOR Certificates may vary significantly over time and from class to class.

SUBORDINATED CERTIFICATES

    The Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates provide credit enhancement for the certificates that have a higher payment priority, and the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates may absorb losses on the mortgage loans. The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates, in that order, will be progressively more sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans are higher than those assumed by a holder of a related Subordinated Certificate, the actual yield to maturity on such holder's certificate may be lower than the yield expected by such holder based on that assumption. Realized losses on the mortgage loans will reduce the Class Certificate Balance of the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates then outstanding with the lowest relative payment priority if and to the extent that the aggregate Class Certificate Balances of all classes of certificates, following all distributions on a Distribution Date, exceed the aggregate Stated Principal Balances of the related mortgage loans. As a result of such a reduction of the Class Certificate Balance of a class of Subordinated Certificates, less interest will accrue on those classes of certificates than would otherwise be the case.

                                    S-119

<PAGE>

    The Principal Distribution Amount to be made to the holders of the LIBOR Certificates includes the net proceeds in respect of principal received upon the liquidation of a related mortgage loan. If such net proceeds are less than the unpaid principal balance of the liquidated mortgage loan, the aggregate Stated Principal Balances of the mortgage loans will decline more than the aggregate Class Certificate Balances of the Offered Certificates, thus reducing the amount of the overcollateralization. If such difference is not covered by the amount of the overcollateralization or excess interest, the class of Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 certificates then outstanding with the lowest relative payment priority will bear such loss. In addition, the Subordinated Certificates will not be entitled to any principal distributions prior to the related Stepdown Date or during the continuation of a Trigger Event (unless all of the certificates with a higher relative payment priority have been paid in full). Because a Trigger Event may be based on the delinquency, as opposed to the loss, experience on the mortgage loans, a holder of a Subordinated Certificate may not receive distributions of principal for an extended period of time, even if the rate, timing and severity of realized losses on the applicable mortgage loans is consistent with such holder's expectations. Because of the disproportionate distribution of principal to the senior certificates, depending on the timing of realized losses, the Subordinated Certificates may bear a disproportionate percentage of the realized losses on the mortgage loans.

    For all purposes, the Class M-9 certificates will have the lowest payment priority of any class of Subordinated Certificates.

EFFECT ON YIELDS DUE TO RAPID PREPAYMENTS

Any net payment payable to the Swap Provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to certificateholders, and may reduce the Pass-Through Rates on the LIBOR Certificates. This could adversely affect the yield to maturity on your certificates.

WEIGHTED AVERAGE LIVES OF THE LIBOR CERTIFICATES

The weighted average life of a LIBOR Certificate is determined by (a) multiplying the amount of the reduction, if any, of the Class Certificate Balance of the certificate on each Distribution Date by the number of years from the date of issuance to that Distribution Date, (b) summing the results and (c) dividing the sum by the aggregate amount of the reductions in Class Certificate Balance of the certificate referred to in clause (a).

For a discussion of the factors which may influence the rate of payments (including prepayments) of the mortgage loans, see "--PREPAYMENT CONSIDERATIONS AND RISKS" above and "YIELD AND PREPAYMENT CONSIDERATIONS" in the prospectus.

In general, the weighted average lives of the LIBOR Certificates will be shortened if the level of prepayments of principal of the mortgage loans increases. However, the weighted average lives of the LIBOR Certificates will depend upon a variety of other factors, including the timing of changes in the rate of principal payments and the priority sequence of distributions of principal of the classes of certificates. See "DESCRIPTION OF THE CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this prospectus supplement.

The interaction of the foregoing factors may have different effects on various classes of LIBOR Certificates and the effects on any class may vary at different times during the life of that class. Accordingly, no assurance can be given as to the weighted average life of any class of LIBOR Certificates. Further, to the extent the prices of the LIBOR Certificates represent discounts or premiums to their respective original Class Certificate Balances, variability in the weighted average lives of those classes of LIBOR Certificates will result in variability in the related yields to maturity. For an example of how the weighted average lives of the classes of Offered LIBOR Certificates may be affected at various constant percentages of the Prepayment Assumption, see "--DECREMENT TABLES" below.

S-120

<PAGE>

DECREMENT TABLES

The following tables indicate the percentages of the initial Class Certificate Balances of the classes of Offered LIBOR Certificates that would be outstanding after each of the Distribution Dates shown at various constant percentages of the applicable Prepayment Assumption and the corresponding weighted average lives of those classes. The tables have been prepared on the basis of the Structuring Assumptions. It is not likely that (i) all of the mortgage loans will have the characteristics assumed, (ii) all of the mortgage loans will prepay at the constant percentages of the applicable Prepayment Assumption specified in the tables or at any other constant rate or (iii) all of the mortgage loans will prepay at the same rate. Moreover, the diverse remaining terms to maturity and interest rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the specified constant percentages of the applicable Prepayment Assumption, even if the weighted average remaining term to maturity and weighted average interest rates of the mortgage loans are consistent with the remaining terms to maturity and interest rates of the mortgage loans specified in the Structuring Assumptions.

PREPAYMENT SCENARIOS

<TABLE>

```
<CAPTION>
                               SCENARIO I      SCENARIO II     SCENARIO III    SCENARIO IV
SCENARIO V

                               ----------      -----------     ------------    -----------
----------
<S>                            <C>             <C>             <C>             <C>
<C>
% of Prepayment                0%              75%             100%            125%
150%
   Assumption.........
</TABLE>
```

S-121

```
<PAGE>
```

                PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

```
<TABLE>
<CAPTION>
                                         Class A-1                              Class A-
2A
                                    PREPAYMENT SCENARIO                       PREPAYMENT
SCENARIO
                          ---------------------------------------   ------------------------
----------------
        DISTRIBUTION DATE        I      II     III     IV      V      I      II     III
IV      V
-------------------------------  -----  -----  ------  -----  ------ ------  ------  ------
-----  -----
<S>                              <C>    <C>    <C>     <C>    <C>    <C>     <C>     <C>
<C>     <C>
Initial Percentage.............  100    100    100     100    100    100     100     100
100     100
March 2008.....................  99     78     71      64     57     99      63      51
39      27
March 2009.....................  99     50     36      22     10     98      15      0
0       0
March 2010.....................  98     28     11      0      0      97      0       0
0       0
March 2011.....................  98     23     11      0      0      97      0       0
0       0
March 2012.....................  97     17     11      0      0      96      0       0
0       0
March 2013.....................  96     13     7       0      0      94      0       0
0       0
March 2014.....................  95     10     5       0      0      93      0       0
0       0
March 2015.....................  94     8      4       0      0      91      0       0
0       0
March 2016.....................  93     6      3       0      0      89      0       0
0       0
March 2017.....................  92     5      2       0      0      87      0       0
0       0
March 2018.....................  91     4      1       0      0      85      0       0
0       0
March 2019.....................  89     3      1       0      0      82      0       0
0       0
March 2020.....................  88     2      1       0      0      79      0       0
0       0
March 2021.....................  86     2      *       0      0      76      0       0
0       0
March 2022.....................  84     1      0       0      0      72      0       0
0       0
```

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| March 2023..................... | 81 | 1 | 0 | 0 | 0 | 68 | 0 | 0 | 0 0 |
| March 2024..................... | 79 | 1 | 0 | 0 | 0 | 64 | 0 | 0 | 0 0 |
| March 2025..................... | 76 | 1 | 0 | 0 | 0 | 59 | 0 | 0 | 0 0 |
| March 2026..................... | 73 | * | 0 | 0 | 0 | 54 | 0 | 0 | 0 0 |
| March 2027..................... | 70 | * | 0 | 0 | 0 | 48 | 0 | 0 | 0 0 |
| March 2028..................... | 66 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 0 |
| March 2029..................... | 62 | 0 | 0 | 0 | 0 | 34 | 0 | 0 | 0 0 |
| March 2030..................... | 58 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 0 0 |
| March 2031..................... | 53 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 0 0 |
| March 2032..................... | 47 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 0 0 |
| March 2033..................... | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 |
| March 2034..................... | 34 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 |
| March 2035..................... | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 |
| March 2036..................... | 26 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 |
| March 2037..................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 0 |
| Weighted Average Life to Maturity (years)(2)................. | 22.49 | 3.02 | 2.14 | 1.34 | 1.15 | 18.00 | 1.25 | 1.00 | 0.82 0.71 |
| Weighted Average Life to Call (years)(2)(3).............. | 22.49 | 2.79 | 1.96 | 1.34 | 1.15 | 18.00 | 1.25 | 1.00 | 0.82 0.71 |

</TABLE>

----------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.

   *  Indicates an outstanding Class Certificate Balance greater than 0% and less
      than 0.5% of the original Class Certificate Balance.

                              S-122
<PAGE>


        PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

<TABLE>
<CAPTION>

                                        Class A-2B                    Class
A-2C

| DISTRIBUTION DATE | PREPAYMENT SCENARIO | | | | | PREPAYMENT | | | | |
| | I | II | III | IV | V | I | II | III | IV | V |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial Percentage.............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009..................... | 100 | 100 | 57 | 0 | 0 | 100 | 100 | 100 | 70 | 10 |
| March 2010..................... | 100 | * | 0 | 0 | 0 | 100 | 100 | 17 | 0 | 0 |
| March 2011..................... | 100 | 0 | 0 | 0 | 0 | 100 | 74 | 17 | 0 | 0 |
| March 2012..................... | 100 | 0 | 0 | 0 | 0 | 100 | 47 | 13 | 0 | 0 |
| March 2013..................... | 100 | 0 | 0 | 0 | 0 | 100 | 27 | 0 | 0 | 0 |
| March 2014..................... | 100 | 0 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| March 2015..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2016..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2017..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2018..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2019..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2020..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2021..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2022..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2023..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2024..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2025..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2026..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2027..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2028..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2029..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2030..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2031..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2032..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2033..................... | 84 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2034..................... | 31 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

| | I | II | III | IV | V | I | II | III | IV | V |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0 | | | | | | | | |
| March 2035..................... | 0 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 |
| March 2036..................... | 0 | 0 | 0 | 0 | 0 | 80 | 0 | 0 | 0 | 0 |
| March 2037..................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(2)................. | 26.66 | 2.62 | 2.00 | 1.74 | 1.46 | 29.43 | 5.07 | 3.00 | 2.09 | 1.85 |
| Weighted Average Life to Call (years)(2)(3)............... | 26.66 | 2.62 | 2.00 | 1.74 | 1.46 | 29.43 | 5.07 | 3.00 | 2.09 | 1.85 |

</TABLE>

---------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.

*    Indicates an outstanding Class Certificate Balance greater than 0% and less
     than 0.5% of the original Class Certificate Balance.

                              S-123
<PAGE>

          PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

<TABLE>
<CAPTION>

| | Class A-2D | | | | | Class M-1 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PREPAYMENT SCENARIO | | | | | PREPAYMENT SCENARIO | | | | |
| DISTRIBUTION DATE | I | II | III | IV | V | I | II | III | IV | V |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial Percentage............ | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008.................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009.................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2010.................... | 100 | 100 | 100 | 0 | 0 | 100 | 100 | 100 | 100 | 100 |
| March 2011.................... | 100 | 100 | 100 | 0 | 0 | 100 | 72 | 100 | 100 | 100 |
| March 2012.................... | 100 | 100 | 100 | 0 | 0 | 100 | 55 | 33 | 100 | 68 |
| March 2013.................... | 100 | 100 | 91 | 0 | 0 | 100 | 42 | 23 | 77 | 38 |

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| March 2014.................... | 100 | 100 | 63 | 0 | 0 | 100 | 32 | 16 | 48 |
| | | | | | | | | | 22 |
| March 2015.................... | 100 | 98 | 43 | 0 | 0 | 100 | 24 | 11 | 31 |
| | | | | | | | | | 12 |
| March 2016.................... | 100 | 75 | 30 | 0 | 0 | 100 | 19 | 8 | 20 |
| | | | | | | | | | 2 |
| March 2017.................... | 100 | 57 | 21 | 0 | 0 | 100 | 14 | 5 | 12 |
| | | | | | | | | | 0 |
| March 2018.................... | 100 | 43 | 14 | 0 | 0 | 100 | 11 | 4 | 4 |
| | | | | | | | | | 0 |
| March 2019.................... | 100 | 33 | 10 | 0 | 0 | 100 | 8 | 3 | 0 |
| | | | | | | | | | 0 |
| March 2020.................... | 100 | 25 | 7 | 0 | 0 | 100 | 6 | 1 | 0 |
| | | | | | | | | | 0 |
| March 2021.................... | 100 | 19 | 2 | 0 | 0 | 100 | 5 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2022.................... | 100 | 14 | 0 | 0 | 0 | 100 | 4 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2023.................... | 100 | 11 | 0 | 0 | 0 | 100 | 3 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2024.................... | 100 | 8 | 0 | 0 | 0 | 100 | 2 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2025.................... | 100 | 5 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2026.................... | 100 | 2 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2027.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2028.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2029.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2030.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2031.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2032.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2033.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2034.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2035.................... | 100 | 0 | 0 | 0 | 0 | 91 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2036.................... | 100 | 0 | 0 | 0 | 0 | 79 | 0 | 0 | 0 |
| | | | | | | | | | 0 |
| March 2037.................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(2)................. | 29.79 | 11.37 | 8.29 | 2.61 | 2.10 | 29.37 | 6.41 | 5.48 | 7.40 |
| | | | | | | | | | 5.91 |
| Weighted Average Life to Call (years)(2)(3).............. | 29.76 | 8.60 | 6.28 | 2.61 | 2.10 | 29.36 | 5.73 | 4.98 | 4.85 |
| | | | | | | | | | 3.85 |

</TABLE>

----------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.

S-124

\<PAGE\>

PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

\<TABLE\>
\<CAPTION\>

| DISTRIBUTION DATE | Class M-2 | | | | | Class M-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PREPAYMENT SCENARIO | I | II | III | IV | V | I | II | III | IV | V |
| \<S\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> |
| Initial Percentage........... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008.................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009.................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2010.................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2011.................... | 100 | 72 | 66 | 100 | 42 | 100 | 72 | 48 | 89 | 19 |
| March 2012.................... | 100 | 55 | 33 | 43 | 10 | 100 | 55 | 33 | 19 | 10 |
| March 2013.................... | 100 | 42 | 23 | 12 | 6 | 100 | 42 | 23 | 12 | 6 |
| March 2014.................... | 100 | 32 | 16 | 7 | 3 | 100 | 32 | 16 | 7 | 3 |
| March 2015.................... | 100 | 24 | 11 | 5 | 0 | 100 | 24 | 11 | 5 | 0 |
| March 2016.................... | 100 | 19 | 8 | 3 | 0 | 100 | 19 | 8 | 3 | 0 |
| March 2017.................... | 100 | 14 | 5 | 0 | 0 | 100 | 14 | 5 | 0 | 0 |
| March 2018.................... | 100 | 11 | 4 | 0 | 0 | 100 | 11 | 4 | 0 | 0 |
| March 2019.................... | 100 | 8 | 3 | 0 | 0 | 100 | 8 | * | 0 | 0 |
| March 2020.................... | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| March 2021.................... | 100 | 5 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| March 2022.................... | 100 | 4 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 |
| March 2023.................... | 100 | 3 | 0 | 0 | 0 | 100 | 2 | 0 | 0 | 0 |
| March 2024.................... | 100 | * | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2025.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2026.................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

| DISTRIBUTION DATE | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| March 2027..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2028..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2029..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2030..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2031..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2032..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2033..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2034..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2035..................... | 91 | 0 | 0 | 0 | 0 | 91 | 0 | 0 | 0 | 0 |
| March 2036..................... | 79 | 0 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 0 |
| March 2037..................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(2)................. | 29.37 | 6.39 | 5.19 | 5.18 | 4.12 | 29.37 | 6.37 | 5.06 | 4.66 | 3.71 |
| Weighted Average Life to Call (years)(2)(3).............. | 29.36 | 5.72 | 4.70 | 4.71 | 3.74 | 29.36 | 5.72 | 4.58 | 4.28 | 3.41 |

</TABLE>

----------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.

*    Indicates an outstanding Class Certificate Balance greater than 0% and less
     than 0.5% of the original Class Certificate Balance.

S-125

<PAGE>

PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

<TABLE>
<CAPTION>

|  | Class M-4 | | | | | Class M-5 | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | PREPAYMENT SCENARIO | | | | | PREPAYMENT SCENARIO | | | | |
| DISTRIBUTION DATE | I | II | III | IV | V | I | II | III | IV | V |
| ------------------------------ | ----- | ----- | ------ | ----- | ------ | ------ | ------ | ------ | ----- | ----- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | | |

5/27/2020
https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

```
<C>        <C>
```

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) |
|---|---|---|---|---|---|---|---|---|---|---|
| Initial Percentage............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2010..................... | 100 | 100 | 100 | 100 | 82 | 100 | 100 | 100 | 100 | 34 |
| March 2011..................... | 100 | 72 | 48 | 30 | 19 | 100 | 72 | 48 | 30 | 19 |
| March 2012..................... | 100 | 55 | 33 | 19 | 10 | 100 | 55 | 33 | 19 | 10 |
| March 2013..................... | 100 | 42 | 23 | 12 | 6 | 100 | 42 | 23 | 12 | 6 |
| March 2014..................... | 100 | 32 | 16 | 7 | 3 | 100 | 32 | 16 | 7 | 0 |
| March 2015..................... | 100 | 24 | 11 | 5 | 0 | 100 | 24 | 11 | 5 | 0 |
| March 2016..................... | 100 | 19 | 8 | * | 0 | 100 | 19 | 8 | 0 | 0 |
| March 2017..................... | 100 | 14 | 5 | 0 | 0 | 100 | 14 | 5 | 0 | 0 |
| March 2018..................... | 100 | 11 | 4 | 0 | 0 | 100 | 11 | 2 | 0 | 0 |
| March 2019..................... | 100 | 8 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| March 2020..................... | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| March 2021..................... | 100 | 5 | 0 | 0 | 0 | 100 | 5 | 0 | 0 | 0 |
| March 2022..................... | 100 | 4 | 0 | 0 | 0 | 100 | 2 | 0 | 0 | 0 |
| March 2023..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2024..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2025..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2026..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2027..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2028..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2029..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2030..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2031..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2032..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2033..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2034..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2035..................... | 91 | 0 | 0 | 0 | 0 | 91 | 0 | 0 | 0 | 0 |
| March 2036..................... | 79 | 0 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 0 |
| March 2037..................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(2)................. | 29.37 | 6.36 | 4.98 | 4.43 | 3.53 | 29.37 | 6.33 | 4.92 | | |

```
    4.28    3.41
Weighted Average Life to Call
  (years)(2)(3)...............    29.36    5.72    4.51    4.07    3.23    29.36    5.71    4.47
    3.93    3.13
</TABLE>
```

----------------------------------------

(1) Rounded to the nearest whole percentage.

(2) The weighted average life of any class of certificates is determined by (i)
    multiplying the net reduction, if any, of the Class Certificate Balance by
    the number of years from the date of issuance of the certificates to the
    related Distribution Date, (ii) adding the results, and (iii) dividing them
    by the aggregate of the net reductions of the Class Certificate Balance
    described in clause (i).

(3) Calculation assumes the exercise of the 10% Optional Clean-up Call on the
    earliest possible date.

*   Indicates an outstanding Class Certificate Balance greater than 0% and less
    than 0.5% of the original Class Certificate Balance.


                                S-126
<PAGE>

        PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

<TABLE>
<CAPTION>
```

| | Class M-6 | | | | | Class M-7 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PREPAYMENT SCENARIO | | | | | PREPAYMENT SCENARIO | | | | |
| DISTRIBUTION DATE | I | II | III | IV | V | I | II | III | IV | V |
| Initial Percentage.............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2010..................... | 100 | 100 | 100 | 100 | 34 | 100 | 100 | 100 | 100 | 34 |
| March 2011..................... | 100 | 72 | 48 | 30 | 19 | 100 | 72 | 48 | 30 | 19 |
| March 2012..................... | 100 | 55 | 33 | 19 | 10 | 100 | 55 | 33 | 19 | 10 |
| March 2013..................... | 100 | 42 | 23 | 12 | 6 | 100 | 42 | 23 | 12 | 6 |
| March 2014..................... | 100 | 32 | 16 | 8 | 0 | 100 | 32 | 16 | 7 | 0 |
| March 2015..................... | 100 | 24 | 11 | 5 | 0 | 100 | 24 | 11 | * | 0 |
| March 2016..................... | 100 | 19 | 8 | 0 | 0 | 100 | 19 | 8 | 0 | 0 |
| March 2017..................... | 100 | 14 | 5 | 0 | 0 | 100 | 14 | 4 | 0 | 0 |
| March 2018..................... | 100 | 11 | 0 | 0 | 0 | 100 | 11 | 0 | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| March 2019..................... | 100 | 8 | 0 | 0 | 0 | 100 | 8 | 0 | 0 | 0 |
| March 2020..................... | 100 | 6 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 |
| March 2021..................... | 100 | 5 | 0 | 0 | 0 | 100 | 1 | 0 | 0 | 0 |
| March 2022..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2023..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2024..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2025..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2026..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2027..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2028..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2029..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2030..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2031..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2032..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2033..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2034..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2035..................... | 91 | 0 | 0 | 0 | 0 | 91 | 0 | 0 | 0 | 0 |
| March 2036..................... | 79 | 0 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 0 |
| March 2037..................... | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(2).................. | 29.37 | 6.31 | 4.87 | 4.17 | 3.32 | 29.37 | 6.28 | 4.82 | 4.08 | 3.25 |
| Weighted Average Life to Call (years)(2)(3).............. | 29.36 | 5.71 | 4.44 | 3.83 | 3.05 | 29.36 | 5.71 | 4.41 | 3.76 | 2.99 |

</TABLE>

--------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.

*    Indicates an outstanding Class Certificate Balance greater than 0% and less
     than 0.5% of the original Class Certificate Balance.

<PAGE>

PERCENT OF INITIAL CLASS CERTIFICATE BALANCE OUTSTANDING(1)

<TABLE>
<CAPTION>

| | Class M-8 | | | | | Class M-9 | | | | |
| | PREPAYMENT SCENARIO | | | | | PREPAYMENT SCENARIO | | | | |
| DISTRIBUTION DATE | I | II | III | IV | V | I | II | III | IV | V |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Initial Percentage............. | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2008..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2009..................... | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| March 2010..................... | 100 | 100 | 100 | 100 | 34 | 100 | 100 | 100 | 100 | 34 |
| March 2011..................... | 100 | 72 | 48 | 30 | 19 | 100 | 72 | 48 | 30 | 19 |
| March 2012..................... | 100 | 55 | 33 | 19 | 10 | 100 | 55 | 33 | 19 | 10 |
| March 2013..................... | 100 | 42 | 23 | 12 | 1 | 100 | 42 | 23 | 12 | 0 |
| March 2014..................... | 100 | 32 | 16 | 8 | 0 | 100 | 32 | 16 | 2 | 0 |
| March 2015..................... | 100 | 24 | 11 | 0 | 0 | 100 | 24 | 11 | 0 | 0 |
| March 2016..................... | 100 | 19 | 8 | 0 | 0 | 100 | 19 | 4 | 0 | 0 |
| March 2017..................... | 100 | 14 | 0 | 0 | 0 | 100 | 14 | 0 | 0 | 0 |
| March 2018..................... | 100 | 11 | 0 | 0 | 0 | 100 | 11 | 0 | 0 | 0 |
| March 2019..................... | 100 | 8 | 0 | 0 | 0 | 100 | 7 | 0 | 0 | 0 |
| March 2020..................... | 100 | 4 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2021..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2022..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2023..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2024..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2025..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2026..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2027..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2028..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2029..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |
| March 2030..................... | 100 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 |

```
0        0
March 2031....................    100    0    0    0    0    100    0    0
0        0
March 2032....................    100    0    0    0    0    100    0    0
0        0
March 2033....................    100    0    0    0    0    100    0    0
0        0
March 2034....................    100    0    0    0    0    100    0    0
0        0
March 2035....................     91    0    0    0    0     91    0    0
0        0
March 2036....................     79    0    0    0    0     79    0    0
0        0
March 2037....................      0    0    0    0    0      0    0    0
0        0
Weighted Average Life to Maturity
   (years)(2)..................   29.37  6.24  4.76  3.99  3.18  29.37  6.18  4.70
3.91    3.11
Weighted Average Life to Call
   (years)(2)(3)...............   29.36  5.71  4.38  3.69  2.94  29.36  5.71  4.37
3.65    2.90
</TABLE>
```

---------------------------------------

(1)  Rounded to the nearest whole percentage.

(2)  The weighted average life of any class of certificates is determined by (i)
     multiplying the net reduction, if any, of the Class Certificate Balance by
     the number of years from the date of issuance of the certificates to the
     related Distribution Date, (ii) adding the results, and (iii) dividing them
     by the aggregate of the net reductions of the Class Certificate Balance
     described in clause (i).

(3)  Calculation assumes the exercise of the 10% Optional Clean-up Call on the
     earliest possible date.


                                  S-128
<PAGE>


WAC CAP, LOAN GROUP I CAP AND LOAN GROUP II CAP

     The information in the following table has been prepared in accordance with
the Structuring Assumptions except for the following:

o    One-Month LIBOR and the Six-Month LIBOR Loan Index remain constant at
     20.00%; and

o    prepayments on the mortgage loans occur at 100% of the Prepayment
     Assumption (I.E., Scenario III).

     It is highly unlikely, however, that prepayments on the mortgage loans will
occur at a constant rate of 100% of the Prepayment Assumption or at any other
constant percentage. There is no assurance, therefore, of whether or to what
extent the actual interest rates on the mortgage loans, the WAC Cap, the Loan
Group I Cap or the Loan Group II Cap on any Distribution Date will conform to
the corresponding rate set forth for that Distribution Date in the following
table.

| PERIOD | DISTRIBUTION DATE | WAC CAP (%) | LOAN GROUP I CAP (%) | LOAN GROUP II CAP (%) |
|--------|-------------------|-------------|----------------------|-----------------------|
| 1      | Apr-07            | 60.08       | 60.43                | 59.72                 |

| 2  | May-07 | 21.76 | 21.82 | 21.71 |
| 3  | Jun-07 | 21.46 | 21.52 | 21.41 |
| 4  | Jul-07 | 21.65 | 21.70 | 21.59 |
| 5  | Aug-07 | 21.32 | 21.38 | 21.27 |
| 6  | Sep-07 | 21.23 | 21.29 | 21.18 |
| 7  | Oct-07 | 21.38 | 21.43 | 21.32 |
| 8  | Nov-07 | 21.01 | 21.07 | 20.96 |
| 9  | Dec-07 | 21.13 | 21.18 | 21.07 |
| 10 | Jan-08 | 20.73 | 20.78 | 20.68 |
| 11 | Feb-08 | 20.57 | 20.62 | 20.51 |
| 12 | Mar-08 | 20.91 | 20.97 | 20.85 |
| 13 | Apr-08 | 20.24 | 20.29 | 20.18 |
| 14 | May-08 | 20.32 | 20.38 | 20.27 |
| 15 | Jun-08 | 19.91 | 19.96 | 19.86 |
| 16 | Jul-08 | 20.00 | 20.05 | 19.94 |
| 17 | Aug-08 | 19.59 | 19.64 | 19.54 |
| 18 | Sep-08 | 19.43 | 19.48 | 19.37 |
| 19 | Oct-08 | 19.51 | 19.57 | 19.46 |
| 20 | Nov-08 | 19.11 | 19.16 | 19.06 |
| 21 | Dec-08 | 19.19 | 19.24 | 19.14 |
| 22 | Jan-09 | 18.80 | 18.85 | 18.76 |
| 23 | Feb-09 | 19.67 | 19.67 | 19.67 |
| 24 | Mar-09 | 20.27 | 20.25 | 20.29 |
| 25 | Apr-09 | 18.87 | 18.85 | 18.90 |
| 26 | May-09 | 18.71 | 18.69 | 18.74 |
| 27 | Jun-09 | 18.21 | 18.19 | 18.24 |
| 28 | Jul-09 | 18.33 | 18.29 | 18.36 |
| 29 | Aug-09 | 18.56 | 18.51 | 18.61 |
| 30 | Sep-09 | 18.50 | 18.44 | 18.55 |
| 31 | Oct-09 | 18.65 | 18.59 | 18.71 |
| 32 | Nov-09 | 18.17 | 18.11 | 18.22 |
| 33 | Dec-09 | 18.30 | 18.24 | 18.36 |
| 34 | Jan-10 | 17.88 | 17.79 | 17.96 |
| 35 | Feb-10 | 18.51 | 18.47 | 18.56 |
| 36 | Mar-10 | 19.85 | 19.80 | 19.91 |
| 37 | Apr-10 | 18.99 | 18.94 | 19.04 |
| 38 | May-10 | 19.56 | 19.51 | 19.62 |
| 39 | Jun-10 | 19.12 | 19.07 | 19.18 |
| 40 | Jul-10 | 19.40 | 19.33 | 19.46 |
| 41 | Aug-10 | 19.67 | 19.62 | 19.73 |
| 42 | Sep-10 | 19.65 | 19.59 | 19.71 |
| 43 | Oct-10 | 19.91 | 19.85 | 19.98 |
| 44 | Nov-10 | 19.45 | 19.38 | 19.51 |
| 45 | Dec-10 | 19.71 | 19.65 | 19.78 |
| 46 | Jan-11 | 19.28 | 19.20 | 19.35 |
| 47 | Feb-11 | 19.47 | 19.43 | 19.52 |
| 48 | Mar-11 | 20.64 | 20.57 | 20.70 |
| 49 | Apr-11 | 19.33 | 19.27 | 19.40 |
| 50 | May-11 | 19.61 | 19.55 | 19.68 |
| 51 | Jun-11 | 19.15 | 19.09 | 19.21 |
| 52 | Jul-11 | 19.45 | 19.38 | 19.52 |
| 53 | Aug-11 | 19.05 | 19.01 | 19.10 |
| 54 | Sep-11 | 18.97 | 18.93 | 19.01 |
| 55 | Oct-11 | 19.25 | 19.21 | 19.30 |
| 56 | Nov-11 | 18.79 | 18.75 | 18.84 |
| 57 | Dec-11 | 19.07 | 19.03 | 19.12 |
| 58 | Jan-12 | 18.62 | 18.57 | 18.67 |
| 59 | Feb-12 | 18.56 | 18.52 | 18.60 |
| 60 | Mar-12 | 19.26 | 19.21 | 19.31 |
| 61 | Apr-12 | 11.14 | 11.09 | 11.19 |
| 62 | May-12 | 11.49 | 11.44 | 11.54 |
| 63 | Jun-12 | 11.10 | 11.05 | 11.15 |
| 64 | Jul-12 | 11.45 | 11.40 | 11.50 |
| 65 | Aug-12 | 11.07 | 11.01 | 11.12 |
| 66 | Sep-12 | 11.05 | 11.00 | 11.11 |

| 67  | Oct-12 | 11.40 | 11.34 | 11.46 |
| 68  | Nov-12 | 11.01 | 10.96 | 11.07 |
| 69  | Dec-12 | 11.36 | 11.30 | 11.42 |
| 70  | Jan-13 | 10.97 | 10.91 | 11.03 |
| 71  | Feb-13 | 10.95 | 10.89 | 11.01 |
| 72  | Mar-13 | 12.11 | 12.04 | 12.18 |
| 73  | Apr-13 | 10.92 | 10.86 | 10.98 |
| 74  | May-13 | 11.26 | 11.20 | 11.33 |
| 75  | Jun-13 | 10.88 | 10.81 | 10.95 |
| 76  | Jul-13 | 11.22 | 11.15 | 11.29 |
| 77  | Aug-13 | 10.84 | 10.77 | 10.91 |
| 78  | Sep-13 | 10.83 | 10.76 | 10.90 |
| 79  | Oct-13 | 11.17 | 11.09 | 11.24 |
| 80  | Nov-13 | 10.79 | 10.71 | 10.86 |
| 81  | Dec-13 | 11.13 | 11.05 | 11.20 |
| 82  | Jan-14 | 10.75 | 10.67 | 10.82 |
| 83  | Feb-14 | 10.73 | 10.65 | 10.81 |
| 84  | Mar-14 | 11.86 | 11.77 | 11.95 |
| 85  | Apr-14 | 10.69 | 10.61 | 10.77 |
| 86  | May-14 | 11.03 | 10.94 | 11.11 |
| 87  | Jun-14 | 10.65 | 10.57 | 10.74 |
| 88  | Jul-14 | 10.99 | 10.90 | 11.07 |
| 89  | Aug-14 | 10.61 | 10.53 | 10.70 |
| 90  | Sep-14 | 10.59 | 10.51 | 10.68 |
| 91  | Oct-14 | 10.92 | 10.84 | 11.02 |
| 92  | Nov-14 | 10.55 | 10.47 | 10.64 |
| 93  | Dec-14 | 10.88 | 10.79 | 10.98 |
| 94  | Jan-15 | 10.51 | 10.42 | 10.60 |
| 95  | Feb-15 | 10.49 | 10.40 | 10.58 |
| 96  | Mar-15 | 11.59 | 11.49 | 11.70 |
| 97  | Apr-15 | 10.45 | 10.36 | 10.55 |
| 98  | May-15 | 10.78 | 10.69 | 10.88 |
| 99  | Jun-15 | 10.41 | 10.32 | 10.51 |
| 100 | Jul-15 | 10.74 | 10.64 | 10.84 |
| 101 | Aug-15 | 10.37 | 10.28 | 10.47 |
| 102 | Sep-15 | 10.35 | 10.26 | 10.45 |
| 103 | Oct-15 | 10.68 | 10.58 | 10.78 |
| 104 | Nov-15 | 10.31 | 10.22 | 10.41 |
| 105 | Dec-15 | 10.64 | 10.54 | 10.74 |
| 106 | Jan-16 | 10.27 | 10.18 | 10.38 |
| 107 | Feb-16 | 10.26 | 10.16 | 10.36 |
| 108 | Mar-16 | 10.94 | 10.83 | 11.05 |
| 109 | Apr-16 | 10.22 | 10.11 | 10.32 |
| 110 | May-16 | 10.54 | 10.43 | 10.65 |
| 111 | Jun-16 | 10.18 | 10.07 | 10.28 |
| 112 | Jul-16 | 10.50 | 10.39 | 10.61 |
| 113 | Aug-16 | 10.14 | 10.03 | 10.25 |
| 114 | Sep-16 | 10.12 | 10.01 | 10.23 |
| 115 | Oct-16 | 10.44 | 10.33 | 10.55 |
| 116 | Nov-16 | 10.08 | 9.97  | 10.19 |
| 117 | Dec-16 | 10.40 | 10.29 | 10.51 |
| 118 | Jan-17 | 10.04 | 9.93  | 10.15 |
| 119 | Feb-17 | 10.02 | 9.91  | 10.14 |
| 120 | Mar-17 | 11.08 | 10.95 | 11.20 |

S-129

<PAGE>


FINAL SCHEDULED DISTRIBUTION DATE

     The "FINAL SCHEDULED DISTRIBUTION DATE" for each class of LIBOR
certificates is the Distribution Date occurring in March 2037 and for the
Residual Certificates will be the Distribution Date in March 2047.

Since the rate of distributions in reduction of the Class Certificate Balance of each class of LIBOR Certificates will depend on the rate of payment (including prepayments) of the mortgage loans, the Class Certificate Balance of each class could be reduced to zero significantly earlier or later than the Final Scheduled Distribution Date. The rate of payments on the mortgage loans will depend on their particular characteristics, as well as on prevailing interest rates from time to time and other economic factors, and no assurance can be given as to the actual payment experience of the mortgage loans. See "--PREPAYMENT CONSIDERATIONS AND RISKS" and "--WEIGHTED AVERAGE LIVES OF THE LIBOR CERTIFICATES" above and "YIELD AND PREPAYMENT CONSIDERATIONS" in the prospectus.

FEDERAL INCOME TAX CONSEQUENCES

The discussion in this section and in the section "FEDERAL INCOME TAX CONSEQUENCES" in the prospectus is based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change. The discussion below and in the prospectus does not purport to deal with all federal tax consequences applicable to all categories of investors, some of which may be subject to special rules. Investors may wish to consult their own tax advisors in determining the federal, state, local and any other tax consequences to them of the purchase, ownership and disposition of the Offered Certificates. References in this section and in the "ERISA CONSIDERATIONS" section of this prospectus supplement to the "Code" and "Sections" are to the Internal Revenue Code of 1986, as amended.

GENERAL

The pooling and servicing agreement provides that certain segregated asset pools within the issuing entity (exclusive, among other things, of the assets held in the Excess Reserve Fund Account, the Supplemental Interest Trust and the right of each class of LIBOR Certificates to receive Basis Risk Carry Forward Amounts) will comprise multiple REMICs (the "TRUST REMICS") organized in a tiered REMIC structure. Each class of LIBOR Certificates represents (exclusive of the right to receive Basis Risk Carry Forward Amounts) a regular interest (a "REGULAR INTEREST") in a Trust REMIC. The Class RC certificates will represent ownership of the sole class of residual interest in the Trust REMIC that holds the mortgage loans, the Class R certificates will represent ownership of the sole class of residual interest in certain other Trust REMICs, and the Class RX certificates will represent ownership of the sole class of residual interest in a separate Trust REMIC. In addition, each class of the LIBOR Certificates will represent a beneficial interest in the right to receive payments from the Excess Reserve Fund Account and the Supplemental Interest Trust. Elections will be made to treat each of the Trust REMICs as a REMIC for federal income tax purposes.

Upon the issuance of the Offered Certificates, Cadwalader, Wickersham & Taft LLP will deliver its opinion to the effect that, assuming compliance with the pooling and servicing agreement, for federal income tax purposes, the Trust REMICs will each qualify as a REMIC within the meaning of Section 860D of the Code.

TAXATION OF REGULAR INTERESTS

A holder of a class of LIBOR Certificates will be treated for federal income tax purposes as owning an interest in the corresponding class of Regular Interests in the related Trust REMIC. In addition, as described under "--THE BASIS RISK CONTRACT COMPONENT" below, the pooling and servicing agreement provides that each holder of a LIBOR Certificate will be treated as owning an interest in a limited recourse notional principal cap contract (each, a "BASIS RISK CONTRACT") representing the right to receive Basis Risk Carry Forward Amounts from the Excess Reserve Fund Account and the Supplemental Interest Trust. The Regular Interest component of a LIBOR Certificate will be entitled to receive interest and principal payments at the times and in the amounts equal to those made on the LIBOR Certificate to which it

<PAGE>

corresponds, except that (i) the maximum interest rate of that Regular Interest component will equal the lesser of the Loan Group I Cap or Loan Group II Cap, as applicable, or the WAC Cap, in the case of the Class A Certificates, or the WAC Cap in the case of the Class M Certificates, in each case computed for this purpose without regard to any Net Swap Receipts or Cap Payments, (ii) Basis Risk Carry Forward Amounts will be deemed to include the excess, if any, of the Loan Group I Cap or Loan Group II Cap, as applicable, or the WAC Cap over the maximum interest rate specified in clause (i), and (iii) any Swap Termination Payment from Available Funds will be treated as being payable FIRST from Net Monthly Excess Cashflow and SECOND from amounts distributed on the Regular Interests. As a result of the foregoing, the amount of distributions on the Regular Interest component of a LIBOR Certificate may exceed the actual amount of distributions on the LIBOR Certificate.

A holder of a LIBOR Certificate must allocate its purchase price for the LIBOR Certificate between its components--the Regular Interest component and, to the extent it has measurable value, the Basis Risk Contract component. To the extent the Basis Risk Contract component of a LIBOR Certificate has value, the Regular Interest component will be viewed as having been issued at a lesser premium or with an additional amount of original issue discount ("OID") (which could cause the total amount of OID to exceed a statutorily defined DE MINIMIS amount). See "FEDERAL INCOME TAX CONSEQUENCES--TREATMENT BY THE REMIC OF OID, MARKET DISCOUNT, AND AMORTIZABLE PREMIUM" in the prospectus.

Upon the sale, exchange, or other disposition of a LIBOR Certificate, the holder must allocate the amount realized between the components of the LIBOR Certificate based on the relative fair market values of those components at the time of sale. Assuming that a LIBOR Certificate is held as a "capital asset" within the meaning of Section 1221 of the Code, gain or loss on the disposition of an interest in the Basis Risk Contract component should be capital gain or loss, and gain or loss on the Regular Interest component will be treated as described in the prospectus under "FEDERAL INCOME TAX CONSEQUENCES--GAIN OR LOSS ON DISPOSITION."

Interest on the Regular Interest component of a LIBOR Certificate must be included in income by a holder under the accrual method of accounting, regardless of the holder's regular method of accounting. In addition, the Regular Interest components of the LIBOR Certificates could be considered to have been issued with OID. See "FEDERAL INCOME TAX CONSEQUENCES--TREATMENT BY THE REMIC OF OID, MARKET DISCOUNT, AND AMORTIZABLE PREMIUM" in the prospectus. The prepayment assumption that will be used in determining the accrual of any OID and market discount, or the amortization of bond premium, if any, will be a rate equal to 100% of the related Prepayment Assumption, as set forth under "PREPAYMENT AND YIELD CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this prospectus supplement. No representation is made that the mortgage loans will prepay at such a rate or at any other rate. OID must be included in income as it accrues on a constant yield method, regardless of whether the holder receives currently the cash attributable to such OID.

RESIDUAL CERTIFICATES

The holders of the Residual Certificates must include the taxable income of the related REMIC in their federal taxable income. The Residual Certificates will remain outstanding for federal income tax purposes until there are no certificates of any other class outstanding. Prospective investors are cautioned that the Residual Certificates' REMIC taxable income and the tax liability on the Residual Certificates may exceed, and may substantially exceed, cash distributions to the holders of the Residual Certificates during certain

periods, in which event, the holder's of the Residual Certificates must have
sufficient alternative sources of funds to pay such tax liability. Furthermore,
it is anticipated that all or a substantial portion of the taxable income of the
related REMIC includible by the holders of the Residual Certificates will be
treated as "excess inclusion" income, resulting in (i) the inability of such
holder to use net operating losses to offset such income from the related REMIC,
(ii) the treatment of such income as "unrelated business taxable income" to
certain holders who are otherwise tax exempt and (iii) the treatment of such
income as subject to 30% withholding tax to certain non-U.S. investors, with no
exemption or treaty reduction.

      The Residual Certificates will be considered to represent "noneconomic
residual interests," with the result that transfers would be disregarded for
federal income tax purposes if any significant purpose of the transferor was to
impede the assessment or collection of tax. Accordingly, the Residual
Certificates are

                                     S-131


<PAGE>


subject to certain restrictions on transfer and any prospective transferee will
be required to furnish the securities administrator with an affidavit as
described in this prospectus supplement under "DESCRIPTION OF THE
CERTIFICATES--RESTRICTIONS ON TRANSFER OF THE RESIDUAL CERTIFICATES." See
"FEDERAL INCOME TAX CONSEQUENCES--TAX TREATMENT OF REMIC REGULAR INTERESTS AND
OTHER DEBT INSTRUMENTS," and "-TAX TREATMENT OF REMIC RESIDUAL INTERESTS" in the
prospectus.

      An individual, trust or estate that holds a Residual Certificate (whether
such certificate is held directly or indirectly through certain pass through
entities) also may have additional gross income with respect to, but may be
subject to limitations on the deductibility of, servicing fees on the mortgage
loans and other administrative expenses of the related REMIC in computing such
holder's regular tax liability, and may not be able to deduct such fees or
expenses to any extent in computing such holder's alternative minimum tax
liability. Unless required otherwise by applicable authority, it is anticipated
that such expenses will be allocated to the holder of the Class RC certificates.
In addition, some portion of a purchaser's basis, if any, in a Residual
Certificate may not be recovered until termination of the related REMIC.
Furthermore, regulations have been issued concerning the federal income tax
consequences of any consideration paid to a transferee on a transfer of the
Residual Certificates, including any "safe harbor" payment described in the
prospectus. See "DESCRIPTION OF THE CERTIFICATES--RESTRICTIONS ON TRANSFER OF
THE RESIDUAL CERTIFICATES" in this prospectus supplement and "FEDERAL INCOME TAX
CONSEQUENCES--TAX TREATMENT OF REMIC RESIDUAL INTERESTS" in the prospectus. Any
transferee receiving consideration with respect to a Residual Certificate should
consult its tax advisors.

      Due to the special tax treatment of residual interests, the effective after
tax return of the Residual Certificates may be significantly lower than would be
the case if the Residual Certificates were taxed as debt instruments, or may be
negative.

      Prospective purchasers of the Residual Certificates should consider
carefully the tax consequences of an investment in Residual Certificates
discussed in the prospectus and should consult their own tax advisors with
respect to those consequences. See "FEDERAL INCOME TAX CONSEQUENCES-TAX
TREATMENT OF REMIC RESIDUAL INTERESTS" in the prospectus.

STATUS OF THE OFFERED CERTIFICATES

      The Residual Certificates and the Regular Interest components of the LIBOR

Certificates will be treated as assets described in Section 7701(a)(19)(C) of
the Code for a "domestic building and loan association," and as "real estate
assets" under Section 856(c)(5)(B) of the Code for a "real estate investment
trust" ("REIT"), generally, in the same proportion that the assets of the
issuing entity, exclusive of the Excess Reserve Fund Account and the
Supplemental Interest Trust, would be so treated. In addition, to the extent the
Regular Interest component of an Offered Certificate represents real estate
assets under Section 856(c)(5)(B) of the Code, the interest derived from that
component and the Residual Certificates would be interest on obligations secured
by interests in real property for purposes of Section 856(c)(3)(B) of the Code
for a REIT. The Basis Risk Contract components of the LIBOR Certificates will
not, however, qualify as assets described in Section 7701(a)(19)(C) of the Code
or as real estate assets under Section 856(c)(5)(B) of the Code.

THE BASIS RISK CONTRACT COMPONENT

     Each holder of a LIBOR Certificate will be treated for federal income tax
purposes as having entered into a notional principal contract pursuant to its
rights to receive payment with respect to the Basis Risk Contract component on
the date it purchases its certificate. The Basis Risk Contract components are
beneficially owned by the holders of the LIBOR Certificates in the portion of
the assets of the issuing entity, exclusive of the REMICs, which is treated as a
grantor trust for federal income tax purposes. The Internal Revenue Service (the
"IRS") has issued final regulations under Section 446 of the Code relating to
notional principal contracts (the "NOTIONAL PRINCIPAL CONTRACT REGULATIONS").

     As indicated above, holders of the LIBOR Certificates must allocate the
price they pay for such certificates between the Regular Interest component and
the Basis Risk Contract component based on their relative fair market values. To
the extent the Basis Risk Contract component is determined to have a

                                    S-132


<PAGE>


value on the closing date that is greater than zero, a portion of such purchase
price will be allocable to such rights, and such portion will be treated as a
cap premium (the "CAP PREMIUM") paid by holders of the LIBOR Certificates. A
holder of a LIBOR Certificate will be required to amortize the Cap Premium under
a level payment method as if the Cap Premium represented the present value of a
series of equal payments made over the life of the Basis Risk Contract (adjusted
to take into account decreases in notional principal amount), discounted at a
rate equal to the rate used to determine the amount of the Cap Premium (or some
other reasonable rate). Holders are urged to consult their tax advisors
concerning the appropriate method of amortizing any Cap Premium. The Notional
Principal Contract Regulations treat a nonperiodic payment made under a cap
contract as a loan for federal income tax purposes if the payment is
"significant." It is not known whether any Cap Premium would be treated in part
as a loan under the Notional Principal Contract Regulations.

     Under the Notional Principal Contract Regulations (i) all taxpayers must
recognize periodic payments with respect to a notional principal contract under
the accrual method of accounting, and (ii) any periodic payments received under
the applicable Basis Risk Contract must be netted against payments, if any,
deemed made as a result of the Cap Premiums over the recipient's taxable year,
rather than accounted for on a gross basis. Net income or deduction with respect
to net payments under a Basis Risk Contract for a taxable year should constitute
ordinary income or ordinary deduction. The IRS could contend the amount is
capital gain or loss, but such treatment is unlikely, at least in the absence of
further regulations. Any regulations requiring capital gain or loss treatment
presumably would apply only prospectively.

In addition, any amounts payable on a Regular Interest component in excess of the amount of payments on the LIBOR Certificates to which it relates as a result of certain Swap Termination Payments will be treated as having been received by the beneficial owners of such LIBOR Certificates and then paid by such owners to the Supplemental Interest Trust pursuant to the Basis Risk Contract, and such excess may be treated as a payment on a notional principal contract that is made by the beneficial owner during the applicable taxable year and that is taken into account in determining the beneficial owner's net income or net deduction with respect to the Basis Risk Contract for such taxable year. Although not clear, net income or a net deduction with respect to the Basis Risk Contract should be treated as ordinary income or as an ordinary deduction. Alternatively, such payments by beneficial owners of the LIBOR Certificates may be treated as a guarantee of the obligation of the holder of the Class X certificates to make payments under the interest rate swap agreement.

Any amount of proceeds from the sale, redemption or retirement of a LIBOR Certificate that is considered to be allocated to the holder's rights under the applicable Basis Risk Contract would be considered a "termination payment" under the Notional Principal Contract Regulations allocable to that LIBOR Certificate. A holder of such LIBOR Certificate will have gain or loss from such a termination of a Basis Risk Contract equal to (i) any termination payment it received or is deemed to have received minus (ii) the unamortized portion of any Cap Premium paid (or deemed paid) by the beneficial owner upon entering into or acquiring its interest in a Basis Risk Contract.

Gain or loss realized upon the termination of a Basis Risk Contract will generally be treated as capital gain or loss. Moreover, in the case of a bank or thrift institution, Section 582(c) of the Code would likely not apply to treat such gain or loss as ordinary.

A beneficial owner's ability to recognize a net deduction with respect to the Basis Risk Contract component of a LIBOR Certificate or any such guarantee payment may be limited under Sections 67 and/or 68 of the Code in the case of (1) estates and trusts and (2) individuals owning an interest in such component directly or through a "pass-through entity" (other than in connection with such individual's trade or business). Pass-through entities include partnerships, S corporations, grantor trusts and non-publicly offered regulated investment companies, but do not include estates, nongrantor trusts, cooperatives, real estate investment trusts and publicly offered regulated investment companies. Further, such a beneficial owner will not be able to recognize a net deduction with respect to the Basis Risk Contract component or any such guarantee payment in computing the beneficial owner's alternative minimum tax liability. Because a beneficial owner of a LIBOR Certificate will be required to include in income the amount deemed to have been paid by such owner pursuant to the Basis Risk Contract or such guarantee but may not be able to deduct that amount from income, a beneficial owner of a LIBOR Certificate may have

<center>S-133</center>

&lt;PAGE&gt;

income that exceeds cash distributions on the LIBOR Certificate, in any period and over the term of the LIBOR Certificate. As a result, the LIBOR Certificates may not be a suitable investment for any taxpayer whose net deduction with respect to the Basis Risk Contract or guarantee would be subject to the limitations described above. Subject to the foregoing, if for any year the amount of that year's amortized cost exceeds the sum of the periodic payments, such excess is allowable as an ordinary deduction.

OTHER MATTERS

For a discussion of information reporting, backup withholding and taxation

of foreign investors in the certificates, see "FEDERAL INCOME TAX
CONSEQUENCES--BACKUP WITHHOLDING" and "--TAXATION OF CERTAIN FOREIGN HOLDERS OF
DEBT INSTRUMENTS" in the prospectus.

<div align="center">STATE AND LOCAL TAXES</div>

     The depositor makes no representations regarding the tax consequences of
purchase, ownership or disposition of the LIBOR Certificates and the Residual
Certificates under the tax laws of any state, local or other jurisdiction.
Investors considering an investment in the LIBOR Certificates and the Residual
Certificates may wish to consult their own tax advisors regarding these tax
consequences.

<div align="center">ERISA CONSIDERATIONS</div>

     The Employee Retirement Income Security Act of 1974, as amended ("ERISA"),
and Section 4975 of the Code, impose requirements on employee benefit plans
subject to Title I of ERISA, and on certain other retirement plans and
arrangements, including individual retirement accounts and annuities and Keogh
plans, as well as on collective investment funds, separate accounts and other
entities in which such plans, accounts or arrangements are invested
(collectively, the "PLANS") and on persons who bear certain relationships to
such Plans. See "ERISA CONSIDERATIONS" in the prospectus.

     The U.S. Department of Labor (the "DOL") has granted to Goldman, Sachs &
Co., the underwriter, an administrative exemption (Prohibited Transaction
Exemption ("PTE") 89-88, Exemption Application No. D-7573, 54 Fed. Reg. 42582
(1989)) (the "EXEMPTION") from certain of the prohibited transaction rules of
ERISA with respect to the initial purchase, the holding and the subsequent
resale by Plans of certificates representing interests in asset-backed
pass-through trusts that consist of certain receivables, loans and other
obligations that meet the conditions and requirements of the Exemption. The
receivables covered by the Exemption include secured residential, commercial,
and home equity loans such as the mortgage loans in the issuing entity. The
Exemption has been amended to extend exemptive relief to certificates, including
Subordinated Certificates, rated in the four highest generic rating categories
in certain designated transactions, provided the conditions of the Exemption are
met. The Exemption will apply to the acquisition, holding and resale of the
Offered LIBOR Certificates (the "ERISA ELIGIBLE CERTIFICATES") by a Plan
(subject to the discussion below concerning the interest rate swap agreement),
provided that specific conditions (certain of which are described below) are
met.

     Among the conditions which must be satisfied for the Exemption, as amended,
to apply to the ERISA Eligible Certificates are the following:

          (1) The acquisition of the ERISA Eligible Certificates by a Plan
     is on terms (including the price for the ERISA Eligible Certificates)
     that are at least as favorable to the Plan as they would be in an
     arm's length transaction with an unrelated party;

          (2) The ERISA Eligible Certificates acquired by the Plan have
     received a rating at the time of such acquisition that is one of the
     four highest generic rating categories from S&P, Moody's, Fitch, Inc.,
     DBRS Limited or DBRS, Inc.;

          (3) The trustee is not an affiliate of any other member of the
     Restricted Group (as defined below) other than an underwriter;

<div align="center">S-134</div>

<PAGE>

(4) The sum of all payments made to and retained by the underwriter in connection with the distribution of the ERISA Eligible Certificates represents not more than reasonable compensation for underwriting the ERISA Eligible Certificates. The sum of all payments made to and retained by the depositor pursuant to the sale of the mortgage loans to the issuing entity represents not more than the fair market value of such mortgage loans. The sum of all payments made to and retained by the servicer represents not more than reasonable compensation for the servicer's services under the pooling and servicing agreement and reimbursement of the servicer's reasonable expenses in connection with its services; and

(5) The Plan investing in the ERISA Eligible Certificates is an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933, as amended.

Moreover, the Exemption would provide relief from certain self-dealing/conflict of interest prohibited transactions that may arise when a Plan fiduciary causes a Plan to acquire certificates in a trust containing receivables on which the fiduciary (or its affiliate) is an obligor only if, among other requirements, (i) in the case of the acquisition of ERISA Eligible Certificates in connection with the initial issuance, at least 50% of each class of ERISA Eligible Certificates and at least 50% of the aggregate interests in the issuing entity are acquired by persons independent of the Restricted Group (as defined below), (ii) the Plan's investment in ERISA Eligible Certificates does not exceed 25% of each class of ERISA Eligible Certificates outstanding at the time of the acquisition, (iii) immediately after the acquisition, no more than 25% of the assets of any Plan for which the fiduciary has discretionary authority or renders investment advice are invested in certificates representing an interest in one or more trusts containing assets sold or serviced by the same entity, and (iv) the fiduciary or its affiliate is an obligor with respect to obligations representing no more than 5% of the fair market value of the obligations in the trust. This relief is not available to Plans sponsored by the depositor, the underwriter, the trustee, the master servicer, the securities administrator or the servicer, the Swap Provider, the Cap Provider, any obligor with respect to mortgage loans included in the issuing entity constituting more than 5% of the aggregate unamortized principal balance of the assets of the issuing entity, or any affiliate of such parties (the "RESTRICTED GROUP").

Except as provided below with respect to the interest rate swap agreement, the depositor believes that the Exemption will apply to the acquisition and holding by Plans of the ERISA Eligible Certificates sold by the underwriter and that all conditions of the Exemption other than those within the control of the investors have been met. In addition, as of the date of this prospectus supplement, there is no obligor with respect to mortgage loans included in the issuing entity constituting more than 5% of the aggregate unamortized principal balance of the assets of the issuing entity.

Each purchaser that is a Plan or that is investing on behalf of or with plan assets of a Plan in reliance on the Exemption will be deemed to represent that it qualifies as an accredited investor as defined in Rule 501(a)(1) of Regulation D of the Securities Act.

The rating of a certificate may change. If a class of certificates no longer has a rating of at least BBB- or its equivalent, then certificates of that class will no longer be eligible for relief under the Exemption, and consequently may not be purchased by or sold to a Plan (although a Plan that had purchased the certificates when it had a permitted rating would not be required by the Exemption to dispose of it).

The interest rate swap agreement does not meet all of the requirements for an "eligible swap" under the Exemption, and consequently is not eligible for the exemptive relief available under the Exemption. For ERISA purposes, an interest in a class of LIBOR Certificates should represent beneficial interest in two

assets, (i) the right to receive payments with respect to the applicable class without taking into account payments made or received with respect to the interest rate swap agreement and (ii) the rights and obligations under the interest rate swap agreement. A Plan's purchase and holding of an ERISA Eligible Certificate could constitute or otherwise result in a prohibited transaction under ERISA and Section 4975 of the Code between the Plan and the Swap Provider unless an exemption is available.

Accordingly, as long as the interest rate swap agreement is in effect, no Plan or other person using Plan assets may acquire or hold any interest in an ERISA Eligible Certificate unless such acquisition or holding is eligible for the exemptive relief available under Department of Labor Prohibited Transaction

S-135

<PAGE>

Class Exemption ("PTCE") 84-14 (for transactions by independent "QUALIFIED PROFESSIONAL ASSET MANAGERS"), PTCE 91-38 (for transactions by bank collective investment funds), PTCE 90-1 (for transactions by insurance company pooled separate accounts), PTCE 95-60 (for transactions by insurance company general accounts) or PTCE 96-23 (for transactions effected by "IN-HOUSE ASSET MANAGERS") or similar exemption under similar law (collectively, the "INVESTOR-BASED EXEMPTIONS"). It should be noted, however, that even if the conditions specified in one or more of the Investor-Based Exemptions are met, the scope of relief provided by the Investor-Based Exemptions may not necessarily cover all acts that might be construed as prohibited transactions. Plan fiduciaries should consult their legal counsel concerning these issues. As long as the interest rate swap agreement is in effect, each beneficial owner of an ERISA Eligible Certificate, or any interest in an ERISA Eligible Certificate, shall be deemed to have represented that either (i) it is not a Plan or person using Plan assets or (ii) its acquisition and holding of such certificate are eligible for the exemptive relief available under at least one of the Investor-Based Exemptions.

Employee benefit plans that are governmental plans (as defined in section 3(32) of ERISA) and certain church plans (as defined in section 3(33) of ERISA) are not subject to ERISA requirements. However, such plans may be subject to applicable provisions of other federal and state laws materially similar to the provisions of ERISA or the Code (any such applicable law, "SIMILAR LAW").

Any Plan fiduciary who proposes to cause a Plan to purchase ERISA Eligible Certificates should consult with its own counsel with respect to the potential consequences under ERISA and the Code of the Plan's acquisition and ownership of ERISA Eligible Certificates. Assets of a Plan or individual retirement account should not be invested in the ERISA Eligible Certificates unless it is clear that the assets of the issuing entity will not be plan assets or unless it is clear that the Exemption and, as long as the interest rate swap agreement is in effect, one or more of the Investor-Based Exemptions will apply and exempt all potential prohibited transactions.

The Residual Certificates may not be purchased by or transferred to a Plan or any other person investing "plan assets" of any Plan (or any plan subject to Similar Law). Accordingly, the preceding discussion does not purport to discuss any considerations under ERISA, the Code or Similar Law with respect to the purchase, acquisition or resale of the Residual Certificates.

The recently enacted Pension Protection Act of 2006 makes significant changes to ERISA rules relating to prohibited transactions and plan assets, among other areas. Potential investors should consult with their advisors regarding the consequences of these changes.

LEGAL INVESTMENT

The Offered Certificates will not constitute "mortgage related securities"

under the Secondary Mortgage Market Enhancement Act of 1984, as amended, and as a result, the appropriate characterization of the Offered Certificates under various legal investment restrictions, and thus the ability of investors subject to these restrictions to purchase the Offered Certificates, is subject to significant interpretive uncertainties.

No representations are made as to the proper characterization of the Offered Certificates for legal investment, financial institution regulatory purposes, or other purposes, or as to the ability of particular investors to purchase the Offered Certificates under applicable legal investment restrictions.

Accordingly, the uncertainties described above (and any unfavorable future determinations concerning the legal investment or financial institution regulatory characteristics of the Offered Certificates) may adversely affect the liquidity of the Offered Certificates. Investors whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements, or review by regulatory authorities should consult with their own legal advisors in determining whether, and to what extent, the Offered Certificates will constitute legal investments for them or are subject to investment, capital or other restrictions.

See "LEGAL INVESTMENT" in the prospectus.

                              S-136


<PAGE>


                         LEGAL MATTERS

The validity of the certificates and certain federal income tax matters will be passed upon for the depositor and the underwriter by Cadwalader, Wickersham & Taft LLP, New York, New York.

                    METHOD OF DISTRIBUTION

The depositor has agreed to sell to the underwriter, and the underwriter has agreed to purchase, all of the Offered Certificates.

An underwriting agreement between the depositor and the underwriter governs the sale of the Offered Certificates. The aggregate proceeds (excluding accrued interest) to the depositor from the sale of the Offered Certificates, before deducting expenses estimated to be approximately $1,094,100, will be approximately 99.29% of the initial aggregate Class Certificate Balances of the Offered Certificates. Under the underwriting agreement, the underwriter has agreed to take and pay for all of the Offered Certificates, if any are taken. The underwriter will distribute the Offered Certificates from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The difference between the purchase price for the Offered Certificates paid to the depositor and the proceeds from the sale of the Offered Certificates realized by the underwriter will constitute underwriting discounts and commissions.

The Offered Certificates are a new issue of securities with no established trading market. The depositor has been advised by the underwriter that the underwriter intends to make a market in the Offered Certificates but is not obligated to do so and may discontinue market making at any time without notice. No assurance can be given as to the liquidity of the trading market for the Offered Certificates.

The depositor has agreed to indemnify the underwriter against certain civil liabilities, including liabilities under the Securities Act of 1933, as amended.

Goldman, Sachs & Co., the underwriter, is an affiliate, through common
parent ownership, of the sponsor, the depositor, the swap provider, the cap
provider and Avelo.


REPORTS TO CERTIFICATEHOLDERS


The securities administrator will be required to prepare and make available
to the certificateholders statements containing information with respect to
principal and interest payments and the issuing entity as is described in this
prospectus supplement. See "DESCRIPTION OF THE CERTIFICATES--REPORTS TO
CERTIFICATEHOLDERS" in this prospectus supplement. Copies of these statements
will be filed with the SEC through its EDGAR system located at
"http://www.sec.gov" under the name of "GSAMP Trust 2007-HE2" as an exhibit to
the monthly distribution reports on Form 10-D for the certificates for so long
as the issuing entity is subject to the reporting requirement of the Securities
Exchange Act of 1934, as amended. In addition, the servicer will be required to
furnish to the securities administrator or the depositor, as applicable, the
compliance statements, assessments of compliance and related accountants'
attestation reports detailed under "THE POOLING AND SERVICING
AGREEMENT--SERVICER REPORTS" in this prospectus supplement. Copies of these
statements and reports will be filed with the SEC under the name of the issuing
entity as an exhibit to the issuing entity's annual statement on Form 10-K for
the Offered Certificates.


                              S-137

<PAGE>


                             RATINGS


In order to be issued, the Offered Certificates must be assigned ratings
not lower than the following by Standard & Poor's Ratings Services, a division
of The McGraw-Hill Companies, Inc. ("S&P") and Moody's Investors Service, Inc.
("MOODY'S"):

| CLASS | S&P | MOODY'S |
| ----- | --- | ------- |
| A-1................ | AAA | Aaa |
| A-2A............... | AAA | Aaa |
| A-2B............... | AAA | Aaa |
| A-2C............... | AAA | Aaa |
| A-2D............... | AAA | Aaa |
| M-1................ | AA+ | Aa1 |
| M-2................ | AA | Aa2 |
| M-3................ | AA- | Aa3 |
| M-4................ | A+ | A1 |
| M-5................ | A | A2 |
| M-6................ | A- | A3 |
| M-7................ | BBB+ | Baa1 |
| M-8................ | BBB | Baa2 |
| M-9................ | BBB- | Baa3 |
| R  ................ | AAA | N/A |
| RC | AAA | N/A |
| RX | AAA | N/A |

A securities rating addresses the likelihood of the receipt by a
certificateholder of distributions on the mortgage loans to which they are
entitled to by the Final Scheduled Distribution Date. The rating takes into
consideration the characteristics of the mortgage loans and the structural,
legal and tax aspects associated with the certificates. The ratings on the
Offered Certificates do not, however, constitute statements regarding the
likelihood or frequency of prepayments on the mortgage loans, the payment of the
Basis Risk Carry Forward Amount or the possibility that a holder of an Offered
Certificate might realize a lower than anticipated yield. Explanations of the

significance of such ratings may be obtained from Standard & Poor's Ratings
Services, 55 Water Street, New York, New York 10041, and Moody's Investors
Service, Inc., 99 Church Street, New York, New York 10007.

A security rating is not a recommendation to buy, sell or hold securities
and may be subject to revision or withdrawal at any time by the assigning rating
organization. Each security rating should be evaluated independently of any
other security rating. S&P and Moody's will monitor the ratings assigned to the
Offered Certificates while the Offered Certificates remain outstanding. In the
event that the ratings initially assigned to any of the Offered Certificates by
S&P or Moody's are subsequently lowered for any reason, no person or entity is
obligated to provide any additional support or credit enhancement with respect
to such Offered Certificates.

<div align="center">S-138</div>

<PAGE>

<div align="center">GLOSSARY OF TERMS</div>

The following terms have the meanings given below when used in this
prospectus supplement.

"ACCRUED CERTIFICATE INTEREST" means, for each class of LIBOR Certificates
on any Distribution Date, the amount of interest accrued during the related
Interest Accrual Period on the related Class Certificate Balance immediately
prior to such Distribution Date at the related Pass-Through Rate, as reduced by
that class's share of net prepayment interest shortfalls and any shortfalls
resulting from the application of the Servicemembers Civil Relief Act or any
similar state statute, as described in "DESCRIPTION OF THE
CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this
prospectus supplement.

"ADJUSTMENT DATE" has the meaning set forth in "THE MORTGAGE LOAN
POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"ADJUSTABLE-RATE PREPAYMENT CURVE" or "ARM PPC" has the meaning set forth
in "PREPAYMENT AND YIELD CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this
prospectus supplement.

"AEGIS" means Aegis Mortgage Corporation, a Delaware corporation.

"AEGIS MORTGAGE LOANS" means those mortgage loans in the issuing entity
that were acquired from Aegis.

"APPLIED REALIZED LOSS AMOUNT" has the meaning set forth in "DESCRIPTION OF
THE CERTIFICATES-- PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this
prospectus supplement.

"ARM" means an adjustable-rate mortgage loan.

"AVAILABLE FUNDS" means, with respect to any Distribution Date, the sum of
the following amounts, to the extent received by the securities administrator,
with respect to the mortgage loans, net of amounts payable or reimbursable to
the depositor, the servicer, the custodians, the master servicer, the securities
administrator and the trustee, if any, payable with respect to that Distribution
Date: (1) the aggregate amount of monthly payments on the mortgage loans due on
the due date in the related Due Period and received by the servicer on or prior
to the related Determination Date, after deduction of the applicable servicing
fee and the master servicing fee and the securities administrator fee for that
Distribution Date, together with any related P&I Advances for that Distribution
Date, (2) certain unscheduled payments in respect of the mortgage loans received
by the servicer during the related Prepayment Period, including prepayments,

Insurance Proceeds, Condemnation Proceeds and net Liquidation Proceeds, excluding Prepayment Premiums, (3) Compensating Interest payments in respect of prepayment interest shortfalls for that Distribution Date, (4) the proceeds from repurchases of mortgage loans and any Substitution Adjustment Amounts received in connection with the substitution of mortgage loans with respect to that Distribution Date and (5) all proceeds received with respect to any Optional Clean-up Call. The holders of the Class P certificates will be entitled to all Prepayment Premiums received on the mortgage loans and such amounts will not be part of Available Funds or available for distribution to the holders of the Offered Certificates.

"AVELO" means Avelo Mortgage, L.L.C., a Delaware limited liability company.

"BASIC PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the aggregate Principal Remittance Amount for that Distribution Date over (ii) the Excess Overcollateralized Amount, if any, for that Distribution Date.

"BASIS RISK CARRY FORWARD AMOUNT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--EXCESS RESERVE FUND ACCOUNT" in this prospectus supplement.

"BASIS RISK CONTRACT" has the meaning set forth in "FEDERAL INCOME TAX CONSEQUENCES--TAXATION OF REGULAR INTERESTS" in this prospectus supplement.

S-139

<PAGE>

"BASIS RISK PAYMENT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--EXCESS RESERVE FUND ACCOUNT" in this prospectus supplement.

"BULK MORTGAGE LOANS" has the meaning set forth in "THE MORTGAGE LOAN POOL--GENERAL" in this prospectus supplement.

"CAP PAYMENT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus supplement.

"CAP PROVIDER" has the meaning set forth in "INTEREST RATE CAP AND SWAP COUNTERPARTY" in this prospectus supplement.

"CLASS A" means the Class A-1, Class A-2A, Class A-2B, Class A-2C and Class A-2D certificates, collectively.

"CLASS A CERTIFICATE GROUP" means the Class A-1 Certificate Group or the Class A-2 Certificate Group, as applicable. o "CLASS A PRINCIPAL ALLOCATION PERCENTAGE" for any Distribution Date is the percentage equivalent of a fraction, determined as follows:

            (i) with respect to the Class A-1 Certificate Group, a fraction, the numerator of which is the portion of the Principal Remittance Amount for that Distribution Date that is attributable to the principal received or advanced on the group I mortgage loans and the denominator of which is the Principal Remittance Amount for that Distribution Date; and

            (ii) with respect to the Class A-2 Certificate Group, a fraction, the numerator of which is the portion of the Principal Remittance Amount for that Distribution Date that is attributable to the principal received or advanced on the group II mortgage loans and the denominator of which is the Principal Remittance Amount for that Distribution Date.

"CLASS A PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (a) the aggregate Class Certificate Balance of the Class A certificates immediately prior to that Distribution Date over (b) the lesser of (x) 46.40% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (y) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS A-1 CERTIFICATE GROUP" means the Class A-1 certificates.

"CLASS A-2 CERTIFICATE GROUP" means the Class A-2A, Class A-2B, Class A-2C and Class A-2D certificates, collectively.

"CLASS CERTIFICATE BALANCE" means, with respect to any class of LIBOR Certificates as of any Distribution Date, the initial Class Certificate Balance of that class reduced by the sum of:

o all amounts previously distributed to holders of certificates of that class as payments of principal, and

o the amount of any Applied Realized Loss Amounts previously allocated to that class of certificates;

provided, however, that immediately following the Distribution Date on which a Subsequent Recovery is distributed, the Class Certificate Balances of any class or classes of certificates that have been previously reduced by Applied Realized Loss Amounts will be increased, in order of seniority, by the amount of the Subsequent Recovery distributed on such Distribution Date (up to the amount of Applied Realized Loss Amounts allocated to such class or classes).

"CLASS M-1 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date) and (b) the

S-140

<PAGE>

Class Certificate Balance of the Class M-1 certificates immediately prior to that Distribution Date over (ii) the lesser of (a) 54.90% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS M-2 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date) and (c) the Class Certificate Balance of the Class M-2 certificates immediately prior to that Distribution Date over (ii) the lesser of (a) 62.70% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS M-3 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution

Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount for that Distribution Date) and (d) the Class Certificate Balance of the Class M-3 certificates immediately prior to that Distribution Date, over the lesser of (a) 67.50% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS M-4 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount for that Distribution Date), (d) the Class Certificate Balance of the Class M-3 certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount for that Distribution Date) and (e) the Class Certificate Balance of the Class M-4 certificates immediately prior to that Distribution Date, over the lesser of (a) 71.70% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS M-5 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount for that Distribution Date), (d) the Class Certificate Balance of the Class M-3 certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount for that Distribution Date), (e) the Class Certificate Balance of the Class M-4 certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount for that Distribution Date) and (f) the Class Certificate Balance of the Class M-5 certificates immediately prior to that Distribution Date, over the lesser of (a) 75.50% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

"CLASS M-6 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the

S-141


<PAGE>


Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2

Principal Distribution Amount for that Distribution Date), (d) the Class Certificate Balance of the Class M-3 certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount for that Distribution Date), (e) the Class Certificate Balance of the Class M-4 certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount for that Distribution Date), (f) the Class Certificate Balance of the Class M-5 certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount for that Distribution Date) and (g) the Class Certificate Balance of the Class M-6 certificates immediately prior to that Distribution Date, over the lesser of (a) 78.90% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

     "CLASS M-7 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount for that Distribution Date), (d) the Class Certificate Balance of the Class M-3 certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount for that Distribution Date), (e) the Class Certificate Balance of the Class M-4 certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount for that Distribution Date), (f) the Class Certificate Balance of the Class M-5 certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount for that Distribution Date), (g) the Class Certificate Balance of the Class M-6 certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount for that Distribution Date) and (h) the Class Certificate Balance of the Class M-7 certificates immediately prior to that Distribution Date, over the lesser of (a) 82.50% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date over the Overcollateralization Floor.

     "CLASS M-8 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any Distribution Date, the excess of (i) the sum of (a) the aggregate Class Certificate Balances of the Class A certificates (after taking into account the distribution of the Class A Principal Distribution Amount for that Distribution Date), (b) the Class Certificate Balance of the Class M-1 certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount for that Distribution Date), (c) the Class Certificate Balance of the Class M-2 certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount for that Distribution Date), (d) the Class Certificate Balance of the Class M-3 certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount for that Distribution Date), (e) the Class Certificate Balance of the Class M-4 certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount for that Distribution Date), (f) the Class Certificate Balance of the Class M-5 certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount for that Distribution Date), (g) the Class Certificate Balance of the Class M-6 certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount for that Distribution Date), (h) the Class Certificate Balance of the Class M-7 certificates (after taking into account the distribution of the Class M-7 Principal Distribution Amount for that Distribution Date) and (i) the Class Certificate Balance of the Class M-8 certificates immediately prior to that Distribution Date, over the lesser of (a) 85.70% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date and (b) the excess, if any, of the aggregate Stated Principal

Balance of the mortgage loans for that Distribution Date over the
Overcollateralization Floor.

     "CLASS M-9 PRINCIPAL DISTRIBUTION AMOUNT" means, with respect to any
Distribution Date, the excess of (i) the sum of (a) the aggregate Class
Certificate Balances of the Class A certificates (after taking into account the
distribution of the Class A Principal Distribution Amount for that Distribution
Date), (b) the Class Certificate Balance of the Class M-1 certificates (after
taking into account the distribution of the Class M-1 Principal Distribution
Amount for that Distribution Date), (c) the Class Certificate Balance of the

                              S-142

<PAGE>


Class M-2 certificates (after taking into account the distribution of the Class
M-2 Principal Distribution Amount for that Distribution Date), (d) the Class
Certificate Balance of the Class M-3 certificates (after taking into account the
distribution of the Class M-3 Principal Distribution Amount for that
Distribution Date), (e) the Class Certificate Balance of the Class M-4
certificates (after taking into account the distribution of the Class M-4
Principal Distribution Amount for that Distribution Date), (f) the Class
Certificate Balance of the Class M-5 certificates (after taking into account the
distribution of the Class M-5 Principal Distribution Amount for that
Distribution Date), (g) the Class Certificate Balance of the Class M-6
certificates (after taking into account the distribution of the Class M-6
Principal Distribution Amount for that Distribution Date), (h) the Class
Certificate Balance of the Class M-7 certificates (after taking into account the
distribution of the Class M-7 Principal Distribution Amount for that
Distribution Date), (i) the Class Certificate Balance of the Class M-8
certificates (after taking into account the distribution of the Class M-8
Principal Distribution Amount for that Distribution Date) and (j) the Class
Certificate Balance of the Class M-9 certificates immediately prior to that
Distribution Date, over the lesser of (a) 88.70% of the aggregate Stated
Principal Balance of the mortgage loans for that Distribution Date and (b) the
excess, if any, of the aggregate Stated Principal Balance of the mortgage loans
for that Distribution Date over the Overcollateralization Floor.

     "CODE" has the meaning set forth in "FEDERAL INCOME TAX CONSEQUENCES" in
this prospectus supplement.

     "COMBINED ORIGINAL LOAN-TO-VALUE RATIO" or "CLTV" has the meaning set forth
in "THE MORTGAGE LOAN POOL--GENERAL" in this prospectus supplement.

     "COMPENSATING INTEREST" has the meaning set forth in "THE POOLING AND
SERVICING AGREEMENT--PREPAYMENT INTEREST SHORTFALLS" in this prospectus
supplement.

     "CONDEMNATION PROCEEDS" means all awards or settlements in respect of a
mortgaged property, whether permanent or temporary, partial or entire, by
exercise of the power of eminent domain or condemnation.

     "CONDUIT MORTGAGE LOANS" means the mortgage loans in the issuing entity
that were acquired by GSMC through the Goldman Sachs Mortgage Company mortgage
conduit program.

     "CPR" has the meaning set forth in "PREPAYMENT AND YIELD
CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this prospectus supplement.

     "DEFAULTED SWAP TERMINATION PAYMENT" has the meaning set forth in
"DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this
prospectus supplement.

"DELINQUENT" has the meaning set forth in "THE MORTGAGE LOAN POOL--THE MORTGAGE LOANS" in this prospectus supplement.

"DETERMINATION DATE" means, for each Distribution Date, the 18th of the month in which such Distribution Date occurs, or, if that day is not a business day, the immediately preceding business day.

"DISTRIBUTION DATE" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--DISTRIBUTIONS" in this prospectus supplement.

"DOL" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"DOWNGRADE TERMINATING EVENT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"DUE PERIOD" means, with respect to any Distribution Date, the period commencing on the second day of the calendar month preceding the month in which that Distribution Date occurs and ending on the first day in the calendar month in which that Distribution Date occurs.

"ERISA" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

S-143


<PAGE>


"ERISA ELIGIBLE CERTIFICATES" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"EXCESS OVERCOLLATERALIZED AMOUNT" is described in "DESCRIPTION OF THE CERTIFICATES--OVERCOLLATERALIZATION PROVISIONS" in this prospectus supplement.

"EXCESS RESERVE FUND ACCOUNT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--EXCESS RESERVE FUND ACCOUNT" in this prospectus supplement.

"EXEMPTION" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"EXPENSE FEE RATE" means, with respect to any mortgage loan, a per annum rate equal to the sum of the servicing fee rate and the master servicer fee rate. See "DESCRIPTION OF THE CERTIFICATES--ADMINISTRATION FEES" and "THE POOLING AND SERVICING AGREEMENT--SERVICING, SECURITIES ADMINISTRATOR, TRUSTEE AND CUSTODIAL FEES AND OTHER COMPENSATION AND PAYMENT OF EXPENSES" in this prospectus supplement.

"EXTRA PRINCIPAL DISTRIBUTION AMOUNT" means, as of any Distribution Date, the lesser of (x) the related Total Monthly Excess Spread for that Distribution Date and (y) the related Overcollateralization Deficiency for that Distribution Date.

"FINAL SCHEDULED DISTRIBUTION DATE" has the meaning set forth in "PREPAYMENT AND YIELD CONSIDERATIONS--FINAL SCHEDULED DISTRIBUTION DATE" in this prospectus supplement.

"FIXED-RATE PREPAYMENT CURVE" has the meaning set forth in "PREPAYMENT AND YIELD CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this prospectus supplement.

"40-YEAR TRIGGER EVENT" is in effect if on the 241st Distribution Date or any Distribution Date thereafter, the aggregate Stated Principal Balance of the mortgage loans with a 40-year original terms to maturity, exceeds the Overcollateralized Amount for such Distribution Date (after giving effect to

principal distributions on such Distribution Date other than principal distributions resulting from this event).

"GROSS MARGIN" has the meaning set forth in "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"GSMC" means Goldman Sachs Mortgage Company, a New York limited partnership.

"GSMC REPRESENTATIONS AGREEMENT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--REPRESENTATIONS AND WARRANTIES RELATING TO THE MORTGAGE LOANS" in this prospectus supplement.

"GSMMDP" has the meaning set forth in "INTEREST RATE CAP AND SWAP COUNTERPARTY" in this prospectus supplement.

"INDEX" shall mean the Six-Month LIBOR Loan Index.

"INITIAL CAP" has the meaning set forth in "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"INSURANCE PROCEEDS" means, with respect to each mortgage loan, proceeds of insurance policies insuring the mortgage loan or the related mortgaged property.

"INTEREST ACCRUAL PERIOD" means, for any Distribution Date, the period commencing on the immediately preceding Distribution Date (or, for the initial Distribution Date, the closing date) and ending on the day immediately preceding the current Distribution Date.

"INTEREST REMITTANCE AMOUNT" means, with respect to any Distribution Date and the mortgage loans in a loan group, that portion of Available Funds attributable to interest received or advanced on the mortgage loans in that mortgage loan group (calculated net of the fees payable to the servicer and the master servicer), net of any Net Swap Payments and Swap Termination Payments, other than Defaulted

<div align="center">S-144</div>

<PAGE>

Swap Termination Payments, payable to the Swap Provider from Available Funds attributable to that loan group with respect to that Distribution Date.

"INVESTOR-BASED EXEMPTIONS" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"LIBOR CERTIFICATES" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--GENERAL" in this prospectus supplement.

"LIBOR DETERMINATION DATE" means, with respect to any Interest Accrual Period and the LIBOR Certificates, the second London business day preceding the commencement of that Interest Accrual Period. For purposes of determining One-Month LIBOR, a "London business day" is any day on which dealings in deposits of United States dollars are transacted in the London interbank market.

"LIQUIDATION PROCEEDS" means any cash received in connection with the liquidation of a defaulted mortgage loan, whether through a trustee's sale, foreclosure sale or otherwise, including any Subsequent Recoveries.

"LOAN GROUP I CAP" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus supplement.

"LOAN GROUP II CAP" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus supplement.

"MAXIMUM RATE" has the meaning set forth in "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"MERS DESIGNATED MORTGAGE LOAN" means any mortgage loan for which (1) Mortgage Electronic Registration Systems, Inc., its successors and assigns has been designated the mortgagee of record and (2) the trustee is designated the investor pursuant to the procedures manual of MERSCORP, Inc.

"MINIMUM RATE" has the meaning set forth in "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"MOODY'S" has the meaning set forth in "RATINGS" in this prospectus supplement.

"NC CAPITAL" shall mean NC Capital Corporation, a California corporation.

"NET MONTHLY EXCESS CASH FLOW" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--OVERCOLLATERALIZATION PROVISIONS" in this prospectus supplement.

"NET SWAP PAYMENT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"NET SWAP RECEIPT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"NEW CENTURY" means New Century Financial Corporation, a Maryland corporation.

"NEW CENTURY MORTGAGE LOANS" means those mortgage loans in the issuing entity that were acquired from New Century.

"OFFERED CERTIFICATES" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--GENERAL" in this prospectus supplement.

"OFFERED LIBOR CERTIFICATES" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--GENERAL" in this prospectus supplement.

S-145

<PAGE>

"ONE-MONTH LIBOR" means, with respect to any LIBOR Determination Date, the London interbank offered rate for one-month United States dollar deposits which appears in the Reuters Page LIBOR01 as of 11:00 a.m., London time, on that date. If the rate does not appear on Reuters Page LIBOR01, the rate for that day will be determined on the basis of the rates at which deposits in United States dollars are offered by the Reference Banks at approximately 11:00 a.m. (London time), on that day to prime banks in the London interbank market. The securities administrator will be required to request the principal London office of each of the Reference Banks to provide a quotation of its rate. If at least two quotations are provided, the rate for that day will be the arithmetic mean of the quotations (rounded upwards if necessary to the nearest whole multiple of 1/16%). If fewer than two quotations are provided as requested, the rate for that day will be the arithmetic mean of the rates quoted by major banks in New York City, selected by the securities administrator (after consultation with the depositor), at approximately 11:00 a.m. (New York City time) on that day for loans in United States dollars to leading European banks.

"OPTIONAL CLEAN-UP CALL" has the meaning set forth in "THE POOLING AND

SERVICING AGREEMENT--TERMINATION; OPTIONAL CLEAN-UP CALL" in this prospectus supplement.

"ORIGINAL SALE DATE" means, with regard to each mortgage loan, the date on which GSMC acquired such mortgage loan from the applicable original loan seller.

"OVERCOLLATERALIZATION DEFICIENCY" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--OVERCOLLATERALIZATION Provisions" in this prospectus supplement.

"OVERCOLLATERALIZATION FLOOR" means 0.50% of the aggregate Stated Principal Balance of the mortgage loans as of the cut-off date.

"OVERCOLLATERALIZATION REDUCTION AMOUNT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--OVERCOLLATERALIZATION PROVISIONS" in this prospectus supplement.

"OVERCOLLATERALIZED AMOUNT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--OVERCOLLATERALIZATION PROVISIONS" in this prospectus supplement.

"P&I ADVANCES" means advances made by the servicer (which may include the master servicer or the trustee as successor servicer and any other successor servicer) on each Distribution Date with respect to delinquent payments of interest and principal on the mortgage loans, less the servicing fee.

"PASS-THROUGH RATE" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus supplement.

"PERIODIC CAP" has the meaning set forth in "THE MORTGAGE LOAN POOL--ADJUSTABLE-RATE MORTGAGE LOANS" in this prospectus supplement.

"PLAN" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"PREPAYMENT ASSUMPTION" has the meaning set forth in "PREPAYMENT AND YIELD CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this prospectus supplement.

"PREPAYMENT PERIOD" means, with respect to any Distribution Date, the calendar month preceding the month in which that Distribution Date occurs.

"PREPAYMENT PREMIUM" has the meaning set forth in "THE MORTGAGE LOAN POOL--PREPAYMENT PREMIUMS" in this prospectus supplement.

"PRINCIPAL DISTRIBUTION AMOUNT" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus supplement.

"PRINCIPAL REMITTANCE AMOUNT" means, with respect to any Distribution Date, to the extent of funds available for distribution as described in this prospectus supplement, the amount equal to the sum of the following amounts (without duplication) with respect to the related Due Period: (i) each scheduled payment of principal on a mortgage loan due during the related Due Period and received by the servicer

S-146

<PAGE>

on or prior to the related Determination Date or advanced by the servicer for the related Servicer Remittance Date, (ii) all full and partial principal prepayments received on the mortgage loans during the related Prepayment Period,

(iii) all net Liquidation Proceeds, Condemnation Proceeds and Insurance Proceeds on the mortgage loans allocable to principal and received during the related Prepayment Period, (iv) the portion of the repurchase price allocable to principal with respect to each mortgage loan that was repurchased with respect to that Distribution Date, (v) the portion of Substitution Adjustment Amounts allocable to principal received in connection with the substitution of any mortgage loan as of that Distribution Date, and (vi) the portion of the proceeds received with respect to any Optional Clean-up Call (to the extent they relate to principal).

"PTCE" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"PTE" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

"RATING AGENCY CONDITION" means, with respect to any action to which a Rating Agency Condition applies, that each rating agency shall have been given ten days (or such shorter period as is acceptable to each rating agency) prior notice of that action and that each of the rating agencies shall have notified the trustee, the master servicer, the securities administrator, the servicer, the depositor and the issuing entity in writing that such action will not result in a reduction, qualification or withdrawal of the then current rating of the certificates that it maintains.

"RECORD DATE" means, with respect to any Distribution Date and any class of certificates, the last business day of the related Interest Accrual Period, unless the certificates are issued in definitive form, in which case the Record Date will be the last business day of the month immediately preceding the month in which that Distribution Date occurs.

"REFERENCE BANKS" means leading banks selected by the securities administrator (after consultation with the depositor) and engaged in transactions in Eurodollar deposits in the international Eurocurrency market.

"REGULAR INTEREST" has the meaning set forth in "FEDERAL INCOME TAX CONSEQUENCES--GENERAL" in this prospectus supplement.

"REGULATION AB" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"REIT" has the meaning set forth in "FEDERAL INCOME TAX CONSEQUENCES" in this prospectus supplement.

"REQUIRED SWAP COUNTERPARTY RATING" means, with respect to the Swap Provider, a replacement counterparty or entity guaranteeing the obligations of such replacement counterparty, (x) either (i) if such counterparty or entity has only a long-term rating by Moody's, a long-term senior, unsecured debt obligation rating, credit rating or other similar rating (as the case may be, the "LONG-TERM RATING") of at least "Aa3" by Moody's and if rated "Aa3" by Moody's is not on negative credit watch by Moody's or (ii) if such counterparty or entity has a Long-Term Rating and a short-term rating by Moody's, a Long-Term Rating of at least "A1" by Moody's and a short-term rating of "P-1" by Moody's and, in each case, such rating is not on negative credit watch by Moody's and (y) (i) a short-term rating of at least "A-1" by S&P or (ii) if such counterparty or entity does not have a short-term rating by S&P, a Long-Term Rating of at least "A+" by S&P.

"RESIDUAL CERTIFICATES" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--GENERAL" in this prospectus supplement.

"RESTRICTED GROUP" has the meaning set forth in "ERISA CONSIDERATIONS" in this prospectus supplement.

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

&lt;PAGE&gt;

"REUTERS PAGE LIBOR01" means the display page currently so designated on the Reuters 3000 Xtra Service (or such other page as may replace that page on that service or any successor service for displaying comparable rates or prices).

"S&P" has the meaning set forth in "RATINGS" in this prospectus supplement.

"SENIOR ENHANCEMENT PERCENTAGE" means with respect to any Distribution Date, the percentage obtained by dividing (x) the sum of (i) the aggregate Class Certificate Balance of the Subordinated Certificates and (ii) the Overcollateralized Amount (in each case after taking into account the distributions of the related Principal Distribution Amount for that Distribution Date) by (y) the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date.

"SENIOR SPECIFIED ENHANCEMENT PERCENTAGE" on any date of determination is approximately 53.60%.

"SERVICER REMITTANCE DATE" means, with respect to any Distribution Date, two business days immediately preceding that Distribution Date.

"SIGNIFICANCE ESTIMATE" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"SIGNIFICANCE PERCENTAGE" has the meaning set forth in "DESCRIPTION OF THE CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

"SIX-MONTH LIBOR LOAN INDEX" has the meaning set forth in "THE MORTGAGE LOAN POOL--THE INDEX" in this prospectus supplement.

"SOUTHSTAR" means SouthStar Funding, LLC, a Delaware limited liability company.

"SOUTHSTAR MORTGAGE LOANS" means those mortgage loans in the issuing entity that were acquired from SouthStar.

"SPECIFIED OVERCOLLATERALIZED AMOUNT" means, prior to the Stepdown Date, an amount equal to 5.65% of the aggregate Stated Principal Balance of the mortgage loans as of the cut-off date; on and after the Stepdown Date, an amount equal to 11.30% of the aggregate Stated Principal Balance of the mortgage loans for that Distribution Date, subject, until the Class Certificate Balance of each class of LIBOR Certificates has been reduced to zero, to a minimum amount equal to the Overcollateralization Floor; provided, however, that if, on any Distribution Date, a Trigger Event has occurred, the Specified Overcollateralized Amount will not be reduced to the applicable percentage of the then Stated Principal Balance of the mortgage loans but instead will remain the same as the prior period's Specified Overcollateralized Amount until the Distribution Date on which a Trigger Event is no longer occurring. When the Class Certificate Balance of each class of LIBOR Certificates has been reduced to zero, the Specified Overcollateralized Amount will thereafter equal zero.

"STATED PRINCIPAL BALANCE" means, as to any mortgage loan and as of any date of determination, (i) the principal balance of the mortgage loan at the cut-off date after giving effect to payments of principal due on or before such date (whether or not received), minus (ii) all amounts previously remitted to the securities administrator with respect to the related mortgage loan representing payments or recoveries of principal, including advances in respect of scheduled payments of principal. For purposes of any Distribution Date, the Stated Principal Balance of any mortgage loan will give effect to any scheduled payments of principal received by the servicer on or prior to the related

Determination Date or advanced by the servicer for the related Servicer
Remittance Date and any unscheduled principal payments and other unscheduled
principal collections received during the related Prepayment Period, and the
Stated Principal Balance of any mortgage loan that has prepaid in full or has
been liquidated during the related Prepayment Period will be zero.

     "STEPDOWN DATE" means the earlier to occur of (a) the date on which the
aggregate Class Certificate Balances of the Class A certificates have been
reduced to zero and (b) the later to occur of (i) the

<div align="center">S-148</div>

&lt;PAGE&gt;

Distribution Date in April 2010 and (ii) the first Distribution Date on which
the Senior Enhancement Percentage is greater than or equal to the Senior
Specified Enhancement Percentage.

     "STRUCTURING ASSUMPTIONS" has the meaning set forth in "PREPAYMENT AND
YIELD CONSIDERATIONS--STRUCTURING ASSUMPTIONS" in this prospectus supplement.

     "SUBORDINATED CERTIFICATES" means, collectively, the Class M-1, Class M-2,
Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9
certificates.

     "SUBSEQUENT RECOVERY" has the meaning set forth in "DESCRIPTION OF THE
CERTIFICATES--PRIORITY OF DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this
prospectus supplement.

     "SUBSTITUTE MORTGAGE LOAN" means a mortgage loan substituted by a
representing party within two years of the closing date for a mortgage loan that
is in breach of such representing party's representations and warranties
regarding the mortgage loans, which must, on the date of such substitution, (i)
have a principal balance, after deduction of the principal portion of the
scheduled payment due in the month of substitution, not in excess of the
principal balance of the mortgage loan in breach; (ii) be accruing interest at a
rate no lower than and not more than 1% per annum higher than, that of the
mortgage loan in breach; (iii) have a remaining term to maturity no greater than
(and not more than one year less than that of) the mortgage loan in breach; (iv)
be of the same type as the mortgage loan in breach (i.e., fixed-rate or
adjustable-rate with same Periodic Cap and Index) and (v) comply with each
representation and warranty made by such representing party.

     "SUBSTITUTION ADJUSTMENT AMOUNT" has the meaning set forth in "DESCRIPTION
OF THE CERTIFICATES--REPRESENTATIONS AND WARRANTIES RELATING TO THE MORTGAGE
LOANS" in this prospectus supplement.

     "SUBSTITUTION EVENT" has the meaning set forth in "DESCRIPTION OF THE
CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

     "SUPPLEMENTAL INTEREST TRUST" has the meaning set forth in "DESCRIPTION OF
THE CERTIFICATES--SUPPLEMENTAL INTEREST TRUST" in this prospectus supplement.

     "SWAP PROVIDER" has the meaning set forth in "INTEREST RATE CAP AND SWAP
COUNTERPARTY" in this prospectus supplement.

     "SWAP TERMINATION PAYMENT" has the meaning set forth in "DESCRIPTION OF THE
CERTIFICATES--INTEREST RATE SWAP AGREEMENT" in this prospectus supplement.

     "TOTAL MONTHLY EXCESS SPREAD" means, with respect to any Distribution Date,
the excess, if any, of (x) the interest collected on the mortgage loans by the
servicer on or prior to the related Determination Date or advanced by the
servicer for the related Servicer Remittance Date, net of the servicing fee and

the master servicer fee and plus Cap Payments and Net Swap Receipts and less Net
Swap Payments and Swap Termination Payments (to the extent not previously paid
by a replacement swap provider), other than Defaulted Swap Termination Payments,
payable to the Swap Provider from Available Funds for such Distribution Date,
over (y) the amounts paid to the classes of certificates as described under the
subheading "STEP 1" in "DESCRIPTION OF THE CERTIFICATES--PRIORITY OF
DISTRIBUTIONS AND ALLOCATION OF LOSSES" in this prospectus supplement; provided
that Net Swap Receipts and Cap Payments shall be included in Total Monthly
Excess Spread (and correspondingly, in Extra Principal Distribution Amount) only
to the extent of current or prior Realized Losses not previously reimbursed.

        "TRIGGER EVENT," with respect to any Distribution Date, means the
circumstances in which (i) the quotient (expressed as a percentage) of (x) the
rolling three month average of the aggregate unpaid principal balance of the
mortgage loans that are 60 days or more Delinquent, including mortgage loans in
foreclosure, all REO properties and all mortgage loans where the mortgagor has
filed for bankruptcy, and (y) the aggregate unpaid principal balance of the
mortgage loans, as of the last day of the related Due Period, equals or exceeds
16.00% or (ii) the aggregate amount of realized losses incurred since the
cut-off date through the last day of the related Prepayment Period divided by
the aggregate Stated Principal

                                S-149


<PAGE>


Balance of the mortgage loans as of the cut-off date exceeds the applicable
percentages described below with respect to such Distribution Date:

<TABLE>
<CAPTION>

| DISTRIBUTION DATE OCCURRING IN | CUMULATIVE REALIZED LOSS PERCENTAGE |
| --- | --- |
| <S> | <C> |
| April 2009 - March 2010 | 1.90% for the first month, plus an additional 1/12th of 2.35% for each month thereafter |
| April 2010 - March 2011 | 4.25% for the first month, plus an additional 1/12th of 2.40% for each month thereafter |
| April 2011 - March 2012 | 6.65% for the first month, plus an additional 1/12th of 1.95% for each month thereafter |
| April 2012 - March 2013 | 8.60% for the first month, plus an additional 1/12th of 1.10% for each month thereafter |
| April 2013 - March 2014 | 9.70% for the first month, plus an additional 1/12th of 0.10% for each month thereafter |
| April 2014 and thereafter | 9.80% |

</TABLE>

        "TRUST REMICS" has the meaning set forth in "FEDERAL INCOME TAX
CONSEQUENCES--GENERAL" in this prospectus supplement.

        "UNPAID INTEREST AMOUNT" for any class of certificates and any Distribution
Date will equal the sum of (a) the portion of Accrued Certificate Interest from
Distribution Dates prior to the current Distribution Date remaining unpaid
immediately prior to the current Distribution Date, and (b) interest on the
amount in clause (a) at the applicable Pass-Through Rate (to the extent
permitted by applicable law).

        "U.S. BANK" means U.S. Bank National Association, a national banking

association.

"WAC CAP" has the meaning set forth in "DESCRIPTION OF THE
CERTIFICATES--CALCULATION OF INTEREST AND PRINCIPAL" in this prospectus
supplement.

S-150


<PAGE>


ANNEX I

CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS

A holder that is not a "United States person" (a "U.S. PERSON") within the
meaning of Section 7701(a)(30) of the Code (a "NON-U.S. HOLDER") holding a
book-entry certificate through Clearstream, societe anonyme, Euroclear or DTC
may be subject to U.S. withholding tax unless such holder provides certain
documentation to the issuer of such holder's book-entry certificate, the paying
agent or any other entity required to withhold tax (any of the foregoing, a
"U.S. WITHHOLDING AGENT") establishing an exemption from withholding. A non-U.S.
holder may be subject to withholding unless each U.S. withholding agent
receives:

1. from a non-U.S. holder that is classified as a corporation for U.S.
federal income tax purposes or is an individual, and is eligible for the
benefits of the portfolio interest exemption or an exemption (or reduced rate)
based on a treaty, a duly completed and executed IRS Form W-8BEN (or any
successor form);

2. from a non-U.S. holder that is eligible for an exemption on the basis
that the holder's income from the LIBOR Certificate is effectively connected to
its U.S. trade or business, a duly completed and executed IRS Form W-8ECI (or
any successor form);

3. from a non-U.S. holder that is classified as a partnership for U.S.
federal income tax purposes, a duly completed and executed IRS Form W-8IMY (or
any successor form) with all supporting documentation (as specified in the U.S.
Treasury Regulations) required to substantiate exemptions from withholding on
behalf of its partners; certain partnerships may enter into agreements with the
IRS providing for different documentation requirements and it is recommended
that such partnerships consult their tax advisors with respect to these
certification rules;

4. from a non-U.S. holder that is an intermediary (i.e., a person acting as
a custodian, a broker, nominee or otherwise as an agent for the beneficial owner
of an Offered Certificate):

(a) if the intermediary is a "qualified intermediary" (a "QUALIFIED
INTERMEDIARY") within the meaning of section 1.1441-1(e)(5)(ii) of the U.S.
Treasury Regulations, a duly completed and executed IRS Form W-8IMY (or any
successor or substitute form)--

(i) stating the name, permanent residence address and qualified
intermediary employer identification number of the qualified
intermediary and the country under the laws of which the qualified
intermediary is created, incorporated or governed,

(ii) certifying that the qualified intermediary has provided, or

will provide, a withholding statement as required under section
1.1441-1(e)(5)(v) of the U.S. Treasury Regulations,

(iii) certifying that, with respect to accounts it identifies on
its withholding statement, the qualified intermediary is not acting for
its own account but is acting as a qualified intermediary, and

(iv) providing any other information, certifications, or statements
that may be required by the IRS Form W-8IMY or accompanying
instructions in addition to, or in lieu of, the information and
certifications described in section 1.1441-1(e)(3)(ii) or
1.1441-1(e)(5)(v) of the U.S. Treasury Regulations; or

                              I-1

<PAGE>

(b) if the intermediary is not a qualified intermediary (a
"NONQUALIFIED INTERMEDIARY"), a duly completed and executed IRS Form W-8IMY
(or any successor or substitute form)--

(i) stating the name and permanent residence address of the
nonqualified intermediary and the country under the laws of which the
nonqualified intermediary is created, incorporated or governed,

(ii) certifying that the nonqualified intermediary is not acting
for its own account,

(iii) certifying that the nonqualified intermediary has provided,
or will provide, a withholding statement that is associated with the
appropriate IRS Forms W-8 and W-9 required to substantiate exemptions
from withholding on behalf of such nonqualified intermediary's
beneficial owners, and

(iv) providing any other information, certifications or statements
that may be required by the IRS Form W-8IMY or accompanying
instructions in addition to, or in lieu of, the information,
certifications, and statements described in section 1.1441-1(e)(3)(iii)
or (iv) of the U.S. Treasury Regulations; or

    5. from a non-U.S. holder that is a trust, depending on whether the trust
is classified for U.S. federal income tax purposes as the beneficial owner of
the Offered Certificate, either an IRS Form W-8BEN or W-8IMY; any non-U.S.
holder that is a trust should consult its tax advisors to determine which of
these forms it should provide.

    All non-U.S. holders will be required to update the above-listed forms and
any supporting documentation in accordance with the requirements under the U.S.
Treasury Regulations. These forms generally remain in effect for a period
starting on the date the form is signed and ending on the last day of the third
succeeding calendar year, unless a change in circumstances makes any information
on the form incorrect. Under certain circumstances, an IRS Form W-8BEN, if
furnished with a taxpayer identification number, remains in effect until the
status of the beneficial owner changes, or a change in circumstances makes any
information on the form incorrect.

    In addition, all holders, including holders that are U.S. persons, holding
book-entry certificates through Clearstream, SOCIETE ANONYME, Euroclear or DTC
may be subject to backup withholding unless the holder--

(i) provides the appropriate IRS Form W-8 (or any successor or
substitute form), duly completed and executed, if the holder is a
non-U.S. holder;

      (ii) provides a duly completed and executed IRS Form W-9, if the
holder is a U.S. person; or

      (iii) can be treated as an "exempt recipient" within the meaning of
section 1.6049-4(c)(1)(ii) of the U.S. Treasury Regulations (e.g., a
corporation or a financial institution such as a bank).


    This summary does not deal with all of the aspects of U.S. federal income
tax withholding or backup withholding that may be relevant to investors that are
non-U.S. holders. Such holders are advised to consult their own tax advisors for
specific tax advice concerning their holding and disposing of book-entry
certificates.

<div align="center">I-2</div>


&lt;PAGE&gt;


<div align="center">ANNEX II</div>

<div align="center">INTEREST RATE SWAP NOTIONAL AMOUNT AMORTIZATION SCHEDULE</div>

&lt;TABLE&gt;
&lt;CAPTION&gt;

| DISTRIBUTION DATE | INTEREST RATE SWAP NOTIONAL AMOUNT ($) |
| ----------------- | -------------------------------------- |
| &lt;S&gt;               | &lt;C&gt;                                    |
| Apr-07            | 953,736,000                            |
| May-07            | 941,043,707                            |
| Jun-07            | 925,413,021                            |
| Jul-07            | 906,869,070                            |
| Aug-07            | 885,460,409                            |
| Sep-07            | 861,263,822                            |
| Oct-07            | 834,381,072                            |
| Nov-07            | 804,942,526                            |
| Dec-07            | 773,104,470                            |
| Jan-08            | 739,057,111                            |
| Feb-08            | 703,175,044                            |
| Mar-08            | 668,498,037                            |
| Apr-08            | 635,422,237                            |
| May-08            | 603,872,917                            |
| Jun-08            | 573,763,213                            |
| Jul-08            | 545,043,996                            |
| Aug-08            | 517,650,115                            |
| Sep-08            | 491,500,605                            |
| Oct-08            | 466,540,751                            |
| Nov-08            | 442,690,767                            |
| Dec-08            | 419,930,590                            |
| Jan-09            | 398,112,474                            |
| Feb-09            | 375,995,496                            |
| Mar-09            | 330,644,267                            |
| Apr-09            | 287,993,421                            |
| May-09            | 251,802,350                            |
| Jun-09            | 233,800,557                            |
| Jul-09            | 218,901,738                            |
| Aug-09            | 213,794,000                            |
| Sep-09            | 213,794,000                            |
| Oct-09            | 209,287,426                            |
| Nov-09            | 198,684,918                            |
| Dec-09            | 188,646,513                            |

```
                    Jan-10            179,141,055
                    Feb-10            170,139,592
                    Mar-10            161,615,257
                    Apr-10            153,540,290
                    May-10            145,889,881
                    Jun-10            138,640,749
                    Jul-10            131,770,950
                    Aug-10            125,259,823
                    Sep-10            119,087,915
                    Oct-10            113,236,589
                    Nov-10            107,688,420
                    Dec-10            102,426,980
                    Jan-11             97,436,760
                    Feb-11             92,703,121
                    Mar-11             88,212,252
                    Apr-11             83,951,095
                    May-11             79,907,328
                    Jun-11             76,069,318
                    Jul-11             72,426,075
                    Aug-11             68,967,222
                    Sep-11             65,682,950
                    Oct-11             62,564,003
                    Nov-11             59,601,634
                    Dec-11             56,787,542
                    Jan-12             54,113,941
                    Feb-12             51,572,594
                    Mar-12             49,152,640
        Apr-12 and thereafter                0
</TABLE>


                                    II-1



<PAGE>



                              ANNEX III

                      INTEREST RATE CAP SCHEDULE


<TABLE>
<CAPTION>

                                      INTEREST
                                      RATE CAP
                                      NOTIONAL
             DISTRIBUTION DATE        AMOUNT ($)
             -----------------        ----------
<S>                                   <C>
                    Apr-07                    0
                    May-07            2,184,633
                    Jun-07            4,898,905
                    Jul-07            8,137,089
                    Aug-07           11,885,559
                    Sep-07           16,121,835
                    Oct-07           20,815,277
                    Nov-07           25,926,181
                    Dec-07           31,406,479
                    Jan-08           37,198,025
                    Feb-08           43,200,536
                    Mar-08           48,738,287
                    Apr-08           53,742,295
                    May-08           58,247,826
                    Jun-08           62,290,746
```

```
              Jul-08            65,898,553
              Aug-08            69,100,954
              Sep-08            71,929,467
              Oct-08            74,407,956
              Nov-08            76,563,750
              Dec-08            78,415,431
              Jan-09            79,996,750
              Feb-09            81,478,617
              Mar-09            85,725,575
              Apr-09            88,469,357
              May-09            89,492,939
              Jun-09            89,124,362
              Jul-09            88,462,811
              Aug-09            78,672,012
              Sep-09            64,411,827
              Oct-09            55,263,232
              Nov-09            52,788,698
              Dec-09            50,302,956
              Jan-10            47,813,145
              Feb-10            45,326,037
              Mar-10            52,178,743
              Apr-10            60,253,710
              May-10            67,823,175
              Jun-10            66,491,066
              Jul-10            65,138,638
              Aug-10            63,771,120
              Sep-10            62,393,293
              Oct-10            61,009,293
              Nov-10            59,622,962
              Dec-10            58,237,778
              Jan-11            56,856,866
              Feb-11            55,483,033
              Mar-11            54,118,794
              Apr-11            52,766,378
              May-11            51,427,770
              Jun-11            50,104,724
              Jul-11            48,798,781
              Aug-11            47,511,289
              Sep-11            46,243,410
              Oct-11            44,996,157
              Nov-11            43,770,384
              Dec-11            42,566,793
              Jan-12            41,385,989
              Feb-12            40,228,007
              Mar-12            39,089,446
       Apr-12 and thereafter         0
</TABLE>


                      III-1



<PAGE>



                 SCHEDULE A
              COLLATERAL TERM SHEET
        THE MORTGAGE LOANS - ALL COLLATERAL


<TABLE>
<CAPTION>
SELECTED MORTGAGE LOAN DATA(1)
-----------------------------
```

```
<S>
<C>
 AGGREGATE SCHEDULED PRINCIPAL BALANCE:(2)
$998,091,543
 NUMBER OF MORTGAGE LOANS:
5,030
 AVERAGE SCHEDULED PRINCIPAL BALANCE:
$198,428
 WEIGHTED AVERAGE GROSS INTEREST RATE:
8.152%
 WEIGHTED AVERAGE NET INTEREST RATE:(3)
7.642%
 WEIGHTED AVERAGE ORIGINAL FICO SCORE:
622
 WEIGHTED AVERAGE COMBINED ORIGINAL LTV RATIO:(4)
81.38%
 WEIGHTED AVERAGE COMBINED ORIGINAL LTV RATIO WITH SILENT SECONDS:(4)
85.76%
 WEIGHTED AVERAGE STATED REMAINING TERM (MONTHS):
358
 WEIGHTED AVERAGE SEASONING (MONTHS):
1
 WEIGHTED AVERAGE MONTHS TO ROLL:(5)
26
 WEIGHTED AVERAGE GROSS MARGIN:(5)
6.055%
 WEIGHTED AVERAGE INITIAL RATE CAP:(5)
2.113%
 WEIGHTED AVERAGE PERIODIC RATE CAP:(5)
1.366%
 WEIGHTED AVERAGE GROSS MAXIMUM LIFETIME RATE:(5)
14.901%
 PERCENTAGE OF MORTGAGE LOANS WITH SILENT SECONDS:(6)
18.46%
 NON-ZERO WEIGHTED AVERAGE DEBT TO INCOME RATIO AT ORIGINATION:
41.91%
 PERCENTAGE OF MORTGAGE LOANS WITH MORTGAGE INSURANCE:
0.00%
</TABLE>
```

(1)  All percentages calculated herein are percentages of scheduled principal
     balance as of the statistical calculation date unless otherwise noted.

(2)  All percentages calculated in this table are based on scheduled principal
     balances, unless otherwise noted, as of the statistical calculation date
     and are subject to a variance of +/-10%.

(3)  The weighted average net interest rate is equal to the weighted average
     gross interest rate less the servicing and master servicing fee rates.

(4)  With respect to the second lien mortgage loans, the combined original LTV
     ratio reflects the ratio of the sum of the original principal balance of
     the second lien mortgage loans, plus the original principal balance of the
     related first lien mortgage loan to the original value of the related
     mortgaged property. The combined original LTV ratio with silent seconds
     reflects the ratio of the sum of the original principal balance of the
     second lien mortgage loans, including any second lien mortgage loan not
     included in the mortgage loan pool that is secured by the related mortgaged
     property and originated in connection with the origination of the first
     lien mortgage loan, plus the original principal balance of the related
     first lien mortgage loan, to the original value of the related mortgaged
     property.

(5)  Represents the weighted average of the adjustable-rate mortgage loans in
     the mortgage loan pool.

(6)  Represents percentage of mortgage loans in the mortgage loan pool as to
     which a second lien mortgage loan secured by the related mortgaged property
     was originated in connection with the origination of the first lien
     mortgage loan and the second lien mortgage loan is not included in the
     mortgage loan pool.

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                   A-1


<PAGE>



                   DISTRIBUTION BY CURRENT PRINCIPAL BALANCE

<TABLE>
<CAPTION>

| COMBINED ORIGINAL BALANCE SS. | NUMBER OF LOANS | PCT. PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. CURRENT PRINCIPAL BALANCE | WT. AVG. CLTV INCLD FULL DOC | PCT. OWNER OCCUPIED | WT. AVG. PRINCIPAL BALANCE | LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| $ 50,000 & Below | 517 | $ 17,279,526 | 1.73% | 10.656% | 647 | $ 33,423 | 96.07% | 96.07% | 66.97% | 88.35% |
| $ 50,001 - $ 75,000 | 433 | 27,424,994 | 2.75 | 9.854 | 618 | 63,337 | 83.19 | 84.47 | 67.78 | 79.61 |
| $ 75,001 - $100,000 | 463 | 40,411,583 | 4.05 | 9.242 | 609 | 87,282 | 80.84 | 83.91 | 68.93 | 88.87 |
| $100,001 - $125,000 | 448 | 50,619,571 | 5.07 | 8.893 | 608 | 112,990 | 81.87 | 85.41 | 70.53 | 87.83 |
| $125,001 - $150,000 | 423 | 58,206,099 | 5.83 | 8.649 | 610 | 137,603 | 80.71 | | | |

| | 84.70 | 74.96 | 92.17 | | | | |
|---|---|---|---|---|---|---|---|
| $150,001 - $200,000 | 775 | 135,623,329 | 13.59 | 8.215 | 614 | 174,998 | 80.27 |
| 84.18 | 68.77 | 89.19 | | | | | |
| $200,001 - $250,000 | 584 | 130,748,863 | 13.10 | 8.026 | 614 | 223,885 | 80.54 |
| 84.67 | 64.19 | 91.51 | | | | | |
| $250,001 - $300,000 | 363 | 99,582,752 | 9.98 | 8.007 | 611 | 274,333 | 81.42 |
| 85.28 | 63.29 | 92.98 | | | | | |
| $300,001 - $350,000 | 289 | 93,808,283 | 9.40 | 7.849 | 625 | 324,596 | 80.25 |
| 85.21 | 59.11 | 90.50 | | | | | |
| $350,001 - $400,000 | 241 | 89,831,279 | 9.00 | 7.694 | 626 | 372,744 | 81.09 |
| 86.29 | 58.65 | 92.93 | | | | | |
| $400,001 - $450,000 | 174 | 74,203,001 | 7.43 | 7.561 | 630 | 426,454 | 81.64 |
| 87.39 | 58.69 | 97.64 | | | | | |
| $450,001 - $500,000 | 131 | 62,361,769 | 6.25 | 7.567 | 626 | 476,044 | 80.79 |
| 86.30 | 54.15 | 92.31 | | | | | |
| $500,001 - $550,000 | 60 | 31,552,624 | 3.16 | 7.745 | 647 | 525,877 | 81.54 |
| 90.15 | 44.95 | 93.42 | | | | | |
| $550,001 - $600,000 | 43 | 24,806,422 | 2.49 | 7.785 | 650 | 576,894 | 83.02 |
| 88.10 | 50.97 | 93.00 | | | | | |
| $600,001 & Above | 86 | 61,631,445 | 6.17 | 8.044 | 651 | 716,645 | 82.94 |
| 86.96 | 46.72 | 97.50 | | | | | |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | |
| 81.38% | 85.76% | 61.98% | 91.71% | | | | |

</TABLE>

DISTRIBUTION BY CURRENT RATE

<TABLE>
<CAPTION>

| WT. AVG. CLTV CURRENT RATE INCLD SS. | PCT. PCT. FULL DOC | NUMBER OWNER OF LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | | <C> | <C> | <C> <C> | | <C> |
| <C> | <C> | <C> | | | | | | |
| 5.000 - 5.499% | 4 | $ 895,998 | | 0.09% | 5.329% | 710 | $ 224,000 | 60.74% |
| 64.66% | 80.37% | 100.00% | | | | | | |
| 5.500 - 5.999% | 69 | 22,174,934 | | 2.22 | 5.802 | 669 | 321,376 | 75.33 |
| 80.75 | 89.50 | 98.59 | | | | | | |
| 6.000 - 6.499% | 218 | 62,338,717 | | 6.25 | 6.268 | 657 | 285,957 | 76.35 |
| 80.07 | 86.68 | 97.81 | | | | | | |
| 6.500 - 6.999% | 512 | 142,588,909 | | 14.29 | 6.763 | 647 | 278,494 | 78.17 |
| 83.58 | 79.56 | 97.71 | | | | | | |
| 7.000 - 7.499% | 457 | 117,669,795 | | 11.79 | 7.268 | 630 | 257,483 | 78.85 |
| 86.92 | 67.50 | 97.38 | | | | | | |
| 7.500 - 7.999% | 699 | 165,144,529 | | 16.55 | 7.759 | 630 | 236,258 | 80.80 |
| 86.94 | 62.31 | 92.86 | | | | | | |
| 8.000 - 8.499% | 532 | 123,804,725 | | 12.40 | 8.251 | 616 | 232,716 | 81.05 |
| 85.83 | 56.08 | 90.88 | | | | | | |
| 8.500 - 8.999% | 644 | 126,759,116 | | 12.70 | 8.738 | 604 | 196,831 | 83.15 |
| 86.24 | 55.07 | 86.46 | | | | | | |
| 9.000 - 9.499% | 378 | 66,479,428 | | 6.66 | 9.245 | 591 | 175,872 | 83.06 |
| 84.89 | 52.42 | 86.60 | | | | | | |
| 9.500 - 9.999% | 595 | 81,548,810 | | 8.17 | 9.730 | 590 | 137,057 | 85.24 |
| 86.68 | 47.87 | 82.89 | | | | | | |
| 10.000% & Above | 922 | 88,686,582 | | 8.89 | 10.979 | 606 | 96,189 | 89.38 |

```
90.07      39.63    86.95
------------------------------------------------------------------------------
------------------------------
TOTAL:            5,030  $998,091,543     100.00%    8.152%        622  $   198,428      81.38%
85.76%   61.98%   91.71%
==============================================================================
==============================
```
</TABLE>


<TABLE>
<CAPTION>

DISTRIBUTION BY CREDIT SCORE

| CREDIT SCORE INCLD SS. | PCT. NUMBER OF LOANS | PCT. FULL DOC | PRINCIPAL BALANCE | OWNER OCCUPIED | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 740 & Above | 127 | 86.88% | $28,547,195 | 41.40% 79.99% | 2.86% | 7.455% | 766 | $ 224,781 | 79.56% | |
| 720 - 739 | 92 | 89.21 | 18,315,962 | 36.69 88.73 | 1.84 | 7.660 | 729 | 199,087 | 81.27 | |
| 700 - 719 | 158 | 87.58 | 37,867,210 | 46.44 87.07 | 3.79 | 7.526 | 709 | 239,666 | 81.05 | |
| 680 - 699 | 240 | 90.61 | 51,453,319 | 42.64 86.17 | 5.16 | 7.603 | 688 | 214,389 | 82.71 | |
| 660 - 679 | 476 | 90.02 | 91,319,783 | 48.38 85.89 | 9.15 | 7.805 | 668 | 191,848 | 82.84 | |
| 640 - 659 | 740 | 91.07 | 148,179,667 | 49.36 88.73 | 14.85 | 7.886 | 649 | 200,243 | 83.06 | |
| 620 - 639 | 724 | 88.65 | 141,144,094 | 71.28 91.93 | 14.14 | 7.935 | 629 | 194,950 | 84.01 | |
| 600 - 619 | 817 | 87.85 | 158,549,535 | 73.23 93.64 | 15.89 | 8.222 | 610 | 194,063 | 83.41 | |
| 580 - 599 | 512 | 82.32 | 111,742,983 | 70.55 94.61 | 11.20 | 8.342 | 590 | 218,248 | 82.02 | |
| 560 - 579 | 326 | 78.72 | 63,028,893 | 63.13 96.18 | 6.31 | 8.575 | 569 | 193,340 | 78.00 | |
| 540 - 559 | 334 | 77.03 | 62,382,200 | 68.28 97.32 | 6.25 | 8.687 | 551 | 186,773 | 76.52 | |
| 520 - 539 | 256 | 74.01 | 44,841,644 | 70.16 97.95 | 4.49 | 9.057 | 530 | 175,163 | 73.49 | |
| 500 - 519 | 228 | 75.31 | 40,719,060 | 83.14 97.91 | 4.08 | 9.365 | 510 | 178,592 | 74.63 | |

```
------------------------------------------------------------------------------
------------------------------
TOTAL:            5,030  $998,091,543     100.00%    8.152%        622  $   198,428      81.38%
85.76%   61.98%   91.71%
==============================================================================
==============================
```
</TABLE>


This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in

this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                  A-2


<PAGE>




                            DISTRIBUTION BY LIEN

<TABLE>
<CAPTION>

                                         PCT. OF    WT. AVG.                                  WT. AVG.
                                         POOL BY     GROSS       WT. AVG.       AVG.          COMBINED
WT. AVG.                    PCT.
             NUMBER      PRINCIPAL      PRINCIPAL   INTEREST     ORIGINAL     PRINCIPAL       ORIGINAL
CLTV        PCT.        OWNER
  LIEN     OF LOANS      BALANCE         BALANCE      RATE         FICO        BALANCE          LTV
INCLD SS.  FULL DOC    OCCUPIED
-----------------------------------------------------------------------------------------------------
-----------------------------
<S>          <C>         <C>              <C>         <C>         <C>   <C>                     <C>
<C>        <C>         <C>
  1         4,331     $963,004,030      96.48%      8.045%        621    $     222,351        80.72%
85.26%     62.30%      91.74%
  2           699       35,087,513       3.52       11.081        660          50,197         99.68
99.68      53.17       90.83
-----------------------------------------------------------------------------------------------------
-----------------------------
 TOTAL:     5,030     $998,091,543     100.00%      8.152%        622    $     198,428        81.38%
85.76%     61.98%      91.71%
=====================================================================================================
==============================
</TABLE>


                       DISTRIBUTION BY COMBINED ORIGINAL LTV

<TABLE>
<CAPTION>

                                         PCT. OF    WT. AVG.                                  WT. AVG.  WT.
AVG.
                                         POOL BY     GROSS       WT. AVG.       AVG.          COMBINED
CLTV                      PCT.
 COMBINED    NUMBER    PRINCIPAL        PRINCIPAL   INTEREST     ORIGINAL     PRINCIPAL       ORIGINAL
INCLD     PCT.        OWNER
 ORIGINAL LTV  OF LOANS   BALANCE        BALANCE      RATE         FICO        BALANCE          LTV
SS.       FULL DOC    OCCUPIED
--------------------------------------------------------------------------------------------------------

```
                              ------------------------------
<S>                   <C>   <C>              <C>        <C>        <C>   <C>             <C>
<C>         <C>          <C>
60.00% &  Below       354   $59,996,793      6.01%      7.717%     607   $   169,482     49.69%
49.93%      60.21%       90.24%
60.01 -  70.00%       384    83,510,924      8.37       7.907      597       217,476     66.45
66.77       55.03       90.73
70.01 -  80.00%     1,680   395,241,749     39.60       7.749      630       235,263     78.61
89.22       60.57       94.45
80.01 -  85.00%       561   126,109,358     12.64       8.171      598       224,794     84.31
85.16       64.71       93.31
85.01 -  90.00%       766   173,114,834     17.34       8.330      623       225,998     89.54
89.70       59.52       84.12
90.01 -  95.00%       427    95,676,152      9.59       8.499      629       224,066     94.66
94.67       76.83       92.83
95.01 - 100.00%       858    64,441,733      6.46      10.310      651        75,107     99.92
99.92       60.52       93.15

                              ------------------------------------------------------------------
                              ------------------------------
TOTAL:              5,030   $998,091,543   100.00%      8.152%     622   $   198,428     81.38%
85.76%      61.98%       91.71%
                              ==================================================================
                              ==============================
</TABLE>
```

DISTRIBUTION BY COMBINED ORIGINAL LTV WITH SILENT SECONDS

```
<TABLE>
<CAPTION>
   COMBINED
   ORIGINAL                             PCT. OF    WT. AVG.                              WT. AVG.   WT.
AVG.
   LTV WITH                             POOL BY    GROSS      WT. AVG.    AVG.           COMBINED   CLTV
PCT.
      SILENT        NUMBER    PRINCIPAL PRINCIPAL  INTEREST   ORIGINAL   PRINCIPAL       ORIGINAL
INCLD      PCT.        OWNER
      SECONDS      OF LOANS   BALANCE   BALANCE    RATE       FICO       BALANCE         LTV        SS.
FULL DOC   OCCUPIED
                              ------------------------------------------------------------------
                              ------------------------------
<S>                   <C>   <C>              <C>        <C>        <C>   <C>             <C>        <C>
<C>         <C>         <C>
60.00% & Below        351   $ 59,342,393     5.95%      7.714%     607   $   169,067     49.60%
49.65%      60.38%       90.43%
60.01 -  70.00%       380    82,477,835      8.26       7.919      595       217,047     66.42
66.45       55.76       91.03
70.01 -  80.00%       835   183,703,825     18.41       7.921      601       220,005     77.02
77.12       67.05       94.12
80.01 -  85.00%       521   117,851,827     11.81       8.132      598       226,203     84.21
84.25       65.29       93.57
85.01 -  90.00%       754   170,744,452     17.11       8.313      624       226,452     89.41
89.53       59.76       84.14
90.01 -  95.00%       493   110,750,250     11.10       8.460      627       224,646     93.01
94.67       74.85       91.57
95.01 - 100.00%     1,696   273,220,961     27.37       8.255      654       161,097     84.79
99.94       55.55       94.57

                              ------------------------------------------------------------------
                              ------------------------------
TOTAL:              5,030   $998,091,543   100.00%      8.152%     622   $   198,428     81.38%
85.76%      61.98%       91.71%
                              ==================================================================
                              ==============================
</TABLE>
```

```
<TABLE>
<CAPTION>
```

DISTRIBUTION BY DOCUMENTATION

| DOCUMENTATION FULL DOC | NUMBER OF LOANS OWNER OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| | `<C>` | | | | | | | |
| Full Doc 100.00% | 3,304 95.08% | $618,639,425 | 61.98% | 7.868% | 613 | $187,240 | 81.71% | 85.55% |
| Stated Doc 0.00 | 1,615 86.20 | 358,463,916 | 35.91 | 8.625 | 637 | 221,959 | 80.61 | 85.91 |
| Limited Doc 0.00 | 104 87.36 | 20,107,079 | 2.01 | 8.394 | 624 | 193,337 | 85.64 | 90.52 |
| No Doc 0.00 | 7 64.59 | 881,123 | 0.09 | 9.248 | 679 | 125,875 | 72.52 | 72.52 |
| TOTAL: 61.98% | 5,030 91.71% | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% |

```
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

A-3

```
<PAGE>
```

DISTRIBUTION BY PURPOSE

```
<TABLE>
<CAPTION>
```

| | PCT. OF POOL BY | WT. AVG. GROSS | WT. AVG. | AVG. | WT. AVG. COMBINED | WT. |

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

| PURPOSE | NUMBER OF LOANS | PRINCIPAL BALANCE | PRINCIPAL BALANCE (PCT.) | INTEREST RATE | ORIGINAL FICO | PRINCIPAL BALANCE | ORIGINAL LTV | CLTV INCLD SS. | FULL DOC | OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| Cashout Refi | 2,594 | $573,351,918 | 57.44% | 8.033% | 609 | $ 221,030 | 79.12% | 79.64% | 66.09% | 93.30% |
| Purchase | 1,913 | 307,748,855 | 30.83 | 8.531 | 644 | 160,872 | 85.41 | 96.25 | 49.75 | 86.68 |
| Rate/term Refi | 523 | 116,990,770 | 11.72 | 7.736 | 626 | 223,692 | 81.89 | 88.20 | 74.02 | 97.14 |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $ 198,428 | 81.38% | 85.76% | 61.98% | 91.71% |

</TABLE>

DISTRIBUTION BY OCCUPANCY

<TABLE>
<CAPTION>

| OCCUPANCY | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIGINAL LTV | WT. AVG. COMBINED CLTV INCLD SS. | FULL DOC | OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,518 | $915,365,016 | 91.71% | 8.087% | 619 | $202,604 | 81.32% | 85.83% | 64.26% | 100.00% |
| Investor | 340 | 56,463,884 | 5.66 | 8.997 | 648 | 166,070 | 82.03 | 82.43 | 34.62 | 0.00 |
| Second Home | 172 | 26,262,642 | 2.63 | 8.584 | 659 | 152,690 | 82.37 | 90.82 | 41.38 | 0.00 |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% | 61.98% | 91.71% |

</TABLE>

DISTRIBUTION BY PROPERTY TYPE

<TABLE>
<CAPTION>

| PROPERTY TYPE | NUMBER OF LOANS | PCT. OWNER OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | AVG. WT. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. CLTV INCLD SS. | FULL DOC | OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Property Type | Number of Loans | Principal Balance | Pct. of Pool | Wt. Avg. Gross Interest Rate | Wt. Avg. Original FICO | Avg. Principal Balance | Wt. Avg. Original LTV | Wt. Avg. Combined CLTV Incld SS | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| Single Family | 3,643 | $702,547,091 | 70.39% | 8.154% | 618 | $192,849 | 80.97% | 85.00% | 63.68% | 93.46% |
| PUD | 741 | 151,838,656 | 15.21 | 8.014 | 625 | 204,910 | 83.46 | 88.67 | 67.15 | 91.70 |
| Condo | 340 | 60,881,514 | 6.10 | 8.483 | 636 | 179,063 | 83.12 | 89.93 | 48.62 | 83.28 |
| 2 Family | 226 | 57,130,477 | 5.72 | 7.922 | 638 | 252,790 | 79.29 | 85.03 | 49.26 | 89.57 |
| 3-4 Family | 71 | 24,749,327 | 2.48 | 8.664 | 639 | 348,582 | 80.78 | 81.23 | 43.07 | 68.25 |
| Townhouse | 9 | 944,477 | 0.09 | 8.060 | 626 | 104,942 | 83.70 | 83.70 | 92.59 | 80.68 |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% | 61.98% | 91.71% |

</TABLE>

DISTRIBUTION BY STATE

<TABLE>
<CAPTION>

| State | Number of Loans | Principal Balance | Pct. of Pool by Principal Balance | Wt. Avg. Gross Interest Rate | Wt. Avg. Original FICO | Avg. Principal Balance | Wt. Avg. Original LTV | Wt. Avg. Combined CLTV Incld SS | Pct. Full Doc | Pct. Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| CA | 887 | $292,860,179 | 29.34% | 7.817% | 631 | $330,169 | 80.20% | 85.79% | 51.74% | 93.74% |
| FL | 563 | 103,077,634 | 10.33 | 8.110 | 617 | 183,086 | 79.97 | 83.98 | 58.69 | 89.16 |
| NY | 214 | 59,523,854 | 5.96 | 7.794 | 635 | 278,149 | 78.01 | 82.86 | 54.46 | 95.13 |
| TX | 443 | 41,748,579 | 4.18 | 8.664 | 616 | 94,241 | 82.67 | 87.61 | 64.30 | 88.21 |
| NJ | 159 | 39,694,104 | 3.98 | 8.329 | 616 | 249,648 | 78.25 | 81.16 | 60.97 | 94.00 |
| MD | 168 | 38,604,137 | 3.87 | 8.059 | 605 | 229,787 | 80.95 | 84.06 | 77.27 | 96.38 |
| VA | 165 | 33,667,440 | 3.37 | 8.036 | 616 | 204,045 | 83.03 | 85.39 | 74.40 | 89.41 |
| AZ | 183 | 33,486,223 | 3.36 | 7.988 | 619 | 182,985 | 79.93 | 84.49 | 65.27 | 89.26 |
| GA | 184 | 29,440,441 | 2.95 | 8.979 | 627 | 160,002 | 86.93 | 89.99 | 58.86 | 81.50 |
| IL | 150 | 26,443,039 | 2.65 | 8.400 | 619 | 176,287 | 84.64 | 88.07 | 71.53 | 91.42 |
| Other | 1,914 | 299,545,913 | 30.01 | 8.410 | 617 | 156,503 | 83.13 | 87.07 | 70.17 | 91.07 |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% | 61.98% | 91.71% |

</TABLE>

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

A-4

<PAGE>

DISTRIBUTION BY ZIP

<TABLE>
<CAPTION>

| ZIP<br>FULL DOC | NUMBER<br>OF LOANS<br>OWNER<br>OCCUPIED | PRINCIPAL<br>BALANCE | PCT. OF<br>POOL BY<br>PRINCIPAL<br>BALANCE | WT. AVG.<br>GROSS<br>INTEREST<br>RATE | WT. AVG.<br>ORIGINAL<br>FICO | AVG.<br>PRINCIPAL<br>BALANCE | WT. AVG.<br>COMBINED<br>ORIGINAL<br>LTV | WT. AVG.<br>CLTV<br>INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 92336<br>55.85% | 10<br>91.24% | $3,767,503 | 0.38% | 7.382% | 659 | $376,750 | 80.37% | 89.67% |
| 92571<br>39.18 | 10<br>89.04 | 2,996,373 | 0.30 | 7.974 | 645 | 299,637 | 80.14 | 86.58 |
| 91342<br>33.58 | 7<br>100.00 | 2,953,729 | 0.30 | 7.107 | 652 | 421,961 | 75.85 | 89.13 |
| 90805<br>48.81 | 7<br>100.00 | 2,518,350 | 0.25 | 7.989 | 615 | 359,764 | 84.57 | 93.78 |
| 92703<br>20.43 | 5<br>83.44 | 2,413,622 | 0.24 | 7.278 | 656 | 482,724 | 79.79 | 87.84 |
| 90650<br>33.13 | 6<br>100.00 | 2,387,652 | 0.24 | 7.869 | 621 | 397,942 | 83.72 | 83.72 |
| 92376<br>58.89 | 9<br>100.00 | 2,342,376 | 0.23 | 8.310 | 617 | 260,264 | 86.57 | 91.04 |
| 92335<br>49.59 | 8<br>85.19 | 2,217,777 | 0.22 | 8.401 | 656 | 277,222 | 86.94 | 89.67 |
| 11208<br>100.00 | 6<br>100.00 | 2,182,736 | 0.22 | 6.804 | 628 | 363,789 | 76.82 | 81.02 |
| 94565<br>71.23 | 6<br>82.13 | 2,149,302 | 0.22 | 8.285 | 610 | 358,217 | 86.32 | 86.32 |
| Other<br>62.30 | 4,956<br>91.67 | 972,162,123 | 97.40 | 8.163 | 622 | 196,159 | 81.37 | 85.70 |
| TOTAL:<br>61.98% | 5,030<br>91.71% | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% |

</TABLE>

```
================================================================================
================================
</TABLE>
```

### DISTRIBUTION BY REMAINING MONTHS TO MATURITY

```
<TABLE>
<CAPTION>
```

| REMAINING MONTHS TO MATURITY FULL DOC | NUMBER OF LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| \<S\> \<C\> | \<C\> \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> |
| 1 - 180 78.59% | 58 97.11% | $ 6,322,575 | 0.63% | 8.398% | 634 | $109,010 | 76.29% | 76.29% |
| 181 - 240 80.58 | 25 94.98 | 3,047,293 | 0.31 | 7.918 | 619 | 121,892 | 69.96 | 70.56 |
| 241 - 360 61.89 | 4,925 91.64 | 983,837,568 | 98.57 | 8.150 | 622 | 199,764 | 81.45 | 85.87 |
| 421 - 480 46.93 | 22 97.45 | 4,884,107 | 0.49 | 8.392 | 639 | 222,005 | 82.68 | 85.36 |
| TOTAL: 61.98% | 5,030 91.71% | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% |

```
================================================================================
================================
</TABLE>
```

### DISTRIBUTION BY AMORTIZATION TYPE

```
<TABLE>
<CAPTION>
```

| AMORTIZATION TYPE SS. FULL DOC | NUMBER OF LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD PCT. OWNER |
|---|---|---|---|---|---|---|---|---|
| \<S\> \<C\> \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | \<C\> | |
| 2 YR ARM 85.83% 57.65% 86.87% | 870 | $147,581,642 | 14.79% | 8.759% | 607 | $169,634 | 82.22% | |
| 2 YR ARM 40/40 89.23 54.42 96.17 | 16 | 3,249,482 | 0.33 | 8.768 | 605 | 203,093 | 86.22 | |
| 2 YR ARM BALLOON 40/30 84.10 49.88 87.06 | 882 | 217,266,469 | 21.77 | 8.432 | 599 | 246,334 | 80.12 | |
| 2 YR ARM BALLOON 45/30 92.27 77.40 100.00 | 19 | 5,079,185 | 0.51 | 8.159 | 649 | 267,326 | 90.72 | |
| 2 YR ARM BALLOON 50/30 91.20 54.98 94.61 | 319 | 91,967,568 | 9.21 | 7.850 | 633 | 288,300 | 83.72 | |
| 2 YR ARM IO 91.51 64.17 97.59 | 470 | 147,764,668 | 14.80 | 7.573 | 643 | 314,393 | 82.44 | |
| 3 YR ARM 86.18 69.05 88.00 | 183 | 30,866,793 | 3.09 | 8.384 | 605 | 168,671 | 83.48 | |
| 3 YR ARM 40/40 65.00 100.00 100.00 | 1 | 201,500 | 0.02 | 6.200 | 569 | 201,500 | 65.00 | |

```
 3 YR ARM BALLOON  40/30      210     44,210,978   4.43    8.177   609   210,528    82.49
85.25      62.83      85.84
 3 YR ARM BALLOON  50/30       46     11,848,643   1.19    7.476   611   257,579    79.76
85.70      76.35     100.00
 3 YR ARM IO                   73     22,824,028   2.29    7.193   653   312,658    81.95
87.36      57.81      98.13
 40 YR FIXED                    5      1,433,125   0.14    7.848   727   286,625    77.13
79.45      22.48     100.00
 5 YR ARM                      22      3,383,955   0.34    7.850   632   153,816    84.40
85.96      75.73      81.95
 5 YR ARM BALLOON  40/30       10      2,425,789   0.24    6.499   650   242,579    78.70
78.70      74.70     100.00
 5 YR ARM BALLOON  45/30        1        166,968   0.02    8.000   667   166,968   100.00
100.00     100.00     100.00
 5 YR ARM BALLOON  50/30        7      1,693,601   0.17    7.593   614   241,943    83.09
84.24      69.30     100.00
 5 YR ARM IO                   10      2,808,044   0.28    7.579   660   280,804    82.35
92.30      79.58     100.00
 FIXED                      1,439    154,641,440  15.49    8.600   631   107,465    82.23
83.22      71.63      93.00
 FIXED BALLOON 30/15           17        994,012   0.10   12.513   642    58,471    99.18
99.18      95.86     100.00
 FIXED BALLOON 40/30          216     47,305,270   4.74    7.822   622   219,006    73.88
77.03      74.27      92.93
 FIXED BALLOON 45/30            5        646,448   0.06    8.561   645   129,290    98.42
98.42      77.88     100.00
 FIXED BALLOON 50/30          141     37,988,441   3.81    7.106   648   269,422    78.25
80.58      78.81      98.04
 FIXED IO                      68     21,743,494   2.18    6.863   660   319,757    77.77
82.29      78.16      96.89
--------------------------------------------------------------------------------------------
------------------------------
 TOTAL:                     5,030   $998,091,543 100.00%   8.152%  622  $198,428    81.38%
85.76%     61.98%     91.71%
============================================================================================
============================
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                       A-5
<PAGE>

                        DISTRIBUTION BY INITIAL PERIODIC CAP
<TABLE>

<CAPTION>

| INITIAL PCT. PERIODIC PCT. CAP FULL DOC | NUMBER OWNER OF LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% 68.94% | 12 81.45% | $ 2,402,500 | 0.24% | 9.178% | 583 | $200,208 | 78.78% | 79.91% |
| 2.000% 56.83 | 2,746 90.37 | 646,184,875 | 64.74 | 8.199 | 619 | 235,319 | 81.93 | 87.55 |
| 3.000% 64.87 | 378 94.68 | 84,266,124 | 8.44 | 7.879 | 608 | 222,926 | 81.99 | 84.91 |
| 3.200% 100.00 | 1 100.00 | 145,939 | 0.01 | 10.295 | 553 | 145,939 | 87.95 | 87.95 |
| 3.500% 100.00 | 2 100.00 | 339,874 | 0.03 | 6.276 | 686 | 169,937 | 72.19 | 82.55 |
| N/A 73.51 | 1,891 94.11 | 264,752,230 | 26.53 | 8.115 | 635 | 140,006 | 79.88 | 81.74 |
| TOTAL: 61.98% | 5,030 91.71% | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% |

</TABLE>

DISTRIBUTION BY PERIODIC CAP

<TABLE>
<CAPTION>

| PCT. PERIODIC PCT. CAP FULL DOC | NUMBER OWNER OF LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% 61.51% | 949 92.14% | $197,143,403 | 19.75% | 8.288% | 617 | $207,738 | 84.33% | 87.11% |
| 1.500% 56.54 | 2,188 90.36 | 535,508,140 | 53.65 | 8.120 | 617 | 244,748 | 81.04 | 87.25 |
| 2.000% 0.00 | 2 100.00 | 687,770 | 0.07 | 8.145 | 615 | 343,885 | 82.50 | 92.50 |
| N/A 73.51 | 1,891 94.11 | 264,752,230 | 26.53 | 8.115 | 635 | 140,006 | 79.88 | 81.74 |
| TOTAL: 61.98% | 5,030 91.71% | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% |

</TABLE>

DISTRIBUTION BY MONTHS TO RATE RESET

<TABLE>

<CAPTION>

| MONTHS TO RATE RESET FULL DOC | NUMBER OF LOANS OWNER OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIGINAL LTV | WT. AVG. COMBINED CLTV INCLD SS. | PCT. | PCT. |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 13 - 24 | 2,576 | $612,909,014 | 61.41% | 8.216% | 617 | $237,931 | 81.84% | 87.47% | 56.21% | 90.84% |
| 25 - 36 | 513 | 109,951,941 | 11.02 | 7.952 | 617 | 214,331 | 82.33 | 85.96 | 65.06 | 90.55 |
| 49 & Above | 50 | 10,478,357 | 1.05 | 7.426 | 642 | 209,567 | 82.57 | 85.92 | 75.87 | 94.17 |
| N/A | 1,891 | 264,752,230 | 26.53 | 8.115 | 635 | 140,006 | 79.88 | 81.74 | 73.51 | 94.11 |
| TOTAL: | 5,030 | $998,091,543 | 100.00% | 8.152% | 622 | $198,428 | 81.38% | 85.76% | 61.98% | 91.71% |

</TABLE>

DISTRIBUTION BY LIFE MAXIMUM RATE

<TABLE>
<CAPTION>

| LIFE MAXIMUM RATE FULL DOC | NUMBER OF LOANS OWNER OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIGINAL LTV | WT. AVG. COMBINED CLTV INCLD SS. | PCT. | PCT. |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 0.001 - 11.999% | 26 | $ 8,087,938 | 0.81% | 5.806% | 676 | $311,075 | 72.93% | 76.10% | 81.51% | 96.14% |
| 12.000 - 12.499% | 43 | 10,466,428 | 1.05 | 6.225 | 639 | 243,405 | 80.05 | 82.27 | 88.85 | 98.31 |
| 12.500 - 12.999% | 119 | 31,345,413 | 3.14 | 6.412 | 639 | 263,407 | 78.63 | 83.30 | 84.32 | 100.00 |
| 13.000 - 13.499% | 148 | 39,197,580 | 3.93 | 6.738 | 630 | 264,849 | 80.50 | 87.10 | 82.78 | 99.25 |
| 13.500 - 13.999% | 342 | 96,717,007 | 9.69 | 7.103 | 637 | 282,798 | 81.57 | 89.18 | 73.29 | 97.51 |
| 14.000 - 14.499% | 363 | 97,353,423 | 9.75 | 7.523 | 629 | 268,191 | 80.36 | 88.97 | 60.57 | 94.09 |
| 14.500 - 14.999% | 504 | 121,338,930 | 12.16 | 7.970 | 629 | 240,752 | 81.69 | 88.28 | 56.66 | 89.68 |
| 15.000 - 15.499% | 373 | 93,379,731 | 9.36 | 8.425 | 614 | 250,348 | 81.16 | 86.70 | 49.08 | 89.91 |
| 15.500 - 15.999% | 448 | 98,147,228 | 9.83 | 8.906 | 601 | 219,079 | 84.11 | 87.53 | 50.70 | 87.26 |
| 16.000% & Above | 773 | 137,305,635 | 13.76 | 9.929 | 585 | 177,627 | 84.29 | 85.75 | 40.11 | 82.70 |
| N/A | 1,891 | 264,752,230 | 26.53 | 8.115 | 635 | 140,006 | 79.88 | 81.74 | 73.51 | 94.11 |

```
------------------------------
  TOTAL:          5,030  $998,091,543  100.00%    8.152%    622    $198,428    81.38%
85.76%    61.98%    91.71%
================================================================================
============================
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                    A-6
<PAGE>


                             DISTRIBUTION BY MARGIN

<TABLE>
<CAPTION>
```

| MARGIN | PCT. INCLD FULL DOC | PCT. OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV SS. |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 0.001 - 4.999% | 83.40% | 74.22% | 246 | $ 59,947,208 | 6.01% | 6.871% | 636 | $243,688 | 80.15% | 97.87% |
| 5.000 - 5.499% | 86.34 | 57.47 | 112 | 23,928,518 | 2.40 | 7.975 | 616 | 213,647 | 83.72 | 87.59 |
| 5.500 - 5.999% | 88.97 | 63.61 | 582 | 146,923,413 | 14.72 | 7.905 | 627 | 252,446 | 82.43 | 90.40 |
| 6.000 - 6.499% | 88.44 | 55.85 | 1,620 | 385,160,037 | 38.59 | 8.122 | 619 | 237,753 | 81.93 | 89.48 |
| 6.500 - 6.999% | 82.82 | 44.73 | 296 | 67,733,304 | 6.79 | 9.025 | 589 | 228,829 | 80.99 | 91.51 |
| 7.000 - 7.499% | 82.12 | 53.62 | 207 | 37,448,473 | 3.75 | 9.801 | 586 | 180,910 | 81.58 | 95.27 |
| 7.500 - 7.999% | 84.31 | 55.07 | 44 | 7,299,712 | 0.73 | 9.337 | 594 | 165,903 | 83.82 | 97.95 |
| 8.000 - 8.499% | | | 23 | 4,178,210 | 0.42 | 9.881 | 607 | 181,661 | 94.18 | |

```
95.79     60.33     92.19
 8.500 - 8.999%      7       609,273    0.06   10.272   606      87,039   86.24
86.24     31.83     70.34
 9.000 - 9.499%      1        49,983    0.01   11.150   519      49,983   64.94
64.94    100.00      0.00
 9.500% & Above      1        61,181    0.01   11.525   583      61,181   69.94
69.94    100.00      0.00
 N/A             1,891   264,752,230   26.53    8.115   635     140,006   79.88
81.74     73.51     94.11
--------------------------------------------------------------------------------
-----------------------------
 TOTAL:          5,030  $998,091,543  100.00%   8.152%  622    $198,428   81.38%
85.76%    61.98%    91.71%
================================================================================
===============================
</TABLE>
```

                         DISTRIBUTION BY INTEREST ONLY TERM

```
<TABLE>
<CAPTION>
 INTEREST                    PCT. OF   WT. AVG.                    WT. AVG.
  ONLY                       POOL BY   GROSS       WT. AVG.   AVG.     COMBINED   WT. AVG.
  PCT.
   TERM       NUMBER  PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL  ORIGINAL    CLTV
  PCT.        OWNER
  (MONTHS)  OF LOANS  BALANCE    BALANCE     RATE      FICO     BALANCE      LTV     INCLD SS.
  FULL DOC   OCCUPIED
--------------------------------------------------------------------------------
-------------------------------
 <S>          <C>       <C>        <C>        <C>       <C>       <C>        <C>        <C>
 <C>          <C>
 0          4,409   $802,951,309   80.45%    8.322%    616     $182,116    81.27%     84.73%
 61.20%      90.28%
 60           607    190,473,533   19.08     7.436     647      313,795    81.74      89.83
 64.45       97.55
 120           14      4,666,700    0.47     8.024     631      333,336    86.82      97.14
 96.18      100.00
--------------------------------------------------------------------------------
-------------------------------
 TOTAL:      5,030   $998,091,543  100.00%   8.152%    622     $198,428    81.38%     85.76%
 61.98%      91.71%
================================================================================
===============================
</TABLE>
```

                         DISTRIBUTION BY DELINQUENCY (ABS)

```
<TABLE>
<CAPTION>
                             PCT. OF   WT. AVG.                    WT. AVG.   WT.
 AVG.
               NUMBER        POOL BY   GROSS       WT. AVG.   AVG.    COMBINED    CLTV
 PCT.       PCT.
 DELINQUENCY    OF      PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL  ORIGINAL
 INCLD      FULL     OWNER
   (ABS)      LOANS    BALANCE    BALANCE     RATE      FICO     BALANCE      LTV       SS.
 DOC        OCCUPIED
--------------------------------------------------------------------------------
-------------------------------
 <S>          <C>       <C>        <C>        <C>       <C>       <C>        <C>        <C>
 <C>          <C>
 Current    5,093   $1,010,850,494  100.00%   8.164%   622     $198,478    81.37%
 85.81%      61.80%    91.79%
--------------------------------------------------------------------------------
-------------------------------
```

```
-----------------------------
 TOTAL:         5,093   $1,010,850,494  100.00%    8.164%        622    $198,478    81.37%
85.81%    61.80%    91.79%
=====================================================================================
=============================
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.



                                      A-7


<PAGE>



SELECTED MORTGAGE LOAN DATA(1)
------------------------------

                    THE MORTGAGE LOANS - GROUP I

<TABLE>
<S>                                                           <C>
 AGGREGATE SCHEDULED PRINCIPAL BALANCE:(2)                    $507,040,906
 NUMBER OF MORTGAGE LOANS:                                          2,842
 AVERAGE SCHEDULED PRINCIPAL BALANCE:                            $178,410
 WEIGHTED AVERAGE GROSS INTEREST RATE:                            8.223%
 WEIGHTED AVERAGE NET INTEREST RATE:(3)                           7.713%
 WEIGHTED AVERAGE ORIGINAL FICO SCORE:                               613
 WEIGHTED AVERAGE COMBINED ORIGINAL LTV RATIO:(4)                 81.86%
 WEIGHTED AVERAGE COMBINED LTV RATIO WITH SILENT SECONDS:(4)      84.60%
 WEIGHTED AVERAGE STATED REMAINING TERM (MONTHS):                    358
 WEIGHTED AVERAGE SEASONING (MONTHS):                                  1
 WEIGHTED AVERAGE MONTHS TO ROLL:(5)                                  26
 WEIGHTED AVERAGE GROSS MARGIN:(5)                                6.096%
 WEIGHTED AVERAGE INITIAL RATE CAP:(5)                            2.121%
 WEIGHTED AVERAGE PERIODIC RATE CAP:(5)                           1.376%
 WEIGHTED AVERAGE GROSS MAXIMUM LIFETIME RATE:(5)                15.071%
 PERCENTAGE OF MORTGAGE LOANS WITH SILENT SECONDS:(6)             11.57%
 NON-ZERO WEIGHTED AVERAGE DEBT TO INCOME RATIO AT ORIGINATION:   41.79%
 PERCENTAGE OF MORTGAGE LOANS WITH MORTGAGE INSURANCE:            0.00%
</TABLE>

(1)  All percentages calculated herein are percentages of scheduled principal
```

balance as of the statistical calculation date unless otherwise noted.

(2) All percentages calculated in this table are based on scheduled principal
    balances, unless otherwise noted, as of the statistical calculation date
    and are subject to a variance of +/-10%.

(3) The weighted average net interest rate is equal to the weighted average
    gross interest rate less the servicing and master servicing fee rates.

(4) With respect to the second lien mortgage loans, the combined original LTV
    ratio reflects the ratio of the sum of the original principal balance of
    the second lien mortgage loans, plus the original principal balance of the
    related first lien mortgage loan to the original value of the related
    mortgaged property. The combined original LTV ratio with silent seconds
    reflects the ratio of the sum of the original principal balance of the
    second lien mortgage loans, including any second lien mortgage loan not
    included in the mortgage loan pool that is secured by the related mortgaged
    property and originated in connection with the origination of the first
    lien mortgage loan, plus the original principal balance of the related
    first lien mortgage loan, to the original value of the related mortgaged
    property.

(5) Represents the weighted average of the adjustable-rate mortgage loans in
    the mortgage loan pool.

(6) Represents percentage of mortgage loans in the mortgage loan pool as to
    which a second lien mortgage loan secured by the related mortgaged property
    was originated in connection with the origination of the first lien
    mortgage loan and the second lien mortgage loan is not included in the
    mortgage loan pool.

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

A-8

<PAGE>

DISTRIBUTION BY CURRENT PRINCIPAL BALANCE
<TABLE>
<CAPTION>
                                    PCT. OF   WT. AVG.                    WT. AVG.
WT. AVG.

| CURRENT CLTV INCLD PRINCIPAL BALANCE SS. | PCT. FULL DOC | NUMBER PCT. OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | POOL BY PRINCIPAL BALANCE | GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| $ 50,000 & Below 94.51% | 73.39% | 227 98.65% | $ 7,426,513 | 1.46% | 10.750% | 635 | $ 32,716 | 94.51% |
| $ 50,001 - $ 75,000 85.27 | 68.21 | 247 76.60 | 15,794,493 | 3.12 | 9.790 | 611 | 63,945 | 83.56 |
| $ 75,001 - $100,000 83.96 | 69.87 | 266 88.19 | 23,264,772 | 4.59 | 9.066 | 605 | 87,462 | 80.28 |
| $100,001 - $125,000 86.59 | 69.71 | 294 85.59 | 33,255,924 | 6.56 | 8.695 | 604 | 113,115 | 82.28 |
| $125,001 - $150,000 85.75 | 75.27 | 267 92.17 | 36,774,680 | 7.25 | 8.516 | 607 | 137,733 | 81.32 |
| $150,001 - $200,000 84.66 | 67.99 | 507 85.82 | 88,737,808 | 17.50 | 8.278 | 610 | 175,025 | 81.72 |
| $200,001 - $250,000 84.62 | 61.37 | 378 87.91 | 84,732,364 | 16.71 | 8.043 | 613 | 224,160 | 81.83 |
| $250,001 - $300,000 83.95 | 63.84 | 249 90.96 | 67,974,410 | 13.41 | 8.020 | 606 | 272,990 | 82.25 |
| $300,001 - $350,000 83.77 | 57.78 | 183 87.84 | 59,604,173 | 11.76 | 7.845 | 622 | 325,706 | 81.36 |
| $350,001 - $400,000 84.18 | 66.64 | 158 90.60 | 59,064,056 | 11.65 | 7.740 | 616 | 373,823 | 81.71 |
| $400,001 - $450,000 83.85 | 49.91 | 36 97.00 | 14,881,984 | 2.94 | 7.828 | 629 | 413,388 | 81.12 |
| $450,001 - $500,000 82.83 | 52.56 | 19 78.99 | 9,151,836 | 1.80 | 7.464 | 642 | 481,676 | 79.48 |
| $500,001 - $550,000 76.70 | 24.18 | 4 75.48 | 2,080,249 | 0.41 | 7.319 | 611 | 520,062 | 76.70 |
| $550,001 - $600,000 75.07 | 0.00 | 5 80.48 | 2,914,317 | 0.57 | 8.672 | 622 | 582,863 | 75.07 |
| $600,001 & Above 90.15 | 51.51 | 2 100.00 | 1,383,328 | 0.27 | 7.711 | 688 | 691,664 | 90.15 |
| TOTAL: 84.60% | 64.36% | 2,842 88.28% | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% |

```
===================================================================================
</TABLE>
```

DISTRIBUTION BY CURRENT RATE

```
<TABLE>
<CAPTION>
```

| CURRENT RATE DOC | PCT. FULL PCT. OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | WT. AVG. AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5.000 - 5.499% 0.00% | 100.00% | 1 | $ 175,898 | 0.03% | 5.475% | 727 | $175,898 | 80.00% | 100.00% |

| | Number of Loans | Principal Balance | Pct. of Pool | WT Avg Gross Interest Rate | WT Avg Orig FICO | Avg Principal Balance | WT Avg Combined Orig LTV | WT Avg CLTV Incl SS | Pct Full Doc | Pct Owner Occupied |
|---|---|---|---|---|---|---|---|---|---|---|
| 5.500 - 5.999% | 26 | 7,523,736 | 1.48 | 5.806 | 660 | 289,374 | 76.67 | 80.19 | 78.94 | 100.00 |
| 6.000 - 6.499% | 127 | 32,166,328 | 6.34 | 6.273 | 660 | 253,278 | 79.33 | 81.87 | 86.45 | 96.84 |
| 6.500 - 6.999% | 274 | 65,545,169 | 12.93 | 6.768 | 643 | 239,216 | 79.23 | 83.59 | 76.54 | 96.22 |
| 7.000 - 7.499% | 241 | 52,726,910 | 10.40 | 7.255 | 626 | 218,784 | 79.71 | 84.81 | 75.10 | 95.62 |
| 7.500 - 7.999% | 401 | 80,013,635 | 15.78 | 7.771 | 621 | 199,535 | 82.37 | 86.23 | 69.57 | 89.60 |
| 8.000 - 8.499% | 322 | 63,777,033 | 12.58 | 8.262 | 612 | 198,065 | 81.27 | 83.68 | 58.97 | 86.73 |
| 8.500 - 8.999% | 414 | 73,320,771 | 14.46 | 8.735 | 596 | 177,103 | 83.39 | 85.12 | 59.10 | 82.23 |
| 9.000 - 9.499% | 242 | 40,339,508 | 7.96 | 9.257 | 587 | 166,692 | 83.26 | 84.72 | 54.03 | 81.63 |
| 9.500 - 9.999% | 342 | 50,707,930 | 10.00 | 9.730 | 581 | 148,269 | 84.19 | 85.08 | 52.63 | 80.88 |
| 10.000% & Above | 452 | 40,743,990 | 8.04 | 10.826 | 586 | 90,142 | 84.72 | 85.50 | 43.49 | 83.51 |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% | 64.36% | 88.28% |

</TABLE>

DISTRIBUTION BY CREDIT SCORE

<TABLE>
<CAPTION>

| CREDIT SCORE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 740 & Above | 54 | $ 10,134,251 | 2.00% | 7.571% | 769 | $187,671 | 80.83% | 85.19% | 47.39% | 57.44% |
| 720 - 739 | 39 | 7,224,627 | 1.42 | 7.277 | 729 | 185,247 | 82.68 | 87.78 | 46.12 | 80.48 |
| 700 - 719 | 72 | 14,665,047 | 2.89 | 7.530 | 711 | 203,681 | 83.12 | 88.85 | 51.95 | 79.18 |
| 680 - 699 | 127 | 23,025,147 | 4.54 | 7.682 | 688 | 181,300 | 83.57 | 87.90 | 50.21 | 76.19 |
| 660 - 679 | 235 | 39,927,561 | 7.87 | 7.794 | 668 | 169,905 | 84.16 | 87.71 | 50.40 | 75.42 |
| 640 - 659 | 358 | 61,744,580 | 12.18 | 7.695 | 649 | 172,471 | 83.18 | 89.15 | 60.98 | 83.57 |
| 620 - 639 | 400 | 70,713,775 | 13.95 | 7.920 | 629 | 176,784 | 84.41 | 87.85 | 71.36 | 86.70 |
| 600 - 619 | 485 | 84,964,918 | 16.76 | 8.190 | 610 | 175,185 | 83.00 | 86.38 | 70.30 | 90.21 |
| 580 - 599 | 309 | 60,468,582 | 11.93 | 8.371 | 589 | 195,691 | 82.91 | 83.14 | 69.00 | 93.17 |
| 560 - 579 | 201 | 36,737,203 | 7.25 | 8.592 | 570 | 182,772 | 79.72 | 80.35 | 61.50 | 96.69 |
| 540 - 559 | 227 | 39,616,864 | 7.81 | 8.872 | 551 | 174,524 | 78.07 | 78.60 | 63.48 | 96.53 |
| 520 - 539 | 174 | 29,542,642 | 5.83 | 9.161 | 530 | 169,785 | 75.50 | 75.88 | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 64.65 | 97.80 | | | | | | | |
| 500 - 519 | 161 | 28,275,710 | 5.58 | 9.438 | 510 | 175,626 | 76.55 | 77.11 |
| 79.47 | 99.56 | | | | | | | |
| ---- | | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% |
| 64.36% | 88.28% | | | | | | | |

=======================================================================================================
=============================
</TABLE>


This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                    A-9

<PAGE>


                        DISTRIBUTION BY LIEN
<TABLE>
<CAPTION>

| | NUMBER | | PCT. OF POOL BY | WT. AVG. GROSS | WT. AVG. | AVG. | WT. AVG. COMBINED | WT AVG. CLTV |
|---|---|---|---|---|---|---|---|---|
| PCT. FULL DOC | PCT. OF OWNER OCCUPIED | | PRINCIPAL | PRINCIPAL | INTEREST | PRINCIPAL | ORIGINAL | INCLD |
| LIEN | LOANS | BALANCE | BALANCE | RATE | FICO | BALANCE | LTV | SS. |
| ---- | | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | | | | | | | |
| 1 | 2,612 | $499,030,866 | 98.42% | 8.178% | 613 | $191,053 | 81.58% | 84.37% |
| 64.30% | 88.09% | | | | | | | |
| 2 | 230 | 8,010,041 | 1.58 | 11.056 | 648 | 34,826 | 99.38 | 99.38 |
| 67.84 | 100.00 | | | | | | | |
| ---- | | ---- | ---- | ---- | ---- | ---- | ---- | ---- |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% |
| 64.36% | 88.28% | | | | | | | |

=======================================================================================================
=============================
</TABLE>

DISTRIBUTION BY COMBINED ORIGINAL LTV

```
<TABLE>
<CAPTION>
                                         PCT. OF    WT. AVG.                            WT AVG.    WT.
AVG.
                        NUMBER           POOL BY    GROSS      WT. AVG.    AVG.         COMBINED   CLTV
PCT.       PCT.
  COMBINED    OF        PRINCIPAL        PRINCIPAL  INTEREST   ORIGINAL    PRINCIPAL    ORIGINAL   INCLD
FULL       OWNER
  ORIGINAL LTV  LOANS   BALANCE          BALANCE    RATE       FICO        BALANCE      LTV        SS.
DOC        OCCUPIED
-------------------------------------------------------------------------------------------------------
-----------------------------
<S>                   <C>     <C>         <C>        <C>        <C>        <C>          <C>        <C>
<C>        <C>
 60.00% & Below       186     $30,864,450 6.09%      7.925%     606        $165,938     49.28%
49.48%     39.80%    86.03%
 60.01 -  70.00%      192     40,253,300  7.94       8.231      592        209,653      66.69      66.99
32.10      88.91
 70.01 -  80.00%      856     162,247,979 32.00      7.957      614        189,542      78.46      86.53
64.78      90.89
 80.01 -  85.00%      446     90,833,841  17.91      8.169      592        203,663      84.32      84.88
73.05      93.34
 85.01 -  90.00%      538     103,826,768 20.48      8.322      626        192,987      89.52      89.63
63.29      77.34
 90.01 -  95.00%      275     52,354,025  10.33      8.350      629        190,378      94.63      94.64
83.38      90.07
 95.01 - 100.00%      349     26,660,544  5.26       9.729      644        76,391       99.88      99.88
76.10      95.89
-------------------------------------------------------------------------------------------------------
-----------------------------
 TOTAL:               2,842   $507,040,906 100.00%   8.223%     613        $178,410     81.86%
84.60%     64.36%    88.28%
=======================================================================================================
=============================
</TABLE>
```

DISTRIBUTION BY COMBINED ORIGINAL LTV WITH SILENT SECONDS

```
<TABLE>
<CAPTION>
  COMBINED
  ORIGINAL                               PCT. OF    WT. AVG.                            WT. AVG.   WT.
AVG.
  LTV WITH     NUMBER                    POOL BY    GROSS      WT. AVG.    AVG.         COMBINED
CLTV       PCT.      PCT.
  SILENT       OF        PRINCIPAL       PRINCIPAL  INTEREST   ORIGINAL    PRINCIPAL    ORIGINAL
INCLD      FULL      OWNER
  SECONDS      LOANS     BALANCE         BALANCE    RATE       FICO        BALANCE      LTV
SS.        DOC       OCCUPIED
-------------------------------------------------------------------------------------------------------
-----------------------------
<S>                   <C>     <C>         <C>        <C>        <C>        <C>          <C>        <C>
<C>        <C>
 60.00% & Below       185     $ 30,689,450 6.05%     7.925%     606        $165,889     49.24%
49.34%     39.45%    86.52%
 60.01 -  70.00%      188     39,522,688  7.79       8.231      591        210,227      66.65
66.69      32.46     89.57
 70.01 -  80.00%      487     95,476,004  18.83      8.189      590        196,049      77.47
77.54      60.86     92.46
 80.01 -  85.00%      421     87,402,216  17.24      8.155      591        207,606      84.21
```

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 84.27 | 72.69 | 92.97 | | | | | | |
| 85.01 - 90.00% | 531 | 103,055,310 | 20.32 | 8.318 | 626 | 194,078 | 89.41 | |
| 89.52 | 63.24 | 77.55 | | | | | | |
| 90.01 - 95.00% | 322 | 61,057,759 | 12.04 | 8.295 | 628 | 189,620 | 92.70 | |
| 94.64 | 82.02 | 88.60 | | | | | | |
| 95.01 - 100.00% | 708 | 89,837,479 | 17.72 | 8.268 | 647 | 126,889 | 86.06 | |
| 99.91 | 71.78 | 91.39 | | | | | | |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | |
| 84.60% | 64.36% | 88.28% | | | | | | |

</TABLE>

DISTRIBUTION BY DOCUMENTATION

<TABLE>
<CAPTION>

| FULL DOCUMENTATION | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. | FULL DOC | OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Full Doc | 1,904 | $326,315,858 | 64.36% | 7.996% | 608 | $171,384 | 83.83% | 86.81% | 100.00% | 94.09% |
| Stated Doc | 894 | 172,496,617 | 34.02 | 8.657 | 622 | 192,949 | 78.08 | 80.35 | 0.00 | 77.34 |
| Limited Doc | 42 | 8,023,431 | 1.58 | 8.144 | 614 | 191,034 | 83.21 | 86.62 | 0.00 | 87.70 |
| No Doc | 2 | 205,000 | 0.04 | 9.015 | 681 | 102,500 | 69.41 | 69.41 | 0.00 | 66.83 |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% | 64.36% | 88.28% |

</TABLE>

DISTRIBUTION BY PURPOSE

<TABLE>
<CAPTION>

| PURPOSE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. CLTV INCLD SS. | FULL DOC | OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Cashout Refi | 1,676 | $333,603,517 | 65.79% | 8.159% | 606 | $199,047 | 80.26% | 80.80% | 63.01% | 91.59% |

```
 Purchase          761    89,735,419   17.70    8.815     634    117,918   86.24
94.26    58.79     67.72
 Rate/term Refi    405    83,701,971   16.51    7.848     621    206,672   83.54
89.40    75.70     97.13
  --------------------------------------------------------------------------------
  ----------------------------
 TOTAL:           2,842  $507,040,906  100.00%  8.223%    613   $178,410   81.86%
84.60%   64.36%    88.28%
  ================================================================================
  ==============================
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.


                                    A-10



<PAGE>


                         DISTRIBUTION BY OCCUPANCY


<TABLE>
<CAPTION>
```

| INCLD DOC | FULL DOC | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV SS. | PCT. OWNER OCCUPIED | PCT. FULL OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|---|
| <S> | | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Owner Occupied | | 2,502 | $447,604,212 | 88.28% | 8.145% | 608 | $178,899 | 81.79% | 84.54% | 68.59% | 100.00% |
| Investor | | 262 | 45,335,023 | 8.94 | 8.973 | 651 | 173,034 | 83.10 | 83.49 | 33.40 | 0.00 |

```
 Second Home       78    14,101,671    2.78    8.307    656    180,791    80.02
90.33    29.41       0.00
-----------------------------------------------------------------------------
-----------------------------
 TOTAL:          2,842   $507,040,906  100.00%  8.223%   613   $178,410   81.86%
84.60%   64.36%      88.28%
=============================================================================
=============================
</TABLE>
```

DISTRIBUTION BY PROPERTY TYPE

```
<TABLE>
<CAPTION>
```

| PROPERTY TYPE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT AVG. GROSS INTEREST RATE | WT AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Single Family | 2,192 | $367,900,211 | 72.56% | 8.236% | 610 | $167,838 | 81.89% | | 84.45% | 66.41% 91.03% |
| PUD | 315 | 65,695,703 | 12.96 | 8.084 | 614 | 208,558 | 83.60 | 87.20 | 69.26 | 88.57 |
| 2 Family | 125 | 29,256,402 | 5.77 | 7.848 | 625 | 234,051 | 77.64 | 80.93 | 53.18 | 83.35 |
| Condo | 154 | 27,504,652 | 5.42 | 8.450 | 622 | 178,602 | 82.78 | 86.58 | 52.31 | 75.80 |
| 3-4 Family | 52 | 16,249,057 | 3.20 | 8.792 | 636 | 312,482 | 80.10 | 80.78 | 38.05 | 54.82 |
| Townhouse | 4 | 434,882 | 0.09 | 8.292 | 616 | 108,720 | 85.77 | 85.77 | 83.91 | 83.91 |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | | 84.60% | 64.36% 88.28% |

```
</TABLE>
```

DISTRIBUTION BY STATE

```
<TABLE>
<CAPTION>
```

| STATE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| CA | 360 | $105,564,056 | 20.82% | 7.827% | 617 | $293,233 | 79.18% | 81.10% | | |

| STATE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL | WT. AVG. GROSS INT. RATE | AVG. FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIG. LTV | WT. AVG. CLTV | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 53.52% | 87.21% |
| FL | 299 | 54,832,891 | 10.81 | 8.048 | 613 | 183,388 | 79.61 | 81.48 | 54.83 | 84.37 |
| NY | 107 | 28,016,375 | 5.53 | 7.733 | 618 | 261,835 | 77.10 | 80.70 | 60.92 | 91.53 |
| TX | 235 | 22,890,366 | 4.51 | 8.691 | 609 | 97,406 | 81.92 | 85.18 | 64.26 | 84.17 |
| MD | 105 | 22,221,127 | 4.38 | 8.175 | 602 | 211,630 | 80.78 | 83.39 | 72.79 | 96.77 |
| NJ | 87 | 20,805,264 | 4.10 | 8.454 | 607 | 239,141 | 78.72 | 80.77 | 59.13 | 91.38 |
| IL | 116 | 20,595,185 | 4.06 | 8.282 | 617 | 177,545 | 84.26 | 87.66 | 74.46 | 89.77 |
| AZ | 110 | 19,229,348 | 3.79 | 7.901 | 619 | 174,812 | 81.83 | 85.39 | 61.78 | 87.69 |
| VA | 94 | 17,739,282 | 3.50 | 8.194 | 619 | 188,716 | 85.50 | 88.55 | 73.38 | 86.76 |
| GA | 105 | 15,369,348 | 3.03 | 8.901 | 621 | 146,375 | 87.11 | 89.80 | 65.20 | 77.03 |
| Other | 1,224 | 179,777,665 | 35.46 | 8.479 | 611 | 146,877 | 84.27 | 87.47 | 71.89 | 89.70 |
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% | 64.36% | 88.28% |

```
==================================================================================
==============================
</TABLE>
```

DISTRIBUTION BY ZIP

```
<TABLE>
<CAPTION>
```

| ZIP (PCT. FULL DOC) | NUMBER OF LOANS (PCT. OWNER OCCUPIED) | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| `<S>` `<C>` | `<C>` `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| 11208 | 4 | $ 1,788,432 | 0.35% | 6.529% | 646 | $447,108 | 80.02% | 85.15% |
| 100.00% | 100.00% | | | | | | | |
| 93536 | 5 | 1,645,717 | 0.32 | 7.506 | 607 | 329,143 | 84.87 | 88.82 |
| 58.24 | 100.00 | | | | | | | |
| 92571 | 6 | 1,635,862 | 0.32 | 7.950 | 634 | 272,644 | 77.74 | 81.65 |
| 38.25 | 79.92 | | | | | | | |
| 90650 | 4 | 1,538,852 | 0.30 | 8.444 | 590 | 384,713 | 83.21 | 83.21 |
| 24.43 | 100.00 | | | | | | | |
| 93550 | 5 | 1,475,417 | 0.29 | 7.164 | 640 | 295,083 | 81.23 | 84.85 |
| 22.63 | 67.09 | | | | | | | |
| 92336 | 4 | 1,410,770 | 0.28 | 6.990 | 656 | 352,692 | 76.32 | 76.32 |
| 76.62 | 76.62 | | | | | | | |
| 60402 | 6 | 1,295,644 | 0.26 | 7.879 | 622 | 215,941 | 85.92 | 88.65 |
| 61.01 | 100.00 | | | | | | | |
| 22193 | 4 | 1,277,929 | 0.25 | 7.975 | 581 | 319,482 | 87.02 | 87.02 |
| 45.82 | 100.00 | | | | | | | |
| 90059 | 4 | 1,269,717 | 0.25 | 7.007 | 608 | 317,429 | 69.88 | 69.88 |
| 26.09 | 76.02 | | | | | | | |
| 11203 | 3 | 1,254,803 | 0.25 | 6.856 | 635 | 418,268 | 76.23 | 81.84 |
| 36.24 | 100.00 | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Other | 2,797 | 492,447,763 | 97.12 | 8.247 | 613 | 176,063 | 81.91 | 84.65 |
| 64.78 | 88.22 | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TOTAL: | 2,842 | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% |
| 64.36% | 88.28% | | | | | | | |

</TABLE>

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.


                                    A-11


<PAGE>


                    DISTRIBUTION BY REMAINING MONTHS TO MATURITY

<TABLE>
<CAPTION>

| REMAINING MONTHS TO MATURITY FULL DOC | NUMBER OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIGINAL LTV | WT. AVG. COMBINED CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | | | | | | | |
| 1 - 180 | 31 | $  3,327,825 | 0.66% | 8.026% | 620 | $107,349 | 77.83% | 77.83% |
| 64.54% | 94.50% | | | | | | | |
| 181 - 240 | 18 | 2,191,258 | 0.43 | 8.021 | 628 | 121,737 | 73.82 | 74.66 |
| 73.00 | 100.00 | | | | | | | |
| 241 - 360 | 2,784 | 499,672,629 | 98.55 | 8.223 | 613 | 179,480 | 81.90 | 84.67 |
| 64.40 | 88.14 | | | | | | | |

```
 421 - 480       9     1,849,194      0.36     9.071     610      205,466     88.78      90.86
41.44    100.00
```

```
 TOTAL:      2,842  $507,040,906    100.00%    8.223%     613     $178,410    81.86%     84.60%
64.36%    88.28%
```

</TABLE>

DISTRIBUTION BY AMORTIZATION TYPE

<TABLE>
<CAPTION>

| AMORTIZATION TYPE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 2 YR ARM | 539 | $ 84,380,970 | 16.64% | 8.868% | 599 | $156,551 | 82.65% | 85.22% | 60.47% | 81.73% |
| 2 YR ARM 40/40 | 8 | 1,780,194 | 0.35 | 9.126 | 609 | 222,524 | 90.06 | 92.22 | 39.17 | 100.00 |
| 2 YR ARM BALLOON 40/30 | 567 | 121,476,676 | 23.96 | 8.570 | 591 | 214,245 | 80.46 | 82.42 | 53.02 | 80.40 |
| 2 YR ARM BALLOON 45/30 | 15 | 2,734,185 | 0.54 | 8.123 | 639 | 182,279 | 93.80 | 96.67 | 100.00 | 100.00 |
| 2 YR ARM BALLOON 50/30 | 158 | 34,128,726 | 6.73 | 7.808 | 624 | 216,005 | 83.64 | 89.28 | 61.20 | 92.86 |
| 2 YR ARM IO | 218 | 53,464,049 | 10.54 | 7.510 | 636 | 245,248 | 82.98 | 89.12 | 78.52 | 96.26 |
| 3 YR ARM | 113 | 18,345,599 | 3.62 | 8.375 | 603 | 162,350 | 84.70 | 87.09 | 68.32 | 89.09 |
| 3 YR ARM BALLOON 40/30 | 158 | 31,606,491 | 6.23 | 8.318 | 616 | 200,041 | 84.80 | 87.31 | 55.46 | 82.56 |
| 3 YR ARM BALLOON 50/30 | 28 | 6,320,878 | 1.25 | 7.452 | 621 | 225,746 | 82.61 | 85.44 | 70.74 | 100.00 |
| 3 YR ARM IO | 41 | 10,361,614 | 2.04 | 7.340 | 644 | 252,722 | 84.35 | 89.51 | 59.49 | 98.15 |
| 40 YR FIXED | 1 | 69,000 | 0.01 | 7.650 | 637 | 69,000 | 55.78 | 55.78 | 100.00 | 100.00 |
| 5 YR ARM | 10 | 1,627,683 | 0.32 | 8.143 | 645 | 162,768 | 87.04 | 88.40 | 70.08 | 86.82 |
| 5 YR ARM BALLOON 40/30 | 5 | 1,186,667 | 0.23 | 6.507 | 657 | 237,333 | 81.73 | 81.73 | 48.28 | 100.00 |
| 5 YR ARM BALLOON 45/30 | 1 | 166,968 | 0.03 | 8.000 | 667 | 166,968 | 100.00 | 100.00 | 100.00 | 100.00 |
| 5 YR ARM BALLOON 50/30 | 2 | 357,706 | 0.07 | 7.905 | 609 | 178,853 | 89.83 | 89.83 | 100.00 | 100.00 |
| 5 YR ARM IO | 4 | 817,000 | 0.16 | 7.312 | 652 | 204,250 | 86.54 | 89.78 | 71.82 | 100.00 |
| FIXED | 683 | 77,802,172 | 15.34 | 8.316 | 624 | 113,912 | 81.28 | 82.33 | 71.62 | 93.51 |
| FIXED BALLOON 30/15 | 10 | 280,631 | 0.06 | 12.375 | 629 | 28,063 | 99.73 | 99.73 | 100.00 | 100.00 |
| FIXED BALLOON 40/30 | 143 | 27,000,666 | 5.33 | 8.046 | 607 | 188,816 | 77.16 | 79.25 | 72.65 | 91.10 |

```
 FIXED BALLOON 45/30          5        646,448      0.13      8.561      645    129,290   98.42
 98.42     77.88      100.00
 FIXED BALLOON 50/30         97     23,099,605      4.56      7.122      647    238,140   78.60
 80.99     77.51       98.29
 FIXED IO                    36      9,386,977      1.85      6.905      659    260,749   79.19
 80.37     74.20      100.00
 -----------------------------------------------------------------------------------------------
 -----------------------------------
 TOTAL:                    2,842   $507,040,906  100.00%     8.223%      613   $178,410   81.86%
 84.60%    64.36%     88.28%
 ===============================================================================================
 ===================================
```

</TABLE>


                    DISTRIBUTION BY INITIAL PERIODIC CAP


<TABLE>
<CAPTION>

| INITIAL PCT. PERIODIC FULL CAP DOC | NUMBER PCT. OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% 63.58% | 10 78.24% | $ 2,048,965 | 0.40% | 8.956% | 584 | $204,896 | 80.67% | 80.67% |
| 2.000% 60.98 | 1,624 84.77 | 320,294,835 | 63.17 | 8.368 | 608 | 197,226 | 82.23 | 85.63 |
| 3.000% 61.42 | 231 94.89 | 46,089,700 | 9.09 | 7.921 | 607 | 199,523 | 84.95 | 86.94 |
| 3.200% 100.00 | 1 100.00 | 145,939 | 0.03 | 10.295 | 553 | 145,939 | 87.95 | 87.95 |
| 3.500% 100.00 | 1 100.00 | 175,967 | 0.03 | 6.975 | 691 | 175,967 | 80.00 | 100.00 |
| N/A 73.08 | 975 94.33 | 138,285,500 | 27.27 | 7.977 | 627 | 141,831 | 79.99 | 81.47 |
| TOTAL: 64.36% | 2,842 88.28% | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | 84.60% |

</TABLE>


This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior

information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

A-12

<PAGE>

## DISTRIBUTION BY PERIODIC CAP

<TABLE>
<CAPTION>

| WT. AVG. CLTV PERIODIC INCLD CAP SS. | PCT. FULL DOC | PCT. OF OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | WT. AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% 88.90% | 63.88% | 491 92.62% | | $91,634,477 | 18.07% | 8.268% | 616 | $186,628 | 86.42% |
| 1.500% 84.75 | 60.24 | 1,375 83.80 | | 276,776,979 | 54.59 | 8.332 | 605 | 201,292 | 81.28 |
| 2.000% 85.00 | 0.00 | 1 100.00 | | 343,951 | 0.07 | 7.990 | 567 | 343,951 | 85.00 |
| N/A 81.47 | 73.08 | 975 94.33 | | 138,285,500 | 27.27 | 7.977 | 627 | 141,831 | 79.99 |
| TOTAL: 84.60% | 64.36% | 2,842 88.28% | | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% |

</TABLE>

## DISTRIBUTION BY MONTHS TO RATE RESET

<TABLE>
<CAPTION>

| WT. AVG. MONTHS CLTV TO RATE INCLD RESET SS. | PCT. FULL DOC | PCT. OF OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | WT. AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 13 - 24 | | 1,505 | | $297,964,800 | 58.77% | 8.376% | 605 | $197,983 | 82.08% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 85.39% | 60.99% | 85.34% | | | | | |
| 25 - 36 | | 340 | 66,634,583 | 13.14 | 8.099 | 617 | 195,984 | 84.50 |
| 87.42 | 61.07 | 88.44 | | | | | |
| 49 & Above | | 22 | 4,156,024 | 0.82 | 7.486 | 647 | 188,910 | 86.19 |
| 87.36 | 67.98 | 94.84 | | | | | |
| N/A | | 975 | 138,285,500 | 27.27 | 7.977 | 627 | 141,831 | 79.99 |
| 81.47 | 73.08 | 94.33 | | | | | |

```
--------  ------   --------     ------------   ---------   --------   --------   ---------  --------  --
-----     ------   --------
TOTAL:             2,842        $507,040,906   100.00%     8.223%     613        $178,410   81.86%
84.60%    64.36%   88.28%
========  ======   ========     ============   =========   ========   ========   =========  ========
=======   ======   ========
</TABLE>
```

### DISTRIBUTION BY LIFE MAXIMUM RATE

```
<TABLE>
<CAPTION>
```

| | | | PCT. OF | WT. AVG. | | | WT. AVG. |
|---|---|---|---|---|---|---|---|
| | | NUMBER | POOL BY | GROSS | WT. AVG. | AVG. | COMBINED |
| CLTV | PCT. | PCT. OF | | | | | |
| WT. AVG. | | | | | | | |
| LIFE MAXIMUM | FULL | OWNER | PRINCIPAL | PRINCIPAL | INTEREST | ORIGINAL | PRINCIPAL | ORIGINAL |
| INCLD | DOC | LOANS | BALANCE | BALANCE | RATE | FICO | BALANCE | LTV |
| RATE | | OCCUPIED | | | | | |
| SS. | | | | | | | |

```
----------------  ------   --------     ------------   ---------   --------   --------   ---------  --------  --
-----     ------   --------
<S>               <C>      <C>          <C>            <C>         <C>        <C>        <C>        <C>
<C>       <C>      <C>
```

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0.001 - 11.999% | | 9 | $2,525,795 | 0.50% | 5.864% | 689 | 280,644 | 78.49% |
| 83.46% | 40.79% | 100.00% | | | | | |
| 12.000 - 12.499% | | 25 | 6,411,886 | 1.26 | 6.226 | 654 | 256,475 | 85.58 |
| 88.79 | 81.80 | 97.25 | | | | | |
| 12.500 - 12.999% | | 56 | 13,362,903 | 2.64 | 6.453 | 638 | 238,623 | 80.11 |
| 83.97 | 86.58 | 100.00 | | | | | |
| 13.000 - 13.499% | | 69 | 16,841,816 | 3.32 | 6.734 | 629 | 244,084 | 83.50 |
| 87.43 | 83.01 | 99.41 | | | | | |
| 13.500 - 13.999% | | 177 | 41,496,384 | 8.18 | 7.140 | 629 | 234,443 | 82.71 |
| 88.37 | 73.37 | 95.40 | | | | | |
| 14.000 - 14.499% | | 187 | 41,471,389 | 8.18 | 7.556 | 624 | 221,772 | 81.26 |
| 87.05 | 70.65 | 91.64 | | | | | |
| 14.500 - 14.999% | | 281 | 57,212,869 | 11.28 | 7.976 | 618 | 203,605 | 82.79 |
| 87.01 | 66.73 | 86.26 | | | | | |
| 15.000 - 15.499% | | 219 | 45,793,338 | 9.03 | 8.450 | 607 | 209,102 | 80.83 |
| 83.43 | 53.13 | 84.32 | | | | | |
| 15.500 - 15.999% | | 303 | 57,406,979 | 11.32 | 8.878 | 595 | 189,462 | 83.67 |
| 85.52 | 55.13 | 79.89 | | | | | |
| 16.000% & Above | | 541 | 86,232,048 | 17.01 | 9.852 | 579 | 159,394 | 83.24 |
| 84.32 | 45.84 | 77.56 | | | | | |
| N/A | | 975 | 138,285,500 | 27.27 | 7.977 | 627 | 141,831 | 79.99 |
| 81.47 | 73.08 | 94.33 | | | | | |

```
----------------  ------   --------     ------------   ---------   --------   --------   ---------  --------  --
-----     ------   --------
TOTAL:             2,842        $507,040,906   100.00%     8.223%     613        $178,410   81.86%
84.60%    64.36%   88.28%
================  ======   ========     ============   =========   ========   ========   =========  ========
=======   ======   ========
</TABLE>
```

### DISTRIBUTION BY MARGIN

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

```
<TABLE>
<CAPTION>

                                              PCT. OF    WT. AVG.                           WT. AVG.
WT. AVG.
                        NUMBER                POOL BY    GROSS      WT. AVG.    AVG.        COMBINED
CLTV      PCT.    PCT.
          FULL    OF      PRINCIPAL PRINCIPAL INTEREST   ORIGINAL   PRINCIPAL  ORIGINAL
INCLD             OWNER
  MARGIN          LOANS   BALANCE   BALANCE    RATE       FICO       BALANCE    LTV
SS.       DOC     OCCUPIED
--------------  ------  --------
----      ------  --------
<S>              <C>     <C>        <C>        <C>        <C>        <C>        <C>         <C>
<C>       <C>
0.001 - 4.999%   107     $24,767,802   4.88%   6.815%     647        $231,475   84.21%
88.64%    71.96%  98.51%
5.000 - 5.499%   60      12,769,999    2.52    8.080      617        212,833    85.95
86.68     53.10   88.03
5.500 - 5.999%   334     70,109,365    13.83   8.035      617        209,908    82.76
86.99     65.48   86.16
6.000 - 6.499%   1,002   197,785,213   39.01   8.300      609        197,390    82.46
86.13     61.58   82.68
6.500 - 6.999%   194     37,889,417    7.47    9.090      577        195,306    80.62
81.51     50.71   88.86
7.000 - 7.499%   114     18,277,002    3.60    9.650      578        160,325    79.90
80.37     50.59   95.08
7.500 - 7.999%   35      4,771,035     0.94    9.398      585        136,315    85.72
86.48     59.06   96.86
8.000 - 8.499%   15      1,830,181     0.36    10.027     603        122,012    96.36
96.36     84.42   82.17
8.500 - 8.999%   6       555,393       0.11    10.221     613        92,566     88.07
88.07     25.21   77.16
N/A              975     138,285,500   27.27   7.977      627        141,831    79.99
81.47     73.08   94.33
--------------  ------  --------      ---------  --------  --------  ---------  --------  --
-----     ------  --------
TOTAL:           2,842   $507,040,906  100.00%  8.223%     613        $178,410   81.86%
84.60%    64.36%  88.28%
==============  ======  ============  =========  ========  ========  =========  ========
=======   ======  ========
</TABLE>
```

This material is for your information. This material is not to be construed as an offer to sell or the solicitation of any offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. The information contained in this material may not pertain to any securities that will actually be sold. The information contained in this material may be based on assumptions regarding market conditions and other matters as reflected in this material. We make no representations regarding the reasonableness of such assumptions or the likelihood that any of such assumptions will coincide with actual market conditions or events, and this material should not be relied upon for such purposes. We and our affiliates, officers, directors, partners and employees, including persons involved in the preparation or issuance of this material may, from time to time, have long or short positions in, and buy or sell, the securities mentioned in this material or derivatives of those securities (including options). Information contained in this material is current as of the date appearing on this material only and supersedes all prior information regarding the securities and assets referred to in this material. Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In addition, subject to applicable law, you may disclose any and all aspects of any potential transaction or structure described herein that are necessary to support any U.S. federal income tax benefits, without Goldman, Sachs & Co. imposing any limitation of any kind.

A-13

<PAGE>

## DISTRIBUTION BY INTEREST ONLY TERM

<TABLE>
<CAPTION>

| WT. AVG. INTEREST ONLY TERMS INCLD (MONTHS) SS. | PCT. FULL DOC | NUMBER PCT. OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | |
|---|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 0 84.01% | 62.50% | 2,543 86.78% | $433,011,266 | 85.40% | 8.363% | 608 | $170,276 | 81.71% | |
| 60 87.93 | 74.84 | 292 96.99 | 72,865,740 | 14.37 | 7.394 | 640 | 249,540 | 82.58 | |
| 120 97.02 | 100.00 | 7 100.00 | 1,163,900 | 0.23 | 8.243 | 632 | 166,271 | 92.05 | |
| TOTAL: 84.60% | 64.36% | 2,842 88.28% | $507,040,906 | 100.00% | 8.223% | 613 | $178,410 | 81.86% | |

</TABLE>

## DISTRIBUTION BY DELINQUENCY (ABS)

<TABLE>
<CAPTION>

| WT. AVG. CLTV DELINQUENCY INCLD (ABS) SS. | PCT. FULL DOC | NUMBER PCT. OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | |
|---|---|---|---|---|---|---|---|---|---|
| <S> <C> | <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | |
| Current 84.61% | 64.37% | 2,840 88.27% | $506,558,562 | 100.00% | 8.222% | 613 | $178,366 | 81.86% | |
| TOTAL: 84.61% | 64.37% | 2,840 88.27% | $506,558,562 | 100.00% | 8.222% | 613 | $178,366 | 81.86% | |

</TABLE>

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.


                                A-14



<PAGE>


SELECTED MORTGAGE LOAN DATA(1)
------------------------------


                        THE MORTGAGE LOANS - GROUP II


AGGREGATE SCHEDULED PRINCIPAL BALANCE:(2)                    $491,050,636
NUMBER OF MORTGAGE LOANS:                                           2,188
AVERAGE SCHEDULED PRINCIPAL BALANCE:                            $224,429
WEIGHTED AVERAGE GROSS INTEREST RATE:                             8.077%
WEIGHTED AVERAGE NET INTEREST RATE:(3)                            7.567%
WEIGHTED AVERAGE ORIGINAL FICO SCORE:                                631
WEIGHTED AVERAGE COMBINED ORIGINAL LTV RATIO:(4)                  80.89%
WEIGHTED AVERAGE COMBINED LTV RATIO WITH SILENT SECONDS:(4)       86.96%
WEIGHTED AVERAGE STATED REMAINING TERM (MONTHS):                     359
WEIGHTED AVERAGE SEASONING (MONTHS):                                   1
WEIGHTED AVERAGE MONTHS TO ROLL:(5)                                   25
WEIGHTED AVERAGE GROSS MARGIN:(5)                                 6.014%
WEIGHTED AVERAGE INITIAL RATE CAP:(5)                             2.104%
WEIGHTED AVERAGE PERIODIC RATE CAP:(5)                            1.356%
WEIGHTED AVERAGE GROSS MAXIMUM LIFETIME RATE:(5)                 14.729%
PERCENTAGE OF MORTGAGE LOANS WITH SILENT SECONDS:(6)              25.57%
NON-ZERO WEIGHTED AVERAGE DEBT TO INCOME RATIO AT ORIGINATION:    42.04%
PERCENTAGE OF MORTGAGE LOANS WITH MORTGAGE INSURANCE:             0.00%


(1)  All percentages calculated herein are percentages of scheduled principal
     balance as of the statistical calculation date unless otherwise noted.
(2)  All percentages calculated in this table are based on scheduled principal
     balances, unless otherwise noted, as of the statistical calculation date
     and are subject to a variance of +/-10%.
(3)  The weighted average net interest rate is equal to the weighted average
     gross interest rate less the servicing and master servicing fee rates.
(4)  With respect to the second lien mortgage loans, the combined original LTV
     ratio reflects the ratio of the sum of the original principal balance of
     the second lien mortgage loans, plus the original principal balance of the
     related first lien mortgage loan to the original value of the related

https://www.sec.gov/Archives/edgar/data/807641/000093041307003626/c48011_424b5.txt

mortgaged property. The combined original LTV ratio with silent seconds
reflects the ratio of the sum of the original principal balance of the
second lien mortgage loans, including any second lien mortgage loan not
included in the mortgage loan pool that is secured by the related mortgaged
property and originated in connection with the origination of the first
lien mortgage loan, plus the original principal balance of the related
first lien mortgage loan, to the original value of the related mortgaged
property.

(5) Represents the weighted average of the adjustable-rate mortgage loans in
the mortgage loan pool.

(6) Represents percentage of mortgage loans in the mortgage loan pool as to
which a second lien mortgage loan secured by the related mortgaged property
was originated in connection with the origination of the first lien
mortgage loan and the second lien mortgage loan is not included in the
mortgage loan pool.


This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.


A-15


<PAGE>

                    DISTRIBUTION BY CURRENT PRINCIPAL BALANCE
<TABLE>
<CAPTION>

| SS. | CURRENT PRINCIPAL BALANCE | CLTV DOC | PCT. OF FULL OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| $50,000 & Below | 97.25% | 62.14% | 80.58% | 290 | $9,853,013 | 2.01% | 10.586% | 656 | $33,976 | 97.25% |
| $50,001 - $75,000 | 83.37 | 67.19 | 83.70 | 86 | 11,630,501 | 2.37 | 9.941 | 627 | 62,530 | 82.69 |
| $75,001 - $100,000 | | | | 97 | 17,146,812 | 3.49 | 9.481 | 613 | 87,040 | 81.60 |

| | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 83.84 | 67.64 | 89.81 |
| $100,001 - $125,000 | 154 | 17,363,647 | 3.54 | 9.274 | 617 | 112,751 | 81.09 | 83.14 | 72.11 | 92.11 |
| $125,001 - $150,000 | 156 | 21,431,419 | 4.36 | 8.877 | 614 | 137,381 | 79.67 | 82.90 | 74.43 | 92.17 |
| $150,001 - $200,000 | 268 | 46,885,521 | 9.55 | 8.096 | 622 | 174,946 | 77.52 | 83.28 | 70.23 | 95.57 |
| $200,001 - $250,000 | 206 | 46,016,500 | 9.37 | 7.995 | 616 | 223,381 | 78.15 | 84.76 | 69.38 | 98.14 |
| $250,001 - $300,000 | 114 | 31,608,342 | 6.44 | 7.981 | 621 | 277,266 | 79.62 | 88.14 | 62.12 | 97.34 |
| $300,001 - $350,000 | 106 | 34,204,111 | 6.97 | 7.855 | 631 | 322,680 | 78.31 | 87.71 | 61.42 | 95.13 |
| $350,001 - $400,000 | 83 | 30,767,223 | 6.27 | 7.606 | 646 | 370,689 | 79.90 | 90.35 | 43.33 | 97.42 |
| $400,001 - $450,000 | 138 | 59,321,017 | 12.08 | 7.495 | 630 | 429,862 | 81.78 | 88.27 | 60.89 | 97.80 |
| $450,001 - $500,000 | 112 | 53,209,934 | 10.84 | 7.585 | 623 | 475,089 | 81.02 | 86.89 | 54.43 | 94.60 |
| $500,001 - $550,000 | 56 | 29,472,375 | 6.00 | 7.775 | 650 | 526,292 | 81.88 | 91.10 | 46.41 | 94.69 |
| $550,001 - $600,000 | 38 | 21,892,105 | 4.46 | 7.667 | 654 | 576,108 | 84.08 | 89.83 | 57.75 | 94.67 |
| $600,001 & Above | 84 | 60,248,118 | 12.27 | 8.051 | 650 | 717,239 | 82.77 | 86.89 | 46.61 | 97.44 |
| TOTAL: | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% | 59.53% | 95.26% |

</TABLE>

DISTRIBUTION BY CURRENT RATE

<TABLE>
<CAPTION>

| CURRENT RATE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 5.000 - 5.499% | 3 | $720,100 | 0.15% | 5.294% | 706 | $240,033 | 56.03% | 56.03% | 100.00% | 100.00% |
| 5.500 - 5.999% | 43 | 14,651,198 | 2.98 | 5.801 | 673 | 340,726 | 74.64 | 81.04 | 94.92 | 97.87 |
| 6.000 - 6.499% | 91 | 30,172,389 | 6.14 | 6.263 | 655 | 331,565 | 73.18 | 78.15 | 86.92 | 98.84 |
| 6.500 - 6.999% | 238 | 77,043,740 | 15.69 | 6.758 | 650 | 323,713 | 77.27 | 83.58 | 82.13 | 98.98 |
| 7.000 - 7.499% | 216 | 64,942,885 | 13.23 | 7.279 | 634 | 300,662 | 78.16 | 88.63 | 61.33 | 98.81 |
| 7.500 - 7.999% | 298 | 85,130,894 | 17.34 | 7.748 | 638 | 285,674 | 79.32 | 87.60 | 55.48 | 95.91 |
| 8.000 - 8.499% | 210 | 60,027,692 | 12.22 | 8.240 | 621 | 285,846 | 80.82 | 88.11 | 53.00 | 95.29 |
| 8.500 - 8.999% | 230 | 53,438,345 | 10.88 | 8.744 | 614 | 232,341 | 82.82 | 87.79 | 49.55 | 92.25 |
| 9.000 - 9.499% | 136 | 26,139,921 | 5.32 | 9.227 | 598 | 192,205 | 82.75 | | | |

```
85.15     49.93    94.25
9.500 - 9.999%       253    30,840,880    6.28    9.730    604    121,901    86.97
89.31     40.06    86.21
10.000% & Above      470    47,942,593    9.76   11.109    623    102,006    93.35
93.95     36.36    89.87
--------------   ------   ------------  ---------  --------  --------  ---------  --------
-------  -------  --------
TOTAL:             2,188  $491,050,636   100.00%   8.077%    631   $224,429    80.89%
86.96%    59.53%   95.26%
===============  ======  ============  =========  ========  ========  =========  ========
=======  =======  ========
</TABLE>
```

```
                    DISTRIBUTION BY CREDIT SCORE
<TABLE>
<CAPTION>
                                    PCT. OF     WT. AVG.                             WT. AVG.
WT. AVG.
                         NUMBER     POOL BY      GROSS     WT. AVG.   AVG.       COMBINED
CLTV     PCT.     PCT.
CREDIT            OF     PRINCIPAL  PRINCIPAL   INTEREST   ORIGINAL   PRINCIPAL   ORIGINAL
INCLD    FULL    OWNER
  SCORE          LOANS   BALANCE    BALANCE      RATE        FICO     BALANCE      LTV
SS.      DOC     OCCUPIED
--------------   ------  ------------  ---------  --------  --------  ---------  --------   -
------   ------  --------
<S>                      <C>         <C>        <C>        <C>        <C>        <C>
<C>      <C>     <C>
740 & Above         73   $18,412,944   3.75%     7.391%     764      $252,232    78.86%
87.81%   38.11%   92.40%
720 - 739           53    11,091,335   2.26      7.910      729       209,270    80.35
90.14    30.55    94.11
700 - 719           86    23,202,163   4.73      7.523      708       269,793    79.74
86.77    42.96    92.06
680 - 699          113    28,428,171   5.79      7.539      688       251,577    82.01
92.80    36.52    94.25
660 - 679          241    51,392,222  10.47      7.813      669       213,246    81.82
91.82    46.81    94.03
640 - 659          382    86,435,087  17.60      8.023      649       226,270    82.98
92.44    41.06    92.41
620 - 639          324    70,430,319  14.34      7.950      628       217,378    83.60
89.46    71.20    97.17
600 - 619          332    73,584,617  14.99      8.258      609       221,640    83.89
89.55    76.61    97.60
580 - 599          203    51,274,401  10.44      8.307      590       252,583    80.96
81.35    72.38    96.32
560 - 579          125    26,291,690   5.35      8.552      568       210,334    75.59
76.44    65.41    95.45
540 - 559          107    22,765,335   4.64      8.365      552       212,760    73.82
74.29    76.64    98.71
520 - 539           82    15,299,002   3.12      8.857      531       186,573    69.60
70.41    80.82    98.25
500 - 519           67    12,443,350   2.53      9.198      510       185,722    70.28
71.24    91.46    94.15
--------------   ------  ------------  ---------  --------  -------  ---------  --------
-------  -------  --------
TOTAL:           2,188  $491,050,636   100.00%   8.077%     631     $224,429    80.89%
86.96%   59.53%   95.26%
===============  ======  ============  =========  ========  ========  =========  ========
=======  =======  ========
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that

will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                  A-16

<PAGE>


                        DISTRIBUTION BY LIEN
<TABLE>
<CAPTION>
                                     PCT. OF    WT. AVG.                        WT. AVG.    WT.
AVG.
                      NUMBER         POOL BY     GROSS      WT. AVG.    AVG.     COMBINED    CLTV
PCT.      PCT.
                        OF       PRINCIPAL    PRINCIPAL   INTEREST   ORIGINAL  PRINCIPAL  ORIGINAL   INCLD
FULL      OWNER
  LIEN     LOANS       BALANCE      BALANCE      RATE       FICO      BALANCE     LTV       SS.
DOC      OCCUPIED
--------  ------    ------------   ---------   --------   --------   ---------  --------   -------
------   --------
<S>       <C>        <C>           <C>         <C>        <C>        <C>        <C>        <C>
<C>       <C>
1          1,719     $463,973,164   94.49%      7.902%     629       $269,909   79.79%     86.22%
60.15%    95.67%
2            469      27,077,472     5.51       11.089     663         57,734   99.77      99.77
48.83     88.12
--------  ------    ------------   ---------   --------   -------    ---------  --------   -------
-------   --------
TOTAL:     2,188     $491,050,636  100.00%      8.077%     631       $224,429   80.89%     86.96%
59.53%    95.26%
========  ======    ============   =========   ========   ========  =========  ========   =======
=======   ========
</TABLE>


                    DISTRIBUTION BY COMBINED ORIGINAL LTV
<TABLE>
<CAPTION>
                                     PCT. OF    WT. AVG.                                   WT. AVG.
WT. AVG.
                      NUMBER         POOL BY     GROSS      WT. AVG.    AVG.     COMBINED
CLTV      PCT.      PCT.
COMBINED                OF       PRINCIPAL    PRINCIPAL   INTEREST   ORIGINAL  PRINCIPAL  ORIGINAL
INCLD      FULL      OWNER
ORIGINAL  LTV        LOANS       BALANCE      BALANCE      RATE       FICO      BALANCE     LTV
SS.       DOC      OCCUPIED
----------------  ------    ------------   ---------   --------   --------   ---------  --------
-------   ------    --------
<S>                <C>       <C>           <C>         <C>        <C>        <C>        <C>
<C>       <C>       <C>
60.00% &  Below      168     $29,132,343    5.93%       7.497%     607       $173,407   50.13%
50.41%    81.84%    94.70%

<TABLE>

| CLTV | SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|---|
| 60.01 - 70.00% | 66.57 | 76.37 | 192 | 43,257,625 | 8.81 | 7.606 | 600 | 225,300 | 66.22 | |
| 70.01 - 80.00% | 91.09 | 57.64 | 824 | 232,993,770 | 47.45 | 7.604 | 642 | 282,759 | 78.70 | |
| 80.01 - 85.00% | 85.85 | 43.24 | 115 | 35,275,517 | 7.18 | 8.175 | 615 | 306,744 | 84.30 | |
| 85.01 - 90.00% | 89.82 | 53.87 | 228 | 69,288,066 | 14.11 | 8.343 | 620 | 303,895 | 89.56 | |
| 90.01 - 95.00% | 94.71 | 68.90 | 152 | 43,322,127 | 8.82 | 8.680 | 628 | 285,014 | 94.71 | |
| 95.01 - 100.00% | 99.95 | 49.52 | 509 | 37,781,189 | 7.69 | 10.720 | 656 | 74,226 | 99.95 | |
| TOTAL: | 86.96% | 59.53% | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 95.26% |

</TABLE>

DISTRIBUTION BY COMBINED ORIGINAL LTV WITH SILENT SECONDS

<TABLE>
<CAPTION>

| COMBINED ORIGINAL LTV WITH SILENT SECONDS INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV |
|---|---|---|---|---|---|---|---|---|---|
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` | `<C>` |
| 60.00% & Below / 49.99% | 82.80% | 94.62% | 166 | $ 28,652,943 | 5.84% | 7.488% | 607 | $172,608 | 49.99% |
| 60.01 - 70.00% / 66.23 | 77.18 | 92.38 | 192 | 42,955,147 | 8.75 | 7.631 | 599 | 223,725 | 66.21 |
| 70.01 - 80.00% / 76.66 | 73.74 | 95.91 | 348 | 88,227,821 | 17.97 | 7.631 | 613 | 253,528 | 76.54 |
| 80.01 - 85.00% / 84.20 | 44.05 | 95.28 | 100 | 30,449,610 | 6.20 | 8.068 | 619 | 304,496 | 84.20 |
| 85.01 - 90.00% / 89.55 | 54.46 | 94.16 | 223 | 67,689,141 | 13.78 | 8.305 | 620 | 303,539 | 89.42 |
| 90.01 - 95.00% / 94.70 | 66.04 | 95.22 | 171 | 49,692,492 | 10.12 | 8.663 | 625 | 290,599 | 93.40 |
| 95.01 - 100.00% / 99.96 | 47.60 | 96.13 | 988 | 183,383,481 | 37.35 | 8.248 | 658 | 185,611 | 84.17 |
| TOTAL: / 86.96% | 59.53% | 95.26% | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% |

</TABLE>

DISTRIBUTION BY DOCUMENTATION

<TABLE>
<CAPTION>

|  |  |  | PCT. OF | WT. AVG. |  |  | WT. AVG. | WT. AVG. |
|---|---|---|---|---|---|---|---|---|
|  | NUMBER |  | POOL BY | GROSS | WT. AVG. | AVG. | COMBINED | |
| CLTV | PCT. | PCT. |  |  |  |  | |

```
                  OF        PRINCIPAL   PRINCIPAL   INTEREST   ORIGINAL   PRINCIPAL   ORIGINAL   INCLD
FULL      OWNER
DOCUMENTATION   LOANS       BALANCE     BALANCE     RATE       FICO       BALANCE     LTV        SS.
DOC       OCCUPIED
--------------  ------   ------------  ---------   --------   --------   ---------   --------   -----
--        ------   --------
<S>             <C>          <C>          <C>         <C>        <C>         <C>         <C>        <C>
<C>       <C>
Full Doc        1,400    $292,323,567   59.53%     7.725%     618       $208,803    79.34%
84.13%    100.00%   96.19%
Stated Doc        721     185,967,299   37.87      8.595      652        257,930    82.95
91.06     0.00      94.43
Limited Doc        62      12,083,648    2.46      8.559      630        194,898    87.26
93.11     0.00      87.14
No Doc              5         676,123    0.14      9.318      678        135,225    73.46
73.46     0.00      63.92
--------------  ------   ------------  ---------   --------   -------   ---------   --------   -----
--        -------   --------
TOTAL:          2,188    $491,050,636  100.00%     8.077%     631       $224,429    80.89%
86.96%    59.53%    95.26%
============    ======   ============  =========   ========   ========  =========   ========
=======   =======   ========
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                      A-17
<PAGE>

                            DISTRIBUTION BY PURPOSE
<TABLE>
<CAPTION>

```
                                     PCT. OF     WT. AVG.                          WT. AVG.   WT.
AVG.
                  NUMBER             POOL BY      GROSS      WT. AVG.    AVG.       COMBINED
CLTV     PCT.     PCT.
                    OF              PRINCIPAL    PRINCIPAL   INTEREST   ORIGINAL   PRINCIPAL   ORIGINAL
INCLD    FULL     OWNER
PURPOSE           LOANS    OCCUPIED   BALANCE     BALANCE     RATE       FICO       BALANCE     LTV
SS.      DOC
--------------  ------   --------   ------------  ---------   --------   --------   ---------   --------   ---
----      ------   --------
<S>             <C>          <C>          <C>         <C>        <C>         <C>         <C>        <C>
Cashout Refi      918    $239,748,402   48.82%     7.857%     615       $261,164    77.53%
```
</TABLE>

```
78.02%   70.38%   95.69%
Purchase           1,152   218,013,436    44.40    8.415    648    189,248   85.07
97.07    46.04    94.49
Rate/term Refi      118    33,288,799     6.78    7.454    639    282,108   77.75
85.20    69.80    97.16
--------------   ------  ------------  ---------  --------  -------  ---------  --------  --
-----  -------  --------
TOTAL:            2,188  $491,050,636   100.00%   8.077%    631    $224,429   80.89%
86.96%   59.53%   95.26%
==============   ======  ============  =========  ========  =======  =========  ========
======  =======  ========
```
</TABLE>

<div align="center">DISTRIBUTION BY OCCUPANCY</div>

<TABLE>
<CAPTION>

| OCCUPANCY | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | AVG. CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Owner Occupied | 2,016 | $467,760,804 | 95.26% | 8.032% | 630 | $232,024 | 80.86% | 87.06% | 60.12% | 100.00% |
| Second Home | 94 | 12,160,971 | 2.48 | 8.905 | 662 | 129,372 | 85.09 | 91.39 | 55.55 | 0.00 |
| Investor | 78 | 11,128,861 | 2.27 | 9.097 | 634 | 142,678 | 77.66 | 78.11 | 39.61 | 0.00 |
| TOTAL: | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% | 59.53% | 95.26% |

</TABLE>

<div align="center">DISTRIBUTION BY PROPERTY TYPE</div>

<TABLE>
<CAPTION>

| PROPERTY TYPE | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | AVG. CLTV INCLD SS. | PCT. FULL DOC | PCT. OWNER OCCUPIED |
|---|---|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Single Family | 1,451 | $334,646,880 | 68.15% | 8.063% | 627 | $230,632 | 79.96% | 85.60% | 60.69% | 96.13% |
| PUD | 426 | 86,142,953 | 17.54 | 7.960 | 634 | 202,214 | 83.35 | 89.79 | 65.54 | 94.10 |
| Condo | 186 | 33,376,863 | 6.80 | 8.509 | 648 | 179,445 | 83.41 | 92.70 | 45.57 | 89.44 |
| 2 Family | 101 | 27,874,075 | 5.68 | 7.999 | 652 | 275,981 | 81.03 | 89.34 | 45.14 | 96.11 |

```
3-4 Family      19      8,500,270    1.73    8.419    645    447,383    82.09    82.09
52.66    93.94
Townhouse        5        509,596    0.10    7.861    635    101,919    81.93    81.93
100.00    77.92
--------    ------    ------------    ---------    --------    ------    ---------    --------    ------
-    -------    --------
TOTAL:       2,188   $491,050,636  100.00%    8.077%   631   $224,429    80.89%
86.96%    59.53%    95.26%
=========    ======    ============    =========    ========    ========    =========    ========
=======    =======    ========
```

</TABLE>

                    DISTRIBUTION BY STATE

<TABLE>
<CAPTION>

|  | NUMBER | | PCT. OF POOL BY | WT. AVG. GROSS | WT. AVG. | AVG. | WT. AVG. COMBINED | WT. AVG. CLTV |
| PCT. PCT. | OF | PRINCIPAL | PRINCIPAL | INTEREST | ORIGINAL | PRINCIPAL | ORIGINAL | INCLD |
| FULL OWNER STATE DOC OCCUPIED | LOANS | BALANCE | BALANCE | RATE | FICO | BALANCE | LTV | SS. |
| -------- ------ ------ -------- | ------ | ------------ | --------- | -------- | -------- | --------- | -------- | ------- |
| <S> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| CA 50.74% 97.41% | 527 | $187,296,123 | 38.14% | 7.811% | 639 | $355,401 | 80.77% | 88.43% |
| FL 63.07 94.61 | 264 | 48,244,743 | 9.82 | 8.180 | 622 | 182,745 | 80.39 | 86.81 |
| NY 48.71 98.33 | 107 | 31,507,479 | 6.42 | 7.849 | 651 | 294,462 | 78.82 | 84.78 |
| NJ 63.00 96.89 | 72 | 18,888,840 | 3.85 | 8.192 | 625 | 262,345 | 77.73 | 81.59 |
| TX 64.34 93.11 | 208 | 18,858,213 | 3.84 | 8.630 | 625 | 90,664 | 83.58 | 90.56 |
| MD 83.35 95.85 | 63 | 16,383,010 | 3.34 | 7.902 | 611 | 260,048 | 81.17 | 84.97 |
| VA 75.54 92.36 | 71 | 15,928,158 | 3.24 | 7.859 | 613 | 224,340 | 80.27 | 81.87 |
| AZ 69.99 91.36 | 73 | 14,256,876 | 2.90 | 8.105 | 620 | 195,300 | 77.37 | 83.27 |
| GA 51.95 86.38 | 79 | 14,071,093 | 2.87 | 9.065 | 633 | 178,115 | 86.74 | 90.20 |
| NV 51.70 80.07 | 45 | 10,204,904 | 2.08 | 8.077 | 664 | 226,776 | 82.46 | 93.20 |
| Other 68.65 94.49 | 679 | 115,411,199 | 23.50 | 8.352 | 623 | 169,972 | 81.57 | 86.02 |
| ------- ------ ------ -------- | ------ | ------------ | --------- | -------- | ------- | --------- | -------- | ------- |
| TOTAL: 59.53% 95.26% | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% |
| ======= ====== ====== ======== | ====== | ============ | ========= | ======== | ======== | ========= | ======== | ======= |

</TABLE>

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon

for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                    A-18
<PAGE>


                            DISTRIBUTION BY ZIP

<TABLE>
<CAPTION>

| ZIP | PCT. FULL DOC | PCT. OWNER OCCUPIED | NUMBER OF LOANS | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD SS. |
|-----|---------------|----------------------|-----------------|-------------------|-----------------------------------|------------------------------|------------------------|------------------------|--------------------------------|-------------------------|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 91342 | 39.29% | 100.00% | 6 | $2,524,729 | 0.51% | 7.083% | 660 | $420,788 | 77.69% | 93.23% |
| 92336 | 43.41 | 100.00 | 6 | 2,356,733 | 0.48 | 7.616 | 660 | 392,789 | 82.79 | 97.67 |
| 92703 | 24.48 | 100.00 | 4 | 2,014,000 | 0.41 | 7.477 | 628 | 503,500 | 83.95 | 93.60 |
| 95762 | 0.00 | 100.00 | 2 | 1,768,000 | 0.36 | 8.813 | 644 | 884,000 | 78.77 | 78.77 |
| 10466 | 69.86 | 77.63 | 6 | 1,758,715 | 0.36 | 7.324 | 658 | 293,119 | 80.07 | 84.89 |
| 90805 | 29.28 | 100.00 | 4 | 1,584,800 | 0.32 | 7.757 | 644 | 396,200 | 82.68 | 97.32 |
| 91206 | 0.00 | 100.00 | 3 | 1,542,884 | 0.31 | 8.900 | 743 | 514,295 | 82.11 | 100.00 |
| 94565 | 58.67 | 100.00 | 4 | 1,496,441 | 0.30 | 8.470 | 614 | 374,110 | 93.78 | 93.78 |
| 11221 | 21.80 | 100.00 | 3 | 1,490,696 | 0.30 | 8.792 | 673 | 496,899 | 79.03 | 79.03 |
| 92335 | 46.86 | 100.00 | 6 | 1,485,870 | 0.30 | 8.354 | 674 | 247,645 | 84.08 | 88.16 |
| Other | 60.51 | 95.16 | 2,144 | 473,027,769 | 96.33 | 8.082 | 630 | 220,629 | 80.84 | 86.81 |
| TOTAL: | 59.53% | 95.26% | 2,188 | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% |

</TABLE>


                    DISTRIBUTION BY REMAINING MONTHS TO MATURITY

```
<TABLE>
<CAPTION>
REMAINING                      PCT. OF    WT. AVG.                        WT. AVG.    WT. AVG.
MONTHS      NUMBER             POOL BY     GROSS      WT. AVG.    AVG.     COMBINED    CLTV
PCT.        PCT.
TO          OF       PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL  ORIGINAL    INCLD
FULL        OWNER
MATURITY    LOANS     BALANCE    BALANCE    RATE      FICO      BALANCE    LTV        SS.
DOC         OCCUPIED
---------   ------  ------------ ---------  --------  --------  ---------  --------  -------
------      --------
<S>         <C>      <C>         <C>        <C>       <C>        <C>       <C>       <C>
<C>         <C>
1 - 180        27   $2,994,750    0.61%      8.810%    649      $110,917   74.57%    74.57%
94.22%      100.00%
181 - 240       7      856,034    0.17       7.653     595       122,291   60.06     60.06
100.00      82.12
241 - 360   2,141  484,164,939   98.60       8.074     631       226,140   80.98     87.12
59.30       95.25
421 - 480      13    3,034,914    0.62       7.978     658       233,455   78.96     82.01
50.27       95.90
---------   ------  ------------ ---------  --------  -------   ---------  --------  -------
-------     --------
TOTAL:      2,188  $491,050,636  100.00%     8.077%    631      $224,429   80.89%    86.96%
59.53%      95.26%
=========   ======  ============ =========  ========  ========  =========  ========  =======
=======     =======
</TABLE>


                     DISTRIBUTION BY AMORTIZATION TYPE


<TABLE>
<CAPTION>
                                 PCT. OF    WT. AVG.                          WT.
AVG.    WT. AVG.
                       NUMBER    POOL BY     GROSS      WT. AVG.    AVG.
COMBINED    CLTV      PCT.       PCT.
                       OF      PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL  ORIGINAL
INCLD       FULL      OWNER
  AMORTIZATION TYPE   LOANS     BALANCE    BALANCE    RATE      FICO      BALANCE    LTV
SS.         DOC       OCCUPIED
--------------------  ------  ------------ ---------  --------  --------  ---------  -------
-           -------   ------   --------
<S>                    <C>     <C>         <C>        <C>       <C>        <C>       <C>
<C>         <C>       <C>
2 YR ARM               331   $63,200,672   12.87%     8.615%    617      $190,939   81.64%
86.65%      53.88%    93.75%
2 YR ARM 40/40           8     1,469,289    0.30       8.333     601       183,661   81.58
85.60       72.90     91.53
2 YR ARM BALLOON 40/30 315    95,789,793   19.51       8.257     610       304,095   79.68
86.23       45.89     95.51
2 YR ARM BALLOON 45/30   4     2,345,000    0.48       8.202     659       586,250   87.13
87.13       51.04    100.00
2 YR ARM BALLOON 50/30 161    57,838,842   11.78       7.875     639       359,247   83.76
92.34       51.32     95.63
2 YR ARM IO            252    94,300,619   19.20       7.609     647       374,209   82.14
92.87       56.04     98.34
3 YR ARM                70    12,521,193    2.55       8.398     610       178,874   81.69
84.84       70.13     86.41
3 YR ARM 40/40           1       201,500    0.04       6.200     569       201,500   65.00
65.00      100.00    100.00
3 YR ARM BALLOON 40/30  52    12,604,487    2.57       7.823     592       242,394   76.67
80.08       81.32     94.06
```

```
3 YR ARM BALLOON 50/30     18      5,527,764      1.13     7.503    600    307,098    76.50
86.00      82.77     100.00
3 YR ARM IO                32     12,462,414      2.54     7.071    660    389,450    79.94
85.56      56.42      98.12
40 YR FIXED                 4      1,364,125      0.28     7.858    732    341,031    78.21
80.65      18.56     100.00
5 YR ARM                   12      1,756,272      0.36     7.579    621    146,356    81.95
83.70      80.96      77.44
5 YR ARM BALLOON 40/30      5      1,239,121      0.25     6.492    644    247,824    75.80
75.80     100.00     100.00
5 YR ARM BALLOON 50/30      5      1,335,895      0.27     7.510    615    267,179    81.29
82.75      61.08     100.00
5 YR ARM IO                 6      1,991,044      0.41     7.689    664    331,841    80.63
93.33      82.76     100.00
FIXED                     756     76,839,268     15.65     8.888    638    101,639    83.20
84.13      71.64      92.49
FIXED BALLOON 30/15         7        713,381      0.15    12.567    647    101,912    98.96
98.96      94.23     100.00
FIXED BALLOON 40/30        73     20,304,604      4.13     7.524    643    278,145    69.52
74.08      76.42      95.37
FIXED BALLOON 50/30        44     14,888,836      3.03     7.081    651    338,383    77.70
79.93      80.82      97.65
FIXED IO                   32     12,356,517      2.52     6.831    661    386,141    76.69
83.75      81.16      94.52
------------------      ------   ------------   ---------  --------  -------  ---------  -------
-  -------   -------   -------
TOTAL:                  2,188   $491,050,636    100.00%    8.077%    631   $224,429    80.89%
86.96%     59.53%     95.26%
==================      ======   ============   =========  ========  =======  =========
========  =======   =======   =======
</TABLE>
```

This material is for your information. This material is not to be construed as an offer to sell or the solicitation of any offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. The information contained in this material may not pertain to any securities that will actually be sold. The information contained in this material may be based on assumptions regarding market conditions and other matters as reflected in this material. We make no representations regarding the reasonableness of such assumptions or the likelihood that any of such assumptions will coincide with actual market conditions or events, and this material should not be relied upon for such purposes. We and our affiliates, officers, directors, partners and employees, including persons involved in the preparation or issuance of this material may, from time to time, have long or short positions in, and buy or sell, the securities mentioned in this material or derivatives of those securities (including options). Information contained in this material is current as of the date appearing on this material only and supersedes all prior information regarding the securities and assets referred to in this material. Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In addition, subject to applicable law, you may disclose any and all aspects of any potential transaction or structure described herein that are necessary to support any U.S. federal income tax benefits, without Goldman, Sachs & Co. imposing any limitation of any kind.

A-19

```
<PAGE>
```

DISTRIBUTION BY INITIAL PERIODIC CAP

```
<TABLE>
<CAPTION>
                               PCT. OF    WT. AVG.                    WT. AVG.   WT.
```

| INITIAL PERIODIC CAP / AVG. PCT. FULL DOC | NUMBER OF LOANS / PCT. OWNER OCCUPIED | PRINCIPAL BALANCE | POOL BY PRINCIPAL BALANCE | GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | COMBINED ORIGINAL LTV | CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% / 100.00% | 2 / 100.00% | $353,535 | 0.07% | 10.464% | 575 | $176,768 | 67.85% | 75.50% |
| 2.000% / 52.75 | 1,122 / 95.88 | 325,890,040 | 66.37 | 8.033 | 629 | 290,455 | 81.64 | 89.43 |
| 3.000% / 69.04 | 147 / 94.42 | 38,176,424 | 7.77 | 7.827 | 609 | 259,704 | 78.43 | 82.46 |
| 3.500% / 100.00 | 1 / 100.00 | 163,906 | 0.03 | 5.525 | 681 | 163,906 | 63.81 | 63.81 |
| N/A / 73.97 | 916 / 93.88 | 126,466,730 | 25.75 | 8.265 | 644 | 138,064 | 79.75 | 82.03 |
| TOTAL: 59.53% | 2,188 / 95.26% | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% |

DISTRIBUTION BY PERIODIC CAP

| PERIODIC CAP / AVG. PCT. FULL DOC | NUMBER OF LOANS / PCT. OWNER OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 1.000% / 59.46% | 458 / 91.72% | $105,508,926 | 21.49% | 8.305% | 618 | $230,369 | 82.52% | 85.55% |
| 1.500% / 52.58 | 813 / 97.37 | 258,731,161 | 52.69 | 7.893 | 630 | 318,243 | 80.78 | 89.93 |
| 2.000% / 0.00 | 1 / 100.00 | 343,819 | 0.07 | 8.300 | 664 | 343,819 | 80.00 | 100.00 |
| N/A / 73.97 | 916 / 93.88 | 126,466,730 | 25.75 | 8.265 | 644 | 138,064 | 79.75 | 82.03 |
| TOTAL: 59.53% | 2,188 / 95.26% | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% |

DISTRIBUTION BY MONTHS TO RATE RESET

| AVG. MONTHS PCT. TO RATE FULL RESET DOC | NUMBER PCT. OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | POOL BY PRINCIPAL BALANCE | GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | COMBINED ORIGINAL LTV | CLTV INCLD SS. |
|---|---|---|---|---|---|---|---|---|
| --------- ------ | ------ -------- | ------------ | --------- | -------- | -------- | --------- | -------- | ------- |
| <S> <C> | <C> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| 13 - 24 51.69% | 1,071 96.04% | $314,944,215 | 64.14% | 8.065% | 628 | $294,066 | 81.62% | 89.43% |
| 25 - 36 71.20 | 173 93.80 | 43,317,358 | 8.82 | 7.724 | 618 | 250,389 | 78.99 | 83.72 |
| 49 & Above 81.06 | 28 93.73 | 6,322,333 | 1.29 | 7.386 | 638 | 225,798 | 80.19 | 84.98 |
| N/A 73.97 | 916 93.88 | 126,466,730 | 25.75 | 8.265 | 644 | 138,064 | 79.75 | 82.03 |
| ------ ------- | ------ ------- | ------------ | --------- | -------- | ------- | --------- | -------- | ------- |
| TOTAL: 59.53% | 2,188 95.26% | $491,050,636 | 100.00% | 8.077% | 631 | $224,429 | 80.89% | 86.96% |
| ====== ======= | ====== ======= | ============ | ========= | ======== | ======== | ========= | ======== | ======= |

</TABLE>

                    DISTRIBUTION BY LIFE MAXIMUM RATE

<TABLE>
<CAPTION>

| LIFE MAXIMUM RATE SS. | PCT. FULL DOC | NUMBER OF OWNER LOANS OCCUPIED | PRINCIPAL BALANCE | PCT. OF POOL BY PRINCIPAL BALANCE | WT. AVG. GROSS INTEREST RATE | WT. AVG. ORIGINAL FICO | AVG. PRINCIPAL BALANCE | WT. AVG. COMBINED ORIGINAL LTV | WT. AVG. CLTV INCLD |
|---|---|---|---|---|---|---|---|---|---|
| ---------------- ------ | ------ | -------- | ------------ | --------- | -------- | -------- | --------- | -------- | - |
| <S> <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | |
| 0.001 - 11.999% 72.75% | 100.00% | 17 94.39% | $5,562,143 | 1.13% | 5.780% | 669 | $327,185 | 70.40% | |
| 12.000 - 12.499% 71.96 | 100.00 | 18 100.00 | 4,054,542 | 0.83 | 6.224 | 616 | 225,252 | 71.32 | |
| 12.500 - 12.999% 82.80 | 82.65 | 63 100.00 | 17,982,510 | 3.66 | 6.382 | 640 | 285,437 | 77.53 | |
| 13.000 - 13.499% 86.85 | 82.61 | 79 99.12 | 22,355,764 | 4.55 | 6.741 | 631 | 282,984 | 78.24 | |
| 13.500 - 13.999% 89.79 | 73.22 | 165 99.10 | 55,220,623 | 11.25 | 7.075 | 644 | 334,670 | 80.72 | |
| 14.000 - 14.499% 90.40 | 53.09 | 176 95.91 | 55,882,034 | 11.38 | 7.499 | 634 | 317,512 | 79.69 | |
| 14.500 - 14.999% 89.41 | 47.67 | 223 92.72 | 64,126,061 | 13.06 | 7.964 | 638 | 287,561 | 80.70 | |
| 15.000 - 15.499% 89.85 | 45.18 | 154 95.30 | 47,586,394 | 9.69 | 8.401 | 621 | 309,003 | 81.48 | |
| 15.500 - 15.999% 90.36 | 44.46 | 145 97.65 | 40,740,248 | 8.30 | 8.945 | 610 | 280,967 | 84.73 | |
| 16.000% & Above 88.15 | 30.43 | 232 91.39 | 51,073,587 | 10.40 | 10.060 | 595 | 220,145 | 86.07 | |
| N/A 82.03 | 73.97 | 916 93.88 | 126,466,730 | 25.75 | 8.265 | 644 | 138,064 | 79.75 | |

```
----------------  ------  ------------  ---------  --------  -------  ---------  --------  -
------  -------  -------
TOTAL:              2,188   $491,050,636   100.00%    8.077%    631    $224,429   80.89%
86.96%   59.53%   95.26%
================  ======  ============  =========  ========  =======  =========  ========
=======  =======  =======
</TABLE>
```

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                              A-20

<PAGE>


                      DISTRIBUTION BY MARGIN

<TABLE>
<CAPTION>

| | | | | PCT. OF | WT. AVG. | | | WT. AVG. |
| WT. AVG. | | | | | | | | |
| | | NUMBER | | POOL BY | GROSS | WT. AVG. | AVG. | COMBINED |
| CLTV | PCT. | PCT. OF | | | | | | |
| INCLD | FULL | OWNER | PRINCIPAL | PRINCIPAL | INTEREST | ORIGINAL | PRINCIPAL | ORIGINAL |
| MARGIN | DOC | LOANS | BALANCE | BALANCE | RATE | FICO | BALANCE | LTV |
| SS. | | OCCUPIED | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| <C> | <C> | <C> | | | | | | |
| 0.001 - 4.999% | | 139 | $35,179,406 | 7.16% | 6.911% | 629 | $253,089 | 77.30% |
| 79.72% | 75.81% | 97.42% | | | | | | |
| 5.000 - 5.499% | | 52 | 11,158,520 | 2.27 | 7.855 | 615 | 214,587 | 81.16 |
| 85.96 | 62.47 | 87.09 | | | | | | |
| 5.500 - 5.999% | | 248 | 76,814,049 | 15.64 | 7.787 | 637 | 309,734 | 82.12 |
| 90.77 | 61.91 | 94.27 | | | | | | |
| 6.000 - 6.499% | | 618 | 187,374,824 | 38.16 | 7.934 | 631 | 303,196 | 81.36 |
| 90.87 | 49.80 | 96.67 | | | | | | |
| 6.500 - 6.999% | | 102 | 29,843,887 | 6.08 | 8.943 | 603 | 292,587 | 81.46 |
| 84.49 | 37.14 | 94.88 | | | | | | |
| 7.000 - 7.499% | | 93 | 19,171,471 | 3.90 | 9.945 | 593 | 206,145 | 83.18 |
| 83.80 | 56.51 | 95.45 | | | | | | |
| 7.500 - 7.999% | | 9 | 2,528,677 | 0.51 | 9.221 | 611 | 280,964 | 80.22 |
| 80.22 | 47.54 | 100.00 | | | | | | |
| 8.000 - 8.499% | | 8 | 2,348,029 | 0.48 | 9.767 | 610 | 293,504 | 92.47 |
```

```
95.34      41.55     100.00
8.500 - 8.999%        1       53,880      0.01     10.800    536       53,880    67.38
67.38     100.00      0.00
9.000 - 9.499%        1       49,983      0.01     11.150    519       49,983    64.94
64.94     100.00      0.00
9.500% & Above        1       61,181      0.01     11.525    583       61,181    69.94
69.94     100.00      0.00
N/A                 916   126,466,730    25.75      8.265    644      138,064    79.75
82.03      73.97     93.88
----------------   ------   ------------  ---------  --------  -------   ---------  --------  -
------   -------   -------
TOTAL:             2,188  $491,050,636   100.00%     8.077%   631     $224,429    80.89%
86.96%     59.53%    95.26%
================   ======   ============  =========  ========  =======   =========  ========
=======   =======   =======
</TABLE>
```

              DISTRIBUTION BY INTEREST ONLY TERM

```
<TABLE>
<CAPTION>
INTEREST                         PCT. OF    WT. AVG.                    WT. AVG.   WT.
AVG.
ONLY         NUMBER              POOL BY     GROSS    WT. AVG.   AVG.    COMBINED   CLTV
PCT.     PCT.
TERM          OF      PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL ORIGINAL  INCLD
FULL     OWNER
(MONTHS)    LOANS     BALANCE    BALANCE     RATE     FICO     BALANCE    LTV      SS.
DOC      OCCUPIED
----------  ------  ------------ ---------  --------  --------  ---------  --------  -------
------   --------
<S>          <C>      <C>         <C>        <C>       <C>       <C>        <C>      <C>
<C>      <C>
0          1,866  $369,940,043   75.34%     8.274%    625     $198,253    80.75%   85.58%
59.68%   94.37%
60           315   117,607,793   23.95      7.462     650      373,358    81.22    91.02
58.01    97.89
120            7     3,502,800    0.71      7.951     631      500,400    85.08    97.18
94.90   100.00
---------  ------  ------------ ---------  --------  -------   ---------  --------  -------
-------  -------
TOTAL:     2,188  $491,050,636   100.00%    8.077%    631     $224,429    80.89%   86.96%
59.53%   95.26%
=========  ======  ============ =========  ========  ========  =========  ========  =======
=======  =======
</TABLE>
```

              DISTRIBUTION BY DELINQUENCY (ABS)

```
<TABLE>
<CAPTION>
                                 PCT. OF    WT. AVG.                    WT. AVG.   WT.
AVG.
             NUMBER              POOL BY     GROSS    WT. AVG.   AVG.    COMBINED   CLTV
PCT.     PCT.
DELINQUENCY    OF      PRINCIPAL  PRINCIPAL  INTEREST  ORIGINAL  PRINCIPAL ORIGINAL  INCLD
FULL     OWNER
(ABS)       LOANS     BALANCE    BALANCE     RATE     FICO     BALANCE    LTV      SS.
DOC      OCCUPIED
----------  ------  ------------ ---------  --------  --------  ---------  --------  ------
-   ------   --------
<S>          <C>      <C>         <C>        <C>       <C>       <C>        <C>      <C>
<C>      <C>
```

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Current | 2,253 | $504,291,932 | 100.00% | 8.105% | 630 | $223,831 | 80.87% |
| 87.02% | 59.21% | 95.32% | | | | | | |

```
-----------  ------  ------------  ---------  --------  -------  ---------  --------  ------
-  -------  -------
```

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TOTAL: | 2,253 | $504,291,932 | 100.00% | 8.105% | 630 | $223,831 | 80.87% |
| 87.02% | 59.21% | 95.32% | | | | | | |

```
===========  ======  ============  =========  ========  =======  =========  ========
======  =======  =======
```

</TABLE>

This material is for your information. This material is not to be construed as
an offer to sell or the solicitation of any offer to buy any security in any
jurisdiction where such an offer or solicitation would be illegal. The
information contained in this material may not pertain to any securities that
will actually be sold. The information contained in this material may be based
on assumptions regarding market conditions and other matters as reflected in
this material. We make no representations regarding the reasonableness of such
assumptions or the likelihood that any of such assumptions will coincide with
actual market conditions or events, and this material should not be relied upon
for such purposes. We and our affiliates, officers, directors, partners and
employees, including persons involved in the preparation or issuance of this
material may, from time to time, have long or short positions in, and buy or
sell, the securities mentioned in this material or derivatives of those
securities (including options). Information contained in this material is
current as of the date appearing on this material only and supersedes all prior
information regarding the securities and assets referred to in this material.
Goldman, Sachs & Co. does not provide accounting, tax or legal advice. In
addition, subject to applicable law, you may disclose any and all aspects of any
potential transaction or structure described herein that are necessary to
support any U.S. federal income tax benefits, without Goldman, Sachs & Co.
imposing any limitation of any kind.

                                      A-21

<PAGE>

                      [THIS PAGE INTENTIONALLY LEFT BLANK]

<PAGE>

                                   PROSPECTUS

                          Asset-Backed Securities
               (Issuable in Series by Separate Issuing Entities)

                        GS MORTGAGE SECURITIES CORP.
                                   Depositor

      GS Mortgage Securities Corp. may, through one or more issuing entities
that are trusts, offer to sell certificates and notes in one or more series with
one or more classes. The certificates of a series will evidence the beneficial
ownership of one or more such trusts and the notes will evidence the debt
obligations of a trust fund. Each trust or trust fund will consist primarily of
the following mortgage related assets:

      o     mortgage loans secured by one- to four-family residential
            properties,

- o    mortgage loans secured by multifamily residential properties,

- o    loans secured by security interests on shares in cooperative housing corporations,

- o    conditional sales contracts and installment sales or loan agreements secured by manufactured housing,

- o    closed-end and revolving credit line mortgage loans (or certain revolving credit line mortgage loan balances);

- o    mortgage pass-through securities issued or guaranteed by the Government National Mortgage Association, the Federal National Mortgage Association, Federal Home Loan Mortgage Corporation or other government agencies or government-sponsored agencies or privately issued mortgage-backed securities; and

- o    mortgage loans secured by commercial real estate properties; provided that such loans will not constitute 10% or more, by principal balance, of the pool of assets for any series of securities.

The certificates or notes of any series may be called "mortgage-backed certificates", "mortgage pass-through certificates", "mortgage-backed notes", "asset-backed certificates", or "asset-backed notes".

AN INVESTMENT IN THE CERTIFICATES OR NOTES OF ANY SERIES INVOLVES SIGNIFICANT RISKS. YOU SHOULD REVIEW THE INFORMATION UNDER THE CAPTION "RISK FACTORS" BEGINNING ON PAGE 2 IN THIS PROSPECTUS BEFORE DECIDING WHETHER TO MAKE AN INVESTMENT.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURES IN THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Prior to issuance there will have been no market for the certificates or notes of any series. We cannot assure you that a secondary market for the certificates or notes will develop.

Offers of the certificates or notes, as applicable, may be made through one or more different methods, including offerings through underwriters. Underwritten notes and underwritten certificates will be distributed, or sold by underwriters managed by:

Goldman, Sachs & Co.

The date of this Prospectus is February 13, 2007.

<PAGE>

TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT.......................................................1
INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE.............................1
RISK FACTORS...............................................................2
   You May Have Difficulty Selling The Securities..........................2
   Book-Entry Securities May Delay Receipt of Payment and Reports..........2
   Your Return on an Investment in The Securities Is Uncertain.............2
   Prepayments on the Mortgage Assets Could Lead to Shortfalls in the
     Distribution of Interest on Your Securities.........................3
   Delay in Receipt of Liquidation Proceeds; Liquidation Proceeds May
     Be Less Than the Mortgage Loan Balance..............................3
   High Loan-to-Value Ratios Increase Risk of Loss........................4
   Some of the Mortgage Loans May Have an Initial Interest-Only

    Period, Which May Result in Increased Delinquencies and Losses........4
Your Yield May Be Subject to Any Negative Amortization on the
    Related Mortgage Loans...............................................4
Interest Only and Principal Only Securities Involve Additional Risk......5
Subordinated Securities Involve More Risks and May Incur Losses..........5
Trust or Trust Fund Assets Are the Only Source of Payments on the
    Securities...........................................................5
The Securities Are Obligations of the Trust Only........................6
Delays and Expenses Inherent in Foreclosure Procedures Could Delay
    Distributions to You or Result in Losses.............................6
The Concentration of Mortgage Assets in Specific Geographic Areas
    May Increase the Risk of Loss........................................6
Financial Instruments May Not Avoid Losses..............................7
Environmental Conditions Affecting Mortgaged Properties May Result
    in Losses............................................................7
Security Interests in Manufactured Homes May Be Lost....................8
Residential Real Estate Values May Fluctuate and Adversely Affect
    Your Investment in the Securities....................................8
Increased Use of New Mortgage Loan Products by Borrowers May Result
    in Decline in Real Estate Values Generally...........................8
The Trust May Contain Mortgage Assets Secured by Subordinated
    Liens; These Mortgage Assets Are More Likely Than Mortgage
    Assets Secured by Senior Liens to Experience Losses..................9
Violation of Various Federal, State and Local Laws May Result in
    Losses on the Mortgage Loans.........................................9
If Consumer Protection Laws are Violated in the Origination or
    Servicing of the Loans, Losses on Your Investment Could Result.......10
Assets of the Trust or Trust Fund May Include Mortgage Loans
    Originated Under Less Stringent Underwriting Standards...............10
Assets of the Trust or Trust Fund May Include Delinquent and
    Sub-Performing Residential Mortgage Loans...........................11
Value of Collateral Securing Cooperative Loans May Diminish in Value....11
Bankruptcy of the Depositor or a Sponsor May Delay or Reduce
    Collections on Loans................................................11
The Securities Are Not Suitable Investments for All Investors...........12
Your Investment May Not Be Liquid......................................12
The Ratings on Your Certificates Could Be Reduced or Withdrawn..........13
Conflicts of Interest between the Master Servicer and the Trust........13
Servicing Fee May be Insufficient to Engage Replacement Master
    Servicers or Servicers..............................................13
You May Have Income for Tax Purposes Prior to Your Receipt of Cash......13
THE TRUSTS OR TRUST FUNDS...............................................14
    The Mortgage Loans - General........................................15
    Single Family and Cooperative Loans.................................17
    Multifamily Loans...................................................18
    Manufactured Housing Contracts......................................18
    Revolving Credit Line Mortgage Loans................................19
    Agency Securities...................................................19
    Private Mortgage-Backed Securities..................................24
    U.S. Government Securities..........................................26
    Substitution of Mortgage Assets.....................................26

i

&lt;PAGE&gt;

    Pre-Funding and Capitalized Interest Accounts.......................26
USE OF PROCEEDS.........................................................27
THE DEPOSITOR...........................................................27
THE SPONSOR.............................................................27
THE MORTGAGE LOANS......................................................28
    General.............................................................28
    Goldman Sachs Mortgage Conduit Program Underwriting Guidelines......29
    Representations and Warranties; Repurchases.........................32
    Optional Purchase of Defaulted Loans................................33
DESCRIPTION OF THE SECURITIES...........................................33

```
        General................................................................33
        Distributions on Securities...........................................35
        Advances..............................................................37
        Reports to Securityholders............................................38
        Exchangeable Securities...............................................38
        Book-Entry Registration...............................................40
CREDIT ENHANCEMENT............................................................45
        General...............................................................45
        Subordination.........................................................45
        Pool Insurance Policies...............................................46
        Special Hazard Insurance Policies.....................................46
        Bankruptcy Bonds......................................................47
        FHA Insurance; VA Guarantees; RHS Guarantees..........................48
            FHA Loans.........................................................48
            VA Loans..........................................................50
            RHS Loans.........................................................51
        FHA Insurance on Multifamily Loans....................................52
        Reserve and Other Accounts............................................53
        Other Insurance, Guarantees and Similar Instruments or Agreements.....53
        Overcollateralization.................................................53
        Excess Spread.........................................................54
        Cross Support.........................................................54
YIELD AND PREPAYMENT CONSIDERATIONS...........................................54
ADMINISTRATION................................................................56
        Assignment of Mortgage Assets.........................................56
        Payments on Mortgage Loans; Deposits to Accounts......................58
        Sub-Servicing.........................................................60
        Collection Procedures.................................................61
        Hazard Insurance......................................................62
        Realization Upon Defaulted Mortgage Loans.............................63
        Servicing and Other Compensation and Payment of Expenses..............65
        Evidence as to Compliance.............................................65
        Certain Matters Regarding the Master Servicer and Us..................66
        Events of Default; Rights Upon Event of Default.......................67
        The Trustee...........................................................69
        Duties of the Trustee.................................................69
        Resignation and Removal of Trustee....................................70
        Amendment.............................................................70
        Termination; Optional Termination....................................71
LEGAL ASPECTS OF THE MORTGAGE LOANS...........................................72
        General...............................................................72
        Foreclosure/Repossession..............................................75
            General...........................................................75
        Rights Of Redemption..................................................78
            General...........................................................78
        Anti-Deficiency Legislation And Other Limitations On Lenders..........79
        Due-On-Sale Clauses...................................................80
        Prepayment Charges....................................................81
        Subordinate Financing.................................................81
        Applicability of Usury Laws...........................................81
        Servicemembers Civil Relief Act and the California Military and
            Veterans Code.....................................................82
        Product Liability and Related Litigation..............................83
        Environmental Considerations..........................................83
        Forfeiture for Drug, RICO and Money Laundering Violations.............85
        Other Legal Considerations............................................85
FEDERAL INCOME TAX CONSEQUENCES...............................................85
        General...............................................................85
        Miscellaneous Itemized Deductions.....................................86
        Tax Treatment of REMIC Regular Interests and Other Debt Instruments...87
        OID...................................................................88
        Market Discount.......................................................91
        Amortizable Premium...................................................92
        Consequences of Realized Losses.......................................93
        Gain or Loss on Disposition...........................................93
```

Tax Treatment of Exchangeable Securities...................................94
Taxation of Certain Foreign Holders of Debt Instruments.................96
Backup Withholding.........................................................97
Reporting and Tax Administration.........................................97
Tax Treatment of REMIC Residual Interests..............................98
Special Considerations for Certain Types of Investors.................101
Treatment by the REMIC of OID, Market Discount and Amortizable
    Premium..............................................................104
REMIC-Level Taxes........................................................104
REMIC Qualification......................................................104
Grantor Trusts...........................................................104
Tax Treatment of the Grantor Trust Security...........................105
Treatment of Pass-Through Securities...................................105
Treatment of Strip Securities..........................................106

<div align="center">ii</div>

<PAGE>

Determination of Income with Respect to Strip Securities..............107
Purchase of Complementary Classes of Strip Securities.................108
Possible Alternative Characterizations of Strip Securities............108
Limitations on Deductions With Respect to Strip Securities............108
Sale of a Grantor Trust Security.......................................108
Taxation of Certain Foreign Holders of Grantor Trust Securities.......109
Backup Withholding of Grantor Trust Securities........................109
Reporting and Tax Administration of Grantor Trust Securities..........109
Taxation of Owners of Owner Trust Securities..........................110
Partnership Taxation.....................................................110
Discount and Premium of Mortgage Loans................................111
Section 708 Termination.................................................111
Gain or Loss on Disposition of Partnership Securities.................111
Allocations Between Transferors and Transferees.......................112
Section 731 Distributions...............................................112
Section 754 Election.....................................................112
Administrative Matters...................................................113
Tax Consequences to Foreign Securityholders of a Partnership Trust.....113
Backup Withholding on Partnership Securities..........................114
STATE, FOREIGN AND LOCAL TAX CONSEQUENCES.................................114
ERISA CONSIDERATIONS......................................................114
    General..............................................................114
    ERISA Considerations Relating to Certificates......................115
    Underwriter Exemption................................................116
    ERISA Considerations Relating to Notes.............................122
LEGAL INVESTMENT...........................................................123
METHOD OF DISTRIBUTION.....................................................125
LEGAL MATTERS..............................................................126
FINANCIAL INFORMATION......................................................126
RATINGS.....................................................................126
REPORTS TO SECURITYHOLDERS.................................................127
WHERE YOU CAN FIND MORE INFORMATION.......................................127
INDEX.......................................................................128
ANNEX I  CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS.......A-1

<div align="center">iii</div>

<PAGE>

<div align="center">PROSPECTUS SUPPLEMENT</div>

We provide information to you about the certificates and notes in two
separate documents that provide progressively more detail:

o    this prospectus, which provides general information, some of which
     may not apply to your series of certificates or notes; and

o    the accompanying prospectus supplement, which describes the specific

terms of your series of certificates or notes.

You should rely primarily on the description of your certificates or notes in the accompanying prospectus supplement. This prospectus may not be used to consummate sales of any certificates or any notes unless it is accompanied by a prospectus supplement relating to the certificates or notes being sold.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The Securities and Exchange Commission allows us to "incorporate by reference" information that we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and the information that we file later with the Securities and Exchange Commission will automatically update and supersede this information.

All documents (other than Annual Reports on Form 10-K) filed by us with respect to a trust fund referred to in the accompanying prospectus supplement and the related series of securities after the date of this prospectus and before the end of the related offering pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, are incorporated by reference in this prospectus and are a part of this prospectus from the date of their filing. Any statement contained in a document incorporated by reference in this prospectus is modified or superseded for all purposes of this prospectus to the extent that a statement contained in this prospectus (or in the accompanying prospectus supplement) or in any other subsequently filed document that also is incorporated by reference differs from that statement. Any statement so modified or superseded shall not, except as so modified or superseded, constitute a part of this prospectus. If so specified in any such document, such document shall also be deemed to be incorporated by reference in the registration statement of which this prospectus forms a part.

You may request a copy of these filings, at no cost, by writing or telephoning us at our principal executive offices at the following address:

GS Mortgage Securities Corp.
85 Broad Street
New York, New York 10004
Telephone: (212) 902-1000

You should rely only on the information incorporated by reference or provided in this prospectus or any prospectus supplement. We have not authorized anyone else to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. Do not assume that the information in this prospectus or any prospectus supplement is accurate as of any date other than the date on the front of these documents.

<PAGE>

## RISK FACTORS

An investment in the certificates or notes of any series involves significant risks. Before making an investment decision, you should carefully review the following information and the information under the caption "risk factors" in the applicable prospectus supplement.

You May Have Difficulty Selling The Securities

There will be no market for the certificates or notes of any series before their issuance. We cannot assure you that a secondary market will develop or, if a secondary market does develop, that it will provide liquidity of investment or will continue for the life of the certificates or notes. The market value of the certificates or notes will fluctuate with changes in prevailing rates of interest. Consequently, the sale of the certificates or notes in any market that may develop may be at a discount from the certificates' or notes' par value or

purchase price. You generally have no right to request redemption of the
certificates or notes. The certificates and notes are redeemable only under the
limited circumstances, if any, described in the related prospectus supplement.
We do not intend to list any class of certificates or notes on any securities
exchange or to quote the certificates or notes in the automated quotation system
of a regulated securities association. However, if we intend such listing or
such quotation with respect to some or all of the certificates in a series of
certificates or some or all of the notes in a series of notes, we will include
information relevant to such listing in the related prospectus supplement. If
the certificates or notes are not listed or quoted, you may experience more
difficulty selling certificates or notes. The prospectus supplement for a series
may indicate that a specified underwriter intends to establish a secondary
market in some or all of the classes of a series. However, no underwriter will
be obligated to do so.

Book-Entry Securities May Delay Receipt of Payment and Reports

     If the trust fund issues certificates or notes in book-entry form, you may
experience delays in receipt of your payments and/or reports, since payments and
reports will initially be made to the book-entry depository or its nominee. In
addition, the issuance of certificates or notes in book-entry form may reduce
the liquidity of certificates and notes so issued in the secondary trading
market, since some investors may be unwilling to purchase certificates and notes
for which they cannot receive physical certificates.

Your Return on an Investment in The Securities Is Uncertain

     Your pre-tax return on any investment in certificates or notes of any
series will depend on (1) the price that you pay for those certificates or
notes, (2) the rate at which interest accrues on the certificates or notes and
(3) the rate at which you receive a return of the principal and, consequently,
the length of time that your certificates or notes are outstanding and accruing
interest.

     o     The Rate of Return of Principal is Uncertain. The amount of
           distributions of principal of the certificates or notes of any
           series and when you will receive those distributions depends on the
           amount and the times at which borrowers make principal payments on
           the mortgage assets. Those principal payments may be regularly
           scheduled payments or unscheduled payments resulting from
           prepayments of, or defaults on, the mortgage assets. In general,
           borrowers may prepay their mortgage loans in whole or in part at any
           time. Principal payments also result from repurchases due to
           conversions of adjustable rate loans to fixed rate loans, breaches
           of representations and warranties or the exercise of an optional
           termination right. A prepayment of a mortgage loan generally will
           result in a prepayment on the securities. If you purchase your
           securities at a discount and principal is repaid slower than you
           anticipate, then your yield may be lower than you anticipate. If you
           purchase your securities at a premium and principal is repaid faster
           than you anticipate, then your yield may be lower than you
           anticipate. In addition, a series of certificates or notes may have
           (1) certain classes that are paid principal after other classes or
           (2) certain types of certificates or notes that are more sensitive
           to prepayments. If you own either of these types of certificates or
           notes, changes in timing and the amount of principal payments by

                                        2

<PAGE>

           borrowers may adversely affect you. A variety of economic, social,
           competitive and other factors, including changes in interest rates,
           may influence the rate of prepayments on the mortgage loans. We
           cannot predict the amount and timing of payments that will be
           received and paid to holders of certificates or holders of notes in

any month or over the period of time that such certificates or notes remain outstanding.

    o    Optional Termination May Adversely Affect Yield. A trust fund may be subject to optional termination. Any such optional termination may adversely affect the yield to maturity on the related series of certificates or notes. If the mortgage assets include properties which the related trust or trust fund acquired through foreclosure or deed-in-lieu of foreclosure, the purchase price paid to exercise the optional termination may be less than the outstanding principal balances of the related series of certificates or notes. In such event, the holders of one or more classes of certificates or notes may incur a loss.

    o    Credit Enhancement Will Not Cover All Losses. An investment in the certificates or notes involves a risk that you may lose all or part of your investment. Although a trust fund may include some form of credit enhancement, that credit enhancement may not cover every class of note or every class of certificate issued by such trust fund. In addition, every form of credit enhancement will have certain limitations on, and exclusions from, coverage. In most cases, credit enhancements will be subject to periodic reduction in accordance with a schedule or formula. The trustee may be permitted to reduce, terminate or substitute all or a portion of the credit enhancement for any series, if the applicable rating agencies indicate that the reduction, termination or substitution will not adversely affect the then-current rating of such series.

Prepayments on the Mortgage Assets Could Lead to Shortfalls in the Distribution of Interest on Your Securities

    When a voluntary principal prepayment is made by the borrower on a mortgage loan (excluding any payments made upon liquidation of any mortgage loan), the borrower is charged interest on the amount of prepaid principal only up to the date of the prepayment, instead of for a full month. However, principal prepayments will only be passed through to the holders of the securities once a month on the distribution date that follows the prepayment period in which the prepayment was received by the applicable servicer. The applicable series of securities may contain provisions requiring the applicable servicer to pay an amount without any right of reimbursement, for those shortfalls in interest collections payable on the securities that are attributable to the difference between the interest paid by a borrower in connection with certain voluntary principal prepayments and thirty days' interest on the prepaid mortgage loan, which may be limited by all or a portion of the monthly servicing fee for the related distribution date.

    If the servicer fails to make required compensating interest payments or the shortfall exceeds the limitation based on the monthly servicing fee for the related distribution date, there will be fewer funds available for the distribution of interest on the securities. In addition, no compensating interest payments will be available to cover prepayment interest shortfalls resulting from types of voluntary prepayments specified in the related prospectus supplement for which the applicable servicer is not required to make a compensating interest payment or involuntary prepayments (such as liquidation of a defaulted mortgage loan). Such shortfalls of interest, if they result in the inability of the trust to pay the full amount of the current interest on the securities, will result in a reduction of the yield on your securities.

Delay in Receipt of Liquidation Proceeds; Liquidation Proceeds May Be Less Than the Mortgage Loan Balance

    Substantial delays could be encountered in connection with the liquidation of delinquent mortgage loans in the related trust. Further, reimbursement of advances made on a mortgage loan, liquidation expenses such as legal fees, real estate taxes, hazard insurance and maintenance and preservation expenses may

reduce the portion of liquidation proceeds payable on the securities. If a
mortgaged property fails to provide adequate security for the mortgage loan, you
will incur a loss on your investment if the credit enhancements are insufficient
to cover the loss.

3

&lt;PAGE&gt;

High Loan-to-Value Ratios Increase Risk of Loss

    A trust or trust fund may include mortgage loans with combined original
loan-to-value ratios of 80% or higher. Mortgage loans with higher combined
original loan-to-value ratios may present a greater risk of loss than mortgage
loans with original loan-to-value ratios of 80% or below.

    Additionally, the determination of the value of a mortgaged property used
in the calculation of the loan-to-value ratios of the mortgage loans may differ
from the appraised value of such mortgaged properties if current appraisals were
obtained.

Some of the Mortgage Loans May Have an Initial Interest-Only Period, Which May
  Result in Increased Delinquencies and Losses

    A trust or trust fund may include mortgage loans that have an initial
interest-only period. During this period, the payment made by the related
borrower will be less than it would be if principal of the mortgage loan was
required to amortize and if the interest rate adjusts to a rate higher than the
initial fixed rate. In addition, the mortgage loan principal balance will not be
reduced because there will be no scheduled monthly payments of principal during
this period. As a result, no principal payments will be made on the securities
with respect to these mortgage loans during their interest-only period unless
there is a principal prepayment.

    After the initial interest-only period, the scheduled monthly payment on
these mortgage loans will increase, which may result in increased delinquencies
by the related borrowers, particularly if interest rates have increased and the
borrower is unable to refinance. In addition, losses may be greater on these
mortgage loans as a result of the mortgage loan not amortizing during the early
years of these mortgage loans. Although the amount of principal included in each
scheduled monthly payment for a traditional mortgage loan is relatively small
during the first few years after the origination of a mortgage loan, in the
aggregate the amount can be significant. Any resulting delinquencies and losses,
to the extent not covered by credit enhancement, will be allocated to the
securities.

    The performance of these mortgage loans may be significantly different
from mortgage loans that amortize from origination and from mortgage loans whose
interest rate adjusted from inception. In particular, there may be a higher
expectation by these mortgagors of refinancing their mortgage loans with a new
mortgage loan, in particular, one with an initial interest-only period, which
may result in higher or lower prepayment speeds than would otherwise be the
case. In addition, the failure by the related mortgagor to build equity in the
property may affect the delinquency, loss and prepayment experience with respect
to these mortgage loans.

Your Yield May Be Subject to Any Negative Amortization on the Related Mortgage
  Loans

    A trust or trust fund may include mortgage loans that are negative
amortization loans. Generally, the interest rates on negative amortization loans
adjust monthly but their monthly payments and amortization schedules adjust
based on a different schedule (e.g., annually). In addition, in many cases, the
amount by which a monthly payment may be adjusted on an adjustment date may be
limited and may not be sufficient to amortize fully the unpaid principal balance
of a mortgage loan over its remaining term to maturity. In addition, the initial

interest rates on negative amortization loans may be lower than the sum of the indices applicable at origination and the related margins. During a period of rising interest rates, as well as prior to the applicable adjustment to the monthly payment, the amount of interest accruing on the principal balance of these mortgage loans may exceed the amount of the minimum monthly payment. As a result, a portion of the accrued interest on negatively amortizing loans may become deferred interest, which will be added to their principal balances and will also bear interest at the applicable interest rates. The amount of any deferred interest accrued on a mortgage loan during a due period will reduce the amount of interest available to be distributed on the related securities on the related distribution date.

     If the interest rates on negative amortization loans decrease prior to an adjustment in the monthly payment, a larger portion of the monthly payment will be applied to the unpaid principal balance of the mortgage loan, which may cause the related classes of securities to amortize more quickly. Conversely, if

                                        4
<PAGE>

the interest rates on negative amortization loans increase prior to an adjustment in the monthly payment, a smaller portion of the monthly payment will be applied to the unpaid principal balance of the mortgage loan, which may cause the related classes of securities to amortize more slowly.

     In addition, as the principal balance of a negative amortization loan will increase by the amount of deferred interest allocated to such loan, the increasing principal balance of a negative amortization loan may approach or exceed the value of the related mortgaged property, thus increasing the likelihood of defaults as well as the amount of any loss experienced with respect to any such negative amortization that is required to be liquidated. Furthermore, each negative amortization loan will generally provide for the payment of any remaining unamortized principal balance (due to the addition of deferred interest, if any, to the principal balance of the loan) in a single payment at the maturity of such loan. Because the related mortgagors may be required to make a larger single payment upon maturity, it is possible that the default risk associated with negative amortization loans is greater than associated with fully amortizing mortgage loans.

Interest Only and Principal Only Securities Involve Additional Risk

     Certain securities, called "interest only securities" or "principal only securities," involve greater uncertainty regarding the return on investment. An interest only security is not entitled to any principal payments. If the mortgage assets in a pool prepay at rapid rates, it will reduce the amount of interest available to pay a related interest only security and may cause an investor in that interest only security to fail to recover the investor's initial investment.

     A principal only security is not entitled to any interest payments, and is usually sold at a price that is less than the face amount of the security. If an investor in a principal only security receives payments on the security at a slow rate, the return on the investment will be low (because, in part, there are no interest payments to compensate the investor for the use of the investor's money).

     The prices offered by potential purchasers for interest only securities and principal only securities vary significantly from time to time, and there may be times when no potential purchaser is willing to buy an interest only security or principal only security. As a result, an investment in such securities involves a high degree of risk.

Subordinated Securities Involve More Risks and May Incur Losses

     A series of certificates or notes may provide that one or more classes of

such certificates or notes are subordinated in right of payment to one or more
other classes of that series or to one or more tranches of certificates or notes
within a class of a series. Certificates or notes that are subordinated to other
certificates or notes have a greater risk of loss because the subordinated
certificates or notes will not receive principal, interest, or both until the
more senior certificates or notes receive the payments to which they are
entitled. Losses are generally allocated first to subordinated securities. If
the amount available for payments to holders of certificates and notes is less
than the amount required, including as a result of losses on the mortgage
assets, the holders of the subordinated certificates or notes will not receive
the payments that they would have if there had not been a shortfall in the
amount available.

Trust or Trust Fund Assets Are the Only Source of Payments on the Securities

        Any trust or trust fund will not have any significant assets or sources of
funds other than the mortgage assets and the credit enhancement identified in
the related prospectus supplement. The trust or trust fund will be the only
person obligated to make payments on the certificates or notes issued by that
trust or trust fund. In general, investors will not have recourse against us,
the trustee, the master servicer, or any of our or their affiliates. Proceeds of
the assets included in the related trust funds (including the mortgage assets
and any form of credit enhancement) will be the sole source of payments on the
securities, and there will be no recourse to the depositor, a master servicer or
any other entity in the event that such proceeds are insufficient or otherwise
unavailable to make all payments provided for under the securities. As a result,
you must depend on payments on the mortgage assets and any related credit
enhancement for the required payments on your certificates or notes. Any credit
enhancement will not cover all

                                          5
<PAGE>

contingencies, and losses in excess of the coverage the credit enhancement
provides will be borne directly by the affected securityholders.

The Securities Are Obligations of the Trust Only

        The securities will not represent an interest in or obligation of the
depositor, any underwriter, the sponsor, any servicer, any seller, any
responsible party, the trustee or any of their respective affiliates. Unless
otherwise specified in the related prospectus supplement, neither the securities
nor the underlying mortgage loans will be guaranteed or insured by any
governmental agency or instrumentality or by the depositor, any underwriter, the
sponsor, any servicer, any responsible party, the trustee or any of their
respective affiliates. Proceeds of the assets included in the trust will be the
sole source of payments on the securities, and there will be no recourse to the
depositor, any underwriter, the sponsor, any servicer, any responsible party,
the trustee or any other person in the event that such proceeds are insufficient
or otherwise unavailable to make all payments provided for under the securities.

Delays and Expenses Inherent in Foreclosure Procedures Could Delay Distributions
  to You or Result in Losses

        Substantial delays may occur before mortgage assets are liquidated and the
proceeds forwarded to the trust or trust fund. Property foreclosure actions are
regulated by state statutes and rules and, like many lawsuits, are characterized
by significant delays and expenses if defenses or counterclaims are made. As a
result, foreclosure actions can sometimes take several years to complete and
mortgaged property proceeds may not cover the defaulted mortgage loan amount.
Expenses incurred in the course of liquidating defaulted mortgage loans will be
applied to reduce the foreclosure proceeds available to the trust or trust fund.
Liquidation expenses with respect to defaulted mortgage assets do not vary
directly with the outstanding principal balances of the mortgage assets at the
time of default. Therefore, assuming that a master servicer, servicer or

sub-servicer took the same steps in realizing on a defaulted mortgage asset
having a small remaining principal balance as it would in the case of a
defaulted mortgage asset having a large remaining principal balance, the amount
realized after expenses of liquidation would be smaller as a percentage of the
outstanding principal of the small mortgage assets than would be the case with
the larger defaulted mortgage assets having a large remaining principal balance.
Also, some states prohibit a lender from obtaining a judgment against the
mortgagor for amounts not covered by property proceeds if the mortgaged property
is sold outside of a judicial proceeding. As a result, you may experience delays
in receipt of moneys or reductions in amounts payable to you.

     There is no assurance that the value of the mortgaged assets for any
series of certificates or notes at any time will equal or exceed the principal
amount of the outstanding certificates or notes of the series. If trust assets
have to be sold because of an event of default or otherwise, providers of
services to the trust (including the trustee, the master servicer, and the
credit enhancement providers, if any) generally will be entitled to receive the
proceeds of the sale to the extent of their unpaid fees and other amounts due
them before any proceeds are paid to the trust or the trust fund. As a result,
you may not receive the full amount of interest and principal due on your
certificates or notes.

     Your investment may be adversely affected by declines in property values.
If the outstanding balance of a mortgage loan or contract and any secondary
financing on the underlying property is greater than the value of the property,
there is an increased risk of delinquency, foreclosure and loss. A decline in
property values could extinguish the value of a junior mortgagee's interest in a
property and, thus, reduce proceeds payable to the securityholders.

The Concentration of Mortgage Assets in Specific Geographic Areas May Increase
   the Risk of Loss

     The mortgage assets underlying a series of certificates or notes may be
concentrated in certain geographic regions of the United States. In such a case,
losses on the mortgage assets may be higher than would be the case if the
mortgaged properties were more geographically diversified. For example,

                                        6

<PAGE>

some of the mortgaged properties may be more susceptible to certain types of
special hazards, such as earthquakes, hurricanes, floods, fires and other
natural disasters and major civil disturbances, than residential properties
located in other parts of the country.

     In addition, the economies of the states with high concentrations of
mortgaged properties may be adversely affected to a greater degree than the
economies of other areas of the country by certain regional developments. If the
residential real estate markets in an area of concentration experience an
overall decline in property values after the dates of origination of the
respective mortgage assets, then the rates of delinquencies, foreclosures and
losses on the mortgage assets may increase and the increase may be substantial.

     The concentration of mortgage assets with specific characteristics
relating to the types of properties, property characteristics, and geographic
location are likely to change over time. Principal payments may affect the
concentration levels. Principal payments could include voluntary prepayments and
prepayments resulting from casualty or condemnation, defaults and liquidations
and from repurchases due to breaches of representations and warranties. Because
principal payments on the mortgage assets are payable to the subordinated
securities at a slower rate than principal payments are made to the senior
securities, the subordinated securities are more likely to be exposed to any
risks associated with changes in concentrations of mortgage loan or property
characteristics.

Financial Instruments May Not Avoid Losses

        A trust or trust fund may include one or more financial instruments that
are interest rate or currency swap agreements or interest rate cap, collar or
floor agreements, to provide protection against certain types of risks or to
provide certain cash flow characteristics for one or more classes of a series.
The protection or benefit any such financial instrument provides will be
dependent on the performance of the provider of such financial instrument. If
such provider were unable or unwilling to perform its obligations under the
related financial instrument, the related class or classes of certificates or
notes could be adversely affected. Any withdrawal or reduction in a credit
rating assigned to such provider may reduce the market price of the applicable
certificates or notes and may affect a holder's ability to sell them. If a
financial instrument is intended to provide an approximate or partial hedge for
certain risks or cash flow characteristics, holders of the applicable class or
classes will bear the risk that such an imperfect hedge may result in a material
adverse effect on the yield to maturity, the market price and the liquidity of
such class or classes.

Environmental Conditions Affecting Mortgaged Properties May Result in Losses

        Environmental conditions may diminish the value of the mortgage assets and
give rise to liability of various parties. There are many federal and state
environmental laws concerning hazardous wastes, hazardous substances, petroleum
substances (including heating oil and gasoline), radon and other materials which
may affect the property securing the mortgage assets. For example, under the
Federal Comprehensive Environmental Response, Compensation and Liability Act, as
amended, and possibly under state law in certain states, a secured party which
takes a deed-in-lieu of foreclosure or purchases a mortgaged property at a
foreclosure sale may become liable in certain circumstances for the costs of a
remedial action if hazardous wastes or hazardous substances have been released
or disposed of on the property. Such costs may be substantial. It is possible
that costs for remedial action could become a liability of a trust fund. Such
costs would reduce the amounts otherwise distributable to holders of
certificates or notes if a mortgaged property securing a mortgage loan became
the property of a trust fund and if such trust fund incurred such costs.
Moreover, certain states by statute impose a priority lien for any such costs
incurred by such state on the property. In such states, liens for the cost of
any remedial action have priority even over prior recorded liens. In these
states, the security interest of the trustee in a property that is subject to
such a lien could be adversely affected.

                                        7

<PAGE>

Security Interests in Manufactured Homes May Be Lost

        The method of perfecting a security interest in a manufactured home
depends on the laws of the state in which the manufactured home is located and,
in some cases, the facts and circumstances surrounding the location of the
manufactured home (for example, whether the manufactured home has become
permanently affixed to its site). If a manufactured home is moved from one state
to another, the master servicer, or the sub-servicer must take steps to
re-perfect the security interest under the laws of the new state. Generally, the
master servicer or the sub-servicer would become aware of the need to take such
steps following notice due to the notation of the lender's lien on the
applicable certificate of title. However, if through fraud or administrative
error the master servicer, the servicer or the sub-servicer did not take such
steps in a timely manner, the perfected status of the lien on the related
manufactured home could be lost.

        Similarly, if a manufactured home were to become or be deemed to be
permanently affixed to its site, the master servicer, or sub-servicer may have
to take additional steps to maintain the priority and/or perfection of the
security interest granted by the related manufactured housing contract. Although

the borrower will have agreed not to permit the manufactured home to become or
to be deemed to be permanently affixed to the site, we cannot assure you that
the borrower will comply with this agreement. If the borrower does not comply,
the applicable servicer would be unlikely to discover such noncompliance, which
would hinder the servicer's ability to take additional steps, if any, required
under applicable law to maintain the priority and/or perfection of the lien on
the manufactured home.

Residential Real Estate Values May Fluctuate and Adversely Affect Your
  Investment in the Securities

        We cannot assure you that values of the mortgaged properties have remained
or will remain at their levels on the dates of origination of the related
mortgage loans. If the residential real estate market experiences an overall
decline in property values such that the outstanding principal balances of the
mortgage loans, and any secondary financing on the mortgaged properties, in a
particular mortgage pool become equal to or greater than the value of the
mortgaged properties, the actual rates of delinquencies, foreclosures and losses
could be higher than those now generally experienced in the mortgage lending
industry. In that event, the securities, and your investment in the securities,
may not perform as you anticipate.

        In addition, adverse economic conditions and other factors (which may or
may not affect real property values) may affect the mortgagors' timely payment
of scheduled payments of principal and interest on the mortgage loans and,
accordingly, the actual rates of delinquencies, foreclosures and losses with
respect to any mortgage pool. For example, in the case of multifamily loans,
such other factors could include excessive building resulting in an oversupply
of rental housing stock or a decrease in employment reducing the demand for
rental units in an area; federal, state or local regulations and controls
affecting rents; prices of goods and energy; environmental restrictions;
increasing labor and material costs; and the relative attractiveness to tenants
of the mortgaged properties. To the extent that credit enhancements do not cover
such losses, such losses will be borne, at least in part, by the holders of the
securities of the related series.

Increased Use of New Mortgage Loan Products by Borrowers May Result in Decline
  in Real Estate Values Generally

        In recent years, borrowers have increasingly financed their homes with new
mortgage loan products, which in many cases have allowed them to purchase homes
that they might otherwise have been unable to afford. Many of these new products
feature low monthly payments during the initial years of the loan that can
increase (in some cases, significantly) over the loan term. There is little
historical data with respect to these new mortgage loan products. Consequently,
as borrowers face potentially higher monthly payments for the remaining terms of
their loans, it is possible that, combined with other economic conditions such
as increasing interest rates and deterioration of home values, borrower
delinquencies

                                    8
<PAGE>

and defaults could exceed anticipated levels. In that event, the securities, and
your investment in the securities, may not perform as you anticipate.

The Trust May Contain Mortgage Assets Secured by Subordinated Liens; These
  Mortgage Assets Are More Likely Than Mortgage Assets Secured by Senior Liens
  to Experience Losses

        The trust may contain mortgage assets that are in a subordinate lien
position. Mortgages or deeds of trust securing subordinate mortgage assets will
be satisfied after the claims of the senior mortgage holders and the foreclosure
costs are satisfied. In addition, a subordinate lender may only foreclose in a
manner that is consistent with the rights of the senior lender. As a result, the

subordinate lender generally must either pay the related senior lender in full at or before the foreclosure sale or agree to make the regular payments on the senior mortgage asset. Since the trust will not have any source of funds to satisfy any senior mortgage or to continue making payments on that mortgage, the trust's ability as a practical matter to foreclose on any subordinate mortgage will be limited. In addition, since foreclosure proceeds first retire any senior liens, the foreclosure proceeds may not be sufficient to pay all amounts owed to you.

An overall decline in the residential real estate markets could adversely affect the values of the mortgaged properties and cause the outstanding principal balances of the second lien mortgage loans, together with the senior mortgage loans secured by the same mortgaged properties, to equal or exceed the value of the mortgaged properties. This type of decline would adversely affect the position of a subordinate mortgagee before having the same effect on the related first mortgagee. A rise in interest rates over a period of time and the general condition of a mortgaged property as well as other factors may have the effect of reducing the value of the mortgaged property from the appraised value at the time the mortgage loan was originated. If there is a reduction in value of the mortgaged property, the ratio of the amount of the mortgage loan to the value of the mortgaged property may increase over what it was at the time the mortgage loan was originated. This type of increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the second lien mortgage loan after satisfaction of any senior liens. In circumstances where the applicable servicer determines that it would be uneconomical to foreclose on the related mortgaged property, the servicer may write off the entire outstanding principal balance of the related subordinate lien mortgage loan as bad debt.

Violation of Various Federal, State and Local Laws May Result in Losses on the
  Mortgage Loans

There has been an increased focus by state and federal banking regulatory agencies, state attorneys general offices, the Federal Trade Commission, the U.S. Department of Justice, the U.S. Department of Housing and Urban Development and state and local governmental authorities on certain lending practices by some companies in the subprime industry, sometimes referred to as "predatory lending" practices. Sanctions have been imposed by state, local and federal governmental agencies for practices including, but not limited to, charging borrowers excessive fees, imposing higher interest rates than the borrower's credit risk warrants and failing to adequately disclose the material terms of loans to the borrowers.

Applicable state and local laws generally regulate interest rates and other charges, require certain disclosure, impact closing practices, and require licensing of originators. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, ownership, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

    o the Federal Truth in Lending Act and Regulation Z promulgated under that Act, which require certain disclosures to the mortgagors regarding the terms of the mortgage loans;

    o the Equal Credit Opportunity Act and Regulation B promulgated under that Act, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of

                                      9

<PAGE>

public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

o the Fair Credit Reporting Act, which regulates the use and reporting of
information related to the mortgagor's credit experience.

Violations of certain provisions of these federal, state and local laws
may limit the ability of the applicable servicer to collect all or part of the
principal of, or interest on, the mortgage loans and in addition could subject
the related trust to damages and administrative enforcement (including
disgorgement of prior interest and fees paid). In particular, an originator's
failure to comply with certain requirements of federal and state laws could
subject the trust (and other assignees of the mortgage loans) to monetary
penalties, and result in the obligors' rescinding the mortgage loans against
either the trust or subsequent holders of the mortgage loans.

If Consumer Protection Laws are Violated in the Origination or Servicing of the
  Loans, Losses on Your Investment Could Result

In addition to federal laws, most states and some local governments have
laws and public policies for the protection of consumers that prohibit unfair
and deceptive practices in the origination, servicing and collection of loans,
regulate interest rates and other loan changes and require licensing of loan
originators and servicers. Violations of these laws may limit the ability of the
master servicer or the sub-servicer to collect interest or principal on the
mortgage assets and may entitle the borrowers to a refund of amounts previously
paid. Any limit on the master servicer's or the sub-servicer's ability to
collect interest or principal on a mortgage loan may result in a loss to you.

The mortgage loans may also be governed by federal laws relating to the
origination and underwriting of mortgage loans. These laws:

o    require specified disclosures to the borrowers regarding the terms
     of the mortgage loans;

o    prohibit discrimination on the basis of age, race, color, sex,
     religion, marital status, national origin, receipt of public
     assistance or the exercise of any right under the consumer credit
     protection act in the extension of credit;

o    regulate the use and reporting of information related to the
     borrower's credit experience;

o    require additional application disclosures, limit changes that may
     be made to the loan documents without the borrower's consent and
     restrict a lender's ability to declare a default or to suspend or
     reduce a borrower's credit limit to enumerated events;

o    permit a homeowner to withhold payment if defective craftsmanship or
     incomplete work do not meet the quality and durability standards
     agreed to by the homeowner and the contractor; and

o    limit the ability of the master servicer or the sub-servicer to
     collect full amounts of interest on some mortgage assets and
     interfere with the ability of the master servicer or the
     sub-servicer to foreclose on some mortgaged properties.

If particular provisions of these federal laws are violated, the master
servicer or the sub-servicer may be unable to collect all or part of the
principal or interest on the mortgage assets. The trust also could be exposed to
damages and administrative enforcement. In either event, losses on your
investment could result.

Assets of the Trust or Trust Fund May Include Mortgage Loans Originated Under
  Less Stringent Underwriting Standards

The assets of the trust or trust fund may include residential mortgage
loans that were made, in part, to borrowers who, for one reason or another, are

not able, or do not wish, to obtain financing from

10

<PAGE>

traditional sources. These mortgage loans may be considered to be of a riskier
nature than mortgage loans made by traditional sources of financing, so that the
holders of the securities may be deemed to be at greater risk of loss than if
the mortgage loans were made to other types of borrowers.

The underwriting standards used in the origination of these mortgage loans
are generally less stringent than those of Fannie Mae or Freddie Mac with
respect to a borrower's credit history and in certain other respects. Borrowers
on these mortgage loans may have an impaired or unsubstantiated credit history.
As a result of this less stringent approach to underwriting, the mortgage loans
purchased by the trust may experience higher rates of delinquencies, defaults
and foreclosures than mortgage loans underwritten in a manner which is more
similar to the Fannie Mae and Freddie Mac guidelines.

Assets of the Trust or Trust Fund May Include Delinquent and Sub-Performing
  Residential Mortgage Loans

The assets of the trust or trust fund may include residential mortgage
loans that are delinquent or sub-performing. The credit enhancement provided
with respect to your series of securities may not cover all losses related to
these delinquent or sub-performing residential loans. You should consider the
risk that including these residential loans in the trust fund could increase the
risk that you will suffer losses because:

   o    the rate of defaults and prepayments on the residential mortgage
        loans to increase; and

   o    in turn, losses may exceed the available credit enhancement for the
        series and affect the yield on your securities.

Value of Collateral Securing Cooperative Loans May Diminish in Value

Certain of the mortgage loans may be cooperative loans. The cooperative
(1) owns all the real property that comprises the project, including the land
and the apartment building comprised of separate dwelling units and common areas
or (2) leases the land generally by a long term ground lease and owns the
apartment building. The cooperative is directly responsible for project
management and, in most cases, payment of real estate taxes and hazard and
liability insurance. If there is a blanket mortgage on the property and/or
underlying land, as is generally the case, the cooperative, as project
mortgagor, is also responsible for meeting these mortgage obligations.
Ordinarily, the cooperative incurs a blanket mortgage in connection with the
construction or purchase of the cooperative's apartment building. The interest
of the occupants under proprietary leases or occupancy agreements to which the
cooperative is a party are generally subordinate to the interest of the holder
of the blanket mortgage in that building. If the cooperative is unable to meet
the payment obligations arising under its blanket mortgage, the mortgagee
holding the blanket mortgage could foreclose on that mortgage and terminate all
subordinate proprietary leases and occupancy agreements. In addition, the
blanket mortgage on a cooperative may provide financing in the form of a
mortgage that does not fully amortize with a significant portion of principal
being due in one lump sum at final maturity. The inability of the cooperative to
refinance this mortgage and its consequent inability to make such final payment
could lead to foreclosure by the mortgagee providing the financing. A
foreclosure in either event by the holder of the blanket mortgage could
eliminate or significantly diminish the value of any collateral held by the
lender who financed the purchase by an individual tenant stockholder of
cooperative shares or, in the case of a trust fund including cooperative loans,
the collateral securing the cooperative loans. See "Legal Aspects of the
Mortgage Loans - General - Cooperative Loans" in this prospectus.

Bankruptcy of the Depositor or a Sponsor May Delay or Reduce Collections on
  Loans

    The depositor and the sponsor for each series of securities may be
eligible to become a debtor under the United States Bankruptcy Code. If the
depositor or a sponsor for any series of securities were to become a debtor
under the United States Bankruptcy Code, the bankruptcy court could be asked to
determine whether the mortgage assets that support your series of securities
constitute property of the debtor, or whether they constitute property of the
related issuing entity. If the bankruptcy court were to

                                    11

<PAGE>

determine that the mortgage assets constitute property of the estate of the
debtor, there could be delays in payments to certificateholders of collections
on the mortgage assets and/or reductions in the amount of the payments paid to
certificateholders. The mortgage assets would not constitute property of the
estate of the depositor or of the sponsor if the transfer of the mortgage assets
from the sponsor to the depositor and from the depositor to the related issuing
entity are treated as true sales, rather than pledges, of the mortgage assets.

    The transactions contemplated by this prospectus and the related
prospectus supplements will be structured so that, if there were to be a
bankruptcy proceeding with respect to the sponsor or the depositor, the
transfers described above should be treated as true sales, and not as pledges.
The mortgage assets should accordingly be treated as property of the related
issuing entity and not as part of the bankruptcy estate of the depositor or
sponsor. In addition, the depositor is operated in a manner that should make it
unlikely that it would become the subject of a bankruptcy filing.

    However, there can be no assurance that a bankruptcy court would not
recharacterize the transfers described above as borrowings of the depositor or
sponsor secured by pledges of the mortgage assets. Any request by the debtor (or
any of its creditors) for such a recharacterization of these transfers, if
successful, could result in delays in payments of collections on the mortgage
assets and/or reductions in the amount of the payments paid to
certificateholders, which could result in losses on the related series of
securities. Even if a request to recharacterize these transfers were to be
denied, delays in payments on the mortgage assets and resulting delays or losses
on the related series of securities could result.

The Securities Are Not Suitable Investments for All Investors

    The certificates and the notes are complex investments that are not
appropriate for all investors. The interaction of the factors described in this
prospectus and the related prospectus supplement is difficult to analyze and may
change from time to time while the certificates or notes of a series are
outstanding. It is impossible to predict with any certainty the amount or timing
of distributions on the certificates or notes of a series or the likely return
on an investment in any such securities. As a result, only sophisticated
investors with the resources to analyze the potential risks and rewards of an
investment in the certificates or notes should consider such an investment.

Your Investment May Not Be Liquid

    The underwriter intends to make a secondary market in the securities, but
it will have no obligation to do so. We cannot assure you that such a secondary
market will develop or, if it develops, that it will continue. Consequently, you
may not be able to sell your securities readily or at prices that will enable
you to realize your desired yield. The market values of the securities are
likely to fluctuate; these fluctuations may be significant and could result in
significant losses to you.

The secondary markets for asset backed securities have experienced periods
of illiquidity and can be expected to do so in the future. Illiquidity can have
a severely adverse effect on the prices of securities that are especially
sensitive to prepayment, credit, or interest rate risk, or that have been
structured to meet the investment requirements of limited categories of
investors. The related prospectus supplement may specify that the securities are
not "mortgage related securities" for purposes of the Secondary Mortgage Market
Enhancement Act of 1984, as amended. In that case, many institutions that lack
the legal authority to invest in securities that do not constitute "mortgage
related securities" will not be able to invest in those securities, thereby
limiting the market for those securities. If your investment activities are
subject to legal investment laws and regulations, regulatory capital
requirements, or review by regulatory authorities, then you may be subject to
restrictions on investment in the securities. You should consult your own legal
advisors for assistance in determining the suitability of and consequences to
you of the purchase, ownership, and sale of those securities. See "Legal
Investment" in this prospectus and in the related prospectus supplement.

12

<PAGE>

The Ratings on Your Certificates Could Be Reduced or Withdrawn

     Each rating agency rating the securities may change or withdraw its
initial ratings at any time in the future if, in its judgment, circumstances
warrant a change. No person is obligated to maintain the ratings at their
initial levels. If a rating agency reduces or withdraws its rating on one or
more classes of the securities, the liquidity and market value of the affected
securities is likely to be reduced.

Conflicts of Interest between the Master Servicer and the Trust

     The master servicer or an affiliate of the master servicer may initially
own all or a portion of certain classes of the securities. The timing of
mortgage loan foreclosures and sales of the related mortgaged properties, which
will be under the control of the master servicer, may affect the weighted
average lives and yields of the securities. Although the servicing standard in
the related servicing agreement will obligate the master servicer to service the
mortgage loans without regard to the ownership or non ownership of any
securities by the master servicer or any of its affiliates, you should consider
the possibility that the timing of such foreclosures or sales may not be in the
best interests of all securityholders. You should also consider that, other than
the general servicing standard described above, no specific guidelines will be
set forth in the related servicing agreement to resolve or minimize potential
conflicts of interest of this sort.

Servicing Fee May be Insufficient to Engage Replacement Master Servicers or
  Servicers

     To the extent that the prospectus supplement indicates that the fee
payable to the Master Servicer or other servicer is based on a fee rate that is
a percentage of the outstanding mortgage loan balances, no assurance can be made
that such fee rate in the future will be sufficient to attract a replacement
Master Servicer or other servicer to accept an appointment for the related
series. In addition, to the extent the mortgage pool of any series has amortized
significantly at the time that a replacement Master Servicer or other servicer
is sought, the aggregate fee that would be payable to any such replacement may
not be sufficient to attract a replacement to accept an appointment for the
related series.

You May Have Income for Tax Purposes Prior to Your Receipt of Cash

     Securities purchased at a discount and securities purchased at a premium
that are deemed to have original issue discount may incur tax liabilities prior
to a holder's receiving the related cash payments.

In addition, holders of REMIC residual certificates will be required to report on their federal income tax returns as ordinary income their pro rata share of the taxable income of the REMIC, regardless of the amount or timing of their receipt of cash payments, as described in "Federal Income Tax Consequences" in this prospectus. Accordingly, holders of offered securities that constitute REMIC residual certificates may have taxable income and tax liabilities arising from their investment during a taxable year in excess of the cash received during that year. The requirement that holders of REMIC residual certificates report their pro rata share of the taxable income and net loss will continue until the outstanding balances of all classes of securities of the series have been reduced to zero, even though holders of REMIC residual certificates have received full payment of their stated interest and principal. The holder's share of the REMIC taxable income may be treated as excess inclusion income to the holder, which:

    o    generally, will not be subject to offset by losses from other
         activities,

    o    for a tax-exempt holder, will be treated as unrelated business
         taxable income, and

    o    for a foreign holder, will not qualify for exemption from
         withholding tax.

    Individual holders of REMIC residual certificates may be limited in their ability to deduct servicing fees and other expenses of the REMIC. In addition, REMIC residual certificates are subject to certain restrictions on transfer. Because of the special tax treatment of REMIC residual certificates, the taxable income arising in a given year on a REMIC residual certificate will not be equal to the taxable income associated with investment in a corporate bond or stripped instrument having similar cash flow

                              13

<PAGE>

characteristics and pre-tax yield. Therefore, the after-tax yield on the REMIC residual certificate may be significantly less than that of a corporate bond or stripped instrument having similar cash flow characteristics. See "Federal Income Tax Consequences" in this prospectus.

                    THE TRUSTS OR TRUST FUNDS

    A trust or trust fund for a series of securities will consist primarily of mortgage assets consisting of:

    1. a mortgage pool* comprised of:

    o    Single family loans. "Single family loans" consist of mortgage loans
         secured by one- to four-family residential properties (which may
         have mixed residential and commercial uses),

    o    Multifamily loans. "Multifamily loans" consist of mortgage loans
         secured by multifamily residential properties (which may have mixed
         residential and commercial uses),

    o    Cooperative loans. "Cooperative loans" consist of loans secured by
         security interests or similar liens on shares in cooperative housing
         corporations and the related proprietary leases or occupancy
         agreements,

    o    Manufactured housing contracts. "Manufactured housing contracts"
         consist of conditional sales contracts and installment sales or loan
         agreements secured by manufactured housing,

o    Revolving credit line mortgage loans. "Revolving credit line
     mortgage loans" consist of mortgage loans (or certain revolving
     credit line mortgage loan balances) secured by one- to four-family
     or multifamily residential properties (which may have mixed
     residential and commercial uses), the unpaid principal balances of
     which may vary during a specified period of time as the related line
     of credit is repaid or drawn down by the borrower from time to time,
     and/or

o    Commercial real estate loans. "Commercial real estate loans" consist
     of mortgage loans secured by commercial real estate properties;
     provided that such loans will not constitute 10% or more, by
     principal balance, of the pool of assets for any series of
     securities;

   2. mortgage pass-through securities issued or guaranteed by the Government
National Mortgage Association, Federal National Mortgage Association, Federal
Home Loan Mortgage Corporation or other government agencies or
government-sponsored agencies, which are referred to in this prospectus as
"agency securities"; and/or

   3. mortgage-backed securities issued by entities other than government
agencies or government-sponsored agencies, which are referred to in this
prospectus as "privately issued mortgage-backed securities", in each case, as
specified in the related prospectus supplement, together with payments in
respect of such mortgage assets and certain other accounts, obligations or
agreements, such as U.S. Government Securities, in each case as specified in the
related prospectus supplement.

   The single and multifamily loans, the cooperative loans, the manufactured
housing contracts and the revolving credit line mortgage loans are sometimes
referred to in this prospectus as the "mortgage loans." If the related
prospectus supplement so specifies, certain certificates in a series of
certificates or certain notes in a series of notes will evidence the entire
beneficial ownership interest in, or the debt

------------------------

* Whenever the terms "mortgage pool" and "securities" are used in this
prospectus, such terms will be deemed to apply, unless the context indicates
otherwise, to one specific mortgage pool and the securities representing certain
undivided interests in, or the debt obligations of, a single trust fund
consisting primarily of the mortgage loans in such mortgage pool. Similarly, the
term "interest rate" will refer to the interest rate borne by the securities of
one specific series and the term "trust fund" will refer to one specific trust
fund or the trust which owns the assets of such trust fund.

                                       14
<PAGE>

obligations of, a trust fund, and, in turn the assets of such trust fund will
consist of a beneficial ownership interest in another trust fund which will
contain the underlying trust assets. The certificates and notes are sometimes
referred to in this prospectus as the securities.

   We will acquire the mortgage assets, either directly or through
affiliates, from originators or other entities, who are referred to as
"lenders," or in the market and we will convey the mortgage assets to the
related trust fund.

   As used in this prospectus, "Agreement" means, (1) with respect to the
certificates of a series, the pooling and servicing agreement or the trust
agreement and (2) with respect to the notes of a series, the indenture or the
master servicing agreement, as the context requires.

The following is a brief description of the assets expected to be included in a trust or a trust fund. If specific information respecting assets is not known at the time that the related securities of a series are initially offered, more general information of the nature described below will be provided in the related prospectus supplement. Specific information will be filed in a report on Form 8-K to be filed with the Securities and Exchange Commission within four business days after the initial issuance of such securities. A copy of the pooling and servicing agreement or the trust agreement and/or the indenture, as applicable, with respect to each series will be in a report on Form 8-K. You will be able to inspect such agreements at the corporate trust office of the trustee specified in the related prospectus supplement. A schedule of the mortgage assets relating to such series will be attached to the Agreement delivered to the trustee upon delivery of the securities.

The Mortgage Loans - General

The real property and manufactured homes, as the case may be, that secure repayment of the mortgage loans, which this prospectus refers to as the mortgaged properties, may be located in any one of the fifty states or the District of Columbia, Guam, Puerto Rico or any other territory of the United States. Certain mortgage loans may be conventional loans (i.e., loans that are not insured or guaranteed by any governmental agency), insured by the Federal Housing Authority - also referred to as the "FHA" - or partially guaranteed by the Veterans Administration - also referred to as the "VA" or the Rural Housing Service of the United State Department of Agriculture - also referred to as "RHS" - as specified in the related prospectus supplement and described below. Primary mortgage guaranty insurance policies (each a "primary insurance policy") may wholly or partially cover mortgage loans with certain Loan-to-Value Ratios or certain principal balances. The related prospectus supplement will describe the existence, extent and duration of any such coverage.

Mortgage loans in a mortgage pool will provide that borrowers make payments monthly or bi-weekly or as specified in the related prospectus supplement. Unless otherwise specified in the related prospectus supplement, payments will be due on the first day of each month for all of the monthly-pay mortgage loans in a mortgage pool. The related prospectus supplement will describe the payment terms of the mortgage loans included in a trust fund. Such payment terms may include any of the following features:

o    Borrowers may pay interest at a fixed rate, a rate adjustable from
     time to time in relation to an index, a rate that is fixed for a
     period of time or under certain circumstances and is followed by an
     adjustable rate, a rate that otherwise varies from time to time, or
     a rate that is convertible from an adjustable rate to a fixed rate.
     Periodic adjustment limitations, maximum rates, minimum rates or a
     combination of such limitations may apply to changes to an
     adjustable rate. Accrued interest may be deferred and added to the
     principal of a mortgage loan for such periods and under such
     circumstances as the related prospectus supplement may specify.
     Mortgage loans may provide for the payment of interest at a rate
     lower than the specified interest rate on the mortgage loan for a
     period of time or for the life of the mortgage loan, and the amount
     of any difference may be contributed from funds supplied by the
     seller of the mortgaged property or another source or may be treated
     as accrued interest added to the principal of the mortgage loan;

                                    15

<PAGE>

o    Principal may be payable on a level debt service basis to amortize
     the mortgage loan fully over its term. Principal may be calculated
     on the basis of an assumed amortization schedule that is
     significantly longer than the original term to maturity or on an
     interest rate that is different from the interest rate on the
     mortgage loan or may not be amortized during all or a portion of the

original term. A mortgage loan as to which substantial payment of principal is due on the maturity date is referred to as a balloon loan, and the final payment is referred to as a balloon payment. Payment of all or a substantial portion of the principal may be due on maturity. Principal may include deferred interest that has been added to the principal balance of the mortgage loan;

o   Periodic payments of principal and interest (also referred to as scheduled payments) may be fixed for the life of the mortgage loan or may increase over a specified period of time or may change from period to period. Mortgage loans may include limits on periodic increases or decreases in the amount of monthly payments and may include maximum or minimum monthly payments. Certain mortgage loans, sometimes called graduated payment mortgage loans, may (1) require the monthly payments of principal and interest to increase for a specified period or (2) provide for deferred payment of a portion of the interest due monthly during such period, and add such interest to the principal balance of the mortgage loan. This procedure is referred to as negative amortization. In a negatively amortizing loan, the difference between the scheduled payment of interest and the amount of interest actually accrued is added monthly to the outstanding principal balance. Other mortgage loans, sometimes referred to as growing equity mortgage loans, may provide for periodic scheduled payment increases for a specified period with the full amount of such increases being applied to principal; and

o   A prepayment fee may apply to prepayments of principal. Such prepayment fee may be fixed for the life of the mortgage loan or may decline over time. Certain mortgage loans may permit prepayments after expiration of a lockout period and may require the payment of a prepayment fee in connection with any subsequent prepayment. Other mortgage loans may permit prepayments without payment of a fee unless the prepayment occurs during specified time periods. The mortgage loans may include due-on-sale clauses, which permit the mortgagee to demand payment of the entire mortgage loan in connection with the sale by the mortgagor or certain transfers of the related mortgaged property. Other mortgage loans may be assumable by persons meeting the then applicable underwriting standards of the lender.

Each prospectus supplement will contain information, as of a date specified in such prospectus supplement and to the extent then specifically known to us, about the mortgage loans contained in the related mortgage pool, including:

o   the aggregate principal balance and the average principal balance of the mortgage loans as of the date specified in the related prospectus supplement,

o   the type of property securing the mortgage loans (e.g., one- to four-family houses, vacation and second homes, manufactured homes, multifamily apartments, leasehold interests, investment properties, condotels-which generally are condominium units at properties that may include features similar to those commonly found at hotels, such as maid service, a front desk or resident manager, rental pools and commercial space, or such other amenities as may be described in the related prospectus supplement-or other real property),

o   the original terms to maturity of the mortgage loans,

o   the aggregate principal balance of mortgage loans having Loan-to-Value Ratios at origination exceeding 80%,

o   the specified interest rate or accrual percentage rates or range of specified interest rates or accrual percentage rates borne by the

mortgage loans, and

o    the geographical distribution of the mortgage loans on a
     state-by-state basis.

16

<PAGE>


    The "Loan-to-Value Ratio" of a mortgage loan at any time is the fraction,
expressed as a percentage, the numerator of which is the outstanding principal
balance of the mortgage loan and the denominator of which is the collateral
value of the related mortgaged property. The collateral value of a mortgaged
property, other than with respect to manufactured housing contracts and certain
mortgage loans the proceeds of which were used to refinance an existing mortgage
loan (each, a "Refinance Loan"), is the lesser of (a) the appraised value
determined in an appraisal obtained by the originator at origination of such
mortgage loan and (b) the sales price for such property. In the case of
Refinance Loans, the collateral value of the related mortgaged property
generally is the appraised value of the mortgaged property determined in an
appraisal obtained at the time of refinancing. For purposes of calculating the
Loan-to-Value Ratio of a manufactured housing contract relating to a new
manufactured home, the collateral value is no greater than the sum of a fixed
percentage of the list price of the unit actually billed by the manufacturer to
the dealer (exclusive of freight to the dealer site) including "accessories"
identified in the invoice plus the actual cost of any accessories purchased from
the dealer, a delivery and set-up allowance, depending on the size of the unit,
and the cost of state and local taxes, filing fees and up to three years prepaid
hazard insurance premiums. The collateral value of a used manufactured home is
the least of the sales price, appraised value, and National Automobile Dealer's
Association book value plus prepaid taxes and hazard insurance premiums. The
appraised value of a manufactured home is based upon the age and condition of
the manufactured housing unit and the quality and condition of the mobile home
park in which it is situated, if applicable.


    We will cause the mortgage loans comprising each mortgage pool to be
assigned to the trustee named in the related prospectus supplement for the
benefit of the holders of the certificates or notes, as applicable, of the
related series. To the extent one or more servicers or master servicers are
appointed for a related series (each, a "Master Servicer"), they will be
required to service the mortgage loans, either directly or through
sub-servicers, pursuant to the pooling and servicing agreement or, if the series
includes notes, pursuant to a servicing agreement among us, the Master Servicer
and the related trust or trust fund. Alternately, the trustee may also serve in
the capacity of the master servicer if so specified in the related prospectus
supplement or applicable Agreement. The related prospectus supplement will
identify any master servicer, any servicer affiliated with the applicable
sponsor, any servicer that services at least 10% of the mortgage loans
underlying the related securities and any other material servicer that is
responsible for performing an aspect of the servicing on which the securities
would be materially dependent. The Master Servicer or sub-servicers will receive
a fee for such services. With respect to mortgage loans serviced by a Master
Servicer through a sub-servicer, the Master Servicer will remain liable for its
servicing obligations under the applicable agreement, as if the Master Servicer
alone were servicing such mortgage loans.


    With respect to a series of securities, to the extent specified in the
related prospectus supplement, we will obtain certain representations and
warranties from the entities from whom we purchase the mortgage loans. To the
extent specified in the related prospectus supplement, we will assign our rights
with respect to such representations and warranties to the trustee for such
series of notes or such series of certificates, as applicable. We will have
obligations with respect to a series only to the extent specified in the related
prospectus supplement. The obligations of each Master Servicer with respect to
the mortgage loans will consist principally of its contractual servicing

Case 1:19-cv-02307-RGG Document 29-2 Filed 05/29/20 Page 283 of 418

obligations under the related agreement and its obligation to make certain cash
advances in the event of delinquencies in payments on or with respect to the
mortgage loans in the amounts described under "Description of the
Securities--Advances." The obligations of a Master Servicer to make advances may
be subject to limitations, to the extent this prospectus and the related
prospectus supplement provide.

Single Family and Cooperative Loans

        Single family loans will consist of mortgage loans, deeds of trust or
other beneficial interests in mortgage loans or deeds of trust, secured by liens
on one- to four-family residential or mixed residential and commercial use
properties. The single family loans may include loans secured by mortgages or
deeds of trust on condominium units in condominium buildings together with such
condominium unit's appurtenant interest in the common elements of the
condominium building. Cooperative loans will be secured by security interests in
or similar liens on stock, shares or membership certificates issued by

                                       17

<PAGE>

private, nonprofit, cooperative housing corporations, known as cooperatives, and
in the related proprietary leases or occupancy agreements granting exclusive
rights to occupy specific dwelling units in such cooperatives' buildings. Single
family loans and cooperative loans may be conventional (i.e., loans that are not
insured or guaranteed by any governmental agency), insured by the FHA or
partially guaranteed by the VA or the RHS, as specified in the related
prospectus supplement. Single family loans and cooperative loans will have
individual principal balances at origination of not less than $5,000, and
original terms to stated maturity of 15 to 40 years or such other individual
principal balances at origination and/or original terms to stated maturity as
the related prospectus supplement specifies.

        The mortgaged properties relating to single family loans will consist of
detached or semi-detached one-family dwelling units, two- to four-family
dwelling units, townhouses, rowhouses, individual condominium units, individual
units in planned unit developments, and certain other dwelling units, which may
be part of a mixed use property. Such mortgaged properties may include vacation
and second homes, investment properties and leasehold interests. Certain
mortgage loans may be originated or acquired in connection with employee
relocation programs.

Multifamily Loans

        Multifamily loans will consist of mortgage loans, deeds of trust or other
beneficial interests in mortgage loans or deeds of trust, secured by liens on
rental apartment buildings or projects containing five or more residential units
and which may be part of a mixed use property. Such loans may be conventional
loans or FHA-insured loans, as the related prospectus supplement specifies.
Multifamily loans generally will have original terms to stated maturity of not
more than 40 years or as otherwise specified in the related prospectus
supplement.

        Mortgaged properties which secure multifamily loans may include high-rise,
mid-rise and garden apartments. Apartment buildings that the cooperative owns
may secure certain of the multifamily loans. The cooperative owns all the
apartment units in the building and all common areas. Tenant-stockholders own
the cooperative. Through ownership of stock, shares or membership certificates
in the corporation, the tenant-stockholders receive proprietary leases or
occupancy agreements, which confer exclusive rights to occupy specific
apartments or units. Generally, a tenant-stockholder of a cooperative must make
a monthly payment to the cooperative representing such tenant-stockholder's pro
rata share of the cooperative's payments for its mortgage loan, real property
taxes, maintenance expenses and other capital or ordinary expenses. Those
payments are in addition to any payments of principal and interest the

tenant-stockholder must make on any loans to the tenant-stockholder secured by
its shares in the cooperative. The cooperative will be directly responsible for
building management and, in most cases, payment of real estate taxes and hazard
and liability insurance. A cooperative's ability to meet debt service
obligations on a multifamily loan, as well as all other operating expenses, will
be dependent in large part on the receipt of maintenance payments from the
tenant-stockholders, as well as any rental income from units or commercial areas
the cooperative might control. In some cases, unanticipated expenditures may
have to be paid by special assessments on the tenant-stockholders.

Manufactured Housing Contracts

     The manufactured housing contracts will consist of manufactured housing
conditional sales contracts and installment sales or loan agreements each
secured by a manufactured home. Manufactured housing contracts may be
conventional, insured by the FHA or partially guaranteed by the VA or the RHS,
as specified in the related prospectus supplement. Each manufactured housing
contract will be fully amortizing and will bear interest at its accrual
percentage rate. Manufactured housing contracts will have individual principal
balances at origination of not less than $5,000 and original terms to stated
maturity of 5 to 40 years, or such other individual principal balances at
origination and/or terms to stated maturity as are specified in the
related prospectus supplement.

     The "manufactured homes" securing the manufactured housing contracts will
consist of manufactured homes within the meaning of 42 United States Code,
Section 5402(6), which defines a "manufactured home" as "a structure,
transportable in one or more sections, which in the traveling

                                      18
<PAGE>

mode, is eight body feet or more in width or forty body feet or more in length,
or, when erected on site, is three hundred twenty or more square feet, and which
is built on a permanent chassis and designed to be used as a dwelling with or
without a permanent foundation when connected to the required utilities, and
includes the plumbing, heating, air conditioning, and electrical systems
contained in the home; except that such term shall include any structure which
meets all the requirements of this paragraph except the size requirements and
with respect to which the manufacturer voluntarily files a certification
required by the Secretary of Housing and Urban Development and complies with the
standards established under this chapter." In the past, manufactured homes were
commonly referred to as "mobile homes."

Revolving Credit Line Mortgage Loans

     Revolving credit line mortgage loans may consist, in whole or in part, of
mortgage loans or other beneficial interests in mortgage loans or certain
revolving credit line mortgage loan balances. Interest on each revolving credit
line mortgage loan, excluding introductory rates offered from time to time
during promotional periods, may be computed and payable monthly on the average
daily outstanding principal balance of such loan. From time to time prior to the
expiration of the related draw period specified in a revolving credit line
mortgage loan, principal amounts on such revolving credit line mortgage loan may
be drawn down (up to a maximum amount as set forth in the related prospectus
supplement) or repaid. If specified in the related prospectus supplement, new
draws by borrowers under the revolving credit line mortgage loans will
automatically become part of the trust fund described in the prospectus
supplement. As a result, the aggregate balance of the revolving credit line
mortgage loans will fluctuate from day to day as new draws by borrowers are
added to the trust fund and principal payments are applied to such balances and
such amounts will usually differ each day. The full amount of a closed-end
revolving credit line mortgage loan is advanced at the inception of the
revolving credit line mortgage loan and generally is repayable in equal, or
substantially equal, installments of an amount sufficient to amortize fully the

revolving credit line mortgage loan at its stated maturity. Except to the extent
provided in the related prospectus supplement, the original terms to stated
maturity of closed-end revolving credit line mortgage loans generally will not
exceed 360 months. If specified in the related prospectus supplement, the terms
to stated maturity of closed-end revolving credit line mortgage loans may exceed
360 months.

     Under certain circumstances, under a revolving credit line mortgage loan,
a borrower may choose an interest-only payment option, during which the borrower
is obligated to pay only the amount of interest that accrues on the loan during
the billing cycle, and may also elect to pay all or a portion of the principal.
An interest-only payment option may terminate at the end of a specific period,
after which the borrower must begin paying at least a minimum monthly portion of
the average outstanding principal balance of the revolving credit line mortgage
loan.

Agency Securities

     Government National Mortgage Association. Government National Mortgage
Association, commonly known as GNMA ("GNMA"), is a wholly-owned corporate
instrumentality of the United States with the United States Department of
Housing and Urban Development. Section 306(g) of Title II of the National
Housing Act of 1934, as amended (the "Housing Act"), authorizes GNMA to
guarantee the timely payment of the principal of and interest on certificates,
known as GNMA certificates, which represent an interest in a pool of mortgage
loans insured by FHA under the Housing Act, or Title V of the Housing Act of
1949, or partially guaranteed by the VA under the Servicemen's Readjustment Act
of 1944, as amended, or Chapter 37 of Title 38, United States Code or by the RHS
under Title V of the Housing Act of 1949. The mortgage loans insured by the FHA
are referred to as FHA Loans ("FHA Loans"). The loans partially guaranteed by
the VA are referred to as VA Loans ("VA Loans"), and loans partially guaranteed
by the RHS are referred to as RHS Loans ("RHS Loans").

     Section 306(g) of the Housing Act provides that "the full faith and credit
of the United States is pledged to the payment of all amounts which may be
required to be paid under any guarantee under this subsection." In order to meet
its obligations under any such guarantee, GNMA may, under Section 306(d) of the
Housing Act, borrow from the United States Treasury in an amount which is at any

                                       19

<PAGE>

time sufficient to enable GNMA, with no limitations as to amount, to perform its
obligations under its guarantee.

     GNMA Certificates. Each GNMA certificate that a trust fund holds (which
may be issued under either the GNMA I Program or the GNMA II Program) will be a
"fully modified pass-through" mortgaged-backed certificate issued and serviced
by a mortgage banking company or other financial concern, known as a GNMA
issuer, approved by GNMA or approved by Fannie Mae as a seller-servicer of FHA
Loans, VA Loans and/or RHS Loans. Each GNMA certificate which is issued under
the GNMA I Program is a "GNMA I Certificate," and each GNMA certificate which is
issued under the GNMA II Program is a "GNMA II Certificate." The mortgage loans
underlying the GNMA certificates will consist of FHA Loans, VA Loans, RHS loans
and other loans eligible for inclusion in loan pools underlying GNMA
certificates. A one- to four-family residential or mixed use property or a
manufactured home secures each such mortgage loan. GNMA will approve the
issuance of each such GNMA certificate in accordance with a guaranty agreement
between GNMA and the GNMA issuer. Pursuant to its guaranty agreement, a GNMA
issuer will advance its own funds to make timely payments of all amounts due on
each such GNMA certificate, even if the payments received by the GNMA issuer on
the FHA Loans, VA Loans or RHS Loans underlying each such GNMA certificate are
less than the amounts due on each such GNMA certificate.

     GNMA will guarantee the full and timely payment of principal of and

interest on each GNMA certificate. GNMA's guarantee is backed by the full faith
and credit of the United States. Each such GNMA certificate will have an
original maturity of not more than 30 years (but may have original maturities of
substantially less than 30 years). Each such GNMA certificate will be based on
and backed by a pool of FHA Loans, VA Loans or RHS Loans secured by one- to
four-family residential or mixed use properties or manufactured homes. Each such
GNMA certificate will provide for the payment by or on behalf of the GNMA issuer
to the registered holder of such GNMA certificate of scheduled monthly payments
of principal and interest equal to the registered holder's proportionate
interest in the aggregate amount of the monthly principal and interest payment
on each FHA Loan, VA Loan or RHS Loans underlying such GNMA certificate, less
the applicable servicing and guarantee fee which together equal the difference
between the interest on the FHA Loan, VA Loan or RHS Loans and the pass-through
rate on the GNMA certificate. In addition, each payment will include
proportionate pass-through payments of any prepayments of principal on the FHA
Loans, VA Loans or RHS Loans underlying such GNMA certificate and Liquidation
Proceeds in the event of a foreclosure or other disposition of any such FHA
Loans, VA Loans or RHS Loans.

     If a GNMA issuer is unable to make the payments on a GNMA certificate as
it becomes due, it must promptly notify GNMA and request GNMA to make such
payment. Upon notification and request, GNMA will make such payments directly to
the registered holder of such GNMA certificate. In the event the GNMA issuer
makes no payment and the GNMA issuer fails to notify and request GNMA to make
such payment, the holder of such GNMA certificate will have recourse only
against GNMA to obtain such payment. The trustee or its nominee, as registered
holder of the GNMA certificates held in a trust fund, will have the right to
proceed directly against GNMA under the terms of the guaranty agreements
relating to such GNMA certificates for any amounts that are not paid when due.

     All mortgage loans underlying a particular GNMA I Certificate must have
the same interest rate (except for pools of mortgage loans secured by
manufactured homes) over the term of the loan. The interest rate on such GNMA I
Certificate will equal the interest rate on the mortgage loans included in the
pool of mortgage loans underlying such GNMA I Certificate, less one-half
percentage point per annum of the unpaid principal balance of the mortgage
loans.

     Mortgage loans underlying a particular GNMA II Certificate may have per
annum interest rates that vary from each other by up to one percentage point.
The interest rate on each GNMA II Certificate will be between one-half
percentage point and one and one-half percentage points lower than the highest
interest rate on the mortgage loans included in the pool of mortgage loans
underlying such GNMA II Certificate (except for pools of mortgage loans secured
by manufactured homes).

                                        20
<PAGE>

     Regular monthly installment payments on each GNMA certificate held in a
trust fund will be comprised of interest due as specified on such GNMA
certificate plus the scheduled principal payments on the FHA Loans, VA Loans or
RHS Loans underlying such GNMA certificate due on the first day of the month in
which the scheduled monthly installments on such GNMA certificate is due. Such
regular monthly installments on each such GNMA certificate are required: (i) to
be paid to the trustee as registered holder by the 15th day of each month in the
case of a GNMA I Certificate, and (ii) to be mailed to the trustee by the 20th
day of each month in the case of a GNMA II Certificate. Any Principal
Prepayments on any FHA Loans, VA Loans or RHS Loans underlying a GNMA
certificate held in a trust fund or any other early recovery of principal on
such loan will be passed through to the trustee as the registered holder of such
GNMA certificate.

     GNMA certificates may be backed by graduated payment mortgage loans or by

"buydown" mortgage loans for which funds will have been provided (and deposited into escrow accounts) for application to the payment of a portion of the borrowers' monthly payments during the early years of such mortgage loan. Payments due to the registered holders of GNMA certificates backed by pools containing "buydown" mortgage loans will be computed in the same manner as payments derived from other GNMA certificates and will include amounts to be collected from both the borrower and the related escrow account. The graduated payment mortgage loans will provide for graduated interest payments that, during the early years of such mortgage loans, will be less than the amount of stated interest on such mortgage loans. The interest not so paid will be added to the principal of such graduated payment mortgage loans and, together with interest thereon, will be paid in subsequent years. The obligations of GNMA and of a GNMA issuer will be the same irrespective of whether graduated payment mortgage loans or buydown loans back the GNMA certificates. No statistics comparable to the FHA's prepayment experience on level payment, non-buydown loans are available in respect of graduated payment or buydown mortgages. GNMA certificates related to a series of certificates may be held in book-entry form.

    If a related prospectus supplement so specifies, multifamily mortgage loans having the characteristics specified in such prospectus supplement may back the GNMA certificates.

    The GNMA certificates included in a trust fund, and the related underlying mortgage loans, may have characteristics and terms different from those described above. The related prospectus supplement will describe any such different characteristics and terms.

    Federal National Mortgage Association. The Federal National Mortgage Association, commonly referred to as Fannie Mae ("Fannie Mae"), is a federally chartered and privately owned corporation organized and existing under the Federal National Mortgage Association Charter Act. Fannie Mae was originally established in 1938 as a United States government agency to provide supplemental liquidity to the mortgage market and was transformed into a stockholder-owned and privately managed corporation by legislation enacted in 1968.

    Fannie Mae provides funds to the mortgage market primarily by purchasing mortgage loans from lenders, thereby replenishing their funds for additional lending. Fannie Mae acquires funds to purchase mortgage loans from many capital market investors that may not ordinarily invest in mortgages, thereby expanding the total amount of funds available for housing. Operating nationwide, Fannie Mae helps to redistribute mortgage funds from capital-surplus to capital-short areas.

    Fannie Mae Certificates. Fannie Mae certificates are guaranteed mortgage pass-through certificates representing fractional undivided interests in a pool of mortgage loans formed by Fannie Mae. Each mortgage loan must meet the applicable standards of the Fannie Mae purchase program. Mortgage loans comprising a pool are either provided by Fannie Mae from its own portfolio or purchased pursuant to the criteria of the Fannie Mae purchase program.

    Mortgage loans underlying Fannie Mae certificates that a trust fund holds will consist of conventional mortgage loans, FHA Loans, VA Loans or RHS Loans. Original maturities of substantially all of the conventional, level payment mortgage loans underlying a Fannie Mae certificate are expected to be between either 8 to 15 years or 20 to 40 years. The original maturities of substantially all of the fixed rate level payment FHA Loans, VA Loans or RHS Loans are expected to be 30 years.

                                        21

<PAGE>


    Mortgage loans underlying a Fannie Mae certificate may have annual interest rates that vary by as much as two percentage points from each other. The rate of interest payable on a Fannie Mae certificate is equal to the lowest

interest rate of any mortgage loan in the related pool, less a specified minimum annual percentage representing servicing compensation and Fannie Mae's guaranty fee. Under a regular servicing option (pursuant to which the mortgagee or other servicer assumes the entire risk of foreclosure losses), the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will be between 50 basis points and 250 basis points greater than its annual pass-through rate and under a special servicing option (pursuant to which Fannie Mae assumes the entire risk for foreclosure losses), the annual interest rates on the mortgage loans underlying a Fannie Mae certificate will generally be between 55 basis points and 255 basis points greater than the annual Fannie Mae certificate pass-through rate. If the related prospectus supplement so specifies, adjustable rate mortgages may back the Fannie Mae certificates.

Fannie Mae guarantees to each registered holder of a Fannie Mae certificate that it will distribute amounts representing such holder's proportionate share of scheduled principal and interest payments at the applicable pass-through rate provided for by such Fannie Mae certificate on the underlying mortgage loans, whether or not received. Fannie Mae also guarantees that it will distribute such holder's proportionate share of the full principal amount of any foreclosed or other finally liquidated mortgage loan, whether or not such principal amount is actually recovered. The obligations of Fannie Mae under its guarantees are obligations solely of Fannie Mae and are not backed by, nor entitled to, the full faith and credit of the United States. Although the Secretary of the Treasury of the United States has discretionary authority to lend Fannie Mae up to $2.25 billion outstanding at any time, the United States and its agencies are not obligated to finance Fannie Mae's operations or to assist Fannie Mae in any other manner. If Fannie Mae were unable to satisfy its obligations, distributions to holders of Fannie Mae certificates would consist solely of payments and other recoveries on the underlying mortgage loans and, accordingly, delinquent payments and defaults on such mortgage loans would affect monthly distributions to holders of Fannie Mae certificates.

Fannie Mae certificates evidencing interests in pools of mortgage loans formed on or after May 1, 1985 (other than Fannie Mae certificates backed by pools containing graduated payment mortgage loans or mortgage loans secured by multifamily projects) are available in book-entry form only. Distributions of principal and interest on each Fannie Mae certificate will be made by Fannie Mae on the 25th day of each month to the persons in whose name the Fannie Mae certificate is entered in the books of the Federal Reserve Banks (or registered on the Fannie Mae certificate register in the case of fully registered Fannie Mae certificates) as of the close of business on the last day of the preceding month. With respect to Fannie Mae certificates issued in book-entry form, distributions thereon will be made by wire, and with respect to fully registered Fannie Mae certificates, distributions thereon will be made by check.

The Fannie Mae certificates included in a trust fund, and the related underlying mortgage loans, may have characteristics and terms different from those discussed in this prospectus. The related prospectus supplement will describe any such different characteristics and terms.

Federal Home Loan Mortgage Corporation. The Federal Home Loan Mortgage Corporation, commonly referred to as Freddie Mac ("Freddie Mac"), is a publicly held United States government-sponsored enterprise created pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, as amended, commonly known as the FHLMC Act. Freddie Mac was established primarily to increase the availability of mortgage credit for the financing of urgently needed housing. Freddie Mac seeks to provide an enhanced degree of liquidity for residential mortgage investments by assisting in the development of secondary markets for conventional mortgages. The principal activity of Freddie Mac consists of the purchase of first lien conventional mortgage loans or participation interests in such mortgage loans. Freddie Mac then sells the mortgage loans or participations so purchased in the form of mortgage securities, primarily Freddie Mac certificates. Freddie Mac is confined to purchasing, so far as practicable, mortgage loans that it deems to be of such quality, type and class as to meet the purchase standards imposed by

Case 1:19-cv-02007-RGC Document 29-2 Filed 05/29/20 Page 289 of 418

private institutional mortgage investors.

     Freddie Mac Certificates. Each Freddie Mac certificate represents an
undivided interest in a pool of mortgage loans that may consist of first lien
conventional loans, FHA Loans, VA Loans or RHS Loans.

                                      22

<PAGE>

Such loans are commonly referred to as a Freddie Mac certificate group. Freddie
Mac certificates are sold under the terms of a mortgage participation
certificate agreement. A Freddie Mac certificate may be issued under either
Freddie Mac's Cash Program or Guarantor Program.

     Freddie Mac guarantees to each registered holder of a Freddie Mac
certificate the timely payment of interest on the underlying mortgage loans to
the extent of the applicable Freddie Mac certificate rate on the registered
holder's pro rata share of the unpaid principal balance outstanding on the
underlying mortgage loans in the Freddie Mac certificate group represented by
such Freddie Mac certificate, whether or not received. Freddie Mac also
guarantees to each registered holder of a Freddie Mac certificate collection by
such holder of all principal on the underlying mortgage loans, without any
offset or deduction, to the extent of such holder's pro rata share of such
principal, but does not, except if and to the extent specified in the prospectus
supplement for a series of Freddie Mac certificates, guarantee the timely
payment of scheduled principal. Under Freddie Mac's Gold PC Program, Freddie Mac
guarantees the timely payment of principal based on the difference between the
pool factor, published in the month preceding the month of distribution and the
pool factor published in such month of distribution. Pursuant to its guarantees,
Freddie Mac indemnifies holders of Freddie Mac certificates against any
diminution in principal by reason of charges for property repairs, maintenance
and foreclosure. Freddie Mac may remit the amount due on account of its
guarantee of collection of principal at any time after default on an underlying
mortgage loan, but not later than (a) 30 days following foreclosure sale, (b) 30
days following payment of the claim by any mortgage insurer, or (c) 30 days
following the expiration of any right of redemption, whichever occurs later, but
in any event no later than one year after demand has been made upon the
mortgagor for accelerated payment of principal. In taking actions regarding the
collection of principal after default on the mortgage loans underlying Freddie
Mac certificates, including the timing of demand for acceleration, Freddie Mac
reserves the right to exercise its judgment with respect to the mortgage loans
in the same manner as for mortgage loans which it has purchased but not sold.
The length of time necessary for Freddie Mac to determine that a mortgage loan
should be accelerated varies with the particular circumstances of each
mortgagor, and Freddie Mac has not adopted standards which require that the
demand be made within any specified period.

     Freddie Mac certificates are not guaranteed by the United States or by any
Federal Home Loan Bank. The Freddie Mac certificates do not constitute debts or
obligations of the United States or any Federal Home Loan Bank. The obligations
of Freddie Mac under its guarantee are obligations solely of Freddie Mac and are
not backed by, nor entitled to, the full faith and credit of the United States.
If Freddie Mac was unable to satisfy such obligations, distributions to holders
of Freddie Mac certificates would consist solely of payments and other
recoveries on the underlying mortgage loans and, accordingly, delinquent
payments and defaults on such mortgage loans would affect monthly distributions
to holders of Freddie Mac certificates.

     Registered holders of Freddie Mac certificates are entitled to receive
their monthly pro rata share of all principal payments on the underlying
mortgage loans received by Freddie Mac, including any scheduled principal
payments, full and partial repayments of principal and principal received by
Freddie Mac by virtue of condemnation, insurance, liquidation or foreclosure,
and repurchases of the mortgage loans by Freddie Mac or the seller of the
mortgage loans. Freddie Mac is required to remit each registered Freddie Mac

certificateholder's pro rata share of principal payments on the underlying
mortgage loans, interest at the Freddie Mac pass-through rate and any other sums
such as prepayment fees, within 60 days of the date on which such payments are
deemed to have been received by Freddie Mac.

Under Freddie Mac's cash program, there is no limitation on the amount by
which interest rates on the mortgage loans underlying a Freddie Mac certificate
may exceed the pass-through rate on the Freddie Mac certificate. Under such
program, Freddie Mac purchases groups of whole mortgage loans from sellers at
specified percentages of their unpaid principal balances, adjusted for accrued
or prepaid interest, which when applied to the interest rate of the mortgage
loans and participations purchased, results in the yield (expressed as a
percentage) required by Freddie Mac. The required yield, which includes a
minimum servicing fee retained by the servicer, is calculated using the
outstanding principal balance. The range of interest rates on the mortgage loans
and participations in a Freddie Mac certificate

                                      23

<PAGE>

group under the Cash Program will vary since mortgage loans and participations
are purchased and assigned to a Freddie Mac certificate group based upon their
yield to Freddie Mac rather than on the interest rate on the underlying mortgage
loans. Under Freddie Mac's Guarantor Program, the pass-through rate on a Freddie
Mac certificate is established based upon the lowest interest rate on the
underlying mortgage loans, minus a minimum servicing fee and the amount of
Freddie Mac's management and guaranty income as agreed upon between the seller
and Freddie Mac.

Freddie Mac certificates duly presented for registration of ownership on
or before the last business day of a month are registered effective as of the
first day of the month. The first remittance to a registered holder of a Freddie
Mac certificate will be distributed so as to be received normally by the 15th
day of the second month following the month in which the purchaser became a
registered holder of the Freddie Mac certificates. Thereafter, such remittance
will be distributed monthly to the registered holder so as to be received
normally by the 15th day of each month. The Federal Reserve Bank of New York
maintains book-entry accounts with respect to Freddie Mac certificates sold by
Freddie Mac on or after January 2, 1985, and makes payments of principal and
interest each month to the registered holders of such Freddie Mac certificates
in accordance with such holders' instructions.

Stripped Mortgage-Backed Securities. Agency securities may consist of one
or more stripped mortgage-backed securities, each as described in this
prospectus and in the related prospectus supplement. Each stripped
mortgage-backed security will represent an undivided interest in all or part of
either the principal distributions (but not the interest distributions) or the
interest distributions (but not the principal distributions), or in some
specified portion of the principal and interest distributions (but not all of
such distributions) on certain Freddie Mac, Fannie Mae, GNMA or other government
agency or government-sponsored agency certificates. The yield on and value of
stripped mortgage-backed securities are extremely sensitive to the timing and
amount of Principal Prepayments on the underlying securities. The underlying
securities will be held under a trust agreement by Freddie Mac, Fannie Mae, GNMA
or another government agency or government-sponsored agency, each as trustee, or
by another trustee named in the related prospectus supplement. Freddie Mac,
Fannie Mae, GNMA or another government agency or government-sponsored agency
will guarantee each stripped agency security to the same extent as such entity
guarantees the underlying securities backing such stripped agency security.

Other Agency Securities. If the related prospectus supplement so
specifies, a trust fund may include other mortgage pass-through certificates
issued or guaranteed by GNMA, Fannie Mae, Freddie Mac or other government
agencies or government-sponsored agencies. The related prospectus supplement
will describe the characteristics of any such mortgage pass-through

certificates. If so specified, a trust fund may hold a combination of different
types of agency securities.

Private Mortgage-Backed Securities

        General. Private mortgage-backed securities may consist of (a) mortgage
pass-through certificates evidencing a direct or indirect undivided interest in
a pool of mortgage loans, or (b) collateralized mortgage obligations secured by
mortgage loans. Private mortgage-backed securities ("PMBS") will have been
issued pursuant to a pooling and servicing agreement - a "PMBS pooling and
servicing agreement." The private mortgage-backed securities in a trust fund may
include a class or classes of securities that are callable at the option of
another class or classes of securities. The seller/servicer, which this
prospectus refers to as the "PMBS servicer," of the underlying mortgage loans
will have entered into the PMBS pooling and servicing agreement with the trustee
under the PMBS pooling and servicing agreement. The trustee under the PMBS
pooling and servicing agreement is referred to as the "PMBS trustee." The PMBS
trustee or its agent, or a custodian, will possess the mortgage loans underlying
such private mortgage-backed security. Mortgage loans underlying a private
mortgage-backed security will be serviced by the PMBS servicer directly or by
one or more sub-servicers who may be subject to the supervision of the PMBS
servicer. The PMBS servicer will be a Fannie Mae or Freddie Mac approved
servicer and, if FHA Loans underlie the private mortgage-backed securities,
approved by the Department of Housing and Urban Development as an FHA mortgagee,
or such other servicer as the related prospectus supplement may specify. The
Department of Housing and Urban Development is sometimes referred to as HUD.


                                      24

<PAGE>


        The PMBS either will have been previously registered under the Securities
Act of 1933, as amended, or each of the following will have been satisfied with
respect to the PMBS: (1) neither the issuer of the PMBS nor any of its
affiliates has a direct or indirect agreement, arrangement, relationship or
understanding relating to the PMBS and the related series of securities to be
issued; (2) neither the issuer of the PMBS nor any of its affiliates is an
affiliate of the sponsor, depositor, issuing entity or underwriter of the
related series of securities to be issued and (3) the depositor would be free to
publicly resell the PMBS without registration under the Securities Act of 1933,
as amended. If the issuer of the PMBS is required to file reports under the
Exchange Act of 1934, as amended, the related prospectus supplement will
describe how to locate such reports of the PMBS issuer. The PMBS issuer
generally will be a financial institution or other entity engaged generally in
the business of mortgage lending or the acquisition of mortgage loans, a public
agency or instrumentality of a state, local or federal government, or a limited
purpose or other corporation organized for the purpose of, among other things,
establishing trusts and acquiring and selling housing loans to such trusts and
selling beneficial interests in such trusts. If the related prospectus
supplement so specifies, the PMBS issuer may be one of our affiliates where the
PMBS have been previously registered under the Securities Act of 1933, as
amended or the PMBS themselves are exempt from registration under Section 3 of
the Securities Act of 1933, as amended. The obligations of the PMBS issuer
generally will be limited to certain representations and warranties with respect
to the assets it conveyed to the related trust or its assignment of the
representations and warranties of another entity from which it acquired the
assets. The PMBS issuer will not generally have guaranteed any of the assets
conveyed to the related trust or any of the private mortgage-backed securities
issued under the PMBS pooling and servicing agreement. Additionally, although
the mortgage loans underlying the private mortgage-backed securities may be
guaranteed by an agency or instrumentality of the United States, the private
mortgage-backed securities themselves will not be so guaranteed. The related
prospectus supplement will state the market price of the PMBS and the basis on
which the market price was determined.

Distributions of principal and interest will be made on the private
mortgage-backed securities on the dates specified in the related prospectus
supplement. The private mortgage-backed securities may be entitled to receive
nominal or no principal distributions or nominal or no interest distributions.
The PMBS trustee or the PMBS servicer will make principal and interest
distributions on the private mortgage-backed securities. The PMBS issuer or the
PMBS servicer may have the right to repurchase assets underlying the private
mortgage-backed securities after a certain date or under other circumstances
specified in the related prospectus supplement.

Underlying Loans. The mortgage loans underlying the private
mortgage-backed securities may consist of fixed rate, level payment, fully
amortizing loans or graduated payment mortgage loans, buydown loans, adjustable
rate mortgage loans, or loans having balloon payments or other special payment
features. Each underlying mortgage loan may be secured by single family
property, multifamily property, manufactured home or by an assignment of the
proprietary lease or occupancy agreement relating to a specific dwelling within
a cooperative and the related shares issued by such cooperative. In general, the
underlying loans will be similar to the mortgage loans that may be directly part
of the mortgage assets.

Credit Support Relating to Private Mortgage-Backed Securities. Credit
support in the form of subordination of other private mortgage certificates
issued under the PMBS pooling and servicing agreement, reserve funds, insurance
policies, letters of credit, financial guaranty insurance policies, guarantees
or other types of credit support may be provided with respect to the mortgage
loans underlying the private mortgage-backed securities or with respect to the
private mortgage-backed securities themselves.

Additional Information. The prospectus supplement for a series for which
the trust fund includes private mortgage-backed securities will specify:

1. the aggregate approximate principal amount and type of the private
mortgage-backed securities to be included in the trust fund,

25

<PAGE>

2. certain characteristics of the mortgage loans which comprise the
underlying assets for the private mortgage-backed securities including, to the
extent available:

o   the payment features of such mortgage loans,

o   the approximate aggregate principal balance, if known, of the
    underlying mortgage loans insured or guaranteed by a governmental
    entity,

o   the servicing fee or range of servicing fees with respect to the
    mortgage loans,

o   the minimum and maximum stated maturities of the underlying mortgage
    loans at origination and

o   delinquency experience with respect to the mortgage loans,

3. the pass-through or certificate rate of the private mortgage-backed
securities or the method of determining such rate,

4. the PMBS issuer, the PMBS servicer (if other than the PMBS issuer) and
the PMBS trustee for such private mortgage-backed securities,

5. certain characteristics of credit support, if any, such as

subordination, reserve funds, insurance policies, letters of credit or
guarantees relating to the mortgage loans underlying the private mortgage-backed
securities or to such private mortgage-backed securities themselves,

     6. the terms on which the underlying mortgage loans for such private
mortgage-backed securities, or such private mortgage-backed securities
themselves, may, or are required to, be purchased before their stated maturity
or the stated maturity of the private mortgage-backed securities, and

     7. If the issuer of the PMBS is required to file reports under the
Exchange Act of 1934, as amended, the related prospectus supplement will
describe how to locate such reports of the PMBS issuer.

U.S. Government Securities

     If the related prospectus supplement so specifies, United States Treasury
securities and other securities issued by the U.S. Government, any of its
agencies or other issuers established by federal statute (collectively, "U.S.
Government Securities") may be included in the trust assets. Such securities
will be backed by the full faith and credit of the United States or will
represent the obligations of the U.S. Government or such agency or such other
issuer or obligations payable from the proceeds of U.S. Government Securities,
as specified in the related prospectus supplement.

Substitution of Mortgage Assets

     If the related prospectus supplement so provides, substitution of mortgage
assets will be permitted in the event of breaches of representations and
warranties with respect to any original mortgage asset. Substitution of mortgage
assets also will be permitted in the event the trustee or such other party
specified in the prospectus supplement determines that the documentation with
respect to any mortgage asset is incomplete. The related prospectus supplement
will indicate the period during which such substitution will be permitted and
any other conditions to substitution.

Pre-Funding and Capitalized Interest Accounts

     If the related prospectus supplement so specifies, a trust fund will
include one or more segregated trust accounts, known as "pre-funding accounts,"
established and maintained with the trustee for the related series. If so
specified, on the closing date for such series, a portion of the proceeds of the
sale of the securities of such series (such amount generally to be equal to the
excess of (a) the principal amounts of securities being sold over (b) the
principal balance (as of the related cut-off date) of the mortgage assets on the
closing date), will be deposited in the pre-funding account and may be used to

<div align="center">26</div>

&lt;PAGE&gt;

purchase additional mortgage loans during the pre-funding period specified in
the related prospectus supplement. The pre-funding period will not exceed one
year and the portion of the proceeds for the related series that is to be used
for the purchase of additional mortgage loans will not be in excess of 50% of
the total proceeds from the offering of the related series. The mortgage loans
to be so purchased will be required to have certain characteristics specified in
the related prospectus supplement. Each additional mortgage loan so purchased
must conform to the representations and warranties in the applicable Agreement.
Therefore, the characteristics of the mortgage assets at the end of the
pre-funding period will conform in all material respects to the characteristics
of the mortgage assets on the closing date. If any of the principal balance of
the trust assets as of the closing date that were deposited in the pre-funding
account remain on deposit at the end of the pre-funding period, such amount will
be applied in the manner specified in the related prospectus supplement to
prepay the securities of the applicable series. Pending the acquisition of
additional assets during the pre-funding period, all amounts in the pre-funding

account will be invested in Permitted Investments, as defined under "Credit
Enhancement--Reserve and Other Accounts." It is expected that substantially all
of the funds deposited in the pre-funding account will be used during the
related pre-funding period to purchase additional assets as described above. If,
however, amounts remain in the pre-funding account at the end of the pre-funding
period, such amounts will be distributed to the securityholders, as described in
the related prospectus supplement.

     If a pre-funding account is established, one or more segregated trust
accounts, known as "capitalized interest accounts", may be established and
maintained with the trustee for the related series. On the closing date for such
series, a portion of the proceeds of the sale of the securities of such series
will be deposited in the capitalized interest account and used to fund the
excess, if any, of (a) the sum of (1) the amount of interest accrued on the
securities of such series and (2) if the related prospectus supplement so
specifies, certain fees or expenses during the pre-funding period such as
trustee fees and credit enhancement fees, over (b) the amount of interest
available to pay interest on such securities and, if applicable, such fees and
expenses from the mortgage assets or other assets in the trust fund. Any amounts
on deposit in the capitalized interest account at the end of the pre-funding
period that are not necessary for such purposes will be distributed to the
person specified in the related prospectus supplement.

                              USE OF PROCEEDS

     We intend to use the net proceeds from the sale of the securities of each
series to repay short-term loans, if any, incurred to finance the purchase of
the trust assets related to such securities, to acquire certain of the trust
assets to be deposited in the related trust fund, and/or to pay other expenses
connected with pooling such assets and issuing securities.

                              THE DEPOSITOR

     We are a Delaware corporation organized on December 5, 1986. We are
engaged in the business of acquiring mortgage assets and selling interests in
mortgage assets or notes secured by, or certificates backed by, such mortgage
assets. We are a wholly-owned subsidiary of Goldman Sachs Mortgage Company, a
New York limited partnership, and an affiliate of Goldman, Sachs & Co. We
maintain our principal office at 85 Broad Street, New York, New York 10004. Our
telephone number is (212) 902-1000.

     We do not have, nor do we expect in the future to have, any significant
assets.

                              THE SPONSOR

     The prospectus supplement for each series of securities will identify the
sponsor or sponsors for the related series. If specified in the related
prospectus supplement, the sponsor may be Goldman Sachs Mortgage Company, a New
York limited partnership and the parent of the depositor. GSMC was formed in
1984. Its general partner is Goldman Sachs Real Estate Funding Corp. and its
limited partner is The

                                   27
<PAGE>

Goldman Sachs Group, Inc. (NYSE:GS). GSMC's executive offices are located at 85
Broad Street, New York, New York 10004, telephone number (212) 902-1000. GSMC
purchases closed, independently funded, first- and subordinate-lien residential
mortgage loans for its own investment, securitization, or resale. In addition,
GSMC provides warehouse and repurchase financing to mortgage lenders. GSMC does
not service loans. Instead GSMC contracts with another entity to service the
loans on its behalf. GSMC also may engage in the secondary market activities
noted above for non-real estate-secured loans in certain jurisdictions and other
activities, but its principal business activity involves real estate-secured

assets.

GSMC has been active as a sponsor in the securitization market since 2001. As a sponsor, GSMC acquires residential mortgage loans in the secondary mortgage market and initiates the securitization of the loans it acquires by transferring the mortgage loans to the depositor, which loans will ultimately be transferred to the issuing entity for the related securitization.

As of December 31, 2006, GSMC has sponsored the securitization of approximately $162 billion of residential mortgage loans, which include prime, subprime, Alt-A, FHA/VA/RHS, second lien, home equity line of credit, "scratch and dent," re-performing and seasoned loans, among others.

GSMC acquires residential mortgage loans in two contexts:

   (1)   through bulk purchases, generally consisting of mortgage loan
         pools greater than $50 million; and

   (2)   through conduit purchases.

Prior to acquiring any mortgage loans, GSMC will conduct a review of the related mortgage loan seller. GSMC's review process consists of reviewing select financial information for credit and risk assessment and underwriting guideline review, senior level management discussion and background checks. The scope of the loan due diligence will depend on the credit quality of the mortgage loans.

The underwriting guideline review considers mortgage loan origination processes and systems. In addition, such review considers corporate policy and procedures relating to HOEPA and state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and material investors.

Servicers are assessed based upon review of systems and reporting capabilities (as compared against industry standard), review of collection procedures and confirmation of servicers' ability to provide loan-level data. In addition, GSMC conducts background checks, meets with senior management to determine whether the servicer complies with industry standards and otherwise monitors the servicer on an ongoing basis.

                         THE MORTGAGE LOANS

General

We will have purchased the mortgage loans, either directly or through affiliates, from lenders or other loan sellers who may or may not be affiliated with us. We do not originate mortgage loans. In general, each lender or loan seller will represent and warrant that all mortgage loans originated and/or sold by it to us or one of our affiliates will have been underwritten in accordance with standards consistent with those used by mortgage lenders or manufactured home lenders during the period of origination or such other standards as we have required of such lender or loan seller, in any case, as specified in the applicable prospectus supplement. We may elect to re-underwrite some of the mortgage loans based upon our own criteria. As to any mortgage loan insured by the FHA or partially guaranteed by the VA or the RHS, the lender will represent that it has complied with underwriting policies of the FHA, the VA or the RHS, as the case may be.

                                28

<PAGE>

The lender or an agent acting on the lender's behalf applies the underwriting standards to evaluate the borrower's credit standing and repayment ability, and to evaluate the value and adequacy of the mortgaged property as

collateral. In general, the lender may require that a prospective borrower fill
out a detailed application designed to provide to the underwriting officer
pertinent credit information. As a part of the description of the borrower's
financial condition, the lender may require the borrower to provide a current
list of assets and liabilities and a statement of income and expense as well as
an authorization to apply for a credit report, which summarizes the borrower's
credit history with local merchants and lenders and any record of bankruptcy.
The lender may obtain employment verification from an independent source
(typically the borrower's employer). The employment verification reports the
length of employment with that organization, the current salary and whether it
is expected that the borrower will continue such employment in the future. If a
prospective borrower is self employed, the lender may require the borrower to
submit copies of signed tax returns. The lender may require the borrower to
authorize verification of deposits at financial institutions where the borrower
has demand or savings accounts. In determining the adequacy of the mortgaged
property as collateral, the lender will generally obtain an appraisal to
determine the fair market value of each property considered for financing.

        In the case of single family loans, cooperative loans and manufactured
housing contracts, once all applicable employment, credit and property
information is received, the lender makes a determination as to whether the
prospective borrower has sufficient monthly income available (as to meet the
borrower's monthly obligations on the proposed mortgage loan and other expenses
related to the mortgaged property such as property taxes and hazard insurance).
The underwriting standards applied by lenders may be varied in appropriate cases
where factors such as low Loan-to-Value Ratios or other favorable credit factors
exist.

        A lender may originate mortgage loans under a reduced documentation
program with balances that exceed, in size or other respects, general agency
criteria. A reduced documentation program facilitates the loan approval process
and improves the lender's competitive position among other loan originators.
Under a reduced documentation program, more emphasis is placed on property
underwriting than on credit underwriting and certain credit underwriting
documentation concerning income and employment verification is waived.

        Certain of the types of mortgage loans that may be included in the
mortgage pools are recently developed. These types of mortgage loans may involve
additional uncertainties not present in traditional types of loans. For example,
certain of such mortgage loans may provide that the mortgagor or obligors make
escalating or variable payments. These types of mortgage loans are underwritten
on the basis of a judgment that mortgagors or obligors will have the ability to
make the monthly payments required initially. In some instances, however, a
mortgagor's or obligor's income may not be sufficient to permit continued loan
payments as such payments increase.

        We may, in connection with the acquisition of mortgage loans,
re-underwrite the mortgage loans based upon criteria we believe are appropriate
depending to some extent on our or our affiliates' prior experience with the
lender and the servicer, as well as our prior experience with a particular type
of loan or with loans relating to mortgaged properties in a particular
geographical region. A standard approach to re-underwriting will be to compare
loan file information and information that is represented to us on a tape with
respect to a percentage of the mortgage loans we deem appropriate in the
circumstances. We will not undertake any independent investigations of the
creditworthiness of particular obligors.

Goldman Sachs Mortgage Conduit Program Underwriting Guidelines

        If so specified in the related prospectus supplement, we may acquire
mortgage loans from GSMC that GSMC acquired through its conduit program.

        The information set forth below has been provided by GSMC.

        All of the mortgage loans that GSMC may acquire through its conduit

program will be acquired generally in accordance with the underwriting criteria
described in this section. In certain instances, compensating factors
demonstrated to the mortgage loan originator by a prospective borrower may

<div align="center">29</div>

&lt;PAGE&gt;

warrant GSMC to make certain exceptions to these guidelines. In such instances
GSMC would purchase a mortgage loan that did not completely conform to the
guidelines set out below.

   The underwriting guidelines used to originate certain of the mortgage
loans acquired by GSMC are different from and, in some cases, less stringent
than, the underwriting standards established by Fannie Mae or Freddie Mac. The
differences primarily relate to loan characteristics such as original principal
balances, loan-to-value ratios, borrower income, required documentation,
interest rates, borrower occupancy of the mortgaged property and/or property
types. Mortgage loans originated pursuant to underwriting standards different
from those of Fannie Mae and Freddie Mac may experience higher rates of
delinquency and/or credit losses than mortgage loans originated by Fannie Mae or
Freddie Mac. In addition, compensating factors demonstrated by a prospective
borrower may warrant certain exceptions to the underwriting standards described
in this section.

   Generally, each borrower applying for a mortgage loan must complete a
credit application. The credit application is designed to provide the
originating lender with relevant credit information about the prospective
borrower such as information with respect to the borrower's assets, liabilities,
income (except as described below), credit history, employment history and
personal information. In addition, prospective borrowers generally must provide
an authorization to apply for a credit report. A credit report summarizes the
borrower's past credit experience with lenders and other debtors, including any
record of bankruptcy. Sometimes, the borrower is required to authorize the
originating lender to verify deposits at financial institutions identified by
the borrower as institutions at which the borrower maintains demand or savings
accounts. The originating lender may also consider certain non-wage income of
the borrower in the underwriting process, including income derived from
mortgaged properties that are investment properties or two- to four-unit
dwellings. Generally, the originating lender will not consider income derived
from vacation or second homes in the underwriting process. Certain borrowers
with acceptable payment histories are not required to state their income on
their loan application and, as a result, the originating lender does not verify
their income.

   Based on the data referred to above (and verification of that data, to the
extent required), the originating lender makes a determination about whether the
borrower's monthly income (if required to be stated) will be sufficient to
enable the borrower to meet its monthly obligations on the mortgage loan and
other expenses related to the property, including property taxes, utility costs,
standard hazard insurance and other fixed and revolving obligations other than
housing expenses. Generally, scheduled payments on a mortgage loan during the
first twelve months of its term plus taxes and insurance and all scheduled
payments on obligations that extend beyond ten months may equal no more than a
specified percentage of the prospective borrower's gross income. The permitted
percentage is determined on the basis of various underwriting criteria,
including the LTV ratio of the mortgage loan and, in certain instances, the
amount of liquid assets available to the borrower after origination.

   In addition to its "full" documentation program, loans acquired by GSMC
through its conduit program may also be originated under the following limited
documentation programs: "reduced income," "stated income," "stated income/stated
assets" or "no doc." These limited documentation programs are designed to
streamline the underwriting process.

The "reduced income," "stated income," "stated income/stated asset" and "no doc" programs generally require less documentation and verification than do "full" documentation programs.

Generally, the "full" documentation program requires information with respect to the borrower's income and assets (i.e., standard Fannie Mae/Freddie Mac approved forms for verification of income/employment, assets and certain payment histories). However, alternative forms of standard verifications may also be used for income (i.e., W-2 forms, tax returns and/or pay stubs) and assets (i.e., bank statements). Generally, under "full" documentation programs at least one year of income documentation is provided. Employment history must also be verified by the originating lender.

Generally, the "reduced" documentation program requires similar information with respect to the borrower's income as a "full" documentation program. However, under "reduced" documentation

                              30
<PAGE>

programs only six months of income documentation is generally provided. Employment history must also be verified by the originating lender.

Generally, under the "stated income" program, the borrower's income is stated on the credit application but not verified by the originator. However, employment history must be verified by the originating lender.

Generally, under the "stated income/stated assets" program, both income and assets are stated on the loan application, but the originator verifies neither; although the stated income must be reasonable relative to the borrower's stated employment. However, employment history must be verified by the originating lender.

Generally, under the "no doc" program, the borrower's income and assets are neither stated on the credit application nor verified by the originator. The underwriting for mortgage loans originated under a "no doc" program may be based primarily or entirely on the appraised value of the mortgaged property and the LTV ratio at origination as well as on the payment history and credit score of the related borrower. Employment history is neither stated nor verified by the originating lender.

The following charts summarize GSMC's maximum loan-to-value ratio requirements under its various documentation programs:

Full Documentation

| Minimum FICO Score | Owner Occupied | | 2nd Home | | Non-Owner Occupied | |
|---|---|---|---|---|---|---|
| | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) |
| 700 | 100% | 100% | 95% | 95% | 90% | 90% |
| 680 | 100 | 100 | 95 | 95 | 90 | 90 |
| 640 | 100 | 100 | 90 | 90 | 90 | 90 |
| 620 | 100 | 100 | 90 | 90 | 85 | 90 |
| 600 | 100 | 100 | 90 | 90 | 85 | 90 |
| 580 | 90 | 95 | 90 | 90 | 80 | 90 |
| 560 | 90 | 95 | 85 | 90 | 75 | 9 |
| 540 | 85 | 95 | n/a | n/a | n/a | n/a |

(1)  The maximum permitted loan-to-value ratio and combined loan-to-value ratio may be reduced for: cash out refinances and debt consolidations, certain property types, and loan amount.

Reduced Documentation

|  | Owner Occupied | | 2nd Home | | Non-Owner Occupied | |
|---|---|---|---|---|---|---|
| Minimum FICO Score | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) |
| 700 | 100% | 100% | 95% | 95% | 85% | 90% |
| 680 | 100 | 100 | 90 | 90 | 85 | 90 |
| 640 | 100 | 100 | 90 | 90 | 80 | 90 |
| 620 | 95 | 95 | 85 | 90 | 75 | 90 |
| 600 | 90 | 90 | 85 | 90 | 75 | 90 |
| 580 | 90 | 90 | 80 | 90 | 75 | 90 |
| 560 | 85 | 90 | 80 | 80 | 75 | 90 |
| 540 | 80 | 90 | n/a | n/a | n/a | n/a |

(1) The maximum permitted loan-to-value ratio and combined loan-to-value ratio may be reduced for: cash out refinances and debt consolidations, certain property types, and loan amount.

31

<PAGE>

### Stated Income / Stated Income Stated Asset Documentation

|  | Owner Occupied | | 2nd Home | | Non-Owner Occupied | |
|---|---|---|---|---|---|---|
| Minimum FICO Score | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) |
| 700 | 100% | 100% | 90% | 90% | 85% | 90% |
| 680 | 100 | 100 | 90 | 90 | 80 | 90 |
| 640 | 90 | 100 | 85 | 90 | 80 | 90 |
| 620 | 85 | 90 | 80 | 90 | 75 | 90 |
| 600 | 85 | 90 | 80 | 90 | 70 | 90 |
| 580 | 80 | 90 | 75 | 90 | 70 | 90 |
| 560 | 75 | 90 | 65 | 90 | 60 | 90 |

(1) The maximum permitted loan-to-value ratio and combined loan-to-value ratio may be reduced for: cash out refinances and debt consolidations, certain property types, and loan amount.

### No Documentation

|  | Owner Occupied | | 2nd Home | | Non-Owner Occupied | |
|---|---|---|---|---|---|---|
| Minimum FICO Score | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) | Maximum LTV(1) | Maximum CLTV(1) |
| 700 | 95% | 95% | 85% | 85% | 80% | 80% |
| 680 | 90 | 90 | 85 | 85 | 75 | 75 |
| 660 | 85 | 85 | 80 | 80 | 70 | 70 |

(1) The maximum permitted loan-to-value ratio and combined loan-to-value ratio may be reduced for: cash out refinances and debt consolidations, certain property types, and loan amount.

An appraisal is generally conducted on each mortgaged property by the originating lender. The appraisal must be conducted in accordance with established appraisal procedure guidelines acceptable to the originator in order to determine the adequacy of the mortgaged property as security for repayment of the related mortgage loan. All appraisals must be on forms acceptable to Fannie Mae and/or Freddie Mac and conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal

Foundation. Appraisers may be staff licensed appraisers employed by the
originator or independent licensed appraisers selected in accordance with
established appraisal procedure guidelines acceptable to the originator.
Generally, the appraisal procedure guidelines require the appraiser or an agent
on its behalf to inspect the property personally and verify whether the property
is in good condition and that, if new, construction has been substantially
completed. The appraisal generally will be based upon a market data analysis of
recent sales of comparable properties and, when deemed applicable, an analysis
based on income generated from the property or a replacement cost analysis based
on the current cost of constructing or purchasing a similar property.

Representations and Warranties; Repurchases

        Generally, representations and warranties will be made in respect of the
mortgage loans that are included in the assets of the trust fund. The related
prospectus supplement will identify the party or parties (any such party, a
"Responsible Party") responsible for making representations and warranties and
will provide a summary of the representations and warranties, in each case, for
those mortgage loans that comprise the collateral that supports the securities
offered by the related prospectus supplement. If provided in the related
prospectus supplement, the Responsible Party may make the representations and
warranties in respect of a mortgage loan as of the date on which the Responsible
Party sold the mortgage loan to us or one of our affiliates or as of such other
date prior to the issuance of the related securities, as may be specified in the
related prospectus supplement. A substantial period of time may have elapsed
between such date and the date of initial issuance of the series of securities
evidencing an interest in, or secured by, such mortgage loan. In these
circumstances, since the representations and warranties of a

                                        32

<PAGE>

Responsible Party will not address events that may occur through the date of
issuance of the related securities, the Responsible Party's repurchase
obligation described below will not arise if the relevant event that would
otherwise have given rise to such an obligation with respect to a mortgage loan
occurs after the date the Responsible Party made the representation and warranty
but prior to the date of issuance of the related securities.

        In general, the Master Servicer or the trustee, if the Master Servicer is
the Responsible Party, will be required to promptly notify the relevant
Responsible Party of any breach of any representation or warranty made by it in
respect of a mortgage loan that materially and adversely affects the interests
of the securityholders with respect to such mortgage loan. If the Responsible
Party cannot cure such breach generally within a specified period after notice
from the Master Servicer or the trustee, as the case may be, then the
Responsible Party generally will be obligated to repurchase such mortgage loan
from the trust at a price equal to the unpaid principal balance of such mortgage
loan as of the date of the repurchase plus accrued interest to the first day of
the month following the month of repurchase at the rate specified on the
mortgage loan (less any amount payable as related servicing compensation if the
Responsible Party is the Master Servicer) or such other price as may be
described in the related prospectus supplement. This repurchase obligation will
constitute the sole remedy available to holders of securities or the trustee for
a breach of representation and warranty. Certain rights of substitution for
defective mortgagee loans may be provided with respect to a series in the
related prospectus supplement.

        We and the Master Servicer (unless the Master Servicer is the Responsible
Party) will not be obligated to purchase a mortgage loan if a Responsible Party
defaults on its obligation to do so. We cannot assure you that the Responsible
Parties will carry out their respective repurchase obligations with respect to
mortgage loans.

    If the related prospectus supplement so specifies, we may have acquired
the mortgage loans from a loan seller that acquired the mortgage loans from a
third party that made certain representations and warranties to that loan seller
as of the time of the sale to that loan seller. In lieu of making
representations and warranties as of the time of the sale to us, the loan seller
may assign the representations and warranties from the third party to us. We, in
turn, will assign them to the trustee on behalf of the securityholders. In such
cases, the third party will be obligated to purchase a mortgage loan upon a
breach of such representations and warranties.

    Any Responsible Party and any third party that conveyed the mortgage loans
to a loan seller may experience financial difficulties and in some instances may
enter into insolvency proceedings. As a consequence, the applicable Responsible
Party or third party may be unable to perform its repurchase obligations with
respect to the mortgage loans. Any arrangements for the assignment of
representations and the repurchase of mortgage loans must be acceptable to each
rating agency rating the related securities.

Optional Purchase of Defaulted Loans

    If the related prospectus supplement so specifies, the Master Servicer or
another entity identified in such prospectus supplement may, at its option,
purchase from the trust fund any mortgage loan that is delinquent in payment by
90 days or more. Any such purchase shall be at the price described in the
related prospectus supplement.

                      DESCRIPTION OF THE SECURITIES

General

    A trust will issue certificates in series pursuant to separate pooling and
servicing agreements or a trust agreement among us, one or more Master
Servicers, if applicable, and the trustee. A trust fund will issue the notes of
a series pursuant to an indenture between such trust fund and the entity named
in the related prospectus supplement as trustee with respect to such notes. The
provisions of each such

                                   33

<PAGE>

Agreement will vary depending upon the nature of the certificates or notes to be
issued under the Agreement and the nature of the related trust fund.

    The series of certificates or notes may be referred to in the prospectus
supplement as "mortgage-backed certificates", "mortgage pass-through
certificates", "mortgage-backed notes", "asset-backed certificates", or
"asset-backed notes."

    A form of a pooling and servicing agreement, a form of a trust agreement
and a form of an indenture are exhibits to the Registration Statement of which
this prospectus is a part. The following summaries describe certain provisions
that may appear in each such Agreement. The prospectus supplement for a series
of certificates or a series of notes, as applicable, will provide additional
information regarding each such Agreement relating to such series. The summaries
do not purport to be complete and are subject to, and are qualified in their
entirety by reference to the applicable prospectus supplement. We will provide a
copy of the applicable Agreement or Agreements (without exhibits) relating to
any series without charge upon written request of a holder of such series
addressed to:

                        GS Mortgage Securities Corp.
                             85 Broad Street
                          New York, New York 10004

The securities of a series will be issued in fully registered form, in the denominations specified in the related prospectus supplement. The securities, as applicable, will evidence specified beneficial ownership interests in, or debt secured by the assets of, the related trust fund and will not be entitled to distributions in respect of the trust assets included in any other trust fund we establish. The securities will not represent our obligations or the obligations of any of our affiliates. The mortgage loans will not be insured or guaranteed by any governmental entity or other person unless the prospectus supplement provides that loans are included that have the benefit of FHA insurance or VA or RHS guarantees, primary mortgage insurance, pool insurance or another form of insurance or guarantee. Each trust or trust fund will consist of, to the extent provided in the related prospectus supplement:

      o     the mortgage assets, as from time to time are subject to the related Agreement (exclusive of any amounts specified in the related prospectus supplement ("Retained Interest")),

      o     such assets as from time to time are required to be deposited in the related Protected Account, Securities Account or any other accounts established pursuant to the related Agreement (collectively, the "Accounts");

      o     property that secured a mortgage loan and which is acquired on behalf of the securityholders by foreclosure or deed in lieu of foreclosure;

      o     U.S. Government Securities; and

      o     any primary insurance policies, FHA insurance, VA guarantees, RHS guarantees or other insurance policies.

If so specified in the related prospectus supplement, a trust or trust fund may include one or more of the following:

      o     reinvestment income on payments received on the trust assets,

      o     a reserve fund,

      o     a mortgage pool insurance policy,

      o     a special hazard insurance policy,

      o     a bankruptcy bond,

34

&lt;PAGE&gt;

      o     one or more letters of credit,

      o     a financial guaranty insurance policy,

      o     third party guarantees,

      o     U.S. Government Securities designed to assure payment of the securities, or

      o     financial instruments that are interest rate or currency swap agreements, caps, collars or floors to provide protection against certain types of risks or to provide certain cash flow characteristics for one or more classes.

The trusts or trust funds will issue each series of securities in one or more classes. Each class of securities of a series will evidence beneficial

ownership of a specified percentage (which may be 0%) or portion of future
interest payments and a specified percentage (which may be 0%) or portion of
future payments on the assets in the related trust fund or will evidence the
obligations of the related trust fund to make payments from amounts received on
such assets in the related trust fund. A series of securities may include one or
more classes that receive certain preferential treatment with respect to one or
more other classes of securities of such series. Insurance policies or other
forms of credit enhancement may cover certain series or classes of securities.
Distributions on one or more classes of a series of securities may be made
before distributions on one or more other classes, after the occurrence of
specified events, in accordance with a schedule or formula, on the basis of
collections from designated portions of the assets in the related trust fund or
on a different basis. The related prospectus supplement will describe the
priority of payment among classes in a series.

     The trustee distributes principal and interest (or, where applicable,
principal only or interest only) on the related securities on each distribution
date (i.e., monthly, quarterly, semi-annually or at such other intervals and on
the dates specified in the related prospectus supplement) in the proportions
specified in the related prospectus supplement. The trustee will make
distributions to the persons in whose names the securities are registered at the
close of business on the record dates specified in the related prospectus
supplement. Distributions will be made by check or money order mailed to the
persons entitled to the distributions at the address appearing in the register
maintained for holders of securities or, if the related prospectus supplement so
specifies, in the case of securities that are of a certain minimum denomination,
upon written request by the holder of such securities, by wire transfer or by
such other means. However, the final distribution in retirement of the
securities will be made only upon presentation and surrender of the securities
at the office or agency of the trustee or other person specified in the notice
to holders of such final distribution.

     Except with respect to residual securities of Real Estate Mortgage
Investment Conduits, commonly known as "REMICs," and any other securities that
may be identified in the related prospectus supplement, the securities will be
freely transferable and exchangeable at the corporate trust office of the
trustee as described in the related prospectus supplement. No service charge
will be made for any registration of exchange or transfer of securities of any
series but the trustee may require payment of a sum sufficient to cover any
related tax or other governmental charge. Certain representations will be
required in connection with the transfer of REMIC residual securities, as
provided in the related prospectus supplement.

Distributions on Securities

     General. In general, the method of determining the amount of distributions
on a particular series of securities will depend on the type of credit support,
if any, that is used with respect to such securities. Descriptions of various
methods that may be used to determine the amount of distributions on the
securities of a particular series are listed below. The prospectus supplement
for each series of securities will describe the method to be used in determining
the amount of distributions on the securities of such series.

                                   35

<PAGE>


     The trustee will make distributions allocable to principal and/or interest
on the securities out of, and only to the extent of, funds in the related
Securities Account, including any funds transferred from any reserve account and
funds received as a result of credit enhancement or from other specified
sources, which may include accounts funded to cover basis risk shortfall amounts
or capitalized interest accounts. As between securities of different classes and
as between distributions of interest and principal and, if applicable, between

distributions of prepayments of principal and scheduled payments of principal, distributions made on any distribution date will be applied as specified in the related prospectus supplement. The trustee will make distributions to any class of securities pro rata to all securityholders of that class or as otherwise specified in the related prospectus supplement.

Available Funds. The trustee will make all distributions on the securities of each series on each distribution date from the Available Funds in accordance with the terms described in the related prospectus supplement and as the related Agreement specifies. "Available Funds" for each distribution date will generally equal the amounts on deposit in the related Securities Account on a date specified in the related prospectus supplement, net of related fees and expenses payable by the related trust fund and other amounts to be held in the Securities Account for distribution on future distribution dates.

Distributions of Interest. Interest generally will accrue on the aggregate current principal amount (or, in the case of securities entitled only to distributions allocable to interest, the aggregate notional principal balance) of each class of securities entitled to interest from the date, at the interest rate and for the periods specified in the related prospectus supplement. To the extent funds are available for distribution, interest accrued on each class of securities entitled to interest (other than a class of securities that provides for interest that accrues, but is not currently payable, which are referred to as "accrual securities") will be distributable on the distribution dates specified in the related prospectus supplement. Interest will be distributed until the aggregate current principal amount of the securities of such class has been distributed in full. In the case of securities entitled only to distributions allocable to interest, interest will be distributed until the aggregate notional principal balance of such securities is reduced to zero or for the period of time designated in the related prospectus supplement. The original current principal amount of each security will equal the aggregate distributions allocable to principal to which such security is entitled. Distributions of interest on each security that is not entitled to distributions of principal will be calculated based on the notional principal balance of such security or as otherwise is specified in the related prospectus supplement. The notional principal balance of a security will not evidence an interest in or entitlement to distributions allocable to principal but will be used solely for convenience in expressing the calculation of interest and for certain other purposes.

With respect to any class of accrual securities, if the related prospectus supplement so specifies, any interest that has accrued but is not paid on a given distribution date will be added to the aggregate current principal amount of such class of securities on that distribution date. Distributions of interest on each class of accrual securities will commence after the occurrence of the events specified in the related prospectus supplement. Prior to such time, the aggregate current principal amount of such class of accrual securities will increase on each distribution date by the amount of interest that accrued on such class of accrual securities during the preceding interest accrual period. Any such class of accrual securities will thereafter accrue interest on its outstanding current principal amount as so adjusted.

Distributions of Principal. The aggregate "current principal amount" of any class of securities entitled to distributions of principal generally will be the aggregate original current principal amount of such class of securities specified in the related prospectus supplement, reduced by all distributions and losses allocable to principal. The related prospectus supplement will specify the method by which the amount of principal to be distributed on the securities on each distribution date will be calculated and the manner in which such amount will be allocated among the classes of securities entitled to distributions of principal.

If the related prospectus supplement provides, one or more classes of senior securities will be entitled to receive all or a disproportionate percentage of the payments of principal received from borrowers in advance of

scheduled due dates and that are not accompanied by amounts representing
scheduled interest due after the month of such payments ("Principal
Prepayments"). The related prospectus supplement will set forth the percentages
and circumstances governing such payments. Any such

                                   36
<PAGE>

allocation of Principal Prepayments to such class or classes of securities will
accelerate the amortization of such senior securities and increase the interests
evidenced by the subordinated securities in the trust fund. Increasing the
interests of the subordinated securities relative to that of the senior
securities is intended to preserve the availability of the subordination
provided by the subordinated securities.

     Unscheduled Distributions. If the related prospectus supplement so
specifies, the securities will be subject to receipt of distributions before the
next scheduled distribution date. If applicable, the trustee will be required to
make such unscheduled distributions on the day and in the amount specified in
the related prospectus supplement if, due to substantial payments of principal
(including Principal Prepayments) on the mortgage assets, excessive losses on
the mortgage assets or low rates then available for reinvestment of such
payments, the trustee or the Master Servicer determines, based on the
assumptions specified in the related Agreement, that the amount anticipated to
be on deposit in the Securities Account on the next distribution date, together
with, if applicable, any amounts available to be withdrawn from any reserve
account, may be insufficient to make required distributions on the securities on
such distribution date. The amount of any such unscheduled distribution that is
allocable to principal generally will not exceed the amount that would otherwise
have been distributed as principal on the securities on the next distribution
date. All unscheduled distributions generally will include interest at the
applicable interest rate (if any) on the amount of the unscheduled distribution
allocable to principal for the period and to the date specified in the related
prospectus supplement.

     All distributions of principal in any unscheduled distribution generally
will be made in the same priority and manner as distributions of principal on
the securities would have been made on the next distribution date. With respect
to securities of the same class, unscheduled distributions of principal
generally will be made on a pro rata basis. The trustee will give notice of any
unscheduled distribution before the date of such distribution.

Advances

     The Master Servicer or other person designated in the prospectus
supplement may be required to advance on or before each distribution date (from
its own funds, funds advanced by sub-servicers or funds held in any of the
Accounts for future distributions to the holders of such securities) an amount
equal to the aggregate of payments of principal and interest or of interest only
that were delinquent on the related determination date and were not advanced by
any sub-servicer. Such advances will generally be subject to the Master
Servicer's determination that they will be recoverable out of late payments by
mortgagors, Liquidation Proceeds, Insurance Proceeds or otherwise with respect
to the specific mortgage loan or, if required by the applicable rating agency,
with respect to any of the mortgage loans.

     In making advances, the Master Servicer or other person designated in the
prospectus supplement will attempt to maintain a regular flow of scheduled
interest and principal payments to holders of the securities. Advances do not
represent an obligation of the Master Servicer or such other person to guarantee
or insure against losses. If the Master Servicer or other person designated in
the prospectus supplement makes advances from cash held for future distribution
to securityholders, the Master Servicer or such other person will replace such
funds on or before any future distribution date to the extent that funds in the

applicable Account on such distribution date would be less than the payments then required to be made to securityholders. Any funds advanced will be reimbursable to the Master Servicer or such other person out of recoveries on the specific mortgage loans with respect to which such advances were made. Advances (and any advances a sub-servicer makes) may also be reimbursable from cash otherwise distributable to securityholders to the extent the Master Servicer or other person designated in the prospectus supplement determines that any such advances previously made are not ultimately recoverable from the proceeds with respect to the specific mortgage loan or, if required by the applicable rating agency, at such time as a loss is realized with respect to a specific mortgage loan. The Master Servicer or other person designated in the prospectus supplement will be obligated to make advances, to the extent recoverable out of Insurance Proceeds, Liquidation Proceeds or otherwise, in respect of certain taxes and insurance premiums the mortgagors have not paid on a timely basis. Funds so advanced are reimbursable to the Master Servicer or such other person to the extent the related Agreement permits, as specified in the related prospectus supplement. As specified in the related prospectus supplement, a

<center>37</center>

<PAGE>

cash advance reserve fund, a surety bond or other arrangements may support the Master Servicer's obligations to make advances.

Reports to Securityholders

     Prior to or on a distribution date or at such other time as is specified in the related prospectus supplement or Agreement, the Master Servicer or the trustee will furnish to each securityholder of record of the related series a statement setting forth, to the extent applicable or material to such holders of that series of securities, among other things:

     1. the amount of such distribution allocable to principal;

     2. the amount of such distribution allocable to interest;

     3. the outstanding current principal amount or notional principal balance of such class after giving effect to the distribution of principal on such distribution date;

     4. unless the interest rate is a fixed rate, the interest rate applicable to the distribution on the distribution date; and

     5. the number and aggregate principal balances of mortgage loans in the related mortgage pool delinquent (a) one-month, (b) two months or (c) three or more months, and the number and aggregate principal balances of mortgage loans in foreclosure.

Exchangeable Securities

     General. If specified in the related prospectus supplement, a series of securities may include one or more classes that are "exchangeable securities." In any of these series, the holders of one or more of the classes of exchangeable securities will be entitled, after notice and payment to the trustee of an administrative fee, to exchange all or a portion of those classes of exchangeable securities for proportionate interests in one or more other specified classes of exchangeable securities in such series.

     If a series includes exchangeable securities as described in the related prospectus supplement, all of these classes of exchangeable securities will be listed in the related prospectus supplement. The classes of securities that are exchangeable for one another will be referred to in the related prospectus supplement as "related" to each other, and each related grouping of exchangeable

securities will be referred to as a "combination." Each combination of
exchangeable securities will be issued by the related trust fund. The classes of
exchangeable securities constituting each combination will, in the aggregate,
represent a distinct combination of uncertificated interests in the related
trust fund. At any time after their initial issuance, any class of exchangeable
securities may be exchanged for the related class or classes of exchangeable
securities. In some cases, multiple classes of exchangeable securities may be
exchanged for one or more classes of related exchangeable securities.

        The descriptions in the related prospectus supplement of the securities of
a series that includes exchangeable securities, including descriptions of
principal and interest distributions, registration and denomination of
securities, credit enhancement, yield and prepayment considerations, tax and
investment legal considerations and considerations of the Employee Retirement
Income Security Act of 1974, as amended ("ERISA"), also will apply to each class
of exchangeable securities. The related prospectus supplement will separately
describe the yield and prepayment considerations applicable to, and the risks of
investment in each class of exchangeable securities. For example, separate
decrement tables and yield tables, if applicable, will be included for each
class of exchangeable securities.

        Exchanges. If a holder of exchangeable securities elects to exchange its
exchangeable securities for related exchangeable securities, then:

        o       the aggregate principal balance of the related exchangeable
                securities received in the exchange, immediately after the exchange,
                will equal the aggregate principal balance, immediately prior to


                                       38
<PAGE>

                the exchange, of the exchangeable securities so exchanged (for
                purposes of an exchange, interest-only classes of exchangeable
                securities will have a principal balance of zero);

        o       the aggregate amount of interest payable on each distribution date
                with respect to the related exchangeable securities received in the
                exchange will equal the aggregate amount of interest payable on each
                distribution date with respect to the exchangeable securities so
                exchanged; and

        o       the class or classes of exchangeable securities will be exchanged in
                the applicable proportions, if any, described in the related
                prospectus supplement.

        Different types of combinations may exist. Any individual series of
securities may have multiple types of combinations. Some examples of
combinations of exchangeable securities that differ in their interest
characteristics include:

        o       A class of exchangeable securities with an interest rate that varies
                directly with changes in an index and a class of exchangeable
                securities with an interest rate that varies indirectly with changes
                in the index may be exchangeable, together, for a related class of
                exchangeable securities with a fixed interest rate. In such a
                combination, the classes of exchangeable securities with interest
                rates that vary with an index would produce, in the aggregate, an
                annual interest amount equal to that generated by the related class
                of exchangeable securities with a fixed interest rate. In addition,
                the aggregate principal balance of the two classes of exchangeable
                securities with interest rates that vary with an index would equal
                the aggregate principal balance of the related class of exchangeable
                securities with the fixed interest rate.

    o    An interest-only class and a principal-only class of exchangeable securities may be exchangeable, together, for a related class of exchangeable securities that is entitled to both principal and interest payments. In such a combination, the aggregate principal balance of the related class would be equal to the aggregate principal balance of the principal-only class of exchangeable securities, and the interest rate on the related class, when applied to the aggregate principal balance of this related class, would generate interest equal to the annual interest amount of the interest-only class of exchangeable securities.

    o    Two classes of principal and interest classes of exchangeable securities with different fixed interest rates may be exchangeable, together, for a single class of related exchangeable securities that is entitled to both principal and interest payments. In such a combination, the aggregate principal balance of the single class of related exchangeable securities would be equal to the aggregate principal balance of the two classes of exchangeable securities, and the single class of related exchangeable securities would have a fixed interest rate that, when applied to the principal balance of the two classes of exchangeable securities, would generate interest equal to the aggregate annual interest amount of the two classes of exchangeable securities.

In some series, a securityholder may be able to exchange its exchangeable securities for other related exchangeable securities that have different principal payment characteristics. Some examples of combinations of exchangeable securities that differ in the principal payment characteristics include:

    o    A class of exchangeable securities that accretes all of its interest for a specified period, with the accreted amount added to the aggregate principal balance of the class of exchangeable securities, and a second class of exchangeable securities that receives principal payments from these accretions, may be exchangeable, together, for a single class of related exchangeable securities that receives payments of interest continuously from the first distribution date on which it receives interest until it is retired.

    o    A class of exchangeable securities that is a planned amortization class, and a class of exchangeable securities that only receives principal payments on a distribution date if scheduled payments have been made on the planned amortization class, may be exchangeable, together, for a class of related exchangeable securities that receives principal payments without regard to

<center>39</center>

&lt;PAGE&gt;

    the planned amortization schedule for the planned amortization class from the first distribution date on which it receives principal until it is retired.

A number of factors may limit the ability of a holder of exchangeable securities to effect an exchange. For example, the securityholder must own, at the time of the proposed exchange, the class or classes of exchangeable securities necessary to make the exchange in the necessary proportions. If a securityholder does not own the necessary classes of exchangeable securities or does not own the necessary classes of exchangeable securities in the proper proportions, the securityholder may not be able to obtain the desired classes of exchangeable securities. The securityholder desiring to make the exchange may not be able to purchase the necessary class of exchangeable securities from the then current owner at a reasonable price, or the necessary proportion of the needed class of exchangeable securities may no longer be available due to principal payments or prepayments that have been applied to that class of

exchangeable securities.

　　　Procedures. The related prospectus supplement will describe the procedures that must be followed to make an exchange of exchangeable securities. A securityholder will be required to provide notice to the trustee prior to the proposed exchange date within the time period specified in the related prospectus supplement. The notice must include the outstanding principal or notional amount of the exchangeable securities to be exchanged and the related securities to be received, and the proposed exchange date. When the trustee receives this notice, it will provide instructions to the securityholder regarding delivery of the exchangeable securities and payment of the administrative fee. A securityholder's notice to the trustee will become irrevocable on the day prior to the proposed exchange date specified in the related prospectus supplement. Any exchangeable securities in book entry form will be subject to the rules, regulations and procedures applicable to DTC's book entry securities.

　　　If the related prospectus supplement describes exchange proportions for a combination of classes of exchangeable securities, these proportions will be based on the original, rather than the outstanding, principal or notional amounts of these classes.

　　　Payments on an exchangeable security received in an exchange will be made as described in the related prospectus supplement. Payments will be made to the securityholder of record as of the applicable record date.

Book-Entry Registration

　　　If the related prospectus supplement so specifies, one or more classes of securities of any series may be issued in book entry form. Persons acquiring beneficial ownership interests in the book-entry securities may elect to hold their securities through The Depository Trust Company ("DTC"), in the United States, Clearstream Banking, societe anonyme ("Clearstream") or the Euroclear Bank ("Euroclear"), as operator of the Euroclear System, in Europe. Transfers within DTC, Clearstream or Euroclear, as the case may be, will be in accordance with the usual rules and operating procedures of the relevant system. Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and counterparties holding directly or indirectly through Clearstream or Euroclear, on the other, will be effected in DTC through the relevant depositories of Clearstream or Euroclear, respectively, and each a participating member of DTC. The interests of the beneficial owners of interests in the securities will be represented by book entries on the records of DTC and its participating members. All references in this prospectus to the securities reflect the rights of beneficial owners only as such rights may be exercised through DTC and its participating organizations for so long as such securities are held by DTC.

　　　DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC also facilitates the post-trade settlement among DTC participants ("Direct Participants") of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities. Direct Participants include both U.S. and non-U.S. securities brokers, dealers,

40

<PAGE>

banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation

("DTCC"). DTCC, in turn, is owned by a number of Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participant"). The DTC Rules applicable to its Participants are on file with the SEC. More information about DTC can be found at www.dtcc.com and www.dtc.org.

The book entry securities will be issued in one or more certificates or notes, as the case may be, that equal the aggregate principal balance or notional amount of the applicable class or classes of securities, equal to an amount up to $500 million per certificate. If any class exceeds the principal amount or notional amount of $500 million, one certificate will be issued with respect to each $500 million principal amount or notional amount, and an additional certificate will be issued with respect to any remaining principal amount or notional amount of such issue. Each entry will initially be registered in the name of DTC's partnership nominee, Cede & Co., or any other name as may be requested by an authorized representative of DTC or one of the relevant depositories. Clearstream and Euroclear will hold omnibus positions on behalf of their Participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositories that in turn will hold such positions in customers' securities accounts in the depositories' names on the books of DTC. DTC has no knowledge of the actual Beneficial Owners (as defined below) of the securities. Except as described below, no person acquiring a book entry security will be entitled to receive a physical certificate or note representing such security. Unless and until physical securities are issued, it is anticipated that the only "Securityholder" will be Cede & Co., as nominee of DTC. Beneficial owners are only permitted to exercise their rights indirectly through Direct Participants and DTC.

An owner's ownership of a book entry security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary (each, a "Financial Intermediary"), that maintains the beneficial owner's account for such purpose. In turn, the Financial Intermediary's ownership of such book-entry security will be recorded on the records of DTC or on the records of a participating firm that acts as agent for the Financial Intermediary, if the Beneficial Owner's Financial Intermediary is not a DTC Participant, whose interest will in turn be recorded on the records of DTC, and on the records of Clearstream or Euroclear, as appropriate.

Purchases of securities under the DTC system must be made by or through DTC Participants, which will receive a credit for the securities on DTC's records. The ownership interest of each actual purchaser of each security ("Beneficial Owner") is in turn to be recorded on the DTC Participant's records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct Participant or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the securities are to be accomplished by entries made on the books of a Direct Participant or Indirect Participant acting on behalf of Beneficial Owners. Beneficial Owners will not receive securities representing their ownership interests in securities, except in the event that use of book-entry system for the securities is discontinued.

Beneficial Owners that are not Direct Participants or Indirect Participants but desire to purchase, sell or otherwise transfer ownership of, or other interests in, book-entry securities may do so only through Direct Participants and Indirect Participants. In addition, beneficial owners will receive all distributions of principal and interest from the trustee, or a paying agent on behalf of the trustee, through DTC Direct Participants. DTC will

forward such distributions to its Direct Participants, which thereafter will
forward them to Indirect Participants or Beneficial Owners. Beneficial Owners
will not be recognized by the trustee or any paying agent as holders of the
securities, and Beneficial Owners will be permitted to exercise the rights of
the holders of the securities only indirectly through DTC and its Direct
Participants.

                                      41

<PAGE>


        Conveyance of notices and other communications by DTC to Direct
Participants, by Direct Participants to Indirect Participants, and by Direct
Participants and Indirect Participants to Beneficial Owners will be governed by
arrangements among them, subject to any statutory or regulatory requirements as
may be in effect from time to time.

        Redemption notices shall be sent to DTC. If less than all of the
securities within an issue are being redeemed, DTC's practice is to determine by
lot the amount of the interest of each Direct Participant in such issue to be
redeemed.

        Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or
vote with respect to securities unless authorized by a Direct Participant in
accordance with DTC's Procedures. Under its procedures, DTC mails an Omnibus
Proxy to Issuer as soon as possible after the record date. The Omnibus Proxy
assigns Cede & Co.'s consenting or voting rights to those Direct Participants to
whose accounts securities are credited on the record date (identified in a
listing attached to the Omnibus Proxy).

        Beneficial Owners will receive all distributions allocable to principal
and interest with respect to the book entry securities from the trustee through
DTC and DTC Direct Participants. While the book entry securities are outstanding
(except under the circumstances described below), under the rules, regulations
and procedures creating, governing and affecting DTC and its operations (the
"Rules"), DTC is required to make book entry transfers among Participants on
whose behalf it acts with respect to the securities. DTC is required to receive
and transmit distributions allocable to principal and interest with respect to
the securities. Direct Participants and Indirect Participants with whom
Beneficial Owners have accounts with respect to securities are similarly
required to make book entry transfers and receive and transmit such
distributions on behalf of their respective beneficial owners. Accordingly,
although Beneficial Owners will not possess physical certificates or notes, the
Rules provide a mechanism by which Beneficial Owners will receive distributions
and will be able to transfer their beneficial ownership interests in the
securities.

        Beneficial Owners will not receive or be entitled to receive physical
certificates for the securities referred to as "Definitive Securities" (the
"Definitive Securities"), except under the limited circumstances described
below. Unless and until Definitive Securities are issued, beneficial owners who
are not Direct Participants may transfer ownership of securities only through
Direct Participants and Indirect Participants by instructing such Direct
Participants and Indirect Participants to transfer beneficial ownership
interests in the securities by book-entry transfer through DTC for the account
of the purchasers of such securities, which account is maintained with their
respective Direct Participants or Indirect Participants. Under the Rules and in
accordance with DTC's normal procedures, transfers of ownership of securities
will be executed through DTC and the accounts of the respective Direct
Participants at DTC will be debited and credited. Similarly, the Direct
Participants and Indirect Participants will make debits or credits, as the case
may be, on their records on behalf of the selling and purchasing beneficial
owners.

Because of time zone differences, it is possible that credits of securities received in Clearstream or Euroclear as a result of a transaction with a Participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such securities settled during such processing will be reported to the relevant Euroclear or Clearstream Participants on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream Participant or Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but, due to time zone differences, may be available in the relevant Clearstream or Euroclear cash account only as of the Business Day following settlement in DTC.

Transfers between Participants will occur in accordance with DTC rules. Transfers between Clearstream Participants and Euroclear Participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Participants or Euroclear Participants, on the other, will be effected in DTC in accordance with the Rules on behalf of the relevant European international clearing system by the relevant depository, each of which is a participating member of DTC; provided, however,

42

<PAGE>

that such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines. The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depository to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day funds settlement applicable to DTC. Clearstream Participants and Euroclear Participants may not deliver instructions directly to the relevant depositories for Clearstream or Euroclear.

Clearstream has advised that it is incorporated under the laws of the Grand Duchy of Luxembourg as a professional depository. Clearstream holds securities for its Participants. Clearstream facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in account of Clearstream Participants, eliminating the need for physical movement of securities. Transactions may be settled through Clearstream in many currencies, including United States dollars. Clearstream provides to Clearstream Participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Commission de Surveillance du Secteur Financier in Luxembourg. Clearstream Participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream Participant, either directly or indirectly.

Distributions, to the extent received by the relevant depository for Clearstream, with respect to the securities held beneficially through Clearstream will be credited to cash accounts of Clearstream Participants in accordance with its rules and procedures.

Euroclear was created to hold securities for its Participants and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for movement of physical securities and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium (the "Euroclear Operator"). The Euroclear Operator holds securities and book entry interests in securities for participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and participants of certain other securities intermediaries through electronic book entry changes in accounts of such participants or other securities intermediaries. Non-participants of Euroclear may hold and transfer book entry interests in securities through accounts with a direct participant of Euroclear or any other securities intermediary that holds book entry interests in the related securities through one or more Securities Intermediaries standing between such other securities intermediary and the Euroclear Operator.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. Euroclear Bank Operator acts under the Terms and Conditions only on behalf of Euroclear Participants, and has no record of or relationship with persons holding through Euroclear Participants.

The trustee is responsible to make payments and distributions on the book-entry securities to Cede & Co. DTC will be responsible for crediting the amount of such distributions to the accounts of the applicable Direct Participants in accordance with DTC's normal procedures. Each Direct Participant will be responsible for disbursing such distributions to the Beneficial Owners that it represents and to each Indirect Participant for which it acts as agent. Each such Indirect Participant will be responsible for disbursing funds to the Beneficial Owners that it represents.

43

<PAGE>

Distributions and payments on the securities will be made to Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participant's accounts upon DTC's receipt of funds and corresponding detail information from the trustee or its agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, Issuer or Agent, subject to any statutory or regulatory requirements as may be in effect from time to time.

Under a book-entry format, Beneficial Owners of the book-entry securities may experience some delay in their receipt of distributions, since such distributions will be forwarded by the trustee to Cede & Co., as nominee of DTC. Distributions with respect to securities held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary. Such distributions will be subject to tax reporting in accordance with relevant United States tax laws and regulations. Because DTC can only act on behalf of financial intermediaries, the ability of a Beneficial Owner to pledge book-entry securities to persons or entities that do not participate in the DTC system, or otherwise take actions in

respect of such book-entry securities, may be limited due to the lack of
physical securities for such book-entry securities. In addition, issuance of the
book-entry securities in book-entry form may reduce the liquidity of such
securities in the secondary market since certain potential investors may be
unwilling to purchase securities for which they cannot obtain physical
certificates or notes.

Monthly and annual reports on the applicable trust fund will be provided
to Cede & Co., as nominee of DTC, and Cede & Co. may make such reports available
to beneficial owners upon request, in accordance with the Rules, and to the DTC
Participants to whose DTC accounts the book-entry securities of such Beneficial
Owners are credited directly or are credited indirectly through Indirect
Participants.

Clearstream or Euroclear, as the case may be, will take any other action
permitted to be taken by a holder under the Agreement on behalf of a Clearstream
Participant or Euroclear Participant only in accordance with its relevant rules
and procedures and subject to the ability of the relevant depository to effect
such actions on its behalf through DTC.

Physical certificates representing a security will be issued to Beneficial
Owners only upon the events specified in the related Agreement. Such events may
include the following:

    o    we (or DTC) advise the trustee in writing that DTC is no longer
         willing or able to properly discharge its responsibilities as
         depository with respect to the securities, and that we are or the
         trustee is unable to locate a qualified successor, or

    o    we notify the trustee and DTC of our intent to terminate the
         book-entry system through DTC and, upon receipt of such intent from
         DTC, the participants holding beneficial interests in the
         certificates agree to initiate such termination.

Upon the occurrence of any of the events specified in the related
Agreement, the trustee will be required to notify all Participants of the
availability through DTC of physical certificates. Upon delivery of the
certificates or notes representing the securities, the trustee will issue the
securities in the form of physical certificates, and thereafter the trustee will
recognize the holders of such physical certificates as securityholders.
Thereafter, distributions of principal of and interest on the securities will be
made by the trustee or a paying agent on behalf of the trustee directly to
securityholders in accordance with the procedures listed in this prospectus and
in the Agreement. The final distribution of any security (whether physical
certificates or securities registered in the name of Cede & Co.), however, will
be made only upon presentation and surrender of such securities on the final
distribution date at such office or agency as is specified in the notice of
final payment to securityholders.

Although DTC, Clearstream and Euroclear have agreed to the foregoing
procedures to facilitate transfers of securities among participants of DTC,
Clearstream and Euroclear, they are under no

                                    44
<PAGE>

obligation to perform or continue to perform such procedures and such procedures
may be discontinued at any time.

We, the Master Servicer, if any, the trust fund and the trustee will not
have any responsibility for any aspect of the records relating to or
distributions made on account of beneficial ownership interests of the
book-entry securities held by Cede & Co., as nominee for DTC, or for
maintaining, supervising or reviewing any records relating to such beneficial
ownership interests.

See also the attached Annex I for certain information regarding U.S. federal income tax documentation requirements for investors holding certificates through Clearstream or Euroclear (or through DTC if the holder has an address outside the United States).

CREDIT ENHANCEMENT

General

Credit enhancement may be provided with respect to one or more classes of a series of securities or with respect to the assets in the related trust fund. Credit enhancement may be in the form of:

- o   the subordination of one or more classes of the securities of such series,

- o   the use of a mortgage pool insurance policy, special hazard insurance policy, bankruptcy bond, FHA insurance, VA guarantees, RHS guarantees, reserve accounts, a letter of credit, a limited financial guaranty insurance policy, other third party guarantees, financial instruments that are interest rate or currency swap agreements, caps, collars or floors, overcollateralization, excess spread, or the use of a cross-support feature, or

- o   any combination of the foregoing.

Most forms of credit enhancement will not provide protection against all risks of loss and generally will not guarantee repayment of the entire principal balance of the securities and interest on the principal balance. If losses occur that exceed the amount covered by credit enhancement or that are not covered by the credit enhancement, holders of one or more classes of securities will bear their allocable share of deficiencies. If a form of credit enhancement applies to several classes of securities, and if principal payments equal to the current principal amounts of certain classes will be distributed before such distributions to other classes, the classes which receive such distributions at a later time are more likely to bear any losses that exceed the amount covered by credit enhancement. If so specified in the related prospectus supplement, the Master Servicer, any other person designated in the related prospectus supplement or we may cancel or reduce coverage under any credit enhancement if such cancellation or reduction would not adversely affect the rating or ratings of the related securities.

Subordination

If so specified in the related prospectus supplement, distributions of scheduled principal, Principal Prepayments, interest or any combination of such distributions that normally would be paid to one or more classes of subordinated securities of a series will, under circumstances and to the extent specified in the prospectus supplement, instead be payable to holders of one or more classes of senior securities. If the related prospectus supplement so specifies, various classes of subordinated securities will be the first to bear delays in receipt of scheduled payments on the mortgage loans and losses on defaulted mortgage loans. Thereafter, various classes of senior securities will bear such delays and losses as specified in the related prospectus supplement. The related prospectus supplement may limit the aggregate distributions in respect of delinquent payments on the mortgage loans over the lives of the securities or at any time, the aggregate losses in respect of defaulted mortgage loans which must be borne by the subordinated securities by virtue of subordination. The prospectus supplement may also limit the amount of the distributions otherwise distributable to the subordinated securityholders that will be distributable to senior securityholders on any distribution date. If aggregate distributions in respect of

&lt;PAGE&gt;

delinquent payments on the mortgage loans or aggregate losses in respect of such mortgage loans exceed the total amounts payable and available for distribution to holders of subordinated securities or, if applicable, they exceed the specified maximum amount, holders of senior securities will experience losses on such securities.

In addition to or in lieu of the foregoing, if so specified in the related prospectus supplement, all or any portion of distributions otherwise payable to holders of subordinated securities on any distribution date may instead be deposited into one or more reserve accounts established with the trustee. Such deposits may be made on each distribution date, on each distribution date for specified periods or until the balance in the reserve account has reached a specified amount. Following payments from the reserve account to holders of senior securities or otherwise, deposits will be made to the extent necessary to restore the balance in the reserve account to required levels. Amounts on deposit in the reserve account may be released to the holders of the class of securities specified in the related prospectus supplement at the times and under the circumstances specified in the related prospectus supplement.

If so specified in the related prospectus supplement, the same class of securities may be senior securities with respect to certain types of payments or certain types of losses or delinquencies and subordinated securities with respect to other types of payment or types of losses or delinquencies. If the related prospectus supplement so specifies, various classes of senior securities and subordinated securities may themselves be subordinate in their right to receive certain distributions to other classes of senior and subordinated securities, respectively, through a cross support mechanism or otherwise.

As among classes of senior securities and as among classes of subordinated securities, distributions may be allocated among such classes:

    o    in the order of their scheduled final distribution dates,

    o    in accordance with a schedule or formula,

    o    in relation to the occurrence of specified events, or

    o    as otherwise specified in the related prospectus supplement.

Pool Insurance Policies

If specified in the prospectus supplement related to a mortgage pool of single family loans or cooperative loans, a separate mortgage pool insurance policy will be obtained for the mortgage pool. The pool insurer named in the prospectus supplement will issue the policy. Subject to the limitations discussed below, each mortgage pool insurance policy will cover a percentage of the loss by reason of default in payment on single family loans or cooperative loans in the mortgage pool as specified in the prospectus supplement. The Master Servicer will present claims under the policy to the pool insurer on behalf of itself, the trustee and the holders of the securities. The mortgage pool insurance policies, however, are not blanket policies against loss, since claims under the policies may only be made respecting particular defaulted mortgage loans and only upon satisfaction of certain conditions precedent described below or as specified in the related prospectus supplement. A mortgage pool insurance policy generally will not cover losses due to a failure to pay or denial of a claim under a primary insurance policy. The related prospectus supplement will describe the material terms of any mortgage pool insurance policies applicable to any series.

Special Hazard Insurance Policies

If the related prospectus supplement so specifies, a separate special

hazard insurance policy will be obtained for the mortgage pool. The special hazard insurer named in the prospectus supplement will issue the policy. Subject to the limitations described below and if so provided in the related prospectus supplement, each special hazard insurance policy will protect holders of the related securities from:

46

<PAGE>

    1. loss by reason of damage to mortgaged properties caused by certain hazards (including earthquakes and, to a limited extent, tidal waves and related water damage) not insured against under the standard form of hazard insurance policy for the respective states in which the mortgaged properties are located or under a flood insurance policy, if the mortgaged property is located in a federally designated flood area, and

    2. loss caused by reason of the application of the coinsurance clause contained in hazard insurance policies.

    Special hazard insurance policies will generally not cover losses caused by war, civil insurrection, certain governmental action, errors in design, faulty workmanship or materials (except under certain circumstances), nuclear reaction, flood (if the mortgaged property is located in a federally designated flood area), chemical contamination and certain other risks. The related prospectus supplement will specify the amount of coverage under any special hazard insurance policy. Each special hazard insurance policy will generally provide that no claim may be paid unless hazard insurance and, if applicable, flood insurance on the property securing the mortgage loan has been kept in force and other protection and preservation expenses have been paid.

    Subject to the foregoing limitations and if so provided in the related prospectus supplement, each special hazard insurance policy will provide that where there has been damage to property securing a foreclosed mortgage loan (title to which has been acquired by the insured) and to the extent such damage is not covered by the hazard insurance policy or flood insurance policy, if any, maintained by the mortgagor or the Master Servicer, the special hazard insurer will pay the lesser of (1) the cost of repair or replacement of such property or (2) upon transfer of the property to the special hazard insurer, the unpaid principal balance of such mortgage loan at the time of acquisition of such property by foreclosure or deed in lieu of foreclosure, plus accrued interest to the date of claim settlement and certain expenses incurred by the Master Servicer with respect to such property. If the unpaid principal balance of a mortgage loan plus accrued interest and certain expenses are paid by the special hazard insurer, the amount of further coverage under the related special hazard insurance policy will be reduced by such amount less any net proceeds from the sale of the property. Any amount paid as the cost of repair of the property will further reduce coverage by such amount. So long as a mortgage pool insurance policy remains in effect, the payment by the special hazard insurer of the cost of repair or of the unpaid principal balance of the related mortgage loan plus accrued interest and certain expenses will not affect the total Insurance Proceeds paid to securityholders, but will affect the relative amounts of coverage remaining under the related special hazard insurance policy.

    If the underlying property has been damaged and not restored, collection of Insurance Proceeds under a mortgage pool insurance policy is generally not possible. A special hazard insurance policy permits full recovery under a mortgage pool insurance policy by providing insurance to restore damaged property.

    To the extent specified in the related prospectus supplement, the Master Servicer may deposit in a special trust account cash, an irrevocable letter of credit or any other instrument acceptable to each nationally recognized rating agency that rates the securities of the related series. Such deposit will

provide protection in lieu of or in addition to the protection the special
hazard insurance policy provides. The amount of any special hazard insurance
policy or of the deposit to the special trust account in lieu of such special
hazard insurance policy relating to such securities may be reduced so long as
any such reduction will not result in a downgrading of the rating of such
securities by any such rating agency.

Bankruptcy Bonds

     If the related prospectus supplement so specifies, an insurer named in
such prospectus supplement will issue a bankruptcy bond. Each bankruptcy bond
will cover certain losses resulting from a bankruptcy court's reduction of
scheduled payments of principal and interest on a mortgage loan or such court's
reduction of the principal amount of a mortgage loan. Each bankruptcy bond will
also cover certain unpaid interest on the amount of such a principal reduction
from the date of the filing of a bankruptcy petition. The related prospectus
supplement will list the required amount of coverage under each

                                    47
<PAGE>

bankruptcy bond. To the extent specified in the prospectus supplement, the
Master Servicer may deposit in the trust fund: cash, an irrevocable letter of
credit or any other instrument acceptable to each rating agency that rates the
securities of the related series. Such deposit will provide protection in lieu
of or in addition to the protection a bankruptcy bond provides.

     The amount of any bankruptcy bond or of the deposit to the special trust
account in lieu of such bankruptcy bond relating to such securities may be
reduced so long as any such reduction will not result in a downgrading of the
rating of such securities by any such rating agency.

     The related prospectus supplement will describe the terms of any
bankruptcy bond relating to a pool of manufactured housing contracts.

FHA Insurance; VA Guarantees; RHS Guarantees

     FHA Loans

     Single family loans designated in the related prospectus supplement as
insured by the FHA will be insured by the Federal Housing Administration ("FHA")
of the United States Department of Housing and Urban Development ("HUD") as
authorized under the National Housing Act of 1934, as amended (the "National
Housing Act"), and the United States Housing Act of 1937, as amended (the
"United States Housing Act"). Various FHA programs, including the standard FHA
203(b) program to finance the acquisition of one- to four-family housing units
and the FHA 245 graduated payment mortgage program will insure such mortgage
loans. These programs generally limit the principal amount and interest rates of
the mortgage loans insured. To be insured by the FHA, mortgage loans are
generally required to have a minimum down payment of approximately 5% of the
original principal amount of the loan. No FHA-insured mortgage loan relating to
a series may have an interest rate or original principal amount exceeding the
applicable FHA limits at the time of origination of such loan.

     FHA is an organizational unit within HUD. FHA was established to encourage
improvement in housing standards and conditions and to exert a stabilizing
influence on the mortgage market. FHA provides insurance for private lenders
against loss on eligible mortgages. Under the FHA mortgage insurance program, an
FHA home mortgage may be made to borrowers meeting certain credit standards
by an approved mortgage lender. FHA insures payment to the holder of that loan
in the event of default by the borrower.

     Although new FHA loans are made only to creditworthy borrowers, FHA
historically has permitted a borrower to sell his or her home to a new

homeowner, subject to the existing FHA loan, without requiring a determination whether the new homeowner would be a creditworthy borrower. In those instances, the original borrower was not relieved of liability for the mortgage note, although no assurance can be made that the mortgage note can be enforced against the original borrower. Moreover, to the extent the new homeowner has not executed an agreement to assume the mortgage debt, the mortgage note cannot be enforced against the new homeowner. The mortgage loan, however, would remain secured by the related mortgaged property and the FHA insurance would remain in effect. The regulations governing assumptions on FHA loans have varied in many respects over the years during which the FHA loans in the mortgage pool were originated.

Insurance premiums for FHA loans are either paid at origination by the originator or are collected by the Master Servicer or any sub-servicer and are paid to FHA. The regulations governing FHA insured single-family mortgage insurance programs generally provide that insurance benefits are payable upon foreclosure (or other acquisition of possession) and conveyance of the mortgaged property to HUD. With respect to a defaulted FHA loan, the Master Servicer or any sub-servicer may be limited in its ability to initiate foreclosure proceedings. Historically, pursuant to an assignment program adopted by HUD pursuant to a consent decree in 1976 (the "Assignment Program"), HUD in certain circumstances offered qualified borrowers who had defaulted on an FHA loan an opportunity to avoid foreclosure and retain their homes. Under the Assignment Program, FHA serviced FHA insured mortgage loans that had defaulted and been assigned to HUD under the Assignment Program. In addition, HUD gave forbearance, for a period of no longer than 36 months, to mortgagors who had demonstrated a temporary

<div align="center">48</div>

<PAGE>

inability to make full payments due to circumstances beyond the mortgagor's control such as a reduction in income or increase in expenses. In April 1996, the Assignment Program was terminated and replaced with mandatory loss mitigation procedures, whereby the servicer of defaulted FHA insured loans must choose from a variety of tools, including special forbearance, mortgage modification, "streamline refinancing," pre-foreclosure sales, and deeds-in-lieu of foreclosure to cure a default prior to filing an FHA insurance claim. The new loss mitigation procedures also permit lenders in certain circumstances to submit partial claims for FHA insurance benefits.

The Master Servicer or any sub-servicer will submit all claims to HUD. Under certain circumstances, as set forth in the regulations, HUD is authorized to request or require the Master Servicer or any sub-servicer to pursue a deficiency judgment against any defaulting mortgagor. In this regard, HUD may request or require (as the case may be under the regulations) the Master Servicer or any sub-servicer to pursue a deficiency judgment in connection with the foreclosure. Under neither case would the Master Servicer or any sub-servicer, as applicable, be responsible for collecting on the judgment. Further, HUD may reimburse the Master Servicer or any sub-servicer, as applicable, for all additional costs of seeking the judgment. The Master Servicer or any sub-servicer, as applicable is the mortgagee with respect to each FHA loan serviced by it for purposes of the FHA insurance solely to facilitate servicing. The Master Servicer or any sub-servicer, as applicable will acknowledge that it has no economic or beneficial interest in the FHA insurance for any mortgage loans serviced by it. Furthermore, no holder of a security, by virtue of holding a security that evidences a beneficial interest in the FHA insured mortgage loans, will have any right against FHA or HUD with respect to the contract of mortgage insurance applicable to any mortgage loan, and each securityholder, by its acceptance of a security, or an interest in a security, will be deemed to have agreed to the foregoing.

The amount of insurance benefits generally paid by the FHA is equal to the entire unpaid principal balance of the defaulted FHA loan, adjusted to reimburse

the Master Servicer or any sub-servicer, as applicable, for certain costs and
expenses and to deduct certain amounts received or retained by the Master
Servicer or any sub-servicer after default. When entitlement to insurance
benefits results from foreclosure (or other acquisition of possession) and
conveyance to HUD, the Master Servicer or any sub-servicer, as applicable is
generally compensated for no more than two-thirds of its foreclosure costs,
attorneys' fees (which costs are evaluated based upon the guidelines of Fannie
Mae, which guidelines are state specific), and certain other costs, and is
compensated for accrued and unpaid mortgage interest for a limited period prior
to the institution of foreclosure or other acquisition in general only to the
extent it was allowed pursuant to a forbearance plan approved by HUD. The
insurance payment itself, upon foreclosure of an FHA-insured single family loan,
bears interest from a date 30 days after the mortgagor's first uncorrected
failure to perform any obligation to make any payment due under the mortgage
loan and, upon assignment, from the date of assignment, to the date of payment
of the claim, in each case at the same interest rate as the applicable FHA
Debenture Rate as defined below.

     In most cases, HUD has the option to pay insurance claims in cash or in
debentures issued by HUD. Currently, claims are being paid in cash. Claims have
not been paid in debentures since 1965. HUD debentures issued in satisfaction of
FHA insurance claims bear interest at the FHA Debenture Rate. The Master
Servicer or any sub-servicer of each FHA-insured single family loan will be
obligated to purchase any such debenture issued in satisfaction of such mortgage
loan upon default for an amount equal to the principal amount of any such
debenture.

     For each FHA Loan, the applicable debenture rate, as announced from time
to time by HUD (the "FHA Debenture Rate") is the rate in effect at the date of
the insurance commitment or endorsement or endorsement for insurance, whichever rate is higher.
The FHA Debenture Rate that applies to a particular mortgage loan generally is
lower than the interest rate on the mortgage loan. FHA Debenture Rates are
published semi-annually by HUD in the Federal Register and a listing of such
rates from 1980 are set forth on HUD's website
(www.hud.gov/offices/hsg/comp/debnrate.cfm).

                                    49

<PAGE>


     VA Loans

     The United States Veterans Administration ("VA") is an Executive Branch
Department of the United States, headed by the Secretary of Veterans Affairs.
The VA currently administers a variety of federal assistance programs on behalf
of eligible veterans and their dependents and beneficiaries, including the VA
loan guaranty program. Under the VA loan guaranty program, a VA loan may be made
to any eligible veteran by an approved private sector mortgage lender. With
respect to any VA loan guaranteed after March 1, 1988, a borrower generally may
sell the related property subject to the existing VA loan only with the prior
approval of the VA. In general, the new borrower must be creditworthy and must
agree to assume the loan obligation. With respect to a VA loan guaranteed before
March 1, 1988, however, the mortgagor generally has an unrestricted right to
sell the related mortgaged property subject to the existing VA loan. The
existing mortgagor is released from liability on the mortgage note only if the
new homeowner qualifies as an acceptable credit risk and agrees to assume the
loan obligation. If the existing mortgagor is not released from liability, there
can be no assurance that the mortgage note can be enforced against such
mortgagor, and to the extent the new homeowner does not execute an agreement to
assume the mortgage debt, the note cannot be enforced against the new homeowner.
The mortgage loan, however, would remain secured by the related mortgaged
property and the VA guaranty would remain in effect.

Mortgage loans designated in the related prospectus supplement as
guaranteed by the VA will be partially guaranteed by the VA under the
Servicemen's Readjustment Act of 1944, as amended. The Servicemen's Readjustment
Act of 1944, as amended, permits a veteran (or in certain instances the spouse
of a veteran) to obtain a mortgage loan guaranty by the VA covering mortgage
financing of the purchase of a one- to four-family dwelling unit at interest
rates permitted by the VA. The program has no mortgage loan limits, requires no
down payment from the purchaser and permits the guaranty of mortgage loans of up
to 30 years' duration. However, no VA loan will have an original principal
amount greater than five times the amount of the related guaranty. VA guarantees
payment of a fixed percentage of the loan indebtedness to the holder of that
loan, up to a maximum dollar amount, in the event of default by the veteran
borrower.

        The amount payable under the guaranty will be the percentage (the "VA
Entitlement Percentage") of the VA loan originally guaranteed applied to the
indebtedness outstanding as of the applicable date of computation specified in
38 United States Code Section 3703(a), as amended, and in the VA regulations,
subject to any applicable caps. Currently, the maximum guaranties that may be
issued by the VA under a VA loan are generally (a) as to loans with an original
principal balance of $45,000 or less, 50% of such loan, (b) as to loans with an
original principal balance of greater than $45,000, but not more than $56,250,
$22,500, (c) as to loans with an original principal balance of more than
$56,250, except those loans that are described in (d), below, the lesser of
$36,000 or 40% of the loan, and (d) as to loans with an original principal
balance of more than $144,000 (for loans made to purchase or construct an
owner-occupied, single-family home or condominium unit), the lesser of $60,000
or 25% of the loan. The liability on the guaranty is reduced or increased pro
rata with any reduction or increase in the amount of indebtedness, but in no
event will the amount payable on the guaranty exceed the amount of the original
guaranty. Because some of the VA loans were originated as many as 29 years ago,
the maximum guaranties applicable to the mortgage loans in the mortgage pool may
differ from those derived from the guidelines set forth above. Upon the
assignment of the mortgage to the VA, the VA may, at its option and without
regard to the guarantee, make full payment to a mortgage holder of unsatisfied
indebtedness on such mortgage loan.

        The amount payable under the guarantee will be the percentage of the
VA-insured single family loan originally guaranteed applied to indebtedness
outstanding as of the applicable date of computation specified in the VA
regulations. Payments under the guarantee will be equal to the unpaid principal
amount of the loan, interest accrued on the unpaid balance of the loan to the
appropriate date of computation and limited expenses of the mortgagee, but in
each case only to the extent that such amounts have not been recovered through
liquidation of the mortgaged property. The amount payable under the guarantee
may in no event exceed the amount of the original guarantee.


                                      50
<PAGE>


        With respect to a defaulted VA-guaranteed single family loan, the Master
Servicer or sub-servicer is, absent exceptional circumstances, authorized to
announce its intention to foreclose only when the default has continued for
three months. However, notwithstanding the foregoing, the regulations require
the Master Servicer or sub-servicer to take immediate action if it determines
that the property to be foreclosed upon has been abandoned by the debtor or has
been or may be subject to extraordinary waste or if there exist conditions
justifying the appointment of a receiver for the property. Generally, a claim
for the guarantee is submitted after liquidation of the mortgaged property.

        When a delinquency is reported to VA and no realistic alternative to
foreclosure is developed by the loan holder or through the VA's supplemental

servicing of the loan, the VA determines, through an economic analysis, whether
the VA will (a) authorize the holder to convey the property securing the VA loan
to the Secretary of Veterans Affairs following termination or (b) pay the loan
guaranty amount to the holder. The decision as to disposition of properties
securing defaulted VA loans is made on a case-by-case basis using the procedures
set forth in applicable statutes, regulations and guidelines. If the property is
conveyed to the VA, then the VA pays the lender the full unpaid principal amount
of the related VA loan, plus accrued and unpaid interest and certain expenses.

    RHS Loans

    The Rural Housing Service ("RHS") is an agency of the United States
Department of Agriculture ("USDA"). To support affordable housing and community
development in rural areas, RHS operates a broad range of programs, including
the guaranteed rural housing loan program. Under this program, RHS guarantees
loans made by approved commercial lenders to eligible borrowers to purchase new
or existing dwellings or new manufactured homes for the borrower's own use as a
residence.

    In order to be eligible for a guaranteed rural housing loan, an applicant
must not already own a home, and must intend to occupy the home purchased with
the loan on a permanent basis. The applicant must be unable to qualify for
conventional mortgage credit, but have a credit history which indicates a
reasonable ability and willingness to meet obligations as they become due. More
than one late payment or any outstanding judgment within the past 12 months, or
any bankruptcy, foreclosure, or debts written off in the preceding 36 months, is
considered unacceptable. More than one 30-day late rent payment in the past 3
years is also considered adverse. Further, the applicant must have an adequate
and dependably available income that does not exceed the applicable county's
established moderate income limit. To demonstrate adequate repayment ability,
applicants must meet underwriting ratios. Income used in these ratios must be
supported by historical evidence.

    The residence to be purchased with the guaranteed loan must be in a
designated rural area. Rural areas are those communities that have a population
under 20,000 and that are rural in character. The residence must be a single
family dwelling that provides decent, safe, and sanitary housing and is modest
in cost. Manufactured homes must be new and permanently installed. While
townhouses and some condominiums are acceptable for the program, duplexes are
not eligible. An acreage may be eligible if the value of the site does not
exceed 30% of the total value of the property and does not contain any farm
service buildings or income-producing land.

    The program provides for loans for up to 100% of market value or for
acquisition cost, whichever is less. No down payment is required. Freddie Mac,
Fannie Mae, GNMA and portfolio lenders may lend up to the appraised value;
therefore, the loan may include closing costs if the appraised value is
sufficient. Loans have 30-year terms and fixed rates at market interest rates.
The interest rate must not exceed the lesser of: (i) the Fannie Mae required net
yield for 90-day commitments on 30-year fixed-rate mortgages plus 60 basis
points or (ii) the established applicable usury rate in the state where the
mortgaged property is located. At closing, a guaranteed rural housing fee equal
to 1.5% of the loan amount is due to RHS. There is no mortgage insurance on
guaranteed rural housing loans.

    RHS guarantees loans at 100% of the Loss Amount for the first 35% of the
original loan amount and the remaining 65% of the original loan amount at 85% of
the Loss Amount. The "Loss Amount" is equal to the sum of the original loan
amount, accrued interest on that amount through the date of liquidation, and the
costs and fees incurred in connection with origination and servicing of the
loan, minus the sale

proceeds received upon liquidation. The maximum loss payable by RHS cannot exceed the lesser of (i) 90% of the original loan amount, and (ii) the sum of (a) 100% of the product of the original loan amount and 0.35 and (b) 85% of any additional loss up to an amount equal to the product of the original loan amount and 0.65.

Lenders seeking to participate in the program must request a determination of eligibility from RHS and execute an RHS Lender Agreement for Participation in Single Family Loan Programs. Lenders must service loans in accordance with this agreement, and must perform services which a reasonable and prudent lender would perform in servicing its own portfolio of non-guaranteed loans. Servicers must report on the status of all guaranteed rural housing borrowers on a quarterly basis, and must report delinquent borrowers (those whose accounts are more than 30 days past due) on a monthly basis. Loss claims may be reduced or denied if the lender does not service the loan in a reasonable and prudent manner or is negligent in servicing the loan, does not proceed expeditiously with liquidation, commits fraud, claims unauthorized items, violates usury laws, fails to obtain required security positions, uses loan funds for unauthorized purposes, or delays filing the loss claim.

With the written approval of RHS, a lender may, but is not required to, allow a transfer of the property to an eligible applicant. The transferee must acquire all of the property securing the guaranteed loan balance and assume the total remaining debt; transfers without assumption are not authorized. In addition, the original debtors will remain liable for the debt.

If a borrower fails to perform under any covenant of the mortgage or deed of trust and the failure continues for 30 days, default occurs. The lender must negotiate in good faith in an attempt to resolve any problem. If a payment is not received by the 20th day after it is due, the lender must make a reasonable attempt to contact the borrower. Before the loan becomes 60 days delinquent, the lender must make a reasonable attempt to hold an interview with the borrower in order to resolve the delinquent account. If the lender is unable to contact the borrower, the lender must determine whether the property has been abandoned and the value of the security is in jeopardy before the account becomes two payments delinquent.

When the loan becomes three payments delinquent, the lender must make a decision regarding liquidation. If the lender decides that liquidation is necessary, the lender must notify RHS. The lender may proceed with liquidation of the account unless there are extenuating circumstances.

Foreclosure must be initiated within 90 days of the date when the lender decides to liquidate the account. RHS encourages lenders and delinquent borrowers to explore acceptable alternatives to foreclosure. When an account is 90 days delinquent and a method other than foreclosure is recommended to resolve delinquency, the lender must submit a servicing plan to RHS. RHS may reject a plan that does not protect its interests with respect to such loan.

If the lender acquires the related mortgaged property, it will be treated as a real estate owned property. If the real estate owned property is sold within six months after liquidation, the loss claim will be based on the sale price, subject to the sale being at market value. If the property cannot be sold within six months, a liquidation value appraisal is obtained by RHS and the lender's loss claim is processed based on the appraised value.

FHA Insurance on Multifamily Loans

There are two primary FHA insurance programs that are available for multifamily loans. Sections 221(d)(3) and (d)(4) of the Housing Act allow HUD to insure mortgage loans that are secured by newly constructed and substantially rehabilitated multifamily rental projects. Section 244 of the Housing Act provides for co-insurance of such mortgage loans made under Sections 221(d)(3) and (d)(4) by HUD/FHA and a HUD-approved co-insurer. Generally the term of such

a mortgage loan may be up to 40 years and the ratio of loan amount to property replacement cost can be up to 90%.

Section 223(f) of the Housing Act allows HUD to insure mortgage loans made for the purchase or refinancing of existing apartment projects which are at least three years old. Section 244 also provides

52

<PAGE>

for co-insurance of mortgage loans made under Section 223(f). Under Section 223(f), the loan proceeds cannot be used for substantial rehabilitation work, but repairs may be made for up to, in general, a dollar amount per apartment unit established from time to time by HUD or, at the discretion of the Secretary of HUD, 25% of the value of the property. In general the loan term may not exceed 35 years and a Loan-to-Value Ratio of no more than 85% is required for the purchase of a project and 70% for the refinancing of a project.

FHA insurance is generally payable in cash or, at the option of the mortgagee, in debentures. Such insurance does not cover 100% of the mortgage loan but is instead subject to certain deductions and certain losses of interest from the date of the default.

Reserve and Other Accounts

If the related prospectus supplement so specifies, we or the Master Servicer will deposit cash, U.S. Treasury or comparable securities, instruments evidencing ownership of principal or interest payments thereon, demand notes, certificates of deposit or a combination of such instruments in the aggregate amount and on the date specified in the related prospectus supplement with the trustee or in one or more reserve accounts established with the trustee. Such cash and the principal and interest payments on such other instruments will be used to pay, or to enhance the likelihood of timely payment of, principal of, and interest on, or, if so specified in the related prospectus supplement, to provide additional protection against losses on the assets of the related trust fund, to pay the expenses of the related trust fund or for other purposes specified in the related prospectus supplement. Any cash in the reserve account and the proceeds of any other instrument upon maturity will be invested, to the extent acceptable to the applicable rating agency, in obligations of the United States and certain agencies of the United States, certificates of deposit, certain commercial paper, time deposits and bankers acceptances sold by eligible commercial banks, certain repurchase agreements of United States government securities with eligible commercial banks and other instruments acceptable to the applicable rating agency ("Permitted Investments"). Instruments held by the trustee and/or deposited in the reserve account generally will name the trustee, in its capacity as trustee for the holders of the securities, as beneficiary. An entity acceptable to the applicable rating agency will issue such instruments. The related prospectus supplement will provide additional information with respect to such instruments.

Any amounts so deposited and payments on instruments so deposited will be available for distribution to the holders of securities for the purposes, in the manner and at the times specified in the related prospectus supplement.

Other Insurance, Guarantees and Similar Instruments or Agreements

If the related prospectus supplement so specifies, a trust fund may include, in lieu of or in addition to some or all of the foregoing, letters of credit, financial guaranty insurance policies, third party guarantees, U.S. Government Securities and other arrangements for providing timely payments or providing additional protection against losses on such trust fund's assets, paying administrative expenses, or accomplishing such other purpose as may be described in the related prospectus supplement. The trust fund may include a guaranteed investment contract or reinvestment agreement pursuant to which funds held in one or more accounts will be invested at a specified rate. If any class

of securities has a floating interest rate, or if any of the mortgage assets has
a floating interest rate, the trust fund may include an interest rate swap
contract, an interest rate cap, collar or floor agreement or similar interest
rate contract to provide limited protection against interest rate risks.

Overcollateralization

     If so specified in the related prospectus supplement, the subordination
provisions of a trust fund may be used to accelerate to a limited extent the
amortization of one or more classes of securities relative to the amortization
of the related assets of the trust fund. The accelerated amortization is
achieved by the application of certain excess interest to the payment of
principal of one or more classes of securities. This acceleration feature
creates, with respect to the assets of the trust fund, overcollateralization
which

                                   53

<PAGE>

results from the excess of the aggregate principal balance of the related assets
of the trust fund, over the principal balance of the related class or classes of
securities. This acceleration may continue for the life of the related security,
or may be limited. In the case of limited acceleration, once the required level
of overcollateralization is reached, and subject to certain provisions specified
in the related prospectus supplement, the limited acceleration feature may
cease, unless necessary to maintain the required level of overcollateralization.

Excess Spread

     If so specified in the related prospectus supplement, a portion of the
interest payments on the mortgage loans in a trust may be applied to reduce the
principal balance of one or more classes of the related securities to provide or
maintain a cushion against losses on the mortgage loans.

Cross Support

     Separate classes of a series of securities may evidence the beneficial
ownership of separate groups of assets included in a trust fund. In such case, a
cross-support feature may provide credit support. A cross-support feature
requires that distributions be made with respect to securities evidencing a
beneficial ownership interest in or secured by other asset groups within the
same trust fund. The related prospectus supplement will describe the manner and
conditions for applying any cross-support feature.

                    YIELD AND PREPAYMENT CONSIDERATIONS

     The amount and timing of principal payments on or in respect of the
mortgage assets included in the related trust funds, the allocation of Available
Funds to various classes of securities, the interest rate for various classes of
securities and the purchase price paid for the securities will affect the yields
to maturity of the securities.

     The original terms to maturity of the mortgage loans in a given mortgage
pool will vary depending upon the type of mortgage loans included in such
mortgage pool. Each prospectus supplement will contain information with respect
to the type and maturities of the mortgage loans in the related mortgage pool.
Unless specified in the related prospectus supplement, borrowers may prepay
their single family loans, cooperative loans, manufactured housing contracts and
revolving credit line mortgage loans without penalty in full or in part at any
time. Multifamily loans may prohibit prepayment for a specified period after
origination, may prohibit partial prepayments entirely, and may require the
payment of a prepayment penalty upon prepayment in full or in part.

     Conventional single family loans, cooperative loans and manufactured
housing contracts generally will contain due-on-sale provisions permitting the

mortgagee or holder of the manufactured housing contract to accelerate the
maturity of the mortgage loan or manufactured housing contract upon sale or
certain transfers by the mortgagor or obligor of the underlying mortgaged
property. Conventional multifamily loans may contain due-on-sale provisions,
due-on-encumbrance provisions, or both. Mortgage loans insured by the FHA, and
single family loans and manufactured housing contracts partially guaranteed by
the VA or RHS, are assumable with the consent of the FHA and the VA or RHS,
respectively. Thus, the rate of prepayments on such mortgage loans may be lower
than that of conventional mortgage loans bearing comparable interest rates. The
Master Servicer will enforce any due-on-sale or due-on-encumbrance clause, to
the extent it has knowledge of the conveyance or further encumbrance or the
proposed conveyance or proposed further encumbrance of the mortgaged property
and reasonably believes that it is entitled to do so under applicable law;
provided, however, that the Master Servicer will not take any enforcement action
that would impair or threaten to impair any recovery under any related insurance
policy.

     When a full prepayment is made on a single family loan or cooperative
loan, the mortgagor is charged interest on the principal amount of the mortgage
loan so prepaid only for the number of days in the month actually elapsed up to
the date of the prepayment rather than for a full month. Similarly, upon
liquidation of a mortgage loan, interest accrues on the principal amount of the
mortgage loan only for the number of days

                                        54

<PAGE>

in the month actually elapsed up to the date of liquidation rather than for a
full month. Consequently, prepayments in full and liquidations generally reduce
the amount of interest passed through in the following month to holders of
securities. In connection with certain series, the Master Servicer or a lender
will be required to use some or all of its servicing compensation to pay
compensating interest to cover such shortfalls. Interest shortfalls also could
result from the application of the Servicemembers Civil Relief Act as described
under "Legal Aspects of the Mortgage Loans--Servicemembers Civil Relief Act and
the California Military and Veterans Code." Partial prepayments in a given month
may be applied to the outstanding principal balances of the mortgage loans so
prepaid on the first day of the month of receipt or the month following receipt.
In the latter case, partial prepayments will not reduce the amount of interest
passed through in such month. Prepayment penalties collected with respect to
multifamily loans will be distributed to the holders of securities, or to other
persons entitled to such funds, as described in the related prospectus
supplement.

     The rate of prepayments with respect to conventional mortgage loans has
fluctuated significantly in recent years. In general, if prevailing rates fall
significantly below the specified interest rates borne by the mortgage loans,
such mortgage loans are likely to be subject to higher prepayment rates than if
prevailing interest rates remain at or above the interest rates specified on the
mortgage loans. Conversely, if prevailing interest rates rise appreciably above
the specified rates borne by the mortgage loans, such mortgage loans are likely
to experience a lower prepayment rate than if prevailing rates remain at or
below the interest rates specified on the mortgage loans. However, we cannot
assure you that such will be the case.

     A variety of economic, geographical, social, tax, legal and additional
factors influence prepayments. Changes in a mortgagor's housing needs, job
transfers, unemployment, a borrower's net equity in the mortgaged properties,
the enforcement of due-on-sale clauses and other servicing decisions may affect
the rate of prepayment on single family loans, cooperative loans, manufactured
housing contracts and revolving credit line mortgage loans. The rate of
principal repayment on adjustable rate mortgage loans, bi-weekly mortgage loans,
graduated payment mortgage loans, growing equity mortgage loans, reverse
mortgage loans, buy-down mortgage loans and mortgage loans with other

characteristics may differ from that of fixed rate, monthly pay, fully
amortizing mortgage loans. The rate of prepayment on multifamily loans may be
affected by other factors, including mortgage loan terms (e.g., the existence of
lockout periods, due-on-sale and due-on-encumbrance clauses and prepayment
penalties), relative economic conditions in the area where the mortgaged
properties are located, the quality of management of the mortgaged properties
and the relative tax benefits associated with the ownership of income-producing
real property.

     The timing of payments on the mortgage assets may significantly affect an
investor's yield. In general, the earlier a prepayment of principal on the
mortgage assets, the greater will be the effect on an investor's yield to
maturity. As a result, the effect on an investor's yield of Principal
Prepayments occurring at a rate higher (or lower) than the rate the investor
anticipated during the period immediately following the issuance of the
securities will not be offset by a subsequent like reduction (or increase) in
the rate of Principal Prepayments.

     The effective yield to securityholders generally will be slightly lower
than the yield otherwise produced by the applicable interest rate and purchase
price, because while interest generally will accrue on each mortgage loan from
the first day of the month, the distribution of such interest will not be made
earlier than a specified date in the month following the month of accrual.

     In the case of any securities purchased at a discount, a slower than
anticipated rate of principal payments could result in an actual yield that is
lower than the anticipated yield. In the case of any securities purchased at a
premium, a faster than anticipated rate of principal payments could result in an
actual yield that is lower than the anticipated yield. A discount or premium
would be determined in relation to the price at which a security will yield its
interest rate, after giving effect to any payment delay.

     Factors other than those this prospectus and the related prospectus
supplement identify could significantly affect Principal Prepayments at any time
and over the lives of the securities. The relative contribution of the various
factors affecting prepayment may also vary from time to time. There can be no


                                       55
<PAGE>

assurance as to the rate of payment of principal of the mortgage assets at any
time or over the lives of the securities.

     The prospectus supplement relating to a series of securities will discuss
in greater detail the effect of the rate and timing of principal payments
(including prepayments) on the yield, weighted average lives and maturities of
such securities (including, but not limited to, any exchangeable securities in
such series).

                               ADMINISTRATION

     Set forth below is a summary of the material provisions of each Agreement
that is not described elsewhere in this prospectus.

Assignment of Mortgage Assets

     Assignment of the Mortgage Loans. At the time the trust fund issues
certificates or notes of a series, we will cause the mortgage loans comprising
the trust fund to be sold and assigned to the trustee. We will not assign or
otherwise distribute to the trustee any Retained Interest specified in the
related prospectus supplement. If notes are issued in a series, such assets will
be pledged to the trustee pursuant to the terms of the indenture. Each mortgage
loan will be identified in a schedule appearing as an exhibit to the related

Agreement. Such schedule will include information as to the outstanding principal balance of each mortgage loan after application of payments due on the cut-off date, as well as information regarding the specified interest rate or accrual percentage rate, the current scheduled monthly payment of principal and interest, the maturity of the mortgage loan, the Loan-to-Value Ratio at origination and certain other information specified in the related Agreement.

We generally will deliver or cause to be delivered to the trustee (or to a custodian for the trustee) or any other party identified in the related prospectus supplement as to each mortgage loan, among other things,

   o     the mortgage note or manufactured housing contract endorsed without
         recourse in blank or to the order of the trustee,

   o     in the case of single family loans or multifamily loans, the
         mortgage, deed of trust or similar instrument (a "Mortgage") with
         evidence of recording indicated on the Mortgage (except for any not
         returned from the public recording office, in which case we will
         deliver or cause to be delivered a copy of such Mortgage together
         with a certificate that the original of such Mortgage was or will be
         delivered to such recording office),

   o     an assignment of the Mortgage or manufactured housing contract to
         the trustee, which assignment will be in recordable form in the case
         of a Mortgage assignment, and

   o     such other security documents as the related prospectus supplement
         may specify.

We or the Master Servicer generally will promptly cause the assignments of the related mortgage loans to be recorded in the appropriate public office for real property records, except, in our discretion, (a) in states in which, in the opinion of counsel acceptable to the trustee, such recording is not required to protect the trustee's interest in such loans against the claim of any subsequent transferee or any successor to or creditor of ours or the originator of such loans, (b) in states acceptable to the rating agencies rating the related securities or (c) in such recording systems as may be acceptable to applicable states and the rating agencies. In the case of manufactured housing contracts, the Master Servicer or we generally will promptly make or cause to be made an appropriate filing of a UCC-1 financing statement in the appropriate states to give notice of the trustee's ownership of the manufactured housing contracts.

Notwithstanding the preceding two paragraphs, with respect to any mortgage loan that has been recorded in the name of Mortgage Electronic Registration Systems, Inc. ("MERS") or its designee, no

                                      56
<PAGE>

mortgage assignment in favor of the trustee (or custodian) will be required to be prepared or delivered. Instead, the Master Servicer will be required to take all actions as are necessary to cause the applicable trust fund to be shown as the owner of the related mortgage loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

With respect to any mortgage loans that are cooperative loans, we generally will cause to be delivered to the trustee (or its custodian):

   o     the related original cooperative note endorsed without recourse in
         blank or to the order of the trustee,

   o     the original security agreement,

   o     the proprietary lease or occupancy agreement,

    o     the recognition agreement,

    o     an executed financing agreement and

    o     the relevant stock certificate and related blank stock powers.

We will cause to be filed in the appropriate office an assignment and a financing statement evidencing the trustee's security interest in each cooperative loan.

A prospectus supplement may provide for deliveries of different documents with respect to mortgage loans or cooperative loans. Documents with respect to revolving credit line mortgage loans will be delivered to the trustee (or custodian) only to the extent specified in the related prospectus supplement. Certain of those documents may be retained by the Master Servicer, which may also be an originator of some or all of the revolving credit line mortgage loans.

The trustee (or its custodian) or any other party identified in the related prospectus supplement will review certain of the mortgage loan documents delivered to them within the time period specified in the related prospectus supplement or the related Agreement, and will hold all documents delivered to them for the benefit of the securityholders. In general, if any such document is found to be missing or defective in any material respect, the trustee (or such custodian) or any other party identified in the related prospectus supplement will be required to notify the Master Servicer and us or in certain circumstances the related lender, or the Master Servicer will notify the related lender. If the responsible party identified in the related prospectus supplement cannot cure the omission or defect within 60 days (or other period specified) after receipt of such notice, the responsible party generally will be obligated to purchase the related mortgage loan from the trust at price equal to its unpaid principal balance as of the date of the repurchase plus accrued and unpaid interest to the first day of the month following the month of repurchase at the rate specified on the mortgage loan (less any amount payable as related servicing compensation if the responsible party is the Master Servicer) or such other price as may be described in the related prospectus supplement. We cannot assure you that a responsible party will fulfill this purchase obligation. Neither we nor the Master Servicer will be obligated to purchase such mortgage loan if the responsible party defaults on its purchase obligation unless the defect also constitutes a breach of our or the Master Servicer's representations or warranties, as the case may be. This purchase obligation generally will constitute the sole remedy available to the securityholders or the trustee for omission of, or a material defect in, a constituent document. The related prospectus supplement may provide for certain rights of substitution for defective mortgage loans with respect to a series.

The trustee will be authorized to appoint a custodian pursuant to a custodial agreement to maintain possession of and, if applicable, to review the documents relating to the mortgage loans as agent of the trustee. Alternately, the trustee or any other party identified in the related prospectus supplement may also serve in the capacity of custodian pursuant to the applicable Agreement.

<div align="center">57</div>

&lt;PAGE&gt;

Assignment of Agency Securities. We will cause agency securities to be registered in the name of the trustee or its nominee. Each agency security will be identified in a schedule appearing as an exhibit to the Agreement, which will specify as to each agency security the original principal amount and outstanding principal balance as of the cut-off date, the annual pass-through rate (if any) and the maturity date.

Assignment of Private Mortgage-Backed Securities. We will cause private mortgage-backed securities to be registered in the name of the trustee on behalf of the trust fund. The trustee (or the custodian) or any other party identified in the related prospectus supplement will have possession of any certificated private mortgage-backed securities. Each private mortgage-backed security will be identified in a schedule appearing as an exhibit to the related Agreement, which may specify the original principal amount, outstanding principal balance as of the cut-off date, annual pass-through rate or interest rate and maturity date or expected final distribution date for each private mortgage-backed security conveyed to the trust.

Payments on Mortgage Loans; Deposits to Accounts

In general, each Master Servicer and sub-servicer servicing the mortgage loans will establish and maintain for one or more series of securities a separate account or accounts for the collection of payments on the related mortgage loans (the "Protected Account"), which must be one of the following:

   o   maintained with a depository institution the debt obligations of
       which (or in the case of a depository institution that is the
       principal subsidiary of a holding company, the obligations of such
       holding company) are rated in one of the two highest rating
       categories by each rating agency rating the series of securities,

   o   an account or accounts the deposits in which are fully insured by
       the Federal Deposit Insurance Corporation,

   o   an account or accounts the deposits in which are insured by the
       Federal Deposit Insurance Corporation (to the limits established by
       the Federal Deposit Insurance Corporation), and the uninsured
       deposits in which are invested in Permitted Investments held in the
       name of the trustee,

   o   an account or accounts otherwise acceptable to each rating agency,
       or

   o   an account that satisfies the requirements specified in the related
       Agreement.

If specified in the related prospectus supplement, the Master Servicer or sub-servicer, as the case may be, may maintain a Protected Account as an interest bearing account, and may be permitted to invest the funds held in a Protected Account, pending each succeeding distribution date, in Permitted Investments. The related Master Servicer or sub-servicer or its designee or another person specified in the prospectus supplement will be entitled to receive any such interest or other income earned on funds in the Protected Account as additional compensation and will be obligated to deposit or deliver for deposit in the Protected Account the amount of any loss immediately as realized. The Protected Account may be maintained with the Master Servicer or sub-servicer or with a depository institution that is an affiliate of the Master Servicer or sub-servicer, provided it meets the standards discussed above.

Each Master Servicer and sub-servicer generally will deposit or cause to be deposited in the Protected Account for each trust fund on a daily basis the following payments and collections received or advances made by or on behalf of it (other than payments representing Retained Interest):

   o   all payments on account of principal, including Principal
       Prepayments and, if the related prospectus supplement so specifies,
       any prepayment penalty, on the mortgage loans;

   o   all payments on account of interest on the mortgage loans, net of
       applicable servicing compensation;

58

<PAGE>

o    all proceeds (net of unreimbursed payments of property taxes, insurance premiums and similar items incurred, and unreimbursed advances made, by the related Master Servicer or sub-servicer, if any) of the title insurance policies, the hazard insurance policies and any primary insurance policies, to the extent such proceeds are not applied to the restoration of the property or released to the mortgagor in accordance with the Master Servicer's normal servicing procedures (collectively, "Insurance Proceeds") and all other cash amounts (net of unreimbursed expenses incurred in connection with liquidation or foreclosure ("Liquidation Expenses") and unreimbursed advances made, by the related Master Servicer or sub-servicer, if any) received and retained in connection with the liquidation of defaulted mortgage loans, by foreclosure or otherwise ("Liquidation Proceeds"), together with any net proceeds received with respect to any properties acquired on behalf of the securityholders by foreclosure or deed in lieu of foreclosure;

o    all proceeds of any mortgage loan or mortgaged property repurchased by us, the Master Servicer or any other party identified in the related prospectus supplement;

o    all payments required to be deposited in the Protected Account with respect to any deductible clause in any blanket insurance policy described under "--Hazard Insurance" below;

o    any amount the Master Servicer or sub-servicer is required to deposit in connection with losses realized on investments for the benefit of the Master Servicer or sub-servicer of funds held in any Accounts; and

o    all other amounts required to be deposited in the Protected Account pursuant to the Agreement.

    If acceptable to each rating agency rating the series of securities, a Protected Account maintained by a Master Servicer or sub-servicer may commingle funds from the mortgage loans deposited in the trust fund with similar funds relating to other mortgage loans which are serviced or owned by the Master Servicer or sub-servicer. The Agreement may require that certain payments related to the mortgage assets be transferred from a Protected Account maintained by a Master Servicer or sub-servicer into another account maintained under conditions acceptable to each rating agency.

    The trustee will be required to establish in its name as trustee for one or more series of securities a trust account or another account acceptable to each rating agency (the "Securities Account"). The Securities Account may be maintained as an interest bearing account or the funds held in the Securities Account may be invested, pending each succeeding distribution date in Permitted Investments. If there is more than one Master Servicer for the rated series of securities, there may be a separate Securities Account or a separate subaccount in a single Securities Account for funds received from each Master Servicer. The related Master Servicer or its designee or another person specified in the related prospectus supplement may be entitled to receive any interest or other income earned on funds in the Securities Account or subaccount of the Securities Account as additional compensation and, if so entitled, will be obligated to deposit or deliver for deposit in the Securities Account or subaccount the amount of any loss immediately as realized. The trustee will be required to deposit into the Securities Account on the business day received all funds received from the Master Servicer for deposit into the Securities Account and any other amounts required to be deposited into the Securities Account pursuant to the Agreement. In addition to other purposes specified in the Agreement, the

trustee will be required to make withdrawals from the Securities Account to make
distributions to securityholders. If the series includes one trust fund that
contains a beneficial ownership interest in another trust fund, funds from the
trust assets may be withdrawn from the Securities Account included in the latter
trust fund and deposited into another Securities Account included in the former
trust fund before transmittal to securityholders with a beneficial ownership
interest in the former trust fund. If the related prospectus supplement so
specifies, the Protected Account and the Securities Account may be combined into
a single Securities Account. With respect to a series backed by agency
securities and/or private mortgage-backed securities, it is likely there would
be only one Securities Account.

59

<PAGE>

Sub-Servicing

Each lender with respect to a mortgage loan or any other servicing entity
may act as the Master Servicer or the sub-servicer for such mortgage loan
pursuant to a sub-servicing agreement. While in general each sub-servicing
agreement will be a contract solely between the Master Servicer and the
sub-servicer, the Agreement pursuant to which a series of securities is issued
will generally provide that, if for any reason the Master Servicer for such
series of securities is no longer the Master Servicer of the related mortgage
loans, the trustee or any successor Master Servicer must recognize the
sub-servicer's rights and obligations under such sub-servicing agreement.

With the approval of the Master Servicer, a sub-servicer may delegate its
servicing obligations to third-party servicers. Such sub-servicer will remain
obligated, or will be released from its obligations, under the related
sub-servicing agreement, as provided in the related prospectus supplement. Each
sub-servicer will perform the customary functions of a servicer of mortgage
loans. Such functions generally include:

    o    collecting payments from mortgagors or obligors and remitting such
         collections to the Master Servicer;

    o    maintaining hazard insurance policies and filing and settling claims
         under such policies, subject in certain cases to the right of the
         Master Servicer to approve in advance any such settlement;

    o    maintaining escrow or impound accounts of mortgagors or obligors for
         payment of taxes, insurance and other items the mortgagor or obligor
         is required to pay pursuant to the related mortgage loan;

    o    processing assumptions or substitutions, although the Master
         Servicer is generally required to exercise due-on-sale clauses to
         the extent such exercise is permitted by law and would not adversely
         affect insurance coverage;

    o    attempting to cure delinquencies;

    o    supervising foreclosures; inspecting and managing mortgaged
         properties under certain circumstances;

    o    maintaining accounting records relating to the mortgage loans; and

    o    to the extent specified in the related prospectus supplement,
         maintaining additional insurance policies or credit support
         instruments and filing and settling claims under those policies.

A sub-servicer may also be obligated to make advances in respect of delinquent

installments of principal and interest on mortgage loans and in respect of
certain taxes and insurance premiums that mortgagors or obligors have not paid
on a timely basis.

As compensation for its servicing duties, each sub-servicer will be
entitled to a monthly servicing fee. Each sub-servicer will generally be
entitled to collect and retain, as part of its servicing compensation, any late
charges or assumption fees provided in the mortgage note or related instruments.
The Master Servicer may be required to reimburse each sub-servicer for certain
expenditures the sub-servicer makes, to the same extent the Master Servicer
would be reimbursed under the Agreement. The Master Servicer may be permitted to
purchase the servicing of mortgage loans if the sub-servicer elects to release
the servicing of such mortgage loans to the Master Servicer.

Each sub-servicer may be required to agree to indemnify the Master
Servicer for any liability or obligation the Master Servicer sustained in
connection with any act or failure to act by the sub-servicer in its servicing
capacity. Each sub-servicer will be required to maintain a fidelity bond and an
errors and omissions policy with respect to its officers, employees and other
persons acting on its behalf or on behalf of the Master Servicer.

                                      60
<PAGE>


Each sub-servicer will service each mortgage loan pursuant to the terms of
the sub-servicing agreement for the entire term of such mortgage loan, unless
the Master Servicer earlier terminates the sub-servicing agreement or unless
servicing is released to the Master Servicer. Upon written notice to the
sub-servicer, the Master Servicer generally may terminate a sub-servicing
agreement without cause.

The Master Servicer may agree with a sub-servicer to amend a sub-servicing
agreement. Upon termination of the sub-servicing agreement, the Master Servicer
may act as servicer of the related mortgage loans or enter into new
sub-servicing agreements with other sub-servicers. If the Master Servicer acts
as servicer, it will not assume liability for the representations and warranties
of the sub-servicer which it replaces. Each sub-servicer must be a lender or
meet the standards for becoming a lender or have such servicing experience as to
be otherwise satisfactory to the Master Servicer and us. The Master Servicer
will make reasonable efforts to have the new sub-servicer assume liability for
the representations and warranties of the terminated sub-servicer. We cannot
assure you that such an assumption will occur. In the event of such an
assumption, the Master Servicer may in the exercise of its business judgment,
release the terminated sub-servicer from liability in respect of such
representations and warranties. Any amendments to a sub-servicing agreement or
new sub-servicing agreement may contain provisions different from those that are
in effect in the original sub-servicing agreement. However, any such amendment
or new agreement may not be inconsistent with or violate such Agreement.

Collection Procedures

The Master Servicer, directly or through one or more sub-servicers, will
make reasonable efforts to collect all payments called for under the mortgage
loans. The Master Servicer will, consistent with each Agreement and any mortgage
pool insurance policy, primary insurance policy, FHA insurance, VA guaranty, RHS
guaranty, special hazard insurance policy, bankruptcy bond or alternative
arrangements, follow such collection procedures as are customary with respect to
mortgage loans that are comparable to the mortgage loans the Master Servicer is
collecting payments on.

In any case in which the mortgagor or obligor has or is about to convey
property securing a conventional mortgage loan, the Master Servicer generally
will, to the extent it has knowledge of such conveyance or proposed conveyance,

exercise or cause to be exercised its rights to accelerate the maturity of such
mortgage loan under any applicable due-on-sale clause. The Master Servicer will
exercise such acceleration rights only if applicable law permits the exercise of
such rights and only if such exercise will not impair or threaten to impair any
recovery under any related primary insurance policy. If these conditions are not
met or if such mortgage loan is insured by the FHA or partially guaranteed by
the VA or RHS, the Master Servicer will enter into or cause to be entered into
an assumption and modification agreement with the person to whom such property
has been or is about to be conveyed. Under such an agreement, the person to whom
the property has been or will be conveyed becomes liable for repayment of the
mortgage loan. To the extent applicable law permits, the mortgagor will remain
liable on the mortgage loan. The Master Servicer will not enter into such an
assignment and assumption agreement if it would jeopardize the trust fund's tax
status. Any fee collected by or on behalf of the Master Servicer for entering
into an assumption agreement will be retained by or on behalf of the Master
Servicer as additional servicing compensation. In the case of multifamily loans,
the Master Servicer generally will agree to exercise any right it may have to
accelerate the maturity of a multifamily loan to the extent it has knowledge of
any further encumbrance of the related mortgaged property effected in violation
of any due-on-encumbrance clause applicable to the loan. In connection with any
such assumption, the terms of the related mortgage loan may not be changed.


     With respect to cooperative loans, any prospective purchaser will
generally have to obtain the approval of the board of directors of the relevant
cooperative before purchasing the shares and acquiring rights under the related
proprietary lease or occupancy agreement. This approval is usually based on the
purchaser's income and net worth and numerous other factors. The necessity of
acquiring such approval could limit the number of potential purchasers for those
shares and otherwise limit the trust fund's ability to sell and realize the
value of those shares.


                                   61
<PAGE>


     In general, a "tenant-stockholder" (as defined in Code Section 216(b)(2))
of a corporation that qualifies as a "cooperative housing corporation" within
the meaning of Code Section 216(b)(1) is allowed a deduction for amounts paid or
accrued within his taxable year to the corporation representing his
proportionate share of certain interest expenses and certain real estate taxes
allowable as a deduction under Code Section 216(a) to the corporation under Code
Sections 163 and 164. In order for a corporation to qualify under Code Section
216(b)(1) for its taxable year in which such items are allowable as a deduction
to the corporation, such Section requires, among other things, that at least 80%
of the gross income of the corporation be derived from its tenant-stockholders
(as defined in Code Section 216(b)(2)). By virtue of this requirement, the
status of a corporation for purposes of Code Section 216(b)(1) must be
determined on a year-to-year basis. Consequently, we cannot assure you that
cooperatives relating to the cooperative loans will qualify under such Section
for any particular year. If such a cooperative fails to qualify for one or more
years, the value of the collateral securing any related cooperative loans could
be significantly impaired because no deduction would be allowable to
tenant-stockholders under Code Section 216(a) with respect to those years. In
view of the significance of the tax benefits accorded tenant-stockholders of a
corporation that qualifies under Code Section 216(b)(1), the likelihood that
such a failure would be permitted to continue over a period of years appears
remote.

Hazard Insurance

     The Master Servicer will require the mortgagor or obligor on each single
family loan, multifamily loan, commercial real estate loan, manufactured housing
contract or revolving credit line mortgage loan to maintain a hazard insurance
policy. Such hazard insurance policy is generally required to provide for no

less than the coverage of the standard form of fire insurance policy with
extended coverage customary for the type of mortgaged property in the state in
which such mortgaged property is located. Such coverage will generally be in an
amount not less than the replacement value of the improvements or manufactured
home securing such mortgage loan or the principal balance owing on such mortgage
loan, whichever is less. All amounts that the Master Servicer collects under any
hazard policy (except for amounts to be applied to the restoration or repair of
the mortgaged property or released to the mortgagor or obligor in accordance
with the Master Servicer's normal servicing procedures) will be deposited in the
related Protected Account. If the Master Servicer maintains a blanket policy
insuring against hazard losses on all the mortgage loans comprising part of a
trust fund, it will conclusively be deemed to have satisfied its obligation
relating to the maintenance of hazard insurance. Such blanket policy may contain
a deductible clause, in which case the Master Servicer will be required to
deposit from its own funds into the related Protected Account the amounts that
would have been deposited in such Protected Account but for such clause. The
related prospectus supplement will specify any additional insurance coverage for
mortgaged properties in a mortgage pool of multifamily loans or commercial real
estate loans.

     In general, the standard form of fire and extended coverage policy covers
physical damage to or destruction of the improvements or manufactured home
securing a mortgage loan by fire, lightning, explosion, smoke, windstorm and
hail, riot, strike and civil commotion, subject to the conditions and exclusions
particularized in each policy. Respective state laws dictate the basic terms of
such policies. Most such policies typically do not cover any physical damage
resulting from the following: war, revolution, governmental actions, floods and
other water-related causes, earth movement (including earthquakes, landslides
and mud flows), nuclear reactions, wet or dry rot, vermin, rodents, insects or
domestic animals, theft and, in certain cases, vandalism. The foregoing list is
merely indicative of certain kinds of uninsured risks and is not intended to be
all-inclusive. If the mortgaged property securing a mortgage loan is located in
a federally designated special flood area at the time of origination, the Master
Servicer will require the mortgagor or obligor to obtain and maintain flood
insurance.

     The hazard insurance policies typically contain a co-insurance clause that
requires the insured at all times to carry insurance of a specified percentage
(generally 80% to 90%) of the full replacement value of the insured property to
recover the full amount of any partial loss. If the insured's coverage falls
below this specified percentage, then the insurer's liability in the event of
partial loss will not exceed the larger of (1) the actual cash value (generally
defined as replacement cost at the time and place of loss, less physical
depreciation) of the improvements damaged or destroyed or (2) such proportion of
the loss,

                                       62

<PAGE>

without deduction for depreciation, as the amount of insurance carried bears to
the specified percentage of the full replacement cost of such improvements.
Since the amount of hazard insurance that the Master Servicer may cause to be
maintained on the improvements securing the mortgage loans declines as the
principal balances owing on the mortgage loans decrease, and since improved real
estate generally has appreciated in value over time in the past, the effect of
this requirement in the event of partial loss may be that hazard Insurance
Proceeds will be insufficient to restore fully the damaged property. If the
related prospectus supplement so specifies, a special hazard insurance policy or
an alternative form of credit enhancement will be obtained to insure against
certain of the uninsured risks described above.

     The Master Servicer will not require that a standard hazard or flood
insurance policy be maintained on the cooperative dwelling relating to any
cooperative loan. Generally, the cooperative itself is responsible for

maintenance of hazard insurance for the property owned by the cooperative and the tenant-stockholders of that cooperative do not maintain individual hazard insurance policies. To the extent, however, that a cooperative and the related borrower on a cooperative loan do not maintain such insurance or do not maintain adequate coverage or any Insurance Proceeds are not applied to the restoration of damaged property, any damage to such borrower's cooperative dwelling or such cooperative's building could significantly reduce the value of the collateral securing such cooperative loan to the extent not covered by other credit support.

Realization Upon Defaulted Mortgage Loans

      Primary Insurance Policies. The Master Servicer will maintain or cause each sub-servicer to maintain, as the case may be, in full force and effect, to the extent specified in the related prospectus supplement, a primary insurance policy with regard to each single family loan that requires such coverage. The Master Servicer will not cancel or refuse to renew any such primary insurance policy in effect at the time of the initial issuance of a series of securities that is required to be kept in force under the applicable Agreement unless the replacement primary insurance policy is sufficient to maintain the current rating of the classes of securities of such series that have been rated.

      The amount of a claim for benefits under a primary insurance policy covering a mortgage loan generally will consist of the insured percentage of the unpaid principal amount of the covered mortgage loan and accrued and unpaid interest on the mortgage loan and reimbursement of certain expenses, less:

      o     all rents or other payments the insured collected or received (other
            than the proceeds of hazard insurance) that are derived from or in
            any way related to the mortgaged property,

      o     hazard Insurance Proceeds in excess of the amount required to
            restore the mortgaged property and which have not been applied to
            the payment of the mortgage loan,

      o     amounts expended but not approved by the issuer of the related
            primary insurance policy (the "primary insurer"),

      o     claim payments the primary insurer previously made and

      o     unpaid premiums.

      Primary insurance policies reimburse certain losses sustained by reason of defaults in borrower's payments. Primary insurance policies will not insure against, and exclude from coverage, a loss sustained by reason of a default arising from or involving certain matters, including:

      o     fraud or negligence in origination or servicing of the mortgage
            loans, including misrepresentation by the originator, borrower or
            other persons involved in the origination of the mortgage loan;

      o     failure to construct the mortgaged property subject to the mortgage
            loan in accordance with specified plans;

      o     physical damage to the mortgaged property; and

                                      63
<PAGE>

      o     the primary insurer not approving the related Master Servicer as a
            servicer.

      Recoveries Under a Primary Insurance Policy. As conditions precedent to

the filing of or payment of a claim under a primary insurance policy covering
a mortgage loan, the insured generally will be required to satisfy certain
conditions that may include the conditions that the insured:

     o   advance or discharge:

        a. all hazard insurance policy premiums and

        b. as necessary and approved in advance by the primary insurer:

            1. real estate property taxes,

            2.   all expenses required to maintain the related mortgaged
property in at least as good a condition as existed at
the effective date of such primary insurance policy,
ordinary wear and tear excepted,

            3.   mortgaged property sales expenses,

            4.   any outstanding liens (as defined in such primary
insurance policy) on the mortgaged property;

            5.   foreclosure costs, including court costs and reasonable
attorneys' fees,

            6.   in the event of any physical loss or damage to the
mortgaged property, have restored and repaired the
mortgaged property to at least as good a condition as
existed at the effective date of such primary insurance
policy, ordinary wear and tear excepted, and

            7.   tender to the primary insurer good and merchantable
title to and possession of the mortgaged property.

In those cases in which a sub-servicer services a single family loan, the
sub-servicer, on behalf of itself, the trustee and securityholders, will present
claims to the primary insurer. The sub-servicer will deposit all collections
under the policy in the Protected Account it maintains. In all other cases, the
Master Servicer, on behalf of itself, the trustee and the securityholders, will
present claims to the primary insurer under each primary insurance policy. The
Master Servicer will take such reasonable steps as are necessary to receive
payment or to permit recovery under the primary insurance policy with respect to
defaulted mortgage loans. As discussed above, all collections by or on behalf of
the Master Servicer under any primary insurance policy and, when the mortgaged
property has not been restored, the hazard insurance policy, are to be deposited
in the Protected Account.

If the mortgaged property securing a defaulted mortgage loan is damaged
and proceeds, if any, from the related hazard insurance policy are insufficient
to restore the mortgaged property to a condition sufficient to permit recovery
under the related primary insurance policy, if any, the Master Servicer will
expend its own funds to restore the damaged mortgaged property only if it
determines (a) that such restoration will increase the proceeds to
securityholders on liquidation of the mortgage loan after reimbursement of the
Master Servicer for its expenses and (b) that it will be able to recover such
expenses from related Insurance Proceeds or Liquidation Proceeds.

If recovery on a defaulted mortgage loan under any related primary
insurance policy is not available for the reasons described in the preceding
paragraph, or if the primary insurance policy does not cover such defaulted
mortgage loan, the Master Servicer will be obligated to follow or cause to be
followed such normal practices and procedures as it deems necessary or advisable
to realize upon the defaulted mortgage loan. If the proceeds of any liquidation
of the mortgaged property securing the defaulted mortgage loan are less than the
principal balance of such mortgage loan plus accrued interest that is payable to

securityholders, the trust fund will realize a loss. The trust fund's loss will
equal the amount of

64

<PAGE>

such difference plus the aggregate of reimbursable expenses the Master Servicer
incurred in connection with such proceedings.

    If the Master Servicer or its designee recovers Insurance Proceeds which,
when added to any related Liquidation Proceeds and after deduction of certain
expenses reimbursable to the Master Servicer, exceed the principal balance of
such mortgage loan plus accrued interest that is payable to securityholders, the
Master Servicer will be entitled to withdraw or retain from the Protected
Account its normal servicing compensation with respect to such mortgage loan. If
the Master Servicer has expended its own funds to restore the damaged mortgaged
property and such funds have not been reimbursed under the related hazard
insurance policy, the Master Servicer will be entitled to withdraw from the
Protected Account out of related Liquidation Proceeds or Insurance Proceeds an
amount equal to the funds it expended, in which event the trust fund may realize
a loss up to the amount so charged.

    Recoveries Under FHA Insurance, VA Guarantees and RHS Guarantees. The
Master Servicer, on behalf of itself, the trustee and the securityholders, will
present claims under any FHA insurance or VA guarantee or RHS guarantee with
respect to the mortgage loans.

Servicing and Other Compensation and Payment of Expenses

    A Master Servicer's or sub-servicer's primary servicing compensation with
respect to a series of securities will come from the monthly payment to it, of
an amount generally equal to a percentage per annum of the outstanding principal
balance of such loan or from such other source specified in the related
prospectus supplement. The related prospectus supplement will describe the
primary compensation to be paid to the Master Servicer or the sub-servicer. If
the Master Servicer's or sub-servicer's primary compensation is a percentage of
the outstanding principal balance of each mortgage loan, such amounts will
decrease as the mortgage loans amortize. In addition to primary compensation,
the Master Servicer or the sub-servicer generally will be entitled to retain all
assumption fees and late payment charges, to the extent collected from
mortgagors, and, to the extent provided in the related prospectus supplement,
any interest or other income earned on funds held in any Accounts.

    To the extent specified in the related Agreement, the Master Servicer may
pay from its servicing compensation certain expenses incurred in connection with
its servicing of the mortgage loans, including, without limitation, payment in
certain cases of premiums for insurance policies, guarantees, sureties or other
forms of credit enhancement, payment of the fees and disbursements of the
trustee and independent accountants, payment of expenses incurred in connection
with distributions and reports to securityholders, and payment of certain other
expenses. The Master Servicer will be entitled to reimbursement of expenses
incurred in enforcing the obligations of sub-servicers and, under certain
limited circumstances, lenders.

Evidence as to Compliance

    The related prospectus supplement will identify each party that will be
required to deliver annually to the trustee, Master Servicer or us, as
applicable, on or before the date specified in the applicable Agreement, an
officer's certificate stating that (i) a review of that party's servicing
activities during the preceding calendar year and of performance under the
Agreement has been made under the supervision of the officer, and (ii) to the
best of the officer's knowledge, based on the review, such party has fulfilled
all its obligations under the Agreement throughout the year, or, if there has
been a failure to fulfill any such obligation, specifying such failure known to

the officer and the nature and status of the failure.

In addition, each party that participates in the servicing and administration of more than 5% of the mortgage loans and other assets comprising a trust for any series will be required to deliver annually to us and/or the trustee, a report (an "Assessment of Compliance") that assesses compliance by that party with the servicing criteria set forth in Item 1122(d) of Regulation AB (17 CFR 229.1122) that contains the following:

    (a)   a statement of the party's responsibility for assessing compliance with the servicing criteria applicable to it;

<div align="center">65</div>

&lt;PAGE&gt;

    (b)   a statement that the party used the criteria in Item 1122(d) of Regulation AB to assess compliance with the applicable servicing criteria;

    (c)   the party's assessment of compliance with the applicable servicing criteria during and as of the end of the prior calendar year, setting forth any material instance of noncompliance identified by the party; and

    (d)   a statement that a registered public accounting firm has issued an attestation report on the party's assessment of compliance with the applicable servicing criteria during and as of the end of the prior calendar year.

Each party that is required to deliver an Assessment of Compliance will also be required to simultaneously deliver a report (an "Attestation Report") of a registered public accounting firm, prepared in accordance with the standards for attestation engagements issued or adopted by the Public Company Accounting Oversight Board, that expresses an opinion, or states that an opinion cannot be expressed, concerning the party's assessment of compliance with the applicable servicing criteria.

Certain Matters Regarding the Master Servicer and Us

The related prospectus supplement will name one or more Master Servicers under each Agreement. Alternatively, the trustee may also serve in the capacity of the Master Servicer if so specified in the related prospectus supplement or applicable Agreement. Each entity serving as Master Servicer may have normal business relationships with our affiliates or us.

The Agreement will provide that a Master Servicer may not resign from its obligations and duties under that servicing agreement except upon a determination that its duties under that agreement are no longer permissible under applicable law or as otherwise specified in the related prospectus supplement. No resignation will become effective until the trustee or a successor servicer has assumed the Master Servicer's obligations and duties under the Agreement.

Each Agreement will further provide that none of the Master Servicer, in certain instances, we, or any director, officer, employee, or agent of the Master Servicer or us will be under any liability to the trustee, the related trust fund or securityholders for any action taken or for refraining from the taking of any action in good faith under such Agreement, or for errors in judgment. However, each Agreement will provide none of we, the trustee, the Master Servicer, or any such person will be protected against any breach of warranties or representations made in such Agreement or any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or negligence (or gross negligence in the case of the depositor) in the performance of duties

or by reason of reckless disregard of obligations and duties under such Agreement. Each Agreement will further provide that we, the trustee, the Master Servicer, in certain instances, and any one of our or the Master Servicer's directors, officers, employees or agents will be entitled to indemnification by the related trust fund and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to such Agreement or the securities, other than any loss, liability or expense related to any specific mortgage loan or mortgage loans (except any such loss, liability or expense otherwise reimbursable pursuant to that pooling and servicing agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or negligence (or gross negligence in the case of the depositor) in the performance of duties or by reason of reckless disregard of obligations and duties under such Agreement. In addition, each Agreement will provide that none of the Master Servicer, the trustee or, in certain instances, we will be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its or our respective responsibilities under the Agreement and which in its or our opinion, as the case may be, may involve us or it in any expense or liability. We, the trustee or the Master Servicer may, however, in its or our discretion, as the case may be, undertake any such action which we may deem necessary or desirable with respect to an Agreement and the rights and duties of the parties to such Agreement and the interests of the securityholders under such Agreement. In such event, the resulting legal expenses and costs of such action and any liability will be expenses, costs and liabilities of the trust fund. The Master Servicer, the trustee, or we as the case may be, will be entitled to be reimbursed out of funds otherwise payable to securityholders.

                                          66

<PAGE>


        Any person into which the Master Servicer may be merged or consolidated, or any person resulting from any merger or consolidation to which the Master Servicer is a party, or any person succeeding to the business of the Master Servicer, will be the successor of the Master Servicer under each Agreement, provided that such person satisfies the requirements for a successor Master Servicer set forth in the related prospectus supplement and further provided that such merger, consolidation or succession does not adversely affect the then current rating or ratings of the class or classes of securities of such series that have been rated.

Events of Default; Rights Upon Event of Default

        Pooling and Servicing Agreement; Trust Agreement; Master Servicing Agreement. An event of default under a pooling and servicing agreement, a trust agreement or a master servicing agreement will be specified in the related prospectus supplement and generally will include:

        o    any failure by the Master Servicer to cause to be deposited in the
             Securities Account any amount so required to be deposited pursuant
             to the Agreement, and such failure continues unremedied for two
             Business Days or such other time period as is specified in the
             Agreement;

        o    any failure by the Master Servicer duly to observe or perform in any
             material respect any of its other covenants or agreements in the
             Agreement that continues unremedied for 60 days or such other time
             period as is specified in the Agreement after the giving of written
             notice of such failure to the Master Servicer by the trustee, or to
             the Master Servicer and the trustee by the holders of securities of
             any class evidencing not less than 25%, or such other percentage as
             is specified in the prospectus supplement, of the aggregate voting
             rights represented by the securities of the related series; and

        o    certain events of insolvency, readjustment of debt, marshaling of

https://www.sec.gov/Archives/edgar/data/807003626/c48011_424b5.txt

assets and liabilities or similar proceedings and certain actions by
or on behalf of the Master Servicer indicating its insolvency,
reorganization or inability to pay its obligations.

     If the related prospectus supplement so specifies, the pooling and
servicing agreement, the trust agreement or master servicing agreement will
permit the trustee to sell the assets of the trust fund if payments from the
assets would be insufficient to make payments required in the Agreement. The
assets of the trust fund will be sold only under the circumstances and in the
manner specified in the related prospectus supplement.

     In general, so long as an event of default under a pooling and servicing
agreement, a trust agreement or a master servicing agreement remains unremedied,
the trustee may, and at the direction of holders of securities evidencing voting
rights aggregating not less than 25%, or such other percentage as is specified
in the related prospectus supplement, of the aggregate voting rights represented
by the securities of the related series and under such circumstances as may be
specified in such Agreement, the trustee shall, terminate all of the rights and
obligations of the Master Servicer under the Agreement relating to such trust
fund and in and to the mortgage loans. Upon such termination, if so specified in
the related prospectus supplement, the trustee will succeed to all of the
responsibilities, duties and liabilities of the Master Servicer under the
Agreement, including, if the related prospectus supplement so specifies, the
obligation to make advances, and will be entitled to similar compensation
arrangements. If the trustee is unwilling or unable so to act, it may appoint,
or petition a court of competent jurisdiction for the appointment of, a mortgage
loan servicing institution meeting the requirements of the related agreement to
act as successor to the Master Servicer under the Agreement. Pending such
appointment, the trustee must act in such capacity if so specified in the
related prospectus supplement. The trustee and any such successor may agree upon
the servicing compensation to be paid, which in no event may be greater than the
compensation payable to the Master Servicer under the Agreement.

     Except as set forth below, no securityholder, solely by virtue of such
holder's status as a securityholder, will have any right under any Agreement to
institute any proceeding with respect to such Agreement. If holders of
securities of any class of such series evidencing not less than 25%, or such
other percentage as is specified in the prospectus supplement, of the aggregate
voting rights constituting

                                      67

<PAGE>

such class make a written request upon the trustee to institute such proceeding
in its own name as trustee and have offered to the trustee reasonable indemnity,
and the trustee for 60 days has neglected or refused to institute any such
proceeding, then a security holder may institute a proceeding with respect to
such agreement.

     Indenture. An event of default under the indenture for each series of
notes will be as specified in the related prospectus supplement and may include:

     o    a default for the number of days specified in the related prospectus
          supplement in the payment of any principal of or interest on any
          note of such series;

     o    failure to perform any other covenant of the trust fund in the
          indenture, which continues for a period of 60 days or such other
          time period as is specified in the indenture after notice of the
          failure is given in accordance with the procedures described in the
          related prospectus supplement;

     o    any representation or warranty made by the trust fund in the
          indenture or in any certificate or other writing delivered pursuant
          to the indenture or in connection therewith with respect to or

affecting such series having been incorrect in a material respect as
of the time made, and such breach is not cured within 60 days (or
such other time period as is specified in the indenture) after
notice of the breach is given in accordance with the procedures
described in the related prospectus supplement;

o    certain events of our or the trust fund's bankruptcy, insolvency,
     receivership or liquidation; or

o    any other event of default provided with respect to notes of that
     series as discussed in the applicable prospectus supplement.

    If an event of default with respect to the notes of any series at the time
outstanding occurs and is continuing, the related prospectus supplement may
specify that either the trustee or the securityholders of a majority of the then
aggregate outstanding amount of the notes of such series may declare the
principal amount (or, if the notes of that series are entitled to payment of
principal only, such portion of the principal amount as the related prospectus
supplement may specify) of all the notes of such series to be due and payable
immediately. Under certain circumstances, holders of a majority in aggregate
outstanding amount of the notes of such series may rescind and annul such
declaration.

    If, following an event of default with respect to any series of notes and
if so specified in the related prospectus supplement, the notes of such series
have been declared to be due and payable, the trustee may, in its discretion,
notwithstanding such acceleration, elect to maintain possession of the
collateral securing the notes of such series and to continue to apply
distributions on such collateral as if there had been no declaration of
acceleration if such collateral continues to provide sufficient funds for the
payment of principal of and interest on the notes of such series as they would
have become due if there had not been such a declaration. In addition, if so
specified in the related prospectus supplement, the trustee may not sell or
otherwise liquidate the collateral securing the notes of a series following an
event of default other than a default in the payment of any principal or
interest on any note of such series for 30 days or more, unless:

o    the securityholders of 100% of the then aggregate outstanding amount
     of the notes of such series consent to such sale,

o    the proceeds of such sale or liquidation are sufficient to pay in
     full the principal of and accrued interest due and unpaid on the
     outstanding notes of such series at the date of such sale or

o    the trustee determines that such collateral would not be sufficient
     on an ongoing basis to make all payments on such notes as such
     payments would have become due if such notes had not been declared
     due and payable, and the trustee obtains the consent of
     securityholders of 66-2/3%, or

                                     68
<PAGE>

          such other percentage as is specified in the indenture, of the then
          aggregate outstanding principal amount of the notes of such series.

    The related prospectus supplement may specify that if the trustee
liquidates the collateral in connection with an event of default involving a
default for 30 days or more in the payment of principal of or interest on the
notes of a series, the trustee will have a prior lien on the proceeds of any
such liquidation for unpaid fees and expenses. As a result, upon the occurrence
of such an event of default, the amount available for distribution to the
securityholders of notes may be less than would otherwise be the case. However,
the trustee may not institute a proceeding for the enforcement of its lien
except in connection with a proceeding for the enforcement of the lien of the

indenture for the benefit of the securityholders of notes after the occurrence
of such an event of default.

In the event that the principal of the notes of a series is declared due
and payable, as described above, the securityholder of any such notes issued at
a discount from par may be entitled to receive no more than an amount equal to
the unpaid principal amount of the notes less the amount of such discount which
is unamortized.

Subject to the provisions of the indenture relating to the duties of the
trustee, in case an event of default shall occur and be continuing with respect
to a series of notes, the trustee will be under no obligation to exercise any of
the rights or powers under the indenture at the request or direction of any of
the securityholders of notes of such series, unless such securityholders have
offered to the trustee security or indemnity satisfactory to it against the
costs, expenses and liabilities that might be incurred by it in complying with
such request or direction. Subject to such provisions for indemnification and
certain limitations contained in the indenture, and if so specified in the
related prospectus supplement, the holders of a majority of the then aggregate
outstanding amount of the notes of such series will have the right to direct the
time, method and place of conducting any proceeding for any remedy available to
the trustee or exercising any trust or power conferred on the trustee with
respect to the notes of such series. The holders of a majority of the then
aggregate outstanding amount of the notes of such series may, in certain cases,
waive any default with respect to the notes, except a default in the payment of
principal or interest or a default in respect of a covenant or provision of the
indenture that cannot be modified without the waiver or consent of all the
holders of the outstanding notes of such series affected thereby.

The Trustee

The related prospectus supplement will set forth the identity of the
commercial bank, savings and loan association, trust company or other entity
named as the trustee for each series of securities and whether it serves in any
additional capacity for such series of securities. The entity serving as trustee
may have normal banking relationships with our affiliates and us. In addition,
for the purpose of meeting the legal requirements of certain local
jurisdictions, the trustee will have the power to appoint co-trustees or
separate trustees of all or any part of the trust fund relating to a series of
securities. In the event of such appointment, all rights, powers, duties and
obligations the applicable Agreement confers or imposes upon the trustee will be
conferred or imposed upon the trustee and each such separate trustee or
co-trustee jointly, or, in any jurisdiction in which the trustee shall be
incompetent or unqualified to perform certain acts, singly upon such separate
trustee or co-trustee who will exercise and perform such rights, powers, duties
and obligations solely at the direction of the trustee. The trustee may also
appoint agents to perform any of the responsibilities of the trustee, which
agents will have any or all of the rights, powers, duties and obligations of the
trustee conferred on them by such appointment; provided that the trustee will
continue to be responsible for its duties and obligations under the Agreement.
In the event a series includes both certificates and notes, a separate trustee
identified in the related prospectus supplement will serve as trustee for the
certificates and for the notes.

Duties of the Trustee

The trustee will not make any representations as to the validity or
sufficiency of the Agreement, the securities or of any assets or related
documents. If no event of default (as defined in the related Agreement) has
occurred, the trustee is required to perform only those duties specifically
required of it

69

<PAGE>

under the Agreement. Upon receipt of the various certificates, statements, reports or other instruments required to be furnished to it, the trustee is required to examine them to determine whether they are in the form the related Agreement requires. However, the trustee (or any custodian) will not be responsible for the accuracy or content of any such documents furnished to it by the securityholders or the Master Servicer under the Agreement.

If so specified in the related prospectus supplement, the trustee may be held liable for its own negligent action or failure to act, or for its own misconduct. However, the trustee will not be personally liable with respect to any action it takes, suffers or omits to take in good faith in accordance with the direction of the securityholders following an event of default. The trustee is not required to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under the Agreement, or in the exercise of any of its rights or powers, if it has reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

Resignation and Removal of Trustee

If so specified in the related prospectus supplement, the trustee may, upon written notice to us, resign at any time. If the trustee resigns a successor trustee will be required to be appointed in accordance with the terms of the related Agreement. If no successor trustee has been appointed and has accepted the appointment within the period specified in the Agreement after the giving of such notice of resignation, the resigning trustee may, if so specified in the related prospectus supplement, petition any court of competent jurisdiction for appointment of a successor trustee.

The trustee may also be removed at any time, if so specified in the related prospectus supplement:

o    if the trustee ceases to be eligible to continue as such under the Agreement,

o    if the trustee becomes insolvent,

o    if the trustee becomes incapable of acting, or

o    if specified in the Agreement by the securityholders evidencing over 51% of the aggregate voting rights of the securities in the trust fund upon written notice to the trustee and to us.

For any resignation or removal of the trustee and appointment of a successor trustee to be effective, the successor trustee must accept the appointment.

Amendment

The parties to each Agreement may amend such Agreement, without the consent of any of the securityholders for the items identified in the related prospectus supplement, which may include:

o    to cure any ambiguity or mistake;

o    to correct any defective provisions or to supplement any provision in the Agreement, which may be inconsistent with any other provision of the Agreement;

o    to comply with any changes in the Internal Revenue Code of 1986, as amended, or

o    to make any other revisions with respect to matters or questions arising under the Agreement that are not inconsistent with the Agreement, provided that such action will not have a material

adverse effect on the interests of any securityholder.

In addition, to the extent provided in the related Agreement and if so specified in the related prospectus supplement, an Agreement may be amended without the consent of any of the securityholders to change the manner in which the Securities Account, the Protected Account or any

<div align="center">70</div>

<PAGE>

other Accounts are maintained, provided that any such change does not adversely affect the then current rating on the class or classes of securities of such series that have been rated. In addition, if a REMIC election is made with respect to a trust fund, the related Agreement may also provide that it can be amended to modify, eliminate or add to any of its provisions to such extent as may be necessary to maintain the qualification of the related trust fund as a REMIC, provided that the trustee has received an opinion of counsel required under the Agreement, generally to the effect that such action is necessary or helpful to maintain such qualification.

With consent of holders of securities of a series evidencing not less than 51%, or such other percentage as is specified in the prospectus supplement, of the aggregate voting rights of each class affected or of all the securities or of specified classes of securities as the prospectus supplement may provide, the parties to an Agreement may amend such Agreement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of such Agreement or of modifying in any manner the rights of the holders of the related securities or for any other purpose specified in the related prospectus supplement. However, unless so specified in the related prospectus supplement, no such amendment may reduce in any manner the amount of or delay the timing of, payments received on trust assets that are required to be distributed on any security without the consent of the holder of such security, or reduce the percentage of securities of any class of holders that are required to consent to any such amendment without the consent of the holders of all securities of such class covered by such Agreement then outstanding. If a REMIC election is made with respect to a trust fund, the related prospectus supplement may specify that the trustee will not be entitled to consent to an amendment to the related Agreement without having first received an opinion of counsel to the effect that such amendment will not cause such trust fund to fail to qualify as a REMIC.

Termination; Optional Termination

The obligations each Agreement creates for a series of securities generally will terminate upon the payment to the related securityholders of all amounts held in any Accounts or by the Master Servicer and required to be paid to them pursuant to such Agreement following the later of:

1. the final payment or other liquidation of the last of the trust assets or the disposition of all property acquired upon foreclosure or deed-in-lieu of foreclosure of any mortgage assets remaining in the trust fund, and

2. the purchase by the Master Servicer or other entity specified in the related prospectus supplement including, if REMIC treatment has been elected, by the holder of the residual interest in the REMIC, from the related trust fund of all of the remaining trust assets and all property acquired in respect of mortgage assets remaining in the trust fund.

Any such purchase of trust assets and property acquired in respect of mortgage assets evidenced by a series of securities will be made at the option of the entity identified in the related prospectus supplement, at a price, and in accordance with the procedures, specified in the related prospectus supplement. Such purchase price may not in all cases equal the entire unpaid principal and accrued unpaid interest on the securities that are outstanding at the time of the optional termination due to, among other things, if the party exercising the option repurchases loans on a distribution date it will purchase

the loans (subject to the purchase of REO property at fair market value) at a
price equal to the unpaid principal balances of the mortgage loans without
interest following payment on such distribution date and the fact that any
component of the purchase price based on existing REO property (i.e., real
property acquired following foreclosure and as to which a realized loss has not
yet been taken) will be equal to the fair market value of such property and not
necessarily the previously outstanding principal balance of the related loan.
There may not be sufficient proceeds to pay off the then current balance of and
accrued and unpaid interest on securities of such series outstanding. The
exercise of such right will cause the termination of the related trust and will
effect early retirement of the securities, but the right of the applicable
entity to so purchase will generally be subject to the principal balance of the
related trust assets being less than the percentage specified in the related
prospectus supplement of the aggregate principal balance of the trust assets at
the cut-off date for the series. The foregoing is subject to the

                                      71

<PAGE>

provision that if a REMIC election is made with respect to a trust fund, any
repurchase pursuant to clause (2) above will be made only in connection with a
"qualified liquidation" of the REMIC within the meaning of Section 860F(a)(4) of
the Code.

                       LEGAL ASPECTS OF THE MORTGAGE LOANS

        The following discussion contains summaries of some legal aspects of
mortgage loans. These summaries are general in nature. Because these legal
aspects are governed primarily by state law which may differ substantially from
state to state, the summaries do not purport to be complete or to reflect the
laws of any particular state, or to encompass the laws of all states in which
the security for the mortgage loans is situated.

General

        Single Family Loans And Multifamily Loans. Depending upon the prevailing
practice in the state in which the property subject to the loan is located,
mortgages, deeds of trust, security deeds or deeds to secure debt will secure
the single family loans and multifamily loans. Deeds of trust are used almost
exclusively in California instead of mortgages. A mortgage creates a lien upon
the real property encumbered by the mortgage. The lien created by the mortgage
generally is not prior to the lien for real estate taxes and assessments.
Priority between mortgages depends on their terms and generally on the order of
recording with a state or county office. There are two parties to a mortgage,
the mortgagor, who is the borrower and owner of the mortgaged property, and the
mortgagee, who is the lender. The mortgagor delivers to the mortgagee a note or
bond and the mortgage. Although a deed of trust is similar to a mortgage, a deed
of trust formally has three parties, the borrower-property owner called the
trustor (similar to a mortgagor), a lender (similar to a mortgagee) called the
beneficiary, and a third-party grantee called the trustee. Under a deed of
trust, the borrower grants the property, irrevocably until the debt is paid, in
trust, generally with a power of sale, to the trustee to secure payment of the
obligation. A security deed and a deed to secure debt are special types of deeds
which indicate on their face that they are granted to secure an underlying debt.
By executing a security deed or deed to secure debt, the grantor conveys title
to, as opposed to merely creating a lien upon, the subject property to the
grantee until such time as the underlying debt is repaid. The mortgagee's
authority under a mortgage, the trustee's authority under a deed of trust and
the grantee's authority under a security deed or deed to secure debt are
governed by law and, with respect to some deeds of trust, the directions of the
beneficiary. The related prospectus supplement will specify the priority of the
lien of the mortgage in a single family loan or multifamily loan.

        Condominiums. Certain of the mortgage loans may be loans secured by
condominium units. The condominium building may be a multi-unit building or

buildings, or a group of buildings whether or not attached to each other,
located on property subject to condominium ownership. Condominium ownership is a
form of ownership of real property as to which each owner is entitled to the
exclusive ownership and possession of his or her individual condominium unit.
The owner also owns a proportionate undivided interest in all parts of the
condominium building (other than the other individual condominium units) and all
areas or facilities, if any, for the common use of the condominium units. The
condominium unit owners appoint or elect the condominium association to govern
the affairs of the condominium.

        Cooperative Loans. Certain of the mortgage loans may be cooperative loans.
The cooperative (1) owns all the real property that comprises the project,
including the land and the apartment building comprised of separate dwelling
units and common areas or (2) leases the land generally by a long-term ground
lease and owns the apartment building. The cooperative is directly responsible
for project management and, in most cases, payment of real estate taxes and
hazard and liability insurance. If there is a blanket mortgage on the property
and/or underlying land, as is generally the case, the cooperative, as project
mortgagor, is also responsible for meeting these mortgage obligations.
Ordinarily, the cooperative incurs a blanket mortgage in connection with the
construction or purchase of the cooperative's apartment building. The interest
of the occupants under proprietary leases or occupancy agreements to which the
cooperative is a party are generally subordinate to the interest of the holder
of the blanket mortgage in that building. If the cooperative is unable to meet
the payment obligations arising under its blanket

                                     72

<PAGE>

mortgage, the mortgagee holding the blanket mortgage could foreclose on that
mortgage and terminate all subordinate proprietary leases and occupancy
agreements. In addition, the blanket mortgage on a cooperative may provide
financing in the form of a mortgage that does not fully amortize with a
significant portion of principal being due in one lump sum at final maturity.
The inability of the cooperative to refinance this mortgage and its consequent
inability to make such final payment could lead to foreclosure by the mortgagee
providing the financing. A foreclosure in either event by the holder of the
blanket mortgage could eliminate or significantly diminish the value of any
collateral held by the lender who financed the purchase by an individual
tenant-stockholder of cooperative shares or, in the case of a trust fund
including cooperative loans, the collateral securing the cooperative loans.

        The cooperative is owned by tenant-stockholders who, through ownership of
stock, shares or membership certificates in the corporation, receive proprietary
leases or occupancy agreements which confer exclusive rights to occupy specific
units. Generally, a tenant-stockholder of a cooperative must make a monthly
payment to the cooperative representing such tenant-stockholder's pro rata share
of the cooperative's payments for its blanket mortgage, real property taxes,
maintenance expenses and other capital or ordinary expenses. An ownership
interest in a cooperative and accompanying rights is financed through a
cooperative share loan evidenced by a promissory note and secured by a security
interest in the occupancy agreement or proprietary lease and in the related
cooperative shares. The lender takes possession of the share certificate and a
counterpart of the proprietary lease or occupancy agreement, and typically a
financing statement covering the proprietary lease or occupancy agreement and
the cooperative shares is filed in the appropriate state and local offices to
perfect the lender's interest in its collateral. Subject to the limitations
discussed below, upon default of the tenant-stockholder, the lender may sue for
judgment on the promissory note, dispose of the collateral at a public or
private sale or otherwise proceed against the collateral or tenant-stockholder
as an individual as provided in the security agreement covering the assignment
of the proprietary lease or occupancy agreement and the pledge of cooperative
shares.

High Cost Loans. Certain of the mortgage loans may be subject to special rules, disclosure requirements and other provisions that were added to the federal Truth in Lending Act by the Homeownership and Equity Protection Act of 1994, if such mortgage loans: (i) were originated on or after October 1, 1995; (ii) are not mortgage loans made to finance the purchase of the mortgaged property; and (iii) have interest rates or origination costs in excess of certain prescribed levels. In addition, various states and local governments have enacted similar laws designed to protect consumers against "predatory lending" practices. Purchasers or assignees of any loans subject to these laws could be liable for all claims and subject to all defenses arising under such provisions that the borrower could assert against the originator of the loan. Remedies available to the borrower include monetary penalties, as well as rescission rights if the appropriate disclosures were not given as required.

Manufactured Housing Contracts. Each manufactured housing contract evidences both (a) the obligation of the obligor to repay the loan evidenced thereby, and (b) the grant of a security interest in the manufactured home to secure repayment of such loan. The manufactured housing contracts generally are "chattel paper" as defined in the Uniform Commercial Code (the "UCC") in effect in the states in which the manufactured homes initially were registered. Pursuant to the UCC, the rules governing the sale of chattel paper are similar to those governing the perfection of a security interest in chattel paper. Under the Agreement, we generally will transfer or cause the transfer of physical possession of the manufactured housing contracts to the trustee or its custodian. In addition, we will make or cause to be made an appropriate filing of a UCC-1 financing statement in the appropriate states to give notice of the trustee's ownership of the manufactured housing contracts.

Under the laws of most states, manufactured housing constitutes personal property and is subject to the motor vehicle registration laws of the state or other jurisdiction in which the unit is located. In a few states, where certificates of title are not required for manufactured homes, the filing of a financing statement under Article 9 of the UCC perfects security interests. Such financing statements are effective for five years and must be renewed before the end of each five year period. The certificate of title laws adopted by the majority of states provide that ownership of motor vehicles and manufactured housing shall be evidenced by a certificate of title issued by the motor vehicles department (or a similar entity) of

<center>73</center>

<PAGE>

such state. In the states which have enacted certificate of title laws, a security interest in a unit of manufactured housing, so long as it is not attached to land in so permanent a fashion as to become a fixture, is generally perfected by the recording of such interest on the certificate of title to the unit in the appropriate motor vehicle registration office or by delivery of the required documents and payment of a fee to such office, depending on state law. The Master Servicer generally will be required to effect such notation or delivery of the required documents and fees, and to obtain possession of the certificate of title, as appropriate under the laws of the state in which any manufactured home is registered. If the Master Servicer fails, due to clerical errors or otherwise, to effect such notation or delivery, or files the security interest under the wrong law (for example, under a motor vehicle title statute rather than under the UCC, in a few states), the trustee may not have a first priority security interest in the manufactured home securing a manufactured housing contract.

As manufactured homes have become larger and often are attached to their sites without any apparent intention to move them, courts in many states have held that manufactured homes may, under certain circumstances, become subject to real estate title and recording laws. As a result, a security interest in a manufactured home could be rendered subordinate to the interests of other parties claiming an interest in the home under applicable state real estate law. In order to perfect a security interest in a manufactured home under real estate

laws, the holder of the security interest must file either a "fixture filing"
under the provisions of the UCC or a real estate mortgage under the real estate
laws of the state where the home is located. The holder of the security interest
must make these filings in the real estate records office of the county where
the home is located. Generally, manufactured housing contracts will contain
provisions prohibiting the obligor from permanently attaching the manufactured
home to its site. So long as the obligor does not violate this agreement, a
security interest in the manufactured home will be governed by the certificate
of title laws or the UCC, and the notation of the security interest on the
certificate of title or the filing of a UCC-1 financing statement will be
effective to maintain the priority of the security interest in the manufactured
home. If, however, a manufactured home is permanently attached to its site,
other parties could obtain an interest in the manufactured home that is prior to
the security interest originally retained by us and transferred to us.

    We will assign or cause to be assigned a security interest in the
manufactured homes to the trustee, on behalf of the securityholders. In general,
we, the Master Servicer and the trustee will not amend the certificates of title
to identify the trustee, on behalf of the securityholders, as the new secured
party. Accordingly, the lender or we will continue to be named as the secured
party on the certificates of title relating to the manufactured homes. In most
states, such assignment is an effective conveyance of such security interest
without amendment of any lien noted on the related certificate of title and the
new secured party succeeds to the lender's or our rights as the secured party.
However, in some states there exists a risk that, in the absence of an amendment
to the certificate of title, such assignment of the security interest might not
be held effective against our or the lender's creditors.

    In the absence of fraud, forgery or permanent affixation of the
manufactured home to its site by the manufactured home owner, or administrative
error by state recording officials, the notation of the lien of the trustee on
the certificate of title or delivery of the required documents and fees should
be sufficient to protect the trustee against the rights of subsequent purchasers
of a manufactured home or subsequent lenders who take a security interest in the
manufactured home. If there are any manufactured homes as to which the security
interest assigned to us and the trustee is not perfected, such security interest
would be subordinate to, among others, subsequent purchasers for value of
manufactured homes and holders of perfected security interests. There also
exists a risk in not identifying the trustee, on behalf of the securityholders,
as the new secured party on the certificate of title that, through fraud or
negligence, the security interest of the trustee could be released.

    If the owner of a manufactured home moves it to a state other than the
state in which such manufactured home initially is registered, under the laws of
most states the perfected security interest in the manufactured home would
continue for four months after such relocation and thereafter until the owner
re-registers the manufactured home in such state. If the owner were to relocate
a manufactured home to another state and re-register the manufactured home in
such state, and if the trustee does not take steps to re-perfect its security
interest in such state, the security interest in the manufactured home

                                      74

<PAGE>

would cease to be perfected. A majority of states generally require surrender of
a certificate of title to re-register a manufactured home; accordingly, the
trustee must surrender possession if it holds the certificate of title to such
manufactured home or, in the case of manufactured homes registered in states
which provide for notation of lien, the Master Servicer would receive notice of
surrender if the security interest in the manufactured home is noted on the
certificate of title. Accordingly, the trustee would have the opportunity to
re-perfect its security interest in the manufactured home in the state of
relocation. In states which do not require a certificate of title for
registration of a manufactured home, re-registration could defeat perfection.

Similarly, when an obligor under a manufactured housing conditional sales contract sells a manufactured home, the obligee must surrender possession of the certificate of title or it will receive notice as a result of its lien noted thereon and accordingly will have an opportunity to require satisfaction of the related manufactured housing conditional sales contract before release of the lien. The Master Servicer will be obligated to take such steps, at the Master Servicer's expense, as are necessary to maintain perfection of security interests in the manufactured homes.

Under the laws of most states, liens for repairs performed on a manufactured home take priority even over a perfected security interest. We will obtain the representation of the lender that the lender has no knowledge of any such liens with respect to any manufactured home securing a manufactured housing contract. However, such liens could arise at any time during the term of a manufactured housing contract. No notice will be given to the trustee or securityholders in the event such a lien arises.

Certain tax liens arising under the Code may, in certain circumstances, have priority over the lien of a mortgage or deed of trust. This may have the effect of delaying or interfering with the enforcement of rights with respect to a defaulted mortgage loan. In addition, substantive requirements are imposed upon mortgage lenders in connection with the origination and the servicing of mortgage loans by numerous federal and some state consumer protection laws. These laws include the federal Truth in Lending Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes. These federal laws impose specific statutory liabilities upon lenders who originate mortgage loans and who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the mortgage loans.

Foreclosure/Repossession

General

Foreclosure is a legal procedure that allows the mortgagee to recover its mortgage debt by enforcing its rights and available legal remedies under the mortgage. If the mortgagor defaults in payment or performance of its obligations under the note or mortgage, the mortgagee has the right to institute foreclosure proceedings to sell the mortgaged property at public auction to satisfy the indebtedness.

Single Family Loans And Multifamily Loans. Foreclosure of a deed of trust is generally accomplished by a non-judicial sale under a specific provision in the deed of trust which authorizes the trustee to sell the property at public auction upon any default by the borrower under the terms of the note or deed of trust. In some states, such as California, the trustee must record a notice of default and send a copy to the borrower-trustor and to any person who has recorded a request for a copy of any notice of default and notice of sale. In addition, the trustee must provide notice in some states to any other person having an interest of record in the real property, including any junior lienholders. Before such non-judicial sale takes place, typically a notice of sale must be posted in a public place and, in most states, including California, published during a specific period of time in one or more newspapers. In addition, these notice provisions require that a copy of the notice of sale be posted on the property and sent to parties having an interest of record in the property.

In some states, including California, the borrower-trustor has the right to reinstate the loan at any time following default until shortly before the trustee's sale. In general, the borrower, or any other person having a junior encumbrance on the real estate, may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and expenses incurred in enforcing the obligation.

75

&lt;PAGE&gt;

Certain state laws control the amount of foreclosure expenses and costs, including attorney's fees, which a lender may recover.

     Foreclosure of a mortgage is generally accomplished by judicial action. The action is initiated by the service of legal pleadings upon all parties having an interest in the real property. Delays in completion of the foreclosure may occasionally result from difficulties in locating necessary parties. When the mortgagee's right to foreclosure is contested, the legal proceedings necessary to resolve the issue can be time-consuming. After the completion of a judicial foreclosure proceeding, the court generally issues a judgment of foreclosure and appoints a referee or other court officer to conduct the sale of the property. In general, the borrower, or any other person having a junior encumbrance on the real estate, may, during a statutorily prescribed reinstatement period, cure a monetary default by paying the entire amount in arrears plus other designated costs and expenses incurred in enforcing the obligation. Generally, state law controls the amount of foreclosure expenses and costs, including attorney's fees, which a lender may recover. After the reinstatement period has expired without the default having been cured, the borrower or junior lienholder no longer has the right to reinstate the loan and must pay the loan in full to prevent the scheduled foreclosure sale. If the mortgage is not reinstated, a notice of sale must be posted in a public place and, in most states, published for a specific period of time in one or more newspapers. In addition, some state laws require that a copy of the notice of sale be posted on the property and sent to all parties having an interest in the real property.

     Although foreclosure sales are typically public sales, frequently no third party purchaser bids in excess of the lender's lien because of the difficulty of determining the exact status of title to the property, the possible deterioration of the property during the foreclosure proceedings and a requirement that the purchaser pay for the property in cash or by cashier's check. Thus the foreclosing lender often purchases the property from the trustee or referee for an amount equal to the principal amount outstanding under the loan, accrued and unpaid interest and the expenses of foreclosure. Thereafter, the lender will assume the burden of ownership, including obtaining hazard insurance and making such repairs at its own expense as are necessary to render the property suitable for sale. The lender will commonly obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property.

     Courts have imposed general equitable principles upon foreclosure. Such principles are designed to mitigate the legal consequences to the borrower of the borrower's defaults under the loan documents. Some courts have been faced with the issue of whether federal or state constitutional provisions reflecting due process concerns for fair notice require that borrowers under deeds of trust receive notice longer than that prescribed by statute. For the most part, these cases have upheld the notice provisions as being reasonable or have found that a trustee's sale under a deed of trust does not involve sufficient state action to afford constitutional protection to the borrower.

     Cooperative Loans. The cooperative shares the tenant-stockholder owns and that are pledged to the lender are, in almost all cases, subject to restrictions on transfer as set forth in the cooperative's certificate of incorporation and bylaws, as well as the proprietary lease or occupancy agreement. The cooperative may cancel the cooperative shares for the tenant-stockholder's failure to pay rent or other obligations or charges owed, including mechanics' liens against the cooperative apartment building such tenant-stockholder incurs. The proprietary lease or occupancy agreement generally permits the cooperative to terminate such lease or agreement in the event an obligor fails to make payments or defaults in the performance of covenants required under the lease or agreement. Typically, the lender and the cooperative enter into a recognition agreement which establishes the rights and obligations of both parties in the

event the tenant-stockholder defaults on its obligations under the proprietary lease or occupancy agreement. The tenant-stockholder's default under the proprietary lease or occupancy agreement will usually constitute a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, if the tenant-stockholder has defaulted under the proprietary lease or occupancy agreement, the cooperative will take no action to terminate such lease or agreement until the lender has been provided with an opportunity to cure the default. The recognition

<center>76</center>

<PAGE>

agreement typically provides that if the proprietary lease or occupancy agreement is terminated, the cooperative will recognize the lender's lien against proceeds from the sale of the cooperative apartment, subject, however, to the cooperative's right to sums due under such proprietary lease or occupancy agreement. The total amount the tenant-stockholder owes to the cooperative, which the lender generally cannot restrict and does not monitor, could reduce the value of the collateral below the outstanding principal balance of the cooperative loan and accrued and unpaid interest thereon.

Recognition agreements also provide that in the event of a foreclosure on a cooperative loan, the lender must obtain the approval or consent of the cooperative as required by the proprietary lease before transferring the cooperative shares or assigning the proprietary lease.

In some states, foreclosure on the cooperative shares is accomplished by a sale in accordance with the provisions of Article 9 of the UCC and the security agreement relating to those shares. Article 9 of UCC requires that a sale be conducted in a "commercially reasonable" manner. Whether a foreclosure sale has been conducted in a "commercially reasonable" manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the foreclosure. Generally, a sale conducted according to the usual practice of banks selling similar collateral will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to the right of the cooperative to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency.

In the case of foreclosure on a building which was converted from a rental building to a building owned by a cooperative under a non-eviction plan, some states require that a purchaser at a foreclosure sale take the property subject to rent control and rent stabilization laws. In such instances, existing shareholders and tenants are entitled to remain in the building pursuant to such laws.

Manufactured Housing Contracts. The Master Servicer on behalf of the trustee, to the extent the related Agreement requires, may take action to enforce the trustee's security interest with respect to manufactured housing contracts in default by repossession and resale of the manufactured homes securing such manufactured housing contracts in default. So long as the manufactured home has not become subject to the real estate law, a creditor can repossess a manufactured home securing a manufactured housing contract by voluntary surrender, by "self-help" repossession that is "peaceful" (i.e.., without breach of the peace) or, in the absence of voluntary surrender and the

ability to repossess without breach of the peace, by judicial process. The
holder of a manufactured housing contract must give the debtor a number of days'
notice, generally varying from 10 to 30 days depending on the state, before
commencement of any repossession. The UCC and consumer protection laws in most
states place restrictions on repossession sales, including requiring prior
notice to the debtor and commercial reasonableness in effecting such a sale. The
law in most states also requires that the debtor be given notice of any sale
before resale of the unit so that the debtor may redeem at or before such
resale. In the event of such repossession and resale of a manufactured home, the
trustee would be entitled to be paid out of the sale proceeds before such
proceeds could be applied to the payment of the claims of unsecured creditors or
the holders of subsequently perfected security interests or, thereafter, to the
debtor.

    Revolving Credit Line Mortgage Loans. The federal Truth in Lending Act was
amended by the Home Equity Loan Consumer Protection Act of 1988 which placed
significant limitations on the grounds that open-end home equity loan - (i.e.,
revolving credit line mortgage loan) lenders and their assignees could use to
accelerate loan balances, suspend the right to future advances or change the
terms of the loan agreement. These limitations are applicable to home equity
plans entered into on or after November 7, 1989. A lender may terminate a loan
and demand repayment of the entire outstanding balance only if: (i) there is
fraud or material misrepresentation by the borrower in connection with the loan;
(ii) the

<div align="center">77</div>

&lt;PAGE&gt;

borrower fails to meet the repayment terms of the loan agreement; (iii) any
action or inaction by the borrower adversely affects the lender's security for
the loan, or any right of the lender in such security; or (iv) federal law
dealing with credit extended by a depository institution to its executive
officers specifically requires that, as a condition of the loan, the credit
shall become due and payable on demand; provided that the lender includes such a
provision in the initial agreement. A lender may suspend additional advances or
reduce the borrower's credit limit during any period in which: (i) the value of
the property declines significantly below the property's appraised value for the
purpose of the plan; (ii) the lender reasonably believes that the borrower will
be unable to fulfill the repayment obligations under the plan because of a
material change in the borrower's financial circumstances; (iii) the borrower is
in default of any material obligation under the agreement; (iv) the lender is
precluded by government action from imposing the interest rate provided for in
the agreement; (v) the priority of the lender's security interest is adversely
affected by government action to the extent that the value of the security
interest is less than 120 percent of the credit line; or (vi) the lender is
notified by its regulatory agency that continued advances constitute an unsafe
and unsound practice.

    Under the laws applicable in most states, a creditor is entitled to obtain
a deficiency judgment from a debtor for any deficiency on repossession and
resale of the manufactured home securing such a debtor's loan. However, some
states impose prohibitions or limitations on deficiency judgments.

    Certain other statutory provisions, including federal and state bankruptcy
and insolvency laws and general equitable principles, may limit or delay the
ability of a lender to repossess and resell collateral.

Rights Of Redemption

    General

    The purposes of a foreclosure action are to enable the mortgagee to
realize upon its security and to bar the mortgagor, and all persons who have an
interest in the property which is subordinate to the mortgage being foreclosed,
from exercise of their "equity of redemption." The doctrine of equity of

redemption provides that, until the property covered by a mortgage has been sold
in accordance with a properly conducted foreclosure and foreclosure sale, those
having an interest which is subordinate to that of the foreclosing mortgagee
have an equity of redemption and may redeem the property by paying the entire
debt with interest. In addition, in some states, when a foreclosure action has
been commenced, the redeeming party must pay certain costs of such action. Those
having an equity of redemption must generally be made parties and joined in the
foreclosure proceeding in order for their equity of redemption to be cut off and
terminated.

The equity of redemption is a common-law (non-statutory) right that exists
prior to completion of the foreclosure, is not waivable by the mortgagor, and
must be exercised prior to foreclosure sale. Such equity of redemption should be
distinguished from the post-sale statutory rights of redemption. In some states,
after sale pursuant to a deed of trust or foreclosure of a mortgage, the
mortgagor and foreclosed junior lienholders are given a statutory period in
which to redeem the property from the foreclosure sale. In some states,
statutory redemption may occur only upon payment of the foreclosure sale price.
In other states, redemption may be authorized if the former mortgagor pays only
a portion of the sums due. The effect of a statutory right of redemption is to
diminish the ability of the lender to sell the foreclosed property. The exercise
of a right of redemption would defeat the title of any purchaser from a
foreclosure sale or sale under a deed of trust. Consequently, the practical
effect of the redemption right is to force the lender to maintain the property
and pay the expenses of ownership until the redemption period has expired. In
some states, a post-sale statutory right of redemption may exist following a
judicial foreclosure, but not following a trustee's sale under a deed of trust.

Single Family Loans and Multifamily Loans. In certain states, after sale
pursuant to a deed of trust or foreclosure of a mortgage, the borrower and
foreclosed junior lienholders are given a statutory period in which to redeem
the property from the foreclosure sale. In certain other states, including
California, this right of redemption applies only to sales following judicial
foreclosure, and not to sales pursuant to a non-judicial power of sale. In some
states, redemption may occur only upon payment of the entire

78

<PAGE>

principal balance of the loan, accrued interest and expenses of foreclosure. In
other states, redemption may be authorized if the former borrower pays only a
portion of the sums due. The effect of a statutory right of redemption would
defeat the title of any purchaser from the lender after foreclosure or sale
under a deed of trust. Consequently, the practical effect of the redemption
right is to force the lender to retain the property and pay the expenses of
ownership until the redemption period has run.

Manufactured Housing Contracts. While state laws do not usually require
notice to be given debtors before repossession, many states do require delivery
of a notice of default and of the debtor's right to cure defaults before
repossession. The law in most states also requires that the debtor be given
notice of sale before the resale of the home so that the owner may redeem at or
before resale. In addition, the sale must comply with the requirements of the
UCC. Manufactured homes are most often resold through private sale.

Anti-Deficiency Legislation And Other Limitations On Lenders

Certain states, including California, have adopted statutory prohibitions
restricting the right of the beneficiary or mortgagee to obtain a deficiency
judgment against borrowers financing the purchase of their residence or
following sale under a deed of trust or certain other foreclosure proceedings. A
deficiency judgment is a personal judgment against the borrower equal in most
cases to the difference between the amount due to the lender and the fair market
value of the real property sold at the foreclosure sale. As a result of these
prohibitions, it is anticipated that in many instances the Master Servicer will

not seek deficiency judgments against defaulting mortgagors. Under the laws applicable in most states, a creditor is entitled to obtain a deficiency judgment for any deficiency following possession and resale of a manufactured home. However, some states impose prohibitions or limitations on deficiency judgments in such cases.

Some state statutes may require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. In certain other states, the lender has the option of bringing a personal action against the borrower on the debt without first exhausting such security. However, in some of these states, the lender, following judgment on such personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. The practical effect of the election requirement, when applicable, is that lenders will usually proceed first against the security rather than bringing a personal action against the borrower.

In some states, exceptions to the anti-deficiency statutes are provided for in certain instances where the value of the lender's security has been impaired by acts or omissions of the borrower.

In addition to anti-deficiency and related legislation, numerous other federal and state statutory provisions, including the federal bankruptcy laws and state laws affording relief to debtors, may interfere with or affect the ability of the secured mortgage lender to realize upon its security. For example, in a proceeding under the federal Bankruptcy Code, a lender may not foreclose on a mortgaged property without the permission of the bankruptcy court. Courts with federal bankruptcy jurisdiction have also indicated that the terms of a mortgage loan secured by property of the debtor may be modified. These courts have allowed modifications that include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule, forgiving all or a portion of the debt and reducing the lender's security interest to the value of the residence, thus leaving the lender a general unsecured creditor for the difference between the value of the residence and the outstanding balance of the loan. Generally, however, the terms of a mortgage loan secured only by a mortgage on real property that is the debtor's principal residence may not be modified pursuant to a plan confirmed pursuant to Chapter 11 or Chapter 13 except with respect to mortgage payment arrearages, which may be cured within a reasonable time period. The effect of any such proceedings under the federal Bankruptcy Code, including but not limited to any automatic stay, could result in delays in receiving payments on the mortgage loans underlying a series of securities and possible reductions in the aggregate amount of such payments. Some states also have homestead exemption laws which would protect a principal residence from a liquidation in bankruptcy.

79

<PAGE>

Federal and local real estate tax laws provide priority to certain tax liens over the lien of a mortgagee or secured party. Numerous federal and state consumer protection laws impose substantive requirements upon mortgage lenders and manufactured housing lenders in connection with the origination, servicing and enforcement of single family loans, cooperative loans, manufactured housing contracts and revolving credit line mortgage loans. These laws include the federal Truth in Lending Act, Real Estate Settlement Procedures Act, Equal Credit Opportunity Act, Fair Credit Billing Act, Fair Credit Reporting Act and related statutes and regulations. These federal and state laws impose specific statutory liabilities upon lenders who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the loans or contracts.

The so-called "Holder-in-Due-Course" Rule of the Federal Trade Commission (the "FTC"), has the effect of subjecting a seller (and certain related creditors and their assignees) in a consumer credit transaction, and any assignee of the creditor to all claims and defenses that the debtor in the transaction could assert against the original creditor. Liability under the FTC Rule is limited to the amounts the debtor paid on the contract, and the holder of the contract may also be unable to collect amounts still due under the contract.

Most of the manufactured housing contracts in a mortgage pool will be subject to the requirements of the FTC Rule. Accordingly, the trustee, as holder of the manufactured housing contracts, will be subject to any claims or defenses that the purchaser of the related manufactured home may assert against the seller of the manufactured home, subject to a maximum liability equal to the amounts the obligor paid on the manufactured housing contract. If an obligor is successful in asserting any such claim or defense, and if the lender had or should have had knowledge of such claim or defense, the Master Servicer will have the right to require the lender to repurchase the manufactured housing contract because of a breach of its representation and warranty that no claims or defenses exist which would affect the obligor's obligation to make the required payments under the manufactured housing contract.

Generally, Article 9 of the UCC governs foreclosure on cooperative shares and the related proprietary lease or occupancy agreement. Some courts have interpreted section 9-610 of the UCC to prohibit a deficiency award unless the creditor establishes that the sale of the collateral (which, in the case of a cooperative loan, would be the shares of the cooperative and the related proprietary lease or occupancy agreement) was conducted in a commercially reasonable manner.

Due-On-Sale Clauses

Each conventional mortgage loan contains due-on-sale clauses. These clauses generally provide that the lender may accelerate the maturity of the loan if the mortgagor sells, transfers or conveys the related mortgaged property. The enforceability of due-on-sale clauses has been the subject of legislation or litigation in many states and, in some cases, the enforceability of these clauses was limited or denied. However, with respect to certain loans the Garn-St. Germain Depository Institutions Act of 1982 (the "Garn-St. Germain Act") preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses and permits lenders to enforce these clauses in accordance with their terms, subject to certain limited exceptions. Due-on-sale clauses contained in mortgage loans originated by federal savings and loan associations or federal savings banks are fully enforceable pursuant to regulations of the United States Federal Home Loan Bank Board, as succeeded by the Office of Thrift Supervision, which preempt state law restrictions on the enforcement of such clauses. Similarly, due-on-sale clauses in mortgage loans made by national banks and federal credit unions are now fully enforceable pursuant to preemptive regulations of the Office of the Comptroller of the Currency and the National Credit Union Administration Board, respectively.

The Garn-St. Germain Act also sets forth nine specific instances in which a mortgage lender covered by the act (including federal savings and loan associations and federal savings banks) may not exercise a due-on-sale clause, notwithstanding the fact that a transfer of the property may have occurred. These include intra-family transfers, certain transfers by operation of law, leases of fewer than three years not containing an option to purchase and the creation of a junior encumbrance. Regulations promulgated under the Garn-St. Germain Act also prohibit the imposition of a prepayment penalty upon the

80

acceleration of a loan pursuant to a due-on-sale clause. The inability to
enforce a due-on-sale clause may result in a mortgage that bears an interest
rate below the current market rate being assumed by a new home buyer rather than
being paid off, which may affect the average life of the mortgage loans and the
number of mortgage loans which may extend to maturity.

Prepayment Charges

     Under certain state laws, prepayment charges may not be imposed after a
certain period of time following origination of single family loans, cooperative
loans, manufactured housing contracts or revolving credit line mortgage loans
with respect to prepayments on loans secured by liens encumbering owner-occupied
residential or mixed use properties. Since many of the mortgaged properties will
be owner-occupied, it is anticipated that prepayment charges may not be imposed
with respect to many of the single family loans, cooperative loans, manufactured
housing contracts and revolving credit line mortgage loans. The absence of such
a restraint on prepayment, particularly with respect to fixed rate single family
loans, cooperative loans, manufactured housing contracts or revolving credit
line mortgage loans having higher specified interest rates or accrual percentage
rates, may increase the likelihood of refinancing or other early retirement of
such loans or contracts. Legal restrictions, if any, on prepayment of
multifamily loans will be described in the related prospectus supplement.

Subordinate Financing

     Where a mortgagor encumbers mortgaged property with one or more junior
liens, the senior lender is subjected to additional risk. First, the mortgagor
may have difficulty servicing and repaying multiple loans. In addition, if the
junior loan permits recourse to the mortgagor (as junior loans often do) and the
senior loan does not, a mortgagor may be more likely to repay sums due on the
junior loan than those on the senior loan. Second, acts of the senior lender
that prejudice the junior lender or impair the junior lender's security interest
may create a superior equity in favor of the junior lender. For example, if the
mortgagor and the senior lender agree to an increase in the principal amount of
or the interest rate payable on the senior loan, the senior lender may lose its
priority to the extent that any existing junior lender is harmed or the
mortgagor is additionally burdened. Third, if the mortgagor defaults on the
senior loan and/or any junior loan or loans, the existence of junior loans and
actions taken by junior lenders can impair the security available to the senior
lender and can interfere with or delay the taking of action by the senior
lender. Moreover, the filing of a bankruptcy petition by a junior lender may
operate to stay foreclosure or similar proceedings by the senior lender.

Applicability of Usury Laws

     Title V of the Depository Institutions Deregulation and Monetary Control
Act of 1980, enacted in March 1980, referred to in this prospectus as Title V,
provides that state usury limitations shall not apply to certain types of
residential first mortgage loans originated by certain lenders after March 31,
1980. The Office of Thrift Supervision, as successor to the Federal Home Loan
Bank Board, is authorized to issue rules and regulations and to publish
interpretations governing implementation of Title V. The statute authorized the
states to reimpose interest rate limits by adopting, before April 1, 1983, a law
or constitutional provision which expressly rejects an application of the
federal law. In addition, even where Title V is not so rejected, any state is
authorized by the law to adopt a provision limiting discount points or other
charges on mortgage loans covered by Title V. Certain states have taken action
to reimpose interest rate limits and/or to limit discount points or other
charges.

     Title V also provides that, subject to the following conditions, state
usury limitations will not apply to any loan which is secured by a first lien on
certain kinds of residential manufactured housing. The manufactured housing
contracts would be covered if they satisfy certain conditions, among other
things, governing the terms of any prepayment, late charges and deferral fees

and requiring a 30-day notice period before instituting any action leading to repossession of or foreclosure with respect to the related unit. Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting before April 1, 1983 a law or constitutional provision which expressly rejects application of the federal law. Fifteen states adopted such a law prior to the April 1, 1983 deadline. In addition, even where

<div align="center">81</div>

<PAGE>

Title V was not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on loans covered by Title V. In any state in which application of Title V was expressly rejected or a provision limiting discount points or other charges has been adopted, no manufactured housing contract which imposes finance charges or provides for discount points or charges in excess of permitted levels will be included in any trust fund.

We believe that a court interpreting Title V would hold that residential first mortgage loans that are originated on or after January 1, 1980 are subject to federal preemption. Therefore, in a state that has not taken the requisite action to reject application of Title V or to adopt a provision limiting discount points or other charges prior to origination of such mortgage loans, any such limitation under such state's usury law would not apply to such mortgage loans.

Statutes differ in their provisions as to the consequences of a usurious loan. One group of statutes requires the lender to forfeit the interest due above the applicable limit or impose a specified penalty. Under this statutory scheme, the mortgagor may cancel the recorded mortgage or deed of trust upon paying its debt with lawful interest, and the lender may foreclose, but only for the debt plus lawful interest. A second group of statutes is more severe. A violation of this type of usury law results in the invalidation of the transaction, thereby permitting the mortgagor to cancel the recorded mortgage or deed of trust without any payment or prohibiting the lender from foreclosing.

Servicemembers Civil Relief Act and the California Military and Veterans Code

Generally, under the terms of the Servicemembers Civil Relief Act (the "Relief Act"), a borrower who enters military service after the origination of the borrower's residential loan, including a borrower who was in reserve status and is called to active duty after origination of the mortgage loan, upon notification by such borrower, shall not be charged interest, including fees and charges, in excess of 6% per annum during the period of the borrower's active duty status. In addition to adjusting the interest, the lender must forgive any such interest in excess of 6%, unless a court or administrative agency orders otherwise upon application of the lender. In addition, the Relief Act provides broad discretion for a court to modify a mortgage loan upon application by the borrower. The Relief Act applies to borrowers who are members of the Army, Navy, Air Force, Marines, National Guard, Reserves, Coast Guard, and officers of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration assigned to duty with the military. The California Military and Veterans Code provides protection equivalent to that provided by the Relief Act to California national guard members called up to active service by the Governor, California national guard members called up to active service by the President and reservists called to active duty, and also allows such eligible borrowers to defer any obligation on their residential mortgage loans for a period of up to 180 days (or a lesser period equivalent to such borrower's period of active duty plus 60 calendar days). Because the Relief Act and the California Military and Veterans Code apply to borrowers who enter military service, no information can be provided as to the number of mortgage loans that may be affected by the Relief Act or the California Military and Veterans Code. Application of the Relief Act or the California Military and Veterans Code would adversely affect, for an indeterminate period of time, the ability of the Master Servicer to collect full amounts of interest or principal on certain of the

mortgage loans.

        Any shortfalls in interest or principal collections resulting from the
application of the Relief Act or the California Military and Veterans Code would
result in a reduction of the amounts distributable to the holders of the related
series of securities, and the prospectus supplement may specify that the
shortfalls would not be covered by advances or, any form of credit support
provided in connection with the securities. In addition, the Relief Act and the
California Military and Veterans Code impose limitations that impair the ability
of the Master Servicer to foreclose on an affected mortgage loan or enforce
rights under a Home Improvement Contract or Manufactured Housing Contract during
the borrower's period of active duty status, and, under certain circumstances,
during an additional three month period after that period. Thus, if a mortgage
loan or Home Improvement Contract or Manufactured Housing Contract goes into
default, there may be delays and losses occasioned as a result.

                                      82
<PAGE>

Product Liability and Related Litigation

        Certain environmental and product liability claims may be asserted
alleging personal injury or property damage from the existence of certain
chemical substances which may be present in building materials. For example,
formaldehyde and asbestos have been and in some cases are incorporated into many
building materials used in manufactured and other housing. As a consequence,
lawsuits may arise from time to time asserting claims against manufacturers or
builders of the housing, suppliers of component parts, and related persons in
the distribution process. Plaintiffs have won such judgments in certain such
lawsuits.

        Under the FTC Holder in Due-Course Rule, the holder of any manufactured
housing contract secured by a manufactured home with respect to which a product
liability claim has been successfully asserted may be liable to the obligor for
the amount the obligor paid on the related manufactured housing contract.
Additionally, the holder may be unable to collect amounts still due under the
manufactured housing contract. In general, the successful assertion of a product
liability claim constitutes a breach of a representation or warranty of the
lender, and the securityholders would suffer a loss only to the extent that (1)
the lender breached its obligation to repurchase the manufactured housing
contract in the event an obligor is successful in asserting such a claim, and
(2) the lender, we or the trustee were unsuccessful in asserting any claim of
contribution or subrogation on behalf of the securityholders against the
manufacturer or other persons who were directly liable to the plaintiff for the
damages. Typical products liability insurance policies held by manufacturers and
component suppliers of manufactured homes may not cover liabilities arising from
formaldehyde and certain other chemicals in manufactured housing, with the
result that recoveries from such manufacturers, suppliers or other persons may
be limited to their corporate assets without the benefit of insurance.

        To the extent that the related prospectus supplement describes, the
mortgage loans may include installment sales contracts entered into with the
builders of the homes located on the mortgaged properties. The mortgagors in
some instances may have claims and defenses against the builders which could be
asserted against the trust fund.

Environmental Considerations

        Real property pledged as security to a lender may be subject to certain
environmental risks. Under the laws of certain states, contamination of a
property may give rise to a lien on the property to secure recovery of the costs
of clean-up. In several states, such a lien has priority over the lien of an
existing mortgage against such property. In addition, under the laws of some
states and under the federal Comprehensive Environmental Response, Compensation,
and Liability Act of 1980, as amended ("CERCLA"), a lender may be liable, as an

"owner" or "operator," for costs of addressing releases or threatened releases of hazardous substances that require remedy at a property securing a mortgage loan owned by such lender, if agents or employees of the lender have become sufficiently involved in the operations of the related obligor, regardless of whether or not the environmental damage or threat was caused by such lender's obligor or by a prior owner. A lender also risks such liability arising out of foreclosure of a mortgaged property securing a mortgage loan owned by such lender. Until recent legislation was adopted, it was uncertain what actions could be taken by a secured lender in the event of a loan default without it incurring exposure under CERCLA in the event the property was environmentally contaminated. The Asset Conservation, Lender Liability and Deposit Insurance Act of 1996 (the "1996 Lender Liability Act") provides for a safe harbor for secured lenders from CERCLA liability even though the lender forecloses and sells the real estate securing the loan, provided the secured lender sells "at the earliest practicable, commercially reasonable time, at commercially reasonable terms, taking into account market conditions and legal and regulatory requirements." Although the 1996 Lender Liability Act provides significant protection to secured lenders, it has not been construed by the courts, and there are circumstances in which actions taken could expose a secured lender to CERCLA liability. In addition, the transferee from the secured lender is not entitled to the protections enjoyed by a secured lender. Thus, contamination may decrease the amount that prospective buyers are willing to pay for a mortgaged property and decrease the likelihood that the trust will recover fully on the mortgage loan through foreclosure.

83

<PAGE>


        Application of environmental laws other than CERCLA could also result in the imposition of liability on lenders for costs associated with environmental hazards. The most significant of these other laws is the Resource Conservation and Recovery Act of 1976, as amended ("RCRA"), and state regulatory programs implemented thereunder. Subtitle I of RCRA imposes cleanup liabilities on owners or operators of underground storage tanks. Some states also impose similar liabilities on owners and operators of aboveground storage tanks. The definition of "owner" under RCRA Subtitle I contains a security interest exemption substantially the same as the CERCLA security interest exemption. However, as with CERCLA costs, it is possible that such costs, if imposed in connection with a mortgage loan included as part of the collateral, could become a liability of the trust in certain circumstances.

        At the time the mortgage loans were originated, it is possible that no environmental assessment or a very limited environmental assessment of the related mortgaged properties was conducted. No representations or warranties are made by the trust or the depositor as to the absence or effect of hazardous wastes or hazardous substances on any of the related mortgaged properties. In addition, none of the Master Servicer, any sub-servicer nor any other party have made any representations or warranties or assumed any liability with respect to the absence or effect of hazardous wastes or hazardous substances on any mortgaged property or any casualty resulting from the presence or effect of hazardous wastes or hazardous substances on any mortgaged property, and any loss or liability resulting from the presence or effect of such hazardous wastes or hazardous substances will reduce the amounts otherwise available to pay your certificates.

        Traditionally, many residential mortgage lenders have not taken steps to evaluate whether contaminants are present with respect to any mortgaged property prior to the origination of the mortgage loan or prior to foreclosure or accepting a deed-in-lieu of foreclosure. Accordingly, we have not made and will not make such evaluations prior to the origination of the mortgage loans. Neither we, the Master Servicer nor any sub-servicer will be required by any agreement to undertake any such evaluation prior to foreclosure or accepting a deed-in-lieu of foreclosure. We do not make any representations or warranties or assume any liability with respect to the absence or effect of contaminants on

any related real property or any casualty resulting from the presence or effect
of contaminants. However, we will not be obligated to foreclose on related real
property or accept a deed-in-lieu of foreclosure if it knows or reasonably
believes that there are material contaminated conditions on such property. A
failure so to foreclose may reduce the amounts otherwise available to either
noteholders or certificateholders of the related series of securities.

    Notwithstanding anything to the contrary contained in the pooling and
servicing agreement or master servicing agreement, in connection with a
foreclosure or acceptance of a deed-in-lieu of foreclosure, in the event the
Master Servicer or any sub-servicer have reasonable cause to believe that a
mortgaged property is contaminated by hazardous or toxic substances or wastes,
or if the trustee otherwise requests an environmental inspection or review of
such mortgaged property, such an inspection or review is to be conducted by a
qualified inspector. The cost for such inspection or review shall be borne by
the trust. Upon completion of the inspection or review, the Master Servicer or
the applicable sub-servicer will promptly provide the trustee with a written
report of the environmental inspection.

    After reviewing the environmental inspection report, the Master Servicer,
or any applicable sub-servicer, shall determine how to proceed with respect to
the mortgaged property. In the event the environmental inspection report
indicates that the mortgaged property is contaminated by hazardous or toxic
substances or wastes, and the Master Servicer, or the related sub-servicer,
proceeds with foreclosure or acceptance of a deed in lieu of foreclosure, the
Master Servicer, or the related sub-servicer, shall be reimbursed for all
reasonable costs associated with such foreclosure or acceptance of a
deed-in-lieu of foreclosure and any related environmental clean-up costs, as
applicable, from any proceeds from liquidation, or if these proceeds are
insufficient to fully reimburse the Master Servicer, or the related
sub-servicer, such Master Servicer or sub-servicer, as applicable shall be
entitled to be reimbursed from amounts in the collection account. In the event
the Master Servicer, or any related sub-servicer determines not to proceed with
foreclosure or acceptance of a deed in lieu of foreclosure, the Master Servicer
or sub-servicer, as applicable, shall be reimbursed for all advances the Master
Servicer or sub-servicer made with respect to the related mortgaged property
from the collection account.

                                    84

<PAGE>

Forfeiture for Drug, RICO and Money Laundering Violations

    Federal law provides that property purchased or improved with assets
derived from criminal activity or otherwise tainted, or used in the commission
of certain offenses, can be seized and ordered forfeited to the United States of
America. The offenses which can trigger such a seizure and forfeiture include,
among others, violations of the Racketeer Influenced and Corrupt Organizations
Act, the Bank Secrecy Act, the anti-money laundering laws and regulations,
including the USA Patriot Act of 2001 and the regulations issued pursuant to
that Act, as well as the narcotic drug laws. In many instances, the United
States may seize the property even before a conviction occurs.

    In the event of a forfeiture proceeding, a lender may be able to establish
its interest in the property by proving that: (i) its mortgage was executed and
recorded before the commission of the illegal conduct from which the assets used
to purchase or improve the property were derived or before the commission of any
other crime upon which the forfeiture is based, or (ii) the lender, at the time
of the execution of the mortgage, was reasonably without cause to believe that
the property was subject to forfeiture. However, there is no assurance that such
a defense will be successful.

Other Legal Considerations

    The mortgage loans are also subject to federal laws, including: (i)

Regulation Z, which requires certain disclosures to the borrowers regarding the
terms of the mortgage loans; (ii) the Equal Credit Opportunity Act and
Regulation B promulgated under such Act, which prohibit discrimination on the
basis of age, race, color, sex, religion, marital status, national origin,
receipt of public assistance or the exercise of any right under the Consumer
Credit Protection Act, in the extension of credit; and (iii) the Fair Credit
Reporting Act, which regulates the use and reporting of information related to
the borrower's credit experience. Violations of certain provisions of these
federal laws may limit the ability of persons to collect all or part of the
principal of or interest on the mortgage loans and in addition could subject
certain persons to damages and administrative enforcement.

                    FEDERAL INCOME TAX CONSEQUENCES

General

    The following discussion represents the opinion of Cadwalader, Wickersham
& Taft LLP, McKee Nelson LLP, Sidley Austin LLP, Thacher Proffitt & Wood LLP or
such other counsel as may be identified in the related prospectus supplement. It
is intended to present a discussion of the material federal income tax
consequences of the purchase, ownership, and disposition of the various types of
securities that may be offered by this prospectus and a related prospectus
supplement. This discussion is based upon laws, regulations, rulings, and
decisions now in effect, all of which are subject to change, in some instances,
retroactively.

    This discussion does not purport to deal with the federal income tax
consequences that may affect particular investors that result from their
individual circumstances, or with certain categories of investors that are given
special treatment under the federal income tax laws, such as banks, insurance
companies, thrift institutions, tax-exempt organizations, foreign investors,
certain regulated entities (such as regulated investment companies ("RICs")),
real estate investment trusts ("REITs"), investment companies, and certain other
organizations to which special rules apply. This discussion focuses primarily on
investors who will hold the securities as capital assets, and not as part of a
hedge, straddle, or conversion transaction. In addition, this discussion does
not describe any tax consequences arising under the laws of any state, locality,
or taxing jurisdiction other than the United States of America.

    No currently effective regulations or other guidance has been issued
concerning certain provisions of the Code, or certain issues relevant to such
provisions that may affect investors in certain of the securities (for example,
the provisions dealing with market discount and stripped debt securities), and
the regulations that do exist under other provisions of the Internal Revenue
Code of 1986, as amended (the "Code") (such as the REMIC provisions and the
original issue discount ("OID") provisions) do not address

                                85

<PAGE>

all potentially relevant issues. Hence, definitive guidance cannot be provided
regarding many aspects of the tax treatment of securityholders, particularly
residual securityholders. Moreover, this summary and the opinions referred to
below are based on current law, and there can be no assurance that the Internal
Revenue Service (the "IRS") will not take positions that would be materially
adverse to investors.

    You are encouraged to consult your own tax advisor in determining the
federal, state, foreign, and any other tax consequences to you of the purchase,
ownership, and disposition of the securities.

    The following discussion generally refers to the beneficial owners of
securities as "holders" or "certificateholders," although in general, the
investors will be the beneficial, but not the registered, holders of the
securities.

Many aspects of the federal income tax treatment of securities issued pursuant to a prospectus supplement will depend on whether an election is made to treat the relevant pool of assets as a REMIC. Each prospectus supplement will indicate whether a REMIC election or elections will be made for the relevant series or a portion of the series.

If a series of securities includes exchangeable securities, each class of exchangeable securities will represent beneficial ownership of one or more interests in one or more REMIC regular interests. The related prospectus supplement will specify whether each class of exchangeable securities represents a proportionate or disproportionate interest in each underlying REMIC regular interest. The exchangeable securities will be created, sold and administered pursuant to an arrangement that will be treated as a grantor trust under subpart E, part I of subchapter J of the Code. The tax treatment of exchangeable securities is discussed under "--Tax Treatment of Exchangeable Securities" below.

For each series, Cadwalader, Wickersham & Taft LLP, McKee Nelson LLP, Sidley Austin LLP, Thacher Proffitt & Wood LLP or such other counsel to the depositor as specified in the related prospectus supplement ("Tax Counsel") will deliver a separate opinion generally to the effect that, assuming timely filing of a REMIC election, if applicable, compliance with applicable documents, the correctness of representations and warranties, and in some instances, other information provided to Tax Counsel, one or more trusts or pools of assets will qualify as (i) one or more REMICs, (ii) one or more grantor trust under subpart E, Part I of subchapter J of the Code that will issue securities ("Grantor Trust Securities"), (iii) a trust treated as a partnership for federal income tax purposes that will issue securities ("Owner Trust Securities"), or (iv) a trust treated either as a partnership or a disregarded entity for federal income tax purposes that will issue notes (such notes, the "Debt Securities"). Those opinions will be based on existing law, but there can be no assurance that the law will not change or that contrary positions will not be taken by the IRS.

Miscellaneous Itemized Deductions

The Code contains various limitations on the ability of individuals, trusts, and estates that own interests in entities that are taxed on a pass-though basis (such as holders of REMIC residual interests ("REMIC Residual Certificates") and interests in a grantor trust) to deduct their respective shares of the entity's deductions. Accordingly, such a holder will be entitled to deduct such fees and expenses under Section 212 of the Code only to the extent that the amount of the fees and expenses, when combined with its other miscellaneous itemized deductions for the taxable year in question, exceeds 2% of its adjusted gross income. In addition, Code Section 68 provides that the amount of itemized deductions otherwise allowable for the taxable year for an individual whose adjusted gross income exceeds a specified amount (the "Applicable Amount") - will be reduced by the lesser of:

o    the excess of adjusted gross income over the Applicable Amount, or

o    80% of the amount of itemized deductions otherwise allowable for the taxable year for taxable years ending on or before December 31, 2005, and by a reduced portion of such amount for taxable years beginning on or after January 1, 2006.

86

<PAGE>

Non-corporate holders of securities also should be aware that miscellaneous itemized deductions are not deductible for purposes of the AMT. The amount of such additional taxable income recognized by holders who are subject to the limitations of either Section 67 or Section 68 may be substantial and may reduce or eliminate the after-tax yield to such holders of an investment

in the certificates of an affected series.

Tax Treatment of REMIC Regular Interests and Other Debt Instruments

     Payments received by holders of REMIC regular interests generally should
be accorded the same tax treatment under the Code as payments received on other
taxable debt instruments. Except as described below for OID, market discount or
premium, interest paid or accrued on REMIC regular interests will be treated as
ordinary income and a principal payment on these certificates will be treated as
a return of capital to the extent that your basis in the certificate is
allocable to that payment. Holders of REMIC regular interests must report income
from such interests under an accrual method of accounting, even if they
otherwise would have used the cash method. The trustee or the Master Servicer
will report annually to the IRS and to holders of record (which generally will
not include the beneficial owner of a certificate) the interest paid or accrued
and OID, if any, accrued on the certificates. The trustee or the Master
Servicer (the "Tax Administrator") will be the party responsible for computing
the amount of OID to be reported to the REMIC regular interest holders each
taxable year.

     To the extent provided in the applicable prospectus supplement, a security
may represent not only the ownership of a REMIC regular interest but also an
interest in a notional principal contract. This can occur, for instance, if the
applicable trust agreement provides that the rate of interest payable by the
REMIC on the regular interest is subject to a cap based on the weighted average
of the net interest rates payable on the qualified mortgages held by the REMIC.
In these instances, the trust agreement may provide for a reserve fund that will
be held as part of the trust fund but not as an asset of any REMIC created
pursuant to the trust agreement (an "outside reserve fund"). The outside reserve
fund would typically be funded from monthly excess cashflow. If the interest
payments on a regular interest were limited due to the above-described cap,
payments of any interest shortfall due to application of that cap would be made
to the regular interest holder to the extent of funds on deposit in the outside
reserve fund. For federal income tax purposes, payments from the outside reserve
fund will be treated as payments under a notional principal contract written by
the owner of the outside reserve fund in favor of the regular interest holders.

     Under temporary Treasury regulations, holders of REMIC regular interests
issued by "single-class REMICs" who are individuals, trusts, estates, or
pass-through entities in which such investors hold interests may be required to
recognize certain amounts of income in addition to interest and discount income.
A single-class REMIC, in general, is a REMIC that (i) would be classified as a
fixed investment or "grantor" trust in the absence of a REMIC election or (ii)
is substantially similar to a fixed investment trust.

     Under the temporary regulations, each holder of a regular or residual
interest in a single-class REMIC is allocated (i) a share of the REMIC's
expenses that normally would be deductible under Section 212 of the Code, (which
may include servicing and administrative fees and insurance premiums) and (ii) a
corresponding amount of additional income. Consequently, an individual, trust or
estate that holds a regular interest in a single-class REMIC - either directly
or through a pass-through entity - will, on a net basis, realize income without
a corresponding receipt or cash or an offsetting deduction from such regular
interest to the extent that its share of allocable investment expenses, when
combined with its other miscellaneous itemized deductions for the taxable year,
fails to exceed 2% of its adjusted gross income. See "--Miscellaneous Itemized
Deductions" above. Any such additional income will be treated as interest
income.

     In addition, as described above, Code Section 68 provides that the amount
of itemized deductions otherwise allowable for the taxable year for an
individual whose adjusted gross income exceeds a specified amount will be
reduced.

<PAGE>

OID

The following discussion of OID applies generally to notes and to
securities that are REMIC regular interests for federal income tax purposes, or
other securities that are classified as debt for federal income tax purposes
(collectively referred to as "Debt Instruments"). Differences in treatment of
REMIC regular interests from other Debt Instruments are noted where applicable.

Certain classes of Debt Instruments of a series may be issued with OID.
Holders of Debt Instruments issued with OID should be aware that they generally
must include OID in income for federal income tax purposes annually under a
constant yield accrual method that reflects compounding. In general, OID is
treated as ordinary income and must be included in income regardless of whether
the related cash payment (if any) has been received.

The amount of OID required to be included in a holder's income in any
taxable year will be computed in accordance with Section 1272(a)(6) of the Code,
which provides rules for the accrual of OID for certain debt instruments
("Prepayable Obligations"), such as Debt Obligations, that are subject to
prepayment by reason of prepayments of underlying obligations. Under Section
1272(a)(6), the amount and rate of accrual of OID on a Prepayable Obligation
generally is calculated based on (i) a single constant yield to maturity and
(ii) the prepayment rate assumed in pricing the Prepayable Obligation (the
"Prepayment Assumption"). Although regulations exist that govern the accrual of
OID in general (the "OID Regulations") those regulations do not address Section
1272(a)(6). Accordingly, absent additional guidance, the Tax Administrator will,
except as otherwise provided in a prospectus supplement, base its computations
on an interpretation of Section 1272(a)(6), the OID Regulations, and certain
other guidance. However, there can be no assurance that the methodology
described below represents the correct manner of calculating OID on the Debt
Obligations.

Prospective purchasers should be aware that neither we, the trustee, the
Master Servicer, nor any servicer will make any representation that the mortgage
assets underlying a series will in fact prepay at a rate conforming to the
applicable Prepayment Assumption or at any other rate.

OID is defined as the excess, if any, of a debt instrument's "stated
redemption price at maturity" (generally, but not always, its principal amount)
over its "issue price." The issue price of a Debt Instrument generally will
equal the initial price at which a substantial amount of certificates of the
same class is sold to the public. A debt instrument's stated redemption price is
the sum of all payments to be made on the instrument other than "qualified
stated interest" ("QSI"). To be QSI, interest must be unconditionally payable
(in cash or property other than additional obligations of the issuer):

     o     at least annually; and

     o     at a single fixed rate or certain variable rates set out in the OID
          Regulations.

Under these rules, in general terms, a Debt Instrument will have OID if it
is issued at a significant discount from its principal amount, or if interest:

     o     may be deferred, or

     o     does not accrue at a single fixed rate or certain variable rates set
          out in the OID Regulations.

Under a de minimis rule, a Prepayable Obligation will be considered to
have no OID if the amount of OID is less than 0.25% of the certificate's stated

redemption price at maturity multiplied by its weighted average maturity ("WAM"), calculated as provided in applicable regulations. A holder will include de minimis OID in income on a pro rata basis as principal payments on the obligation are received or, if earlier, upon disposition of the Debt Instrument.

The holder of a Prepayable Obligation generally must include in gross income the sum, for all days during his taxable year on which he holds the obligation, of the "daily portions" of the OID on such obligation. In the case of an original holder of a Debt Instrument, the daily portions of OID generally will

                                        88

<PAGE>

be determined by allocating to each day in any accrual period the instrument's ratable portion of the excess, if any, of (i) the sum of (a) the present value of all payments under the certificate yet to be received as of the close of such period plus (b) the amount of any payments (other than QSI) received on the instrument during such period over (ii) the instrument's "adjusted issue price" at the beginning of such period. The present value of payments yet to be received on a Prepayable Obligation is computed using the pricing prepayment assumptions and the instrument's original yield to maturity - adjusted to take into account the length of the particular accrual period. The adjusted issue price of a Prepayable Instrument at the beginning of the first period is its issue price. The adjusted issue price at the beginning of each subsequent period is increased by the amount of OID allocable to that period and reduced by the amount of any payments (other than QSI) received on the instrument during that period. Thus, an increased or decreased rate of prepayments on a Prepayable Debt Instrument generally will be accompanied by a correspondingly increased or decreased rate of recognition of OID by the holder of such Debt Instrument.

The yield to maturity of a Prepayable Obligation is calculated based on: (i) the Prepayment Assumption and (ii) in some instances, other contingencies not already taken into account under the Prepayment Assumptions that, considering all of the facts and circumstances as of the issue date, are more likely than not to occur. The Tax Administrator's determination of whether a contingency relating to a class of Prepayable Obligations is more likely than not to occur is binding on each holder of an obligation of this class unless the holder explicitly discloses on its federal income tax return that its determination of the yield and maturity of the Debt Instrument is different from that of the Tax Administrator.

The Treasury Department proposed regulations on August 24, 2004 that create a special rule for accruing original issue discount on Debt Instruments providing for a delay between record and payment dates, such that the period over which original issue discount accrues coincides with the period over which the holder's right to interest payment accrues under the governing contract provisions rather than over the period between distribution dates. If the proposed regulations are adopted in the same form as proposed, taxpayers would be required to accrue interest from the issue date to the first record date, but would not be required to accrue interest after the last record date. The proposed regulations are limited to Debt Instruments with delayed payment for periods of fewer than 32 days. The proposed regulations are proposed to apply to any Debt Instrument issued after the date the final regulations are published in the Federal Register.

In many cases, the securities will be subject to optional redemption before their stated maturity dates. For purposes of calculating OID, an optional redemption will be presumed to be exercised if, and only if, as of the issue date, early redemption would result in an original holder receiving a lower yield to maturity of the Debt Instrument than if the Debt Instrument were not redeemed early. If such an option is presumed to be exercised under this rule, OID, if any, on a Debt Instrument will be accelerated. In determining whether an option to redeem debt instruments is presumed to be exercised when one or more

classes of such instruments are issued at a premium, the Tax Administrator will take into account all classes of Debt Instruments of the applicable trust that are subject to the optional redemption to the extent that they are expected to remain outstanding as of the optional redemption date, based on the pricing prepayment assumptions. If, determined on a combined weighted average basis, the certificates of such classes were issued at a premium, the Tax Administrator will presume that the option will be exercised. However, the OID Regulations are unclear as to how the redemption presumption rules should apply to instruments such as the certificates, and there can be no assurance that the IRS will agree with the Tax Administrator's position.

If a Debt Instrument issued with OID is subsequently purchased for a price less or greater than its adjusted issue price, the new holder may have market discount (if the price is less) or, if the new holder's acquisition price exceeds the adjusted issue price, a reduction of the amount of includible OID in subsequent periods. Holders should consult their tax advisers regarding the computation of such reduction.

All OID Election. A holder generally may make an All OID Election to include in gross income all stated interest, acquisition discount, OID, de minimis OID, market discount, and de minimis market discount, and premium that accrues on a Debt Instrument under the constant yield method used to

89

<PAGE>

account for OID. To make the All OID Election, the holder of the Debt Instrument must attach a statement to its timely filed federal income tax return for the taxable year in which the holder acquired the certificate. The statement must identify the instruments to which the election applies. An All OID Election is irrevocable unless the holder obtains the consent of the IRS. If an All OID Election is made for a debt instrument with market discount or premium, the holder is deemed to have made an election to include in income currently the market discount, or to amortize the premium under the constant yield method, on all of the holder's other debt instruments with market discount or premium, as described in "--Market Discount" below. See also "--Amortizable Premium" below.

It is not entirely clear how income should be accrued on a REMIC regular interest, the payments on which consist entirely or primarily of a specified nonvarying portion of the interest payable on one or more of the qualified mortgages held by the REMIC (an "Interest Weighted Certificate"). Unless and until the IRS provides contrary administrative guidance on the income tax treatment of an Interest Weighted Certificate, the Tax Administrator will take the position that an Interest Weighted Certificate does not bear QSI, and will account for the income thereon as described in "--Interest Weighted Certificates and Non-VRDI Certificates" below.

In view of the complexities and current uncertainties as to the manner of inclusion in income of OID on the Debt Instrument, you should consult your tax advisor to determine the appropriate amount and method of inclusion in income of OID on your certificates for federal income tax purposes.

Variable Rate Instruments. A Debt Instrument may pay interest at a variable rate. A variable rate Debt Instrument that qualifies as a "variable rate debt instrument" as that term is defined in the OID Regulations (a "VRDI") will be governed by the rules applicable to VRDIs in the OID Regulations. The applicable prospectus supplement will indicate whether the Tax Administrator intends to treat a Debt Instrument as a VRDI.

All interest payable on a VRDI that provides for stated interest unconditionally payable in cash or property at least annually at a single qualified floating rate or objective rate (a "Single Rate VRDI") is treated as QSI. The amount and accrual of OID on a Single Rate VRDI is determined, in general, by converting such VRDI into a hypothetical fixed rate Debt Instrument

(having a fixed rate equal to the value of the variable rate on the issue date) and applying the rules applicable to fixed rate instruments described under "--OID" above to such hypothetical fixed rate certificate.

Except as provided below, the OID on a VRDI that is not a Single Rate VRDI (a "Multiple Rate VRDI") is determined as for a Single Rate VRDI, except that fixed rates must be substituted for each variable rate formula. The substituted rates are the actual values of the formula on the issue date, except in the case of a VRDI bearing interest at an objective rate, for which the fixed rate substitute is the expected yield of the instrument as of the issue date. For purposes of calculation, each variable rate is assumed to remain at its value as of the issue date. QSI or OID allocable to a particular accrual period for both Single Rate and Multiple Rate VRDIs must be increased or decreased if the interest actually accrued or paid during such accrual period exceeds or is less than the interest assumed to be accrued or paid during such accrual period under the related hypothetical fixed rate certificate.

The amount and accrual of OID on a Multiple Rate VRDI that provides for stated interest at either one or more qualified floating rates or at a qualified inverse floating rate and in addition provides for stated interest at a single fixed rate - other than an initial fixed rate that is intended to approximate the subsequent variable rate - is determined using the method described above for all other Multiple Rate VRDI Certificates except that prior to its conversion to a hypothetical equivalent fixed rate certificate, such Multiple Rate VRDI Certificate is treated as if it provided for a qualified floating rate - or a qualified inverse floating rate, rather than the fixed rate. The qualified floating rate or qualified inverse floating rate replacing the fixed rate must be such that the fair market value of the Multiple Rate VRDI Certificate as of its issue date would be approximately the same as the fair market value of an otherwise identical debt instrument that provides for the qualified floating rate or qualified inverse floating rate, rather than the fixed rate.

90

<PAGE>

REMIC regular interests of certain series may accrue interest based on a weighted average of the interest rates on some or all of the loans or regular interests in a second REMIC held subject to the related pooling and master servicing agreement (such regular interests, "Weighted Average Certificates"). Although the treatment of such certificates is not entirely clear under the OID Regulations, it appears that Weighted Average Certificates bear interest at an "objective rate" and can be considered to have qualified stated interest, provided that the average value of the rate during the first half of the certificate's term is not reasonably expected to be either significantly less than or significantly greater than the average value of the rate during the final half of the certificate's term (i.e., the rate will not result in a significant frontloading or backloading of interest). Until the IRS provides contrary administrative guidance on the income tax treatment of Weighted Average Certificates, or unless otherwise specified in the related prospectus supplement, the Tax Administrator intends to account for such certificates as described above for VRDI Certificates.

Interest Weighted Certificates and Non-VRDI Certificates. The treatment of an Interest Weighted Certificate is unclear under current law. The OID Regulations contain provisions (the "Contingent Payment Regulations") that address the federal income tax treatment of debt obligations that provide for one or more contingent payments ("Contingent Payment Obligations"). Under the Contingent Payment Regulations, any variable rate debt instrument that is not a VRDI is classified as a Contingent Payment

Obligation. However, the Contingent Payment Regulations, by their terms, do not apply to Prepayable Obligations. In the absence of further guidance, the Tax Administrator will account for Interest Weighted Certificates and other

Prepayable Obligations that are Contingent Payment Obligations in accordance with a combination of Code Section 1272(a)(6) and the accounting methodology described in this paragraph. Income will be accrued on such certificates based on a constant yield that is derived from a projected payment schedule as of the settlement date. The projected payment schedule will take into account the related Prepayment Assumptions and the interest payments that are expected to be made on such certificates based on the value of any relevant indices on the issue date. To the extent that actual payments differ from projected payments for a particular taxable year, adjustments to interest income will be made under applicable regulations. In the case of a Weighted Average Certificate, the projected payment schedule will be derived based on the assumption that the principal balances of the mortgage assets that collateralize the certificate pay down pro rata.

Anti-Abuse Rule. The OID Regulations contain an anti-abuse rule. The rule provides that if a principal purpose in structuring a debt instrument, engaging in a transaction, or applying the OID Regulations is to achieve a result that is unreasonable in light of the purposes of the applicable statutes, the IRS can apply or depart from the OID Regulations as necessary or appropriate to achieve a reasonable result. A result is not considered unreasonable under the regulations, however, in the absence of a substantial effect on the present value of a taxpayer's tax liability.

Market Discount

A subsequent purchaser of a Debt Instrument at a discount from its outstanding principal amount - or, in the case of a Debt Instrument having OID, its adjusted issue price - will acquire such Debt Instrument with "market discount." The purchaser generally will be required to recognize the market discount - in addition to any OID - as ordinary income. A Debt Instrument will not be considered to have market discount if the amount of such market discount is de minimis, i.e., less than the product of (i) 0.25% of the remaining principal amount or adjusted issue price, as applicable, of such certificate - multiplied by (ii) the WAM of the certificate remaining after the date of purchase. Market discount generally must be included in income payments other than QSI are received, in an amount equal to the lesser of (i) the amount of such non-QSI payment received or (ii) the amount of market discount that has "accrued," but that has not yet been included in income. The purchaser may make a special election, which generally applies to all market discount instruments held or acquired by the purchaser in the taxable year of election or thereafter, to recognize market discount currently on an uncapped accrual basis (the "Current Recognition Election"). In addition, a purchaser may make an All OID Election with respect to a Debt Instrument purchased with market discount. See "--OID--All OID Election" above.

91

<PAGE>


Until the Treasury promulgates applicable regulations, the relevant legislative history to the REMIC provisions provides that the purchaser of a Debt Instrument with market discount generally may elect to accrue the market discount either: (i) on the basis of a constant interest rate; (ii) in the case of a Debt Instrument not issued with OID, in the ratio of stated interest payable in the relevant period to the total stated interest remaining to be paid from the beginning of such period; or (iii) in the case of a Debt Instrument issued with OID, in the ratio of OID accrued for the relevant period to the total remaining OID at the beginning of such period. Regardless of which computation method is elected, the Prepayment Assumption must be used to calculate the accrual of market discount.

A certificateholder that has acquired any Debt Instrument with market discount generally will be required to treat a portion of any gain on a sale or exchange of the instrument as ordinary income to the extent of the market discount accrued to the date of disposition less any accrued market discount

previously reported as ordinary income. Moreover, such a holder (unless it has made the current accrual election) generally must defer interest deductions attributable to any indebtedness incurred or continued to purchase or carry the Debt Instrument to the extent that they exceed income on the Debt Instrument. Any such deferred interest expense, in general, is allowed as a deduction not later than the year in which the related market discount income is recognized. Under the Contingent Payment Regulations, a secondary market purchaser of an Interest Weighted Certificate or other Contingent Payment Obligation at a discount generally would continue to accrue interest and determine adjustments on such obligation based on the original projected payment schedule devised by the issuer of such certificate. See "--OID--Interest Weighted Certificates and Non-VRDI Certificates" above. Such holder would be required, however, to allocate the difference between the adjusted issue price of the obligation and its basis in the obligation as positive adjustments to the accruals or projected payments on the certificate over the remaining term of the obligation in a manner that is reasonable - e.g., based on a constant yield to maturity.

       Treasury regulations implementing the market discount rules have not yet been issued, and uncertainty exists with respect to many aspects of those rules.

Amortizable Premium

       A purchaser of a Debt Instrument at a premium over its principal amount may elect to amortize such premium under a constant yield method that reflects compounding based on the interval between payments on the instrument. The applicable legislative history indicates that premium is to be accrued in the same manner as market discount; accordingly, the accrual of such premium will be calculated using the Prepayment Assumption. Amortized premium generally would be treated as an offset to interest income on a Debt Instrument and not as a separate deduction item. Any election to amortize premium will apply to all taxable debt instruments held by the holder at the beginning of the taxable year in which the election is made, and to all taxable debt instruments acquired thereafter by such holder, and will be irrevocable without the consent of the IRS. Purchasers who pay a premium for a debt instrument should consult their tax advisors regarding the election to amortize premium and the method to be employed.

       In cases where premium must be amortized on the basis of the price and date of an optional redemption, the certificate will be treated as having matured on the redemption date for the redemption price and then having been reissued on that date for that price. Any premium remaining on the certificate at the time of the deemed reissuance will be amortized on the basis of (i) the original principal amount and maturity date or (ii) the price and date of any succeeding optional redemption, under the principles described above.

       Under the Contingent Payment Regulations, a secondary market purchaser of a Non-VRDI Certificate or an Interest Weighted Certificate at a premium generally would continue to accrue interest and determine adjustments on such certificate based on the original projected payment schedule devised by the issuer of such certificate. See "--OID" above. The holder of such a certificate would allocate the difference between its basis in the certificate and the adjusted issue price of the certificate as negative adjustments to the accruals or projected payments on the certificate over the remaining term of the certificate in a manner that is reasonable - e.g., based on a constant yield to maturity.

                                      92

<PAGE>


Consequences of Realized Losses

       Under Section 166 of the Code, both corporate holders of Debt Instruments and noncorporate holders that acquire Debt Instruments in connection with a

trade or business should be allowed to deduct, as ordinary losses, any losses sustained during a taxable year in which such instruments become wholly or partially worthless as the result of one or more Realized Losses on the underlying assets. However, a noncorporate holder that does not acquire a Debt Instrument in connection with its trade or business will not be entitled to deduct a loss under Code Section 166 until such instrument becomes wholly worthless - i.e., until its outstanding principal balance has been reduced to zero, and the loss will be characterized as short-term capital loss. However, the character and timing of any losses may be governed by Code Section 165(g) relating to worthless securities rather than by Code Section 166 if the Debt Instruments are considered issued by a corporation. This could occur, for example, if the issuing trust were disregarded as separate from a single holder of the equity interest in the trust that was a corporation.

Each holder of a Debt Instrument will be required to accrue OID on such instrument without giving effect to any reduction in distributions attributable to a default or delinquency on the underlying assets until a Realized Loss is allocated to such Debt Instrument or until such earlier time as it can be established that any such reduction will ultimately will not be recoverable. As a result, the amount of OID reported in any period by the holder of a Debt Instrument could exceed significantly the amount of economic income actually realized by the holder in such period. Although the holder of a Debt Instrument eventually will recognize a loss or a reduction in income attributable to previously included OID that, as a result of a realized loss, ultimately will not be realized, the law is unclear with respect to the timing and character of such loss or reduction in income. Accordingly, you should consult with your tax advisor with respect to the federal income tax consequences of Realized Losses attributable to OID.

Gain or Loss on Disposition

If a Debt Instrument is sold, the holder will recognize gain or loss equal to the difference between the amount realized on the sale and his adjusted basis in the certificate. The adjusted basis of a Debt Instrument generally will equal the cost of the instrument to the holder, increased by any OID or market discount previously includible in the holder's gross income, and reduced by the portion of the basis of the debt instrument allocable to payments thereon, other than QSI, previously received by the holder and by any amortized premium. Similarly, a holder who receives a scheduled or prepaid principal payment on a Debt Instrument will recognize gain or loss equal to the difference between the amount of the payment and the allocable portion of his adjusted basis in the certificate. Except to the extent that the market discount rules apply and except as provided below, any gain or loss on the sale or other disposition Debt Instrument generally will be capital gain or loss. Such gain or loss will be long-term gain or loss if the certificate is held as a capital asset for more than 12 months.

Gain from the disposition of a REMIC regular interest that otherwise would be capital gain will be treated as ordinary income to the extent that the amount actually includible in income with respect to the certificate by the certificateholder during his holding period is less than the amount that would have been includible in income if the yield on that certificate during the holding period had been 110% of the "applicable federal rate" as of the date that the holder acquired the certificate. Although the legislative history to the 1986 Act indicates that the portion of the gain from disposition of a REMIC regular interest that will be recharacterized as ordinary income is limited to the amount of OID, if any, on the certificate that was not previously includible in income, the applicable Code provision contains no such limitation; further, the Prepayable Obligation rules indicate that all OID, including OID not yet accrued, on a Prepayable Obligation would be treated as ordinary income.

A portion of any gain from the sale of a Debt Obligation that might otherwise be capital gain may be treated as ordinary income to the extent that such certificate is held as part of a "conversion transaction" within the meaning of Section 1258 of the Code. A conversion transaction generally is one

in which the taxpayer has taken two or more positions in property that reduce or
eliminate market risk, if substantially all of the taxpayer's return is
attributable to the time value of the taxpayer's net investment in such
transaction. The amount of gain realized in a conversion transaction that is
recharacterized as ordinary


                                        93

<PAGE>

income generally will not exceed the amount of interest that would have accrued
on the taxpayer's net investment at 120% of the appropriate "applicable federal
rate," which rate is computed and published monthly by the IRS, at the time the
taxpayer entered into the conversion transaction, subject to appropriate
reduction for prior inclusion of interest and other ordinary income from the
transaction.

Tax Treatment of Exchangeable Securities

        Exchangeable Securities Representing Proportionate Interests in Two or
More REMIC Regular Interests. The related prospectus supplement for a series
will specify whether an exchangeable security represents beneficial ownership of
a proportionate interest in each REMIC regular interest corresponding to that
exchangeable security. Each beneficial owner of such an exchangeable security
should account for its ownership interest in each REMIC regular interest
underlying that exchangeable security as described under "--Tax Treatment of
REMIC Regular Interests and Other Debt Instruments." If a beneficial owner of an
exchangeable security acquires an interest in two or more underlying REMIC
regular interests other than in an exchange described under "Description of the
Securities--Exchangeable Securities" in this prospectus, the beneficial owner
must allocate its cost to acquire that exchangeable security among the related
underlying REMIC regular interests in proportion to their relative fair market
values at the time of acquisition. When such a beneficial owner sells the
exchangeable security, the owner must allocate the sale proceeds among the
underlying REMIC regular interests in proportion to their relative fair market
values at the time of sale.

        Under the OID Regulations, if two or more debt instruments are issued in
connection with the same transaction or related transaction (determined based on
all the facts and circumstances), those debt instruments are treated as a single
debt instrument for purposes of the provisions of the Code applicable to OID,
unless an exception applies. Under this rule, if an exchangeable security
represents beneficial ownership of two or more REMIC regular interests, those
REMIC regular interests could be treated as a single debt instrument for OID
purposes. In addition, if the two or more REMIC regular interests underlying an
exchangeable security were aggregated for OID purposes and a beneficial owner of
an exchangeable security were to (i) exchange that exchangeable security for the
related underlying REMIC regular interests, (ii) sell one of those related REMIC
regular interests and (iii) retain one or more of the remaining related REMIC
regular interests, the beneficial owner might be treated as having engaged in a
"coupon stripping" or "bond stripping" transaction within the meaning of Section
1286 of the Code. Under Section 1286 of the Code, a beneficial owner of an
exchangeable security that engages in a coupon stripping or bond stripping
transaction must allocate its basis in the original exchangeable security
between the related underlying REMIC regular interests sold and the related
REMIC regular interests retained in proportion to their relative fair market
values as of the date of the stripping transaction. The beneficial owner then
must recognize gain or loss on the REMIC regular interests sold using its basis
allocable to those REMIC regular interests. Also, the beneficial owner then must
treat the REMIC regular interests underlying the exchangeable securities
retained as a newly issued debt instrument that was purchased for an amount
equal to the beneficial owner's basis allocable to those REMIC regular
interests. Accordingly, the beneficial owner must accrue interest and OID with
respect to the REMIC regular interests retained based on the beneficial owner's
basis in those REMIC regular interests.

As a result, when compared to treating each REMIC regular interest underlying an exchangeable security as a separate debt instrument, aggregating the REMIC regular interests underlying an exchangeable security could affect the timing and character of income recognized by a beneficial owner of an exchangeable security. Moreover, if Section 1286 of the Code were to apply to a beneficial owner of an exchangeable security, much of the information necessary to perform the related calculations for information reporting purposes generally would not be available to the trustee. Because it may not be clear whether the aggregation rule in the OID Regulations applies to the exchangeable securities and due to the trustee's lack of information necessary to report computations that might be required by Section 1286 of the Code, the trustee will treat each REMIC regular interest underlying an exchangeable security as a separate debt instrument for information reporting purposes. Prospective investors should note that, if the two or more REMIC regular interests underlying an exchangeable security were aggregated, the timing of accruals of OID applicable to an exchangeable security could be different than that reported to holders and the IRS. Prospective investors are advised to consult their own tax advisors regarding any

94

<PAGE>

possible tax consequences to them if the IRS were to assert that the REMIC regular interests underlying the exchangeable securities should be aggregated for OID purposes.

Exchangeable Securities Representing Disproportionate Interests in REMIC Regular Interests. The related prospectus supplement for a series will specify whether an exchangeable security represents beneficial ownership of a disproportionate interest in the REMIC regular interest corresponding to that exchangeable security. The tax consequences to a beneficial owner of an exchangeable security of this type will be determined under Section 1286 of the Code, except as discussed below. Under Section 1286 of the Code, a beneficial owner of an exchangeable security will be treated as owning "stripped bonds" to the extent of its share of principal payments and "stripped coupons" to the extent of its share of interest payment on the underlying REMIC regular interests. If an exchangeable security entitles the holder to payments of principal and interest on an underlying REMIC regular interest, the IRS could contend that the exchangeable security should be treated (i) as an interest in the underlying REMIC regular interest to the extent that the exchangeable security represents an equal pro rata portion of principal and interest on the underlying REMIC regular interest, and (ii) with respect to the remainder, as an installment obligation consisting of "stripped bonds" to the extent of its share of principal payments or "stripped coupons" to the extent of its share of interest payments. For purposes of information reporting, however, each exchangeable security will be treated as a single debt instrument, regardless of whether it entitles the holder to payments of principal and interest.

Under Section 1286 of the Code, each beneficial owner of an exchangeable security must treat the exchangeable security as a debt instrument originally issued on the date the owner acquires it and as having OID equal to the excess, if any, of its "stated redemption price at maturity" over the price paid by the owner to acquire it. The stated redemption price at maturity for an exchangeable security is determined in the same manner as described with respect to REMIC regular interests under "--OID."

If the exchangeable security has OID, the beneficial owner must include the OID in its ordinary income for federal income tax purposes as the OID accrues, which may be prior to the receipt of the cash attributable to that income. Although the matter is not entirely clear, a beneficial owner should accrue OID using a method similar to that described with respect to the accrual of OID on a REMIC regular interest under "--OID." A beneficial owner, however, determines its yield to maturity based on its purchase price. For a particular

beneficial owner, it is not clear whether the prepayment assumption used for
calculating OID would be one determined at the time the exchangeable security is
acquired or would be the prepayment assumption for the underlying REMIC regular
interests.

     In light of the application of Section 1286 of the Code, a beneficial
owner of an exchangeable security generally will be required to compute accruals
of OID based on its yield, possibly taking into account its own prepayment
assumption. The information necessary to perform the related calculations for
information reporting purposes, however, generally will not be available to the
trustee. Accordingly, any information reporting provided by the trustee with
respect to the exchangeable securities, which information will be based on
pricing information as of the closing date, will largely fail to reflect the
accurate accruals of OID for these certificates. Prospective investors therefore
should be aware that the timing of accruals of OID applicable to an exchangeable
security generally will be different than that reported to holders and the IRS.
Prospective investors are advised to consult their own tax advisors regarding
their obligation to compute and include in income the correct amount of OID
accruals and any possible tax consequences should they fail to do so.

     The rules of Section 1286 of the Code also apply if (i) a beneficial owner
of REMIC regular interests exchanges them for an exchangeable security, (ii) the
beneficial owner sells some, but not all, of the exchangeable securities, and
(iii) the combination of retained exchangeable securities cannot be exchanged
for the related REMIC regular interests. As of the date of such a sale, the
beneficial owner must allocate its basis in the REMIC regular interests between
the part of the REMIC regular interests underlying the exchangeable securities
sold and the part of the REMIC regular interests underlying the exchangeable
securities retained in proportion to their relative fair market values. Section
1286 of the Code treats the beneficial owner as purchasing the exchangeable
securities retained for the amount of the basis allocated to the retained
exchangeable securities, and the beneficial owner must then accrue any OID with
respect to the retained exchangeable securities as described above. Section 1286
of the

                                      95
<PAGE>

Code does not apply, however, if a beneficial owner exchanges REMIC regular
interests for the related exchangeable securities and retains all the
exchangeable securities, see "--Treatment of Exchanges" below.

     Upon the sale of an exchangeable security, a beneficial owner will realize
gain or loss on the sale in an amount equal to the difference between the amount
realized and its adjusted basis in the exchangeable security. The owner's
adjusted basis generally is equal to the owner's cost of the exchangeable
security (or portion of the cost of REMIC regular interests allocable to the
exchangeable security), increased by income previously included, and reduced
(but not below zero) by distributions previously received and by any amortized
premium. If the beneficial owner holds the exchangeable security as a capital
asset, any gain or loss realized will be capital gain or loss, except to the
extent provided under "--Gain or Loss on Disposition."

     Although the matter is not free from doubt, if a beneficial owner acquires
in one transaction (other than an exchange described under "--Treatment of
Exchanges" below) a combination of exchangeable securities that may be exchanged
for underlying REMIC regular interests, the owner should be treated as owning
the underlying REMIC regular interests, in which case Section 1286 of the Code
would not apply. If a beneficial owner acquires such a combination in separate
transactions, the law is unclear as to whether the combination should be
aggregated or each exchangeable security should be treated as a separate debt
instrument. You should consult your tax advisors regarding the proper treatment
of exchangeable securities in this regard.

It is not clear whether exchangeable securities subject to Section 1286 of the Code will be treated as assets described in Section 7701 (a)(19)(C) of the Code or as "real estate assets" under Section 856(c)(5)(B) of the Code. In addition, it is not clear whether the interest or OID derived from such an exchangeable security will be interest on obligations secured by interests in real property for purposes of Section 856(c)(3) of the Code. You should consult your tax advisors regarding the proper treatment of exchangeable securities under these provisions of the Code.

Treatment of Exchanges. If a beneficial owner of one or more exchangeable securities exchanges them for the related exchangeable securities in the manner described under "Description of the Securities--Exchangeable Securities" in this prospectus, the exchange will not be taxable. In such a case, the beneficial owner will be treated as continuing to own after the exchange the same combination of interests in each related underlying REMIC regular interest that it owned immediately prior to the exchange.

Taxation of Certain Foreign Holders of Debt Instruments

REMIC Regular Interests and other Debt Instruments. Interest, including OID, paid on a Debt Instrument to a nonresident alien individual, foreign corporation, or other non-United States person (a "foreign person") generally will be treated as "portfolio interest" and, therefore, will not be subject to any United States withholding tax, provided that (i) such interest is not effectively connected with a trade or business in the United States of the certificateholder, (ii) the trustee or other person who would otherwise be required to withhold tax is provided with appropriate certification on Form W-8BEN that the beneficial owner of the certificate is a foreign person ("foreign person certification") (iii) the foreign person is not a 10% shareholder within the meaning of Section 871(h)(3)(B) of the Code or a controlled foreign corporation as described under Section 881(c)(3)(C) of the Code, and (iv) the foreign person is not a bank receiving interest on a loan made in the ordinary course of business, and (v) the interest is not "contingent" as provided in Section 861(h)(4). If the holder fails to meet the conditions listed above, interest, including OID, paid on the holders' Debt Instruments may be subject to either a 30% withholding tax or backup withholding at a rate of 28%, increasing to 31% after 2010. The 30% withholding tax may be subject to a reduction or elimination under an applicable tax treaty if you certify you are the beneficiary of such a tax treaty on Form W-8BEN. Further, the withholding tax may not apply if your interest, including OID, is effectively connected with your conduct of a trade or business in the United States and if you certify this on Form W-8ECI. See "--Backup Withholding" below.

96

<PAGE>

The 30% withholding tax will apply if IRS determines that withholding is required in order to prevent tax evasion by United States persons.

In the case of Debt Instruments other than REMIC regular interests (which generally cannot be issued with contingent interest) certain types of interest based on the profits, sales, or similar items of the issuer are not eligible for portfolio interest treatment, and accordingly would be subject to withholding. Any such interest will be discussed in the applicable prospectus supplement.

Effective for payments made after December 31, 2000, any foreign investor that invokes the protection of an income tax treaty with respect to United States withholding tax generally will be required to obtain a taxpayer identification number from the IRS in advance and provide verification that such investor is entitled to the protection of the relevant income tax treaty. Foreign tax-exempt investors generally will be required to provide verification of their tax-exempt status. Foreign investors are urged to consult their tax advisors with respect to these new withholding rules.

Backup Withholding

     Under federal income tax law, a certificateholder may be subject to
"backup withholding" under certain circumstances. Backup withholding may apply
to a certificateholder who is a United States person if the certificateholder,
among other things, (i) fails to furnish his social security number or other
taxpayer identification number ("TIN") to the trustee, (ii) furnishes the
trustee an incorrect TIN, (iii) fails to report properly interest and dividends,
or (iv) under certain circumstances, fails to provide the trustee or the
certificateholder's certificates broker with a certified statement, signed under
penalties of perjury, that the TIN provided to the trustee is correct and that
the certificateholder is not subject to backup withholding. Backup withholding
may apply, under certain circumstances, to a certificateholder who is a foreign
person if the certificateholder fails to provide the trustee or the
certificateholder's certificates broker with a foreign person certification.
Backup withholding applies to "reportable payments," which include interest
payments and principal payments to the extent of accrued OID, as well as
distributions of proceeds from the sale of REMIC regular interests or REMIC
Residual Certificates. The backup withholding rate is currently 28%, increasing
to 31% after 2010. Backup withholding, however, does not apply to payments on a
certificate made to certain exempt recipients, such as tax-exempt organizations,
and to certain foreign persons. You should consult your tax advisors for
additional information concerning the potential application of backup
withholding to payments received by you with respect to a certificate.

Reporting and Tax Administration

     REMIC Regular Interests. Reports will be made at least annually to holders
of record of REMIC regular interests, other than those with respect to whom
reporting is not required, and to the IRS as may be required by statute,
regulation, or administrative ruling with respect to (i) interest paid or
accrued on the certificates, (ii) OID, if any, accrued on the certificates, and
(iii) information necessary to compute the accrual of any market discount or the
amortization of any premium on the certificates.

     Residual Certificates. For purposes of federal income tax reporting and
administration, a REMIC of a series generally will be treated as a partnership,
and the related Residual Certificateholders as its partners. A REMIC of a series
will file an annual return on Form 1066 and will be responsible for providing
information to Residual Certificateholders sufficient to enable them to report
properly their shares of the REMIC's taxable income or loss, although it is
anticipated that such information actually will be supplied by the trustee or
the Master Servicer. The REMIC Regulations require reports to be made by a REMIC
to its Residual Certificateholders each calendar quarter in order to permit such
securityholders to compute their taxable income accurately. A person that holds
a Residual Certificate as a nominee for another person is required to furnish
those quarterly reports to the person for whom it is a nominee within 30 days of
receiving such reports. A REMIC is required to file all such quarterly reports
for a taxable year with the IRS as an attachment to the REMIC's income tax
return for that year. As required by the Code, a REMIC of a series' taxable year
will be the calendar year.

     Residual Certificateholders should be aware that their responsibilities as
holders of the residual interest in a REMIC, including the duty to account for
their shares of the REMIC's income or loss on their

                                   97

<PAGE>

returns, continue for the life of the REMIC, even after the principal and
interest on their Residual Certificates have been paid in full.

     A Residual Certificateholder will be designated as the REMIC's tax matters

person ("TMP"). The TMP generally has responsibility for overseeing and
providing notice to the other Residual Certificateholders of certain
administrative and judicial proceedings regarding the REMIC's tax affairs,
although other holders of the Residual Certificates of the same series would be
able to participate in such proceedings in appropriate circumstances. We, the
Master Servicer or an affiliate of either will acquire a portion of the residual
interest in each REMIC of a series in order to permit it to be designated as TMP
for the REMIC or will obtain from the Residual Certificateholders an irrevocable
appointment to perform the functions of the REMIC's TMP and will prepare and
file the REMIC's federal and state income tax and information returns.


     Treasury regulations provide that a holder of a Residual Certificate is
not required to treat items on its return consistently with their treatment on
the REMIC's return if a holder owns 100% of the Residual Certificates for the
entire calendar year. Otherwise, each holder of a Residual Certificate is
required to treat items on its returns consistently with their treatment on the
REMIC's return, unless the holder of a Residual Certificate either files a
statement identifying the inconsistency or establishes that the inconsistency
resulted from incorrect information received from the REMIC. The IRS may assess
a deficiency resulting from a failure to comply with the consistency requirement
without instituting an administrative proceeding at the REMIC level. Any person
that holds a Residual Certificate as a nominee for another person may be
required to furnish the REMIC, in a manner to be provided in Treasury
regulations, with the name and address of such person and other specified
information.

Tax Treatment of REMIC Residual Interests

     Overview. A REMIC is treated for federal income tax purposes as an entity
separate from its owners, and the residual interest is treated as its equity. In
a manner similar to that employed in the taxation of partnerships, REMIC taxable
income or loss will be determined at the REMIC level, but passed through to the
Residual Certificateholders.

     A portion of the income of Residual Certificateholders in REMICs of a
certain series, known as "excess inclusion income" will be treated unfavorably
in three contexts: (i) it may not be offset by current or net operating loss
deductions; (ii) it will be considered unrelated business taxable income
("UBTI") to tax-exempt entities; and (iii) it is ineligible for any statutory or
treaty reduction in the 30% withholding tax that may otherwise available to a
foreign Residual Certificateholder.

     Taxation of Residual Certificateholders. Each Residual Certificateholder
will report its pro rata share of REMIC taxable income or loss for each day
during its taxable year on which it holds the Residual Certificate on its own
federal income tax return. Income realized by a Residual Certificateholder will
be characterized as ordinary income or loss. Prospective investors should be
aware that, because of the way in which REMIC taxable income is calculated, a
Residual Certificateholder may recognize "phantom" income - i.e., income
recognized for tax purposes in excess of income as determined under financial
accounting or economic principles - which will be matched in later years by a
corresponding tax loss or reduction in taxable income, but which could lower the
yield (if any) to Residual Certificateholders due to the lower present value of
such loss or reduction.

     A REMIC generally determines its taxable income or loss in a manner
similar to that of an individual using a calendar year and the accrual method of
accounting. REMIC taxable income or loss will be characterized as ordinary
income or loss and will consist of the REMIC's gross income, including interest,
OID, and market discount income, if any, on the REMIC's assets, including
temporary cash flow investments, premium amortization on the REMIC regular
interests, income from foreclosure property, and any cancellation of
indebtedness income due to the allocation of realized losses to REMIC regular
interests, reduced by the REMIC's deductions, including deductions for interest
and OID expense on the REMIC regular interests, premium amortization and

servicing fees on such assets, the administration expenses of the REMIC and the
REMIC regular interests, any tax imposed on the REMIC's income from foreclosure
property, and any bad debt deductions on the mortgage assets. However, the REMIC
may

                                    98
<PAGE>

not take into account any items allocable to a "prohibited transaction." See
"--REMIC-Level Taxes" below.

     The amount of the REMIC's net loss that may be deducted by a residual
holder is limited to such holder's adjusted basis in the residual interest as of
the end of the relevant taxable year, or the time of disposition of the residual
interest, if earlier. A residual holder's basis in its Residual Certificate
initially is equal to the purchase price, and thereafter is increased by the
amount of taxable income recognized from the residual interest and decreased,
but not below zero, by the amount of distributions made and the amount of net
losses recognized with respect to that certificate. The amount of the loss
allocable to a Residual Certificateholder that is disallowed under the basis
limitation may be carried forward indefinitely, but may be used only to offset
income from the same REMIC.

     The ability of Residual Certificateholders to deduct net losses may be
subject to additional limitations under other provisions of the Code. A
distribution on a Residual Certificate is treated as a non-taxable return of
capital up to the amount of the Residual Certificateholder's adjusted basis in
his Residual Certificate. If a distribution exceeds the adjusted basis of the
Residual Certificate, the excess is treated as gain from the sale of such
Residual Certificate.

     Timing differences may arise between the REMIC's income and corresponding
deductions, creating "phantom income." Because phantom income arises from timing
differences, it will be matched by a corresponding loss or reduction in taxable
income in later years, during which economic or financial income will exceed
REMIC taxable income. Any acceleration of taxable income, however, could lower
the yield to a Residual Certificateholder, since the present value of the tax
paid on that income will exceed the present value of the corresponding tax
reduction in the later years. The amount and timing of any phantom income are
dependent upon (i) the structure of the REMIC of a particular series and (ii)
the rate of prepayment on the mortgage loans comprising or underlying the
REMIC's assets and, therefore, cannot be predicted without reference to a REMIC
of a particular series.

     The assets of the REMICs of certain series may have tax bases that are
less than their principal amounts. In such a case, a Residual Certificateholder
will recover the basis in its Residual Certificate as the REMIC recovers the
portion of its basis in the assets that is attributable to the residual
interest. The REMIC's basis in the assets is recovered as it is allocated to
principal payments received by the REMIC.

     Limitations on Offset or Exemption of REMIC Income. Generally, a Residual
Certificateholder's taxable income for any taxable year may not be less than
such Certificateholder's excess inclusion income for that taxable year. Excess
inclusion income generally equals the excess of REMIC taxable income for the
quarterly period for the Residual Certificates over the product of (i) 120% of
the long-term applicable federal rate that would have applied to the Residual
Certificates if they were debt instruments for federal income tax purposes on
the closing date and (ii) the adjusted issue price of such Residual Certificates
at the beginning of such quarterly period; however, if the residual interest at
the time of issue is a "noneconomic" residual interest, all of the income
derived by the holder may be excess inclusion income. For this purpose, the
adjusted issue price of a residual interest at the beginning of a quarter is the
issue price of the Residual Certificate, increased by prior income accruals and

decreased by losses realized and distributions on the residual interest. Excess inclusion income will be treated as UBTI in the case of a tax exempt organization subject to the tax on UBTI. In addition, under Treasury regulations yet to be issued, if a REIT or a RIC owns a Residual Certificate that generates excess inclusion income, a pro rata portion of the dividends paid by the REIT or the RIC generally will constitute excess inclusion income for its shareholders. Finally, Residual Certificateholders that are foreign persons will not be entitled to any exemption from the 30% withholding tax or a reduced treaty rate with respect to their excess inclusion income from the REMIC. See "--Taxation of Certain Foreign Holders of Debt Instruments" above.

   Non-Recognition of Certain Transfers for Federal Income Tax Purposes. The transfer of a "noneconomic residual interest" to a United States person will be disregarded for tax purposes if a significant purpose of the transfer was to impede the assessment or collection of tax. A similar limitation exists with respect to transfers of certain residual interests to foreign investors.


                                    99
<PAGE>


   A residual interest will be "noneconomic" for this purpose unless, at the time the interest is transferred, (i) the present value of the expected future distributions on the residual interest equals or exceeds the product of (a) the present value of the anticipated excess inclusion income and (b) the highest corporate tax rate for the year in which the transfer occurs, and (ii) the transferor reasonably expects that the transferee will receive distributions from the REMIC in amounts sufficient to satisfy the taxes on excess inclusion income as they accrue. If a transfer of a residual interest is disregarded, the transferor would continue to be treated as the owner of it and thus would continue to be subject to tax on its allocable portion of the net income of the related REMIC. A significant purpose to impede the assessment or collection of tax exists if the transferor, at the time of the transfer, either knew or should have known that the transferee would be unwilling or unable to pay taxes due on its share of the taxable income of the REMIC, - i.e., the transferor has "improper knowledge." A transferor is presumed not to have such improper knowledge if:

        (i) The transferor conducted, at the time of the transfer, a reasonable investigation of the financial condition of the transferee and, as a result of the investigation, the transferor found that the transferee had historically paid its debts as they came due and found no significant evidence to indicate that the transferee would not continue to pay its debts as they come due;

        (ii) The transferee represents to the transferor that it understands that, as the holder of a noneconomic residual interest, it may incur tax liabilities in excess of any cash flows generated by the interest and that it intends to pay the taxes associated with holding the residual interest as they become due;

        (iii) The transferee represents to the transferor that it will not cause the income from the noneconomic residual interest to be attributable to a foreign permanent establishment or fixed base of such transferee; and

        (iv) One of the following two following tests is satisfied: Either:

            (a) The present value of the anticipated tax liabilities associated with holding the residual interest does not exceed the sum of the present value of

                (1) any consideration given to the transferee to acquire the interest,

        (2) the expected future distributions on the interest,
and

        (3) any anticipated tax savings associated with holding
the interest as the REMIC generates losses.

For purposes of that calculation, the present value is calculated
using a discount rate equal to the short-term federal rate and
assumes that the transferee is subject to tax at the highest
corporate rate or, in certain circumstances, the alternative minimum
tax rate; or

        (b) The transfer is made to certain domestic taxable
corporations with large amounts of gross and net assets if an
agreement is made that all future transfers will be to taxable
domestic corporations in transactions that qualify for one of the
safe harbor provisions. Eligibility for this safe harbor requires,
among other things, that the transferor not know of any facts and
circumstances that reasonably indicate that the taxes associated
with the residual interest will not be paid. If the amount of
consideration given to the transferee to acquire the residual
interest is so low that under any set of reasonable assumptions a
reasonable person would conclude that the taxes associated with
holding the residual interest will not be paid, then the transferor
will be deemed to know that the transferee cannot or will not pay
those taxes.

    Ownership of Residual Certificates by Disqualified Organizations. The Code
contains sanctions that are designed to prevent or discourage the direct or
indirect ownership of a REMIC residual interest by the United States, any state
or political subdivision, any foreign government, any international
organization, any agency or instrumentality of any of the foregoing, any
tax-exempt organization - other than a farmers'

                                    100

<PAGE>

cooperative described in Section 521 of the Code - that is not subject to the
tax on UBTI (and thus is would not owe any tax on the income from a residual
interest that it owned), or any rural electrical or telephone cooperative (each
a "Disqualified Organization"). A corporation is not treated as an
instrumentality of the United States or any state or political subdivision of
the United States if all of its activities are subject to tax and, with the
exception of Freddie Mac, a majority of its board of directors is not selected
by such governmental unit. The penalties are as follows:

    First, REMIC status is dependent upon the presence of reasonable
arrangements designed to prevent a Disqualified Organization from acquiring
record ownership of a residual interest. Residual interests in REMICs of a
series are not offered for sale to Disqualified Organizations.

    Second, the Code imposes a one-time tax on the transferor of a residual
interest to a Disqualified Organization. The one-time tax equals the product of
(i) the present value of the total anticipated excess inclusions with respect to
the transferred residual interest for periods after the transfer and (ii) the
highest marginal federal income tax rate applicable to corporations. Where a
transferee is acting as an agent for a Disqualified Organization, the transferee
is subject to the one-time tax. The one-time tax may be waived by the Secretary
of the Treasury if, upon discovery that a transfer is subject to the one-time
tax, the Disqualified Organization promptly disposes of the residual interest
and the transferor pays such amounts as the Secretary may require.

    Third, the Code imposes an annual tax on any pass-through entity - i.e.,
RIC, REIT, common trust, partnership, trust, estate or cooperative described in

Code Section 1381 - that owns a direct or indirect interest in a residual
interest, if record ownership of an interest in the pass-through entity is held
by one or more Disqualified Organizations. The tax imposed equals the highest
corporate income tax rate multiplied by the share of any excess inclusion income
of the pass-through entity for the taxable year that is allocable to the
interests in the pass-through entity held by Disqualified Organizations. The
same tax applies to a nominee who acquires an interest in a residual interest on
behalf of a Disqualified Organization. For example, a broker that holds an
interest in a Residual Certificate in "street name" for a Disqualified
Organization is subject to the tax. Any such tax imposed on a pass-through
entity would be deductible against that entity's ordinary income in determining
the amount of its required distributions. A pass-through entity will not be
liable for the annual tax if the record holder of the interest in the
pass-through entity furnishes to the pass-through entity an affidavit that
states, under penalties of perjury, that the record holder is not a Disqualified
Organization, and the pass-through entity does not have actual knowledge that
such affidavit is false.

     If an "electing large partnership" holds a residual interest, all
interests in the electing large partnership are treated as held by Disqualified
Organizations for purposes of the tax imposed upon a pass-through entity by
Section 860E(c) of the Code. The exception to this tax, otherwise available to a
pass-through entity that is furnished certain affidavits as described above, is
not available to an electing large partnership.

Special Considerations for Certain Types of Investors

     Dealers in Securities. Under Treasury regulations (the "Mark-to-Market
Regulations") relating to the requirement under Section 475 of the Code that
dealers in securities use mark-to-market accounting for federal income tax
purposes, dealers in securities are not permitted to mark to market any residual
interest acquired on or after January 4, 1995.

     Tax-Exempt Entities. Any excess inclusion income with respect to a
Residual Certificate held by a tax-exempt entity, including a qualified
profit-sharing, pension, or other employee benefit plan, will be treated as
UBTI. Although the legislative history and statutory provisions imply otherwise,
the Treasury conceivably could take the position that, under pre-existing Code
provisions, substantially all income on a Residual Certificate, including
non-excess inclusion income, is to be treated as UBTI. See "Tax Treatment of
REMIC Residual Interests--Taxation of Residual Certificateholders" above.

     Individuals and Pass-Through Entities. A holder of a residual interest
that is an individual, trust, or estate will be subject to the usual rules
limiting certain miscellaneous itemized deductions, which may

                                      101
<PAGE>

affect its ability to deduct its allocable share of the fees or expenses
relating to servicing REMIC assets, administering the REMIC, or paying guaranty
fees (if any).

     That same limitation will apply to individuals, trusts, or estates that
hold residual interests indirectly through a grantor trust, a partnership, an S
corporation, a common trust, a REMIC, or a nonpublicly offered RIC. A
nonpublicly offered RIC is a RIC other than one whose shares are (i)
continuously offered pursuant to a public offering, (ii) regularly traded on an
established securities market, or (iii) held by no fewer than 500 persons at all
times during the taxable year. In addition, that limitation will apply to
individuals, trusts, or estates that hold residual interests through any other
person (i) that is not generally subject to federal income tax and (ii) the
character of whose income may affect the character of the income generated by
that person for its owners or beneficiaries. In some cases, the amount of

additional income that would be recognized as a result of the foregoing
limitations by a holder of a residual interest that is an individual, trust, or
estate could be substantial.

    Employee Benefit Plans. See "--Tax-exempt Entities" above and "ERISA
Considerations."

    REITs, RICs, and Others. If a holder of a residual interest is a REIT, and
the related REMIC generates excess inclusion income, a portion of REIT dividends
will be treated as excess inclusion income for the REIT's shareholders, in a
manner to be provided by regulations. Thus, shareholders in a REIT that invests
in Residual Certificates could face unfavorable treatment of a portion of their
REIT dividend income for purposes of (i) using current deductions or net
operating loss carryovers or carrybacks, (ii) UBTI in the case of tax-exempt
shareholders, and (iii) withholding tax in the case of foreign shareholders.
Moreover, because residual holders may recognize phantom income, a REIT
contemplating an investment in Residual Certificates should consider carefully
the effect of any phantom income upon its ability to meet its income
distribution requirements under the Code. The same rules regarding excess
inclusion will apply to a residual holder that is a RIC, common trust, or one of
certain corporations doing business as a cooperative. See "--Foreign Residual
Certificateholders" below and "Tax Treatment of REMIC Interests--Taxation of
Interests--Taxation of Residual Certificateholders" above.

    A Residual Certificate held by a REIT will be treated as a real estate
asset for purposes of the REIT qualification requirements in the same proportion
that the REMIC's assets would be treated as real estate assets if held directly
by the REIT, and interest income derived from such Residual Certificate will be
treated as qualifying interest income for REIT purposes ("Qualifying REIT
Interest") to the same extent. If 95% or more of a REMIC's assets qualify as
real estate assets for REIT purposes, 100% of that REMIC's regular and residual
interests will be treated as real estate assets for REIT purposes, and all of
the income derived from such interests will be treated as Qualifying REIT
Interest. Two or more REMICs that are part of a tiered structure will be treated
as one REMIC for purposes of determining the percentage of assets of each REMIC
that constitutes real estate assets. It is expected that at least 95% of the
assets of a REMIC of a series will be real estate assets throughout the REMIC's
life. The amount treated as a real estate asset in the case of a Residual
Certificate apparently is limited to the REIT's adjusted basis in the
certificate.

    Significant uncertainty exists regarding the treatment of a Residual
Certificate for purposes of the various asset composition requirements
applicable to RICs. A Residual Certificate should be treated as a "security,"
but will not be considered a "government security" for purposes of Section
851(b)(4) of the Code. Moreover, it is unclear whether a Residual Certificate
will be treated as a "voting security" under that Code section. Finally, because
the REMIC will be treated as the "issuer" of the Residual Certificate for
purposes of that Section, a RIC would be unable to invest more than 25% of the
value of its total assets in Residual Certificates of the same REMIC.

    Foreign Residual Certificateholders. Amounts paid to residual holders who
are foreign persons are treated as interest for purposes of the 30% United
States withholding tax on payments to foreign persons. Under Treasury
regulations, non-excess inclusion income received by a residual holders that is
a foreign person generally qualifies as "portfolio interest" exempt from the 30%
withholding tax only to the extent that (i) the assets of the REMIC of a series
are in, or considered to be in, registered form, (ii) the mortgage loans were
originated after July 18, 1984 and (iii) the certificateholder meets the
requirements listed under "--Taxation of Certain Foreign Holders of Debt
Instruments" above. Because mortgage

                                      102

<PAGE>

loans generally are not themselves in "registered form," amounts received by residual holders that are foreign persons may not qualify as "portfolio interest," although the issuance of the Residual Certificates in registered form may be deemed to satisfy the registration requirement. If the portfolio interest exemption is unavailable, such amounts generally will be subject to United States withholding tax when paid or otherwise distributed, or when the residual interest is disposed of, under rules similar to those for withholding on debt instruments that have OID. However, the Code grants the Treasury authority to issue regulations requiring that those amounts be taken into account earlier than otherwise provided where necessary to prevent avoidance of tax - i.e., where the Residual Certificates, as a class, do not have significant value. The portfolio interest exception is not available for excess inclusion income.

A transfer of a residual interest that has "tax avoidance potential" will be disregarded for federal income tax purposes if the transferee is a foreign person. A Residual Certificate will be deemed to have tax avoidance potential unless, at the time of the transfer, the transferor reasonably expects that, for each accrual of excess inclusion income, the REMIC will distribute to the transferee an amount that will equal at least 30% of such amount, and that each such amount will be distributed no later than the close of the calendar year following the calendar year of accrual (the "30% Test"). A transferor of a residual interest to a foreign person will be presumed to have had a reasonable expectation that the 30% Test will be satisfied if that test would be satisfied for all mortgage asset prepayment rates between 50% and 200% of the pricing prepayment assumption. See "--OID," above. If a foreign person transfers a Residual Certificate to a United States person and the transfer, if respected, would permit avoidance of withholding tax on accrued excess inclusion income, the transfer will be disregarded for federal income tax purposes and distributions with respect to the Residual Certificate will continue to be subject to 30% withholding as though the foreign person still owned the Residual Certificate. Investors who are foreign persons should consult their own tax advisors regarding the specific tax consequences to them of owning and disposing of a Residual Certificate.

Thrift Institutions, Banks, and Certain Other Financial Institutions. Generally, gain or loss arising from the sale or exchange of Residual Certificates held by certain financial institutions will give rise to ordinary income or loss, regardless of the length of the holding period for the Residual Certificates. Those financial institutions include banks, mutual savings banks, cooperative banks, domestic building and loan institutions, savings and loan institutions, and similar institutions. See "--Disposition of Residual Certificates" below.

Disposition of Residual Certificates. A special version of the wash sale rules will apply to dispositions of Residual Certificates. Under that version, losses on dispositions of Residual Certificates generally will be disallowed where, within six months before or after the disposition, the seller of such a certificate acquires any residual interest in a REMIC or any interest in a taxable mortgage pool that is economically comparable to a Residual Certificate. Regulations providing for appropriate exceptions to the application of the wash sale rules have been authorized, but have not yet been promulgated.

Regulations have been issued addressing the federal income tax treatment of "inducement fees" received by transferees of non-economic residual interests. The regulations require inducement fees to be included in income over a period that reasonably reflects the after-tax costs and benefits of holding that non-economic residual interest. Under two safe harbor methods, inducement fees may be included in income (i) in the same amounts and over the same period that the taxpayer uses for financial reporting purposes, provided that such period is not shorter than the period the REMIC is expected to generate taxable income or (ii) ratably over the remaining anticipated weighted average life of all the regular and residual interests issued by the REMIC, determined based on actual distributions projected as remaining to be made on such interests under the Prepayment Assumption. If the holder of a non-economic residual interest sells

or otherwise disposes of the non-economic residual interest, any unrecognized portion of the inducement fee generally is required to be taken into account at the time of the sale or disposition. Inducement fees are treated as U.S. source income. Prospective purchasers of the Residual Certificates should consult with their tax advisors regarding the effect of these regulations.


                                    103

<PAGE>


Treatment by the REMIC of OID, Market Discount and Amortizable Premium

     OID. Generally, the REMIC's deductions for OID expense on its REMIC regular interests will be determined in the same manner as for determining the OID income of the holders of such certificates, as described in "--OID" above, without regard to the de minimis rule described in that section.

REMIC-Level Taxes

     Income from certain transactions by the REMIC called prohibited transactions, and the amount of any so-called prohibited contributions, will be taxed directly to the REMIC at a 100% rate. In addition, net income from one prohibited transaction may not be offset by losses from other prohibited transactions. The applicable transaction documents will generally prohibit the REMIC from entering into any prohibited transaction or prohibited contribution that would produce taxable income.

     To the extent that a REMIC derives certain types of income from foreclosure property - generally, income relating to dealer activities of the REMIC, it will be taxed on such income at the highest corporate income tax rate. It is not anticipated that any REMIC of a series will receive significant amounts of such income, although situations may occur in which it is more advantageous for the Servicer to earn income subject to the tax on foreclosure property than to earn no income on such property.

     The burden of such taxes will generally be borne by any outstanding subordinated class of REMIC interests before it is borne by a more senior class of interests.

REMIC Qualification

     The trust underlying a series, or one or more designated pools of assets held by the trust, will qualify under the Code as a REMIC in which the REMIC regular interests and Residual Certificates will constitute the "regular interests" and "residual interests," respectively, if a REMIC election is in effect and certain tests concerning (i) the composition of the REMIC's assets and (ii) the nature of the securityholders' interests in the REMIC are met on a continuing basis.

     If a REMIC Pool fails to comply with one or more of the Code's ongoing requirements for REMIC status during any taxable year, the Code provides that its REMIC status may be lost for that year and thereafter. If REMIC status is lost, the treatment of the former REMIC and the interests in that REMIC for federal income tax purposes is uncertain. The former REMIC might be entitled to treatment as a grantor trust under subpart E, Part 1 of subchapter J of the Code, or as a partnership, in which case no entity-level tax would be imposed on the former REMIC. Alternatively, some or all of the REMIC regular interests may continue to be treated as debt instruments for federal income tax purposes, but the arrangement could be treated as a Taxable Mortgage Pool, as described in "--Special Considerations for Certain Types of Investors-Disposition of Residual Certificates" above. The Code authorizes the Treasury to issue regulations that address situations where a failure to meet the requirements for REMIC status occurs inadvertently and in good faith. Such regulations have not yet been issued. Disqualification relief may be accompanied by sanctions, such

as the imposition of a corporate tax on all or a portion of the REMIC's income
for the period of time in which the requirements for REMIC status are not
satisfied.

Grantor Trusts

    Treatment of the Trust for Federal Income Tax Purposes. With respect to
each series of Grantor Trust Securities, assuming compliance with all applicable
provisions of the Code, the related Grantor Trust (the "Grantor Trust") will be
classified as a fixed investment, or "grantor" trust under subpart E, Part I of
subchapter J of the Code and not as an association taxable as a corporation. For
federal income tax purposes, the owner of a Grantor Trust Security will be
treated as the beneficial owner of an appropriate portion of the principal and
interest payments, according to the characteristics of the security in question,
to be received on the trust assets assigned to your trust for federal income tax
purposes.


                                    104
<PAGE>


Tax Treatment of the Grantor Trust Security

    The types of Grantor Trust Securities offered in a series may include:

    o    Grantor Trust Securities evidencing ownership interests only in the
         interest payments on the trust assets, net of certain fees ("IO
         Securities"),

    o    Grantor Trust Securities evidencing ownership interests in the
         principal, but not the interest, payments on the trust assets ("PO
         Securities"),

    o    Grantor Trust Securities evidencing ownership interests in differing
         percentages of both the interest payments and the principal payments
         on the trust assets ("Ratio Securities"), and

    o    Grantor Trust Securities evidencing ownership in equal percentages
         of the principal and interest payments on the trust assets
         ("Pass-Through Securities").

The federal income tax treatment of Grantor Trust Securities other than
Pass-Through Securities (such securities, "Strip Securities") will be determined
in part by Section 1286 of the Code. Little administrative guidance has been
issued under that Section and, thus, many aspects of its operation are unclear,
particularly the interaction between that Section and the rules pertaining to
discount and premium. Hence, significant uncertainty exists regarding the
federal income tax treatment of the Strip Securities, and potential investors
should consult their own tax advisors concerning such treatment.

    One or more classes of Grantor Trust Securities may be subordinated to one
or more other classes of Grantor Trust Securities of the same series. In
general, such subordination should not affect the federal income tax treatment
of either the subordinated or senior Grantor Trust Securities. However, holders
of the subordinated Grantor Trust Securities will be allocated losses that
otherwise would have been borne by the holders of the more senior Grantor Trust
Securities. Holders of the subordinated Grantor Trust Securities should be able
to recognize any such losses no later than the taxable year in which they become
Realized Losses. Employee benefit plans subject to the Employee Retirement
Income Security Act of 1974, as amended ("ERISA") should consult their own tax
advisors before purchasing any subordinated Grantor Trust Security. See "ERISA
Considerations" in this prospectus and in the accompanying prospectus
supplement.

Treatment of Pass-Through Securities

     The holder of a Pass-Through Security generally will be treated as owning
a pro rata undivided interest in each of the trust assets (excluding any assets
identified as not being owned by such securityholders in a prospectus
supplement). Accordingly, each holder of a Pass-Through Security will be
required to include in income its pro rata share of the entire income from the
trust assets, including interest and discount income, if any. Such
securityholder generally will be able to deduct from its income its pro rata
share of the administrative fees and expenses incurred with respect to the trust
assets, provided that these fees and expenses represent reasonable compensation
for the services rendered. An individual, trust, or estate that holds a
Pass-Through Security directly or through a pass-through entity will be subject
to the limitations on deduction of itemized deductions and other rules limiting
deductions, as if it owned its share of the assets of the trust directly.

     The Code provisions concerning OID, market discount, and amortizable
premium will apply to the trust assets. Although such rules in theory may be
required to be applied on an asset-by-asset basis, for ease of administration
the Tax Administrator will generally apply such rules on an aggregate pool
basis. The rules regarding discount and premium, including the Prepayable
Obligation rules, that are applicable to loans held by a Grantor Trust generally
are the same as those that apply to Debt Instruments. See "--OID," "--Market
Discount" and "--Amortizable Premium" above.


                                        105
<PAGE>


Treatment of Strip Securities

     Many aspects of the federal income tax treatment of the Strip Securities
are uncertain. The discussion below describes the treatment that Tax Counsel
believes is appropriate, but there can be no assurance that the IRS will not
take a contrary position. You should consult your tax advisor with respect to
the federal income tax treatment of the Strip Securities.

     Under Section 1286 of the Code, the separation of ownership of the right
to receive some or all of the interest payments on an obligation from ownership
of the right to receive some or all of the principal payments on such obligation
results in the creation of "stripped coupons" with respect to the separated
rights to interest payments and "stripped bonds" with respect to the principal
and any unseparated interest payments associated with that principal. The
issuance of IO Securities or PO Securities effects a separation of the ownership
of the interest and principal payments on some or all of the trust assets. In
addition, the issuance of Ratio Securities effectively separates and reallocates
the proportionate ownership of the interest and principal payments on the trust
assets. Therefore, Strip Securities will be subject to Section 1286 of the Code.
For federal income tax accounting purposes, Section 1286 of the Code treats a
stripped bond or a stripped coupon as a new debt instrument issued on the date
that the stripped interest is purchased, and at a price equal to its purchase
price or, if more than one stripped interest is purchased, the share of the
purchase price allocable to such stripped interest.

     Each stripped bond or coupon generally will have OID equal to the excess
of its stated redemption price at maturity - or, in the case of a stripped
coupon, the amount payable on the due date of such coupon - over its issue
price. Treasury regulations under Section 1286 of the Code (the "Stripping
Regulations"), however, provide that the OID on a stripped bond or stripped
coupon is zero if the amount of the OID would be de minimis under rules
generally applicable to debt instruments. For purposes of determining whether
such amount would be de minimis,

     o     the number of complete years to maturity is measured from the date

the stripped bond or stripped coupon is purchased,

o    an approach which aggregates the payments to be made on the strip
security may be applied, and

o    unstripped coupons may be treated as stated interest with respect to
the related bonds and, therefore, may be excluded from stated
redemption price at maturity in appropriate circumstances.

In addition, the Stripping Regulations provide that, in certain circumstances,
the excess of a stripped bond's stated redemption price at maturity over its
issue price is treated as market discount, rather than as OID. See
"--Determination of Income With Respect to Strip Securities" below.

     The application of Section 1286 of the Code to the Strip Securities is not
entirely clear under current law. That Section could be interpreted as causing
any or all of the following:

o    in the case of an IO Security, each interest payment due on the
trust assets to be treated as a separate debt instrument,

o    in the case of a Ratio Security entitled to a disproportionately
high share of principal, each excess principal amount - i.e., the
portion of each principal payment on such assets that exceeds the
amount to which the Ratio Securityholder would have been entitled if
he or she had held an undivided interest in the trust assets - to be
treated as a separate debt instrument, and

o    in the case of a Ratio Security entitled to a disproportionately
high share of interest, each excess interest amount to be treated as
a separate debt instrument.

     In addition, Section 1286 of the Code requires the purchase price of a
Strip Security to be allocated among each of the rights to payment on the trust
assets to which the securityholder is entitled that are

<div align="center">106</div>

&lt;PAGE&gt;

treated as separate debt instruments. Despite the foregoing, it may be
appropriate to treat stripped coupons and stripped bonds issued to the same
holder in connection with the same transaction as a single debt instrument,
depending on the facts and circumstances surrounding the issuance. Facts and
circumstances considered relevant for this purpose should include the likelihood
of the debt instruments trading as a unit and the difficulty of allocating the
purchase price of the unit among the individual payments. Strip Securities are
designed to trade as whole investment units and, to the extent that the
underwriter develops a secondary market for the Strip Securities, it anticipates
that the Strip Securities would trade in such market as whole units. In
addition, because no market exists for individual payments on trust assets, the
proper allocation of the security's purchase price to each separate payment on
the trust assets would be difficult and burdensome to determine. Based on those
facts and circumstances, it appears that all payments of principal and interest
to which the holder of a Strip Security is entitled should be treated as a
single installment obligation. Although the OID Regulations do not refer
directly to debt instruments that are governed by Section 1286 of the Code, the
application of the OID Regulations to such instruments is consistent with the
overall statutory and regulatory scheme. Therefore, the Tax Administrator
intends to treat each Strip Security as a single debt instrument for federal
income tax accounting purposes.

Determination of Income with Respect to Strip Securities

     For purposes of determining the amount of income on a Strip Security that

accrues in any period, the rules described in this prospectus under "--OID,"
"--Anti-Abuse Rule," "--Market Discount" and "--Amortizable Premium" above. PO
Securities, and certain classes of Ratio Securities, will be issued at a price
that is less than their stated principal amount and thus generally will be
issued with OID. A Strip Security that would meet the definition of an Interest
Weighted Certificate or a Weighted Average Certificate if it were a REMIC
regular interest is subject to the same tax accounting considerations applicable
to the REMIC regular interest to which it corresponds. As described in
"--OID--Interest Weighted Certificates and Non-VRDI Certificates" above, certain
aspects of the tax accounting treatment of such a Strip Security are unclear.
Unless and until the IRS provides administrative guidance to the contrary, the
Tax Administrator will account for such a Strip Security in the manner described
for the corresponding REMIC regular interest. See "--Interest Weighted
Certificates and Non-VRDI Certificates" above.

    If a PO Security or a Ratio Security that is not considered a Contingent
Payment Obligation (an "Ordinary Ratio Security") subsequently is sold, the
purchaser apparently would be required to treat the difference between the
purchase price and the stated redemption price at maturity as OID. The holders
of such securities generally will be required to include such OID in income as
described in "--OID" above. PO Securities and Ordinary Ratio Securities issued
at a price less than their stated principal amount will be treated as issued
with market discount rather than with OID if, after the most recent disposition
of the related Grantor Trust Security, either (i) the amount of OID on the
Grantor Trust Security is considered to be de minimis under the Stripping
Regulations or (ii) the annual stated rate of interest payable on the Grantor
Trust Security is no more than 1% lower than the annual stated rate of interest
payable on the trust assets from which the Grantor Trust Security was stripped.
The holders of such Grantor Trust Securities generally would be required to
include market discount in income in the manner described in "--Market Discount"
above. Some classes of Ordinary Ratio Securities may be issued at prices that
exceed their stated principal amounts. Subject to the discussion of Superpremium
Securities in "--OID" above, holders of Ordinary Ratio Securities generally will
be able to amortize that premium as described in "--Amortizable Premium" above.

    In light of the application of Section 1286 of the Code, a beneficial
owners of a Strip Security generally will be required to compute accruals of OID
based on its yield, possibly taking into account its own prepayment assumption.
The information necessary to perform the related calculations for information
reporting purposes, however, generally will not be available to the trust
administrator. Accordingly, any information reporting provided by the trust
administrator with respect to these Strip Securities, which information will be
based on pricing information as of the closing date, will largely fail to
reflect the accurate accruals of OID for these certificates. Prospective
investors therefore should be aware that the timing of accruals of OID
applicable to a Strip Security generally will be different than that

                                    107

<PAGE>

reported to holders and the IRS. You should consult your own tax advisor
regarding your obligation to compute and include in income the correct amount of
OID accruals and any possible tax consequences to you if you should fail to do
so.

Purchase of Complementary Classes of Strip Securities

    Strip Securities of certain classes of the same series ("Complementary
Securities"), when held in combination, may provide an aggregate economic effect
equivalent to that of a Pass-Through Security based upon the same trust assets.
When an investor purchases Complementary Securities, it appears that, for
federal income tax purposes, each security should be treated separately and
should be subject to the rules described above. The IRS could assert, however,
that Complementary Securities held in combination should be treated as a single

pass-through type instrument, with the result that the rules governing stripped
bonds and stripped coupons under Section 1286 of the Code would not be applied.
Consequently, investors who acquire Complementary Securities should consult
their own tax advisors as to the proper treatment of such securities.

Possible Alternative Characterizations of Strip Securities

        The IRS could assert that the Strip Securities should be characterized for
tax purposes in a manner different from that described above. For example, the
IRS could contend that each Ratio Security whose interest rate is higher than
the net interest rate distributed from the trust taking into account all of the
securities of that series (the "Net Series Rate") is to be treated as being
composed of two securities: (i) a Pass-Through Security of the same principal
amount as the Ratio Security but generating interest at the Net Series Rate; and
(ii) an IO Security representing the excess of the rate on the Ratio Security
over the Net Series Rate. Similarly, a Ratio Security whose interest rate is
lower than the Net Series Rate could be treated as composed of a Pass-Through
Security with an interest rate equal to the Net Series Rate and a PO Security.
Alternatively, the IRS could interpret Section 1286 of the Code to require that
each individual interest payment with respect to an IO Security or a Ratio
Security be treated as a separate debt instrument for OID purposes. The IRS also
might challenge the manner in which OID is calculated, contending that:

        o       the stated maturity should be used to calculate yield on the Grantor
                Trust Securities,

        o       the Contingent Payment Regulations should not apply to the IO
                Securities, or

        o       the Contingent Payment Regulations should apply to the Ordinary
                Ratio Securities.

Given the variety of alternative treatments of the Grantor Trust Securities and
the different federal income tax consequences that could result from each
alternative, your are urged to consult your tax advisor regarding the proper
treatment of the Grantor Trust Securities for federal income tax purposes.

Limitations on Deductions With Respect to Strip Securities

        The holder of a Strip Security will be treated as owning an interest in
each of the trust assets and will recognize an appropriate share of the income
and expenses associated with those trust assets. Accordingly, an individual,
trust, or estate that holds a Strip Security directly or through a pass-through
entity will be subject to the same limitations on deductions with respect to
such security as are applicable to holders of Pass-Through Securities. See
"--Tax Treatment of the Grantor Trust Security" above.

Sale of a Grantor Trust Security

        A sale of a Grantor Trust Security prior to its maturity will result in
gain or loss equal to the difference, if any, between the amount received and
the holder's adjusted basis in such security. The rules for computing the
adjusted basis of a Grantor Trust Security are the same as in the case of a
REMIC regular interest. See "--Gain or Loss on Disposition" above. Gain or loss
from the sale or other disposition of a Grantor Trust Security generally will be
capital gain or loss to a securityholder if the security is held as a "capital
asset" within the meaning of Section 1221 of the Code, and will be long-term or
short-term

                                      108

<PAGE>

depending on whether the security has been held for more than one year. Ordinary
income treatment, however, will apply to the extent mandated by the OID and

market discount rules or if the securityholder is a financial institution
described in Section 582 of the Code. See "--Gain or Loss on Disposition" above.

Taxation of Certain Foreign Holders of Grantor Trust Securities

        Interest, including OID, paid on a Grantor Trust Security to a foreign
person generally is treated as "portfolio interest" and, therefore, is not
subject to any United States tax, provided that:

        o       such interest is not effectively connected with a trade or business
                in the United States of the securityholder,

        o       the trustee or other person who would otherwise be required to
                withhold tax is provided with foreign person certification,

        o       the foreign person is not a 10% shareholder within the meaning of
                Code Section 871(h)(3)(B) or a controlled foreign corporation as
                described under Code Section 881(c)(3)(C), and

        o       the foreign person is not a bank receiving interest on a loan made
                during the ordinary course of business.

        If the foregoing conditions are not met, interest - including OID - paid
on a Grantor Trust Security may be subject to either a 30% withholding tax or
28% backup withholding (increasing to 31% after 2010).

        In the case of certain series, portfolio interest treatment will not be
available for interest paid with respect to certain classes of Grantor Trust
Securities. Interest on debt instruments issued on or before July 18, 1984 does
not qualify as "portfolio interest" and, therefore, is subject to United States
withholding tax at a 30% rate - or lower treaty rate, if applicable. IO
Securities and PO Securities generally are treated, and Ratio Securities
generally should be treated, as having been issued when they are sold to an
investor. In the case of Pass-Through Securities, however, the issuance date of
the security is determined by the issuance date of the mortgage loans underlying
the trust. Thus, to the extent that the interest received by a holder of a
Pass-Through Security is attributable to mortgage loans issued on or before July
18, 1984, such interest will be subject to the 30% withholding tax. Moreover, to
the extent that a Ratio Security is characterized as a pass-through type
security and the underlying mortgage loans were issued on or before July 18,
1984, interest generated by the security may be subject to the withholding tax.
See "--Grantor Trusts" above.

Backup Withholding of Grantor Trust Securities

        The application of backup withholding to Grantor Trust Securities
generally is the same as in the case of REMIC regular interests. See "--Backup
Withholding" above.

Reporting and Tax Administration of Grantor Trust Securities

        For purposes of reporting and tax administration, the holders of Grantor
Trust Securities will be treated in the same fashion as the owners of the
underlying trust assets.

        On January 24, 2006, the IRS published final regulations which establish a
reporting framework for interests in "widely held fixed investment trusts" and
place the responsibility of reporting on the person in the ownership chain who
holds an interest for a beneficial owner. A widely-held fixed investment trust
is defined as an arrangement classified as a "trust" under Treasury Regulations
Section 301.7701-4(c), in which any interest is held by a middleman, which
includes, but is not limited to (i) a custodian of a person's account, (ii) a
nominee and (iii) a broker holding an interest for a customer in street name.
The trustee, or its designated agent, will be required to calculate and provide
information to requesting persons with respect to the trust in accordance with

these new regulations beginning with respect to the 2007 calendar year. The
trustee (or its designated agent), or the applicable middleman (in the case of

109

<PAGE>

interests held through a middleman), will be required to file information
returns with the IRS and provide tax information statements to securityholders
in accordance with these new regulations after December 31, 2007.

Taxation of Owners of Owner Trust Securities

     In the case of any Owner Trust Security offered pursuant to a prospectus
supplement and issued by a non-REMIC trust that is not a fixed investment trust
(such trust or limited liability company an "Owner Trust," the Tax Counsel will
render its opinion that (i) such security will be classified as debt for federal
income tax purposes; (ii) such security will either classified as debt for
federal income purposes or as an interest in a partnership not taxable as a
corporation or (iii) such security will be taxable as an interest in a
partnership not taxable as a corporation. Such opinion will be based on the
assumption that the terms of the related documents will be complied with, and on
counsel's conclusion that either the trust is not a publicly traded partnership
or the nature of the income of the trust will be exempt it from the rule that
certain publicly traded partnerships are taxable as corporations. Any such
securities may be denominated either as debt or as equity under state law. The
treatment of Owner Trust Securities classified as debt is set forth above. The
following section summarizes federal income tax provisions that would generally
apply to securities classified for tax purposes as partnership interests.

Partnership Taxation

     A trust in which the related prospectus supplement specifies that an
election will be made to treat the trust as a partnership, the Partnership Trust
will not be subject to federal income tax. Rather, each securityholder will be
required to separately take into account such holder's allocated share of
income, gains, losses, deductions and credits of the Partnership Trust. It is
anticipated that the Partnership Trust's income will consist primarily of
interest earned on the mortgage loans (including appropriate adjustments for
market discount, OID and bond premium) as described above under "--OID,"
"--Market Discount" and "--Amortizable Premium" above, and any gain upon
collection or disposition of mortgage loans. The Partnership Trust's deductions
will consist primarily of interest expense accruing on the Debt Securities,
servicing and other fees, and losses or deductions upon collection or
disposition of Debt Securities.

     The tax items of a partnership are allocable to the partners in accordance
with the Code, Treasury regulations and the partnership agreement. The
partnership agreement will provide, in general, unless otherwise specified in a
prospectus supplement that the securityholders will be allocated taxable income
of the Partnership Trust for each period of time specified in the related
prospectus supplement ("Collection Period") equal to the sum of (i) the interest
that accrues on the securities which represent interests in the Partnership
Trust ("Partnership Securities") in accordance with their terms for such
Collection Period, including interest accruing at the applicable pass-through
rate for such Collection Period and interest on amounts previously due on the
Partnership Securities but not yet distributed; (ii) any Partnership Trust
income attributable to discount on the mortgage loans that corresponds to any
excess of the principal amount of the Partnership Securities over their initial
issue price; and (iii) any other amounts of income payable to a securityholder
for such Collection Period. Such allocation will be reduced by any amortization
by the Partnership Trust of premium on mortgage loans that corresponds to any
excess of the issue price of Partnership Securities over their principal amount.
All remaining taxable income of the Partnership Trust will be allocated to the
holder of the residual Partnership Security. Based on the economic arrangement
of the parties, this approach for allocating Partnership Trust income should be

permissible under applicable Treasury regulations, although no assurance can be
given that the IRS would not require a greater amount of income to be allocated
to securityholders. Moreover, even under the foregoing method of allocation,
securityholders may be allocated interest income at the applicable pass-through
rate plus the other income items described above, even though the Partnership
Trust may not have sufficient cash to make current cash distributions of such
amounts. Thus, cash basis holders will in effect be required to report income
from the Partnership Securities on the accrual basis and securityholders may
become liable for taxes on Partnership Trust income even if they have not
received cash from the Partnership Trust to pay such taxes.

<center>110</center>

&lt;PAGE&gt;


    Part or all of the taxable income allocated to a securityholder that is a
pension, profit sharing or employee benefit plan or other tax-exempt entity
(including an individual retirement account) may constitute UBTI generally
taxable to such a holder under the Code.

    A share of expenses of the Partnership Trust (including fees of the Master
Servicer but not interest expense) allocable to an individual, estate or trust
securityholder would be miscellaneous itemized deductions subject to the
limitations described above under "Federal Income Tax Consequences--Tax
Treatment of REMIC Regular Interests and Other Debt Instruments" above.
Accordingly, such deductions might be disallowed to the individual, estate or
trust in whole or in part and might result in such holder being taxed on an
amount of income that exceeds the amount of cash actually distributed to such
holder over the life of the Partnership Trust.

Discount and Premium of Mortgage Loans

    Unless indicated otherwise in the applicable prospectus supplement, it is
not anticipated that the mortgage loans will have been issued with OID and,
therefore, the Partnership Trust should not have OID income. However, the
purchase price paid by the Partnership Trust for the mortgage loans may be
greater or less than the remaining principal balance of the mortgage loans at
the time of purchase. If so, the mortgage loans will have been acquired at a
premium or discount, as the case may be. See "--OID," "--Market Discount" and
"--Amortizable Premium" above. (As indicated above, the Partnership Trust will
make this calculation on an aggregate basis, but might be required to recompute
it on a mortgage loan-by-mortgage loan basis).

    If the Partnership Trust acquires the mortgage loans at a market discount
or premium, the Partnership Trust will elect to include any such discount in
income currently as it accrues over the life of the mortgage loans or to offset
any such premium against interest income on the mortgage loans. As indicated
above, a portion of such market discount income or premium deduction may be
allocated to securityholders.

Section 708 Termination

    Under Section 708 of the Code, the Partnership Trust will be deemed to
terminate for federal income tax purposes if 50% or more of the capital and
profits interests in the Partnership Trust are sold or exchanged within a twelve
month period. If such termination occurs, it would cause a deemed contribution
of the assets of a Partnership Trust (the "old partnership") to a new
Partnership Trust (the "new partnership") in exchange for interests in the new
partnership. Such interests would be deemed distributed to the partners of the
old partnership in liquidation of the old partnership, which would not
constitute a sale or exchange. The Partnership Trust will not comply with
certain technical requirements that might apply when such a constructive
termination occurs. As a result, the Partnership Trust may be subject to certain
tax penalties and may incur additional expenses if it is required to comply with
those requirements. Furthermore, the Partnership Trust might not be able to

comply due to lack of data.

Gain or Loss on Disposition of Partnership Securities

     Generally, capital gain or loss will be recognized on a sale of
Partnership Securities in an amount equal to the difference between the amount
realized and your tax basis in the Partnership Securities sold. A
securityholder's tax basis in a Partnership Security will generally equal the
holder's cost increased by the holder's share of Partnership Trust income
(includible in income) and decreased by any distributions received with respect
to such Partnership Security. In addition, both the tax basis in the Partnership
Securities and the amount realized on a sale of a Partnership Security would
include the holder's share of the Debt Securities and other liabilities of the
Partnership Trust. A holder acquiring Partnership Securities at different prices
will be required to maintain a single aggregate adjusted tax basis in such
Partnership Securities, and, upon sale or other disposition of some of the
Partnership Securities, allocate a portion of such aggregate tax basis to the
Partnership Securities sold (rather than maintaining a separate tax basis in
each Partnership Security for purposes of computing gain or loss on a sale of
that Partnership Security).


                                      111

<PAGE>


     Any gain on the sale of a Partnership Security attributable to the
holder's share of unrecognized accrued market discount on the mortgage loans
would generally be treated as ordinary income to the holder and would give rise
to special tax reporting requirements. The Partnership Trust does not expect to
have any other assets that would give rise to such special reporting
considerations. Thus, to avoid those special reporting requirements, the
Partnership Trust will elect to include market discount in income as it accrues.

     If a securityholder is required to recognize an aggregate amount of income
(not including income attributable to disallowed itemized deductions described
above) over the life of the Partnership Securities that exceeds the aggregate
cash distributions with respect to the Partnership Securities, such excess will
generally give rise to a capital loss upon the retirement of the Partnership
Securities.

Allocations Between Transferors and Transferees

     In general, the Partnership Trust's taxable income and losses will be
determined each Collection Period and the tax items for a particular Collection
Period will be apportioned among the securityholders in proportion to the
principal amount of Partnership Securities owned by them as of the close of the
last day of such Collection Period. As a result, a holder purchasing Partnership
Securities may be allocated tax items (which will affect its tax liability and
tax basis) attributable to periods before the actual transaction.

     The use of such a Collection Period convention may not be permitted by
existing regulations. If a Collection Period convention is not allowed (or only
applies to transfers of less than all of the partner's interest), taxable income
or losses of the Partnership Trust might be reallocated among the
securityholders. The holder of the residual Partnership Security will be
authorized to revise the Partnership Trust's method of allocation between
transferors and transferees to conform to a method permitted by future
regulations.

Section 731 Distributions

     In the case of any distribution to a securityholder, no gain will be
recognized to that securityholder except to the extent that the amount of any
money distributed with respect to such security does not exceed the adjusted

basis of such securityholder's interest in the security. To the extent that the
amount of money distributed exceeds such securityholder's adjusted basis, gain
will be currently recognized. In the case of any distribution to a
securityholder, no loss will be recognized except upon a distribution in
liquidation of a securityholder's interest. Any gain or loss recognized by a
securityholder will be capital gain or loss.

Section 754 Election

      In the event that a securityholder sells its Partnership Securities at a
profit (loss), the purchasing securityholder will have a higher (lower) basis in
the Partnership Securities than the selling securityholder had. The tax basis of
the Partnership Trust's assets would not be adjusted to reflect the higher (or
lower) basis unless the Partnership Trust were to file an election under Section
754 of the Code. In order to avoid the administrative complexities that would be
involved in keeping accurate accounting records, as well as potentially onerous
information reporting requirements, the Partnership Trust will not make such an
election. As a result, a securityholder might be allocated a greater or lesser
amount of Partnership Trust income than would be appropriate based on its own
purchase price for Partnership Securities.

      The American Jobs Creation Act of 2004 added a provision to the Code that
would require a partnership with a "substantial built-in loss" immediately after
a transfer of a partner's interest in such partnership to make the types of
basis adjustments that would be required if an election under Section 754 of the
Code were in effect. This new provision does not apply to a "securitization
partnership." The applicable prospectus supplement will address whether any
partnership in which a security represents an interest will constitute a
securitization partnership for this purpose.


                                    112

<PAGE>


Administrative Matters

      The trustee is required to keep or have kept complete and accurate books
of the Partnership Trust. Such books will be maintained for financial reporting
and tax purposes on an accrual basis and the fiscal year of the Partnership
Trust will be the calendar year. The trustee will file a partnership information
return (IRS Form 1065) with the IRS for each taxable year of the Partnership
Trust and will report each securityholder's allocable share of the items of
Partnership Trust income and expense to holders and the IRS on Schedule K-1. The
trustee will provide the Schedule K-1 information to nominees that fail to
provide the Partnership Trust with the information statement described below and
such nominees will be required to forward such information to the beneficial
owners of the Partnership Securities. Generally, holders must file tax returns
that are consistent with the information return filed by the Partnership Trust
or be subject to penalties unless the holder notifies the IRS of all such
consistencies.

      Under Section 6031 of the Code, any person that holds Partnership
Securities as a nominee at any time during a calendar year is required to
furnish the Partnership Trust with a statement containing certain information on
the nominee, the beneficial owners and the Partnership Securities so held. Such
information includes the (i) name, address and taxpayer identification number of
the nominee and (ii) as to each beneficial owner (x) the name, address and
taxpayer identification number of such person, (y) whether such person is a
United States Person, a tax-exempt entity or a foreign government, an
international organization, or any wholly-owned agency or instrumentality of
either of the foregoing, and (z) certain information on Partnership Securities
that were held, bought or sold on behalf of such persons throughout the year. In
addition, brokers and financial institutions that hold Partnership Securities
through a nominee are required to furnish directly to the trustee information as

to themselves and their ownership of Partnership Securities. A clearing agency
registered under Section 17A of the Securities Exchange Act of 1934, as amended
is not required to furnish any such information statement to the Partnership
Trust. The information referred to above for any calendar year must be furnished
to the Partnership Trust on or before the following January 31. Nominees,
brokers and financial institutions that fail to provide the Partnership Trust
with the information described above may be subject to penalties.

        The holder of the residual Partnership Security will be designated as the
TMP in the servicing agreement and as such, will be responsible for representing
the securityholders in any dispute with the IRS. The Code provides for
administrative examination of a partnership as if the partnership were a
separate and distinct taxpayer. Generally, the statute of limitations for a
partnership item does not expire until three years after the date on which the
partnership information return is filed. Any adverse determination following an
audit of the return of the Partnership Trust by the appropriate taxing
authorities could result in an adjustment of the returns of the securityholders,
and, under certain circumstances, a securityholder may be precluded from
separately litigating a proposed adjustment to the items of the Partnership
Trust. An adjustment could also result in an audit of a securityholder's returns
and adjustments of items not related to the income and losses of the Partnership
Trust.

Tax Consequences to Foreign Securityholders of a Partnership Trust

        It is not clear whether the Partnership Trust would be considered to be
engaged in a trade or business in the United States for purposes of federal
withholding taxes with respect to foreign persons because there is no clear
authority dealing with that issue under facts substantially similar to those
applicable here. Although it is not expected that the Partnership Trust would be
engaged in a trade or business in the United States for such purposes, if so
specified in the applicable prospectus supplement, the Partnership Trust may
withhold as if it were so engaged in order to protect the Partnership Trust from
possible adverse consequences of a failure to withhold. The Partnership Trust
may withhold on the portion of its taxable income that is allocable to
securityholders that are foreign persons pursuant to Section 1446 of the Code,
as if such income were effectively connected to a United States trade or
business. Amounts withheld will be deemed to be distributed to the foreign
securityholder. Subsequent adoption of Treasury regulations or the issuance of
other administrative pronouncements may require the Partnership Trust to change
its withholding procedures. In determining a holder's withholding status, the
Partnership Trust may rely on IRS Form W-8BEN, IRS Form W-9 or the holder's
certification of non-foreign status signed under penalties of perjury.

                                      113

<PAGE>


        To the extent specified in the applicable prospectus supplement, (i) each
foreign securityholder might be required to file an individual or corporate
United States income tax return (including in the case of a corporation, the
branch profits tax) on its share of the Partnership Trust's income, (ii) each
foreign securityholder must obtain a taxpayer identification number from the IRS
and submit that number to the Partnership Trust on Form W-8BEN in order to
ensure appropriate crediting of the taxes withheld, and (iii) a foreign
securityholder generally would be entitled to file with the IRS a claim for
refund with respect to taxes withheld by the Partnership Trust, taking the
position that no taxes were due because the Partnership Trust was not engaged in
a United States trade or business. Notwithstanding the foregoing, interest
payments made (or accrued) to a foreign securityholder may be considered
guaranteed payments to the extent such payments are determined without regard to
the income of the Partnership Trust. If these interest payments are properly
characterized as guaranteed payments, then the interest may not be considered
"portfolio interest." As a result, a foreign securityholder may be subject to

United States federal income tax and withholding at a rate of 30%, unless
reduced or eliminated pursuant to an applicable treaty. In such case, a foreign
securityholder would be entitled to claim a refund for that portion of the taxes
in excess of the taxes that should be paid with respect to the guaranteed
payments. Please consult your tax advisor concerning the withholding
requirements for partners and their partnerships regulations.

Backup Withholding on Partnership Securities

     Distributions made on the Partnership Securities and proceeds from the
sale of the Partnership Securities will be subject to a "backup" withholding tax
not exceeding 31% if, in general, the securityholder fails to comply with
certain identification and certification procedures, unless the holder is an
exempt recipient under applicable provisions of the Code.

                    STATE, FOREIGN AND LOCAL TAX CONSEQUENCES

     In addition to the federal income tax consequences described in "Federal
Income Tax Consequences," you should consider the state, foreign and local
income tax consequences of the acquisition, ownership, and disposition of the
securities. State, foreign or local income tax law may differ substantially from
the corresponding federal law, and this discussion does not purport to describe
any aspect of the income tax laws of any state. Therefore, you are encouraged to
consult your tax advisor with respect to the various state tax consequences of
an investment in the securities.

                            ERISA CONSIDERATIONS

General

     A fiduciary of a pension, profit-sharing, retirement or other employee
benefit plan subject to Title I of the Employee Retirement Income Security Act
of 1974, as amended ("ERISA"), should consider the fiduciary standards under
ERISA in the context of the plan's particular circumstances before authorizing
an investment of a portion of such plan's assets in the securities. Accordingly,
pursuant to Section 404 of ERISA, such fiduciary should consider among other
factors:

     o    whether the investment is for the exclusive benefit of plan
          participants and their beneficiaries;

     o    whether the investment satisfies the applicable diversification
          requirements;

     o    whether the investment is in accordance with the documents and
          instruments governing the plan; and

     o    whether the investment is prudent, considering the nature of the
          investment.

     In addition, benefit plans subject to ERISA, as well as individual
retirement accounts or certain types of Keogh plans not subject to ERISA but
subject to Section 4975 of the Code (each, a "Plan"), are

                                      114

<PAGE>

prohibited from engaging in a broad range of transactions involving Plan assets
and persons having certain specified relationships to a Plan ("parties in
interest" and "disqualified persons"). Such transactions are treated as
"prohibited transactions" under Sections 406 of ERISA and Section 4975 of the
Code imposes excise taxes upon such persons. We, Goldman, Sachs & Co., each
Master Servicer or other servicer, any pool insurer, any special hazard insurer,
the trustee, and certain of our and their affiliates might be considered
"parties in interest" or "disqualified persons" with respect to a Plan. If so,

the acquisition, holding or disposition of securities by or on behalf of such
Plan could be considered to give rise to a "prohibited transaction" within the
meaning of ERISA and the Code unless an exemption is available. Furthermore, if
an investing Plan's assets were deemed to include the mortgage loans and not
merely an interest in the securities, transactions occurring in the management
of mortgage loans might constitute prohibited transactions and the fiduciary
investment standards of ERISA could apply to the assets of the trust fund,
unless an administrative exemption applies.

ERISA Considerations Relating to Certificates

        Plan Assets. In DOL Regulation Section 2510.3-101 (the "Plan Asset
Regulations"), the U.S. Department of Labor has defined what constitutes Plan
assets for purposes of ERISA and Section 4975 of the Code. The Plan Asset
Regulations provide that if a Plan makes an investment in an "equity interest"
in an entity, the assets of the entity will be considered the assets of such
Plan unless certain exceptions apply. We can give no assurance that the
securities will qualify for any of the exceptions under the Plan Asset
Regulation. As a result, the mortgage loans may be considered the assets of any
Plan which acquires securities, unless some administrative exemption is
available.

        Prohibited Transaction Class Exemption 83-1. The U.S. Department of Labor
has issued an administrative exemption, Prohibited Transaction Class Exemption
83-1 ("PTCE 83-1"), which, under certain conditions, exempts from the
application of the prohibited transaction rules of ERISA and the excise tax
provisions of Section 4975 of the Code transactions involving a Plan in
connection with the operation of a "mortgage pool" and the purchase, sale and
holding of "mortgage pool pass-through certificates." A "mortgage pool" is
defined as an investment pool, consisting solely of interest bearing obligations
secured by first or second mortgages or deeds of trust on single-family
residential or mixed use property, property acquired in foreclosure and
undistributed cash. A "mortgage pool pass-through certificate" is defined as a
certificate which represents a beneficial undivided interest in a mortgage pool
which entitles the holder to pass through payments of principal and interest
from the mortgage loans.

        For the exemption to apply, PTCE 83-1 requires that:

        o        we and the trustee maintain a system of insurance or other
                 protection for the mortgage loans and the property securing such
                 mortgage loans, and for indemnifying holders of certificates against
                 reductions in pass-through payments due to defaults in loan payments
                 or property damage in an amount at least equal to the greater of 1%
                 of the aggregate principal balance of the mortgage loans, or 1% of
                 the principal balance of the largest covered pooled mortgage loan;

        o        the trustee may not be our affiliate; and

        o        the payments we make to and retain in connection with the trust
                 fund, together with all funds inuring to our benefit for
                 administering the trust fund, represent no more than "adequate
                 consideration" for selling the mortgage loans, plus reasonable
                 compensation for services provided to the trust fund.

        In addition, PTCE 83-1 exempts the initial sale of certificates to a Plan
with respect to which we, the special hazard insurer, the pool insurer, the
Master Servicer, or other servicer, or the trustee are or is a party in interest
if the Plan does not pay more than fair market value for such certificate and
the rights and interests evidenced by such certificate are not subordinated to
the rights and interests evidenced by other certificates of the same pool. PTCE
83-1 also exempts from the prohibited transaction rules any transactions in
connection with the servicing and operation of the mortgage pool, provided that
any payments made to the Master Servicer in connection with the servicing of the
trust fund are made in accordance with a binding agreement, copies of which must

be made available to prospective investors.

<center>115</center>

<PAGE>

In the case of any Plan with respect to which we are or the Master Servicer, the special hazard insurer, the pool insurer, or the trustee is a fiduciary, PTCE 83-1 will only apply if, in addition to the other requirements:

o   the initial sale, exchange or transfer of certificates is expressly approved by an independent fiduciary who has authority to manage and control those plan assets being invested in certificates;

o   the Plan pays no more for the certificates than would be paid in an arm's length transaction;

o   no investment management, advisory or underwriting fee, sale commission, or similar compensation is paid to us with regard to the sale, exchange or transfer of certificates to the Plan;

o   the total value of the certificates purchased by such Plan does not exceed 25% of the amount issued; and

o   at least 50% of the aggregate amount of certificates is acquired by persons independent of us, the trustee, the Master Servicer, and the special hazard insurer or pool insurer.

Before purchasing certificates, a fiduciary of a Plan should confirm that the trust fund is a "mortgage pool," that the certificates constitute "mortgage pool pass-through certificates", and that the conditions set forth in PTCE 83-1 would be satisfied. In addition to making its own determination as to the availability of the exemptive relief provided in PTCE 83-1, the Plan fiduciary should consider the availability of any other prohibited transaction exemptions. The Plan fiduciary also should consider its general fiduciary obligations under ERISA in determining whether to purchase any certificates on behalf of a Plan.

Underwriter Exemption

The DOL has granted to Goldman, Sachs & Co. an individual exemption, Prohibited Transaction Exemption 89-88, which was amended pursuant to Prohibited Transaction Exemption 2000-58 ("PTE 2000-58") and Prohibited Transaction Exemption 2002-41 ("PTE 2002-41") (the "Exemption"), that is applicable to certificates that meet its requirements whenever Goldman, Sachs & Co. or its affiliate is the sole underwriter, manager or co-manager of an underwriting syndicate or is the selling or placement agent. The Exemption generally exempts certain transactions from the application of certain of the prohibited transaction provisions of ERISA and the Code provided that the conditions set forth in the Exemption are satisfied. These transactions include the servicing, managing and operation of investment trusts holding fixed (generally non-revolving) pools of enumerated categories of assets which include: single and multifamily residential mortgage loans, home equity loans or receivables (including cooperative housing loans) and guaranteed government mortgage pool certificates and the purchase, sale and holding of certificates which represent beneficial ownership interests in the assets of such trusts.

General Conditions of Exemption. The Exemption sets forth general conditions which must be satisfied for a transaction involving the purchase, sale and holding of the certificates to be eligible for exemptive relief thereunder:

First, the acquisition of certificates by Plans must be on terms that are at least as favorable to the Plan as they would be in an arm's-length transaction with an unrelated party.

Second, the assets held by the trust fund must be fully secured (other
than one- to four- family residential mortgage loans and home equity loans or
receivables backing certain types of certificates, as described below).
(Mortgage loans, loans, obligations and receivables will be collectively
referred to as "loans").

Third, unless the certificates are issued in "designated transactions" (as
described below) and are backed by fully-secured loans, they may not be
subordinated.

<div align="center">116</div>

&lt;PAGE&gt;

Fourth, the certificates at the time of acquisition by the Plan must
generally be rated in one of the three (or in the case of designated
transactions, four) highest generic rating categories by Standard & Poor's
Ratings Services, a Division of The McGraw-Hill Companies, Inc., Moody's
Investors Services, Inc. or Fitch, Inc. (each, a "rating agency").

Fifth, the trustee generally cannot be an affiliate of any other member,
other than the underwriter, of the "Restricted Group," which consists of:

o    any underwriter as defined in the Exemption;

o    the trustee;

o    us;

o    the Master Servicer;

o    each servicer;

o    each insurer;

o    the counterparty of any "interest-rate swap" (as described below)
     held as an asset of the trust fund; and

o    any obligor with respect to loans constituting more than 5% of the
     aggregate unamortized principal balance of the loans held in the
     trust fund as of the date of initial issuance of the certificates.

Sixth, the sum of all payments made to, and retained by, such underwriters
must represent not more than reasonable compensation for underwriting the
certificates; the sum of all payments made to, and retained by, us pursuant to
the assignment of the loans to the related trust fund must represent not more
than the fair market value of such loans; and the sum of all payments made to,
and retained by, the Master Servicer and any other servicer must represent not
more than reasonable compensation for such person's services under the Agreement
and reimbursement of such person's reasonable expenses in connection therewith.

Seventh, the following seasoning requirements must be met:

o    The investment pool must consist only of assets of the type
     enumerated in the Exemption and which have been included in other
     investment pools;

o    Certificates evidencing interests in such other investment pools
     must have been rated in one of the three (or in the case of
     designated transactions, four) highest generic rating categories by
     one of the rating agencies for at least one year prior to a Plan's
     acquisition of certificates; and

o    Certificates evidencing interests in such other investment pools

must have been purchased by investors other than Plans for at least
one year prior to a Plan's acquisition of certificates.

        Finally, the investing Plan must be an accredited investor as defined in
Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under
the Securities Act of 1933, as amended. We assume that only Plans which are
accredited investors under the federal securities laws will be permitted to
purchase the certificates. Any certificates representing a beneficial ownership
interest in revolving credit line mortgage loans will not satisfy the general
conditions of the Exemption.

        Recent Amendments to Exemption. PTE 2000-58 (the "Amendment") amended the
Exemption to make the acquisition of certificates by Plans in an initial
offering or in a secondary market transaction, the holding or transfer of
certificates and the servicing, management and operation of the trust fund and
its assets eligible for exemptive relief to a broader range of certificates.
Prior to such amendment, the

                                        117
<PAGE>

Exemption generally permitted Plans to purchase only unsubordinated certificates
rated within the highest three generic rating categories backed by secured
collateral. Such certificates had to be issued by a trust fund which was a
grantor trust or a REMIC whose corpus could not include certain types of assets
such as interest-rate swaps.

        Types of Trust Funds. The Amendment has expanded the types of permitted
trust funds to include owner trusts, as well as grantor trusts and REMICs. Owner
trusts are subject to certain restrictions in their governing documents to
ensure that their assets may not be reached by our creditors in the event of
bankruptcy or other insolvency and must provide certain legal opinions.

        Designated Transactions. In the case where the certificates are
backed by trust fund assets which are residential, home equity or multifamily
loans which are described and defined in the Exemption as designated
transactions ("Designated Transactions"), the Amendment permits the certificates
issued by the trust fund in such transactions to be rated in one of the highest
four generic rating categories by a rating agency and/or to be subordinated. The
assets will qualify for Designated Transaction treatment under the Exemption
unless otherwise specified in the prospectus supplement. In addition, one subset
of Designated Transactions, residential (one- to four- family) and home equity
loans, may be less than fully secured, provided that the rights and interests
evidenced by certificates issued in such Designated Transactions are:

        o       not subordinated to the rights and interests evidenced by securities
                of the same trust fund;

        o       such certificates acquired by the Plan have received a rating from a
                rating agency at the time of such acquisition that is in one of the
                two highest generic rating categories; and

        o       any loan included in the corpus or assets of the trust fund is
                secured by collateral whose fair market value on the closing date of
                the Designated Transactions is at least equal to 80% of the sum of:

                        (a) the outstanding principal balance due under the loan which
                is held by the trust fund and

                        (b) the outstanding principal balance(s) of any other loan(s)
                of higher priority (whether or not held by the trust fund) which are
                secured by the same collateral.

        Insurance Company General Accounts. In the event that certificates do not
meet the requirements of the Exemption solely because they are subordinated

certificates or fail to meet a minimum rating requirement under the Exemption,
certain Plans may be eligible to purchase certificates pursuant to Section III
of Prohibited Transaction Class Exemption 95-60 ("PTCE 95-60") which permits
insurance company general accounts as defined in PTCE 95-60 to purchase such
certificates if they otherwise meet all of the other requirements of the
Exemption.

    Permitted Assets. The Amendment permits an interest-rate swap to be an
asset of a trust fund which issues certificates acquired by Plans in an initial
offering or in the secondary market and clarifies the requirements regarding
yield supplement agreements. An interest-rate swap (or if purchased by or on
behalf of the trust fund) an interest-rate cap contract (collectively, a "Swap"
or "Swap Agreement") is a permitted trust fund asset if it:

    o    is an "eligible Swap";

    o    is with an "eligible counterparty;"

    o    is purchased by a "qualified plan investor;"

    o    meets certain additional specific conditions which depend on whether
         the Swap is a "ratings dependent Swap" or a "non-ratings dependent
         Swap;" and

                                118
<PAGE>

    o    permits the trust fund to make termination payments to the Swap
         (other than currently scheduled payments) solely from excess spread
         or amounts otherwise payable to the servicer or us.

    The preamble to the Amendment specifies that it is not intended to limit
transactions that were permissible before its publication. Consequently, certain
other interest-rate cap contracts may be permissible under the Exemption.

    An "eligible Swap" is one that:

    o    is denominated in U.S. dollars;

    o    pursuant to which the trust fund pays or receives, on or immediately
         prior to the respective payment or distribution date for the class
         of certificates to which the Swap relates, a fixed rate of interest
         or a floating rate of interest based on a publicly available index
         (e.g., LIBOR or the U.S. Federal Reserve's Cost of Funds Index
         (COFI)), with the trust fund receiving such payments on at least a
         quarterly basis and obligated to make separate payments no more
         frequently than the counterparty, with all simultaneous payments
         being netted ("Allowable Interest Rate");

    o    has a notional amount that does not exceed either:

              (a) the principal balance of the class of certificates to
         which the Swap relates, or

              (b) the portion of the principal balance of such class
         represented by obligations ("Allowable Notional Amount");

    o    is not leveraged (i.e., payments are based on the applicable
         notional amount, the day count fractions, the fixed or floating
         rates permitted above, and the difference between their products,
         calculated on a one-to-one ratio and not on a multiplier of such
         difference);

    o    does not incorporate any provision which could cause a unilateral

alteration in any of the above four requirements; and

    o     has a final termination date that is either the earlier of the date
            on which the issuer terminates or the related class of certificates
            are fully repaid.

      An "eligible counterparty" means a bank or other financial institution
which has a rating at the date of issuance of the certificates, which is in one
of the three highest long-term credit rating categories or one of the two
highest short-term credit rating categories, utilized by at least one of the
rating agencies rating the certificates; provided that, if a counterparty is
relying on its short-term rating to establish eligibility hereunder, such
counterparty must either have a long-term rating in one of the three highest
long-term rating categories or not have a long-term rating from the applicable
rating agency.

      A "qualified plan investor" is a Plan or Plans where the decision to buy
such class of certificates is made on behalf of the Plan by an independent
fiduciary qualified to understand the Swap transaction and the effect the Swap
would have on the rating of the certificates and such fiduciary is either:

    o     a "qualified professional asset manager" ("QPAM") under Prohibited
           Transaction Class Exemption 84-14 ("PTCE 84-14") (see below);

    o     an "in-house asset manager" under Prohibited Transaction Class
           Exemption 96-23 ("PTCE 96-23") (see below); or

    o     has total assets (both Plan and non-Plan) under management of at
           least $100 million at the time the certificates are acquired by the
           Plan.

      In "ratings dependent Swaps" (where the rating of a class of certificates
is dependent on the terms and conditions of the Swap), the Swap Agreement must
provide that if the credit rating of the counterparty

                                   119

<PAGE>

is withdrawn or reduced by any rating agency below a level specified by the
rating agency, the servicer must, within the period specified under the related
pooling and servicing agreement or other applicable Agreement:

    o     obtain a replacement Swap Agreement with an eligible counterparty
           which is acceptable to the rating agency and the terms of which are
           substantially the same as the current Swap Agreement (at which time
           the earlier Swap Agreement must terminate); or

    o     cause the Swap counterparty to establish any collateralization or
           other arrangement satisfactory to the rating agency such that the
           then-current rating by the rating agency of the particular class of
           certificates will not be withdrawn or reduced (and the terms of the
           Swap Agreement must specifically obligate the counterparty to
           perform these duties for any class of certificates with a term of
           more than one year).

      In the event that the servicer fails to meet these obligations, Plan
certificateholders must be notified in the immediately following periodic report
which is provided to certificateholders but in no event later than the end of
the second month beginning after the date of such failure. Sixty days after the
receipt of such report, the exemptive relief provided under the Exemption will
prospectively cease to be applicable to any class of certificates held by a Plan
which involves such ratings dependent Swap.

      "Non-ratings dependent Swaps" (those where the rating of the certificates
does not depend on the terms and conditions of the Swap) are subject to the

following conditions. If the credit rating of the counterparty is withdrawn or reduced below the lowest level permitted above, the servicer will, within a specified period after such rating withdrawal or reduction:

- o   obtain a replacement Swap Agreement with an eligible counterparty, the terms of which are substantially the same as the current Swap Agreement (at which time the earlier Swap Agreement must terminate);

- o   cause the counterparty to post collateral with the trust fund in an amount equal to all payments owed by the counterparty if the Swap transaction were terminated; or

- o   terminate the Swap Agreement in accordance with its terms.

An "eligible yield supplement agreement" is any yield supplement agreement or similar arrangement or, if purchased by or on behalf of the trust fund, an interest rate cap contract to supplement the interest rates otherwise payable on obligations held by the trust fund ("EYS Agreement"). If the EYS Agreement has a notional principal amount and/or is written on an International Swaps and Derivatives Association, Inc. (ISDA) form, the EYS Agreement may only be held as an asset of the trust fund with respect to certificates purchased by Plans on or after April 7, 1998 if it meets the following conditions:

- o   it is denominated in U.S. dollars;

- o   it pays an Allowable Interest Rate;

- o   it is not leveraged;

- o   it does not allow any of these three preceding requirements to be unilaterally altered without the consent of the trustee;

- o   it is entered into between the trust fund and an eligible counterparty; and

- o   it has an Allowable Notional Amount.

Pre-Funding Accounts. The Exemption was amended by PTE 97-34 to extend exemptive relief to certificates issued in transactions using pre-funding accounts whereby a portion of the loans backing the certificates are transferred to the trust fund within a specified period following the closing date ("DOL

120

<PAGE>

Pre-Funding Period") (see below) instead of requiring that all such loans be either identified or transferred on or before the closing date. The relief is effective provided that the following conditions are met:

First, the ratio of the amount allocated to the pre-funding account to the total principal amount of the certificates being offered ("Pre-Funding Limit") must not exceed twenty-five percent (25%).

Second, all loans transferred after the closing date (referred to here as "additional loans") must meet the same terms and conditions for eligibility as the original loans used to create the trust fund, which terms and conditions have been approved by the rating agency.

Third, the transfer of such additional loans to the trust fund during the DOL Pre-Funding Period must not result in the certificates receiving a lower credit rating from the rating agency upon termination of the DOL Pre-Funding Period than the rating that was obtained at the time of the initial issuance of the certificates by the trust fund.

Fourth, solely as a result of the use of pre-funding, the weighted average

annual percentage interest rate (the "average interest rate") for all of the loans in the trust fund at the end of the DOL Pre-Funding Period must not be more than 100 basis points lower than the average interest rate for the loans which were transferred to the trust fund on the closing date.

Fifth, either:

o     the characteristics of the additional loans must be monitored by an insurer or other credit support provider which is independent of the us; or

o     an independent accountant retained by us must provide us with a letter (with copies provided to the rating agency, the underwriter and the trustee) stating whether or not the characteristics of the additional loans conform to the characteristics described in the prospectus, prospectus supplement, Private Placement Memorandum ("Offering Documents") and/or the Agreement. In preparing such letter, the independent accountant must use the same type of procedures as were applicable to the loans which were transferred as of the closing date.

Sixth, the DOL Pre-Funding Period must end no later than three months or 90 days after the closing date or earlier, in certain circumstances, if the amount on deposit in the pre-funding account is reduced below the minimum level specified in the Agreement or an event of default occurs under the Agreement.

Seventh, amounts transferred to any pre-funding account and/or capitalized interest account used in connection with the pre-funding may be invested only in investments which are permitted by the rating agency and:

o     are direct obligations of, or obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality of the United States (provided that such obligations are backed by the full faith and credit of the United States); or

o     have been rated (or the obligor has been rated) in one of the three highest generic rating categories by the rating agency ("Acceptable Investments").

Eighth, certain disclosure requirements must be met.

Revolving Pool Features. The Exemption only covers certificates backed by "fixed" pools of loans which require that all the loans must be transferred to the trust fund or identified at closing (or transferred within the DOL Pre-Funding Period, if pre-funding meeting the conditions described above is used). Accordingly, certificates issued by trust funds which feature revolving pools of assets will not be eligible for a purchase by Plans. However, securities which are notes backed by revolving pools of assets may be eligible for purchase by Plans pursuant to certain other prohibited transaction exemptions. See discussion below in "--ERISA Considerations Relating to Notes."

121

<PAGE>

Limitations on Scope of the Exemption. If the general conditions of the Exemption are satisfied, the Exemption may provide an exemption from the restrictions imposed by ERISA and the Code in connection with the initial acquisition, transfer or holding, and the acquisition or disposition in the secondary market, of the certificates by Plans. However, no exemption is provided from the restrictions of ERISA for the acquisition or holding of a certificate on behalf of an "Excluded Plan" by any person who is a fiduciary with respect to the assets of such Excluded Plan. For those purposes, an "Excluded Plan" is a Plan sponsored by any member of the Restricted Group.

Exemptive relief may also be provided for the acquisition, holding and
disposition of certificates by Plans if the fiduciary or its affiliate is the
obligor with respect to 5% or less of the fair market value of the loans in the
trust fund provided that:

    o    the Plan is not an Excluded Plan,

    o    each Plan's investment in each class of certificates does not exceed
        25% of the outstanding certificates in the class,

    o    after the Plan's acquisition of the certificates, no more than 25%
        of the assets over which the fiduciary has investment authority are
        invested in certificates of a trust containing assets which are sold
        or serviced by the same entity; and

    o    in the case of initial issuance (but not secondary market
        transactions), at least 50% of each class of certificates and at
        least 50% of the aggregate interests in the trust fund are acquired
        by persons independent of the Restricted Group.

ERISA Considerations Relating to Notes

    Under the Plan Asset Regulations, the assets of the trust fund would be
treated as "plan assets" of a Plan for the purposes of ERISA and the Code only
if the Plan acquires an "equity interest" in the trust fund and none of the
exceptions contained in the Plan Asset Regulations is applicable. An equity
interest is defined under the Plan Asset Regulations as an interest other than
an instrument which is treated as indebtedness under applicable local law and
which has no substantial equity features. Assuming that the notes are treated as
indebtedness without substantial equity features for purposes of the Plan Asset
Regulations, then such notes will be eligible for purchase by Plans. However,
without regard to whether the notes are treated as an "equity interest" for such
purposes, the acquisition or holding of notes by or on behalf of a Plan could be
considered to give rise to a prohibited transaction if the trust fund or any of
its affiliates is or becomes a party in interest or disqualified person with
respect to such Plan, or in the event that a note is purchased in the secondary
market and such purchase constitutes a sale or exchange between a Plan and a
party in interest or disqualified person with respect to such Plan. There can be
no assurance that the trust fund or any of its affiliates will not be or become
a party in interest or a disqualified person with respect to a Plan that
acquires notes.

    The Amendment to the Exemption permits trust funds which are grantor
trusts, owner trusts or REMICs to issue notes, as well as certificates, provided
a legal opinion is received to the effect that the noteholders have a perfected
security interest in the trust fund's assets. The exemptive relief provided
under the Exemption for any prohibited transactions which could be caused as a
result of the operation, management or servicing of the trust fund and its
assets would not be necessary with respect to notes with no substantial equity
features which are issued as obligations of the trust fund. However, the
Exemption would provide prohibited transaction exemptive relief, provided that
the same conditions of the Exemption described above relating to certificates
are met with respect to the notes. The same limitations of such exemptive relief
relating to acquisitions of certificates by fiduciaries with respect to Excluded
Plans would also be applicable to the notes as described under "--Limitations on
Scope of the Exemption" above.

    In the event that the Exemption is not applicable to the notes, one or
more other prohibited transaction exemptions may be available to Plans
purchasing or transferring the notes depending in part upon the type of Plan
fiduciary making the decision to acquire the notes and the circumstances under
which such decision is made. These exemptions include, but are not limited to,
Prohibited Transaction

<PAGE>

Class Exemption 90-1 (regarding investments by insurance company pooled separate
accounts), Prohibited Transaction Class Exemption 91-38 (regarding investments
by bank collective investments funds), PTCE 84-14 (regarding transactions
effected by "qualified professional asset managers"), PTCE 95-60 (regarding
investments by insurance company general accounts) and PTCE 96-23 (regarding
transactions effected by "in-house asset managers") (collectively, the
"Investor-Based Exemptions"). However, even if the conditions specified in these
Investor-Based Exemptions are met, the scope of the relief provided under such
Exemptions might or might not cover all acts which might be construed as
prohibited transactions.

        EACH PROSPECTUS SUPPLEMENT WILL CONTAIN INFORMATION CONCERNING
CONSIDERATIONS RELATING TO ERISA AND THE CODE THAT ARE APPLICABLE TO THE RELATED
SECURITIES. BEFORE PURCHASING SECURITIES IN RELIANCE ON PTCE 83-1, THE
EXEMPTION, THE INVESTOR-BASED EXEMPTIONS OR ANY OTHER EXEMPTION, A FIDUCIARY OF
A PLAN SHOULD ITSELF CONFIRM THAT REQUIREMENTS SET FORTH IN SUCH EXEMPTION WOULD
BE SATISFIED.

        ANY PLAN INVESTOR WHO PROPOSES TO USE "PLAN ASSETS" OF ANY PLAN TO
PURCHASE SECURITIES OF ANY SERIES OR CLASS SHOULD CONSULT WITH ITS COUNSEL
WITH RESPECT TO THE POTENTIAL CONSEQUENCES UNDER ERISA AND SECTION 4975 OF THE
CODE OF THE ACQUISITION AND OWNERSHIP OF SUCH SECURITIES.

        A governmental plan as defined in ERISA is not subject to ERISA, or Code
Section 4975. However, such governmental plan may be subject to federal, state
and local law, which is, to a material extent, similar to the provisions of
ERISA or a Code Section 4975. A fiduciary of a governmental plan should make its
own determination as to the propriety of such investment under applicable
fiduciary or other investment standards, and the need for the availability of
any exemptive relief under any similar law.

                              LEGAL INVESTMENT

        The prospectus supplement for each series of securities will specify
which, if any, of the classes of securities offered by it will constitute
"mortgage related securities" for purposes of the Secondary Mortgage Market
Enhancement Act of 1984, as amended ("SMMEA"). Generally, the only classes of
securities that will qualify as "mortgage related securities" will be those that
(1) are rated in one of two highest rating categories by at least one nationally
recognized statistical rating organization; and (2) represents ownership of, or
is secured by, one or more promissory notes or certificate of interest or
participation in such notes which notes: (a) are directly secured by first liens
on real estate and (b) were originated by certain types of originators specified
in SMMEA. Classes of securities that qualify as "mortgage related securities"
will be legal investments for those investors whose authorized investments are
subject to state regulation, to the same extent as, under applicable law,
obligations issued by or guaranteed as to principal and interest by the United
States constitute legal investments for them. Those investors are persons,
trusts, corporations, partnerships, associations, business trusts and business
entities (including depository institutions, life insurance companies and
pension funds) created pursuant to or existing under the laws of the United
States or of any state (including the District of Columbia and Puerto Rico).
Under SMMEA, if a state enacted legislation before October 4, 1991 specifically
limiting the legal investment authority of those entities with respect to
"mortgage related securities," the securities will constitute legal investments
for entities subject to the legislation only to the extent provided in it.
Approximately twenty-one states adopted limiting legislation before the October
4, 1991 deadline.

        Under SMMEA, a number of states enacted legislation, before October 4,
1991, limiting to various extents the ability of certain entities (in
particular, insurance companies) to invest in "mortgage related securities"
secured by liens on residential, or mixed residential and commercial properties,

in most cases by requiring the affected investors to rely solely upon existing
state law, and not SMMEA. Pursuant to Section 347 of the Riegle Community
Development and Regulatory Improvement Act of 1994, which amended the definition
of "mortgage related security" to include, in relevant part, classes of
securities satisfying the rating and qualified originator requirements for
"mortgage related securities," but evidencing interests in a trust fund
consisting, in whole or in part, of first liens on one or more parcels of real
estate


                                      123
<PAGE>

upon which are located one or more commercial structures, states were
authorized to enact legislation, on or before September 23, 2001, specifically
referring to Section 347 and prohibiting or restricting the purchase, holding or
investment by state-regulated entities in those types of securities.
Accordingly, the investors affected by any state legislation overriding the
preemptive effect of SMMEA will be authorized to invest in Certificates
qualifying as "mortgage related securities" only to the extent provided in that
legislation.

     SMMEA also amended the legal investment authority of federally-chartered
depository institutions as follows: federal savings and loan associations and
federal savings banks may invest in, sell or otherwise deal in "mortgage related
securities" without limitation as to the percentage of their assets represented
by their investment, federal credit unions may invest in those securities, and
national banks may purchase those securities for their own account without
regard to the limitations generally applicable to investment securities set
forth in 12 U.S.C. ss. 24 (Seventh), subject in each case to those regulations
as the applicable federal authority may prescribe. In this connection, the
Office of the Comptroller of the Currency (the "OCC") has amended 12 C.F.R. Part
1 to authorize national banks to purchase and sell for their own account,
without limitation as to a percentage of the bank's capital and surplus (but
subject to compliance with certain general standards in 12 C.F.R. ss. 1.5
concerning "safety and soundness" and retention of credit information), certain
"Type IV securities," defined in 12 C.F.R. ss. 1.2(m) to include certain
"residential mortgage-related securities" and "commercial mortgage-related
securities." As so defined, "residential mortgage-related security" and
"commercial mortgage-related security" mean, in relevant part, "mortgage related
security" within the meaning of SMMEA, provided that, in the case of a
"commercial mortgage-related security," it "represents ownership of a promissory
note or certificate of interest or participation that is directly secured by a
first lien on one or more parcels of real estate upon which one or more
commercial structures are located and that is fully secured by interests in a
pool of loans to numerous obligors." In the absence of any rule or
administrative interpretation by the OCC defining the term "numerous obligors,"
no representation is made as to whether any of the offered securities will
qualify as "commercial mortgage-related securities," and thus as "Type IV
securities," for investment by national banks. The National Credit Union
Administration (the "NCUA") has adopted rules, codified at 12 C.F.R. Part 703,
which permit federal credit unions to invest in "mortgage related securities,"
other than stripped mortgage related securities (unless the credit union
complies with the requirements of 12 C.F.R. ss. 703.16(e) for investing in those
securities), residual interests in mortgage related securities, and commercial
mortgage related securities, subject to compliance with general rules governing
investment policies and practices; however, credit unions approved for the
NCUA's "investment pilot program" under 12 C.F.R. ss. 703.19 may be able to
invest in those prohibited forms of securities, while "RegFlex Credit Unions"
may invest in commercial mortgage related securities under certain conditions
pursuant to 12 C.F.R. Section 742.4(b)(2). The Office of Thrift Supervision (the
"OTS") has issued Thrift Bulletin 13a (December 1, 1998), "Management of
Interest Rate Risk, Investment Securities, and Derivatives Activities," and
Thrift Bulletin 73a (December 18, 2001), "Investing in Complex Securities,"
which thrift institutions subject to the jurisdiction of the OTS should consider

Case 1:19-cv-02307-RCC Document 29-2 Filed 05/29/20 Page 408 of 418

before investing in any of the offered securities.

     All depository institutions considering an investment in the securities
should review the "Supervisory Policy Statement on Investment Securities and
End-User Derivatives Activities" (the "1998 Policy Statement") of the Federal
Financial Institutions Examination Council, which has been adopted by the Board
of Governors of the Federal Reserve System, the OCC, the Federal Deposit
Insurance Corporation and the OTS, effective May 26, 1998, and by the NCUA,
effective October 1, 1998. The 1998 Policy Statement sets forth general
guidelines which depository institutions must follow in managing risks
(including market, credit, liquidity, operational (transaction), and legal
risks) applicable to all securities (including mortgage pass-through securities
and mortgage-derivative products) used for investment purposes.

     Investors whose investment activities are subject to regulation by federal
or state authorities should review rules, policies, and guidelines adopted from
time to time by those authorities before purchasing any classes of securities,
as certain classes may be deemed unsuitable investments, or may otherwise be
restricted, under those rules, policies, or guidelines (in certain instances
irrespective of SMMEA).


                                      124

<PAGE>


     The foregoing does not take into consideration the applicability of
statutes, rules, regulations, orders, guidelines, or agreements generally
governing investments made by a particular investor, including, but not limited
to, "prudent investor" provisions, percentage-of-assets limits and provisions
that may restrict or prohibit investment in securities that are not "interest
bearing" or "income paying," and, with regard to any securities issued in
book-entry form, provisions which may restrict or prohibit investments in
securities which are issued in book-entry form.

     Except as to the status of certain classes of securities as "mortgage
related securities," no representations are made as to the proper
characterization of the securities for legal investment purposes, financial
institution regulatory purposes, or other purposes, or as to the ability of
particular investors to purchase securities under applicable legal investment
restrictions. The uncertainties described above (and any unfavorable future
determinations concerning legal investment or financial institution regulatory
characteristics of the securities) may adversely affect the liquidity of the
securities.

     Accordingly, all investors whose investment activities are subject to
legal investment laws and regulations, regulatory capital requirements, or
review by regulatory authorities should consult with their own legal advisors in
determining whether and to what extent the securities constitute legal
investments or are subject to investment, capital, or other restrictions, and,
if applicable, whether SMMEA has been overridden in any jurisdiction relevant to
that investor.

     There may be other restrictions on the ability of certain investors,
including depository institutions, either to purchase securities or to purchase
securities representing more than a specified percentage of the investor's
assets. Investors are encouraged to consult their own legal advisors in
determining whether and to what extent the securities constitute legal
investments for them.

                            METHOD OF DISTRIBUTION

     We will offer the securities in series. The distribution of the securities
may be effected from time to time in one or more transactions, including
negotiated transactions, at a fixed public offering price or at varying prices

to be determined at the time of sale or at the time of commitment for such securities. If so specified in the related prospectus supplement, Goldman, Sachs & Co., our affiliate, acting as underwriter with other underwriters, if any, named in such prospectus supplement will distribute the securities in a firm commitment underwriting, subject to the terms and conditions of the underwriting agreement. In such event, the related prospectus supplement may also specify that the underwriters will not be obligated to pay for any securities agreed to be purchased by purchasers pursuant to purchase agreements acceptable to us. In connection with the sale of the securities, underwriters may receive compensation from us or from purchasers of the securities in the form of discounts, concessions or commissions. The related prospectus supplement will describe any such compensation that we pay.

Alternatively, the related prospectus supplement may specify that Goldman, Sachs & Co. with other underwriters, if any, named in the prospectus supplement, each acting as agent (if so specified in the related prospectus supplement, on a best effort basis) or in some cases as principal with respect to securities that it has previously purchased or agreed to purchase, will distribute the securities. If the underwriters act as agents in the sale of securities, the underwriters will receive a selling commission with respect to each series of securities, depending on market conditions, expressed as a percentage of the aggregate principal balance of the securities sold as of the closing date. The exact percentage for each series of securities will be disclosed in the related prospectus supplement. To the extent that the underwriters elect to purchase securities as principal, the underwriters may realize losses or profits based upon the difference between its purchase price and the sales price. The related prospectus supplement with respect to any series offered other than through underwriters will contain information regarding the nature of such offering and any agreements to be entered into between us and purchasers of securities of such series.

The securities of any series may also be distributed by inclusion as underlying securities that back the securities of another issuing entity, whether such issuing entity is formed by us or otherwise.

125

<PAGE>

We will indemnify Goldman, Sachs & Co. and any underwriters against certain civil liabilities, including liabilities under the Securities Act of 1933, or will contribute to payments Goldman, Sachs & Co. and any underwriters may be required to make in respect of such liabilities.

In the ordinary course of business, we and Goldman, Sachs & Co. may engage in various securities and financing transactions, including repurchase agreements to provide interim financing of our mortgage loans pending the sale of such mortgage loans or interests in such mortgage loans, including the securities.

Goldman, Sachs & Co. may use this prospectus and the related prospectus supplement in connection with offers and sales related to market-making transactions in the securities. Goldman, Sachs & Co. may act as principal or agent in such transactions. Such sales will be made at prices related to prevailing market prices at the time of sale or otherwise.

We anticipate that the securities will be sold primarily to institutional investors. Purchasers of securities, including dealers, may, depending on the facts and circumstances of such purchases, be deemed to be "underwriters" within the meaning of the Securities Act of 1933 in connection with reoffers and sales by them of securities. Securityholders should consult with their legal advisors in this regard before any such reoffer or sale.

LEGAL MATTERS

Cadwalader, Wickersham & Taft LLP, New York, New York, McKee Nelson LLP, Washington D.C., Sidley Austin LLP, New York, New York, Thacher Proffitt & Wood LLP, New York, New York or such other counsel to the depositor and the underwriters as may be identified in the related prospectus supplement, will pass upon the legality of the securities of each series, including certain federal income tax consequences with respect to such securities.

FINANCIAL INFORMATION

A new trust fund will be formed with respect to each series of securities and no trust fund will engage in any business activities or have any assets or obligations before the issuance of the related series of securities. Accordingly, no financial statements with respect to any trust fund will be included in this prospectus or in the related prospectus supplement.

RATINGS

It is a condition to the issuance of the securities of each series offered by this prospectus and by the related prospectus supplement that the nationally recognized statistical rating agency or agencies specified in the prospectus supplement shall have rated the securities in one of the four highest rating categories.

Ratings on mortgage-backed securities address the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans or other assets. These ratings address the structural, legal and issuer-related aspects associated with such securities, the nature of the underlying mortgage loans or other assets and the credit quality of the guarantor, if any. Ratings on mortgage-backed securities do not represent any assessment of the likelihood of Principal Prepayments by mortgagors or of the degree by which such prepayments might differ from those originally anticipated. As a result, securityholders might suffer a lower than anticipated yield, and, in addition, holders of stripped securities under certain scenarios might fail to recoup their underlying investments.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. You should evaluate each security rating independently of any other security rating.

126

<PAGE>


REPORTS TO SECURITYHOLDERS

The Master Servicer, the trustee or such other party that may be identified in the related prospectus supplement will prepare and forward to the securityholders of each series statements containing information with respect to principal and interest payments and the related issuing entity, as will be described in the related prospectus supplement. Copies of these statements will be filed with the SEC through its EDGAR system located at "http://www.sec.gov" under the name of the related issuing entity as an exhibit to such issuing entity's monthly distribution reports on Form 10-D for each series of securities for so long as the related issuing entity is subject to the reporting requirement of the Securities Exchange Act of 1934, as amended. In addition, each party to the servicing function for a series of securities will be required to furnish to the trustee, Master Servicer or us, as applicable, the compliance statements, Assessments of Compliance and Attestation Reports detailed under "Administration--Evidence as to Compliance." Copies of these statements and reports will be filed with the SEC under the name of the related issuing entity as an exhibit to such issuing entity's annual statement on Form 10-K for the related series of securities.

WHERE YOU CAN FIND MORE INFORMATION

We have filed with the Securities and Exchange Commission a registration statement under the Securities Act of 1933, as amended, with respect to the securities. This prospectus and the prospectus supplement relating to each series contain summaries of the material terms of the documents they refer to, but do not contain all of the information set forth in the registration statement of which this prospectus is a part. For further information, we refer you to such registration statement. You can inspect and copy the registration statement and any other materials that we file with the Securities and Exchange Commission, including distribution reports on Form 10-D, annual reports on Form 10-K, current reports on Form 8-K and any amendments to these reports at the public reference facilities maintained by the Securities and Exchange Commission. The Securities and Exchange Commission's public reference facilities are located at its Public Reference Room, 100 F Street, N.E., Washington, D.C. 20549. Information as to the operation of the public reference facility is available by calling the Securities and Exchange Commission at 1-800-SEC-0330. The Securities and Exchange Commission maintains an Internet website that contains reports, proxy and information statements and other information that we file electronically with the Securities and Exchange Commission. The address of such Internet website is (http://www.sec.gov).

This prospectus and any prospectus supplement do not constitute an offer to sell or a solicitation of an offer to buy any securities other than the certificates and notes referred to in this prospectus and any prospectus supplement. This prospectus and any prospectus supplement do not constitute an offer of securities to any person in any state or other jurisdiction in which such offer would be unlawful.

If so specified in the related prospectus supplement, copies of all filings through the EDGAR system of the related issuing entity on Forms 10-D, 10-K and 8-K will be made available on the applicable trustee's or other identified party's website.

127

<PAGE>

INDEX

Unless the context indicates otherwise, the following terms shall have the meanings set forth on the page indicated below:

1996 Lender Liability Act..................................................83
1998 Policy Statement.....................................................124
30% Test..................................................................103
Acceptable Investments....................................................121
Accounts..................................................................34
accrual securities........................................................36
additional loans..........................................................121
agency securities.........................................................14
Agreement.................................................................15
Allowable Interest Rate...................................................119
Allowable Notional Amount.................................................119
Amendment.................................................................117
Applicable Amount.........................................................86
Assessment of Compliance..................................................65
Assignment Program........................................................48
Attestation Report........................................................66
Available Funds...........................................................36
average interest rate.....................................................121
Beneficial Owner..........................................................41
capitalized interest accounts.............................................27
CERCLA....................................................................83
Clearstream...............................................................40
Code......................................................................85
Collection Period.........................................................110

combination..............................................38
Commercial real estate loans.............................14
Complementary Securities................................108
Contingent Payment Obligations...........................91
Contingent Payment Regulations...........................91
Cooperative loans........................................14
current principal amount.................................36
Current Recognition Election.............................91
Debt Instruments.........................................88
Debt Securities..........................................86
Definitive Securities....................................42
Designated Transactions.................................118
Direct Participants......................................40
Disqualified Organization...............................101
disqualified persons....................................115
DOL Pre-Funding Period..................................121
DTC......................................................40
DTCC.....................................................41
eligible counterparty...................................119
eligible Swap...........................................119
eligible yield supplement agreement.....................120
ERISA.........................................38, 105, 114
Euroclear................................................40
Euroclear Operator.......................................43
excess inclusion income..................................98
exchangeable securities..................................38
Excluded Plan...........................................122
Exemption...............................................116
EYS Agreement...........................................120
Fannie Mae...............................................21
FHA..................................................15, 48
FHA Debenture Rate.......................................49
FHA Loans................................................19
Financial Intermediary...................................41
foreign person...........................................96
foreign person certification.............................96
Freddie Mac..............................................22
FTC......................................................80
Garn-St. Germain Act.....................................80
GNMA.....................................................19
GNMA I Certificate.......................................20
GNMA II Certificate......................................20
Grantor Trust...........................................104
Grantor Trust Securities.................................86
Housing Act..............................................19
HUD......................................................48
Indirect Participant.....................................41
Insurance Proceeds.......................................59
Interest Weighted Certificate............................90
Investor-Based Exemptions...............................123
IO Securities...........................................105
IRS......................................................86
lenders..................................................15
Liquidation Expenses.....................................59
Liquidation Proceeds.....................................59
loans...................................................116
Loan-to-Value Ratio......................................17
Loss Amount..............................................51
manufactured home........................................18
Manufactured housing contracts...........................14
Mark-to-Market Regulations..............................101
Master Servicer..........................................17
MERS.....................................................56
Mortgage.................................................56
mortgage loans...........................................14

mortgage pool.................................................................115, 116
mortgage pool pass-through certificate...........................................115
mortgage pool pass-through certificates..........................................116
multifamily loans.................................................................14
Multiple Rate VRDI................................................................90
National Housing Act..............................................................48
NCUA............................................................................124
Net Series Rate..................................................................108
new partnership..................................................................111


                                   128

<PAGE>

nonqualified intermediary........................................................A-1
Non-ratings dependent Swaps......................................................120
non-U.S. holder..................................................................A-1
OCC............................................................................124
Offering Documents...............................................................121
OID...............................................................................85
OID Regulations...................................................................88
old partnership..................................................................111
Ordinary Ratio Security..........................................................107
OTS............................................................................124
outside reserve fund..............................................................87
Owner Trust......................................................................110
Owner Trust Securities............................................................86
parties in interest..............................................................115
Partnership Securities...........................................................110
Pass-Through Securities..........................................................105
Permitted Investments.............................................................53
Plan...........................................................................114
Plan Asset Regulations...........................................................115
PMBS..............................................................................24
PMBS pooling and servicing agreement..............................................24
PMBS servicer.....................................................................24
PMBS trustee......................................................................24
PO Securities....................................................................105
pre-funding accounts..............................................................26
Pre-Funding Limit................................................................121
Prepayable Obligations............................................................88
Prepayment Assumption.............................................................88
primary insurance policy..........................................................15
primary insurer...................................................................63
Principal Prepayments.............................................................36
privately issued mortgage-backed securities.......................................14
Protected Account.................................................................58
PTCE 83-1........................................................................115
PTCE 84-14.......................................................................119
PTCE 95-60.......................................................................118
PTCE 96-23.......................................................................119
PTE 2000-58......................................................................116
PTE 2002-41......................................................................116
QPAM.............................................................................119
QSI...............................................................................88
qualified intermediary...........................................................A-1
qualified plan investor..........................................................119
Qualifying REIT Interest.........................................................102
rating agency....................................................................117
ratings dependent Swaps..........................................................119
Ratio Securities.................................................................105
RCRA..............................................................................84
Refinance Loan....................................................................17
REITs.............................................................................85
related...........................................................................38
Relief Act........................................................................82

REMIC Residual Certificates..............................................86
REMICs...................................................................35
Responsible Party........................................................32
Restricted Group........................................................117
Retained Interest........................................................34
revolving credit line mortgage loans.....................................14
RHS..................................................................15, 51
RHS Loans................................................................19
RICs.....................................................................85
Rules....................................................................42
Securities Account.......................................................59
Securityholder...........................................................41
single family loans......................................................14
Single Rate VRDI.........................................................90
single-class REMICs......................................................87
SMMEA...................................................................123
Strip Securities........................................................105
Stripping Regulations...................................................106
Swap....................................................................118
Swap Agreement..........................................................118
Tax Administrator........................................................87
Tax Counsel..............................................................86
TIN......................................................................97
TMP......................................................................98
U.S. Government Securities...............................................26
U.S. person.............................................................A-1
U.S. withholding agent..................................................A-1
UBTI.....................................................................98
UCC......................................................................73
United States Housing Act................................................48
USDA.....................................................................51
VA...................................................................15, 50
VA Entitlement Percentage................................................50
VA Loans.................................................................19
VRDI.....................................................................90
WAM......................................................................88
Weighted Average Certificates............................................91

129

<PAGE>

[THIS PAGE INTENTIONALLY LEFT BLANK]

<PAGE>

ANNEX I

CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS

A holder that is not a "United States person" (a "U.S. person") within the
meaning of Section 7701(a)(30) of the Internal Revenue Code (a "non-U.S.
holder") holding a book-entry certificate through Clearstream, Euroclear or DTC
may be subject to U.S. withholding tax unless such holder provides certain
documentation to the issuer of such holder's book-entry certificate, the paying
agent or any other entity required to withhold tax (any of the foregoing, a
"U.S. withholding agent") establishing an exemption from withholding. A non-U.S.
holder may be subject to withholding unless each U.S. withholding agent
receives:

1. from a non-U.S. holder that is classified as a corporation for U.S.
federal income tax purposes or is an individual, and is eligible for the
benefits of the portfolio interest exemption or an exemption (or reduced rate)
based on a treaty, a duly completed and executed IRS form W-8BEN (or any
successor form);

2. from a non-U.S. holder that is eligible for an exemption on the basis that the holder's income from the Offered Security is effectively connected to its U.S. trade or business, a duly completed and executed IRS Form W-8ECI (or any successor form);

3. from a non-U.S. holder that is classified as a partnership for U.S. federal income tax purposes, a duly completed and executed IRS Form W-8IMY (or any successor form) with all supporting documentation (as specified in the U.S. Treasury Regulations) required to substantiate exemptions from withholding on behalf of its partners; certain partnerships may enter into agreements with the IRS providing for different documentation requirements and it is recommended that such partnerships consult their tax advisors with respect to these certification rules;

4. from a non-U.S. holder that is an intermediary (i.e., a person acting as a custodian, a broker, nominee or otherwise as an agent for the beneficial owner of an Offered Security):

(a)    if the intermediary is a "qualified intermediary" within the meaning of section 1.1441-1(e)5(ii) of the U.S. Treasury Regulations (a "qualified intermediary"), a duly completed and executed IRS Form W-8IMY (or any successor or substitute form)--

(i)    stating the name, permanent residence address and qualified intermediary employer identification number of the qualified intermediary and the country under the laws of which the qualified intermediary is created, incorporated or governed,

(ii)   certifying that the qualified intermediary has provided, or will provide, a withholding a statement as required under section 1.1441-1(e)(5)(v) of the U.S. Treasury Regulations,

(iii)  certifying that, with respect to accounts it identifies on its withholding statement, the qualified intermediary is not acting for its own account but is acting as a qualified intermediary, and

(iv)   providing any other information, certifications, or statements that may be required by the IRS Form W-8IMY or accompanying instructions in addition to, or in lieu of, the information and certifications described in section 1.1441(e)(3)(ii), or 1.1441-1(e)(5)(v) of the U.S. Treasury Regulations; or

(b)    if the intermediary is not a qualified intermediary (a "nonqualified intermediary"), a duly completed and executed IRS Form W-8IMY (or any successor or substitute form)--

A-1

<PAGE>

(i)    stating the name and permanent residence address of the nonqualified intermediary and the country under the laws of which the nonqualified intermediary is created, incorporated or governed,

(ii)   certifying that the nonqualified intermediary is not acting for its own account,

(iii)  certifying that the nonqualified intermediary has provided, or will provide, a withholding statement that is associated with the appropriate IRS Forms W-8 and W-9 required to substantiate exemptions from withholding on behalf of such nonqualified intermediary's beneficial owners, and

(iv)   providing any other information, certifications or statements

that may be required by the IRS Form W-8IMY or accompanying instructions in addition to, or in lieu of the information, certifications, and statements described in section 1.1441-1(e)(3)(iii) or (iv) of the U.S. Treasury Regulations: or

5. from a non-U.S. holder that is a trust, depending on whether the trust is classified for U.S. federal income tax purposes as the beneficial owner of the Offered Security either an IRS Form W-8BEN or W-8IMY; any non-U.S. holder that is a trust should consult its tax advisors to determine which of these forms it should provide.

All non-U.S. holders will be required to update the above-listed forms and any supporting documentation in accordance with the requirements under the U.S. Treasury Regulations. These forms generally remain in effect for a period starting on the date the form is signed and ending on the last day of the third succeeding calendar year, unless a change in circumstances makes any information on the form incorrect. Under certain circumstances, an IRS Form W-8BEN, if furnished with a taxpayer identification number, remains in effect until the status to the beneficial owner changes, to a change in circumstances makes any information on the form incorrect.

In addition, all holders, including holders that are U.S. persons, holding book-entry certificates through Clearstream, Euroclear or DTC may be subject to backup withholding unless the holder --

    (i)    provides the appropriate IRS Form W-8 (or any successor or substitute form), duly completed and executed, if the holder is a non-U.S. holder;

    (ii)   provides a duly completed and executed IRS Form W-9, if the holder is a U.S. person; or

    (iii)  can be treated as a "exempt recipient" within the meaning of section 1.6049-4(c)(1)(ii) of the U.S. treasury Regulations (e.g., a corporation or a financial institution such as a bank).

This summary does not deal with all of the aspects of U.S. federal income tax withholding or backup withholding that may be relevant to investors that are non-U.S. holders. Such holders are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of book-entry certificates.

A-2

<PAGE>

===============================================================================

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS. WE HAVE NOT AUTHORIZED ANYONE TO GIVE YOU DIFFERENT INFORMATION. WE DO NOT CLAIM THE ACCURACY OF THE INFORMATION IN THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS AS OF ANY DATE OTHER THAN THE DATE STATED ON THE COVER PAGE. WE ARE NOT OFFERING THE SECURITIES IN ANY STATES WHERE IT IS NOT PERMITTED.

--------------

GSAMP TRUST 2007-HE2
Issuing Entity


GS MORTGAGE SECURITIES CORP.
Depositor


GOLDMAN SACHS MORTGAGE COMPANY
Sponsor


WELLS FARGO BANK, N.A.
Master Servicer and Securities Administrator


AVELO MORTGAGE, L.L.C.
Servicer


LASALLE BANK NATIONAL ASSOCIATION
Trustee


--------------


DEALER PROSPECTUS DELIVERY OBLIGATION. UNTIL JULY 17, 2007 (90 DAYS AFTER THE
DELIVERY OF THIS PROSPECTUS SUPPLEMENT), ALL DEALERS THAT EFFECT TRANSACTIONS IN
THESE SECURITIES, WHETHER OR NOT PARTICIPATING IN THE OFFERING, MAY BE REQUIRED
TO DELIVER A PROSPECTUS. THIS IS IN ADDITION TO THE DEALER'S OBLIGATION TO
DELIVER A PROSPECTUS WHEN ACTING AS AN UNDERWRITER AND WITH RESPECT TO THEIR
UNSOLD ALLOTMENTS OR SUBSCRIPTIONS.


===============================================================================

===============================================================================

$953,736,200
(Approximate)(1)

GSAMP TRUST 2007-HE2

$370,801,000 CLASS A-1
VARIABLE RATE CERTIFICATES
$216,267,000 CLASS A-2A
VARIABLE RATE CERTIFICATES
$50,045,000 CLASS A-2B
VARIABLE RATE CERTIFICATES
$74,161,000 CLASS A-2C
VARIABLE RATE CERTIFICATES
$28,668,000 CLASS A-2D
VARIABLE RATE CERTIFICATES
$42,961,000 CLASS M-1
VARIABLE RATE CERTIFICATES

5/27/2020

```
                     $39,423,000 CLASS M-2
                   VARIABLE RATE CERTIFICATES
                     $24,261,000 CLASS M-3
                   VARIABLE RATE CERTIFICATES
                     $21,228,000 CLASS M-4
                   VARIABLE RATE CERTIFICATES
                     $19,206,000 CLASS M-5
                   VARIABLE RATE CERTIFICATES
                     $17,184,000 CLASS M-6
                   VARIABLE RATE CERTIFICATES
                     $18,196,000 CLASS M-7
                   VARIABLE RATE CERTIFICATES
                     $16,173,000 CLASS M-8
                   VARIABLE RATE CERTIFICATES
                     $15,162,000 CLASS M-9
                   VARIABLE RATE CERTIFICATES
                         $50 CLASS R
                    RESIDUAL CERTIFICATES
                        $100 CLASS RC
                    RESIDUAL CERTIFICATES
                         $50 CLASS RX
                    RESIDUAL CERTIFICATES




                    ---------------

                    PROSPECTUS SUPPLEMENT

                    ---------------



                    GOLDMAN, SACHS & CO.



----------
(1) Subject to a variance of +/-10%.

===============================================================================

</TEXT>
</DOCUMENT>
```