UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for GSAMP TRUST 2007-HE1, <br><br> Plaintiff, <br><br> -against- <br><br> GOLDMAN SACHS MORTGAGE COMPANY, and GS MORTGAGE SECURITIES CORP., <br><br> Defendants. | Index No. 1:19-cv-02305 <br> [rel. 1:19-cv-02307] |
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for GSAMP TRUST 2007-HE2, <br><br> Plaintiff, <br><br> -against- <br><br> GOLDMAN SACHS MORTGAGE COMPANY, and GS MORTGAGE SECURITIES CORP., <br><br> Defendants. | Index No. 1:19-cv-02307 <br> [rel. 1:19-cv-02305] |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT TO ALLOW PROOF BY SAMPLING

MCKOOL SMITH, P.C.
395 9th Avenue, 50th Floor
New York, NY 10001
(212) 402-9400

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

SUMMARY OF UNDISPUTED FACTS ..............................................................3

    A.    Goldman's Securitization Of The Loans And The Repurchase Protocol ...............3

    B.    Goldman's Refusal To Repurchase Defective Loans ...............................................6

    C.    The Trustee's Claims And Its Method Of Proving Them.......................................6

ARGUMENT ..................................................................................................10

I.     THE TRUST AGREEMENTS DO NOT PROHIBIT SAMPLING ................................10

    A.    The "Sole Remedy" Does Not Obligate The Trustee To Individually Reunderwrite Liquidated Loans Because Damages Are Available In Lieu Of Repurchase ...................................................................................................12

    B.    The Text Of The Trust Agreements Cannot Be Understood To Limit The Trustee's Methods Of Proof...................................................................................13

    C.    The Cases Goldman Has Invoked To Date Are Minority Opinions Or Wholly Inapposite ..............................................................................................16

II.   THE TRUSTEE DOES NOT INTEND TO USE SAMPLING TO COMPLY WITH THE NOTICE PREREQUISITE TO SUIT.................................................................19

III.  DISALLOWING SAMPLING WOULD WASTE  EXTRAORDINARY AMOUNTS OF TIME AND MONEY .......................................................................................20

CONCLUSION..................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*ACE Secs. Corp. Home Equity Loan Trust, Series 2006-SL2 v. DB Structured Prods., Inc.*,
40 Misc. 3d 562 (Sup. Ct. N.Y. Cnty. 2013), *rev'd on other grounds*, 112 A.D.3d 522 (1st Dep't 2013), *reversal aff'd*, 25 N.Y.3d 581 (2015) ..............................11, 19

*ACE Secs. Corp. Home Equity Loan Trust, Series 2007-HE1 v. DB Structured Prods., Inc.*,
41 Misc. 3d 1229(A) (Sup. Ct. N.Y. Cnty. Nov. 21, 2013) ....................................................11

*Ambac Assurance Corp. v. Countrywide Home Loans Inc.*,
179 A.D.3d 518 (1st Dep't 2020) ...........................................................................................11

*Assured Guar. Mun. Corp. v. DB Structured Prods., Inc.*,
44 Misc. 3d 1206(A) (Sup. Ct. N.Y. Cnty. July 3, 2014) .......................................................11

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
920 F. Supp. 2d 475 (S.D.N.Y. 2013)...............................................................................11, 16

*BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A.*,
2017 WL 953550 (S.D.N.Y. Mar. 10, 2017) ..........................................................................18

*BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*,
2018 WL 3120971 (S.D.N.Y. May 17, 2018) .........................................................................18

*Deutsche Bank Nat'l Tr. Co. for Morgn Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC,* 289 F. Supp. 3d 484, 504-05 (S.D.N.Y. 2018)................................................................................11, 13, 15, 19, 20

*Commerce Bank v. Bank of N.Y. Mellon*,
141 A.D.3d 413 (1st Dep't 2016) ...........................................................................................18

*FHFA v. JP Morgan Chase & Co.*,
No. 15-1872-cv-2012, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012)......................................11

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
No. 12-cv-05067-JFK-JLC, 2017 WL 5256760 (S.D.N.Y. Nov. 13, 2017).......................16, 17

*SACO I Trust 2006-5 v. EMC Mortg. LLC*, Index No. 651820/2012, Doc. No. 564 (Sup. Ct. N.Y. Cnty. Dec. 2, 2015)...........................................................................................11

*In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*,
984 F.Supp.2d 1021 (C.D. Cal. 2013) ....................................................................................11

*In re Part 60 RMBS Putback Litig.*,
  Index No. 777000/2015, Doc. No. 456 (Sup. Ct. N.Y. Cnty. Jan. 30, 2018) .........................11

*In re Part 60 RMBS Putback Litig.*, Index No. 777000/2015, Doc. No. 96 (Sup.
  Ct. N.Y. Cnty. Mar. 24, 2016) ...............................................................................11

*Law Debenture Tr. Co. of N.Y. v. WMC Mortg., LLC*,
  No. 3:12-cv-1538 (CSH), 2017 WL 3401254 (D. Conn. Aug. 8, 2017) ................................20

*Law Debenture Trust Company of New York v. WMC Mortg., LLC*,
  No. 3:12-cv-1538 (CSH), 2015 WL 9581729 (D. Conn. Dec. 30, 2015)...............................11

*Massachusetts Mut. Life. Ins. Co. v. Residential Funding Co., LLC*,
  989 F.Supp.2d 165 (D. Mass. 2013) ........................................................................11

*MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.*,
  No. 12-cv-7322-PKC, 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015)....................................16, 17

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  30 Misc. 3d 1201(A) (Sup. Ct. N.Y. Cnty. Dec. 22, 2010) ......................................11

*MBIA Ins. Corp. v. Credit Suisse Secs.*,
  Index No. 603751/2009, Doc. No. 655 (Sup. Ct. N.Y. Cnty. June 24, 2014) .........................11

*Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Cap.*
  *Holdings, LLC*,
  Index No. 652763/2012, Doc. No. 241 (Sup. Ct. N.Y. Cnty. June 30, 2017) .........................11

*National Credit Union Admin. Bd. v. RBS Securities, Inc.*,
  No. 2:11-cv-02340, 2014 WL 1745448 (D. Kan. April 30, 2014) .........................................11

*Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap.,*
  *Inc.*,
  133 A.D.3d 96 (1st Dep't 2015) .....................................................................12, 20

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*,
  2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018) ..........................................................18

*Royal Park Investments SA/NV v. U.S. Bank N.A.*,
  No. 14-cv-2590-VM-RWL, 2018 WL 3350323 (S.D.N.Y. July 8, 2018)..............................17

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)...............................................................................................21

*W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*,
  2017 WL 3392855 (Ohio Ct. Com. Pl. Aug 4, 2017), *aff'd*, 129 N.E. 1085
  (Ohio Ct. App. Feb. 8, 2019) ...............................................................................18

*Wells Fargo Bank, N.A. v. Bank of Am., N.A.*,
  No. 10-cv-9584, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013)..............................................13

**OTHER AUTHORITIES**

12 C.F.R. § 373.2 ...................................................................................................................3

Fed. R. Civ. P. 56(a) ............................................................................................................10

Local Civil Rule 56.1 .............................................................................................................1

Steven Wolowitz & Christopher Houpt, *N.Y. Prac., Com. Litig. In N.Y. State
  Courts, Conveyance Of The Securitized Assets*, § 91:4 (4th ed. 2019).....................................3

Plaintiff U.S. Bank National Association, in its capacity as trustee (the "Trustee") of the Goldman Sachs Alternative Mortgage Products Trust 2007-HE1 ("GSAMP 2007-HE1") and Goldman Sachs Alternative Mortgage Products Trust 2007-HE2 ("GSAMP 2007-HE2," and together with GSAMP 2007-HE1, the "Trusts"), respectfully submits this memorandum in support of its motion for partial summary judgment on the propriety of utilizing statistical sampling and extrapolation to prove liability and damages at the trial of the above-captioned actions (the "Actions"). The facts upon which this motion is based are set forth in the Trustee's Statement of Undisputed Material Facts Under Local Civil Rule 56.1 in Support of Partial Summary Judgment to Allow Proof by Sampling (cited herein as "56.1 ¶ __"), the July 28, 2021 declaration of Christopher P. Johnson, Esq. ("Johnson Dec."), the July 28, 2021 declaration of Karl N. Snow, Ph.D. ("Snow Dec."), the July 27, 2021 declaration of Robert W. Hunter. ("Hunter Dec."), and the July 26, 2021 declaration of Susan E. Jacobsen. ("Jacobsen Dec."), each of which is submitted herewith.

## PRELIMINARY STATEMENT

This motion for partial summary judgment seeks to confirm, prior to the conclusion of discovery, that the majority rule allowing for proof via statistical sampling and extrapolation in cases involving residential mortgage-backed securities ("RMBS") trusts applies in these Actions. By adopting the majority rule on sampling at this stage of these litigations, the Court will streamline every step of the discovery process, reduce the burden on the parties and their experts by orders of magnitude, and ensure that the Actions are tried in an efficient and timely manner.

Defendants Goldman Sachs Mortgage Company, L.P. ("GSMC") and GS Mortgage Securities Corp. ("GS Securities" and, with GSMC, "Defendants" or "Goldman") can be expected to argue that sampling is inappropriate here for two reasons, neither of which has any

merit. They will likely argue that: (i) sampling cannot identify the specific defective loans in the population outside the sample upon which its damages obligation to the Trustee will be premised, thereby precluding Goldman from performing the "sole remedy" of repurchase; and (ii) sampling leaves unresolved the question of whether the Trustee provided the requisite notice to Goldman of each breaching loan upon which its claims are premised.

The Trustee can reliably anticipate that Goldman will advance these arguments because Goldman's counsel has advanced them on behalf of other RMBS defendants many times before. And in each and every such instance, those arguments have been rejected. (*See* Part I, *infra*.) *First*, courts have routinely determined that the agreements governing an RMBS trust do not preclude the use of sampling to establish Goldman's liability and damages because those agreements provide for an equitable remedy – *i.e.*, specific performance of Goldman's repurchase obligation – that, for noncompliant liquidated loans, can be satisfied via the payment of damages in lieu of repurchase. Relying upon that authority, the Trustee here is sampling exclusively from the Trusts' population of liquidated loans, not from the loans that are still active in the Trusts. *Second*, the agreements governing the Trusts provide for a procedural notice requirement that countless RMBS courts have determined has *already* been satisfied here with respect to every defective loan that Goldman deposited into the Trusts. In other words, the Trustee is *not* proffering its sampling and extrapolation exercise to establish its compliance with the procedural prerequisite to suit. Goldman's anticipated efforts to muddy the analytical waters should be viewed as nothing more than that.

With respect, this Court should not deviate from the well-trodden path that other jurists considering this question at both the trial and appellate level have laid out before us. Sampling is a long-accepted mechanism for reliably establishing contested facts at trial, and here it will

provide the same result that would be achieved by analyzing and presenting proof at trial of every single at-issue loan. The Trusts' governing agreements do not preclude its use, nor does the caselaw. Partial summary judgment should be granted in the Trustee's favor so the Actions can proceed expeditiously through fact and expert discovery to trial without any uncertainty as to this foundational premise of how the Trustee intends to prove its claims and quantify its damages.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

These Actions assert claims arising out of the false representations and warranties that GSMC provided in the contracts by which it securitized thousands of loans into the Trusts, and GS Securities' failure to enforce GSMC's repurchase obligation. GSMC was the Trusts' "Sponsor" (56.1 ¶¶ 1 & 5) – *i.e.*, it "organize[d] and initiate[d] a[n asset-backed] securitization transaction by selling or transferring assets, either directly or indirectly, including through an affiliate, to the issuing entity." 12 C.F.R. § 373.2. GS Securities was the Trusts' "Depositor" (56.1 ¶¶ 2-3) – *i.e.*, a special purpose entity GSMC created solely for one or more securitizations, but that conducts no other business. *See* 4C Steven Wolowitz & Christopher Houpt, *N.Y. Prac., Com. Litig. In N.Y. State Courts, Conveyance Of The Securitized Assets*, § 91:4 (4th ed. 2019).

### A.    Goldman's Securitization Of The Loans And The Repurchase Protocol

The securitization process began when GSMC acquired approximately 8,500 mortgage loans with an aggregate principal balance of approximately $1.7 billion (the "Loans") from loan originators via "Purchase Agreements." (56.1 ¶¶ 5, 19, & 28.) In the Purchase Agreements, the originators made representations and warranties ("Warranties") to Goldman about the quality and characteristics of the Loans. (56.1 ¶ 7, 10, 13, & 16.) Goldman subsequently entered into a series of agreements by which it created the Trusts, deposited the Loans into the Trusts, restated

certain of the originators' Warranties, and provided further Warranties regarding the Loans to the Trusts' investors (together, the "Trust Agreements").[1] (56.1 ¶¶ 6, 8, 9, 11, 12, 14, 15, 17, 18, 20, 21, 22, 25, 29-31, & 34.)

But RMBS sponsors like Goldman were able to attract investors, who had neither access to nor the ability to diligence the Loans prior to purchasing trust certificates, only by giving the Warranties teeth. To that end, Goldman retained the risk that its securitizations included Loans that might not comply with the Warranties. Goldman did so by agreeing that, within a certain number of days of either discovery by or notice to GSMC of any material breach of either GSMC's Warranties or certain of the originators' Warranties, GSMC would cure, repurchase, or cause the repurchase of any noncompliant Loans (the "Repurchase Obligation").[2] Thus, for example, one of the several operative Trust Agreements provides as follows:

> Within sixty (60) days of the earlier of either discovery by or notice to [GSMC] of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein (or which materially and adversely affects the value of the applicable Mortgage Loan or the interest of the Depositor therein), [GSMC] shall cure such breach in all material respects and, if such breach cannot be cured, [GSMC] shall, at the Depositor's option, within sixty (60) calendar days of [GSMC's] receipt of request from the Depositor, repurchase such Mortgage Loan at the Repurchase Price. In the event that such a breach shall involve any representation or warranty set forth in Section 2 of this [RWA], and such breach cannot be cured within sixty (60) days of the earlier of either discovery by or notice to [GSMC] of such breach, all of the Mortgage Loans materially and adversely affected thereby shall, at the Depositor's option, be repurchased by [GSMC] at the Repurchase Price.

---

[1] For the GSAMP Trust 2007-HE1 the Trust Agreements include the Pooling and Servicing Agreement (the "HE1 PSA"), the Representations and Warranties Agreement (the "HE1 RWA"), and four agreements by which GSMC assigned its rights to certain mortgage loans to GS Securities (the "HE1 AARAs"). For GSAMP Trust 2007-HE2, the Trust Agreements include the Pooling and Servicing Agreement (the "HE2 PSA," and together with the HE1 PSA, the "PSAs"), and the Representations and Warranties Agreement (the "HE2 RWA").

[2] GSMC's Repurchase Obligation is located in Sections 9 or 10 of the HE1 AARAs (depending on the AARA), Section 3 of the HE1 RWA, and Section 3 of the HE2 RWA. (56.1 ¶¶ 9, 12, 15, 18, 22 & 31.)

Notwithstanding the above sentence, within thirty (30) days of the earlier of either discovery by, or notice to, [GSMC] of any breach of the representations or warranties set forth in clauses (t), (x), (bb), (cc), (dd) and (ff) of Exhibit VII, [GSMC] shall repurchase the affected Mortgage Loan or Mortgage Loans at the Repurchase Price, together with all expenses incurred by the Depositor as a result of such repurchase.

(56.1 ¶ 22).[3]  The PSAs expressly empower the Trustee to enforce GSMC's Repurchase Obligations.  (56.1 ¶¶ 25-27, 32-34, & 36.)

The Trust Agreements do not include any language providing the degree of specificity required in any notice of breach, the standard for evaluating a claim of breach, or the method of proof by which breaches may be established.  In stark contrast, the Trust Agreements spell out with precision the "Repurchase Price" that GSMC must pay to the Trusts upon the identification of any breaching loan:

With respect to any Mortgage Loan, (a) repurchased by the Sponsor, an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to the Securities Administrator to the date of repurchase, (iii) all unreimbursed Servicing Advances, (iv) all expenses incurred by the Servicer, the Master Servicer, the Trust or the Trustee, as the case may be, in respect of a breach or defect, including, without limitation, expenses arising out of the Servicer's, the Master Servicer's or the Trustee's, as the case may be, enforcement of the Sponsor's repurchase obligations, to the extent not included in clause (iii), and (v) any costs and damages incurred by the Trust in connection with any violation by such Mortgage Loan of any predatory lending law or abusive lending law, and (b) repurchased by Aames, the "Repurchase Price" as defined in the Aames Purchase Agreement, repurchased by NovaStar, the "Repurchase Price" as defined in the NovaStar Purchase Agreement, repurchased by First Horizon, the "Repurchase Price" as defined in the First Horizon Purchase Agreement or repurchased by Decision One, the "Repurchase Price" as defined in the Decision One Purchase Agreement, as applicable.

---

[3]  Other repurchase provisions from the HE1 AARAs and the HE2 RWA are quoted in full in Part I.B. below.  The repurchase provisions differ in some respects relating to the repurchase obligations for breaches of certain Warranties and the role of the Depositor in the repurchase process, but none of the provisions address how to either establish notice or prove breaches.

(56.1 ¶ 24.)[4]

### B.   Goldman's Refusal To Repurchase Defective Loans

In December 2018, a holder of GSAMP 2007-HE1 certificates notified the Trustee that it had conducted an investigation revealing that at least 617 of the Trust's Loans materially failed to comply with one or more of the Warranties.  (56.1 ¶ 37.)  Shortly thereafter, the Trustee received notice from a holder of certificates in GSAMP 2007-HE2 that at least 1,041 of that Trust's Loans were materially defective.  (56.1 ¶ 38.)  Promptly upon receiving such notifications, the Trustee alerted Goldman and all other transaction parties regarding the holders' investigations, the enumerated Loans in each Trust that had been identified as defective, and each holder's statement that its respective investigation was ongoing and that further investigation will reveal additional breaching loans.  (56.1 ¶¶ 37-42.)  The Trustee demanded that Goldman cure or repurchase the defective Loans that were specifically identified by the certificateholders _and_ all other defective loans in each of the Trusts.  (_Id._)

Goldman flatly refused the Trustee's demands as to each and every single Loan, without conducting so much as a cursory investigation into the claimed deficiencies.  (56.1 ¶ 43.)  In the wake of Goldman's wholesale abdication of its contractual promises, the Trustee timely commenced the instant Actions.  (56.1 ¶¶ 44-45.)

### C.   The Trustee's Claims And Its Method Of Proving Them

The Trustee's complaints detail the securitization process, identify exemplar Warranties with which the Loans failed to comply, discuss the myriad ways in which they so failed, and

---

[4]  This is an example of one of the at-issue Repurchase Price definitions.  The other definitions are similarly precise. (_See_ 56.1 ¶ 33.)

demand that Goldman honor its Repurchase Obligation or pay equivalent damages as to every single breaching Loan in each of the Trusts.  (56.1 ¶¶ 47-56.)

Some of the Loans at issue in these Actions are currently performing, or in other words are "active."  However, the vast majority of the unpaid loans for which the Trustee seeks damages have been liquidated.  "Liquidated Loans" are

> With respect to any Distribution Date, a defaulted Mortgage Loan (including any REO Property) which was liquidated or charged-off in the calendar month preceding the month of such Distribution Date and as to which the Servicer has certified (in accordance with this Agreement) that it has made a Final Recovery Determination.

(56.1 ¶ 59.)  Because Liquidated Loans have exited the Trust, there is nothing for Goldman to cure or repurchase with respect to them.  Accordingly, as to the Trusts' populations of Liquidated Loans, the Trustee seeks damages in lieu of specific performance in the amount of the Repurchase Price.  The complaints specify that the Trustee is seeking specific performance of the repurchase remedy or damages in lieu thereof as to _all_ Loans that breach the Warranties.  (56.1 ¶¶ 51 & 56.)

The Trustee's plan for proving the extent of Goldman's liability and the damages it owes the Trusts therefor tracks this distinction between active and Liquidated Loans.  _First_, the Trustee intends to put on loan-by-loan proof as to certain of the Trusts' active Loans.[5]  The Trustee is selecting at-issue active Loans by looking for loans that met certain loss and/or delinquency thresholds.

_Second_, the Trustee intends to employ its statistics and damages expert, Karl Snow, Ph.D., to select random samples from the populations of Liquidated Loans from each of the

---

[5]  The Trustee also intends to put on loan-by-loan proof for loans that have liquidated or will liquidate after the date the Trustee pulled its Liquidated Loan samples.

Trusts' two loan groups that exited the Trusts with losses greater than $100 as of December 28, 2020 (the date upon which Dr. Snow drew the random samples). (56.1 ¶¶ 57, 58.) Dr. Snow determined that 400-Loan samples from each loan group (*i.e.*, 800 Loans per Trust) would result in maximal margins of error of plus or minus five percent for each such population of Liquidated Loans.[6] (56.1 ¶ 62.)

After the (i) adversely-selected active Loans and (ii) randomly-selected Liquidated Loans were identified, the Trustee began the process of collecting the materials that will enable its reunderwriting expert, Robert Hunter, to determine whether those Loans comply with or breach the Warranties.[7] (56.1 ¶¶ 64-66.) Mr. Hunter had no role in determining which Loans were

---

[6] Dr. Snow also drew backup samples from which Loans could be drawn to replace any Loans in the primary samples that are later determined to be incapable of being reunderwritten while preserving the randomness of sampling exercise. (56.1 ¶ 63.)

[7] The nature of proof in RMBS repurchase actions requires a plaintiff to "reunderwrite" mortgage loans – *i.e.*, hire experts to assess the true characteristics of loans as to which the defendant made Warranties by, *inter alia*, comparing information regarding the borrower, the loan, and the mortgaged property against the Warranties and the underwriting guidelines applicable to each respective loan. (*See* 56.1 ¶ 65.) In every instance with which the undersigned counsel is aware, defendants' experts do not undertake their own reunderwriting review; instead, they merely attempt to criticize the findings and conclusions of the plaintiff's expert(s). Reunderwriting is a long and labor-intensive process with no economies of scale – there is increased cost and time associated with each additional reunderwritten loan.

The plaintiff's first step in reunderwriting is to collect the necessary "Loan Documents" for each Loan. Loan Documents generally include the loan origination file for each loan (the "Loan File"), one or more sets of servicing records for the loan (the "Servicing Files"), the originator's guidelines used to underwrite each loan (the "Underwriting Guidelines"), and files containing individual loan characteristics that loan originators or RMBS sponsors represented in connection with selling the loans or securitizing the trusts at-issue ("Loan Tapes"). (*See* 56.1 ¶ 66.)

Next, to avoid unnecessary disputes and expense down the road, the parties here agreed to "Matching Protocols," which call for them to attempt to reach agreement as to which specific Loan Files and Underwriting Guidelines apply to each Loan prior to the experts conducting their analyses of the Loans. (56.1 ¶ 67.) Although the Matching Protocols are designed to save time and expense by avoiding disputes later in the Actions, the matching process is itself time-consuming, and Defendants have represented that they are capable of matching only 300 loans total each month. (56.1 ¶ 68.)

selected for his review, and his reunderwriting process is agnostic as to such matters.  In other words, Mr. Hunter will implement a process to analyze each selected Loan on its own, without regard to whether it was individually selected or randomly selected to be a part of one of the samples.  The ratio of defective Liquidated Loans, as determined by Mr. Hunter and the Trustee's other experts (and, ultimately, the Court), to the number of Liquidated Loans in the sample will determine the breach rate for each population of Liquidated Loans.[8]  Dr. Snow will then extrapolate the breach rates to the Liquidated Loan populations and calculate the resultant damages with a reliable statistical degree of accuracy.[9]

As of December 28, 2020, 4,305 out of the approximately 8,500 Loans across the two Trusts had been deemed Liquidated Loans.  (56.1 ¶¶ 60, 61.)  The Trustee's sampling plan will reduce by 2,700 the number of Liquidated Loans that must proceed through the Matching Protocols, be subject to first- and third-party discovery, be reunderwritten, and ultimately become the subject of proof at trial.  Disallowing sampling could add at least 20 months to the discovery schedule, cost the Trusts millions of dollars in expert and vendor expenses, and make the trial of these Actions needlessly cumbersome and laborious.

_____

Once the Matching process and fact discovery is complete, the Trustee's experts can begin their work of checking each selected Loan for compliance with the Warranties.  The results of that work will be presented in detail in their expert reports at the appropriate time.

[8]  The selected active Loans and Loans liquidated after the sample date will have no role in Dr. Snow's sampling and extrapolation exercise.

[9]  Dr. Snow's methods are described in the Snow Declaration filed herewith.  Dr. Snow's methods will be presented in further detail in his reports, which will be furnished to Goldman at the appropriate time.  For the sake of clarity, the Trustee is not now seeking the Court's approval of Dr. Snow's methodology.  Instead, this motion only seeks to establish that using statistical sampling and extrapolation to prove Goldman's liability and damages is not inconsistent with the Trust Agreements.  That said, Dr. Snow has conducted his sampling exercise for approximately 30 trusts in other RMBS repurchase actions, and in none have defendants been successful in attacking his methods.  The Trustee stands ready to provide the Court with any additional detail regarding Dr. Snow's methods that it may require to resolve this motion.

## ARGUMENT

Fed. R. Civ. P. 56(a) provides that:

[a] party may move for summary judgment, identifying each … defense – or the part of each … defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to material fact and the movant is entitled to judgment as a matter of law.

Here, the Trustee has expressed its intention to use statistical sampling and extrapolation methods to prove material breaches within the populations of Liquidated Loans and the damages for which Goldman is liable.  Defendants have asserted as a defense that sampling is precluded by the PSAs.  Defendants' defense can be resolved as a matter of contract interpretation and there is no dispute as to any fact material to that defense.  Because, as a matter of law, the PSAs do not prohibit the Trustee from using sampling and extrapolation to prove the rate of material breaches in each population of Liquidated Loans and establish the damages that Goldman owes the Trusts, this Court should grant the Trustee partial summary judgment dismissing that defense.

## I.   THE TRUST AGREEMENTS DO NOT PROHIBIT SAMPLING

Statistical sampling is a scientifically tried and true method of estimating characteristics of whole populations by analyzing a smaller, randomly-selected subset of those populations.  Notably, Goldman has not been heard to contest (and is not expected to contest) the scientific validity of statistical sampling.  Goldman's anticipated objections to the Trustee's sampling plan for Liquidated Loans derive entirely from its baseless interpretations of the governing Trust Agreements.  But there is nothing in the text or the structure of the PSAs that prohibits the use of sampling to prove liability and damages – especially as to Liquidated Loans.

This would be true even if Goldman were advancing novel or trust-specific arguments in support of its defense.  But, as became apparent during the proceedings that gave rise to this

motion, Goldman intends to advance arguments that are neither novel nor trust-specific, and

which have been rejected time after time in RMBS repurchase actions. Indeed, but for two

inapposite outliers (discussed *infra*, at Part I.C), every Federal court and New York State court

(including New York's Appellate Division, First Department) that has considered sampling in

RMBS putback cases against sponsors or depositors like Goldman has approved the use of

sampling.[10]

---

[10]  *See Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 504-05 (S.D.N.Y. 2018) ("*MSST 2007-I*"); *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013); *Law Debenture Trust Company of New York v. WMC Mortg., LLC*, No. 3:12-cv-1538 (CSH), 2015 WL 9581729, at *7 (D. Conn. Dec. 30, 2015); *Ambac Assurance Corp. v. Countrywide Home Loans Inc.*, 179 A.D.3d 518, 521 (1st Dep't 2020); *In re Part 60 RMBS Putback Litig.*, Index No. 777000/2015, Doc. No. 456, slip op. at 2-3 (Sup. Ct. N.Y. Cnty. Jan. 30, 2018); Hr. Tr. at 49:15-51:8, *Morgan Stanley Mortg. Loan Trust 2006-14SL v. Morgan Stanley Mortg. Cap. Holdings, LLC*, Index No. 652763/2012, Doc. No. 241 (Sup. Ct. N.Y. Cnty. June 30, 2017); *In re Part 60 RMBS Putback Litig.*, Index No. 777000/2015, Doc. No. 96 (Sup. Ct. N.Y. Cnty. Mar. 24, 2016); Hr. Tr. at 16:21-17:2, *SACO I Trust 2006-5 v. EMC Mortg. LLC*, Index No. 651820/2012, Doc. No. 564 (Sup. Ct. N.Y. Cnty. Dec. 2, 2015); *MBIA Ins. Corp. v. Credit Suisse Secs.*, Index No. 603751/2009, Doc. No. 655 (Sup. Ct. N.Y. Cnty. June 24, 2014); *Assured Guar. Mun. Corp. v. DB Structured Prods., Inc.*, 44 Misc. 3d 1206(A), at *6 (Sup. Ct. N.Y. Cnty. July 3, 2014); *ACE Secs. Corp. Home Equity Loan Trust, Series 2007-HE1 v. DB Structured Prods., Inc.*, 41 Misc. 3d 1229(A), at *2 n.3 (Sup. Ct. N.Y. Cnty. Nov. 21, 2013); *ACE Secs. Corp. Home Equity Loan Trust, Series 2006-SL2 v. DB Structured Prods., Inc.*, 40 Misc. 3d 562, 570 (Sup. Ct. N.Y. Cnty. 2013), *rev'd on other grounds*, 112 A.D.3d 522 (1st Dep't 2013), *reversal aff'd*, 25 N.Y.3d 581 (2015) ("*ACE 2006-SL2*"); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 30 Misc. 3d 1201(A), at *4 (Sup. Ct. N.Y. Cnty. Dec. 22, 2010); *cf. FHFA v. JP Morgan Chase & Co.*, No. 15-1872-cv-2012, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) (permitting sampling to prove liability in securities case arising out of breached warranties in RMBS securitizations); *National Credit Union Admin. Bd. v. RBS Securities, Inc.*, No. 2:11-cv-02340, 2014 WL 1745448 (D. Kan. April 30, 2014) (same); *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, 984 F.Supp.2d 1021 (C.D. Cal. 2013) (same); *Massachusetts Mut. Life. Ins. Co. v. Residential Funding Co., LLC*, 989 F.Supp.2d 165 (D. Mass. 2013) (same).

**A.** **The "Sole Remedy" Does Not Obligate The Trustee To Individually Reunderwrite Liquidated Loans Because Damages Are Available In Lieu Of Repurchase**

As its counsel has many times before, Goldman will likely base its opposition to the Trustee's sampling plan primarily on its idea that the Trustee must specifically identify every single Loan as to which it is entitled to a remedy. Goldman will premise this argument on the idea that the Repurchase Provisions contemplate an exchange among the parties when a breaching Loan is identified: Goldman pays to the Trust the Repurchase Price, and the Trust returns ownership of the defective Loan to Goldman. Goldman then has the option to realize value from the defective Loan as it sees fit (either by continuing to collect the borrower's principal and interest payments, if the Loan is performing, or by seeking recompense via the foreclosure or debt collection process if the Loan has defaulted). Statistical sampling cannot specifically identify the non-sampled Loans in the loan populations upon which the Trustee's damages are premised, and, according to Goldman, that fact precludes Goldman from receiving the benefit of its contractual bargain.

Goldman's position is unfounded as to active Loans,[11] but it completely collapses as to Liquidated Loans, as to which the Trustee is _not seeking specific performance_ of the repurchase remedy for Liquidated Loans. Instead, the Trustee is seeking the equitable remedy of damages in lieu of specific performance in the amount of the Repurchase Price, a remedy that is conclusively available here notwithstanding RMBS defendants' efforts to the contrary. _See Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc._, 133 A.D.3d 96, 107 (1st Dep't 2015) ("_NHELI 2006-FM2_") ("The motion court therefore correctly held that

---

[11] Statistical models can reliably estimate the value of active loans' future performance and credit RMBS sponsors for that value when sampling from active loan populations. Nevertheless, the Trustee does not intend to sample from the populations of active Loans here.

plaintiffs may pursue monetary damages with respect to any defective mortgage loan in those instances where cure or repurchase is impossible."); *see also Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10-cv-9584, 2013 WL 1285289, at *11 (S.D.N.Y. Mar. 28, 2013) ("Here, repurchase is impossible, given the foreclosure and subsequent sale of the Property; however, the PSA specifically provides that, in the event of a material breach of the MLPSA, the purchase price ... represents the appropriate damages calculation").

As Judge Forrest held in *MSST 2007-1*, sampling can be used to satisfy any applicable proof requirements with respect to liquidated loans because damages in the amount of the applicable repurchase price of materially nonconforming loans are "completely fungible." 289 F. Supp. 3d at 502; *see id.* at n.8 ("As [the defendant] has conceded, 'Purchase Price' is defined in such a way as to allow recovery even for foreclosed or liquidated loans. Therefore, there is a fungible and contractually defined price that [the trustee] is able to recover for every loan in the Trust that contains a material breach." (internal citation omitted)). Judge Forrest continued on to say that "there should be no serious dispute in 2018 that statistical sampling is a generally accepted method of proof in RMBS cases," and that "the Court is persuaded that statistical sampling is consistent with [the trustee's] obligations under the Repurchase Protocol, even if one credits [the defendant's] interpretation." *Id.* at 504. There is no reason for this Court to deviate from the conclusion that Judge Forrest reached more than three years ago.

### B. The Text Of The Trust Agreements Cannot Be Understood To Limit The Trustee's Methods Of Proof

In the face of the overwhelming RMBS authority allowing for the use of statistical sampling and extrapolation to prove liability and damages, especially when only Liquidated Loans are involved, Goldman may attempt to focus the Court on a close textual exegesis of the

Trust Agreements, which Goldman will contend reveals their implicit prohibition against the use of statistical sampling to establish the extent of Goldman's breaches.

It can be expected that Goldman will point to the Repurchase Provisions in the various Trust Agreements, which provide as follows:

> Within sixty (60) days of the earlier of either discovery by or notice to [GSMC] of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein (or which materially and adversely affects the value of the applicable Mortgage Loan or the interest of the Depositor therein), [GSMC] shall cure _such breach_ in all material respects and, if _such breach_ cannot be cured, [GSMC] shall, at the Depositor's option, within sixty (60) calendar days of [GSMC's] receipt of request from the Depositor, repurchase _such Mortgage Loan_ at the Repurchase Price. In the event that _such a breach_ shall involve any representation or warranty set forth in Section 2 of this [RWA], and _such breach_ cannot be cured within sixty (60) days of the earlier of either discovery by or notice to [GSMC] of such breach, all of the Mortgage Loans materially and adversely affected thereby shall, at the Depositor's option, be repurchased by [GSMC] at the Repurchase Price. Notwithstanding the above sentence, within thirty (30) days of the earlier of either discovery by, or notice to, [GSMC] of any breach of the representations or warranties set forth in clauses (t), (x), (bb), (cc), (dd) and (ff) of Exhibit VII, [GSMC] shall repurchase the affected Mortgage Loan or Mortgage Loans at the Repurchase Price, together with all expenses incurred by the Depositor as a result of such repurchase.

(HE1 RWA § 3 (emphasis added).)

> Within ninety (90) days of the earlier of either discovery by or notice to [GSMC] of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein (or which materially and adversely affects the value of the applicable Mortgage Loan or the interest of the Depositor therein), [GSMC] shall cure _such breach_ in all material respects and, if _such breach_ cannot be cured, [GSMC] shall, at the Depositor's option, within ninety (90) calendar days of [GSMC's] receipt of request from the Depositor, repurchase _such Mortgage Loan_ at the Repurchase Price. In the event that _such a breach_ shall involve any representation or warranty set forth in Section 2 of this [RWA], and _such breach_ cannot be cured within ninety (90) days of the earlier of either discovery by or notice to [GSMC] of _such breach_, all of the Mortgage Loans materially and adversely affected thereby shall, at the Depositor's option, be repurchased by [GSMC] at the Repurchase Price. Notwithstanding the above sentence, within sixty (60) days of the earlier of either discovery by, or notice to, [GSMC] of any breach of the representations or warranties set forth in clauses (O), (P), (R), (S) and (T) of Exhibit I, [GSMC] shall repurchase the affected Mortgage Loan or Mortgage

> Loans at the Repurchase Price, together with all expenses incurred by the
> Depositor as a result of such repurchase.

(HE2 RWA § 3 (emphasis added).)

> The Assignor hereby acknowledges and agrees that in the event of any breach of
> the representations and warranties made by the Assignor set forth in Section 8
> hereof that materially and adversely affects the value of any Mortgage Loan or the
> interest of the Assignee or the Trust therein within 60 days of the earlier of either
> discovery by or notice to the Assignor of *such breach* of a representation or
> warranty, it shall cure, purchase or cause the purchase of *the applicable Mortgage*
> *Loan* at the Repurchase Price set forth in the Pooling Agreement.

(HE1 Aames AARA § 10 (emphasis added).)[12]

According to Defendants, the Repurchase Provisions' use of terms like "such," "the," or "a" in conjunction with the term "Mortgage Loan" means that any right to repurchase must be proven on a loan-by-loan basis. Once again, Judge Forrest has already rejected an identical argument in *MSST 2007-1*. There, the defendant attempted to limit the number of loans at-issue in that case by arguing that it "lacked the requisite notice for loans not specifically identified in the Breach Letter or Complaint." 289 F. Supp. 3d at 505. The defendant's "primary argument" in support of that gambit was "that the context and structure of the Repurchase Protocol, which discusses 'such breach' and 'the affected Mortgage Loan' is 'inherently loan specific." *Id.* (quoting from the defendant's brief). Judge Forrest rejected that argument out of hand, concluding that the defendant's "argument reads far too much into the fact that the Repurchase Protocol contains certain singular phrases (e.g., 'the affected Mortgage Loan') in the portion detailing [the defendant's] cure/repurchase obligation." *Id.* at 507.

Goldman will likewise "read far too much" into portions of the Repurchase Provisions noted above, should it attempt to convince this Court to disallow sampling on this basis. Having

---

[12] This excerpt is from one of the HE1 AARAs and is substantively identical to the corresponding sections in the other HE1 AARAs.

failed to negotiate for language precluding the use of standard evidentiary and case-management tools like sampling to inoculate itself from large-scale liability and damages, Goldman cannot now ask this Court to re-write the Repurchase Protocols to achieve its desired result.

### C. The Cases Goldman Has Invoked To Date Are Minority Opinions Or Wholly Inapposite

Against the weight of authority allowing RMBS trustees to utilize statistical sampling, there are two rulings that do preclude it. The first was issued by Judge Castel in 2015, wherein he ruled that the applicable repurchase protocol required loan-by-loan proof of materiality. *See MASTR Adjustable Rate Mortg. Trust 2006-OA2 v. UBS Real Estate Secs. Inc.*, No. 12-cv-7322-PKC, 2015 WL 764665, at *11 (S.D.N.Y. Jan. 9, 2015) ("*MARM 2006-OA2*") ("[T]he repurchase remedy negotiated by the parties is loan specific."). With respect, Judge Castel simply misunderstood the scientific underpinnings of sampling and extrapolation. *See Assured*, 920 F. Supp. 2d at 512 ("The very purpose of creating a representative sample of sufficient size is so that, despite the unique characteristics of the individual members populating the underlying pool, the sample is nonetheless reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic."). In short, by limiting the sample's breach rate to only those loans that *materially* breach the warranties, we can reliably estimate the number of loans in the population that *materially* breach the warranties. (*See* Snow Dec., at 8.) In any event, for the reasons discussed above (*see* Part I.A), Judge Castel's concern with identifying specific loans to be remedied is moot with respect to Liquidated Loans, which are exclusively the subject of the Trustee's sampling plan here. Therefore, the *MARM 2006-OA2* ruling provides no useful guidance in this case.

Next, in *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12-cv-05067-JFK-JLC, 2017 WL 5256760, at *7-9 (S.D.N.Y. Nov. 13, 2017), Judge Keenan adopted Judge Castel's

rationale in *MARM 2006-OA2* that the trust's governing agreements prohibit the plaintiff's use of sampling to establish defendant's liability and damages. Specifically, Judge Keenan found that the structure of the repurchase protocol "generally calls for proof of breach on a loan-by-loan basis." *Id.* at *7. He noted that many of the terms used are singular and reference characteristics of individuals loans, and that it would "make[] little sense" to "[p]recisely defin[e] these terms in connection with a sophisticated remedial scheme," only for plaintiff to "'prove' that a loan is in breach without actually identifying the specific loan (and specific breach)." *Id.* He also reasoned that sampling would not show whether defendant "discovered or had notice of a specific breach and whether the breach 'materially' and 'adversely' affected the loan's value." *Id.* at *21-22.

Again, respectfully, Judge Keenan simply erred in analyzing and synthesizing the corpus of RMBS sampling jurisprudence. <u>*First*</u>, the *Homeward* decision does not consider at all the distinction between active and liquidated loans (a review of the parties' submissions show that plaintiff sought to sample both). <u>*Second*</u>, Judge Keenan's analysis fails to distinguish among investor cases against trustees and repurchase cases against sponsors. That distinction is significant because the nature of the claims in each set of cases is markedly different, as discussed in detail below. In short, like *MARM 2006-OA2*, this Court need not and should not accord any weight to the *Homeward* decision when ruling on the instant motion.

Goldman's filings preceding this motion err in much the same way that Judge Keenan did, in that they both ignore the distinction between claims against sponsors like Goldman, as opposed to claims against trustees. Investor actions against trustees are inapposite here because RMBS trustees, unlike originators and sponsors, have no duties to investigate the accuracy of loan representations and warranties. As Judge Lehrburger held in *Royal Park Investments SA/NV*

*v. U.S. Bank N.A.*, No. 14-cv-2590-VM-RWL, 2018 WL 3350323, at *3 (S.D.N.Y. July 8, 2018), this "distinction is important" because "the contractual language governing the trustee is couched in terms of loan-by-loan evaluation and remedy; and, unlike a trustee, an RMBS issuer or sponsor securitizes the loans, conducts due diligence on the loans (or at least is in a position to do so), and makes representations and warranties about the loans." Unlike a sponsor's obligations, a Trustee's obligations to notify its contractual counterparties "upon discovery" of breaches simply cannot be triggered without loan-specific information of the sort sampling cannot provide. *See Commerce Bank v. Bank of N.Y. Mellon*, 141 A.D.3d 413, 415-16 (1st Dep't 2016) ("[T]he trustee of an RMBS … trust does not have a duty to 'nose to the source' of misconduct.").

The cases that Defendants previously cited, and can be expected to invoke again, all involve certificateholders alleging that a trustee *failed to notify* the trustee's counterparties of potential warranty breaches *that the trustee is alleged to have discovered*.[13] One simply cannot identify through sampling (i) the loans, if any, as to which a trustee discovered or received notice of a warranty breach, much less (ii) when the trustee might have discovered any such particular breaches. As a result, sampling cannot prove anything with respect to whether a trustee breached any duty to notify counterparties. But that scenario has no application to the Liquidated Loans here, where the Trustee need merely prove the damages flowing from Liquidated Loans that materially breach the Warranties that Goldman promised to stand behind.

---

[13] *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 4682220, at *12 (S.D.N.Y. Sept. 28, 2018); *BlackRock Balanced Cap. Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*, 2018 WL 3120971, at *1-2 (S.D.N.Y. May 17, 2018); *BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A.*, 2017 WL 953550, at *6 (S.D.N.Y. Mar. 10, 2017); *W. & S. Life Ins. Co. v. Bank of N.Y. Mellon*, 2017 WL 3392855, at *10 (Ohio Ct. Com. Pl. Aug 4, 2017), *aff'd*, 129 N.E. 1085 (Ohio Ct. App. Feb. 8, 2019).

At bottom, statistical sampling "is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many individual loans in the pool contain material breaches," *MSST 2007-1*, 289 F. Supp. 3d at 505, and nothing Goldman might muster in opposition can alter that reality.

## II.    THE TRUSTEE DOES NOT INTEND TO USE SAMPLING TO COMPLY WITH THE NOTICE PREREQUISITE TO SUIT

As a corollary to the argument that Goldman can be expected to make regarding its purported right to repurchase defective Loans, notwithstanding the absence of anything to repurchase after a Loan is Liquidated, Goldman might also argue that the Trustee cannot utilize sampling because sampling cannot establish that the Trustee provided Goldman with notice as to every at-issue Loan.  But this argument would be premised on a fallacy, because, as the New York Court of Appeals held years ago, notice is *not* a substantive condition precedent and, thus, is *not* an element of the Trustee's claims that the Trustee must prove at trial.  *See ACE 2006-SL2*, 25 N.Y.3d at 597-98 ("The Trust's strongest argument is that the cure or repurchase obligation was a substantive condition precedent to suit that delayed accrual of the cause of action. … Here, a cause of action existed for breach of a representation and warranty; the Trust was just limited in its remedies for that breach.  Hence, *the condition was a procedural prerequisite to suit*." (emphasis added)).

In any case, the Trustee is not relying on sampling to satisfy the procedural prerequisite to suit.  Indeed, the Trustee *already has* provided notice to Goldman that Goldman must repurchase or pay damages in the amount of the Repurchase Price to compensate the Trusts for

*every* defective Loan.  (56.1 ¶¶ 37-42, 49-51, & 54-56.)  Any effort by Goldman to conflate the concepts of notice and sampling should be rejected.[14]

### III.   DISALLOWING SAMPLING WOULD WASTE EXTRAORDINARY AMOUNTS OF TIME AND MONEY

Goldman cannot credibly argue that the contracting parties intended to preclude the use of sampling and instead require the needless and costly loan-by-loan review and adjudication for systemic breaches affecting hundreds of thousands of loans in this and other cases.  The only alternative to sampling here would be to extend discovery by well over a year, impose upon both parties the immense expense of reunderwriting every one of the 4,305 Liquidated Loans, and impose upon this Court the burden of trying Goldman's liability as to each one of them.  The end result would be the same, but the minority cases that eschewed a trustee's use of sampling for claims against a sponsor or originator show that such a process is impractical.

For example, in *MARM 2006-OA2*, Judge Castel forbade sampling, which required the parties to undertake a staggering loan-by-loan underwriting of over ten thousand loans and to hire a special master who spent many months and countless hours reviewing one loan after another, at a cost of millions of dollars.  *See MSST 2007-1*, 289 F. Supp. 3d at 502 (describing the *MARM 2006-OA2* approach as "demonstrably impracticable," with "the final cost, both in terms of time and resources expended, … extraordinary"); *Law Debenture Tr. Co. of N.Y. v. WMC Mortg., LLC*, No. 3:12-cv-1538 (CSH), 2017 WL 3401254, at *13 n.6 (D. Conn. Aug. 8, 2017) (noting same).

---

[14]  As at the last conference, Defendants can be expected to argue that the "*HEAT 2007-1*" case currently before the New York Court of Appeals might change the "notice" landscape.  *See U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, APL-2020-00018.  But, because "notice" is merely a procedural, and not a substantive condition, any new procedural notice requirements could be remedied after the fact to comply with the *HEAT 2007-1* decision.

As the United States Supreme Court stated in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016), "[i]n many cases, a representative sample is 'the only practicable means to collect and present relevant data' establishing a defendant's liability." Goldman will suffer no prejudice whatsoever from the Trustee's utilization of sampling and extrapolation to prove liability and damages at trial, except for the "prejudice" that will result from finally being held to account for the contractual promises that Goldman has entirely ignored to date.

## CONCLUSION

For the foregoing reasons, partial summary judgment should be granted that the Trustee may rely on statistical sampling of loans to prove liability and damages at trial.

Dated: July 28, 2021
      New York, New York

McKOOL SMITH, P.C.

By:    */s/ Christopher P. Johnson*
        Christopher P. Johnson

Zachary W. Mazin
Jared S. Siegel
Daniel I. Hendler

cpjohnson@mckoolsmith.com
zmazin@mckoolsmith.com
jsiegel@mckoolsmith.com
dhendler@mckoolsmith.com
395 9th Avenue, 50th Floor
New York, NY 10001
(212) 402-9400

*Attorneys for Plaintiff*