```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
----------------------------:

U.S. BANK NATIONAL             :

ASSOCIATION,                   : Case No.: 19-CV-2307

             Plaintiff,        :

     v.                        :

GOLDMAN SACHS MORTGAGE         : New York, New York

COMPANY, et al.,               :

             Defendants.   : May 23, 2023
----------------------------: CONFERENCE

        TRANSCRIPT OF STATUS CONFERENCE HEARING

        BEFORE THE HONORABLE JENNIFER E. WILLIS

             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:       McKOOL SMITH
                     BY: Zachary Mazin, Esq.
                         Daniel Hendler, Esq.
                         Olivia Visconti, Esq.
                     395 9th Avenue - 50th Floor
                     New York, New York 10001


For Defendants:      ORRICK, HERRINGTON & SUTCLIFFE LLP
                     BY:  Richard Jacobsen, Esq.
                          Nicholas Poli, Esq.
                          Camille Rosca, Esq.
                          David Litterine-Kaufman, Esq.
                     John Ansbro, Esq.
                     51 W. 52nd Street
                     New York, New York 10019


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

PROCEEDINGS

1    THE DEPUTY CLERK:  Docket Number:
2  19-cv-2305.  We ask that attorneys for plaintiffs as
3  well as defendants please rise and state their names
4  for the record.
5    MR. MAZIN:  Good afternoon, Judge Willis.
6  My name is Zachary Mazin.  I'm with McKool Smith.
7  With me are my colleagues, Daniel Hendler and Olivia
8  Visconti.  And I should say Ms. Visconti is awaiting
9  admission to the New York State courts.  If you'd
10  prefer that she sit in the gallery, we're happy to
11  accommodate that, but we'd like to have her here at
12  counsel's table, if that's okay with Your Honor.
13    THE COURT:  That is fine.
14    MR. MAZIN:  Thank you.
15    THE COURT:  And good afternoon to all of
16  you.
17    Defense?
18    MR. JACOBSEN:  Good afternoon, Your Honor.
19  Richard Jacobsen of Orrick, Herrington & Sutcliffe,
20  on behalf of Goldman Sachs.  With me are my
21  colleagues, Nicholas Poli, Camille Rosca, David
22  Litterine-Kaufman, and Mr. Ansbro, who's been a
23  member of the Bar for some 40 years.
24    THE COURT:  All right.  Good afternoon to
25  you all as well.

PROCEEDINGS

1       So we are here for a discovery dispute.

2   Plaintiff is asking to extend the deadline for

3   discovery nine months for two reasons; one, in order

4   to conduct -- I believe there's upwards of 20

5   depositions that are contemplated; and then two, in

6   order to do some verification discovery.  I've

7   obviously reviewed the submissions of the parties.

8       I'll turn to you first, plaintiff.

9       MR. MAZIN:  Thank you, Your Honor.  I

10  actually think I can make things easy for the Court

11  today.  We've made good progress on depositions.  I

12  don't think there's anything on the deposition front

13  that requires Your Honor's intervention.  Happy to

14  provide some context for that.

15      I don't know if Mr. Jacobsen has anything

16  he'd like to say about that.  I'm happy to reserve

17  on that in the event that he does, but I don't have

18  anything that needs the Court's intervention there.

19      So that just leaves the issue of

20  third-party discovery.  We colloquially refer to

21  this work as "verifications work."  During the time

22  since we wrote this letter, we've continued to

23  engage with our expert and our vendors, and they're

24  now telling us that they can be done with this work

25  by August 31st.  And so today, Your Honor, I'd like

1  to ask that we only extend the fact discovery

2  deadline to September 29th.  That would represent

3  five months rather than nine months from the

4  original deadline of April 27th.

5         And I think, more importantly, we've

6  determined that we do not need to also extend the

7  expert discovery schedule.  That means that our

8  opening expert reports will continue to be due in

9  April of 2024, just as they were under the currently

10 operative CMO.  So that keeps the entire case

11 timeline exactly on schedule from where it was.

12 We're just asking to shift an internal deadline.

13        Now, I should say that roughly a month ago,

14 we approached our friends at Orrick and we said,

15 look, we think we can actually shorten the request

16 to six months.  They rejected that out of hand.  And

17 yesterday, after, again, consulting with our expert

18 and vendors, we informed them of this, and they said

19 no yet again.

20        So I'm expecting Mr. Jacobsen to spend a

21 lot of time talking about how this is improper and

22 we could have done all this work before.  And that's

23 fair.  We acknowledge that in our papers.  But I do

24 think that responding to events that occur in the

25 RMBS world, where they themselves were unleashing

1   arguments at trial -- at trial -- that we hadn't
2   seen before constitutes a reason to change course.
3           We were trying to avoid doing this work.
4   It's costly.  It's time-consuming.  The hit rate is
5   low, given the passage of time, where we're going
6   back to employers from 20 -- excuse me -- from 2005
7   and 2006 and hoping to inquire about their
8   employment records from that time.
9           THE COURT:  Well, Counsel, let me ask you
10  to respond to something that was in defendant's
11  portion of the joint letter.  I'm sure this is an
12  argument that they are going to make, but let me,
13  sort of, anticipate it, which is that the arguments
14  that you point to in the RMBS world as, sort of,
15  being a new development which changed your calculus
16  of whether or not it made sense to spend the time
17  and the effort on this verification discovery per
18  defense, they say that these are arguments that are
19  commonly made; that these are arguments that they
20  themselves have made with respect to this particular
21  trustee.
22          And so what I'm gathering, at least from
23  this part of their argument is that this is not new,
24  and so the fact that you, obviously, cite to a
25  particular case -- it looked like there was a

1    decision, I think, January of 2023 that you cited

2    to -- that that is not -- that you should not have

3    been surprised by that; that that is something that

4    you were on notice of as a potential argument that

5    could be made, and that, as a result, that does not

6    create, sort of, good cause to extend the deadline.

7           And, certainly, a lot of the space, a lot

8    of the real estate in your section of the joint

9    letter talks about the fact that, you know, defense

10   won't be harmed by this, that they won't be burdened

11   by it.  And even, I think, the tightening of the

12   schedule -- which I certainly appreciate your

13   efforts to, sort of, continue to move this along

14   from the time that you filed the letter until now,

15   but all of those efforts really just speak to the --

16   you know, is this going to affect any other

17   deadlines?  Is this going to affect defense?

18          And, certainly, the idea of prejudice is a

19   factor, but I think the main one when we look at

20   good cause is diligence on the part of the

21   plaintiff.  So speak to me about, you know,

22   defense's argument that these are not novel

23   arguments and that these, therefore, are arguments

24   you would have known about, or should have known

25   about, and should have planned accordingly in terms

1   of whether you wanted to do this verification

2   discovery or not.

3           MR. MAZIN:  Sure.  Thank you for giving me

4   the opportunity to respond to that, Judge.

5           Mr. Jacobsen is right about one thing.  The

6   defense bar in the RMBS world has been arguing that

7   any evidence that postdates the closing of the loan

8   should not be admissible and is not relevant.

9   They've lost that argument every time they've

10  attempted it.  And so they may attempt it again

11  here, but that's not what -- and I should note the

12  citation in their portion of the letter brief refers

13  to that argument.  That's not what we saw happening.

14  That's not what we're talking about, and that's not

15  what galvanized us to say, you know what, we do need

16  to go back and conduct verification discovery here

17  to insulate us against an argument we may see.

18          They specifically drew a distinction

19  between certain types of post-closing evidence.

20  There's publicly available post-closing evidence

21  about borrowers' ability to repay their loan.  For

22  instance, we can go pull bankruptcy filings that

23  postdate closing where a borrower may have filed

24  bankruptcy, and they said, actually, you know what,

25  back in 2005, I was actually making $20,000, when,

1   on their loan application, they added a zero.

2          Verifications are actual outreach to, in

3   this case, just employers.  Investment banks like

4   Goldman Sachs do this work all the time outside of

5   the context of litigation, right, where they will

6   actually reach out to borrowers themselves and say,

7   hey, how much money did you make in 2005?  Tell us

8   again.  They could reach out to employers.  For

9   self-employed borrowers, they may contact the

10  accountant who signed the letter in the loan file

11  saying, yes, this person made, you know, "X"

12  thousands of dollars in the past year.

13         So that was the development at the HEAT

14  trial that we saw.  And we saw the judge's reaction

15  to it, where they were attempting to color the

16  evidence that the plaintiff did introduce by noting

17  the absence of this other evidence.  And that's why

18  we determined that we needed to change course.

19         So, you know, again, this was -- there was

20  no lack of diligence on our part, Your Honor.  I

21  personally have been litigating RMBS matters now for

22  going on a decade, as have my friends at Orrick.

23  We've been doing this in different cases.  This is

24  my seventh and eighth cases.  I'm sure Mr. Jacobsen

25  has a similar number or more.  We watch developments

PROCEEDINGS

1    occur across the RMBS landscape because it's natural

2    for a judge hearing an RMBS case in one court to be

3    interested in what a judge in another court has to

4    say on the same matter, right?

5           The core of these cases are all roughly the

6    same.  There's differences on the margins.  But the

7    heart of the cases are these investment banks

8    securitized loans that they never should have

9    securitized.  They made reps and warrants about them

10   that the loans did not comport to.  They promised to

11   buy back the bad ones, and then they didn't.  That's

12   the heart of these cases.

13          So we think, given that development, given

14   the fact that we haven't been asleep at the switch,

15   we've been working diligently -- this is the first

16   real extension that we're asking for.  There was a

17   modification to the schedule previously that was a

18   result of a decision that Judge Nathan issued while

19   she was presiding over the case before her

20   elevation.  And that was part of our effort to

21   narrow the scope, to use sampling to evaluate the

22   pool of loans rather than going loan by loan.

23          Goldman could have consented to sampling

24   notwithstanding their view of the governing

25   agreements.  They convinced Judge Nathan they were

1   right about that.  Congratulations.  But they still

2   could have consented to saying, you know what, we'll

3   use sampling anyway because it will compress the

4   time necessary to litigate this case, and you arrive

5   at roughly the same place.  And we would have taken

6   the haircut.  They didn't do that.  And the only

7   reason they didn't do that is because they wanted to

8   increase the cost and the burden on the plaintiffs

9   here.

10          So, again, given that this is our first

11  real request for an extension, it doesn't shift the

12  overall timeline of the case at all, and they can't

13  identify an iota of prejudice, Your Honor -- they

14  won't have to do this work themselves.  They won't

15  have to do any additional work at all, other than

16  receiving whatever it is we're able to obtain from

17  third parties.  We think that this is an easy

18  extension to grant, if I may, and we'd -- I'm happy

19  to respond to anything else that Your Honor is

20  interested in hearing about.  I'm happy to talk more

21  about the verifications process or the underwriting,

22  if you're at all interested, Your Honor.

23          THE COURT:  Let me hear from defense first,

24  and then I may have additional questions for you

25  based on their arguments.

1    MR. MAZIN:  Thank you.

2    MR. JACOBSEN:  Good afternoon, Your Honor.

3    It's nice to meet you.  I just want to -- for the --

4    I have an ear that hasn't popped since I landed last

5    week, so I am functionally deaf in my left ear.  I

6    apologize if I'm loud or have trouble hearing.

7    Your Honor, I respect Mr. Mazin.  We have

8    been litigating against each other in a number of

9    cases for years.  Much of what he just said, I

10   submit, is factually incorrect.  This case has been

11   pending for two and a half years.  And I want to go

12   back to where this case started.

13   It was filed in 2019.  In February '20 --

14   on February 26, 2021, there was a conference before

15   Judge Nathan to contemplate what the schedule would

16   be if sampling is not permitted, and that had

17   nothing to do with burden, whatever.  It had to do

18   with the law and what the contract requires,

19   evidenced by the Court of Appeals decision in HEAT

20   '07-1, which completely upset the landscape of RMBS

21   litigation.

22   And I want to quote from Judge Nathan, who

23   was abundantly clear, Judge Willis.  And this is the

24   February 26, 2021 conference before Judge Nathan.

25   And I'm citing the page 26, beginning at line 8,

PROCEEDINGS

1    Your Honor.

2              Quote from Judge Nathan:  "But other than

3    that, I'll give you this schedule" -- keep in mind,

4    this is over two years ago -- "but we'll declare an

5    understanding that, you know, barring something

6    unexpected, truly unexpected, we're going to stick

7    with this.  So you have to keep your foot on the gas

8    as if it were half of the amount of time that your

9    schedule allows for.  Is that reasonable,

10   Mr. Johnson?"

11             Your Honor, I'll represent that Mr. Johnson

12   is Mr. Mazin's partner on this case and co-lead

13   counsel.

14             MR. MAZIN:  I'll stip that.

15             MR. JACOBSEN:  Thank you.  Agreement.

16   We're making progress.

17             Mr. Johnson:  "It absolutely is, Your

18   Honor.  Our approach is always to keep on the gas."

19             Your Honor, their actions -- or better put,

20   lack thereof -- during the entirety of this case is

21   the antithesis of the diligence that's required to

22   show good cause for an extension.

23             THE COURT:  Counsel, let me ask you,

24   though --

25             MR. JACOBSEN:  Yes.

PROCEEDINGS

1    THE COURT:  And I certainly want to hear

2    all of what you have to say, but I'm, sort of,

3    thinking about the responses that plaintiff just

4    made.  And I'd like to hear a response to that

5    before I lose my train of thought.

6    MR. JACOBSEN:  Yes, Your Honor.

7    THE COURT:  Based on the quote that you

8    just read from Judge Nathan's decision, she talked

9    about -- well, not decision, but from the

10   conference, from her oral decision at the

11   conference, that, barring something unexpected -- or

12   "truly unexpected," I think, was the language you

13   used.  And what I hear coming from plaintiff is that

14   this recent development in the landscape of these

15   type of cases, that January 2023 decision that they

16   cite to, that presumably their argument, as I hear

17   it, is that that was unexpected; that that was a

18   change which, as a result, has affected how they

19   believe they should prepare their case.

20   So I certainly hear you as saying Judge

21   Nathan set a schedule, and it was one that had a lot

22   of time built into it, and that the expectation was

23   everyone should treat that as a firm deadline and

24   don't wait until you get to the last minute.  You

25   should, you know, plan to be done in half that time.

1     I hear all of that.  But she obviously did leave

2     that sort of escape hatch if there was something

3     unexpected that developed.

4          And what I hear from plaintiff -- and,

5     obviously, you can explain to me why they're wrong

6     about that.  But what I hear from them is that that

7     change was unexpected and that that is what changed

8     their priorities about how they would conduct

9     discovery.

10          So tell me why this decision they cite to

11    was not an unexpected development.

12          MR. JACOBSEN:  Absolutely not unexpected,

13    Your Honor.  And I'm going to go back to a timeline,

14    and this is one where, frankly, Mr. Mazin and I have

15    personal experience because we litigated this

16    against each other for different clients back in, I

17    think, 2015.

18          I have been doing RMBS litigation since

19    roughly 2009.  I think Mr. Mazin has been doing it

20    at least for a decade.  I don't know, but certainly

21    as long as a decade.  The sort of verification

22    discovery they're looking for, third-party subpoenas

23    to borrowers or borrowers' employers in this case.

24    That has been litigated over.  That discovery has

25    been served and sought.  There have been protocols

1   for it for almost, if not over, a decade.  Point of

2   fact.  And we were actually reminiscing about it,

3   Mr. Mazin and I, before we walked into your

4   courtroom, Your Honor, we were actually right here

5   in your courtroom.

6           In 2015, there was a hearing in front of a

7   special master who was designated to deal with all

8   of the remaining trustee cases, RMBS cases just like

9   this one in New York Supreme Court.  It took place

10  in The New York Times building.  I was there.

11  Mr. Mazin was there.  All of this discovery has been

12  available to plaintiffs throughout.  There's been no

13  new development.  There's no -- been no constraint

14  on what they can or cannot do.

15          And, furthermore, they made the tactical

16  and strategic decision not to pursue it.  There was

17  no ruling in this Court, no indication from this

18  Court, nothing from Judge Nathan, and certainly

19  nothing from Judge Gardephe that said they can't

20  pursue it.  They made the decision not to, Your

21  Honor.

22          THE COURT:  Let me just -- let me just,

23  sort of, drill down on this because I want to make

24  sure I'm fully understanding everybody's arguments

25  and that you're all speaking to the same point.

PROCEEDINGS

1      MR. JACOBSEN:  Yes, Your Honor.

2      THE COURT:  What I heard plaintiff

3  saying -- plaintiff's counsel saying, was not so

4  much that the concept of this type of discovery

5  being new one way or another, but that the arguments

6  that were made in that particular case, sort of,

7  arguments holding it against the plaintiff or saying

8  to -- you know, to the trier of fact, you should

9  hold it against plaintiff because they don't have

10  this publicly available information, that that --

11  and, obviously, plaintiff will correct me if I'm

12  wrong -- that that is the thing that he is saying is

13  different.  So not the idea that you could get this

14  information, but that an argument was made by

15  defense counsel in that particular case of, they

16  didn't have this, or they didn't show you that, and

17  that that somehow changed the landscape.

18      So I think that's what I understood him to

19  be saying.  So tell me why that is not in --

20      MR. JACOBSEN:  That, too --

21      THE COURT:  -- of recent development.

22      MR. JACOBSEN:  I didn't mean to interrupt,

23  Your Honor.

24      That, too, was incorrect as well.  What

25  Mr. Mazin, I believe, is referring to was a case

1   that my team and I tried for Credit Suisse in

2   January and February and a cross-examination that

3   happened involving a different bank, different

4   trusts in a state court, not federal court, in front

5   of a different judge.

6          That is not a basis to say that they all of

7   a sudden have a change in the law or some unforeseen

8   circumstance that now they're entitled to seek

9   discovery, that they first broached with us in March

10  of 2023, Your Honor.

11         If they were being diligent and if I were

12  them, I would have put in my marker immediately.  I

13  would have started papering over immediately.  Wow,

14  it looks like there's a C change in the law.  It

15  looks like Orrick, on behalf of Goldman Sachs -- you

16  may argue that this material is inadmissible.  I

17  would -- I would also posit, Your Honor -- and I can

18  give you specific examples -- the home equity

19  mortgage trust cases, which we euphemistically refer

20  to as the "Euphrates cases," that was one of the

21  cases that was going to go up to the Court of

22  Appeals on the sampling issue before we settled that

23  case.  We, instead, just went up on the HEAT '07-1

24  case.

25         I recall a -- and it's not Mr. Mazin's

1  firm, to be clear and to be fair.  Quinn Emanuel,

2  representing U.S. Bank in a repurchase case against

3  Credit Suisse, tried to drop 600 subpoenas on

4  third-party borrowers and employers within fact

5  discovery.  That took place -- and my colleagues

6  will correct me -- I believe, in 2014, 2015.  At the

7  latest, 2016.

8          MAR, another case that was in federal

9  court.  I believe that this discovery was sought and

10  contemplated.  And either *Ambac versus Credit Suisse*

11  or *FGIC versus Credit Suisse* -- I will get that cite

12  to Your Honor -- Quinn Emanuel again.  And this is

13  all open.  There was a defense group and there was a

14  plaintiff group.  Everybody knew this.  They were

15  seeking this discovery then.

16          Throughout, defendants have always been

17  arguing about the legitimacy of this evidence,

18  whether or not it's appropriate, whether or not they

19  can -- for instance, borrower verifications or

20  bankruptcy filings, whether or not that is

21  cognizable, or whether or not that's an exception to

22  hearsay.  We argue it is hearsay.  None of this is

23  novel, Your Honor.

24          And I would go back to where you were when

25  you were questioning Mr. Mazin, Judge Willis.  This

1    is about diligence, their diligence.  They've had

2    two and a half years to do this.  And I would also

3    submit that the fact that -- the way in which

4    they've conducted or, in many instances, not

5    conducted depositions is emblematic of the way that

6    they're proceeding with this case.  They've had two

7    and a half years to notice depositions.  We

8    actually, as the defendant, noticed our depositions

9    first.

10            THE COURT:  Well, let me pause you for just

11   a moment because I want to make sure we're focusing

12   on the issues that are still in play.

13            Plaintiff had indicated at the beginning of

14   his argument that the request to extend the deadline

15   with respect to depositions was no longer an area

16   that required judicial intervention because either

17   the -- these big -- you know, the substantial number

18   has been done already, whatever it is.  It seems

19   that that is now on track.

20            And do you agree with that, that the

21   question about extending the deadline with respect

22   to depositions is, sort of, no longer in play, and

23   that, really, we're just talking about allowing for

24   this additional non-party discovery?

25            MR. JACOBSEN:  Your Honor, respectfully, I

 1  think it is in play insofar as the discovery cutoff

 2  in this case was April 27, 2023.  Every single

 3  Goldman Sachs -- I just want to give you a little

 4  context, if you can give me a little latitude here.

 5          Every single Goldman Sachs deponent in this

 6  case, save for one, is a former employee, most of

 7  whom's employment ended 15 or 16 years ago.  We have

 8  made all of them available either before the

 9  discovery cutoff or during May.  They have been

10  unable to or unwilling to pursue some of those.  We

11  actually noticed our depositions of U.S. Bank before

12  they did because we weren't going to -- we weren't

13  going to wait until the end.  And, frankly, we were

14  waiting to see if they were going to notice

15  depositions.  We had to make that strategic

16  decision.  They noticed their depositions a couple

17  weeks later.

18          We've been trying mightily -- mightily --

19  to get these depositions done within April and May.

20  We made every one of our witnesses available April

21  and May, and we've been notified that two of our

22  witnesses they can't take until well into June.

23          Your Honor, I'm using this as an example to

24  show that the standard here for good cause, as you

25  said, and as the law states in Zarazitsia, Channel

1    One, Deezer, Tatizian (phonetic) -- these names -- I
2    did not I choose these case names -- Compagno
3    (phonetic).  I'm going to go with PepsiCola
4    Company -- versus PepsiCola Company.
5            All of them speak to diligence.  All of
6    them speak to their burden.  All of them speak to
7    the plaintiffs having to demonstrate how they could
8    have -- they couldn't get this stuff done because of
9    some unforeseen circumstance and, throughout, they
10   were doing everything they could to get the
11   discovery done.
12           Your Honor, I think their conduct in this
13   case, their lack of diligence, does not meet the
14   standard.  Putting the depositions aside, the
15   verifications they're speaking of, if they got it,
16   it wouldn't just be a four- or five-month extension.
17   We have no obligation to affirmatively go out and
18   take our own, kind of, prophylactic or responsive
19   discovery.  It's their burden.
20           We would be entitled to some extension to
21   respond to that.  It was their obligation to tee
22   this up well before they could have.  Mr. Mazin's
23   firm, his prior firm, his current firm, his
24   colleagues, they've all known that this has been
25   available to them for a decade.  They're not

PROCEEDINGS

1    entitled, I respectfully submit, to seek an
2    extension and get an extension where from their lack
3    of diligence and their lack -- or their strategic or
4    tactical decision are not -- are waiting until the
5    last days of discovery -- literally days -- to seek
6    something that's been available to them throughout.
7            Your Honor, I hope I answered all your
8    questions.  If I didn't, I'm happy to go back to
9    anything that you had asked.
10           THE COURT:  I think you have.
11           MR. JACOBSEN:  Thank you very much, Your
12   Honor.
13           THE COURT:  Plaintiff, I'll turn back to
14   you.  This is obviously your request, so I'll give
15   you the last word.  I also would like to hear
16   specifically your response, again, to defense's
17   argument that the landscape of, sort of, the
18   verification discovery -- the verification discovery
19   landscape from defense's viewpoint has not changed.
20
21           (Audio ends)
22
23
24
25

1                    C E R T I F I C A T E

2

3          I, Adrienne M. Mignano, certify that the

4     foregoing transcript of proceedings in the case of

5     U.S. Bank National Association v. Goldman Sachs

6     Mortgage Company, et al,; Docket #19cv2307 was

7     prepared using digital transcription software and is

8     a true and accurate record of the proceedings.

9

10

11    Signature  _____
                  *Adrienne M. Mignano*

12                    ADRIENNE M. MIGNANO, RPR

13

14    Date:       May 25, 2023

15

16

17

18

19

20

21

22

23

24

25