# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, as Trustee for GSAMP TRUST 2007-HE2,<br><br>             Plaintiff,<br><br>          -against-<br><br>GOLDMAN SACHS MORTGAGE COMPANY and GS MORTGAGE SECURITIES CORP.,<br><br>          Defendants. | Index No. 1:19-cv-02307<br>[rel. 1:19-cv-02305]<br><br><br>**~~FIRST~~SECOND AMENDED AND SUPPLEMENTAL COMPLAINT** |

U.S. Bank National Association ("Plaintiff," "U.S. Bank" or the "Trustee"), in its capacity as Trustee of the Goldman Sachs Alternative Mortgage Products Trust 2007-HE2 ("GSAMP 2007-HE2" or the "Trust"), by its attorneys, McKool Smith P.C., for its Complaint herein against Goldman Sachs Mortgage Company ("Goldman Sachs" or the "Sponsor") and GS Mortgage Securities Corp. ("GSMSC," or the "Depositor" and together with Goldman Sachs, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for breach of contract stemming from Defendants' willful failure to abide by their unambiguous contractual obligations relating to a securitized pool of approximately 5,000 mortgage loans (the "Mortgage Loans" or "Loans") with an aggregate principal balance of approximately $1 billion, which were conveyed to the Trust pursuant to a Pooling and Servicing Agreement dated as of March 1, 2007 (the "PSA").

2.      Goldman Sachs, as Sponsor of the GSAMP 2007-HE2 securitization, made numerous representations and warranties regarding the nature and quality of the Mortgage Loans

that were securitized in the Trust (the "Mortgage Warranties").  The Mortgage Warranties included representations that, among other things, the Mortgage Loans complied with specified underwriting methodology and that the information on Mortgage Loan Schedules available to investors was complete, true, and correct.  These Mortgage Warranties were meant to assure eventual investors in GSAMP 2007-HE2 that the Mortgage Loans were of a certain quality.

3.      Pursuant to the PSA and the referenced and integrated agreements therein, Goldman Sachs agreed that if a Loan breached a Mortgage Warranty and such breach materially and adversely affected the value of that Mortgage Loan (a "Defective Loan"), or in certain circumstances, breached a Mortgage Warranty without regard to whether the breach materially and adversely affected the value of that Mortgage Loan (also a "Defective Loan"), Goldman Sachs would cure such breach or repurchase the Defective Loan within, at most, 90 days of the earlier of discovering or receiving notice of the breach (the "Cure/Repurchase Obligation"). This Cure/Repurchase Obligation was meant to assure potential investors in the Trust that Goldman Sachs had assumed and retained the risk with respect to any materially non-conforming Loans.

4.      The Mortgage Warranties and the Cure/Repurchase Obligation were of particular importance to potential investors because, as Goldman Sachs knew, the Trust and potential investors did not have the ability (and were not required) to conduct any meaningful due diligence regarding the quality of the Loans.

5.      Upon its sale of the Loans to the Depositor, Goldman Sachs also conveyed to the Depositor all of the right, title and interest that Goldman Sachs had in the Mortgage Loans. When the Depositor then deposited the Loans in the Trust, the Depositor also conveyed to the Trustee certain of its rights with respect to the Loans, including the Depositor's right to enforce

the Mortgage Warranties.  The PSA empowered the Trustee to enforce those rights for the benefit of the Trust and the holders of the certificates issued by the Trust (the "Certificateholders").  The Depositor is also contractually obligated to use reasonable efforts to assist the Trustee in enforcing the Mortgage Warranties.

6.      A Certificateholder's post-securitization investigation into the Mortgage Loans indicated that at least 1,041 Mortgage Loans do not comply with one or more of the Mortgage Warranties and that those breaches of the Mortgage Warranties materially and adversely affected the value of the Mortgage Loans at the time of their sale to the Trust and thereafter.

7.      Upon learning from the Certificateholder of the existence of the Defective Loans, the Trustee promptly served notices on Defendants and demanded that Goldman Sachs comply with its obligations either to cure the breaches or repurchase the Defective Loans (the "Pre-Complaint Breach Notice").  In response, Goldman Sachs has neither cured nor repurchased any of the Defective Loans identified in the Pre-Complaint Breach Notice.

8.      During the litigation of this action, the Trustee retained Robert W. Hunter as an expert to re-underwrite Mortgage Loans in the Trust and identify the Defective Loans.  The Trustee also retained Peter R. Rubinstein, Ph.D., as an expert to determine whether the re-underwritten loan characteristics in the Mortgage Loan Schedule, as identified by Mr. Hunter, materially and adversely affected the value of the Mortgage Loans and/or the interests of the Certificateholders.

9.      On April 15, 2024, the Trustee served upon Defendants Mr. Hunter's expert report (the "Hunter Report"), which identified 2,358 Defective Loans, and Dr. Rubinstein's expert report (the "Rubinstein Report"), which found that, as to 1,559 of the 2,708 Mortgage Loans re-underwritten by Mr. Hunter, misstatements in the Mortgage Loan Schedule materially

and adversely affected the value of the Loans and/or the interests of the Certificateholders.  In total, the Hunter and Rubinstein Reports identified 2,413 Defective Loans.

10. Based upon the foregoing, on April 26, 2024, the Trustee served Goldman Sachs with an additional Breach Notice (the "Post-Complaint Breach Notice") that demanded repurchase of, or equivalent compensation for, all the Defective Loans identified by Mr. Hunter and Dr. Rubinstein, as well as all other Mortgage Loans containing breaches of the Mortgage Warranties that materially and adversely affect the value of those Mortgage Loans.  In response, Goldman Sachs has neither cured nor repurchased any of the Defective Loans identified in the additional Post-Complaint Breach Notice, and Goldman Sachs's cure or repurchase deadline has now expired.

11. ~~8.~~ Upon information and belief, based upon the results of the Certificateholder's investigation, additional investigation, including a re-underwriting of the Mortgage Loan files and an analysis of the documents contained (or missing) therein, will reveal substantial additional evidence of breaches throughout the Trust's Mortgage Loans.  Indeed, the U.S. Department of Justice ("DOJ") found—and Goldman Sachs acknowledged—that Goldman Sachs was aware that as many as 23% of loans in different loan pools it securitized around the same period that this Trust was securitized contained severe underwriting and compliance issues.[1]  Based upon all of the foregoing, the Trustee believes that breaches of Mortgage Warranties and document defects are likely pervasive throughout the Mortgage Loans

---

[1] *See* Statement of Facts, *available at* https://www.justice.gov/opa/file/839891/download (the "SOF").  In the SOF, The Goldman Sachs Group, Inc., the parent company of Defendants, agreed to DOJ's Statement of Facts on behalf of itself and its subsidiaries and affiliates as part of its settlement with DOJ of claims concerning its marketing and structuring of residential mortgage backed securities, including the securities that underlie the Trust.

securitized in the Trust, and that there are likely thousands of Defective Loans, beyond those already specifically identified.

12.    9. The Trustee is authorized to enforce the Mortgage Warranties and now seeks to compel Defendants to specifically perform their contractual obligations, including Goldman Sachs's obligation to repurchase, or otherwise compensate the Trust for, each Defective Loan, including those identified in the Pre-Complaint and Post-Complaint Breach NoticeNotices, those that Goldman Sachs otherwise discovered, and any other Defective Loans to be identified.  The Trust is also entitled to damages for each of Defendants' failure to comply with its obligations pursuant to the PSA and the related Trust Agreements (defined below).

## PARTIES

13.    10. Plaintiff U.S. Bank National Association is a federally-chartered national banking association organized and existing under the laws of the United States that, pursuant to 12 U.S.C. § 22, has designated a Cincinnati, Ohio address as its "main office."  U.S. Bank serves as Trustee of the GSAMP 2007-HE2 Trust and appears herein solely in its capacity as Trustee on behalf of the Trust.

14.    11. Defendant Goldman Sachs is a limited partnership organized under the laws of New York that maintains its principal place of business in New York.  Upon information and belief, Goldman Sachs's sole general partner is Goldman Sachs Real Estate Funding Corp., a New York corporation with its principal place of business at 200 West Street, New York, New York 10282, and its sole limited partner is Goldman Sachs Bank USA, a New York State-chartered bank also with its principal place of business at 200 West Street, New York, New York 10282.  Goldman Sachs is the Sponsor under the PSA, the purchaser of Mortgage Loans pursuant to certain integrated agreements referenced within the PSA, and the seller of the

Mortgage Loans pursuant to an integrated agreement referenced within and attached as Exhibit S to the PSA.

15.    ~~12.~~ Defendant GSMSC is a corporation organized under the laws of Delaware and maintains its principal place of business in New York.  GSMSC is the Depositor under the PSA.

**JURISDICTION AND VENUE**

16.    ~~13.~~ The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Plaintiff is diverse of citizenship from all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  By removing this action from the Supreme Court of the State of New York, County of New York, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants have both recognized this Court's subject matter jurisdiction and consented to this Court's exercise of personal jurisdiction over them.

17.    ~~14.~~ Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are residents of this judicial district and because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

**FACTUAL BACKGROUND**

I.    **MORTGAGE-BACKED SECURITIZATIONS**

18.    ~~15.~~ Asset-backed securitization involves pooling cash-producing financial assets and issuing securities backed by those pools of assets.  In a residential mortgage-backed securitization, the cash-producing financial assets are residential mortgage loans, and the securities are called residential mortgage-backed securities, or "RMBS."

19.    ~~16.~~ In the most common form of residential mortgage-backed securitization, an entity known as a "sponsor" first acquires or originates mortgage loans.  The sponsor then creates a "depositor," which is typically a bankruptcy-remote special purpose entity, and the

sponsor, depositor and others establish a trust pursuant to a pooling and servicing agreement or trust indenture. The sponsor typically transfers the mortgage loans to the trust in a two-step process by which (i) the sponsor first sells the loans to the depositor and (ii) the depositor then deposits the assets into the trust. Pursuant to a registration statement filed with the SEC—including a prospectus that describes the general structure of the investment and prospectus supplements that are supposed to describe the mortgage loan collateral—the trust then issues certificates, or RMBS, that are backed by the mortgage loans in the trust in exchange for the loans deposited. RMBS trusts often issue different tranches of RMBS certificates to meet different investor objectives.

20.    17. Underwriters typically purchase the RMBS trust's certificates and then offer, sell, or distribute the certificates to investors. The trust uses the cash from its sale of certificates to the underwriters to pay for the purchase of the mortgage loans in the trust. Investors that purchase the certificates are then paid principal and interest derived from a share of the principal and interest payments generated by the mortgage loans in the trust.

21.    18. RMBS sponsors and/or underwriters typically retain credit rating agencies to assign ratings to the different RMBS tranches prior to issuance. Each credit rating agency employs its own scale with letter designations to describe various levels of risk, but, in general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments. In contrast, C and D ratings are at the bottom of the scale and refer to investments that are currently in or almost in default and exhibit little or no prospect for principal recovery from losses.

22.    19. To obtain credit ratings for the different tranches of an RMBS trust, the RMBS sponsor and/or underwriters provide the credit rating agencies with information about the

pool of mortgage loans underlying the RMBS trust.  Credit rating agencies first analyze this information to determine the losses likely to be suffered by that pool.  To assign ratings for each tranche within the RMBS trust, the credit rating agencies then analyze how the expected losses within the pool of mortgage loans are likely to be suffered by each tranche, based upon the structure of the RMBS trust and its credit enhancements, such as "subordination," "overcollateralization," and "excess spread."  All other things being equal, to the extent credit rating agencies deem the loans in a trust more likely to incur losses, the agencies are more likely to determine that the senior tranches would need higher levels of credit enhancement, including greater subordination relative to junior tranches, to ensure payment to senior certificateholders and justify a AAA rating or its equivalent.  In contrast, all other things being equal, to the extent credit rating agencies deem the loans in a trust less likely to incur losses, the agencies are more likely to determine that the senior, AAA tranches would need lower levels of credit enhancement (*e.g.*, less subordination from junior tranches) to ensure payment to senior certificateholders and justify a rating of AAA or its equivalent.  Accordingly, the size of the AAA tranche relative to the other tranches depends upon the quality of the loans in the underlying collateral group and the entire securitization.

23.    ~~20.~~ As a general matter, certificateholders do not have access to the loan files prior to the securitization of the loans in a trust.  Instead, certificateholders rely upon the representations and warranties, such as the Mortgage Warranties made in the PSA and the agreements referenced and integrated therein, and the disclosures made in the offering materials.

## II.    THE GSAMP 2007-HE2 SECURITIZATION

24.    ~~21.~~ GSAMP 2007-HE2 was established pursuant to the PSA, which was dated as of March 1, 2007 and entered into by and among GSMSC as Depositor; Avelo Mortgage L.L.C.,

as Servicer; U.S. Bank National Association, as a Custodian; Deutsche Bank National Trust Company, as a Custodian; Wells Fargo Bank, National Association, as Master Servicer and Securities Administrator; and LaSalle Bank National Association as trustee.  A true and correct copy of the PSA is attached hereto as Exhibit 1.  The PSA attaches Exhibit A through Exhibit AA (certain of which contain additional exhibits and schedules), and the PSA and those Exhibits reference various integrated agreements (collectively, the "Trust Agreements").[2]  U.S. Bank was subsequently appointed as successor-Trustee and currently serves as the Trustee of the Trust.

25.    22. The GSAMP 2007-HE2 securitization closed on April 20, 2007 and was effectuated through the process generally described in paragraphs 15-20 18-23.  Goldman Sachs, as Sponsor, purchased or otherwise acquired the Mortgage Loans from various loan originators and loan sellers pursuant to various agreements referenced within and integrated into the PSA, including certain "Purchase Agreements"[3] referenced within and integrated into the Representations and Warranties Agreement (the "RWA," attached as Exhibit S to the PSA (Ex.1)).

26.    23. Goldman Sachs, as Sponsor, conveyed the Mortgage Loans to GSMSC, the Depositor, pursuant to certain Trust Agreements integrated into the PSA, including the Bill of Sale referenced within the RWA.

27.    24. Pursuant to the PSA, the Depositor conveyed to the Trustee, its rights, title and interest in the Trust Fund, which included, among other things, approximately 5,000

---

[2]  Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Trust Agreements.

[3]  The Purchase Agreements reference the "Purchase Agreements" defined in the RWA, which include the Aames Purchase Agreement, the Decision One Purchase Agreement, the New Century Purchase Agreement, the NovaStar Purchase Agreement, the Senderra Purchase Agreement, and the Conduit Purchase Agreements, as those terms are defined in the RWA and as applicable.

Mortgage Loans with an aggregate principal balance of approximately $1 billion.  The Trust Fund constitutes the corpus of the Trust established by the PSA.

28.    25. The Trust issued approximately $954,000,000 in certificates (the "Certificates"), which were marketed and sold to investors via, among other things, a prospectus supplement dated April 17, 2007 (the "Prospectus Supplement").  A true and correct copy of the Prospectus Supplement is attached hereto as Exhibit 2.

29.    26. As set forth in the PSA, the Trustee accepted the Trust Fund on behalf of the Trust and assumed (solely in its capacity as Trustee) the obligations of the Depositor under the RWA from and after the Closing Date and solely insofar as they relate to the Mortgage Loans. The Depositor's rights and benefits pursuant to the RWA inured to the benefit of the Trust or to the Trustee on behalf of the Trust.

30.    27. Upon conveyance of the Mortgage Loans to the Trust, the Depositor assigned to the Trustee certain of its rights with respect to the Mortgage Loans, including its right to enforce the Mortgage Warranties made in the RWA.  The Trustee was authorized in certain circumstances to enforce those rights for the benefit of the Trust and the Certificateholders.

## III.    THE RIGHTS OF THE TRUSTEE TO PROTECT THE TRUST AND THE INTERESTS OF CERTIFICATEHOLDERS

### A.    The Trustee Has Authority To Enforce The Mortgage Warranties

31.    28. Pursuant to the PSA, upon the discovery of a breach of a representation or warranty, the Trustee is authorized in certain circumstances to act under the RWA to enforce the rights of the Trust.  (Ex. 1, PSA, § 2.07 at 76.)  The PSA further requires GSMSC to use reasonable efforts to assist the Trustee in enforcing Goldman Sachs's obligations.  (*Id.* at § 2.01 at 70.)  Goldman Sachs and GSMSC are affiliates.

32. ~~29.~~ Under the RWA, the Mortgage Warranties Goldman Sachs made to GSMSC in that RWA likewise inured to the benefit of the Trust or to the Trustee on behalf of the Trust. Specifically, Section 5 of the RWA provides:

> The representations and warranties of [Goldman Sachs] set forth in Section 2 shall inure to the benefit of the Depositor and its successors and assigns until all amounts payable to Certificateholders under the Pooling and Servicing Agreement have been paid in full.

(RWA § 5, Ex. S to PSA (Ex. 1) at 236.)

33. ~~30.~~ Pursuant to the PSA, GSMSC conveyed to the Trustee for the benefit of the Certificateholders all of its right, title, and interest in and to the Trust Fund. The "Trust Fund," as defined in the PSA, includes the rights to enforce Goldman Sachs's obligations under the RWA, including the Mortgage Warranties Goldman Sachs made in that Agreement and including Goldman Sachs's Cure/Repurchase Obligation.

34. ~~31.~~ Section 2.01 of the PSA states:

> The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.

(Ex. 1, PSA § 2.01 at 68.)

35. ~~32.~~ Under Section 2.02 of the PSA, the Trustee, on behalf of the Trust, accepted the Trust Fund and assumed "the obligations of the Depositor under the Representations and Warranties Agreement from and after the Closing Date and solely insofar as they relate to the Mortgage Loans."  (Ex. 1, PSA § 2.02 at 72.)

36. ~~33.~~ Thus, once the Loans were securitized in the Trust, Goldman Sachs owed its obligations under the RWA, including compliance with the Mortgage Warranties, to the Trust,

with the Trustee empowered to enforce such obligations on behalf of the Certificateholders.  And GSMSC is contractually obligated to assist the Trustee in those efforts to enforce its affiliate's obligations.

**B.**    **The Mortgage Warranties**

37.    ~~34.~~ Pursuant to the Purchase Agreements, Goldman Sachs acquired from certain loan originators and/or loan sellers—including:  (1) NC Capital Corporation ("New Century"), (2) Aames Capital Corporation, (3) Decision One Mortgage Company, LLC, (4) NovaStar Mortgage, Inc., (5) Senderra Funding, LLC, and (6) the sellers of the "Conduit Mortgage Loans" (as that term is defined in the RWA) (collectively, the "RWA Sellers")—certain Mortgage Loans that were later securitized into the Trust.  (*See* RWA, Ex. S to PSA (Ex. 1) at 231-232.)

38.    ~~35.~~ Defendants filled the Trust primarily with Loans it acquired from New Century, which comprised approximately 71.9% of the Loans securitized in the Trust, even as New Century's parent company, New Century Financial Corporation, had declared bankruptcy shortly before the Trust closed.  (*See* Prospectus Supplement, S-17 (Ex. 2) at 22-24.)  In light of New Century Financial Corporation's bankruptcy, Goldman Sachs's Cure/Repurchase Obligation would have been especially important to investors as a remedy for Defective Loans.

39.    ~~36.~~ Pursuant to a Bill of Sale dated as of April 20, 2007, Goldman Sachs conveyed to GSMSC the Mortgage Loans it acquired pursuant to the Purchase Agreements.  (*See* RWA, Ex. S to PSA (Ex. 1) at 232.)

40.    ~~37.~~ Pursuant to the RWA, Goldman Sachs made various Mortgage Warranties in connection with its conveyance of the Mortgage Loans that Goldman Sachs acquired from the RWA Sellers pursuant to the Purchase Agreements.  The Mortgage Warranties specified in the RWA appear in various sections, including in Section 2 of the RWA and in Exhibit I to the

RWA.  These Mortgage Warranties inured to the benefit of both GSMSC and the Trust.  (*See*

RWA, Ex. S to PSA (Ex. 1) at 233-242.)

41.    38. The RWA also required Goldman Sachs to ensure that there were neither

missing nor defective Mortgage Loan documents associated with the Mortgage Loan files.

42.    39. The Mortgage Warranties were and are material to the Trust and the

Certificateholders.  Through the Mortgage Warranties, Goldman Sachs guaranteed, among other

things, that the Mortgage Loans met certain credit quality thresholds that indicated that

borrowers would be able to repay their Loans on time and in full, that the Loans were originated

in compliance with legal requirements, and that the originators had the documentation required

to issue the Loans.  Upon information and belief, without these assurances, the Loans would not

have been purchased and securitized in the Trust, or at the very least, would not have been

purchased for the price paid.

43.    40. Moreover, the detail and breadth of the Mortgage Warranties (as well as the

associated cure and repurchase remedies) were critical and necessary for the marketing of the

Trust certificates as, generally, investors in the Trust had no access to the Mortgage Loan files

prior to the formation of the Trust or the sale of the certificates.  Indeed, without the assurances

contained in the Mortgage Warranties and Goldman Sachs's unambiguous Cure/Repurchase

Obligation for Defective Loans, described below, the inability of investors and rating agencies to

conduct due diligence on the Mortgage Loans (as both a practical matter and as per the relevant

Trust Agreements) would have rendered the certificates all but unmarketable.

## IV.    DEFENDANTS' LIABILITY FOR BREACHES
## OF THE MORTGAGE WARRANTIES

44.    ~~41.~~ Goldman Sachs accepted the risk that, if the Mortgage Loans failed to comply with the Mortgage Warranties, Goldman Sachs—not the Trust or Certificateholders—would bear the consequences.

45.    ~~42.~~ With respect to every Mortgage Loan that breaches one of the Mortgage Warranties Goldman Sachs made in the RWA in a way that materially and adversely affects the value of a Mortgage Loan, Goldman Sachs is contractually obligated to cure the breach or repurchase the breaching Mortgage Loan within 90 days of the earlier of discovering or receiving notice of the breach.  Goldman Sachs is also contractually obligated to repurchase every Mortgage Loan that breaches a Mortgage Warranty in specified clauses in Exhibit I to the RWA within 60 days of the earlier of discovering or receiving notice of the breach.  Specifically, Goldman Sachs agreed in the RWA that:

> Within ninety (90) days of the earlier of either discovery by or notice to [Goldman Sachs] of any breach of a representation or warranty which materially and adversely affects the value of the Mortgage Loans or the interest of the Depositor therein (or which materially and adversely affects the value of the applicable Mortgage Loan or the interest of the Depositor therein), [Goldman Sachs] shall cure such breach in all material respects and, if such breach cannot be cured, [Goldman Sachs] shall, at the Depositor's option, within ninety (90) calendar days of [Goldman Sachs's] receipt of request from the Depositor, repurchase such Mortgage Loan at the Repurchase Price.  In the event that such a breach shall involve any representation or warranty set forth in Section 2 of this [RWA], and such breach cannot be cured within ninety (90) days of the earlier of either discovery by or notice to [Goldman Sachs] of such breach, all of the Mortgage Loans materially and adversely affected thereby shall, at the Depositor's option, be repurchased by [Goldman Sachs] at the Repurchase Price. Notwithstanding the above sentence, within sixty (60) days of the earlier of either discovery by, or notice to, [Goldman Sachs] of any breach of the representations or warranties set forth in clauses (O), (P), (R), (S) and (T) of Exhibit I, [Goldman Sachs] shall repurchase the affected Mortgage Loan or Mortgage Loans at the Repurchase Price, together with all expenses incurred by the Depositor as a result of such repurchase.

(RWA § 3, Ex. S to PSA (Ex. 1) at 233-234.)

46.    ~~43.~~ GSMSC also agreed that it "shall use reasonable efforts to assist the Trustee

in enforcing the obligations of the Sponsor under the RWA." (*See* Ex. 1, PSA § 2.01 at 70.)

GSMSC's obligation to assist the Trustee extends to all of the Sponsor's obligations under the

RWA. (*See id*.)

47.    ~~44.~~ Section 2.07 of the PSA provides a mechanism for the enforcement of

Goldman Sachs's Cure/Repurchase Obligation for the benefit of the Trust and the

Certificateholders:

> Upon discovery by any of the parties hereto of a breach of a representation or
> warranty made by the Sponsor pursuant to the Representations and Warranties
> Agreement, the party discovering such breach shall give prompt written notice
> thereof to the other parties to this Agreement and the Sponsor, as applicable.  The
> Trustee shall take such action, with the Depositor's consent, with respect to such
> breach under the Representations and Warranties Agreement, as applicable, as
> may be necessary or appropriate to enforce the rights of the Trust with respect
> thereto.  In such event, the legal expenses and costs of such action and any
> liability resulting therefrom shall be expenses, costs, and liabilities of the Trust
> Fund, and the Trustee shall be entitled to be reimbursed therefor out of the
> Collection Account.

(*Id.*, PSA § 2.07 at 76.)

48.    ~~45.~~ Goldman Sachs was also obligated, among other things, to ensure that there

were neither missing nor defective Mortgage Loan Documents associated with the Mortgage

Loans.  (*See, e.g.*, Ex. 1, PSA § 2.01 at 71-72 & RWA § 4, Ex. S to PSA (Ex. 1) at 235-236.)

Goldman Sachs has not complied with its obligations, as upon information and belief, many of

the Mortgage Loans conveyed to the Trust were missing certain Mortgage Loan Documents

and/or had certain defective Mortgage Loan Documents.

## V.    BREACHES OF THE MORTGAGE REPRESENTATIONS PERVADE THE TRUST

49.    ~~46.~~Upon information and belief, in the course of purchasing for securitization loans originated by others, Goldman Sachs had a practice of reviewing some portion of the loans purchased.  In light of this practice, given the number, severity, and nature of the breaches of Mortgage Warranties uncovered by the Certificateholder's investigation, it is likely that Goldman Sachs's review of the pools from which the Mortgage Loans were drawn revealed at least some of the same problems as those identified in the Pre-Complaint and Post-Complaint Breach ~~Notice~~Notices.  It is also likely that Goldman Sachs knew that Defective Loans were securitized in the Trust and that such Defective Loans are pervasive in the Trust.  Indeed, the existence of breaches throughout the Mortgage Loans, including but not limited to breaches of the types identified in the Pre-Complaint and Post-Complaint Breach ~~Notice~~Notices, is reinforced by Goldman Sachs's admission that their diligence vendors found severe underwriting and compliance issues in 23% of the loans they reviewed during the 2005–2007 time period.

50.    ~~47.~~In or around April 2016, DOJ concluded its investigation of Goldman Sachs's role in the housing and financial crises.  As DOJ found—and Defendants acknowledged—between December 2005 and 2007, Goldman Sachs securitized thousands of prime, Alt-A, and subprime mortgage loans and sold the resulting RMBS for tens of billions of dollars to investors nationwide.  In its "principal" transactions, as here, Goldman Sachs purchased pools of loans from third parties and securitized the loans under its own shelf registration.  Goldman Sachs used its "Goldman Sachs Alternative Mortgage Products," or "GSAMP," shelf for subprime loans.  (SOF at 1-2.)

51.    ~~48.~~As DOJ further found—and as Defendants further acknowledged—Goldman Sachs, assisted by vendors, reviewed samples selected from the pools it purchased.  Despite

finding significant problems in the samples it reviewed, Goldman Sachs "did not increase the

size of the sample or review the unsampled portions of the pools to identify and eliminate any

additional loans with credit exceptions. [Goldman Sachs] failed to do this even when the

samples included significant numbers of loans with credit exceptions." (SOF at 6.) In other

words, Goldman Sachs sampled the loan pools it was securitizing, reviewed the samples, learned

from the reviews that the loan pools were rife with Defective Loans, and then left unsampled

Defective Loans in the loan pools that were securitized (including the Mortgage Loans in the

Trust).

52.    49. Indeed, Goldman Sachs's parent, The Goldman Sachs Group, Inc. (the "GS

Group")[4] acknowledged, including on behalf of Defendants, that:

- "[Goldman Sachs's] due diligence vendors graded a loan as EV3 in one of three circumstances: (i) the vendor concluded the loan was not originated in compliance with applicable laws and regulations or the loan did not comply with applicable underwriting guidelines and lacked sufficient offsetting compensating factors; (ii) the loan complied with underwriting guidelines but had a characteristic that [Goldman Sachs] had asked the due diligence vendor to flag for further review by [Goldman Sachs] (these characteristics were called "overlays"); or (iii) the loan had an issue that the due diligence vendor, on its own initiative, determined should be flagged for further review by [Goldman Sachs]." (SOF at 4.)

- "Even when the percentage of loans graded as EV3s and dropped by [Goldman Sachs] from the due diligence samples indicated that the unsampled portions of the pools likely contained additional loans with credit exceptions, [Goldman Sachs] typically did not increase the size of the sample or review the unsampled portions of the pools to identify and eliminate any additional loans with credit exceptions. [Goldman Sachs] failed to do this even when the samples included significant numbers of loans with credit exceptions." (*Id.* at 6.)

- "In many cases, 80 percent or more of the loans in the loan pools [Goldman Sachs] purchased and securitized were not sampled for credit and compliance due diligence." (*Id.*)

- "In certain instances, the large number of loans dropped from the due diligence samples for non-compliance with underwriting guidelines suggested that other loans

---

[4] *See supra*, n. 1.

in those pools that were not subjected to due diligence may not have complied with underwriting guidelines." (*Id.*)

- GS Group's "Mortgage Capital Committee typically received memoranda detailing each proposed securitization, including summaries of [Goldman Sachs's] due diligence results for certain of the loan pools backing the securitization. Despite the high numbers of loans that [Goldman Sachs] had dropped from the loan pools, the Mortgage Capital Committee approved every RMBS that was presented to it between December 2005 and 2007" [which, upon information and belief, includes the GSAMP 2007-HE2 securitization]. (*See id.*)

53. ~~50.~~ In the SOF, GS Group also acknowledged, including on behalf of Defendants, the following regarding the conduit originators from which Goldman Sachs purchased or otherwise acquired certain of the Mortgage Loans securitized in the Trust, as follows:

> From September 2006 through 2007, [Goldman Sachs] had a program for monitoring conduit originators. Among other things, [Goldman Sachs] monitored the conduit originators for pull-through rates (the percentage of a loan pool that passed due diligence and was purchased), EPDs, and the seller's financial health. If a conduit originator was suspended, [Goldman Sachs] would no longer purchase loans from that originator. [Goldman Sachs] also made statements in certain of its marketing materials concerning the processes by which it monitored conduit loan originators. Between September 2006 and 2007, certain [Goldman Sachs]-sponsored RMBS included a number of loans purchased from conduit originators that, at the time of securitization, had been "suspended" by [Goldman Sachs]. [Goldman Sachs's] offering documents for those RMBS transactions did not inform investors that loans purchased from suspended conduit originators had been included in the RMBS.

(*Id.* at 11-12.)

54. ~~51.~~ The Financial Crisis Inquiry Commission (the "FCIC') also found that Goldman Sachs and its affiliates securitized defective loan pools.

55. ~~52.~~ In 2010, Clayton Holdings, Inc. ("Clayton")—a third-party vendor that reviewed mortgage loans Goldman Sachs purchased for various securitizations—supplied evidence to the FCIC. Clayton's evidence includes the "All Clayton Trending Reports," which

indicates that, between the first quarter of 2006 and the second quarter of 2007, Clayton

characterized as "Event 3" some 22.8% of the mortgage loans it reviewed for Goldman Sachs

and its affiliates.  Non-compliance with applicable underwriting guidelines was the principal

reason for which Clayton would designate a mortgage loan as Event 3.  Clayton's report

indicated that 29% of the mortgage loans initially designated as Event 3 nevertheless were

"waived in" or approved for purchase by Goldman Sachs.  (*See* "Clayton All Trending Report"

at 6, *available at*

http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-R

eport.pdf.)  While Clayton reviewed only a sample of the Goldman-securitized loan pools, the

FCIC concluded in its 2011 "Financial Crisis Inquiry Report," based on its own sample, that

"one could reasonably expect [the untested loans] to have many of the same deficiencies, and at

the same rate, as the sampled loans."  (Fin. Crisis Inquiry Comm'n Public Law 169-70, The

Financial Crisis Inquiry Report: Final Report of the National Commission On The Causes of the

Financial and Economic Crisis In The United States (2001), *available at*

http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.)

Undoubtedly, many such loans made their way into Goldman Sachs's securitizations, including

this Trust.

56.    ~~53.~~ In fact, Goldman Sachs employees characterized the mortgage loans

populating its securitizations and the securitizations themselves as "junk," "dogs," and "lemons."

(*See id.* at 234-236.)

57.    ~~54.~~ On or about September 2, 2011, the Federal Housing Finance Agency

("FHFA") filed a securities action against Goldman Sachs and certain of its affiliates and

executives concerning 40 RMBS offerings in which Fannie Mae and Freddie Mac had invested,

including the Trust at issue here.  The FHFA's review revealed that, for each securitization at issue, Goldman Sachs's and the originators' representations and warranties regarding certain loan characteristics were materially inaccurate.  Goldman Sachs settled those and other claims and agreed to pay $3.15 billion in connection with releases and the purchase of securities that were the subject of statutory claims in the FHFA action.  (*See FHFA v. Goldman, Sachs & Co., et. al.*, No. 11-cv-06198 (S.D.N.Y. 2014); *see* "FHFA Announces Settlement with Goldman Sachs," FHFA News Release dated August 22, 2014, *available at* https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Announces-Settlement-with-Goldman-Sachs.aspx.)

58. 55. Moreover, several other investors have filed actions against Goldman Sachs and/or its subsidiaries and affiliates alleging that mortgage loans securitized in Goldman Sachs-sponsored trusts breached representations and warranties based upon the results of forensic reviews of the mortgage loans securitized in those trusts.[5]

59. 56. Upon information and belief, based on the volume and percentage of Defective Loans identified by the Certificateholder's investigation, the inclusion in the Trust of New Century Loans (even as New Century's parent had recently declared bankruptcy), and Goldman Sachs's practice of "waiving in" Defective Loans as described above, Goldman Sachs knew that Defective Loans were securitized in the Trust from the inception of the Trust, and otherwise discovered pervasive problems with the Mortgage Loans.

---

[5] *See e.g.*, *Allstate Insurance Co. v. Goldman Sachs & Co.*, Index No. 652273/2011 (N.Y. Sup. Ct. Aug. 15, 2011); *Federal Home Loan Bank of Seattle v. Goldman, Sachs & Co., et al.*, No. 09-2-46349-2 SEA (Wa. Super. Ct., Sept. 28, 2010); *Prudential Ins. Co. v. Goldman Sachs & Co. et al.*, No. 12-cv-06590 (D. N.J. Oct. 16, 2012); *Royal Park v. Goldman Sachs*, Index No. 652454/2013 (N.Y. Sup. Ct. July 12, 2013); *Deutsche Zentral-Genossenschaftsbank AG v. Goldman Sachs Group*, Index No. 653134/2012 (N.Y. Sup. Ct. Apr. 5, 2013).

60.    ~~57.~~ The cumulative impact of the knowing or reckless inclusion in the Trust of thousands of Defective Loans completely upsets the reasonable expectations of the parties in providing a cure or repurchase remedy for breaching loans.  If Goldman Sachs had disclosed the true quality of the Loans in the PSA and furnished true and accurate Loan documentation and materials, the purchase and the securitization of the Loans would have been rejected or negotiated on fundamentally different economic terms or the resulting RMBS would have been rendered unmarketable.

61.    ~~58.~~ Moreover, the types of breaches identified in the Pre-Complaint and Post-Complaint Breach ~~Notice~~Notices are substantially identical to the breaches made evident by the government investigations and investor lawsuits referenced above.

62.    ~~59.~~ Goldman Sachs, through its misrepresentations and omissions regarding the quality and characteristics of the Mortgage Loans, sought to induce investors—and did induce the Certificateholders—to buy Certificates that Goldman Sachs knew did not meet its representations of quality and were therefore likely to cause significant losses to investors.  In the Prospectus Supplement pursuant to which these Certificates were marketed to the Certificateholders, Goldman Sachs misrepresented the attributes of the Mortgage Loans with full knowledge that investors would rely on those false representations and omissions.

## VI.    DEFENDANTS HAVE FAILED TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS

63.    ~~60.~~ An investigation into the Mortgage Loans conducted by a Certificateholder revealed that at least 1,041 Mortgage Loans do not comply with one or more of the Mortgage Warranties and that the breaches of the Mortgage Warranties materially and adversely affected and affect the value of the Mortgage Loans.

64.    ~~61.~~ Promptly upon receipt of notice from the Certificateholder of the existence of Defective Loans, the Trustee sought to enforce Defendants' obligations, including Goldman Sachs's Cure/Repurchase Obligation. By letter dated January 23, 2019, the Trustee gave notice to Defendants (among other parties) of the at least 1,041 Loans that breached the Mortgage Warranties that had a material and adverse effect on the value of the Loans and/or the interests of the Certificateholders, as well as the existence of other breaches. The Pre-Complaint Breach Notice demanded that Goldman Sachs either cure the breaches or repurchase the Defective Loans pursuant to their obligations. The Pre-Complaint Breach Notice further included a citation to evidence that Goldman Sachs further was aware of other Defective Loans and asked Goldman Sachs to cure or repurchase the 1,041 identified Loans. The Pre-Complaint Breach Notice requested repurchase of all Defective Loans.

65.    ~~62.~~ The Trustee also requested the assistance of the Depositor in enforcing Goldman Sachs's Cure/Repurchase Obligation. Specifically, by letter dated February 20, 2019, the Trustee informed the Depositor that, pursuant to Section 2.01 of the PSA, the Depositor is obligated to use reasonable efforts to assist the Trustee in enforcing the obligations of the Sponsor under the RWA. The Depositor, however, has refused to assist the Trustee in enforcing the obligations of Goldman Sachs.

66.    ~~63.~~ Indeed, far from assisting the Trustee in enforcing the obligations of Goldman Sachs, GSMSC has attempted to block such enforcement by the trustee with respect to another similarly-situated trust. In related litigation regarding the Goldman Sachs Alternative Mortgage Products Trust 2007-HE1 ("GSAMP 2007-HE1"), GSMSC has asserted that, pursuant to Section 2.07 of the Pooling and Servicing Agreement for the GSAMP 2007-HE1 trust (which is materially identical to Section 2.07 of the PSA for the GSAMP 2007-HE2 Trust), the trustee

needs the consent of GSMSC before bringing claims to enforce Goldman Sachs's cure and

repurchase obligations.  There is no legal or factual basis for any such argument for the

following reasons, among others:

- When the Trustee enforced the rights of the Trust under Section 2.07 of the PSA by sending to each Defendant, including the Depositor, the Pre-Complaint Breach Notice, the Depositor never suggested that Depositor consent was required for the Trustee to enforce Goldman Sachs's Cure/Repurchase Obligation in that manner;

- At the direction of a Certificateholder in the Trust, the Trustee's February 20, 2019 letter to the Depositor requested that,

> [t]o the extent it may be determined that such consent is required, …, no later than 12 p.m. Eastern Standard Time on February 21, 2019, the Depositor specifically confirm its consent to the filing by the Trustee of a Summons with Notice against the Sponsor, the Depositor, and/or others regarding their breaches of Representations, Warranties, and/or other obligations they may have with respect to any and all loans in the Trust, including but not limited to the breaches of representations and warranties alleged in the Repurchase Letter and related matters (the 'Claims').  To the extent the Depositor fails to respond by 12 p.m. Eastern Standard Time on February 21, 2019, the Trustee will deem such silence to constitute a confirmation of its consent to the Trustee's filing of a Summons with Notice.[6]

The Depositor failed to respond by February 21, 2019 and thereby confirmed any consent that might have been required.

- Months after the Trustee initiated this litigation, by letter dated May 22, 2019, the Depositor objected not to the Trustee's litigation of this action, but only to the use of Trust funds to fund the litigation.  Specifically, the Depositor objected only that "Section 2.07 of the [PSA] states that the Trustee cannot prosecute [this action] using funds from the Collection Account[] without the Depositor's Consent.  The Depositor hereby states, unequivocally, that it does not consent to the use of Collection Account funds to prosecute [this action]."[7]

---

[6]  The February 20, 2019 letter specifically noted that, "[b]y making this request, the Trustee does not concede that the Depositor's express consent is required under these circumstances."

[7]  In a May 21, 2020 order, the Minnesota District Court for the County of Ramsey rejected the position asserted in the Depositor's May 22, 2019 letter and directed the Trustee to prosecute this action using Trust funds, including from the Collection Account, notwithstanding the absence of the Depositor's consent.

In any event, by refusing to assist the Trustee in enforcing the obligations of Goldman Sachs, the Depositor breached its obligations under the PSA.

67.    64. Goldman Sachs has also refused to cure or repurchase every Defective Loan identified in the Pre-Complaint Breach Notice, and while Goldman Sachs repurchased certain Defective Loans, the overwhelming majority of the Defective Loans have not been repurchased.

68.    As noted, during litigation of this action, the Trustee retained Mr. Hunter as an expert to re-underwrite Mortgage Loans in the Trust and identify Defective Loans, and Dr. Rubinstein as an expert to determine whether, based upon the re-underwritten loan characteristics identified by Mr. Hunter, the misrepresentation of certain Loans in the Mortgage Loan Schedule materially and adversely affected the value of those loans and/or the interests of the Certificateholders.

69.    On April 15, 2024, the Trustee served upon Defendants the Hunter Report, which identified 2,358 Defective Loans, including the 1,041 Defective Loans that the Trustee had identified in the Pre-Complaint Breach Notice, and the Rubinstein Report, which found that, as to 1,559 of the 2,708 Mortgage Loans re-underwritten by Mr. Hunter, misstatements in the Mortgage Loan Schedule materially and adversely affected the value of the Loans and/or the interests of the Certificateholders.  In total, the Hunter and Rubinstein Reports identified 2,413 Defective Loans.

70.    To enforce Goldman Sachs's Cure/Repurchase Obligation with respect to the Defective Loans identified in the Hunter and Rubinstein Reports, the Trustee, on April 26, 2024, sent the Post-Complaint Breach Notice to Defendants and other PSA parties.  Like the Pre-Complaint Breach Notice, the Post-Complaint Breach Notice further demanded that Goldman Sachs either cure the breaches or repurchase all Defective Loans.

71.    The 90-day period for Goldman Sachs to cure or repurchase the Defective Loans identified in the Post-Complaint Breach Notice expired on July 25, 2024 with Goldman Sachs having failed to cure or repurchase any of the Defective Loans identified in that Notice.  Indeed, Goldman Sachs asserted by letter on June 25, 2024 that it "is under no obligation to respond" to the Post-Complaint Breach Notice because "the applicable statute of limitations expired." Goldman Sachs's letter then directed the Trustee to this litigation for a determination of the "rights and obligations of the parties."

72.    Goldman Sachs's refusal during the five years of this litigation to repurchase any of the Defective Loans identified in the Pre-Complaint Breach Notice, the Defective Loans identified in the Post-Complaint Breach Notice, and the Defective Loans Goldman Sachs itself discovered renders futile any further compliance by the Trustee with the PSA's repurchase protocol.

73.    65.Upon information and belief, additional investigation, including analysis of missing or defective documents in the Mortgage Loan files and re-underwriting of the Mortgage Loan files themselves, will reveal substantial additional evidence of breaches throughout each of the Trust's Mortgage Loans.  And the Trustee specifically reserves the right based upon further investigations to identify additional Mortgage Loans that breach the Mortgage Warranties for which claims will be made.  Each of the Mortgage Loans identified to Defendants in the Pre-Complaint Breach Notice breaches at least one of Goldman Sachs's Mortgage Warranties and those breaches materially and adversely affected and affect the value of the Mortgage Loans.

74.    66.Upon information and belief, the breaches of Mortgage Warranties and document defects are likely pervasive throughout the Mortgage Loans securitized in the Trust.

As such, there are additional Mortgage Loans in the Trust, beyond those already specifically identified, that do not comply with the Mortgage Warranties.

75. 67. Goldman Sachs's pattern and practice of refusing to abide by its unambiguous obligation to repurchase Defective Loans is clear evidence that it will continue to refuse to abide by its contractual obligations to: (i) cure or repurchase Defective Loans upon Goldman Sachs's discovery of such Loans; or (ii) cure or repurchase Defective Loans upon notice by the Trustee to Goldman Sachs of such Loans.

76. 68. Goldman Sachs's breaches have had a material and adverse effect on the Mortgage Loans, the Trust and its Certificateholders. Accordingly, Plaintiff seeks enforcement of the PSA and related Trust Agreements compelling Goldman Sachs to specifically perform its contractual obligation to repurchase Mortgage Loans, or otherwise compensate the Trust, with respect to all Defective Loans, including those specifically identified in the Pre-Complaint Breach Notice as well as those that the Trustee may identify from further re-underwriting, statistical sampling or other means. Plaintiff also seeks enforcement of the PSA to require the Depositor to assist in enforcing Goldman Sachs's Cure/Repurchase Obligation.

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract / Specific Performance)**
### **(Against Goldman Sachs)**

77. 69. The Trustee repeats and realleges paragraphs 1 through 6976 above as if fully set forth herein.

78. 70. The PSA and RWA are valid contracts.

79. 71. The Trustee is an express party to the PSA and has performed all conditions, covenants and obligations necessary under the PSA and/or related Trust Agreements for the commencement of this action.

26

80. ~~72.~~ Goldman Sachs agreed that it would cure or repurchase any Defective Loans, and the Trustee is empowered to enforce Goldman Sachs's obligation to cure or repurchase pursuant to Section 2.07 of the PSA and the related Trust Agreements.

81. ~~73.~~ The ~~Trustee has~~ Trustee's Pre-Complaint and Post-Complaint Breach Notices provided Goldman Sachs with notice of an aggregate of approximately 2,400 specifically enumerated Defective Loans and ~~the Trustee has~~ demanded that Goldman Sachs comply with its Cure/Repurchase Obligation by, among other things, ~~providing a written demand that Goldman Sachs repurchase 1,041 enumerated Defective Loans~~ repurchasing those and any other Defective Loans.

82. ~~74. Goldman Sachs has not cured or repurchased all of the Defective Loans in~~ In violation of its express contractual obligations in, but not limited to, the RWA, Goldman Sachs has not cured or repurchased any of the Defective Loans in the Trust.

83. ~~75.~~ For these and other reasons to be proven at trial, Goldman Sachs has breached its obligations specified in the PSA and related Trust Agreements.

84. ~~76.~~ Goldman Sachs should be ordered to specifically perform its contractual obligations as specified in the PSA and under the related Trust Agreements.  Included among the obligations Goldman Sachs should specifically perform is its contractual obligation to repurchase all Defective Loans, whether identified thus far by loan number or which further investigation or discovery may uncover.  Where specific performance is unavailable, the Trust is entitled to damages in lieu thereof in an amount to be determined at trial for Goldman Sachs's breach of its Cure/Repurchase Obligation.

**SECOND CAUSE OF ACTION**

**(Breach of Contract / Damages)**
**(Against Goldman Sachs)**

85. ~~77.~~ The Trustee repeats and realleges paragraphs 1 through ~~69~~76 above as if fully set forth herein.

86. ~~78.~~ The PSA and the RWA are valid contracts.

87. ~~79.~~ The Trustee is an express party to the PSA and has performed all conditions, covenants and obligations necessary under the PSA and/or related Trust Agreements for the commencement of this action.

88. ~~80.~~ Goldman Sachs agreed that it would cure or repurchase any Defective Mortgage Loans, and the Trustee is empowered to enforce Goldman Sachs's obligation to cure or repurchase pursuant to Section 2.07 of the PSA and the related Trust Agreements.

89. ~~81.~~ The ~~Trustee has~~Trustee's Pre-Complaint and Post-Complaint Breach Notices provided Goldman Sachs with notice of an aggregate of approximately 2,400 specifically enumerated Defective Loans and ~~the Trustee has~~ demanded that Goldman Sachs comply with its Cure/Repurchase Obligation by, among other things, ~~providing a written demand that Goldman Sachs repurchase 1,041 enumerated Defective Loans~~repurchasing those and any other Defective Loans.

90. ~~82.~~ Goldman Sachs has not cured or repurchased all of the Defective Loans in violation of its express contractual obligations in, but not limited to, the RWA.

91. ~~83.~~ For these and other reasons to be proven at trial, Goldman Sachs has breached its obligations specified in the PSA and related Trust Agreements.

92. ~~84.~~ Upon information and belief, Defective Loans are likely pervasive throughout the Mortgage Loans securitized in the Trust. Specifically, the Trust's damages are caused by

Goldman Sachs's knowingly including Defective Loans in the Trust when Goldman Sachs knew or should have known that such Loans were and are Defective Loans.

93.    ~~85.~~ As such, the Trust is not limited to its contractual repurchase remedy.  This is particularly true where, as here, Goldman Sachs has frustrated the implementation of that remedy by concealing its knowledge of those breaches.

94.    ~~86.~~ Accordingly, the Trust is entitled to damages for breach of contract in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**(Breach of Contract)**
**(Against The Depositor)**

95.    ~~87.~~ The Trustee repeats and realleges paragraphs 1 through ~~69~~76 above as if fully set forth herein.

96.    ~~88.~~ The PSA and RWA are valid contracts.

97.    ~~89.~~ The Trustee is an express party to the PSA and has performed all conditions, covenants and obligations necessary under the PSA and/or related Trust Agreements for the commencement of this action.

98.    ~~90.~~ Under the PSA and the related Trust Agreements, GSMSC agreed, among other things, to "use reasonable efforts to assist the Trustee in enforcing the obligations of the Sponsor under the Representations and Warranties Agreement."

99.    ~~91.~~ The Trustee requested GSMSC's assistance in enforcing the obligations of the Sponsor, but GSMSC did not respond and has not otherwise assisted.

100.    ~~92.~~ GSMSC has breached the PSA and related Trust Agreements.  GSMSC should be ordered to specifically perform each of its contractual obligations under the PSA

and/or related Trust Agreements and be ordered to assist the Trustee in enforcing the obligations of the Sponsor.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE the Trustee respectfully requests that the Court enter judgment granting the relief, including without limitation the following:

a.  Specific performance of Defendants' contractual obligations under the PSA and related Trust Agreements, including without limitation requiring Goldman Sachs to repurchase all Defective Loans and requiring GSMSC to assist the Trustee in enforcing the obligations of the Sponsor;

b.  Damages in an amount to be determined at trial;

c.  Pre-judgment and post-judgment interest at the rates prescribed by law;

d.  Reimbursement of the Trustee's costs and expenses, including reasonable expert fees; and

e.   All other relief at law or in equity to which the Trustee, on behalf of the Trust, may

be entitled.

Dated:        New York, New York
              ~~January ___, 2021~~DRAFT

                                        MCKOOL SMITH, P.C.

                                        By:   __DRAFT_____
                                              Christopher P. Johnson
                                              Zachary W. Mazin
                                              Ayana M. Rivers
                                              Daniel Hendler
                                              ~~Jared S. Siegel~~Hal Shimkoski
                                        ~~One Manhattan West~~
                                        ~~395 Ninth Avenue, 50th Floor~~1301 Avenue of
                                              the Americas, 32nd Floor
                                        New York, NY ~~10001~~10019
                                        cpjohnson@mckoolsmith.com
                                        zmazin@mckoolsmith.com
                                        arivers@mckoolsmith.com
                                        dhendler@mckoolsmith.com
                                        ~~jsiegel~~hshimkoski@mckoolsmith.com
                                        (t) (212) 402-9400
                                        (f) (212) 402-9444

                                        *Attorneys for Plaintiff*

| **Summary report:** |  |
| :--: | :--: |
| **Litera Compare for Word 11.5.0.74 Document comparison done on 7/26/2024 1:07:03 PM** |  |
| **Style name:** Default Style |  |
| **Intelligent Table Comparison:** Active |  |
| **Original filename:** GSAMP 2007-HE2 First Amended Complaint 4850-0587-4646 v.1.docx |  |
| **Modified filename:** GSAMP 2007-HE2 Second Amended Complaint 4850-0587-4646 4875-5187-4254 v.6.docx |  |
| **Changes:** |  |
| Add | 133 |
| Delete | 107 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 240 |